**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RITCHIE RISK-LINKED STRATEGIES, L.L.C., | Case No. 18-11555 (KJC) |
| Debtor. | **Objection Due: August 23, 2018, at 4:00 p.m. (Eastern)**<br>**Hearing Date: September 4, 2018, at 1:30 p.m. (Eastern)** |

**MEMORANDUM OF LAW IN SUPPORT OF HUIZENGA MANAGERS FUND, LLC'S**
**MOTION TO DISMISS THE CASE PURSUANT TO 11 U.S.C. §§ 1112(b) AND 305(a)**

**K&L GATES LLP**
Steven L. Caponi, Esq. (No. 3484)
600 N. King Street
Suite 901
Wilmington, DE 19801
Tel: (302) 416-7000
Email: steven.caponi@klgates.com

*Counsel To Huizenga Managers Fund, LLC*

Of counsel:

Sven T. Nylen, Esq.
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602-4207
Tel: (312) 372-1121
Email: sven.nylen@klgates.com

Christopher J. Barber, Esq.
Gary W. Garner, Esq.
Jonathan D. Miller, Esq.
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Tel: (312) 443-3200
Email: cjb@willmont.com
        gwg@willmont.com
        jm@willmont.com

Steve Jakubowski, Esq.
ROBBINS SALOMON & PATT, LTD.
180 N. La Salle Street, Suite 3300
Chicago, Illinois 60601
Tel: (312) 456-0191
Email: SJakubowski@rsplaw.com

Date: August 8, 2018

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

I.    FACTUAL BACKGROUND ........................................................................ 3

    A.    The Debtor and Affiliated Judgment Parties Violate the DSA in Selling
Investments to Huizenga ................................................................................ 3

    B.    Thane Ritchie Transforms the Debtor into a Shell with Only
Litigation Assets ............................................................................................ 5

    C.    Huizenga Alleges Fraudulent Conduct as to the Debtor and Affiliated
Judgment Parties' Circumvention of Collection of the Second Judgment. .......... 14

    D.    The Debtor and Affiliated Judgment Parties File Actions in Illinois and
Delaware Collaterally Attacking the First and Second Judgments...................... 16

        1.    The First Delaware Action .......................................................... 16

        2.    The Madison/DuPage County Action ........................................ 17

        3.    The St. Clair/Cook County Action............................................. 18

        4.    The Second Delaware Action ..................................................... 19

        5.    The Third Delaware Action ........................................................ 20

        6.    The Second DuPage County Action ........................................... 21

    E.    The Events Precipitating the Debtor's Chapter 11 Filing..................................... 22

II.   ARGUMENT .............................................................................................. 24

    A.    This Case Should Be Dismissed for "Cause" Under Section 1112(b)(4)(A) ....... 24

    B.    Debtor's Petition Should Be Dismissed as Having Not Been Filed in
Good Faith ...................................................................................................... 30

        1.    Applying the Primestone Factors, The Petition Was Not Filed in
Good Faith ................................................................................. 31

        2.    The Case Was Filed Solely to Obtain a Tactical Litigation
Advantage .................................................................................. 35

    C.    The Court Should Also Abstain from Hearing this Case and Dismiss it
Pursuant to Section 305(a) .............................................................................. 37

III.  NOTICE...................................................................................................... 39

IV.   CONCLUSION............................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp.*,
589 F.3d 605 (3d Cir. 2009)...........................................................................25

*A&R Logistics Holdings, Inc. v. FdG Logistics LLC*,
148 A.3d 1171 (Del. 2016) ............................................................................32

*In re Affirmative Ins. Holdings, Inc.*,
565 B.R. 566 (Bankr. D. Del. 2017) ...............................................................38

*In re AMC Inv'rs, LLC*,
406 B.R. 478 (Bankr. D. Del. 2009) ...............................................................37

*In re Argus Grp. 1700, Inc.*,
206 B.R. 737 (Bankr. E.D. Pa. 1996) ........................................................37, 38

*Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*,
682 F.2d 446 (3d Cir. 1982)...........................................................................33

*Cellular Eng'g, Ltd. v. O'Neill*,
820 P.2d 941 (Wash. 1991).............................................................................8

*Conn. Nat'l Bank v. Giacomi*,
699 A.2d 101 (Conn. 1997) .............................................................................8

*In re Corinthian, LLC*,
440 B.R. 97 (Bankr. E.D. Pa. 2009) ...............................................................28

*Crown v. Kobrick Offshore Fund, Ltd.*,
8 N.E.3d 281 (Mass. App. Ct. 2014) ................................................................8

*Darnall Kemna & Co. v. Heppinstall*,
851 P.2d 73 (Alaska 1993)..............................................................................8

*In re Derma Pen, LLC*,
2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014)....................................30, 31, 35

*In re Edwards*,
1996 WL 407253 (Bankr. E.D. Pa. June 17, 1996) ........................................25, 28

*In re Great Am. Pyramid Joint Venture*,
144 B.R. 780 (Bankr. W.D. Tenn. 1992).........................................................26

*Huizenga Managers Fund, LLC v. Ritchie*,
    2016 WL 7508134 (Ill. App. Ct. 1st Dist. Dec. 29, 2016)................................3, 4, 6

*In re Imperial Heights Apartments, Ltd.*,
    18 B.R. 858 (Bankr. S.D. Ohio 1982).......................................................29

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004)...............................................25, 30, 31, 35

*In re JER/Jameson Mezz Borrower II, LLC*,
    461 B.R. 293 (Bankr. D. Del. 2011) ....................................................31, 36

*In re Ledges Apartments*,
    58 B.R. 84 (Bankr. D. Vt. 1986)...........................................................26

*Marion Metal & Roofing Co. v. Wood*,
    243 Ill. App. 3d 890 (Ill. App. Ct. 5th Dist. 1993) ...............................15

*Maritime Elec. Co. v. United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991)..............................................................32

*In re Northshore Mainland Servs., Inc.*,
    537 B.R. 192 (Bankr. D. Del. 2015) ...............................................30, 31, 39

*In re Orienta Coop. Ass'n*,
    256 B.R. 508 (Bankr. W.D. Okla. 2000) .............................................29

*Pal Family Credit Co. v. Cty. of Albany*,
    425 B.R. 1 (N.D.N.Y. 2010)................................................................29

*In re PEM Thistle Landing Tic 23, LLC*,
    2014 WL 1319183 (Bankr. D. Del. Apr. 2, 2014) ...............................28

*In re Pennino*,
    299 B.R. 536 (B.A.P. 8th Cir. 2003)...................................................37

*People v. Walker*,
    395 Ill. App. 3d 860 (Ill. App. Ct. 2d Dist. 2009)..................................5

*Price v. Philip Morris, Inc.*,
    43 N.E.3d 53 (Ill. 2015) ......................................................................5

*In re Primestone Inv. Partners L.P.*,
    272 B.R. 554 (D. Del. 2002)..........................................................30, 31

*In re Red Door Lounge, Inc.*,
    559 B.R. 728 (Bankr. D. Mont. 2016) ..............................................25, 26

*Ritchie v. Huizenga Managers Fund, LLC*,
    2017 WL 7803924 (Del. Super. Ct. Dec. 21, 2017) ............................................................17

*In re Scarborough-St. James Corp.*,
    2015 WL 5672628 (Bankr. D. Del. Sept. 24, 2015) ......................................................25, 28

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999)...........................................................................25, 30, 31, 35

*Tenn. Publ'g Co. v. Am. Nat'l Bank*,
    299 U.S. 18 (1936) .............................................................................................................26

*In re Thompson*,
    1995 WL 358135 (E.D. Pa. June 9, 1995) ........................................................................28

*In re Timbers of Inwood Forest Assocs., Ltd.*,
    808 F.2d 363 (5th Cir. 1987) ............................................................................................36

*In re Wen-Kev Mgmt., Inc.*,
    2014 WL 7370050 (D.N.J. Dec. 29, 2014).................................................................25, 26

*In re Woodbrook Assocs.*,
    19 F.3d 312 (7th Cir. 1994) ..............................................................................................25

**Statutes**

11 U.S.C. § 305........................................................................................................... *passim*

11 U.S.C. § 1112......................................................................................................... *passim*

15 U.S.C. § 80a-3.........................................................................................................26, 27

6 Del. C. § 73-605.......................................................................................................1, 4, 8

735 Ill. Comp. Stat. 5/2-1402.............................................................................................11

735 Ill. Comp. Stat. 5/11-101.......................................................................................18, 19

NOW COMES Huizenga Managers Fund, LLC ("Huizenga"), by and through its undersigned attorneys, and for its Memorandum in Support of its Motion to Dismiss this chapter 11 bankruptcy case (the "Case") of Debtor Ritchie Risk-Linked Strategies, LLC (the "Debtor") pursuant to 11 U.S.C. §§ 1112(b) and 305(a) (the "Motion to Dismiss"), states as follows:

## PRELIMINARY STATEMENT

As of the Petition Date, the Debtor had no business operations, no employees, and *de minimis* assets. It purports to be an investment company, but it has not conducted any such business for years and does not own or hold any investments or securities. The sole purpose of the Debtor's filing, therefore, was to find another forum in which to relitigate the Debtor's decade-old, multi-jurisdictional fight with Huizenga. Huizenga's original case against the Debtor remains pending in Illinois state court and has thus far resulted in more than $22 million in judgments against the Debtor for violating the Delaware Securities Act (the "DSA"). Significantly, those judgments were entered against not just the Debtor, but those in control of the Debtor (the "Affiliated Judgment Parties"), including the mastermind of the entire international enterprise, A.R. Thane Ritchie ("Thane Ritchie"), the Debtor's managing member (Ritchie Partners, LLC ("Ritchie Partners")), and the Debtor's sub-advisor (Ritchie Capital Management, LLC ("RCM")). While those judgments were eventually satisfied, Huizenga is currently pursuing an award of attorneys' fees and costs for several million dollars to which it is entitled under the DSA, 6 Del. C. § 73-605(a)(2).[1]

Hoping to nullify the judgments of the Illinois state court and short-circuit entry of an award of attorneys' fees, the Debtor and the Affiliated Judgment Parties have launched a campaign in multiple venues to collaterally attack the Illinois courts' judgments and rulings. Most recently, on June 18, 2018, the Debtor filed a petition asking the Illinois trial court to

---

[1] The Illinois state court that entered the two judgments is holding Huizenga's request for attorneys' fees and costs in abeyance pending the Debtor and Affiliated Judgment Parties' appeal of the second judgment.

vacate all judgments entered in the case—claiming that the court lacked subject matter jurisdiction over the case since its inception in 2007.   When it became apparent, upon Huizenga's dispositive motion, that these collateral attacks would not only fail, but subject the Debtor, Affiliated Judgment Parties, and their counsel (Chicago-based lawyers of Reed Smith, Debtor's proposed bankruptcy counsel, included) to sanctions, they came to bankruptcy court. They then claimed that the Illinois court was powerless to dismiss the petition, sanction the Debtor, and sanction the Debtor's counsel.

The Debtor states that its goal in this Case is to "maximiz[e] the value of its litigation-related assets." Reed Smith App. ¶ 42, D.I. 22.  The Debtor's representative at the recent Section 341 Meeting, Mr. Michael Cilento, actually testified that the Debtor filed bankruptcy "to stop the frivolous lawsuits from the other entities which would erode—which could potentially erode the value of" the Debtor's litigation claims.  Ex. 48, A-642 at 10:10–19.  Indeed, the Debtor's intent was "primarily to put an end to frivolous litigation to allow them to pursue their current claims against several entities."  *See id.* at 12:14–20.  And, most recently, Chicago-based lawyers of the Debtor's proposed counsel, Reed Smith, admitted in Illinois court on behalf of the Debtor that the Debtor filed this bankruptcy, at least in part, to stop its own frivolous and (now dismissed) petition to vacate in its tracks.  Ex. 49, A-703 at 7:22–8:10 (derailing petition to vacate "was a choice in . . . the context of the filing of the bankruptcy, which is not motivated solely by that point").

In sum, the Debtor filed its no-asset Chapter 11 case for the sole purpose of gaining a litigation advantage in its attempt to nullify two Illinois court judgments obtained by Huizenga. At the time of the filing, the litigation strategies of the Debtor and its affiliates were backfiring on multiple fronts, and the Debtor and its counsel (including Reed Smith's Chicago counsel, among others), faced a serious threat of sanctions.

As such, dismissal of the Debtor's Chapter 11 case is appropriate (i) under Bankruptcy Code section 1112(b) because the case was not filed in good faith and was filed without any rehabilitative purpose, and (ii) under Bankruptcy Code section 305 because dismissal will better serve the interests of the Debtor's only real creditors as well as those of the Debtor, who will then have no need to incur up to $1,500,000 in debt, the sole purpose of which is to fuel more litigation against Huizenga.

## I.      FACTUAL BACKGROUND

### A.      The Debtor and Affiliated Judgment Parties Violate the DSA in Selling Investments to Huizenga

In 2005, the Debtor and Affiliated Judgment Parties sold investments to Huizenga—the "August Investment" and the "October Investment."  However, in doing so, they made material misrepresentations and omissions concerning the risks of those investments, and Huizenga thus commenced an action to recover for its losses.  *See generally Huizenga Managers Fund, LLC v. Ritchie*, No. 1-15-2733, 2016 WL 7508134, at *1–4 (Ill. App. Ct. 1st Dist. Dec. 29, 2016).

In *Huizenga Managers Fund, LLC v. Ritchie*, Case No. 07-CH-9626 (Ill. Cir. Ct. Cook Cty.) (the "DSA Action"), Huizenga alleged that the Debtor and the Affiliated Judgment Parties violated the DSA in connection with their sale of the August Investment and October Investment.  After a bench trial, the Illinois Circuit Court found they had violated the DSA in connection with the October Investment and held them jointly and severally liable to Huizenga for $9,174,199.63 (the "First Judgment").  Ex. 3, A-139–40.  However, the Illinois Circuit Court found the Debtor and Affiliated Judgment Parties not liable in connection with the August Investment.  *See* Ex. 2, A-86–138, Mem. Op. & Judgment, *DSA Action* (Ill. Cir. Ct. Cook Cty. Jan. 27, 2015).

The Debtor and Affiliated Judgment Parties appealed the First Judgment, and Huizenga appealed the finding of non-liability on the August Investment. In December 2016, the Illinois Appellate Court issued an opinion (i) affirming the First Judgment, (ii) reversing the finding of non-liability on the August Investment and directing judgment to be entered against the Debtor and Affiliated Judgment Parties on that investment as well, and (iii) remanding for calculation of prejudgment interest. *Huizenga Managers Fund, LLC v. Ritchie*, No. 1-15-2733, 2016 WL 7508134 (Ill. App. Ct. 1st Dist. Dec. 29, 2016). The Debtor and the Affiliated Judgment Parties' appeals to the Illinois Supreme Court, *id.*, 84 N.E.3d 364 (Ill. 2017), and U.S. Supreme Court, *id.*, 138 S. Ct. 739 (2018), were denied.

On remand, pursuant to the Illinois Appellate Court's directive, the Illinois Circuit Court entered a second judgment order on October 19, 2017, finding the Debtor and the Affiliated Judgment Parties jointly and severally liable to Huizenga for $12,772,529.70 for violating the DSA in connection with the August Investment (the "Second Judgment"). Ex. 7, A-255–58.

Because the DSA entitles a successful plaintiff to an award of "reasonable attorneys' fees," 6 *Del. C.* § 73-605(a)(2), the Illinois Circuit Court retained jurisdiction over "the assessment of attorneys' fees and costs in connection with the First Judgment and the Second Judgment," *see* Ex. 7, A-257, indicating that it would rule on that issue after the Debtor and Affiliated Judgment Parties had exhausted all appeals.

The Debtor and Affiliated Judgment Parties timely filed a Notice of Appeal of the Second Judgment (the "Second Appeal"). On June 14, 2018, the Debtor filed a Motion to Voluntarily Dismiss its appeal. *See* Ex. 31, A-483–86. Although the Debtor, through Reed Smith, did not say so at the time, that maneuver apparently was designed to send the Debtor back to trial court (*see* Ex. 49, A-703 at 7:22–8:10), where the Debtor would file, four days later, the

aforementioned petition to vacate the two judgments.  Ex. 32, A-487–500.[2]  On July 24, 2018,

the Illinois Appellate Court denied the Debtor's Motion.  *See* Ex. 46, A-636.  Reed Smith

continues to represent RCM and Ritchie Partners, two of the Debtor's purported creditors, as

well as the Debtor, in the Second Appeal.

### B. Thane Ritchie Transforms the Debtor into a Shell with Only Litigation Assets

Today, the Debtor is nothing more than a shell of its former self.  The Debtor is managed

by Ritchie Partners as its managing member.  Ritchie Partners, in turn, is managed by RCM.

Ritchie Partners owns 0.97% of the Debtor's membership interests. Ritchie Multi-Strategy

Global, LLC ("RMSG"), an affiliated onshore fund, owns 95.49% of the Debtor's membership

interests. *See* Petition, D.I. 1, at 12.  In other words, nearly all of the Debtor's membership is

comprised of its own affiliates.  Apparently gone are institutional investors, like Huizenga.

In its place, Thane Ritchie has turned the Debtor into nothing more than a funnel for his

own overarching, self-serving purposes.  The following chart (based on disclosures in a SEC

filing by RCM at "Section D, Miscellaneous" of the Form ADV (Ex. 4, A-141–98)) illustrates

the tangled web—something of a Rube Goldberg machine—through which Thane Ritchie spins

control over Ritchie-related affiliates, including the Debtor, Ritchie Partners, and RCM:

---

[2] Huizenga has been unable to identify any other explanation for the Debtor's erratic filings, which, if Huizenga's explanation is right, was incorrect under Illinois procedural law.  *Accord People v. Walker*, 395 Ill. App. 3d 860, 867 (Ill. App. Ct. 2d Dist. 2009) (appeal of civil proceedings for relief from criminal sentencing can proceed during pendency of petition to vacate); *see also Price v. Philip Morris, Inc.*, 43 N.E.3d 53, 60 (Ill. 2015) (petition to vacate is separate proceeding from underlying action giving rise to challenged judgments).



As of the Petition Date, despite this complex structure, by the Debtor's own admission, the Debtor had no operations, no employees, and *de minimis* assets. Amended Petition at 5, D.I. 17. The Debtor has no accounts receivable, investments, or any other asset evidencing any meaningful activity in the marketplace. *See* Schedules at 9–15, D.I. 26. Indeed, the Debtor owns no "[o]ffice furniture, fixtures, and equipment," such as telephones and computers, that it could use to place trades, prepare deal paperwork, and research potential investments. *Id.* at 11. The Debtor owns no software that it could even use to monitor the U.S. equity markets. The Debtor owns no televisions that it could use for any personnel to tune into CNBC or another financial network of choice. And the Debtor has not yet proposed any plan that would somehow reinvigorate the Debtor so that it may again profitably invest after bankruptcy as a *bona fide* investment company. Instead, the Debtor comes to bankruptcy court as a failed feeder fund for other entities in Thane Ritchie's network, Ex. 48, A-641 at 6:8–7:18, and whose independent

market value has disappeared. *See also Huizenga Managers Fund*, 2016 WL 7508134, at *2 (feeder fund structure).

The Debtor's defunct status is not new. The Debtor has conducted no business since 2016 at the very latest, and it does not project any business or operations for the next 12 months either. Indeed, had the Debtor not recently rented or licensed an unnecessary office in Delaware purportedly to hold settlement meetings with Huizenga (at which the Debtor has held no meetings and has not otherwise conducted any business, Ex. 48, A-640 at 5:17–23, A-652 at 50:6–52:1, and has not been visited by any "decision-maker," Petition at 5 (Attachment), D.I. 1), it would have no business-related expenses postpetition. *See* Initial Monthly Operating Report at 3, D.I. 20; Amended Petition, D.I. 17, at 5.

Notably, in a Form ADV filed by RCM on March 31, 2017, RCM lists the Debtor's "[c]urrent gross asset value" at a mere $97.00.  Ex. 4, A-174–75 (Section A (Private Fund), Answer No. 11); Schedules at 16, D.I. 26.  The Debtor could have filed for bankruptcy then in early 2017, if the Debtor had any interest in getting back on track.

Nor does the Debtor apparently contemplate making any real investment in its post-bankruptcy operations.  The Debtor does project spending nearly $700,000 of a contemplated $1.5 million debtor-in-possession financing ("DIP Financing") from RMSG on chapter 11 fees, *see* Ex. 48, A-647 at 32:17–20, Cash Flow Projections at 3, D.I. 20, but—as noted below—these expenditures do not, standing alone, represent legitimate business operations or any rehabilitative purpose.  These expenditures are also a fiction of the Debtor's own creation.  If the Debtor simply confined its litigation to a single proceeding in Illinois, it could limit these proposed litigation expenditures.  *See also supra* Section II(C).

While the Debtor lacks any meaningful assets, the basis of nearly all of its listed liabilities is fabricated.  The Debtor's bankruptcy schedules list RMSG as a "disputed" secured

creditor in the amount of $5,157,271.49.  *See* Schedules at 17, D.I. 26.  Such claims have no merit. The Debtor's Chief Operating Officer, Mr. Michael Cilento, testified at the recent Section 341 Meeting that he was not aware of any agreements or promissory notes that actually evidence this purported claim.  *See* Ex. 48, A-658 at 74:19–76:24.  Further, any purported claim to security is avoidable since no financing statement was filed to perfect that alleged claim until seven days before the filing of the Debtor's chapter 11 petition. *See id.*, A-648 at 36:24–37:17.

Meanwhile, RMSG has actually indemnified the Debtor. RMSG is currently seeking to recover for such indemnification from Huizenga in Delaware Superior Court.  Ex. 45, A-628 ¶ 44, A-632 ¶ 55 (seeking recovery for "liability" that RMSG allegedly "incurred" as non-party to DSA Action).   At the same time, the Debtor's indemnification rights on account of being an affiliate of RMSG, RCM, Ritchie Partners, and most other "Ritchie-related" entities are inexplicably absent from the Debtor's list of assets in Schedule B.

The Schedules also list Thane Ritchie himself as an unsecured creditor in the amount of $13,383,000 for a purported "indemnification claim."  *See* Schedules at 19, D.I. 26. This claim has no merit. Thane Ritchie is not entitled to indemnification from a co-defendant as to which the Illinois courts found Thane Ritchie jointly and severally liable.   Indeed, since Mr. Ritchie utilized the Debtor's Operating Agreement in his violation of the DSA, he may not "base any suit" for indemnification on the Debtor's Operating Agreement.  *See 6 Del. C.* § 73-605(f); *see also, e.g.*, *Darnall Kemna & Co. v. Heppinstall*, 851 P.2d 73, 78 (Alaska 1993); *Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101, 127–29 (Conn. 1997); *Crown v. Kobrick Offshore Fund, Ltd.*, 8 N.E.3d 281, 292 (Mass. App. Ct. 2014); *Cellular Eng'g, Ltd. v. O'Neill*, 820 P.2d 941, 952 (Wash. 1991).  Together with RMSG's meritless indemnification claim, at least $18,540,217.49 (or approximately 46.5%) of the Debtor's $39,863,819.49 in listed liabilities is manufactured through meritless insider claims.

As for the Debtor's purported unsecured liabilities that are listed as liquidated and undisputed in Schedule F of the Schedules, nearly all vendor claims are either (i) fabricated, (ii) lacking supporting invoices or documentation, or (iii) manufactured on the eve of the Petition Date for the sole purpose of establishing the existence of non-insider creditors.

None of the professionals identified in Schedule F of the Schedules actually represents the Debtor or has engagement agreements with the Debtor, except perhaps for Clayborne, Sabo & Wagner LLP's (the "Clayborne Firm"), whose claim is only $1,365 and likely relates to the (frivolous) petition to vacate that the Debtor sought to jettison via these proceedings. *See* Schedule F at 19–23, D.I. 26. Huizenga intends to request discovery from the Debtor that will establish that none of the professionals listed in Schedule F actually billed the Debtor for such amounts. Indeed, the Debtor's representative, Mr. Cilento, does not even recall "looking at specific invoices" from these vendors. *See* Ex. 48, A-660 at 83:10–17. It is further likely that all such professionals had routinely—at least through the month before the Petition Date—been paid directly by RMSG, the Affiliated Judgment Parties, or another "Ritchie-related" entity (i.e. not the Debtor). *See* Ex. 48, A-646 at 27:22-28:15 (Debtor's affiliates would routinely pay the bills); Reed Smith App. ¶ 66, D.I. 22 (litigation fees incurred by the Debtor and Affiliated Judgment Parties paid by RMSG's offshore affiliate).

The purported unsecured notes to Frank Fernandes of $24,982 and Valterra Holdings of $25,124, executed three days before the Debtor's Chapter 11 filing, had no business purpose. The Debtor did not need those funds, for it has no employees or operations and projects total ordinary course transfers of only $6,224.00 for the eight month postpetition period ending February 28, 2019. *See* Operating Report at 3, D.I. 20. To the extent they actually exist, these notes were fabricated for the purpose of creating creditors (and debt) to justify the Debtor's filing. As such, an additional $50,106 of the Debtor's scheduled liabilities is suspect. Together

9

with the two aforementioned insider claims of Ritchie insiders, therefore, approximately 46.6% of the Debtor's liabilities are disingenuous or fraudulent.

But, it gets worse. Other purported creditors—together comprising *well more than half* of the Debtor's purported liabilities—are actually insiders of the Debtor that have pursued actions against the Debtor (with the Debtor's apparent blessing) to default judgment in recent months. As such, the Debtor has commissioned these insiders to ferret away the Debtor's assets, while Huizenga was attempting to collect on the Second Judgment and anticipating that the Illinois courts will soon award attorneys' fees and costs to Huizenga.

On March 5, 2018, Ritchie Risk-Linked Opportunities, LLC ("RRLO") filed a verified complaint against the Debtor in *Ritchie Risk-Linked Opportunities LLC v. Ritchie Risk-Linked Strategies, LLC*, Case No. 18-L-147 (Ill. Cir. Ct. St. Clair Cty.), claiming that the Debtor owed it $1 million for attorneys' fees and related expenses that RMSG's offshore affiliate had incurred, which debt had been assigned to RRLO. *See* Ex. 12, A-316–17.

The verified complaint against the Debtor was signed by the Clayborne Firm, *id.* A-317, which represents the Debtor in connection with its (frivolous and now-dismissed) petition to vacate the Illinois courts' judgments, Ex. 32, A-487–500, as well as a now-voluntarily dismissed collateral action by the Debtor against an affiliate of Huizenga and its counsel. *See* Ex. 27, A-403–17; Ex. 28, A-418.

On April 12, 2018, RRLO obtained a $1 million default judgment against the Debtor, after the Clayborne Firm represented to the Illinois Circuit Court of St. Clair County that the Debtor—its client in other cases—had failed to answer the complaint or file an appearance. Ex. 17, A-353.

10

Recognizing the impropriety of the RRLO judgment, the Debtor's Schedules note that "[t]he Debtor believes that the . . . $1.0 million judgment in favor of [RRLO] . . . [is] avoidable (and or otherwise unenforceable)." Amended Schedules at 6, D.I. 26.

And, it gets worse. That April 12 default judgment was entered while Huizenga was attempting to recover on the Second Judgment through collection proceedings initiated in Cook County, Illinois. *See Huizenga Managers Fund, LLC v. Ritchie*, Case No. 17-CH-14072 (Ill. Cir. Ct. Cook Cty.). Huizenga served the Debtor, Ex. 8, A-259–71, and the Clayborne Firm, Ex. 11, A-304–315, with citations to discover assets in an effort to locate assets in satisfaction of the Second Judgment. Those citations, consistent with Illinois law, each restrained them from any transfer of assets belonging to the Debtor or the Affiliated Judgment Parties. *See* 735 Ill. Comp. Stat. 5/2-1402(c)(1); *id.* 1402(c)(5). Despite those citations, the Clayborne Firm "served" the Debtor and obtained the default judgment, Ex. 17, A-353, to which the Debtor acquiesced.

One day after RRLO obtained that default judgment, on April 13, 2018, Swansea Beneficiary Trust, LLC ("Swansea Trust") filed a verified complaint against the Debtor and Ritchie Partners in *Swansea Beneficiary Trust, LLC v. Ritchie Risk-Linked Strategies, L.L.C.*, Case No. 18-L-0262 (Ill. Cir. Ct. St. Clair Cty.) (Ex. 18, A-354–56), alleging that the Debtor and Ritchie Partners were liable to the Swansea Trust for $20 million. But, the Manager for the Swansea Trust is yet another Ritchie entity—Ritchie Multi Strategy, L.L.C.[3] And indeed, Swansea Trust has the very same address as RRLO. *See* Ex. 48, A-649 at 41:8–14; *see also* Amended Schedules at 22–23, D.I. 26.

The Swansea Trust's verified complaint against the Debtor and Ritchie Partners was once again signed by the Clayborne Firm, Ex. 18, A-356, which during this action, simultaneously

---

[3] This is based on a search of the Illinois Secretary of State's website at https://www.ilsos.gov/corporatellc/CorporateLlcController.

11

represented the Debtor as to its petition to vacate. *See* Ex. 32, A-487–500. The Swansea Trust alleged, among other things, that the Debtor and the Affiliated Judgment Parties spent its own insurance proceeds related to the DSA Action on "unnecessary or avoidable expenses," which the Debtor "should have paid" itself. *See* Ex. 18, A-355 ¶¶ 7–8. Meanwhile, the Debtor and Affiliated Judgment Parties, through Chicago-based lawyers of Reed Smith, were simultaneously suing those same insurance carriers, demanding a judgment requiring the insurers to pay "any judgment amount entered against the Ritchie Insureds [in the DSA Action] in excess of the [policy] limits," as well as attorneys' fees and expenses incurred in the DSA Action. *See, e.g.*, Ex. 9, A-272–296, First Am. Compl. at ¶¶ 77, 88, *Ritchie v. Arch Specialty Ins. Co.*, Case No. 15-CH-13480 (Ill. Cir. Ct. Cook Cty. Jan. 17, 2018).

On April 19, 2018, counsel for Huizenga—at Williams Montgomery & John Ltd.—contacted John Vishneski, Esq. of Reed Smith's Chicago office, notifying him of this action against Reed Smith's longtime client, the Debtor. Concerns regarding the validity of that action are readily apparent from the face of the Swansea Trust's verified complaint, Ex. 18, A-354–56—signed by the Debtor's own attorneys at the Clayborne Firm—and are now articulated in the Debtor's own bankruptcy papers. *See, e.g.*, Amended Schedules at 6, D.I. 26. Despite that, Reed Smith never intervened, and the Swansea Trust's action continued unopposed. Reed Smith maintained that position even though it now articulates on behalf of the Debtor that the Debtor "doesn't believe that the [Swansea Trust] claim has any merit." *See* Ex. 48, A-649 at 40:7–15.

The very next day, on April 20, 2018, the Swansea Trust filed a Verified Complaint in Delaware Chancery Court against Ritchie Partners. *See* Ex. 20, A-358–63. The Swansea Trust purported to seek a declaratory judgment concerning the allocation of expenses between the two Ritchie entities. *See id.*, A-363 ¶ 16. But, what really animated the Swansea Trust was a declaratory judgment seeking answers to various legal questions that Ritchie thought the Illinois

courts got wrong in the DSA Action, *see id.*, A-360–62 ("Whether the Delaware Securities Act applies to out of state security transactions . . . ."), but about which the Debtor now proposes malpractice claims against its external counsel. *See* Amended Schedules at 16, D.I. 26.

Then, on June 28, 2018—the same day the Debtor filed for Chapter 11 bankruptcy—the Swansea Trust filed a motion for default judgment in its St. Clair County action, signed by the Clayborne Firm, claiming that the Debtor had been served and had failed to appear or file an answer. *See* Ex. 37, A-569–71. The court then entered a default judgment for $1,000,000 against the Debtor and Ritchie Partners as of the same day that the Swansea Trust's motion was filed. *See* Ex. 38, A-572–73. Mysteriously, the court then entered an amended judgment for $20,000,000 against the Debtor and Ritchie Partners as of the same day. *See* Ex. 39, A-574–75. As such, the Debtor is suing its insurance carriers and Huizenga for expenses incurred pursuing insurance coverage and defending the DSA Action, Ex. 9, A-272–96, while, at the same time, defaulting on a claim brought on behalf of the Swansea Trust that the Debtor wasted those very same insurance proceeds and never should have received them in the first place.

Conceding the impropriety of the Swansea Trust's default judgment, the Debtor's Bankruptcy Schedules of Assets and Liabilities note, "[t]he Debtor believes that the … $20 million judgment in favor of [the Swansea Trust] [is] avoidable (and or otherwise unenforceable)." Amended Schedules at 6, D.I. 26. Indeed, when asked about the Swansea Trust and RRLO actions at the Section 341 Meeting, the Debtor's proposed bankruptcy counsel concedes that the actions "were taken to protect the Debtor because of concerns that Huizenga was trying to execute on the Debtor's claims" and so "perhaps they could defend the Debtor's assets from execution or act first potentially." Ex. 48, A-649 at 38:13-39:5. In other words, the Debtor acquiesced to the default judgments so that its assets would be transferred to other

Ritchie entities that were not subject to the Illinois court's two judgments or forthcoming award of attorneys' fees and costs to Huizenga after remand of the Second Appeal.

As such, the Debtor (correctly) concedes that $21 million of its $39,863,819.49 in listed liabilities will vanish during bankruptcy.  Together with the $18,540,217.49 in disputed or otherwise meritless claims by the Debtor's insiders (RMSG and Thane Ritchie) and the two claims of Ritchie's personal acquaintances, at least $39,590,323.49 of the Debtor's listed liabilities of $39,863,819.49—i.e. more than 99.3%—is meritless.  (And that is a conservative estimate, given the specious creditor claims of the Debtor's professional firms.)

### C.    Huizenga Alleges Fraudulent Conduct as to the Debtor and Affiliated Judgment Parties' Circumvention of Collection of the Second Judgment.

Against this backdrop, Huizenga filed a Complaint against certain of the Affiliated Judgment Parties alleging that they fraudulently transferred assets during Huizenga's collection proceedings.  *See* Ex. 29, A-419–65.  The Debtor, through its proposed bankruptcy counsel Reed Smith, apparently now concedes that something untoward occurred involving the Debtor in the RRLO and Swansea Trust actions.  *See* Amended Schedules at 6, D.I. 26.  Indeed, when the Debtor was once an active investment fund, it had constructively dissolved into a near worthless entity with $97 in assets, Ex. 4, A-174–75, just as Huizenga was attempting to collect on its judgments.  And, while the Debtor was once active with operations and investors in Illinois, it mysteriously moved any presence offshore to the Cayman Islands, *accord* Amended Petition at 1, D.I. 17 (identifying principal place of business in Cayman Islands), and has only just now licensed office space in Delaware, not for any business operations, but purportedly for settlement meetings with Huizenga.  *See* Ex. 48, A-640 at 5:17–23.[4]

---

[4] Huizenga summarized Ritchie's flight from the United States and efforts to evade lawful service of process at Ex. 30, A-470–75.  Thane Ritchie apparently left the United States just as

In *Huizenga Managers Fund, LLC v. Ritchie*, Case No. 17-L-9244 (Ill. Cir. Ct. Cook Cty.) (Ex. 29, A-419–65) (the "Fraudulent Transfer Action"), Huizenga seeks, among other things, to recover assets that Thane Ritchie and RCM fraudulently transferred in order to prevent Huizenga from collecting on its judgments and the impending award of attorneys' fees and costs in the DSA Action.  Indeed, "[o]n[] the one hand, assets were funneled away from the Ritchie Debtors (most importantly, Ritchie Capital) so that Huizenga could not collect from them.  On the other hand, the Ritchie Debtors were still able to access those assets, because Thane Ritchie could simply direct" offshore entities "to pay the Ritchie Debtors' expenses or transfer assets to himself." Ex. 29, A-432. ¶ 37.  In short, Ritchie has now employed his Rube Goldberg machine to ferret assets away from creditors.

Despite the Debtor's (feigned) concern with "piecemeal" litigation, Reed Smith App. ¶ 42, D.I. 22, Huizenga has not initiated any other actions against the Debtor.[5]

Nearly two weeks after Ritchie's bankruptcy filing, the Debtor, RCM, and Ritchie Partners filed a joint motion to stay the Fraudulent Transfer Action in its entirety—including as it pertains to non-debtors. *See* Ex. 43, A-598–603. On July 25, 2018, the court stayed the Fraudulent Transfer Action with respect to the Debtor, and the parties are briefing whether the action may be stayed as to the non-debtor defendants. The case is currently set for a status hearing on August 31, 2018. *See* Ex. 47, A-637–38.

---

he was launching collateral attacks on the Illinois court's judgments in Delaware and Illinois. *See infra* Section I(D).

[5] As discussed below, Huizenga has also requested damages arising from TROs that various Ritchie non-debtor entities improperly obtained in two actions initiated by the Ritchie entities in Illinois state court. *E.g.*, Ex. 44, A-604–16.  Huizenga's damages requests are considered counterclaims under Illinois law.  *See Marion Metal & Roofing Co. v. Wood*, 243 Ill. App. 3d 890, 894 (Ill. App. Ct. 5th Dist. 1993).

**D.     The Debtor and Affiliated Judgment Parties File Actions in Illinois and Delaware Collaterally Attacking the First and Second Judgments**

After the First Judgment was entered, the Debtor, Affiliated Judgment Parties, and their affiliates launched a series of lawsuits in Illinois and Delaware collaterally attacking both judgments, and seeking to create further obstacles to Huizenga's judgment collection efforts.[6]

**1.     *The First Delaware Action***

In May 2017, the Debtor and Affiliated Judgment Parties, through Reed Smith, filed *Ritchie v. Huizenga Fund Managers Fund, LLC*, Case No. N17C-05-598 MMJ CCLD (Del. Super. Ct.) (Ex. 5, A-199–214), an action demanding that Huizenga indemnify the Debtor and Affiliated Judgment Parties for the judgments entered against them in the DSA Action (referred to herein as the "First Delaware Action"). The Debtor and Affiliated Judgment Parties attacked the Illinois courts' judgments as "problematic" and "manifestly incorrect" and demanded that the Delaware court somehow "remedy" them.  *See* Ex. 6, A-225, A-231–32.

As the First Delaware Action seeks indemnification from Huizenga for the two Illinois judgments, the action bears remarkable similarity to the "unfiled" actions that the Debtor now proposes to file against Huizenga and Peter Huizenga Sr.  *See* Amended Schedules at 16, D.I. 26. By seeking to pursue its claims anew in bankruptcy court, the Debtor proposes to use these bankruptcy proceedings to split its claims.

In December 2017, the court stayed the First Delaware Action pending the outcome of the underlying DSA Action, but clearly indicated that it would not allow the Debtor and the

---

[6] For its part, Reed Smith, which first represented the Debtor in connection with its appeal to the U.S. Supreme Court, has now charged the Debtor and the Affiliated Judgment Parties more than $2 million with no apparent benefit to the Debtor.  *See* Reed Smith App. ¶¶ 56, 66, D.I. 22.  For all of this expense, the value of the Debtor's litigation assets is quickly "erod[ing]" and now apparently also require the assistance of the Bankruptcy Code to be saved.  *See* Ex. 48, A-642 at 10:10–19.

Affiliated Judgment Parties to use the Delaware courts to collaterally attack the Illinois courts'

judgments. The court explained:

> "[T]he full faith and credit clause of the Constitution precludes any inquiry into
> the merits of the cause of action, the logic or consistency of the decision, or the
> validity of the legal principles on which the judgment is based." Even assuming
> the Illinois court incorrectly applied Delaware law, the United States Constitution
> requires this Court to honor the Illinois court's holding. Moreover, allowing
> [Ritchie's] claim for indemnification to proceed in the forum in which the
> underlying action has been litigated for ten years allows for prompt justice, in line
> with "the general policy embedded in the *McWane* doctrine that all related claims
> should be heard in the court in which an action is first brought."

*First Delaware Action*, 2017 WL 7803924, at *2 (Del. Super. Ct. Dec. 21, 2017) (footnote

omitted) (citation omitted).

## 2. *The Madison/DuPage County Action*

Having failed in the First Delaware Action, a month later, two "John Doe" plaintiffs—

purporting to be members and/or managers of the Debtor[7]—filed *John Doe Corp. 1. v. Huizenga*

*Fund Managers Fund, LLC*, originally filed as Case No. 18-CH-52 (Ill. Cir. Ct. Madison Cty.),

now pending as Case No. 18-CH-236 (Ill. Cir. Ct. DuPage Cty.) (A-369–82) ("Madison/DuPage

Action"), against Huizenga in Madison County, Illinois. The plaintiffs claimed that Huizenga

breached contracts with Ritchie during its prosecution of the DSA Action and the Fraudulent

Transfer Action by "disparaging" Ritchie and disclosing purportedly "confidential" information.

The same day the Madison/DuPage Action was filed and without notice to Huizenga, the

plaintiffs obtained an *ex parte* temporary restraining order, A-297–303, which among other

things, barred Huizenga and its attorneys from making any "remark," either "orally or in

---

[7] Notably, on July 12, 2018, the Debtor filed a "Form 207–Appendix A" in this bankruptcy
proceeding, in which it actually identified itself as a plaintiff in the Madison/DuPage Action. *See*
Form 207 – App. A at 21 item 7.7, D.I. 18. The Debtor has since removed that action from its
Form 207. *See* Amended App. A at 21, D.I. 25. Huizenga has not identified any other basis
upon which to conclude that the Plaintiffs in the Madison/DuPage Action are members or
managers of the Debtor, and Huizenga now seeks sanctions relating to this potential fraud. Ex.
44, A-611–14.

writing," that "indirectly" or "incidentally" "disparaged" either the Debtor or Affiliated Judgment Parties. *See* Ex. 10, A-301.

On Huizenga's motion, the Madison/DuPage Action was transferred to DuPage County, and plaintiffs' request to extend the TRO was denied. Thereafter, the TRO expired by its terms pursuant to 735 Ill. Comp. Stat. 5/11-101. Upon transfer to DuPage County, the plaintiffs voluntarily dismissed the action. *See* Ex. 34, A-541–42 at 11:22–12:16. Huizenga's motion for sanctions against the plaintiffs and their attorneys, as well as a request for damages arising from the improper TRO, are currently set for a hearing this month. *See* Ex. 44, A-604–16.

The Debtor now proposes to file parallel breach of contract and confidentiality claims in these proceedings, *see* Amended Schedules at 16, D.I. 26, when it could have joined those claims in DuPage County, if they had any merit.

### 3.    *The St. Clair/Cook County Action*

Uncertain of the Madison/DuPage County Action, RMSG filed *Ritchie Multi-Strategies Global, LLC v. Huizenga Managers Fund, LLC*, originally filed as Case No. 18-CH-0135 (Ill. Cir. Ct. St. Clair Cty.), now pending as Case No. 18-CH-6001 (Ill. Cir. Ct. Cook Cty.) (Ex. 13, A-318–39) ("St. Clair/Cook County Action"), in St. Clair County, Illinois. Just as in the two prior actions, RMSG alleges that Huizenga breached contracts with RMSG during its prosecution of the DSA Action and the Fraudulent Transfer Action by disparaging Ritchie and disclosing purportedly confidential information. This time, the complaint named not just Huizenga, but also Huizenga's attorneys.

Five days later—without notice to any defendant—RMSG obtained an *ex parte* TRO in the St. Clair/Cook County Action, again prohibiting Huizenga and its lawyers from making any "disparaging" remarks or disclosing any "confidential" information about Ritchie or the other Ritchie Defendants, including in pleadings or at oral argument. *See* Ex. 14, A-340–47.

Huizenga again filed a motion to transfer, explaining that (i) venue was improper in St. Clair County, and (ii) the TRO was intended to inhibit Huizenga's ability to litigate against Ritchie and the other Ritchie Defendants in Cook County. The judge granted Huizenga's motion, finding venue was improper in St. Clair County, and transferring the case to Cook County. *See* Ex. 15, A-348. The *ex parte* TRO expired by its terms pursuant to 735 Ill. Comp. Stat. 5/11-101. The St. Clair/Cook County Action is now pending in Cook County as Case No. 18-CH-6001, where RMSG has attempted to voluntarily dismiss its complaint. Among the matters currently pending in the St. Clair/Cook County Action is Huizenga's Petition for Fees and Costs, which is currently set for a hearing on September 6, 2018.

The Debtor now proposes to file parallel breach of contract and confidentiality claims in these proceedings, *see* Amended Schedules at 16, D.I. 26, when identical claims are pending in the St. Clair/Cook County Action. If there was any value to maximize in such claims, it could have been obtained in the proceedings in Cook County. But, again, Ritchie sought a voluntary dismissal, which is pending.

### 4.     *The Second Delaware Action*

On March 19, 2018, a new Ritchie entity, Ritchie CT Opps, LLC ("Ritchie Opps"), filed *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, No. 2018-0196-SG (Del. Ch.) ("Second Delaware Action"), a new action against Huizenga, again seeking a temporary restraining order—this time in Delaware. *See* Ex. 33, A-501–30. Remarkably, Ritchie Opps seeks to proceed (through a subassignment to RMSG) as the purported assignee of Ritchie's energy fund, that wound down in the mid-2000's, *see id.*, A-503–04 ¶¶ 10–11, and was cancelled with the Delaware Secretary of State in November 2017. *See id.*, A-503 ¶ 10. In other words, Ritchie Opps seeks to manufacture rights in litigation through an entity, there the defunct energy fund, that no longer has any legitimate business operations.

19

Ritchie Opps once again asked the court to enjoin Huizenga from making any "disparaging" remarks or disclosing any "confidential information" about the Debtor or the Affiliated Judgment Parties—including in court pleadings in Illinois.  Ritchie Opps filed a rote amendment in response to Huizenga's motion to dismiss, Huizenga filed a motion to dismiss in response, and Ritchie Opps has not yet responded.

But, again, Ritchie Opps pursues breach of contract claims that the Debtor now seeks to file in parallel in these bankruptcy proceedings.

### 5.    *The Third Delaware Action*

On May 3, 2018, RMSG—the same plaintiff as in the St. Clair/Cook County Action and Ritchie Opps's subassignee in the Second Delaware Action—filed yet another complaint in Delaware—*Ritchie Multi-Strategy Global, LLC v. Huizenga Managers Fund, LLC*, No. N18C-05-050 MMJ CCLD (Del. Super. Ct.) ("Third Delaware Action")—collaterally attacking the First and Second Judgments. *See* Ex. 26, A-383–402.  RMSG's original complaint claimed that RMSG "has been damaged in that it has paid [Huizenga] at least $13,383,511.40 in judgments wrongly obtained by [Huizenga] against [the Debtor and Affiliated Judgment Parties]" and "has also been damaged in that it paid at least $5,225,000.00 in attorneys' fees and other litigation costs defending [the Debtor and Affiliated Judgment Parties]." *Id.*, A-399 ¶ 47.  RMSG also filed claims alleging that Huizenga disclosed confidential information.  *See id.*, A-399–401.

In response to Huizenga's motion to dismiss, RMSG amended its complaint, stating that it had not actually paid any judgments entered in the DSA Action as it had originally alleged, but rather that it had "incurred liability" for those judgments because it had allegedly indemnified the Debtor and Affiliated Judgment Parties. Ex. 45, A-632 ¶ 55.  Such "liability" appears nowhere in the Debtor's Amended Schedules, D.I. 26, as an asset of the Debtor.

Huizenga filed a motion to dismiss the amended complaint on July 30, 2018, which is pending.

The Debtor now proposes to file parallel breach of contract and confidentiality claims in these proceedings, *see* Amended Schedules at 16, D.I. 26, when it could simply pursue those claims in the above prior actions or the DSA Action, if they had any merit.

### 6.    *The Second DuPage County Action*

On May 4, 2018, the Debtor, through the Clayborne Firm,[8] filed a new lawsuit against Huizenga's attorneys (and others)—*Ritchie Risk-Linked Strategies, LLC v. Williams Montgomery & John Ltd.*, Case No. 18-L-507 (Ill. Cir. Ct. DuPage Cty.)—claiming that Huizenga's attorneys were liable to the Debtor for $20,000,000.00 for, among other things, "attempting to collect and/or collecting [the] judgment" entered in the DSA Action. *See* Ex. 27, A-403–17 ¶ 20(f). Again, the Debtor complained about alleged disparagements and disclosures of allegedly confidential information.

The Debtor voluntarily dismissed this action soon after it was filed. *See* Ex. 28, A-418. Yet, the Debtor now proposes to file the same claims here in bankruptcy court.

As if these collateral attacks were not enough, various Ritchie entities and Thane Ritchie himself took to mailing letters—better described as screeds—directly to Huizenga and its executives (from a Delaware address), threatening further litigation (including from entities, like Ritchie CT Opps, LLC, A-357, that already filed claims) and claiming the very same litigation assets that the Debtor now seeks to vindicate (again) in bankruptcy court. *See also* Ex. 16, A-349–52 (Ritchie Multi-Strategy, LLC); Ex. 21, A-364 (the Debtor's proposed DIP financer); Ex.

---

[8] Remarkably, at the same time that this action was pending, the Clayborne Firm was pursuing the Swansea Trust's action against the Clayborne Firm's own client, the Debtor.

22, A-365 (Ritchie Multi-Strategy Global, LLC); Ex. 23, A-366–67 (Thane Ritchie himself); Ex. 24, A-368 (default judgment plaintiff RRLO).

### E.   The Events Precipitating the Debtor's Chapter 11 Filing

By June 2018, Ritchie's litigation strategy of filing as many lawsuits as possible in as many venues as possible was rapidly unraveling. The First Delaware Action had been stayed, with the Delaware Superior Court indicating that it would not allow a collateral attack on the First and Second Judgments. Faced with a motion to dismiss in the Second Delaware Action, Ritchie Opps realized it could not survive the motion and instead filed an amended complaint, which Huizenga has moved to dismiss as well. Likewise, with the Third Delaware Action.

In Illinois, Ritchie had elected to dismiss the Second DuPage Action, rather than pursue its frivolous claims against Huizenga's attorneys. And in the St. Clair/Cook County Action, the parties were briefing, among other things, whether RMSG should be required to pay Huizenga's attorneys' fees and costs incurred as a result of the improper *ex parte* TRO, after Ritchie had attempted to voluntarily dismiss that action as well.  In the Madison/DuPage County Action, the court was set to hear argument on Huizenga's motion to dismiss on June 19, 2018. Ritchie knew that when Huizenga succeeded on its motion to dismiss, Ritchie's claims across all of the other parallel cases it had filed would collapse by virtue of preclusion doctrines.[9]  Rather than arguing the merits of Huizenga's motion to dismiss, the Ritchie plaintiffs chose to voluntarily dismiss their action. Ex., 34, A-541–42 at 11:22-12:2.  In short, having failed (or planning for failure) in each of the above six actions, the Debtor proposes to use this bankruptcy court for MDL purposes, all in the name of "maximizing the value of its litigation-related assets."  *See* Reed Smith App. at ¶ 42, D.I. 22.  In the process, the Debtor seeks to assert claims against Huizenga

---

[9] Indeed, the various Ritchie entities have now taken to conceding that they are "interrelated" by virtue of their overlapping contractual relationships. *See, e.g.*, Ex. 45, A-619 ¶ 10.

that it could have asserted long ago, in the First Delaware Action or, even in the DSA Action. And, the Debtor (or its affiliates) has indeed already asserted such claims. This bankruptcy followed when none of those claims had any reasonable likelihood of success, much less $40 million in value.  *See* Amended Schedules at 14, D.I. 26.

From Huizenga's perspective, the Debtor's only unfiled claim with any potential value is its proposed malpractice claim against external counsel, including Sidley Austin LLP ("Sidley") and, possibly, others, for failing to timely raise and preserve a Delaware choice of law issue. But, until this bankruptcy, that Delaware choice of law issue was the very basis upon which the Debtor, through Reed Smith, had paraded around the country *disparaging* the Illinois court's judgments as "manifestly incorrect."  *See* Ex. 6, A-231–32.  So, rather than pursue this malpractice claim at any time in the years since it accrued, the Debtor pretended as if the claim was illegitimate and filed claims asserting that the Illinois courts, not the Debtor's external counsel, got it all wrong.

Against this backdrop came the Debtor's June 18, 2018 petition to vacate.  *See* Ex. 32, A-487–500.  There, the Debtor asked the court to vacate all judgments entered in the DSA Action, claiming that the Circuit Court of Cook County lacked subject matter jurisdiction over the case by virtue of the Delaware choice of law issue (that the Debtor here asserts it waived due to Sidley's malpractice). Huizenga filed a motion to dismiss the petition to vacate and to impose sanctions on both the Debtor and its attorneys for advancing frivolous arguments.  *See* Ex. 35, A-546–62. That motion was set for presentment before Judge Flynn in the Illinois Circuit Court for Cook County on June 29, 2018.

While frantically seeking the default judgment on behalf of the Swansea Trust, Ex. 37, A-569–75, and after unsuccessfully attempting to delay the June 29th hearing, *see* Ex. 36, A-563–68, a little over an hour before that hearing, the Debtor served Huizenga with a "Suggestion of

Bankruptcy," announcing that it had filed for Chapter 11 bankruptcy the night before, thereby invoking the automatic stay of Section 362. *See* Ex. 40, A-576–81.

After the June 29th hearing, at which the Court signaled its disapproval of the petition to vacate, *see, e.g.*, Ex. 41, A-584–85 at 9:6–11:23, the court entered an order requiring Huizenga and the Debtor to submit briefs concerning whether the Court could consider the petition to vacate and sanctions motion notwithstanding the bankruptcy stay. After the Debtor, through lawyers of Reed Smith's Chicago office, admitted that it filed bankruptcy, in part, to jettison its petition to vacate, Ex. 49, A-703 at 7:22–8:10, on August 3, 2018, the Court dismissed the petition to vacate and stayed Huizenga's sanctions request to allow this Court to determine in the first instance whether the bankruptcy stay applies to that request as it relates to the Debtor and its counsel there, namely Reed Smith and the Clayborne Firm. *See* Ex. 50, A-710.

Now apparently conceding that its actions are frivolous, the Debtor has failed to list any liabilities in its Schedules for the sanctions that Huizenga is presently seeking as to the petition to vacate and will seek in the First Delaware Action. Rather, the Debtor now proposes to launch virtually the same frivolous litigation here in bankruptcy court. Arguably at their worst, these proposed claims even seek to recover for damages to the Debtor's "intellectual property," Amended Schedules at 16, D.I. 26, of which the Debtor has none. *See id.* at 13. In short, the Debtor's assets, i.e. litigation claims, are duplicates of claims that have been or could be filed in Illinois state court or otherwise concocted. This Court need not entertain them here.

## II.    ARGUMENT

### A.    This Case Should Be Dismissed for "Cause" Under Section 1112(b)(4)(A)

The Debtor's bankruptcy case—filed without any plan to reorganize, with largely manufactured liabilities, and without any legitimate plan to maximize the Debtor's assets and by

an entity without any business operations—should be dismissed for cause. Section 1112(b)

controls involuntary dismissals of a Chapter 11 case. That Section provides, in relevant part:

> Except as provided in paragraph (2) and subsection (c), on request of a party in
> interest, and after notice and a hearing, the court shall convert a case under this
> chapter to a case under chapter 7 or dismiss a case under this chapter, whichever
> is in the best interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 1104(a) of a trustee or an examiner
> is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

Section 1112(b)(4) sets forth a non-exclusive list of factors that constitute "cause" under

subparagraph (b)(1), including:

> [S]ubstantial or continuing loss to or diminution of the estate and the absence of a
> reasonable likelihood of rehabilitation.

11 U.S.C. § 1112(b)(4)(A). "'Cause' is a flexible standard," and the Section 1112(b)(4) factors

"are not exhaustive." *See In re Scarborough-St. James Corp.*, Case No. 15-10625, 2015 WL

5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (dismissing Chapter 11 bankruptcy for cause

under Section 1112(b) where the debtor was engaged in a two party dispute that was otherwise

being played out in Michigan and New York courts).[10] Under Section 1112, the "initial burden

of proof" for dismissing a Chapter 11 petition for cause—i.e. a preponderance of the evidence—

is on the movant. *See In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994); *In re Red

Door Lounge, Inc.*, 559 B.R. 728, 733 (Bankr. D. Mont. 2016); *see also In re Wen-Kev Mgmt.,

Inc.*, Case No. 13-36463, 2014 WL 7370050, at *3 (D.N.J. Dec. 29, 2014); *In re Edwards*, Case

No. 95-18405, 1996 WL 407253, at *3 (Bankr. E.D. Pa. June 17, 1996). This Court has "broad

---

[10] In addition to the list enumerated in Section 1112(b)(4), cause exists to dismiss a case when
the petition was not filed in good faith. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 618–26 (3d
Cir. 2009); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118–24 (3d Cir. 2004); *In re
SGL Carbon Corp.*, 200 F.3d 154, 159–69 (3d Cir. 1999).

discretion" to dismiss the Debtor's petition for cause under Section 1112(b).  *See Woodbrook*, 19 F.3d at 316; *Wen-Kev*, 2014 WL 7370050, at *3.

Under Section 1112(b), rehabilitation is a more demanding standard than reorganization. *See, e.g.*, *Red Door*, 559 B.R. at 735; *In re Great Am. Pyramid Joint Venture,* 144 B.R. 780, 790–91, 792 (Bankr. W.D. Tenn. 1992) (converting Chapter 11 petition where debtor's business operations had "essentially ceased").  Even where a debtor's plan may be "honest" and "sincere," the bankruptcy court "is not bound to clog its docket with visionary or impracticable schemes for resuscitation."  *See Tenn. Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22 (1936).  Indeed, the debtor's "business prospects [must] justify continuance of the reorganization effort."  *See Red Door*, 559 B.R. at 735 (quotation marks omitted).  In other words, rehabilitation requires the debtor "to put [itself] back in good condition; re-establish [itself] on a firm, sound basis."  *See In re Ledges Apartments*, 58 B.R. 84, 87–88 (Bankr. D. Vt. 1986) (quotation marks omitted) (collecting cases; dismissing Chapter 11 case where debtor's litigation claims "would be better decided by the Vermont State Courts"); *see also, e.g.*, *Wen-Kev*, 2014 WL 7370050, at *4 (affirming conversion of case where debtors had "no hope for a financially sound rehabilitation").

The Debtor fashions itself as an investment company under 15 U.S.C. § 80a-3.  Petition at No. 7B, D.I. 1.  To the extent relevant, 15 U.S.C. § 80a-3 defines an investment company as, among other things,

> any issuer which—(A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; . . . or (C) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets . . . .

*See* 15 U.S.C. § 80a-3(a)(1).  The Debtor has not conducted any such business for years.  The Debtor acknowledges for at least three years it has had no revenue from its purported business as an investment company, or otherwise. *See* Statement of Fin. Affairs at 7, D.I. 18.  The Debtor's Schedules also reflect that, even though the Debtor considers itself an investment company, the debtor does not own or hold any investments or securities. Amended Schedules at 9, D.I. 26. Obviously, it is impossible for the Debtor to operate an investment business without securities, and given the valuable claims of Huizenga and the scorched-earth litigation practices of the Debtor and the Affiliated Judgment Parties, it is virtually assured that the Debtor will never again own or hold any investments or securities.

The reality is that the Debtor has no business to rehabilitate. The Debtor admits as much: "[The Debtor] has no employees or business operations. Its main assets are litigation claims." Petition at 5 (Attachment), D.I. 1.  The Debtor owns no office furniture or equipment, and has no accounts receivable, inventory, or intangible assets. Aside from cash deposited by Affiliated Judgment Parties or other Ritchie-related entities to cover professional fees, the Debtor's assets mostly consist of fabricated litigation claims against Huizenga, its officers, and its counsel of record, which the Debtor somehow values at $40,000,000. The Debtor has not shared the factual basis for these claims or the basis for its valuation, leaving the realizable worth of these assets as highly speculative, at best, and fraudulent at worst.

The Debtor not only acknowledges its lack of operations and revenues, but admits that it does not intend to have any business operations or revenues in the foreseeable future. Rather, it appears that Debtor intends to borrow $1,500,000 to essentially pay estate professionals and for no other purpose.  Initial Monthly Operating Report, D.I. 20.

The Debtor cannot rehabilitate its moribund business, investing, reinvesting, or trading in securities, without having any business assets, facilities, or operations. Administering a

reorganization case without hope of rehabilitation of the Debtor's business is futile and serves no legitimate bankruptcy purpose.   Indeed, when faced with circumstances such as those present here, a debtor without business operations or funds to recommence business operations and merely holding disputed litigation claims, courts have dismissed or converted the Chapter 11 cases, finding that rehabilitation of the debtor is futile.

In *Scarborough-St. James*, the Chapter 11 debtor faced eviction from a shopping center, the debtor's "only asset of any real value."   2015 WL 5672628, at *2.   As the outcome of eviction proceedings in Michigan state court became clear, the debtor filed the petition to maximize its litigation position and wrongfully retain the shopping center.   *See id.* at *3.   The Court dismissed the bankruptcy for cause, recognizing that the debtor's "foray" into bankruptcy court served no valid purpose.   *See id.* at *1, *2; *see also, e.g.*, *In re PEM Thistle Landing Tic 23, LLC*, Case No. 13-13273, 2014 WL 1319183, at *2 (Bankr. D. Del. Apr. 2, 2014) ("Debtor plainly satisfies most of the factors which favor dismissal—single asset case, few unsecured creditors, no operating business, no employees, petition filed on eve of foreclosure and no cash or income."); *In re Corinthian, LLC*, 440 B.R. 97, 103 (Bankr. E.D. Pa. 2009) (dismissing bankruptcy of Chapter 11 debtor without "any current business operations" where reorganization "wholly dependent" upon successful litigation claims in Florida state court); *Edwards*, 1996 WL 407253, at *5–7 (collecting cases; "long and hotly contested battle" and "substantial" claims in bankruptcy would be dismissed with underlying bankruptcy because there is "no reasonable possibility" of reorganization within a "reasonable time" (quotation marks omitted); *In re Thompson*, Civ. No. 92-7461, 1995 WL 358135, at *3–4 (E.D. Pa. June 9, 1995) (affirming dismissal; "[The debtor's] assorted claims appear duplicative, overvalued, and are listed in his plan without any legal indicia of their success. While the sheer number of defendants Thompson listed and the variety of ills Thompson complained of may have illusorily increased the proposed

value of his litigation, such a 'hit and miss' approach to his litigation did not make his claims any more viable.").

Similarly, in *In re Orienta Cooperative Ass'n*, the court found cause to convert the Chapter 11 case where the debtor had no business assets and lacked funds with which to acquire such assets. 256 B.R. 508, 511 (Bankr. W.D. Okla. 2000). The debtor's proposed reorganization depended entirely upon its recovery in a pending lawsuit and a proposed lawsuit. *Id.* In so holding, the Court reasoned that "[p]erhaps the only certainty with regard to the [proposed] action against the CPA firm is that the firm, and its insurers, can be expected to mount a vigorous defense to claims that the firm committed malpractice. It is quite reasonable to assume that such litigation may continue for years." *Id.*

So too in *In re Imperial Heights Apartments, Ltd.*, where the court found cause for dismissal of a Chapter 11 case because the estate consisted only of a proposed cause of action to claim "tenuous equity in an apartment complex." 18 B.R. 858, 863–64 (Bankr. S.D. Ohio 1982). The court found that the absence of a viable economic entity reflected adversely upon the "reasonable likelihood of rehabilitation" and demonstrated the "inability to effectuate a plan" in bankruptcy. *Id.* at 864.

*Pal Family Credit Co. v. County of Albany* also bears many similarities to the instant case. 425 B.R. 1 (N.D.N.Y. 2010). There, the court affirmed the dismissal for cause of two jointly administered Chapter 11 cases filed by debtors, which had few unsecured creditors, no income or expenses, no employees, and no reasonable likelihood of reorganizing. *Id.* at 5–6. The court found that the cases were "essentially two-party disputes that can be resolved in state court," and the filing of the bankruptcy was an attempt by debtors to avoid losses in litigation. *Id.* at 4–5, 6.

In short, there is no reasonable likelihood of rehabilitating a business, like the Debtor's, that is non-existent with speculative claims that the Debtor and its affiliates (and the Delaware Superior Court) have already rejected.

**B.      Debtor's Petition Should Be Dismissed as Having Not Been Filed in Good Faith**

In addition to the above statutory grounds for dismissal for cause, courts in the Third Circuit Court of Appeals dismiss Chapter 11 cases under 11 U.S.C. § 1112(b) unless the debtor can carry its burden to establish that the petition is filed in good faith. *See Integrated Telecom*, 384 F.3d at 118; *SGL Carbon*, 200 F.3d at 159–62. The requirement of good faith "has strong roots in equity" such that a Chapter 11 debtor "must act in conformity with the [Bankruptcy] Code's underlying principles." *See SGL Carbon*, 200 F.3d at 161. The burden of establishing a Chapter 11 petition's good faith "falls upon the bankruptcy petitioner." *See id.* at 162 n.10; *see also In re Derma Pen, LLC*, Case No. 14-11894, 2014 WL 7269762, at *6 (Bankr. D. Del. Dec. 19, 2014). Even where a petitioner "could successfully reorganize," courts do not entitle a debtor to use the Bankruptcy Code as a gimmick to disadvantage its primary creditors. *See In re Primestone Inv. Partners L.P.,* 272 B.R. 554, 558 (D. Del. 2002).

As this Court has recognized:

> Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'

*In re Northshore Mainland Servs., Inc.,* 537 B.R. 192, 202 (Bankr. D. Del. 2015) (citations omitted).

Applying *Integrated Telecom*, courts focus on "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." 384

F.3d at 119–20 (citing *SGL Carbon*, 200 F.3d at 165); *see also Northshore Mainland*, 537 B.R. at 202.

Examining the totality of the circumstances here, the Debtor's petition was not filed in good faith, and the Debtor cannot carry its burden as to either of the *Integrated Telecom* factors. The Debtor had no financial need for bankruptcy protection and no business operations.  Rather, the Debtor merely had valueless litigation claims that were on the precipice of failure.

  **1.**  ***Applying the Primestone Factors, The Petition Was Not Filed in Good Faith***

Courts consider several indicia of the absence of a good faith Chapter 11 filing, including:  (a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure (or another litigation-related liability); (e) two party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petition; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition; (l) debtor filed solely to create automatic stay; and (m) subjective intent of the debtor.  *See Primestone*, 272 B.R. at 557; *see also Derma Pen*, 2014 WL 7269762, at *6–9; *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298–300 (Bankr. D. Del. 2011).

Ten of the thirteen *Primestone* factors are present here; the others (a), (h), (k) are inapplicable.  Therefore, none of the *Primestone* factors favors the Debtor, as follows:

  i. <u>*Few unsecured creditors*</u>: The Debtor manufactured the list of non-insider creditors for the purpose of justifying this bad faith filing.  Few, except perhaps for one or two litigation firms and the Debtor's insurers—whose claims arise in the context of the litigation that Huizenga brought in Illinois and whose rights could be litigated in Illinois state court (in an action brought by the Debtor)—are real creditors of the Debtor.  *See also JER/Jameson*, 461 B.R. at 299 (discounting creditor claims from professionals paid by financer, not debtor).

  ii. <u>*No ongoing business or employees*</u>:  The Debtor has no business or employees, by its own admission.

31

iii.    _Petition filed on eve of an important, dispositive hearing or event_:  The Debtor's filing came on the eve of a hearing to consider whether its petition to vacate in Illinois state court should be dismissed—and whether the Debtor, Reed Smith, and the Clayborne Firm (a purported creditor) should be sanctioned.  The Debtor, through Reed Smith, has now confirmed that one of the purposes of its bankruptcy petition was to stop its own petition to vacate dead in its tracks.  _See_ Ex. 49, A-703 at 7:22–8:10.  And that maneuver was baseless under Illinois law.  _Accord Philip Morris_, 43 N.E.3d at 60 (petition to vacate is separate proceeding from underlying action giving rise to challenged judgments); _see, e.g._, _Maritime Elec. Co. v. United Jersey Bank_, 959 F.2d 1194, 1205, 1206 (3d Cir. 1991) (declining to stay debtor's counterclaim, for it was brought by, not against, debtor).

iv.    _Two party dispute which can be resolved in pending state court litigation_:  The Debtor's significant liabilities each arise from the DSA Action filed by Huizenga.  Huizenga's judgments spawned (i) a baseless indemnification claim to which RMSG now claims a security interest, Amended Schedules at 17, D.I. 26, (ii) Thane Ritchie's baseless indemnification claim, _id._ at 19, (iii) related claims from the Debtor's insurers, _id._ at 19, and (iv) a myriad of associated legal services provided to the Debtor and the Affiliated Judgment Parties (that traditionally were paid by yet another Ritchie entity), _id._ at 19–23.  Meanwhile, the Debtor proposes to institute claims against the very same parties (and related executives), as well as a malpractice claim against a new defendant, Sidley, that arises from the DSA Action.  Apart from the Debtor's Delaware registration and licensed office space for litigation purposes, the Debtor lacks the very nexus to Delaware about which it has disparaged the Illinois court's judgments in the first place.  _Accord generally A&R Logistics Holdings, Inc. v. FdG Logistics LLC_, 148 A.3d 1171 (Del. 2016), _aff'g_, 131 A.3d 842 (Del. Ch. 2016) (applying then-existing Delaware law concerning territorial nexus for DSA claims that the Debtor failed to raise in the DSA Action).

v.    _No cash or income_:  The Debtor has no business and no income, and has had no business or income since 2016 at the latest. Further, based on its own projections in the Initial Monthly Operating Report, D.I. 20, the Debtor has no expectations of generating any income through the entire 12-month projection period.  Instead, the Debtor proposes to rely on financing from an affiliated offshore entity merely so it can pay its bankruptcy counsel and expenses related to its bankruptcy petition.

vi.    _No pressure from non-moving creditors_:  The Debtor experienced no pressure from creditors that were not already in litigation with the Debtor (i.e. Huizenga and the Debtor's insurers, whose claims arise from Huizenga's litigation) for the simple reason that no such creditors exist.

vii.    _Improper prepetition conduct_:  The Debtor, the Affiliated Judgment Parties, and their affiliates conspired to multiply frivolous litigation, as evidenced by the six separate collateral attacks and petition to vacate that they initiated in Illinois and Delaware courts. The Debtor's amateurish effort to manufacture creditors,

including by defaulting on fraudulent actions brought by its own insiders, to justify the filing of this Case was also improper.

viii.   _No possibility of reorganization_:  The Debtor acknowledges there is nothing to reorganize and that the only rehabilitative purpose is to centralize litigation in this Court, notwithstanding the futility of such effort, constitutional limits on the jurisdiction of this Court, and prohibitions on the use of the bankruptcy court for litigation purposes.

ix.    _Debtor filed solely to stay state court litigation posing imminent threats to the Debtor and Affiliated Judgment Parties_:  The Debtor filed this bankruptcy to bring proceedings in Illinois that could result in liability to the Debtor to a grinding halt.  Hours after filing its bankruptcy petition, the Debtor filed its Suggestion of Bankruptcy in the (frivolous) action filed by the Debtor to vacate the judgments and that could imminently result in sanctions against the Debtor and its counsel, including Reed Smith.  Curiously, the Debtor waited for weeks to even invoke its bankruptcy in the fraud action brought by Huizenga.  But, on the eve of the deadline for the Debtor's responsive pleading, the Debtor invoked its bankruptcy and sought to stay the entire action, including as to the Affiliated Judgment Parties and the Debtor's insurers.  Yet, as to the Debtor's appeal of the Second Judgment in Illinois, the Debtor never invoked its bankruptcy (to stay the appeal as to the Debtor or the Affiliated Judgment Parties for whose benefit the Debtor had been invoking the bankruptcy), presumably because the appeal of an adverse judgment usually does not bring any further adverse consequences to an appellant.  It actually fell to Huizenga to inform the appellate court of the bankruptcy, while the Debtor had a pending (and misguided) motion to dismiss its appeal.  _See Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp._, 682 F.2d 446, 449 (3d Cir. 1982) (defendant's direct appeal of adverse judgment subject to bankruptcy stay).

Meanwhile, the Debtor, through its bankruptcy counsel at Reed Smith, was threatening Huizenga with contempt for even defending against the Debtor and Affiliated Judgment Parties' appeal.  _See_ Ex. 42, A-593 ("I write to inform you that your efforts to continue the prosecution of the Appeal or the underlying [DSA Action] [i.e. the Debtor's petition to vacate in the Debtor's apparent and mistaken view] following the Petition Date violates the automatic stay . . . .").  Proposed bankruptcy counsel at Reed Smith continued, "any further violation of the automatic stay, including any prosecution of the [DSA Action, i.e. the Debtor's petition to vacate], is 'willful' and will compel the Debtor to file a contempt motion compensatory [sic] damages from the Bankruptcy Court."  _See_ Ex. 42, A-596.

x.     _Subjective intent of the debtor_:  As shown by the Debtor's threats of contempt and other litigation conduct, the Debtor has filed these bankruptcy proceedings without any good intent.

Furthermore, the Debtor apparently filed for bankruptcy in derogation of its own contracts.  Under its Operating Agreement, Ex. 1, A-1–85, the Debtor may initiate bankruptcy proceedings if it "pay[s] from the assets of the Fund any and all liabilities and expenses . . . incurred in connection therewith."  *Id.*, A-22 at 18 § 2.1(d)(xvi).  The Debtor, however, does not propose to pay anything from "the assets of the Fund," much less "all liabilities" that it has incurred.  Rather, the Debtor proposes to secure DIP financing from a related offshore entity only to finance its own bankruptcy fees and expenses.  In the process, and as set forth above, the Debtor has failed to comprehensively list its liabilities, which are accruing by the day.

Although the Debtor lists 23 unsecured creditors in its Schedules, aside from Huizenga and the Debtor's litigation insurers, there is only one trade creditor having a claim of $728.10.[11] The remaining creditors consist of alleged claims of insider-related entities, alleged promissory notes with Thane Ritchie's acquaintances, and alleged claims of professionals, none of whom received a single transfer from the Debtor in the one year before the Petition Date.  The creditor list, therefore, was largely manufactured before the Petition Date, included in the initial voluntary petition, D.I. 1, at 9–10, and did not change in two successive formulations.  *See* D.I. 19, at 19–23; D.I. 26, at 19–23.

The Debtor manufactured this list—none of the creditors by the Debtor's own admission received a dime of the Debtor's money within a year of the filing—for the sole purpose of creating creditors to justify this bad faith filing.  *See* D.I. 18, at 8; D.I. 25, at 8.

---

[11] The Regus Group Companies' claim of $728.10 was incurred a month before filing of this case and relates to temporary office space that has never been used by the Debtor and presumably was leased only to establish some presence in Delaware for tactical jurisdictional purposes in pending litigation.

### 2.    *The Case Was Filed Solely to Obtain a Tactical Litigation Advantage*

The Debtor's petition is merely an abusive litigation tactic designed by Thane Ritchie and the Affiliated Judgment Debtors to create additional mayhem in their multijurisdictional collateral attacks on the First and Second Judgments.  This is not a legitimate basis for filing a petition in this Court.  As the Third Circuit stated in *SGL Carbon*, this inquiry seeks to determine whether a petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws" when filing for protection under Chapter 11.  200 F.3d at 165 (citation omitted).

As noted above, the Debtor filed this case on the eve of Judge Flynn's hearing on Debtor's petition to vacate and Huizenga's motion for sanctions. Given the timing of its bankruptcy filing, it is obvious that the Debtor legitimately believed that Judge Flynn was not going to grant its petition to vacate the judgments against it. The Debtor then invoked the bankruptcy stay to prevent or delay Judge Flynn's ruling dismissing the petition (which has now been entered, Ex. 50, A-710) and imposing sanctions on the Debtor and its counsel.

While the Debtor may argue that the bankruptcy stay's protection from litigation is a legitimate reason for filing bankruptcy, the Third Circuit Court of Appeals has decided otherwise. Indeed, "[t]he protection of the automatic stay . . . is not *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing." *15375 Memorial*, 589 F.3d at 620 (quoting *Integrated Telecom*, 384 F.3d at 128).  Indeed, "a naked desire to stay pending litigation, and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing to a good faith one." *Id.* (quotation marks omitted).

The Debtor's blatant abuse of bankruptcy to interfere with the lawful rights of creditors clearly demonstrates the Debtor's lack of good faith in filing this bankruptcy case. Courts, including this one, have consistently held that the desire to use Chapter 11's automatic stay as a litigation tactic does not establish the debtor's good faith. *See, e.g., Derma Pen*, 2014 WL

7269762, at *7, *9 ("Unquestionably, Derma Pen's bankruptcy filing was timed to stop the Utah Litigation with the further purpose of moving the dispute to what the Debtor perceived as a 'friendlier' forum for disposition of the same issues pending before the Utah District Court."); *JER/Jameson*, 461 B.R. at 300 (eve of foreclosure sale).

The Fifth Circuit Court of Appeals could have been describing the circumstances here when it noted in *In re Timbers of Inwood Forest Assocs., Ltd.* that if a Chapter 11 case does not have a rehabilitative purpose, the "automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries." 808 F.2d 363, 373 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988).

The Debtor acknowledges that it does not intend to rehabilitate its business through this bankruptcy, rather it "commenced this Chapter 11 Case for the purpose of (a) maximizing the value of its litigation-related assets . . . [,] to avoid . . . piecemeal litigation with Huizenga that is now in its 12th year and (b) attempting to resolve claims . . . by and against the Debtor." Reed Smith App. ¶ 42, D.I. 22. None of these actions will rehabilitate the Debtor; they will only establish yet another forum to litigate issues that are currently being litigated in Illinois state court.

This Court need not wait for the Debtor to concoct a reorganizational plan before dismissing this case. Where a debtor is part of a "larger enterprise" and was a "mere[] funding mechanism[]" for related entities, there is no need for delay. *See JER/Jameson*, 461 B.R. at 301. This is so even where, unlike here, the collective enterprise has "extensive operations across" an entire region of the United States. *See id.*

In short, the Debtor's did not file this bankruptcy petition in good faith, and it should be dismissed for cause. Huizenga respectfully requests this dismissal in advance of any for-this-bankruptcy-only reorganization plan filed by the Debtor.

**C.     The Court Should Also Abstain from Hearing this Case and Dismiss it Pursuant to Section 305(a)**

Section 305(a)(1) provides that a bankruptcy court "after notice and a hearing, may dismiss a case . . . , or may suspend all proceedings in a case . . . , at any time if—the interests of creditors and the debtor would be better served by such dismissal." 11 U.S.C. § 305(a)(1). The decision to dismiss a case under section 305(a)(1) is left to the discretion of the bankruptcy judge and is not reviewable on appeal. *See* 11 U.S.C. § 305(c); *see also, e.g.*, *In re Pennino*, 299 B.R. 536, 538 (B.A.P. 8th Cir. 2003) (affirming Section 305 dismissal where debtor had filed six actions and lacked "any reasonable prospect for reorganization"); *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996) (abstaining from "a two-party partnership dispute that implicates purely state law issues," and also dismissing under Section 1112(b)), *aff'd*, 206 B.R. 757 (E.D. Pa. 1997). Huizinga bears the burden of demonstrating that the interests of the Debtor and its creditors would benefit from dismissal. *See In re AMC Inv'rs, LLC*, 406 B.R. 478, 487–88 (Bankr. D. Del. 2009).

As when determining "good faith" under Section 1112(b), courts examine a number of factors to determine whether abstention and dismissal under Section 305(a)(1) is in the best interest of creditors. *See AMC*, 406 B.R. at 488. Such factors include: (i) economy and efficient administration; (ii) "whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;" (iii) "whether federal proceedings are necessary to reach a just and equitable solution;" (iv) whether there is an alternative means of achieving equitable distribution of assets; (v) "whether the debtor and the creditors are able to

37

work out a less expensive out-of-court arrangement which better serves all interests in the case;" (vi) "whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process;" and (vii) "the purpose for which bankruptcy jurisdiction has been sought." *See id.*; *see also Argus*, 206 B.R. at 755.

All of these factors weigh in favor of abstention and dismissal. This Case simply creates another litigation overlay on already highly contentious proceedings between Huizinga and the Debtor, Affiliated Judgment Parties, and their affiliates. Nothing can be gained by opening another forum for the parties to litigate, particularly given the Debtor's intent to spend $130,000 per month on professionals alone for litigation against Huizenga in bankruptcy court (on top of the more than $2 million that Reed Smith has already incurred (on top of the Debtor's three other litigation firms)). *See* Initial Monthly Operating Report at 3, D.I. 20.[12] Existing proceedings are sufficient. *See Argus*, 206 B.R. at 756 (Bankr. E.D. Pa. 1997) (finding that bankruptcy likely causes "needless additional expenses" because the debtors would need to be represented by "specialized bankruptcy counsel").

Furthermore, nothing is gained by establishing this forum as some centralized engine for the litigation since every suit would then be subject to mandatory abstention (or permissive abstention at the least). *See In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566, 582 (Bankr. D. Del. 2017) ("The purpose of mandatory abstention is 'to require federal courts to defer to the state courts to handle lawsuits which, although 'related to' a bankruptcy, can be promptly resolved in state court without interfering with the proceedings pending in the federal courts.'").

---

[12] Mr. Cilento testified that, all told, the Debtor has incurred approximately $7 million in post-judgment legal fees to Reed Smith, the Clayborne Firm, Potter Anderson & Corroon LLP, and McGuire Woods LLP.  Ex. 48, A-642 at 13:11–16.

Bankruptcy courts in this district have held that "[d]ismissal or suspension of a case may be appropriate when the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor." *See AMC*, 406 B.R. at 488. Moreover, when relief is available in a non-bankruptcy forum to resolve a two-party dispute, courts should abstain and dismiss the case. *Id.*; *see also Northshore Mainland*, 537 B.R. at 201, 206–07 (dismissing bankruptcy regarding Bahamian debtors, but proceeding as to Delaware debtor with actual operations in the United States, without prejudice to dismissal at a later date).  As described above, relief is available in each of the six non-bankruptcy fora in which the Debtor, Affiliated Judgment Parties, and their affiliates have initiated suit, as well as the one forum in which Huizenga not only initiated suit, but obtained executable judgments, with more to follow. Huizenga, therefore, respectively asks the Court to abstain from and dismiss the Debtor's Case.

III.   **NOTICE**

Notice of this Motion has been provided to: (i) counsel for the United States Trustee for the District of Delaware; (ii) counsel for the Debtor; (iii) all parties who have filed appearances in the Debtor's bankruptcy case; and (iv) each of the creditors listed on the Debtor's amended creditor matrix (D.I. 4).

IV.   **CONCLUSION**

For the foregoing reasons, Huizenga respectfully requests entry of an order (i) dismissing the Debtor's Case pursuant to 11 U.S.C. §§ 1112(b) and/or 305(a), with prejudice, and (ii) granting such other relief to Huizenga as is just and appropriate.

Dated:  August 8, 2018

K&L GATES LLP

/s/ Steven L. Caponi
Steven L. Caponi, Esq. (No. 3484)
600 N. King Street, Suite 901
Wilmington, DE 19801
Tel: (302) 416-7000
Fax: (302) 416-7020
Email: steven.caponi@klgates.com

-and-

Sven T. Nylen, Esq.
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602-4207
Tel: (312) 372-1121
Email: sven.nylen@klgates.com

Of counsel:

Christopher J. Barber, Esq.
Gary W. Garner, Esq.
Jonathan D. Miller, Esq.
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Tel:  (312) 443-3200
Email: cjb@willmont.com
        gwg@willmont.com
        jm@willmont.com

-and-

Steve Jakubowski, Esq.
ROBBINS SALOMON & PATT, LTD.
180 N. La Salle Street, Suite 3300
Chicago, Illinois 60601
Tel: (312) 456-0191
Fax: (312) 782-6690
Email: SJakubowski@rsplaw.com

*Counsel To Huizenga Managers Fund, LLC*