# Exhibit 21

# RITCHIE MULTI-STRATEGY GLOBAL TRADING, LTD.



April 20, 2018

<u>*Via USPS*</u>

Huizenga Managers Fund, LLC
ATTN: Accounts Payable Dept.
2215 York Road
Oak Brook, IL 60523

### SECOND NOTICE – BALANCE DUE IMMEDIATELY $281,250

Dear Huizenga Managers Fund, LLC,

On April 9, 2018 we advised you that you are obligated to pay Ritchie Multi-Strategy Global Trading, LTD for your breaches of the Operating Agreement. You are liable to Ritchie Multi-Strategy Global Trading, LTD in the amount of **$281,250**, which is inclusive of the cost of the judgments you wrongfully obtained, as well as the attorneys' fees, defense costs, and other damages related to your breach of the Agreement. Please remit payment immediately and without delay.

Sincerely,

**Ritchie Multi-Strategy Global Trading, LTD**

cc:    Huizenga Capital Management, LLC
       Peter H. Huizenga
       Cindy Fogg, Chief Financial Officer
       Virginia Turza, Chief Risk Officer & Chief Compliance Officer
       Ronald G. Kenny, Fund Advisor



12 DELAWARE STREET
SUITE E #124
NEW CASTLE, DE 19720

A-364

# Exhibit 22

 **Ritchie Multi-Strategy Global, L.L.C.**

## RMSG, L.L.C.

April 25, 2018

**VIA USPS**

Huizenga Mangers Fund, LLC
ATTN: Accounts Payable Dept.
2215 York Road
Oak Brook, IL 60523

**SECOND NOTICE – BALANCE DUE IMMEDIATELY $14,625**

TO WHOM IT MAY CONCERN:

In a letter dated April 10, 2018, Ritchie Multi-Strategy Global, L.L.C. notified you that Huizenga Managers Fund, LLC and/or affiliated businesses shall be held liable for breaches of contract and other unlawful conduct described therein. As previously explained, Ritchie Multi-Strategy Global, L.L.C. shall pursue its legal and equitable rights against you for breaches of the Subscription Agreement, Operating Agreement, wrongful judgments, attorneys' fees, litigation costs, and other relief permitted by law as remedies for your breaches of contracts and other unlawful conduct, including but not limited to unlawful actions, disparagement and violation of confidentiality obligations.

Currently, we have claims against Huizenga and/or affiliated businesses in the amount of $14,625. In addition, the amount owed is accruing interest at the rate of 9%. Therefore, Ritchie Multi-Strategy Global, L.L.C. hereby demands that you remit payment in foregoing amount, plus interest calculated through the date hereof, to the address above within 10 business days.

Very truly yours,

**Ritchie Multi-Strategy Global, L.L.C.**

cc:    Huizenga Capital Management
       Peter H. Huizenga
       Cindy Fogg, Chief Financial Officer
       Virginia Turza, Chief Risk Officer & Chief Compliance Officer
       Ronald G. Kenny, Fund Advisor

122 Delaware Street * Suite 1, #124 * New Castle, DE 19720
DELAWARE

A-365

# Exhibit 23

April 26, 2018

**Re: Notice of Claim and Demand of Immediate Payment**

Huizenga Managers Fund, LLC
c/o Huizenga Capital Management
Attn. Mr. Peter H. Huizenga Sr.
2215 York Road
Oak Brook, IL 60523

Mr. Peter H. Huizenga, Sr.
44 Baybrook Lane
Oak Brook, IL 60523

Dear Mr. Huizenga:

As you are aware, Huizenga Managers Fund, LLC and Huizenga Stewardship Fund, LLC have obligations under the Subscription Agreements and Operating Agreements relating to Ritchie Multi-Strategy Global, LLC, Ritchie Multi-Strategy Global, Ltd., Ritchie Energy, LLC and Ritchie Risk-Linked Strategies, LLC to indemnify A.R. Thane Ritchie ("Mr. Ritchie") for all losses caused by the Huizenga Fund's breach of its obligations under those contracts.

As the result of improper actions taken at your direct request or on your behalf by agents of Huizenga Managers Fund, LLC, my property in the amount of $13,383,511.36 has been improperly seized pursuant to a wrongfully obtained turnover order. Take notice that I am hereby asserting an Indemnification Claim against you in the amount of $13,383,511.36 ("Indemnification Claim"). I make this Indemnification Claim against Huizenga Managers Fund, LLC and demand immediate payment.

You and/or your agents caused the enclosed Citation to Discover Assets ("Citation") to be issued on April 13, 2018 and delivered to be delivered to Interactive Brokers, LLC at One Pickwick Plaza, Greenwich, Connecticut. The representations of fact set forth in the Citation were certified as true by the agents and advisors of Huizenga Managers Fund, LLC. Not only were the representations false they contained confidential business information related to the assets and businesses of certain "RCM Parties" (as defined in the above-referenced Operating Agreements), including but not limited to Mr. Ritchie and Ritchie Capital Management, Ltd.

The attorney for Huizenga Managers Fund, LLC also wrongfully disclosed confidential information about Mr. Ritchie's assets and financial affairs to representatives of Interactive Brokers, LLC in an email sent on April 18, 2018 and wrongfully threatened to seek a money judgement in excess of $13 million against Interactive Brokers, LLC based on the intentional misrepresentations of material facts set forth in the Citation, unless it joined the abuse of process conspiracy between Huizenga Managers Fund, LLC in order to restrain and controlled the financial assets of entities are not "judgment debtors" under color of Illinois law by means of Citation. This abuse of process and tortious interference with contract and property rights have caused the seizure of my funds in an amount in excess of $13 million.

Take notice that unless this Indemnification Claim is paid immediately, this notice of claim and demand of payment will be cited as the basis for the commencement of an action to avoid any and all fraudulent transfers of funds that were seized, pursuant to the order identified in the attached email dated April 25, 2018, including but not limited to any transfers of funds belong to Huizenga Managers Fund, LLC to or for the benefit of Gary W. Garner, Chris Barber, Scott M. Church, or Williams Montgomery & John, Ltd. and any other transferees.

Accordingly, you have an obligation to retain all relevant emails and other documents.

I further reserve all my rights as to other claims, including the right to combine this claim against you with those of my other claims in the event that the court action is required to enforce Huizenga Managers Fund, LLC's obligation to pay the Indemnification Claim.

Sincerely yours,

A.R. Thane Ritchie

Encl.

Cc:  Ms. Cindy Fogg, Chief Financial Officer
Ms. Virginia Turza, Chief Risk Officer & Chief Compliance Officer
Huizenga Managers Fund, LLC
Stewardship Fund, LLC,

A-367



Align top of FedEx Express® shipping label here.

Part # 152297-435 [6MOI6 EXP 12/16]

SHIP DATE: 26APR18
ACTWGT: 0.30 LB
CAD: 6982427/SSFO1822

BILL CREDIT CARD

ORIGIN ID:ZWIA (302) 543-4399
A R THANE RITCHIE

122 DELAWARE ST
SUITE 1512A
NEW CASTLE, DE 19720
UNITED STATES US

TO  ATTN: VIRGINIA TURZA
HUIZENGA MANGERS FUND LLC
2215 YORK RD

OAK BROOK IL 60523

(000) 000-0000

REF:
REF:
PO:
DEPT:

FedEx
Express

FRI – 27 APR 3:00P
STANDARD OVERNIGHT
DSR
60523
IL-US ORD

TRK# 7807 1103 4424
0201

XH ENLA



427
425
6 C
16:00
4424
04.27



earthsmart

FedEx carbon-neutral
envelope shipping

# Exhibit 24

 **Ritchie Risk-Linked Opportunities, L.L.C.**
122 Delaware Street
Suite 1, #124
New Castle, DE 19720

April 27, 2018

*__Via USPS__*

Huizenga Managers Fund, LLC
ATTN:   Accounts Payable Dept.
2215 York Road
Oak Brook, IL 60523

## SECOND NOTICE – CURRENT BALANCE DUE $281,250

Dear Huizenga Managers Fund, LLC:

On April 11, 2018, Ritchie Risk-Linked Opportunities, LLC (the "Fund") put you on notice that Huizenga Managers Fund, LLC ("Huizenga") is liable for all damages, costs, and expenses incurred in defense against the multiple lawsuits brought by Huizenga against RCM parties.  The Fund documents require the investor to reimburse the Fund for all damages, attorneys fees, and other costs related to these lawsuits, as well as all costs to enjoin you from further contract breaches.

The Fund now demands full reimbursement for its material damages and substantial costs which have already been incurred in defending and contesting these lawsuits.  The amount now due the Fund is **$281,250**, plus interest at the rate of **9%.**

Please pay this amount within 10 days of the date of this letter.   If the Fund does not receive payment in full, Huizenga will be responsible for further interest and additional costs of collection. **The Fund will pursue legal action to recover all amounts due.**

Sincerely,

**Ritchie Risk-Linked Opportunities, L.L.C.**

cc:    Huizenga Capital Management, LLC
       Peter H. Huizenga
       Cindy Fogg, Chief Financial Officer
       Virginia Turza, Chief Risk Officer & Chief Compliance Officer
       Ronald G. Kenny, Fund Advisor

A-368

# Exhibit 25

## IN THE CIRCUIT COURT
## OF THE EIGHTEENTH JUDICIAL DISTRICT
## DUPAGE COUNTY, ILLINOIS

| | |
|---|---|
| JOHN DOE CORP. 1 and JOHN DOE CORP. 2. <br><br> Plaintiffs, <br><br> v. <br><br> HUIZENGA MANAGERS FUND, LLC and HUIZENGA CAPITAL MANAGEMENT, LLC <br><br> Defendants. | No. 18-CH-00236 <br><br> Hon. Bonnie M. Wheaton |

## PLAINTIFFS AMENDED COMPLAINT

Plaintiffs, JOHN DOE CORPORATION 1 and JOHN DOE CORPORATION 2 ("Plaintiffs" or collectively "John Does"), by undersigned counsel, respectfully submit an Amended Complaint against Defendants HUIZENGA MANAGERS FUND LLC ("Huizenga Fund") and HUIZENGA CAPITAL MANAGEMENT LLC ("Huizenga Capital"), and state as follows:

## COUNT I – PRELIMINARY INJUNCTION

1.    John Does are members and/or managers of an investment fund for insurance-related investments ("Investment Fund").

2.    Huizenga Fund is a pooled investment that does business in the State of Illinois and within DuPage County, Illinois.

3.    Huizenga Capital provides investment management services to pooled investment funds, including but not limited to management services to Huizenga Fund, in the State of Illinois and within DuPage County, Illinois.

4.     On or about June 30, 2005, Huizenga Capital, on behalf of Huizenga Fund (jointly referred to hereinafter as "Huizenga"), submitted a Subscription Agreement to the Investment Fund for consideration of Huizenga's offer to purchase a limited liability company equity interest in the Investment Fund. (A copy of the Subscription Agreement was submitted under seal with the Original Complaint and is incorporated herein by reference as Exhibit 1 to this Amended Complaint).

5.     On or about August 1, 2005, the Subscription Agreement submitted by Huizenga to purchase a limited liability equity interest in the Investment Fund was accepted by the Investment Fund. (Ex. 1).

6.     Upon acceptance of Huizenga's Subscription Agreement, Huizenga invested monies into the Investment Fund and received an equity interest therein.

7.     As an express requirement for acceptance of its offer to invest in the Investment Fund, Huizenga consented to and agreed in the Subscription Agreement to be bound by all the terms of the Second Amended and Restated Limited Liability Company Operating Agreement of the Investment Fund, dated August 1, 2005 ("Operating Agreement"). (Ex. 1, ¶ 4).

8.     The Second Amended Operating Agreement was incorporated into and made part of the terms and conditions of the Subscription Agreement. (*Id.*).

9.     The Investment Fund and John Does are third-party beneficiaries of the Subscription Agreement. (*Id.* ¶¶ 12, 15).

10.     As an express condition of the Subscription Agreement Huizenga agreed not to publicly disparage the Investment Fund or any of the other persons and entities referenced in the Subscription Agreement or the Operating Agreement. (*Id.* ¶¶ 4, 17).

A-370

11.    As an express condition of the Subscription Agreement, Huizenga agreed to abide by the express covenants in the incorporated Operating Agreement not to disclose confidential information. (*Id.* ¶¶ 4, 18).

12.    Huizenga agreed that the agreements and covenants set forth in the Subscription Agreement, and the agreements and covenants incorporated in the Operating Agreement that was incorporated within the Subscription Agreement in their entirety, would survive the withdrawal of Huizenga from the Investment Fund and that said agreements and covenants would be binding upon Huizenga's successors and assigns and would further inure to the benefit of the Investment Fund, the John Doe's, and other persons and entities and their respective affiliates, successors, and assigns referenced in the definition of the parties to the Operating Agreement. (*Id.* ¶¶ 4, 12, 15).

13.    Huizenga Fund agreed in the Subscription Agreement that the undertakings, agreements, covenants, representations and warranties, set forth in the Subscription Agreement, would be restated and reaffirmed as to the date of each investment into the Investment Fund by Huizenga. (*Id.* ¶ 15).

14.    On or about September 28, 2005, Huizenga Fund executed and submitted an additional investment Subscription Agreement for an additional limited liability equity interest in the Investment Fund. (A copy of the additional Subscription Agreement was submitted under seal as Exhibit 2 to the Original Complaint and is incorporated herein by reference as Exhibit 2 to this Amended Complaint).

15.    The representations and covenants in the Subscription Agreement, including the covenant not to disparage were not only essential terms and conditions of the Subscription Agreement but also were made as an inducement for acceptance of Huizenga Fund's investment in the Investment Fund. (Ex. 1, ¶ 2).

A-371

16.     The Investment Fund accepted the Huizenga Fund's investment and otherwise performed all of its obligations and conditions under the Subscription Agreement. The Managing Member of the Investment Fund likewise performed all obligations and conditions under the Subscription Agreement.

17.     On November 1, 2005, the Investment Fund amended and restated its Operating Agreement. (A copy of Third Amended and Restated Limited Liability Company Operating Agreement of the Investment Fund (referred to herein as "Operating Agreement") was submitted under seal as Exhibit 3 to the Original Complaint and is incorporated herein by reference as Exhibit 3 to this Amended Complaint).

18.     The Investment Fund performed all of its obligations and conditions under the Operating Agreement. The Managing Member of the Investment Fund likewise performed all obligations and conditions under the Operating Agreement.

19.     "RCM Party" is defined in the Operating Agreement as "(a) RCM, (b) any Affiliate of RCM, and (c) any owner, principal, director, officer or employee of the foregoing." (Ex. 3 § 1.6).

20.     "RCM" is broadly defined in the Operating Agreement as "the Managing Member, the Investment Manager, the Sub-Adviser, and any of their respective Affiliates, which will, collectively, manage the trading and investing of the Company and the Master Fund, and any of their successors or assigns." (*Id.*).

21.     "Affiliate" is broadly defined in the Operating Agreement as "a Person controlling, controlled by or under common control with, that Person, either directly or indirectly through one or more intermediaries. (*Id.*).

22.     "Person" is defined in the Operating Agreement as "any individual, partnership, limited liability company joint venture, corporation, trust, unincorporated organization, government (or any agency or political subdivision thereof) or other entity, whether or not having legal personality."  (*Id.*).

23.     Both Plaintiffs herein are within the Operating Agreement's definition of an RCM Party. (Ex. 3, ¶ 1.6).22. The Operating Agreement prohibits Huizenga from disparaging the Investment Fund and/or any RCM Party. (Ex. 3, ¶ 9.22).

24.     As to confidentiality under the terms of the Operating Agreement, Huizenga must keep confidential a "wide range" of proprietary information, including trade secrets and financial or commercial information that the disclosure of may cause competitive harm to the Fund and/or RCM Parties *unless* Huizenga first obtains written permission of the Managing Member.  (Ex. 3, ¶ 9.21(a)).

25.     The Operating Agreement further expressly provides that all information with respect to such business and assets of the Fund and the RCM Parties shall be presumed confidential and proprietary *unless* the Managing Member otherwise so indicates in writing.  (Ex. 3, ¶ 9.21(b)).

26.     In addition, Huizenga must seek written permission from the Managing Member of the Fund *before* disclosing any confidential information even if Huizenga contends that the information is publicly available. (Ex. 3, ¶ 9.21(b)).

27.     Huizenga covenanted, not once but three separate times in the Operating Agreement that, *except with prior written consent* of the Fund's Managing Member, it would at all times keep confidential and not, directly or indirectly, disclose, divulge, furnish or make accessible to anyone, or use in any manner that would be adverse to the interests of the Fund or

A-373

any RCM Party, any confidential or proprietary information to which Huizenga would become privy relating to the business or assets of the Fund or any of the RCM Parties. (Ex. 3, ¶ 9.21(b)).

28.     Pursuant to the provisions of the Operating Agreement of the Investment Fund, Huizenga agreed not to do anything indirectly by use of affiliates, agents, agreements, contracts, or other means that they had agreed not to do directly and further expressly agreed that they would comply in all respects with the substantive purposes of the Operating Agreement. (Ex. 3, ¶ 9.19).

29.     The Operating Agreement further strictly prohibits Huizenga from making any disclosure of confidential information to its attorneys in this matter since its attorneys are using that information for their personal financial gain of collecting upon their contingency fee by enforcing a judgement. (Ex. 3, ¶ 9.21(b)).

30.     Huizenga obtained a judgment in an Illinois state court against four defendants (who are not parties to this action) (the "Illinois Defendants") based upon a claim brought under the Delaware Securities Act ("DSA").

31.     The basis for the judgment is rife with problems for Huizenga, not the least of which are: (a) the securities transaction sued upon has no nexus to Delaware (and thus is not a viable action under the DSA in any state or federal court); and (b) instead of awarding rescission as the remedy authorized under the applicable DSA provision sued upon, the Illinois court awarded monetary damages. That judgment is now on appeal and Huizenga fears that the Illinois appellate courts may reverse the judgment by applying Delaware Supreme Court precedent that contradicts the Illinois trial judge's interpretation of Delaware law.

32.     Huizenga has undertaken aggressive and wide-ranging efforts designed to harm the business reputations of parties protected from such conduct under the Operating Agreement and Subscription Agreements ("RCM Parties").

33.    In the investment fund industry, the investment manager's most important asset – even more important than past investment performance – is the manager's reputation. One blemish on an investment manager's reputation can cripple the manager's ability to raise capital from investors or obtain financing from banks. Capital is the lifeblood of an investment fund, and is fundamental to the investment manager's livelihood. As might be expected, investment managers are extraordinarily protective of their reputations, and take proactive measures to protect them.

34.    Investment managers commonly protect their reputations by employing strict investor covenants related to confidentiality and non-disparagement. It is standard in the industry for an investor to agree, as a condition of the investment manager's acceptance of the investor's capital, that the investor will not disparage the manager (along with the manager's affiliates and related parties), and will keep the non-public information of the manager and the investment fund strictly confidential. Investment managers began insisting on such covenants as a direct result of a series of cases in which dishonest investors publicly disparaged an investment manager in an attempt to pressure the manager for a significant cash payout. The managers discovered that investors willing to besmirch an investment manager's good name – regardless of truth – could wreck a manager's career and goodwill overnight. Accordingly, many investment managers determined that they would not accept investor capital unless the investor agreed to non-disparagement and confidentiality covenants.

35.    It is for this reason that the Subscription Agreements and the Operating Agreement herein provide for the protection of Plaintiffs herein, other RCM Parties, and others related to them, by prohibiting disparagement and breaches of confidentiality by its investor Members, even after the Members redeem their ownership interest.

A-375

36.    Huizenga attempts to clothe its efforts under the guise of legitimate legal process by asserting disparaging comments and disclosing confidential documents, in violation of the Operating Agreement and Subscription Agreements, in various pleadings, and by serving "Citations to Discover Assets" on law firms that have represented any of the RCM Parties at any time in the last decade.

37.    Huizenga's abusive litigation tactics, disparagement of the RCM Parties and disclosure of their confidential information with impunity are weapons that Huizenga should not be permitted to wield especially when they are contractually prohibited from such conduct.

38.    Contrary to the provisions of Paragraph 17 of the Subscription Agreement, and Section 9.19 and 9.22 of the Operating Agreement, Huizenga and its member manager and its attorneys disparaged the Investment Fund and other parties protected by the non-disparagement provisions of those agreements. Examples include, but are not limited to:

a.    A Ritchie Party is an international fraudster;

b.    A Ritchie Party is fraudulently avoiding creditors;

c.    A Ritchie Party has failed or refused to pay past judgments;

d.    A Ritchie Party used their foreign citizenship for the purpose of engaging in illicit financial activities or financial crimes;

e.    A Ritchie Party is undertaking fraudulent efforts to avoid paying judgments;

f.    A Ritchie Party cast a shadow on and over the financial integrity of Investment Fund and/or one or more of those parties;

g.    The Ritchie Parties are doing everything they can to hinder collection of the judgment;

h.    A Ritchie Party renounced U.S. citizenship and purchased citizenship in St. Kitts & Nevis through a program the U.S. Department of Treasury Financial Crimes Enforcement Network warns is used to engage in illicit financial activities;

i.    The Ritchie Parties are moving assets, entities, and offices offshore, and fraudulently conveying assets to others to avoid creditors;

      j.      The Ritchie Parties have been filing frivolous pleadings to delay or halt judgment collection efforts; and

      k.      A Ritchie Party controls and directs all payments and transfers made from the multitude of entities he has created in order to hide assets and avoid paying liabilities.

39.      The foregoing statements by Huizenga, and all of the many others like them, are not only disparaging, but are not true. For example, there is no evidence that the Ritchie Party referenced in paragraph 38(a) ever committed fraud or that the Ritchie Party in paragraph 38(c) used their citizenship "for the purpose of engaging in illicit financial activities or financial crimes".

40.      As a proximate result of Huizenga Fund's disparaging remarks, including by and through its agent, Huizenga Capital, the Investment Fund and other parties protected by the non-disparagement provisions of the Subscription Agreements and the Operating Agreement, has in the past, is in the present, and will in the future suffer immediate and irreparable harm to its respective business reputation, financial stability, investment acumen, and creditworthiness.

41.      In addition to Huizenga's wrongful use of disparagement as a debt collection device, Huizenga has also intentionally disclosed confidential information on Ritchie Parties in its efforts to collect on the judgment. For example, but by no means the only example, Huizenga has:

      a.      Disclosed confidential information on the investments of Ritchie Parties; and

      b.      Disclosed confidential auditor reports to third parties and filed same in the public record.

42.      Huizenga breached Paragraphs 4 and 18 of the Subscription Agreement by disclosing confidential information.

43.      Huizenga disclosed this confidential information without first obtaining written permission from the Fund's Managing Member in breach of Paragraph 9.21(a) and (b) of the Operating Agreement.

**A-377**

44.     To the extent that Huizenga claims that any of the confidential information it disclosed was publicly available, Huizenga breached Paragraph 9.21(b) of the Operating Agreement because it failed to provide written notice to the Managing Member of the Fund of its intent to publish the confidential information.

45.     Huizenga breached Paragraph 9.22 of the Operating Agreement because it permitted its attorneys to disclose confidential information that Huizenga itself was prohibited from disclosing under Paragraphs 9.21(a) and (b) of the Operating Agreement.

46.     Huizenga breached Paragraph 9.21(b) of the Operating Agreement by providing confidential information to its attorneys for the purpose of having them use the confidential information for personal gain in earning their attorneys' fees or contingency fees to collect the judgement.

47.     John Does have no adequate remedy at law.

48.     Huizenga Fund agreed that irreparable injury would result from the disclosure of any confidential information, and that monetary damages would not be sufficient as compensation for violations of Section 8.21 of the Operating Agreement. (Ex. 3, Section 8.21(f)). Huizenga Fund therefore agreed to the entry of equitable and injunctive relief, on an emergency, temporary, preliminary and/or permanent basis to prevent any breach or continuance of the breach for violation of its confidentiality obligations. (*Id.*).

49.     Huizenga Fund is prohibited by the terms of the Operating Agreement from doing by indirect means, such as through the use of agents such as attorneys that which it has agreed not to do directly. (Ex. 3, Paragraph 9.19). This means that Huizenga Fund is prohibited from using any affiliated entity or other agent, such as its attorneys, in the performance of any act that

A-378

Huizenga Fund is prohibited from itself doing under the Subscription Agreement and the Operating Agreement.

50.    The Affidavit of Michael Cilento was submitted as Exhibit 4 to the Original Complaint and is incorporated herein by reference as Exhibit 4 to this Amended Complaint.

WHEREFORE, John Doe Corporation 1 and John Doe Corporation 2 pray this Court as to Count I of their Amended Complaint as follows:

A.    Enter a preliminary injunction against Huizenga Fund, Huizenga Capital, and their respective directors, officers, employees, agents, heirs, executors, administrators, trustees, representatives, servants, successors, assigns, subsidiaries, sister corporations, parent corporations, and all other persons, firms, entities, trusts, and corporations, by whatever description, acting or claiming, directly, indirectly, incidentally, consequentially, and/or derivatively, by, though, on behalf of, or in concert with, in whole or part, any of the foregoing, from making or publishing, either orally or in writing, any statement, remark, photograph, recording, any and all other means of communication, by whatever description, regarding, relating to, arising out of, either directly, indirectly, incidentally, consequentially, and/or derivatively, any information and/or documents that are disparaging according to the terms, covenants and provisions of the Subscription Agreement and the Operating Agreement of the Investment Fund.

B.    Enter a preliminary injunction against Huizenga Fund, Huizenga Capital, and their respective directors, officers, employees, agents, attorneys, heirs, executors, administrators, trustees, representatives, servants, successors, assigns, subsidiaries, sister corporations, parent corporations, and all other persons, firms, entities, trusts, and corporations, by whatever description, acting or claiming, directly, indirectly, incidentally, consequentially, and/or derivatively, by, though, on behalf of, or in concert with, in whole or part, any of the foregoing,

from filing or making in any civil court proceeding any pleading, exhibit, document, testimony or oral argument that contains any confidential information according to the terms, covenants and provisions of the Subscription Agreement and the Operating Agreement of the Investment Fund.

C.      Pursuant to the provisions of Paragraph 12 of the Subscription Agreement, an order awarding John Doe Corporation 1 and John Doe Corporation 2's attorney's fees and costs of investigating, preparing and bringing/defending this matter; and,

D.      Enter an order for all such further relief as deemed just and equitable by this Court.

## COUNT II–PERMANENT INJUNCTION

1-50.    Plaintiffs herein incorporate by reference paragraphs 1 through 50 of Count I of their Amended Complaint as their paragraphs 1 through 50 of their Count II of the Amended Complaint as if fully set out herein.

WHEREFORE, John Doe Corporation 1 and John Doe Corporation 2, pray this Court as to Count II of their Amended Complaint as follows:

A.      Enter a permanent injunction against Huizenga Fund, Huizenga Capital, and their respective directors, officers, employees, agents, heirs, executors, administrators, trustees, representatives, servants, successors, assigns, subsidiaries, sister corporations, parent corporations, and all other persons, firms, entities, trusts, and corporations, by whatever description, acting or claiming, directly, indirectly, incidentally, consequentially, and/or derivatively, by, though, on behalf of, or in concert with, in whole or part, any of the foregoing, from making or publishing, either orally or in writing, any statement, remark, photograph, recording, any and all other means of communication, by whatever description, regarding, relating to, arising out of, either directly, indirectly, incidentally, consequentially, and/or derivatively, any information and/or documents

**A-380**

that are disparaging according to the terms, covenants and provisions of the Subscription Agreement and the Operating Agreement of the Investment Fund.

B.      Enter a permanent injunction against Huizenga Fund, Huizenga Capital, and their respective directors, officers, employees, agents, attorneys, heirs, executors, administrators, trustees, representatives, servants, successors, assigns, subsidiaries, sister corporations, parent corporations, and all other persons, firms, entities, trusts, and corporations, by whatever description, acting or claiming, directly, indirectly, incidentally, consequentially, and/or derivatively, by, though, on behalf of, or in concert with, in whole or part, any of the foregoing, from filing or making in any civil court proceeding any pleading, exhibit, document, testimony or oral argument that contains any confidential information according to the terms, covenants and provisions of the Subscription Agreement and the Operating Agreement of the Investment Fund.

C.      Pursuant to the provisions of Paragraph 12 of the Subscription Agreement, an order awarding John Doe Corporation 1 and John Doe Corporation 2's attorney's fees and costs of investigating, preparing and bringing/defending this matter; and,

D.      Enter an order for all such further relief as deemed just and equitable by this Court.

A-381

Dated:  May 3, 2018

Respectfully submitted,

**JOHN DOE CORP. 1 and JOHN DOE
CORP. 2**

By: ___/s/ John E. Sabo_____
One of Their Attorneys

| | |
|---|---|
| Jeffrey E. Crane<br>The Law Office of Jeffrey E. Crane, LLC<br>1363 Shermer Rd., Suite 222<br>Northbrook, IL  60062<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>105 W. Madison St., Suite 1500<br>Chicago, IL  60602<br>jeff@jeffcranelaw.com<br>Telephone:     (847) 239-7239<br>Facsimile:      (847) 239-7203<br>ARDC No. 6210226<br>***Attorney for Plaintiffs*** | John E. Sabo<br>B. Jay Dowling<br>CLAYBORNE, SABO & WAGNER LLP<br>525 West Main Street, Suite 105<br>Belleville, IL 62220<br>jsabo@cswlawllp.com<br>jdowling@cswlawllp.com<br>jclayborne@cswlawllp.com<br>***Attorneys for Plaintiffs*** |

14

**A-382**

# Exhibit 26



EFiled:  May 03 2018 05:56PM EDT
Transaction ID 61989371
Case No. N18C-05-050 MMJ
SUMMONS REGISTERED AGE

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|                                             |     |                         |
| ------------------------------------------- | --- | ----------------------- |
| RITCHIE MULTI-STRATEGY                      | )   |                         |
| GLOBAL, LLC, f/k/a RAM CAPITAL,             | )   |                         |
| LLC,                                        | )   |                         |
|                                             | )   |                         |
| Plaintiff,                                  | )   |                         |
|                                             | )   |                         |
| v.                                          | )   | C.A. No. _____-CCLD |
|                                             | )   |                         |
| HUIZENGA MANAGERS FUND, LLC,                | )   |                         |
|                                             | )   |                         |
| Defendant.                                  | )   |                         |

### SUMMONS

**THE STATE OF DELAWARE**
**TO THE SHERIFF OF NEW CASTLE COUNTY:**

**YOU ARE COMMANDED:**

1.      To summon the below-named Defendant so that, within twenty (20)

days after service hereof upon Defendant, exclusive of the day of service, Defendant

shall serve upon John A. Sensing, Plaintiff's attorney, whose address is c/o Potter

Anderson & Corroon LLP, Hercules Plaza, Sixth Floor, 1313 North Market Street,

Wilmington, DE 19801, an answer to the Complaint (and, if an Affidavit of Demand

has been filed, an Affidavit of Defense).

2.      To serve upon Defendant a copy hereof and of the Complaint (and of

the Affidavit of Demand if any has been filed by Plaintiff).

Dated: May 1, 2018

SUSAN A. HEARN,
Prothonotary

Cynthia Coleman

Per Deputy

HUIZENGA MANAGERS FUND, LLC

**TO THE ABOVE-NAMED DEFENDANT:**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the Complaint (and, if an Affidavit of Demand has been filed, an Affidavit of Defense), judgment by default will be rendered against you for the relief demanded in the Complaint (or in the Affidavit of Demand, if any).

SUSAN A. HEARN,
Prothonotary

Cynthia Coleman

Per Deputy

2

A-384

## SUPERIOR COURT
## CIVIL CASE INFORMATION STATEMENT (CIS)

EFiled: May 03 2018 05:56PM EDT
Transaction ID 61989371
Case No. N18C-05-050 MMJ

COUNTY:    N ☑    K ☐    S ☐    CIVIL ACTION NUMBER: _____

| Caption: | Civil Case Code: CCLD |
|---|---|
| RITCHIE MULTI-STRATEGY GLOBAL, LLC, | Civil Case Type: Complex Commercial Litigation Division |
| f/k/a RAM CAPITAL, LLC, | (SEE REVERSE SIDE FOR CODE AND TYPE) |
| Plaintiff, | Name and Status of Party filing document: Plaintiff, RITCHIE MULTI-STRATEGY GLOBAL, LLC, f/k/a RAM CAPITAL, LLC |
| v. | Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM) |
| HUIZENGA MANAGERS FUND, LLC, | COMPLAINT |
| Defendant. | JURY DEMAND:   YES ☐   No ☑ |

| ATTORNEY NAME(S): John A. Sensing, Esq. Ryan C. Cicoski, Esq. Dominique A. Meyer, Esq. | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS: N/A |
|---|---|
| ATTORNEY ID(S): Del. Bar No. 5232 Del. Bar No. 5466 Del. Bar No. 6440 | |
| FIRM NAME: | |
| | EXPLAIN THE RELATIONSHIP(S): N/A |
| ADDRESS: Hercules Plaza, 6th Floor, 1313 North Market Street | |
| P.O. Box 951 Wilmington, DE  19899-0951 | |
| TELEPHONE NUMBER: | |
| | OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT: N/A |
| FAX NUMBER: | |
| E-MAIL ADDRESS: jsensing@potteranderson.com rcicoski@potteranderson.com dmeyer@potteranderson.com | |
| | (IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 5/2009

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS) INSTRUCTIONS

## CIVIL CASE TYPE

Please select the appropriate civil case code and case type (e.g., **CODE - AADM** and **TYPE - Administrative Agency**) from the list below.  Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ACER -  Certiorari
ACCP -  Court of Common Pleas
AIAB -   Industrial Accident Board
APSC -  Public Service Commission
AUIB -  Unemployment Insurance Appeal Board

**COMPLAINTS**
CASB – Asbestos
CAAA - Auto Arb Appeal
CMIS - Civil Miscellaneous
CACT - Class Action
CCON - Condemnation
CCLD - Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt/Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM - Ejectment
CATT - Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT -  Interpleader
CLEM - Lemon Law
CLIB -  Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPIN -  Personal Injury
CPIA -  Personal Injury Auto
CPRL - Products Liability
CPRD - Property Damage
CRPV - Replevin
CSPD - Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery

**MASS TORT**
CBEN - Benzene Cases
CPEL -  Pelvic Mesh Cases
CPRA - Pradaxa Cases
CSER - Seroquel Cases

**INVOLUNTARY COMMITMENTS**
INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF -  Application for Forfeiture
MAAT -  Appointment of Attorney
MGAR -  Appointment of Guardianship
MCED -  Cease and Desist Order
MCDR -  Child Death Review
MCON -  Civil Contempt/Capias
MCVP -  Civil Penalty
MSOJ -  Compel Satisfaction of Judgment
MSAM -  Compel Satisfaction of Mortgage
MCTO - Consent Order
MIND -  Destruction of Indicia of Arrest *
MESP -  Excess Sheriff Proceeds
MHAC -  Habeas Corpus
MTOX -  Hazardous Substance Cleanup
MFOR -  Intercept of Forfeited Money
MISS -  Issuance of Subpoena
MLEX -  Lien Extension
MMAN -  Mandamus
MWIT -  Material Witness *
MWOT -  Material Witness - Out of State
MRAT -  Motion for Risk Assessment
MROP -  Petition for Return of Property
MCRO -  Petition Requesting Order
MROD -  Road Resolution
MSEL -  Sell Real Estate for Property Tax
MSEM -  Set Aside Satisfaction of Mortgage
MSSS -  Set Aside Sheriff's Sale
MSET -  Structured Settlement
MTAX -  Tax Ditches
MREF -  Tax Intercept
MLAG -  Tax Lagoons
MVAC -  Vacate Public Road
MPOS -  Writ of Possession
MPRO -  Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

## * Not eFiled

## DUTY OF THE PLAINTIFF

Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the complaint.

## DUTY OF THE DEFENDANT

Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the answer and/or first responsive pleading.

Revised 5/2013

EFiled:  May 03 2018 05:56PM EDT
Transaction ID 61989371
Case No. N18C-05-050 MMJ CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RITCHIE MULTI-STRATEGY GLOBAL, LLC, f/k/a RAM CAPITAL, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____-CCLD |
| HUIZENGA MANAGERS FUND, LLC, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff Ritchie Multi-Strategy Global, LLC, formerly known as RAM Capital, LLC, for its Complaint against Defendant Huizenga Managers Fund, LLC, states as follows:

### The Parties

1.      Ritchie Multi-Strategy Global, LLC (the "MSG Fund of Funds") is a Delaware limited liability company with its principal place of business in the Cayman Islands.

2.      Huizenga Managers Fund LLC (the "Huizenga Fund") is a Delaware limited liability company.  On information and belief, its principal place of business is in the City of Oak Brook, County of DuPage, State of Illinois.

A-387

## Factual Background

3.      Ritchie Multi-Strategy Global LLC is a fund of funds that was originally known as RAM Capital LLC ("RAM").

4.      RAM became the MSG Fund of Funds in 2005. RAM and MSG Fund of Funds are collectively referred to in this Complaint as the MSG Fund of Funds unless the context dictates otherwise.

5.      The MSG Fund of Funds caters to the needs of high-net-worth families, qualified purchasers, and institutions that desire to deploy their capital in currencies, commodities, and hard and soft assets. These sophisticated investors typically desire to achieve an acceptable risk-adjusted rate of return on investment through the global deployment of their wealth, using a variety of investment strategies in conjunction with tax-efficient vehicles to diversify their investments.

## The MSG Fund of Funds' Investment Structure

6.      The MSG Fund of Funds accepts and pools investments of certain qualified purchasers and invests the majority of that capital into an offshore pooled investment vehicle (the "MSG Master Fund"). The MSG Master Fund then invests that capital in a variety of other pooled investment vehicles that are committed to a particular class of investments or an investment strategy ("Strategy Funds") that are located in the United States and in numerous jurisdictions worldwide.

2

7.     This masters/feeder fund structure, organization and arrangement has become standard in the alternative investment industry since the late 1990's due to the unique competitive environment among investment managers and the demands of qualified purchasers around the globe for investment products that consistently achieve the desired risk-adjusted rate of return while at the same time minimizing tax liabilities and efficiently managing associated risk profiles.

8.     As a limited liability company, the MSG Fund of Funds is governed by an LLC operating agreement (the "Operating Agreement") that grants members and the MSG Fund of Funds certain rights and imposes certain obligations on members. Those rights and obligations are the subject of this litigation.

9.     The MSG Fund of Funds is itself a member of various other companies that it has invested in.   Accordingly, it possesses contractual rights under the operating agreements or articles of association of those companies, including without limitation the MSG Master Fund, various Strategy Funds, and one particular Strategy Fund named Ritchie Risk-Linked Strategies, LLC ("RRLS, LLC").

10.    As illustrated above, the contractual rights and obligations of members of the MSG Fund of Funds intentionally are interrelated with the contractual rights and obligations of the members of the MSG Master Fund and the Strategy Funds in a master/feeder fund structure. This structure is managed and maintained by Ritchie

3

Capital Management, Ltd., a Cayman Islands company with its principal place of business in the Cayman Islands ("RCM, Ltd.")

11.    This interrelated contractual relationship extends the MSG Fund of Funds' contractual rights and the obligations of its members to the contractual relations by and among the members, investment managers and other parties in interest, including the "RCM Parties" as defined in the organizational documents and material contracts of each of the MSG Master Fund, the Strategy Funds, and other pooled investment vehicles managed by RCM, Ltd. for the benefit of investors.

12.    These interrelated contracts include, but are not limited to, subscription agreements, operating agreements and investment management agreements of the MSG Master Fund and the Strategy Funds (the "Material Contracts").

### The Huizenga Fund Invests in the MSG Fund of Funds

13.    The Huizenga Fund is a private investment fund that was organized as a limited liability company under Delaware law in June 2002.

14.    The Huizenga Fund is managed by Huizenga Capital Management, LLC ("HCM"). HCM typically invests the capital of the Huizenga Fund in other private investment funds, such as the MSG Fund of Funds, instead of pursuing its own direct investment and/or trading strategy.

15.    On or about September 30, 2002, the Huizenga Fund purchased limited liability company interests in the MSG Fund of Funds (then named RAM Capital)

4

pursuant to the terms of a Subscription Agreement dated September 30, 2002 (the "RMSG, LLC Subscription Agreement").

16.    In the RMSG, LLC Subscription Agreement, the Huizenga Fund represented that it was a "qualified purchaser" as that term is defined in the RMSG, LLC Subscription Agreement.

17.    Thereafter, the Huizenga Fund became a party to and bound by the terms of the MSG Fund of Funds Operating Agreement, including the terms relating to the RCM Parties and other pooled investment vehicles within the RCM, Ltd.-managed master/feeder fund structure.

18.    In March 2004, the MSG Fund of Funds promulgated and delivered a Supplemental Confidential Information Memorandum (the "RMSG, LLC Supp. CIM") to the Huizenga Fund.  The RMSG, LLC Supp. CIM described in detail RCM, Ltd.'s plans for expanding its financial base in the Cayman Islands.

19.    In July or August 2005, the Huizenga Fund and a majority of members of the MSG Fund of Funds, after notice and an opportunity to be heard, voted to accept certain changes to the MSG Fund of Funds Operating Agreement, including without limitation material changes to its confidentiality provisions.  Effective September 2, 2005 the Fourth Amended and Restated Operating Agreement of the MSG Fund of Funds was executed, delivered and became binding on all members (the "RMSG, LLC Amended Operating Agreement").

5

20.    Before investing in the MSG Fund of Funds, the Huizenga Fund, through its investment manager, HCM, was offered the opportunity to request certain documents and information that would enable it to conduct its due diligence and evaluate the suitability of the MSG Fund of Funds and the RCM, Ltd.-managed master/feeder fund structure's many innovative and unique investment strategies.

21.    Before executing the RMSG, LLC Subscription Agreement, HCM and Peter Huizenga, HCM's controlling member, read and understood the RMSG Supp. CIM, which clearly disclosed the material facts relating to the onshore and offshore "feeder fund" and "master fund" structure that was the essence of the MSG Fund of Funds' investment procedures.

### The Huizenga Fund's Contractual Obligations

22.    The investment opportunity that was made available to the Huizenga Fund was expressly conditioned on the Huizenga Fund making the representations and warranties contained in the Subscription Agreement. As an inducement to allow Huizenga to purchase interests in the MSG Fund of Funds, the Huizenga Fund executed the RMSG, LLC Subscription Agreement and made the numerous representations and warranties to the MSG Fund of Funds set forth therein.

23.    In signing the RMSG, LLC Subscription Agreement, the Huizenga Fund agreed to indemnify and hold harmless the MSG Fund of Funds, its Managing Member, and their members, officers, directors and employees from and against any

and all losses, damages, expenses, liabilities or reasonable attorneys' fees arising from the Huizenga Fund's breach of the representations and warranties and other terms of the Subscription Agreement and/or the Operating Agreement.

24.    The Huizenga Fund also expressly agreed in the RMSG, LLC Subscription Agreement that it was "to be bound by all of the terms and conditions of [the Operating Agreement].... Moreover, the undersigned agrees to be bound by the terms and conditions of all modifications or amendments to the [Operating Agreement] in accordance with the terms thereof."

25.    In reliance on the representations and warranties made by the Huizenga Fund, including but not limited to its representation and warranty that the Huizenga Fund was a "qualified purchaser" as defined in the RMSG, LLC Subscription Agreement, the MSG Fund of Funds accepted the Huizenga Fund's investment on or about September 30, 2002.  On that date, Huizenga Fund invested $1,500,000 in exchange for an equity interest in the MSG Fund of Funds that it still holds today.

26.    Upon the Huizenga Fund becoming a member in the MSG Fund of Funds, it became bound by not only the MSG Fund of Funds' Material Contracts but also by all of the applicable Material Contracts of the Strategy Funds that the MSG Fund of Funds invested in.

27.    The Huizenga Fund has admitted the interrelationship of the MSG Fund of Funds Operating Agreement with the Material Contracts of the other three RCM,

Ltd.-managed Strategy Funds it invested in between 2001 and 2005, including those

Material Contracts of Ritchie Energy, LLC and RRLS, LLC.

28.    Due to the interconnected relationships of the MSG Fund of Funds and

the Strategy Funds they invested in, those Strategy Funds' respective Material

Contracts have substantively identical terms and conditions as those that are at issue

in this case. (Unless stated otherwise, the terms referenced herein shall jointly refer

to the Material Contracts of the MSG Fund of Funds and the terms of the Material

Contracts of the Strategy Funds that the MSG Fund of Funds invested in).

29.    The Definitions section of the Material Contracts' Operating

Agreements contains the following definitions:

> **"RCM Party"** is defined as (a) RCM, (b) any Affiliate of RCM, and
> (c) any owner, principal, director, officer or employee of the foregoing.
>
> **"RCM"** is broadly defined as the Managing Member, the Investment
> Manager, the Sub-Adviser, and any of their respective Affiliates, which
> will, collectively, manage the trading and investing of the Company and
> the Master Fund, and any of their successors or assigns.
>
> **"Affiliate"** of a Person means a Person controlling, controlled or under
> common control with, that Person, either directly or indirectly through
> one or more intermediaries. (For purposes of this definition, the direct
> or indirect ownership of more than 50% of the voting or equity interests
> of a Person shall be conclusively presumed to constitute control.) The
> RCM Funds shall not be considered to constitute Affiliates of RCM.
>
> **"Person"** means any individual, partnership, Limited Liability
> Company, joint venture, corporation, trust, unincorporated
> organization, government (or any agency or political subdivision
> thereof) or other entity, whether or not having legal personality.

8

30.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable except by reason of acts or omissions of an RCM Party finally determined to constitute fraud, bad faith, gross negligence or reckless or intentional misconduct.

31.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable for the performance by an RCM Party of, or the omission by an RCM Party to perform, any act which such RCM Party reasonably believed to be consistent with the advice of attorneys, accountants or other professional advisers or to such RCM Party with respect to matters relating to the MSG Fund of Funds.

32.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable for conduct finally determined to have constituted a violation of law, provided that such RCM Party reasonably believed such conduct to be in the interest of the Fund at the time of such conduct.

33.    Under the terms of the Material Contracts, the Huizenga Fund agreed that the business and assets of the MSG Fund of Funds and the RCM Parties are confidential and involve a wide range of proprietary information, including trade secrets and financial or commercial information, and that disclosure of any such information would cause competitive harm to the MSG Fund of Funds and/or the RCM Parties.

9

**A-395**

34.    Under the terms of the Material Contracts, the Huizenga Fund agreed that all information with respect to such business and assets would be presumed confidential and proprietary unless the Managing Member otherwise indicated in writing.

35.    Under the terms of the Material Contracts, the Huizenga Fund agreed that, except with the prior written consent of the Managing Member, it had and would at all times keep confidential and not, directly or indirectly, disclose, divulge, proprietary information to which the Huizenga Fund became privy relating to the business or assets of the MSG Fund of Funds or of any of the RCM Parties.

36.    Under the terms of the Material Contracts, the Huizenga Fund agreed that if it contended that confidential information had otherwise become public or is required by law, the Huizenga Fund was required to inform the Managing Member prior to disclosing or using it and would give the Managing Member, to the greatest extent reasonably practicable, an opportunity to contest whether such information had in fact otherwise been made public.

37.    Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential information would not become public for the purpose of the Material Contracts if the Huizenga Fund was the party that published or disseminated that information.

10

38.    Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential and proprietary information included the identities of the personnel of the MSG Fund of Funds and the RCM Parties.

39.    Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential and proprietary information included the performance record of the MSG Fund of Funds and the Strategy Funds, and any other financial results or data of the MSG Fund of Funds or the Strategy Funds.

40.    Under the terms of the Material Contracts, the Huizenga Fund agreed that while it could share such confidential information with its investment advisers, beneficial owners, accountants, attorneys, and spouses ("Permitted Confidants") it would not share such information with a Permitted Confidant if it would be used in any manner or respect for personal gain.

41.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would accept full liability for any unauthorized use or disclosure of confidential information by its Permitted Confidants, including its attorneys.

42.    The Huizenga Fund agreed to indemnify and hold harmless the MSG Fund of Funds from and against any and all losses, damages, expenses, liabilities or reasonable attorneys' fees (including attorneys' fees and expenses incurred in a securities or other action in which a judgment in favor of the undersigned is rendered) due to or arising out of a breach of any representation or warranty in its

11

Subscription Agreement to the MSG Fund to Funds and the MSG Fund of Funds Operating Agreement.

43.    Despite those promises, including its commitments to indemnify and hold the RCM Parties harmless, the Huizenga Fund sued a number of Ritchie entities and affiliates (the "Ritchie Party Defendants") and eventually obtained a judgment against some of them (the "Huizenga Litigation").

## COUNT I
### (Breach of Contract – Violation of Non-Liability Provisions)

44.    Plaintiff realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

45.    The Subscription Agreement and Operating Agreement of the MSG Fund of Funds are valid and enforceable contracts as are the Material Contracts of the Strategy Funds that the MSG Fund of Funds invested in.    Plaintiff has substantially and fully performed pursuant to all of these Material Contracts.

46.    The Huizenga Fund breached the Material Contracts by committing the following acts:

    a. holding one or more RCM Parties liable for conduct that did not constitute fraud, bad faith, gross negligence, or reckless or intentional misconduct;

    b. holding one or more RCM Parties liable for their performance when RCM Parties reasonably believed their conduct to be consistent with the advice of attorneys, accountants or other professional advisers to the Fund or to such RCM Party with respect to matters relating to the MSG Fund of Funds or the Strategy Funds it invested in; and

12

c. holding one or more RCM Parties liable for conduct finally
determined to have constituted a violation of law, when such RCM
Parties reasonably believed such conduct to be in the interest of the
Fund at the time of such conduct.

47.    As a result of the Huizenga Fund's breaches of the Operating

Agreement, Plaintiff has been damaged in that it has paid the Huizenga Fund at least

$13,383,511.40 in judgments wrongly obtained by the Huizenga Fund against RCM

Parties that the Huizenga Fund was contractually obligated not to hold liable.

Plaintiff has also been damaged in that it paid at least $5,225,000.00 in attorneys'

fees and other litigation costs defending RCM Parties against claims that the

Huizenga Fund was contractually prohibited from bringing.

48.    The amount in controversy as a result of the Huizenga Fund's breaches

of the Operating Agreement exceeds $1 million.

## COUNT II
### (Breach of Contract – Violation of Confidentiality Terms)

49.    On or about April 16, 2018, the Huizenga Fund served a citation to

discover assets (the "Citation") on a third-party securities broker, Interactive

Brokers, LLC, arising out of the Huizenga Litigation.

50.    The Huizenga Fund used confidential information to identify

Interactive Brokers, LLC as a target for the Citation in violation of the Material

Contract provisions against using confidential information for personal gain.

13

51.    The Huizenga Fund's use of the confidential information to identify Interactive Brokers, LLC as a target for the Citation also violated the Material Contract provisions against using confidential information without obtaining the written permission of the Managing Member.

52.    The Huizenga Fund misled Interactive Brokers, LLC into freezing the trading account of a Connecticut non-judgment debtor in an effort to obtain the leverage it needed to force the Ritchie Party Defendants to pay the judgment.

53.    The freezing of the brokerage account disrupted trade transactions worth millions of dollars and prevented the use of millions of dollars held on account with Interactive Brokers, LLC.

54.    The Huizenga Fund is contractually obligated to indemnify Plaintiff for the losses incurred as the proximate cause of its decision to use confidential information in violation of the Material Contracts.

55.    On or about March 28, 2018, the Huizenga Fund served an information subpoena upon Millennium Technology Value Partners (RCM) L.P. ("Millennium").

56.    The Huizenga Fund used confidential information to identify Millennium as a target for the information subpoena in violation of the Material Contract provisions against using confidential information for personal gain.

14

57.     The Huizenga Fund's use of the confidential information to identify Millennium as a target for the information subpoena also violated the Material Contract provisions against using confidential information without obtaining the written permission of the Managing Member.  Millennium was not a party to the Huizenga Litigation and is not a Ritchie Party Defendant.

58.     The information subpoena requested information on other non-parties to the Huizenga Fund Litigation and their assets.  The Huizenga Fund threatened Millennium with paying the entire amount of the judgment in the Huizenga Fund Litigation when Millennium responded to the subpoena saying it did not possess any assets of any of the Ritchie Party Defendants.

59.     The amount in controversy as a result of Huizenga Fund's breaches of the Operating Agreement exceeds $1 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against the Huizenga Fund as follows:

A.     An order that the Huizenga Fund is obligated to compensate Plaintiff for all losses, liabilities, costs, and expenses that Plaintiff has incurred and will incur as a result of the Huizenga Fund's contractual breaches;

A-401

B.      An order that Plaintiff receive its costs and disbursements in this action, including reasonable attorneys' fees, accountants' and experts' fees, pre- and post-judgment interest, costs, and expenses; and

C.      Any such other relief as this Court may deem just and proper.

POTTER ANDERSON & CORROON LLP

By: */s/ John A. Sensing*
     John A. Sensing (No. 5232)
     Ryan C. Cicoski (No. 5466)
     Dominique A. Meyer (No. 6440)
     Hercules Plaza, Sixth Floor
     1313 North Market Street
     P.O. Box 1150
     Wilmington, DE 19801
     (302) 984-6000 – Telephone
     (302) 658-1192 – Facsimile
     jsensing@potteranderson.com
     rcicoski@potteranderson.com
     dmeyer@potteranderson.com

Dated:  May 3, 2018                *Attorneys for Plaintiff Ritchie Multi-Strategy*
5769489 / 43942-005                *Global, LLC, f/k/a RAM Capital, LLC*

16

**A-402**

# Exhibit 27

*Chris Kachiroubas*
e-Filed in the 18th Judicial Circuit Court
********  DuPage County  ********
TRAN# : 17043973456/( 4272419 )
2018L000507
FILEDATE : 05/04/2018
*Date Submitted : 05/04/2018 06:56 PM*
*Date Accepted : 05/07/2018 08:30 AM*
SABATINO,PEGGY
08-01-2018 RM 2020 9:00 AM

## IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL DUPAGE COUNTY, ILLINOIS

RITCHIE RISK LINKED STRATEGIES, LLC,

    Plaintiff,

v.

WILLIAMS MONTGOMERY & JOHN LTD., CHRISTOPHER BARBER, GARY GARNER, JONATHAN D. MILLER, SCOTT M. CHURCH, PETER HUIZENGA, JR. and HUIZENGA CAPITAL MANAGEMENT, LLC,

    Defendants.

Cause No.: ▮▮▮ **2018L000507**

## COMPLAINT

## COUNT I

NOW COMES the Plaintiff, RITCHIE RISK LINKED STRATEGIES, LLC (RRLS) by and through its attorneys, Clayborne, Sabo & Wagner LLP, and for Count I of its Complaint directed against Defendants, WILLIAMS, MONTGOMERY & JOHN LTD., CHRISTOPHER BARBER, GARY GARNER, JONATHAN D. MILLER, and SCOTT M. CHURCH, states:

1.    RRLS is a Delaware limited liability company with its principal place of business in New Castle County, Delaware.

2.    Williams Montgomery & John Ltd. ("WMJ") is an Illinois corporation that does business as a law firm in the State of Illinois and within DuPage County, Illinois.

3.    Christopher Barber ("Barber") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

4.    Gary Garner ("Garner") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

1

**A-403**

5.      Jonathan D. Miller ("Miller") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

6.      Scott M. Church ("Church") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

7.      Collectively, Barber, Garner, Miller, and Church constitute the "WMJ Attorneys."

8.      Peter Huizenga (Huizenga) is the Investment Manager for Huizenga Managers Fund, L.L.C. ("Huizenga Fund") and resides in DuPage County, Illinois.

9.      Huizenga Capital Management, LLC ("Huizenga Capital") is a limited liability company organized under the laws of the State of Colorado with its principal place of business in DuPage County, Illinois.

10.     Huizenga Capital is the Managing Member and/or Investment Manager of Huizenga Fund, a limited liability company organized under the laws of the State of Delaware with its principal place of business in DuPage County, Illinois.

11.     Ritchie Capital Management, LLC f/k/a Ritchie Capital Markets ("RCM"), is a Delaware limited liability company with its principal place of business in the Cayman Islands.

12.     Ritchie Partners, LLC ("Ritchie Partners") is a Delaware limited liability company with its principal place of business in the Cayman Islands.

13.     The relevant time period is on and after January 29, 2015.

14.     Prior to the relevant time period, Huizenga Capital, on behalf of Huizenga Fund, contacted RCM and Ritchie Partners and requested that Huizenga Fund be permitted to invest with RCM and subsequently RRLS.

2

Document received on 5/4/18 6:56 PM  Document accepted on 05/07/2018 08:31:23 # 4272419/17043973456

15.    Ritchie Partners is the managing member of RRLS.

16.    Prior to the relevant time period, in order to induce RCM and/or Ritchie Partners to permit Huizenga Fund to invest with RCM and RRLS, Huizenga Fund expressly made several representations and warranties, including but not limited to the fact that Huizenga Fund (a) was a knowledgeable investor in the options market; (b) knew that the investment strategy in which it was requesting to invest was not only speculative but involved substantial risk; (c) that it would and did rely upon its own investigation, of the proposed investment and investment strategy, including an assessment of the risk involved; (d) was an "accredited investor" under Regulation D of the Securities and Exchange Commission; (e) was a "qualified purchaser" under Section 2(a)(51)(A) of the Company Act; and (f) that it expressly agreed to not only be contractually bound by the representations, warranties and obligations set forth in the Private Placement Memorandum, Subscription Agreement, and Operating Agreement signed or adopted by it but also to be contractually bound by the interlocking representations, warranties and obligations set forth in RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, the RCM Private Placement Memorandum, RCM Subscription Agreement, RCM Operating Agreement, Ritchie Multi-Strategies Global LLC ("RMSG") Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, Ltd. ("Ritchie Energy") Private Placement Memorandum, Ritchie Energy Subscription Agreement and Ritchie Energy Operating Agreement.    (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

17.    Prior to the relevant time period, based upon the representations, warranties and other contractual obligations that Huizenga Fund expressly and unequivocally provided, RRLS permitted Huizenga Fund to invest.

3

**A-405**

18.    At all times relevant herein, there existed valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund, including but not limited to the RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, RCM Operating Agreement, RMSG Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, Ltd. Private Placement Memorandum, Ritchie Energy Subscription Agreement and Ritchie Energy Operating Agreement. (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

19.    At all times relevant herein, WMJ, Barber, Garner, Miller and Church had actual or constructive knowledge of the existence of the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund.

20.    At all times relevant herein, WMJ, Barber, Garner, Miller and Church intentionally and unjustifiably induced the Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, in one or more of the following respects, including but not limited to:

a.    making outrageous, false, inflammatory and disparaging statements about RRLS, RCM and/or RCM parties;

b.    releasing confidential information;

c.    releasing allegedly quasi-public/confidential information without obtaining prior approval;

d.    using confidential information for personal gain;

e.    filing suit against RCM parties on issues other than fraud, gross negligence or willful disregard of a duty;

f.    attempting to collect and/or collecting a judgment against RCM parties that is not based on fraud, gross negligence or willful disregard of a duty;

4

**A-406**

g.    seeking a money judgment in lieu of rescission on issues other than fraud, gross negligence or willful disregard of a duty;

h.    improperly freezing the assets of independent third parties who are non-judgment debtors;

i.    making misrepresentations to the Delaware Court; and

j.    contacting other investors to persuade them to file suit against RCM parties.

21.    As a proximate result of the intentional and unjustified actions of inducement by WMJ, Barber, Garner, Miller and Church, Huizenga Fund has breached and is continuing to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund.

22.    At all times relevant herein, the actions of WMJ, Barber, Garner, Miller and Church were performed with actual malice and a desire to harm RRLS and independent of their desire to protect Huizenga Fund as exemplified in one or more of the following respects:

a.    making outrageous, false, inflammatory and disparaging statements about RRLS, RCM and/or RCM parties;

b.    releasing confidential information;

c.    releasing allegedly quasi-public/confidential information without obtaining prior approval;

d.    using confidential information for personal gain;

e.    filing suit against RCM parties on issues other than fraud, gross negligence or willful disregard of a duty;

f.    attempting to collect and/or collecting a judgment against RCM parties that is not based on fraud, gross negligence or willful disregard of a duty;

g.    seeking a money judgment in lieu of rescission on issues other than fraud, gross negligence or willful disregard of a duty;

h.    improperly freezing the assets of independent third parties who are non-judgment debtors;

i.    making misrepresentations to the Delaware Court;

5

**A-407**

Document received on 5/4/18 6:56 PM  Document accepted on 05/07/2018 08:31:23 # 4272419/17043973456

j.      contacting other investors to persuade them to file suit against RCM parties;

k.      deploying an army of process servers to harass, intimidate and physically threaten RCM parties and/or independent contractors;

l.      threatening independent third party non-judgment debtors with financial liability.

23.      As a proximate result of the actions of WMJ, Barber, Garner, Miller and Church in inducing Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, RRLS has suffered damages.

WHEREFORE, the Plaintiff RITCHIE RISK LINKED STRATEGIES, LLC prays for damages in its favor and against WMJ, Barber, Garner, Miller and Church in an amount in excess of Twenty Million Dollars ($20,000,000.00), plus attorney fees and its costs of suit.

## COUNT II

NOW COME the Plaintiff, RITCHIE RISK LINKED STRATEGIES, LLC (RRLS) by and through its attorneys, Clayborne, Sabo & Wagner LLP, and for Count II of its Complaint directed against the Defendant, PETER HUIZENGA, JR, states:

1.      RRLS is a Delaware limited liability company with its principal place of business in New Castle County, Delaware.

2.      Williams, Montgomery & John, Ltd. ("WMJ") is an Illinois corporation that does business as a law firm in the State of Illinois and within DuPage County, Illinois.

3.      Christopher Barber ("Barber") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

4.      Gary Garner ("Garner") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

6

**A-408**

5.      Jonathan D. Miller ("Miller") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

6.      Scott M. Church ("Church") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

7.      Collectively, Barber, Garner, Miller, and Church constitute the "WMJ Attorneys."

8.      Peter Huizenga (Huizenga) is the Investment Manager for Huizenga Managers Fund, L.L.C. ("Huizenga Fund") and resides in DuPage County, Illinois.

9.      Huizenga Capital Management, LLC ("Huizenga Capital") is a limited liability company organized under the laws of the State of Colorado with its principal place of business in DuPage County, Illinois.

10.     Huizenga Capital is the Managing Member and/or Investment Manager of Huizenga Managers Fund, L.L.C. ("Huizenga Fund"), a limited liability company organized under the laws of the State of Delaware with its principal place of business in DuPage County, Illinois.

11.     Ritchie Capital Management, LLC, f/k/a Ritchie Capital Markets ("RCM") is a Delaware limited liability company with its principal place of business in the Cayman Islands.

12.     Ritchie Partners, LLC (Ritchie Partners) is a Delaware limited liability company with its principal place of business in New Castle, Delaware.

13.     The relevant time period is on and after January 29, 2015.

14.     Prior to the relevant time period, Huizenga, individually and/or in his capacity as the investment manager, on behalf of Huizenga Fund, contacted RCM and Ritchie Partners and requested that Huizenga Fund be permitted to invest with RCM and subsequently RRLS.

15.     Ritchie Partners is the managing member of RRLS.

7

A-409

16.    Prior to the relevant time period, in order to induce RCM and/or Ritchie Partners to permit Huizenga Fund to invest with RCM and RRLS, Huizenga Fund expressly made several representations and warranties, including but not limited to the fact that Huizenga Fund (a) was a knowledgeable investor in the options market; (b) knew that the investment strategy in which it was requesting to invest was not only speculative but involved substantial risk; (c) that it would and did rely upon its own investigation, of the proposed investment and investment strategy, including an assessment of the risk involved; (d) was an "accredited investor" under Regulation D of the Securities and Exchange Commission; (e) was a "qualified purchaser" under Section 2(a)(51)(A) of the Company Act; and (f) that it expressly agreed to not only be contractually bound by the representations, warranties and obligations set forth in the Private Placement Memorandum, Subscription Agreement, and Operating Agreement signed or adopted by it but also to be contractually bound by the interlocking representations, warranties and obligations set forth in RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, the RCM Private Placement Memorandum, RCM Subscription Agreement, RCM Operating Agreement, RMSG Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, Ltd. Private Placement Memorandum, Ritchie Energy Subscription Agreement, and Ritchie Energy Operating Agreement. (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

17.    Prior to the relevant time period, based upon the representations, warranties and other contractual obligations that Huizenga Fund expressly and unequivocally provided, RRLS permitted Huizenga Fund to invest.

18.    At all times relevant herein, there existed valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund

8

**A-410**

including but not limited to the RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, RCM Operating Agreement, RMSG Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, Ltd. Private Placement Memorandum, Ritchie Energy Subscription Agreement, and Ritchie Energy Operating Agreement. (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

19.     At all times relevant herein, Huizenga, individually and/or in his capacity as the investment manager, had actual or constructive knowledge of the existence of the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund.

20.     At all times relevant herein, Huizenga, individually and/or in his capacity as the investment manager, intentionally and unjustifiably induced the Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, in one or more of the following respects, including but not limited to:

(a)     making outrageous, false, inflammatory and disparaging statements about RRLS, RCM and/or RCM parties;

(b)     releasing confidential information;

(c)     releasing allegedly quasi-public/confidential information without obtaining prior approval;

(d)     using confidential information for personal gain;

(e)     filing suit against RCM parties on issues other than fraud, gross negligence or willful disregard of a duty;

(f)     attempting to collect and/or collecting a judgment against RCM parties that is not based on fraud, gross negligence or willful disregard of a duty;

(g)     seeking a money judgment in lieu of rescission on issues other than fraud, gross negligence or willful disregard of a duty;

9

**A-411**

(h)    improperly freezing the assets of independent third parties who are non-judgment debtors;

(i)    making misrepresentations to the Delaware Court; and,

(j)    contacting other investors to persuade them to file suit against RCM parties.

21.    As a proximate result of the intentional and unjustified actions of inducement by Huizenga, individually and/or in his capacity as the investment manager, the Huizenga Fund has breached and is continuing to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund

22.    As a proximate result of the actions of Huizenga, individually and/or in his capacity as the investment manager, in inducing Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, RRLS has suffered damages.

WHEREFORE, the Plaintiff RITCHIE RISK LINKED STRATEGIES, LLC, prays for damages in its favor and against Huizenga in an amount in excess of Twenty Million Dollars ($20,000,000.00), plus attorney fees and its costs of suit.

## COUNT III

NOW COMES the Plaintiff, RITCHIE RISK LINKED STRATEGIES, LLC (RRLS), by and through its attorneys, Clayborne, Sabo & Wagner LLP, and for Count III of its Complaint directed against the Defendant, HUIZENGA CAPITAL MANAGEMENT, LLC, states:

1.    RRLS is a Delaware limited liability company with its principal place of business in New Castle County, Delaware.

2.    Williams, Montgomery & John Ltd. ("WMJ") is an Illinois corporation that does business as a law firm in the State of Illinois and within DuPage County, Illinois.

10

A-412

3.      Christopher Barber ("Barber") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

4.      Gary Garner ("Garner") is a law partner in WMJ, and upon information and belief, resides in or near Chicago, Illinois.

5.      Jonathan D. Miller ("Miller") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

6.      Scott M. Church ("Church") is a lawyer with WMJ, and upon information and belief, resides in or near Chicago, Illinois.

7.      Collectively, Barber, Garner, Miller, and Church constitute the "WMJ Attorneys."

8.      Peter Huizenga (Huizenga) is the Investment Manager for Huizenga Managers Fund, L.L.C. (Huizenga Fund) and resides in DuPage County, Illinois.

9.      Huizenga Capital Management, LLC ("Huizenga Capital") is a limited liability company organized under the laws of the State of Colorado with its principal place of business in DuPage County, Illinois.

10.     Huizenga Capital is the Managing Member and/or Investment Manager of Huizenga Fund, a limited liability company organized under the laws of the State of Delaware with its principal place of business in DuPage County, Illinois.

11.     Ritchie Capital Management, LLC, (f/k/a Ritchie Capital Markets hereinafter RCM) is a Delaware limited liability company with its principal place of business in the Cayman Islands.

12.     Ritchie Partners, LLC (Ritchie Partners) is a Delaware limited liability company with its principal place of business in the Cayman Islands.

13.     The relevant time period is on and after January 29, 2015.

Document received on 5/4/18 6:56 PM  Document accepted on 05/07/18 08:31:23 # 4272419/17043973456

14.    Prior to the relevant time period, Huizenga Capital, on behalf of Huizenga Fund, contacted RCM and Ritchie Partners and requested that Huizenga Fund be permitted to invest with RCM and subsequently RRLS.

15.    Ritchie Partners is the managing member of RRLS.

16.    Prior to the relevant time period, in order to induce RCM and/or Ritchie Partners to permit Huizenga Fund to invest with RCM and RRLS, Huizenga Fund expressly made several representations and warranties, including but not limited to the fact that Huizenga Fund (a) was a knowledgeable investor in the options market, (b) knew that the investment strategy in which it was requesting to invest was not only speculative but involved substantial risk, (c) that it would and did rely upon its own investigation, of the proposed investment and investment strategy, including an assessment of the risk involved, (d) was an "accredited investor" under Regulation D of the Securities and Exchange Commission, (e) was a "qualified purchaser" under Section 2(a)(51)(A) of the Company Act and (f) that it expressly agreed to not only be contractually bound by the representations, warranties and obligations set forth in the Private Placement Memorandum, Subscription Agreement, and Operating Agreement  signed or adopted by it but also to be contractually bound by the interlocking representations, warranties and obligations set forth in RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, the RCM Private Placement Memorandum, RCM Subscription Agreement, RCM Operating Agreement, RMSG Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, LLC  Private Placement Memorandum, Ritchie Energy Subscription Agreement, and Ritchie Energy Operating Agreement. (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

A-414

Document received on 5/4/18 6:56 PM  Document accepted on 05/07/2018 08:31:23 # 4272419/17043973456

17.    Prior to the relevant time period, based upon the representations, warranties and other contractual obligations that Huizenga Fund expressly and unequivocally provided, RRLS permitted Huizenga Fund to invest.

18.    At all times relevant herein, there existed valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund including but not limited to the RRLS Private Placement Memorandum, RRLS Subscription Agreement, RRLS Operating Agreement, RCM Operating Agreement, Ritchie Multi-Strategies Global LLC (f/k/a RAM Capital, LLC hereinafter RMSG) Private Placement Memorandum, RMSG Subscription Agreement, RMSG Operating Agreement, Ritchie Energy, LLC Private Placement Memorandum, Ritchie Energy Subscription Agreement, and Ritchie Energy Operating Agreement. (See also Exhibit 1 – Chart of contractual representations, warranties and obligations).

19.    At all times relevant herein, Huizenga Capital, by and through its agents and employees, had actual or constructive knowledge of the existence of the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund.

20.    At all times relevant herein, Huizenga Capital, by and through its agents and employees, intentionally and unjustifiably induced the Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, in one or more of the following respects, including but not limited to:

(a)    making outrageous, false, inflammatory and disparaging statements about RRLS, RCM and/or RCM parties;

(b)    releasing confidential information;

(c)    releasing allegedly quasi-public/confidential information without obtaining prior approval;

(d)    using confidential information for personal gain;

13

**A-415**

Document received on 5/4/18 6:56 PM  Document accepted on 05/07/2018 08:31:23 # 4272419/17043973456

(e)     filing suit against RCM parties on issues other than fraud, gross negligence or willful disregard of a duty;

(f)     attempting to collect and/or collecting a judgment against RCM parties that is not based on fraud, gross negligence or willful disregard of a duty;

(g)     seeking a money judgment in lieu of rescission on issues other than fraud, gross negligence or willful disregard of a duty;

(h)     improperly freezing the assets of independent third parties who are non-judgment debtors;

(i)     making misrepresentations to the Delaware Court;

(j)     contacting other investors to persuade them to file suit against RCM parties;

(k)     threatening independent third party non-judgment debtors with financial liability.

21.     As a proximate result of the intentional and unjustified actions of inducement by Huizenga Capital, by and through its agents and employees, Huizenga Fund has breached and is continuing to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and the Huizenga Fund.

22.     As a proximate result of the actions of Huizenga Capital, by and through its agents and employees, in inducing Huizenga Fund to breach the valid and enforceable contracts and contractual representations, warranties and obligations between RRLS and Huizenga Fund, RRLS has suffered damages.

WHEREFORE, Plaintiff RITCHIE RISK LINKED STRATEGIES, LLC, prays for damages in its favor and against HUIZENGA CAPITAL, in an amount in excess of Twenty Million Dollars ($20,000,000.00) plus attorney fees and its costs of suit.

A-416

CLAYBORNE, SABO & WAGNER, LLP

By: /s/ B. Jay Dowling
B. Jay Dowling, # 06198846 (DuPage County No. 28748)
John E. Sabo, # 06196128
525 West Main Street, Suite 105
Belleville, Illinois 62220
T: (618) 239-0187
F: (618) 416-7556

15

**A-417**

# Exhibit 28

A/o

e-FILED
MAY 17, 2018 12:42 PM

*Chris Kachnoubas*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

**IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS**

1990
1800
2840x3

RITCHIE RISK LINKED STRATEGIES,　)
LLC,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　Cause No.:　2018-L-000507
　　　　　　　　　　　　　　　　　　)
WILLIAMS MONTGOMERY & JOHN　　)
LTD., CHRISTOPHER BARBER, GARY　)
GARNER, JONATHAN D. MILLER,　　)
SCOTT M. CHURCH, PETER　　　　　)
HUIZENGA, JR. and HUIZENGA　　　)
CAPITAL MANAGEMENT, LLC,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　)

**CASE CLOSED**

**JUDGE'S INIT.** _M_

## ORDER

Upon Motion of the Plaintiff, RITCHIE RISK LINKED STRATEGOES, LLC to voluntarily dismiss, without prejudice, the Complaint, the Court having reviewed the Court file finds that service of process has not been obtained, and the Court being otherwise fully advised in the premises:

**IT IS HEREBY ORDERED** as follows:

　　　　1.　　Plaintiff's, RITCHIE RISK LINKED STRATEGIES, LLC's, Motion to Voluntarily Dismiss the Complaint, Without Prejudice, is granted.  The above-style cause is herewith dismissed without prejudice to re-file/~~recommence the same~~; and

　　　　2.　　all future Court dates, including the future Court dates of 8/1/18 and 10/22/18, are stricken.

DATED: This _1.7_ day of May, 2018.

_____
Judge

1

# Exhibit 29

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| HUIZENGA MANAGERS FUND, LLC<br><br>       Plaintiff<br><br>       v.<br><br>A.R. THANE RITCHIE, RITCHIE RISK-LINKED STRATEGIES, LLC, RITCHIE PARTNERS, LLC, RITCHIE CAPITAL MANAGEMENT, LLC, RITCHIE CAPITAL MANAGEMENT SEZC, LTD., ARCH SPECIALTY INSURANCE COMPANY and CONTINENTAL CASUALTY COMPANY<br><br>       Defendants. | No. 2017-L-9244<br><br>Hon. Daniel J. Kubasiak<br><br>Jury Trial Demanded |

## SECOND AMENDED COMPLAINT

      Plaintiff Huizenga Managers Fund, LLC ("Huizenga"), for its Second Amended Complaint against defendants A.R. Thane Ritchie ("Thane Ritchie"), Ritchie Risk-Linked Strategies, LLC (the "Ritchie Fund"), Ritchie Partners, LLC ("Ritchie Partners"), Ritchie Capital Management, LLC ("Ritchie Capital"), Ritchie Capital Management SEZC, Ltd. ("Ritchie SEZC"), Continental Casualty Company ("CNA"), and Arch Specialty Insurance Company ("Arch," together with CNA the "Insurers") alleges as follows:

## NATURE OF THE ACTION

      1.    In 2007, Huizenga sued Thane Ritchie and three of his eponymous affiliates—Ritchie Capital, the Ritchie Fund, and Ritchie Partners—in the Circuit Court of Cook County (the "Huizenga/Ritchie Action").[1] Among other things, Huizenga alleged that these Ritchie Debtors

---

[1] Collectively, Thane Ritchie, Ritchie Capital, the Ritchie Fund, and Ritchie Partners are referred to as the "Ritchie Debtors."

1

had violated the Delaware Securities Act ("DSA") in connection with their sale of two investments to Huizenga. Ultimately, the Honorable Peter Flynn and the Illinois Appellate Court agreed, finding the Ritchie Debtors jointly and severally liable to Huizenga for roughly $22 million. Additionally, pursuant to the DSA, Huizenga has a statutory right to an award of its reasonable attorneys' fees and costs. Huizenga's claim on those attorneys' fees and costs remains pending before the trial court.

2.      This case is about two separate frauds.

a.  *First*, the Ritchie Debtors fraudulently transferred assets to affiliated third parties, in an effort to avoid paying their debts to Huizenga. After the Ritchie Debtors were found liable for violating the DSA—and after they realized they would eventually be held liable for Huizenga's attorneys' fees and costs as well—they absconded for the Cayman Islands. Then, at Thane Ritchie's direction, Ritchie Capital began draining itself of any assets that Huizenga could target to recover for the indebtedness owed by the Ritchie Debtors. Specifically, Ritchie Capital assigned its right to the payment of approximately $14 million in deferred fees from Ritchie investment funds, along with tens of millions of dollars in future fees from those funds. Ritchie Capital transferred those assets to a non-judgment debtor affiliate entity, Ritchie Capital Management SEZC, Ltd. ("Ritchie SEZC"). All the while however, Thane Ritchie and Ritchie Capital retained access and control over the assets transferred to Ritchie SEZC. And they used that access and control to direct Ritchie SEZC (and its subordinate affiliates) to disburse

2

those assets for the continued the benefit of Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors.

b. **Second**, the Ritchie Debtors and the Insurers worked a second fraud on Huizenga, by inducing Huizenga to accept (and the Honorable Alexander P. White to enter) an appeal bond ostensibly securing one of Huizenga's judgments. However, the Ritchie Debtors and the Insurers did not disclose to either Huizenga or Judge White that they had a plan whereby the Insurers would attempt to "cancel" the appeal bond the moment it was entered. Had they disclosed their plan, Huizenga never would have agreed to the entry of the appeal bond, the appeal bond never would have been entered, and Huizenga would not have been forced to incur significant attorneys' fees and costs defending its right to the appeal bond.

## JURISDICTION & VENUE

3.    This court has jurisdiction over each of the defendants pursuant to 735 ILCS 5/2-209, by virtue of their acts as described herein and out of which this action arises. Those acts include transacting business in Illinois, committing tortious acts in Illinois, and making and performing contracts substantially connected to Illinois.

4.    Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (i) the transaction or some part thereof out of which the cause of action arose occurred in Cook County, Illinois, and (ii) defendant CNA is a resident of Illinois.

3

**A-421**

## THE PARTIES

### I.    *Huizenga*

5.      Huizenga is a Delaware limited liability company with its principal place of business in Illinois.

### II.    *Thane Ritchie*

6.      At the time the Huizenga/Ritchie Action was filed in 2007, Thane Ritchie was a U.S. citizen and a resident of Illinois. In June 2010, Thane Ritchie testified under oath in the Huizenga/Ritchie Action that he was still a resident of Illinois.

7.      Subsequently, Thane Ritchie renounced his U.S. citizenship. According to the U.S. Federal Register, the IRS received notification of Ritchie's expatriation during the quarter ending September 30, 2011. Closing arguments in the Huizenga/Ritchie Action took place on September 28 and 29, 2011. Thane Ritchie did not notify either Huizenga or Judge Flynn that he had renounced his citizenship.

8.      Currently, Ritchie is a citizen of St. Kitts & Nevis. In September 2015, Thane Ritchie verified a pleading in Case No. 15-CH-13480, pending in the Circuit Court of Cook County, stating that he was a resident of the Cayman Islands. Subsequently, Ritchie revealed that he is a resident of Canada as well.

### III.    *The Ritchie Fund*

9.      At the time the Huizenga/Ritchie Action was filed in 2007, the Ritchie Fund was a Delaware limited liability company with its principal place of business in Geneva, Illinois. In September 2015, Thane Ritchie verified a pleading in Case No. 15-CH-13480, stating that the Ritchie Fund's principal place of business was in Wheaton, Illinois. Subsequently, the Ritchie Fund revealed that its new principal place of business was in the Cayman Islands.

4

A-422

*IV.*    **Ritchie Partners**

10.    At the time the Huizenga/Ritchie Action was filed in 2007, Ritchie Partners was a Delaware limited liability company with its principal place of business in Geneva, Illinois. In September 2015, Thane Ritchie verified a pleading in Case No. 15-CH-13480, stating that Ritchie Partners' principal place of business was in Wheaton, Illinois. Subsequently, Ritchie Partners revealed that its new principal place of business was in the Cayman Islands.

*V.*    **Ritchie Capital**

11.    At the time the Huizenga/Ritchie Action was filed in 2007, Ritchie Capital was a Delaware limited liability company with its principal place of business in Geneva, Illinois. Ritchie Capital now claims to have become a Cayman Islands limited liability company and moved its business to the Cayman Islands as of May 8, 2015. However, in September 2015, Thane Ritchie verified a pleading in Case No. 15-CH-13480, stating that Ritchie Capital remained a Delaware limited liability company and its principal place of business was in Wheaton, Illinois. That same month, Ritchie Capital filed a pleading in Case No. 15-cv-08021 (N.D. Ill.), stating that it was a Delaware limited liability company doing business in Illinois. In February 2017, Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors submitted a proposed Verified Amended Complaint in Case No. 15-CH-13480, representing that Ritchie Capital remained a Delaware limited liability company with its principal place of business in Wheaton, Illinois.

12.    At all times relevant to this Complaint, Thane Ritchie controlled Ritchie Capital. For example, on March 31, 2017, Thane Ritchie signed a filing with the U.S. Securities & Exchange Commission on behalf of Ritchie Capital, identifying himself as Ritchie Capital's Director. On May 24, 2017, Thane Ritchie filed a pleading in the Superior Court of the State of Delaware, stating that at all relevant times, he was the Chief Executive Officer and a Director of

Ritchie Capital. On July 5, 2017, Thane Ritchie signed a filing with the Illinois Secretary of State identifying himself as Ritchie Capital's Director. And on September 1, 2017, Thane Ritchie signed a Canadian securities filing identifying himself as Ritchie Capital's Director.

## VI.    Ritchie SEZC

13.    Defendant Ritchie SEZC is a Cayman Islands corporation. It represents that its principal place of business is in the Cayman Islands. During the time that Ritchie Capital's principal place of business was in Illinois, Ritchie SEZC made and performed contracts with Ritchie Capital, which were substantially connected to Illinois.

14.    Ritchie SEZC has also engaged in numerous financial transactions with lawyers and law firms located in Illinois, transferring millions of dollars to them in exchange for services rendered to Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors in connection with cases pending in state and federal courts in Illinois.

15.    At all times relevant to this Complaint, Thane Ritchie controlled Ritchie SEZC. For example, on March 31, 2017, Thane Ritchie signed a filing with the U.S. Securities & Exchange Commission on behalf of Ritchie SEZC, identifying himself as Ritchie SEZC's Director. And on September 1, 2017, Thane Ritchie signed a Canadian securities filing identifying himself as Ritchie SEZC's Director since March 2012.

## VII.   CNA & Arch

16.    CNA is an Illinois corporation with its principal place of business in Chicago, Illinois. CNA is authorized to and does write insurance policies in Illinois.

17.    Arch is a Missouri corporation with its principal place of business in Jersey City, New Jersey. Arch is authorized to and does write insurance policies in Illinois.

6

**A-424**

## THE UNDERLYING HUIZENGA/RITCHIE ACTION

18.     In 2005, Huizenga made two investments in the Ritchie Fund—a $6 million investment in August (the "August Investment") and a $4.67 million investment in October (the "October Investment").

19.     In 2007, Huizenga filed the Huizenga/Ritchie Action, alleging among other things, that the Ritchie Debtors were liable for selling these investments to Huizenga in violation of the DSA. In addition, pursuant to DSA § 7323(a)(2) (now renumbered 6 Del. C. § 73-605(a)(2)), Huizenga requested an award of its reasonable attorneys' fees and expenses incurred

20.     On January 27, 2015, Judge Peter Flynn issued a Memorandum Opinion ruling in favor of Huizenga on its DSA claims with regard to the October Investment, and in favor of the Ritchie Debtors with regard to the August Investment. In August 2015, Judge Flynn entered a judgment order awarding Huizenga $9,174,199.63 (inclusive of prejudgment interest) for its DSA claims with regard to the October Investment (the "First Judgment"). In the judgment order, Judge Flynn also entered a Rule 304(a) certification, and stated, "[t]his leaves open before this Court until after resolution of any appeal issues regarding attorneys' fees and costs." Accordingly, Huizenga's claim against the Ritchie Debtors for attorneys' fees and costs pursuant to the DSA remained pending.

21.     The Ritchie Debtors appealed Judge Flynn's finding of liability on the October Investment to the Appellate Court of Illinois and Huizenga cross-appealed the finding of non-liability on the August Investment. In December 2016, the Appellate Court entered an order (i) affirming Judge Flynn's finding in favor of Huizenga on the October Investment, and (ii) reversing and remanding Judge Flynn's finding in favor of the Ritchie Debtors on the August Investment. Specifically, the Appellate Court ruled that, "judgment should be entered in Huizenga's favor on

7

the [August Investment] in the amount of $6 million," and remanded to the trial court "to calculate any prejudgment interest it sees fit."

22.     Accordingly, in October 2017, Judge Flynn entered a second judgment order against the Ritchie Debtors, jointly and severally, awarding Huizenga $12,772,529.70 (inclusive of prejudgment interest) for its DSA claims with regard to the August Investment (the "Second Judgment"). In the judgment order, Judge Flynn again included a Rule 304(a) certification and retained jurisdiction "with respect to the assessment of attorneys' fees and costs in connection with the First Judgment and the Second Judgment."

23.     In November 2017, Huizenga received payment on the First Judgment via an appeal bond. In April 2018, Thane Ritchie's attorneys (Clayborne Sabo & Wagner LLP) filed a document in the supplementary proceedings related to the Second Judgment (Case No. 17-CH-14072), stating that (i) they had "come into possession of funds belonging to our client, A.R. Thane Ritchie, in the sum of $14,100,000.00" and (ii) "A.R. Thane Ritchie continues in his belief that this Court does not have proper jurisdiction of this matter…." The Honorable Daniel J. Kubasiak then entered a turnover order directed to Clayborne Sabo & Wagner LLP, which then transferred funds to Huizenga sufficient to satisfy the Second Judgment.

24.     Huizenga's claim against Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors for its attorneys' fees and costs pursuant to the DSA remains pending before Judge Flynn. In a March 26, 2018 memorandum submitted to Judge Flynn, Huizenga stated that its current estimate of the reasonable attorneys' fees and costs it will be entitled to under the DSA will exceed $7 million.

## *FRAUD #1: FRAUDULENT TRANSFER*

25.     In Judge Flynn's January 2015 Memorandum Opinion, he found that Thane Ritchie was "the undisputed captain of the Ritchie ship." Indeed, in addition to Ritchie Capital, the other Ritchie Debtors, and Ritchie SEZC, Thane Ritchie controls dozens of other corporate affiliates he named after himself. For example, Thane Ritchie controls Ritchie Multi-Strategy (Cayman), Ltd., Ritchie RML Trading, Ltd., Ritchie CT Holdings, L.L.C., Ritchie Multi-Strategy Global, L.L.C., Ritchie European Multi-Strategy Trading, Ltd., Ritchie Long/Short Trading, Ltd., Ritchie Structured Multi-Manager, Ltd., Ritchie OF Investments, LLC, Ritchie Multi-Strategy Global Trading, Ltd., Ritchie CT Opps, LLC, Ritchie Multi-Strategy Global Opportunities, LLC, Ritchie Special Credit Investments, Ltd., Ritchie Multi-Strategy Trading, LLC, Ritchie Multi-Strategy Trading Opportunities, LLC, Ritchie Multi-Strategy, LLC, and Ritchie Opportunistic Trading Ltd.

26.     Thane Ritchie has also formed other (more discretely-named) corporate entities to enter into service contracts (e.g., "advisory services" contracts and "back and middle-office services" contracts) with his eponymous corporate progeny. These include Alpha Carta Ltd. ("Alpha Carta") and 60 Degrees Group SEZC, Ltd. ("60 Degrees"). Thane Ritchie controls these "service provider" entities as well.

27.     The flowchart below provides a limited snapshot of the tangled web Thane Ritchie has woven to exert control over—and extract assets from—ostensibly "independent" corporate affiliates.

9



28. By the time Judge Flynn issued his January 2015 Memorandum Opinion, the Ritchie Fund and Ritchie Partners were already functionally insolvent, with *de minimis* assets (if any). And although Thane Ritchie retained control over tens (if not hundreds) of millions of dollars in assets, he had long since retitled those assets in the name of his wife, the JR Marital Trust, and the dozens of eponymous corporate affiliates he controls. That left Ritchie Capital as the one Ritchie Debtor with significant assets in its name that Huizenga could target to satisfy the debts owed by the Ritchie Debtors.

10

29.     Thane Ritchie therefore focused his efforts on moving Ritchie Capital offshore and draining Ritchie Capital of its assets, in an effort to render it judgment proof. On May 8, 2015, Thane Ritchie had himself appointed the sole Director of Ritchie Capital. In a recent submission to this Court, Thane Ritchie claimed that as of that same date, Ritchie Capital moved its principal place of business to the Cayman Islands and had shut down all operations in the U.S.

30.     Although Thane Ritchie now claims that Ritchie Capital had left the U.S. by May 8, 2015, he told the Illinois courts a different story at the time. Indeed, in *September 2015*, Thane Ritchie verified a pleading in Case No. 15-CH-13480, stating that Ritchie Capital's principal place of business remained in Wheaton, Illinois. On information and belief, he did so to conceal the fact that Ritchie Capital (along with the other Ritchie Debtors) was fleeing the country shortly after being found liable for violating the DSA. Similarly—despite Thane Ritchie's current claims—in *September 2015*, Ritchie Capital filed a pleading in Case No. 15-cv-08021 (N.D. Ill.), stating that it continued to do business in Illinois.

31.     Putting Ritchie's contradictory assertions aside, the truth is that to this day, Thane Ritchie's corporate empire (largely comprised of "Ritchie" shell corporations) continues to operate largely out of offices in Wheaton, Illinois and Chicago, Illinois, staffed by employees who are Illinois residents.

32.     Claiming to have moved Ritchie Capital to the Cayman Islands, Thane Ritchie then restructured the flow of funds within his corporate web, to move assets out of Ritchie Capital and into Ritchie SEZC. As of May 8, 2015—the same day Thane Ritchie had himself named Ritchie Capital's sole Director—Ritchie Capital assigned its rights under advisory agreements with several Ritchie investment funds to Ritchie SEZC. Although Huizenga does not have access to a copy of

11

the assignment agreement, Ritchie SEZC has acknowledged the existence of the assignment agreement via filings in the Circuit Court of Cook County.[2]

33.    The rights assigned from Ritchie Capital to Ritchie SEZC include the right to collect management and performance fees as well as operating expenses from those investment funds, which total millions of dollars annually. Additionally, millions of dollars in fees due to Ritchie Capital had been "deferred" over the years. When Thane Ritchie caused Ritchie Capital to assign its rights to Ritchie SEZC, Ritchie SEZC began collecting these millions of dollars in fees and expenses—which in truth were due to Ritchie Capital.

34.    For example:

a.    On June 25, 2015, "Ritchie Capital Management" (it is unclear whether this refers to Ritchie Capital or Ritchie SEZC) demanded via letter that three Ritchie investment funds pay *Ritchie SEZC* nearly $210,000 for reimbursement of "fund operating expenses" that had allegedly been incurred during 2013.

b.    On June 4, 2015, "Ritchie Capital Management" (it is unclear whether this refers to Ritchie Capital or Ritchie SEZC) demanded via letter that four Ritchie investment funds pay *Ritchie SEZC* roughly $650,000 for reimbursement of "fund operating expenses" that had allegedly been incurred during 2014.

c.    On June 3, 2015, Ritchie Capital demanded via letter that four Ritchie investment funds pay *Ritchie SEZC* more than $100,000 for reimbursement of "fund operating expenses" that had allegedly been incurred during April 2015.

d.    On June 10, 2015, "Ritchie Capital Management" (it is unclear whether this refers to Ritchie Capital or Ritchie SEZC) demanded via letter that three Ritchie investment funds pay *Ritchie SEZC* more than $210,000 for reimbursement of "fund operating expenses" that had allegedly been incurred through May 2015.

e.    On June 24, 2015, Ritchie Capital demanded via letter that four Ritchie investment funds pay *Ritchie SEZC* more than $250,000 for reimbursement of "fund operating expenses" that had allegedly been incurred during May 2015.

f.    And on August 27, 2015, "Ritchie Capital Management" (it is unclear whether this refers to Ritchie Capital or Ritchie SEZC) demanded via letter that four Ritchie investment funds pay *Ritchie SEZC* over $775,000 for reimbursement of "fund operating expenses" that had allegedly been incurred during July

---

[2] *See* Ex. A attached hereto (Certification of Ronald G. Kenny).

12

A-430

> 2015—over $500,000 of which was for reimbursement of funds allegedly paid by Ritchie SEZC to Ritchie-affiliate "service providers."

35.    These are just a handful of examples of payments made to Ritchie SEZC that were diverted from Ritchie Capital. Indeed, in 2016 alone, approximately $14 million in deferred fees due to Ritchie Capital were paid. However, on information and belief—based on (i) the May 2015 assignment of rights from Ritchie Capital to Ritchie SEZC, and (ii) the evidence Huizenga has already gathered to date (*see, e.g., supra* ¶ 34)—these $14 million in deferred fees due to Ritchie Capital were in fact paid to Ritchie SEZC as part of Thane Ritchie's ongoing effort to defraud Huizenga.

36.    The scheme did not stop there however. Once the assets were fraudulently transferred from Ritchie Capital to Ritchie SEZC, one of two things happened: either (1) Ritchie SEZC then paid expenses for Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors, or (2) Ritchie SEZC passed the assets on to other Ritchie-affiliated "service providers," and those "service providers" then either transferred money to, or paid expenses for, Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors. Generally speaking, then, the scheme operated as follows:



37.    This scheme accomplished Thane Ritchie's core objective. One the one hand, assets were funneled away from the Ritchie Debtors (most importantly, Ritchie Capital) so that Huizenga could not collect from them. On the other hand, the Ritchie Debtors were still able to access those assets, because Thane Ritchie could simply direct Ritchie SEZC (and its subordinate "service providers") to pay the Ritchie Debtors' expenses or transfer assets to himself.

38.    That is exactly what happened. For example, after the May 2015 assignment of rights from Ritchie Capital to Ritchie SEZC—which effected the transfer of millions of dollars from Ritchie Capital to Ritchie SEZC—Ritchie SEZC and its subordinate "service providers" simply began paying the legal fees and expenses that Thane Ritchie, Ritchie Capital, and the other

14

Ritchie Debtors were incurring in ongoing litigation with Huizenga in Illinois. Many of these payments went to law firms in Illinois, as the examples below demonstrate:

| Date | Payor | Payee | Amount |
|------|-------|-------|--------|
| 9/9/2015 | Ritchie SEZC | McDermott Will & Emery LLP | $271,719.67 |
| 11/4/2015 | 60 Degrees | Sidley Austin LLP | $173,402.84 |
| 12/29/2015 | 60 Degrees | Sidley Austin LLP | $15,726.95 |
| 12/29/2015 | 60 Degrees | McDermott Will & Emery LLP | $50,338.26 |
| 5/5/2016 | Ritchie SEZC | McGuireWoods LLP | $43,680.00 |
| 6/23/2016 | 60 Degrees | McGuireWoods LLP | $35,435.00 |
| 8/23/2016 | Ritchie SEZC | McGuireWoods LLP | $36,247.00 |
| 8/25/2016 | Ritchie SEZC | LawProse | $40,000.00 |
| 9/27/2016 | Ritchie SEZC | LawProse | $46,775.00 |
| 12/7/2016 | Ritchie SEZC | McGuireWoods LLP | $17,115.00 |
| 12/16/2016 | Ritchie SEZC | McGuireWoods LLP | $155,473.50 |
| 12/19/2016 | Ritchie SEZC | LawProse | $40,000.00 |
| 2/9/2017 | Ritchie SEZC | LawProse | $66,430.00 |
| 2/15/2017 | 60 Degrees | LawProse | $50,546.89 |
| 2/15/2017 | Ritchie SEZC | Sidley Austin LLP | $93,636.58 |
| 2/17/2017 | 60 Degrees | Potter Anderson & Corroon LLP | $5,000.00 |
| 3/13/2017 | Ritchie SEZC | Potter Anderson & Corroon LLP | $28,248.17 |
| 3/17/2017 | Ritchie SEZC | LawProse | $160,994.73 |
| 3/20/2017 | Ritchie SEZC | Reed Smith LLP | $39,430.48 |
| 4/12/2017 | Ritchie SEZC | Potter Anderson & Corroon LLP | $29,483.41 |
| 4/24/2017 | Ritchie SEZC | Sidley Austin LLP | $8,387.43 |
| 4/26/2017 | Ritchie SEZC | LawProse | $86,340.00 |
| 5/16/2017 | Ritchie SEZC | Reed Smith LLP | $21,139.13 |
| 5/25/2017 | Ritchie SEZC | Reed Smith LLP | $165,968.32 |
| 6/20/2017 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $20,942.34 |
| 6/20/2017 | Ritchie SEZC | LawProse | $80,700.00 |
| 7/6/2017 | 60 Degrees | McGuireWoods LLP | $101,746.50 |
| 7/19/2017 | Ritchie SEZC | LawProse | $15,395.00 |
| 8/4/2017 | Ritchie SEZC | Novack & Macey LLP | $50,000.00 |
| 8/7/2017 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $21,849.30 |
| 8/16/2017 | 60 Degrees | Novack & Macey LLP | $450,000.00 |
| 9/19/2017 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $21,972.65 |
| 9/28/2017 | Ritchie SEZC | Potter Anderson & Corroon LLP | $32,271.94 |
| 9/28/2017 | Ritchie SEZC | Reed Smith LLP | $460,760.02 |
| 9/29/2017 | Ritchie SEZC | Novack & Macey LLP | $97,081.99 |
| 9/29/2017 | Ritchie SEZC | McGuireWoods LLP | $157,008.31 |
| 9/29/2017 | Ritchie SEZC | Sidley Austin LLP | $235,569.02 |
| 10/11/2017 | 60 Degrees | Markoff Law LLC | $10,000.00 |
| 10/30/2017 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $88,306.41 |
| 12/28/2017 | Ritchie SEZC | Reed Smith LLP | $293.112.63 |

| 12/29/2017 | Ritchie SEZC | Potter Anderson & Corroon LLP | $68,100.32 |
| 12/29/2017 | Ritchie SEZC | McGuireWoods LLP | $300,000.00 |
| 1/11/2018 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $13,156.23 |
| 2/1/2018 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $9,247.76 |
| 2/6/2018 | Ritchie SEZC | Clayborne Sabo & Wagner LLP | $40,898.58 |

39.      Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors also used Ritchie

SEZC as a piggybank to hire lobbyists in Illinois and Delaware—seeking to convince politicians

to submit *amicus* briefs on their behalf to the Illinois Supreme Court and U.S. Supreme Court in

connection with their attempted appeals of the First Judgment (both Courts declined review). For

example, on March 7, 2017, Ritchie SEZC made a $5,000 payment to Mark Kolaz, who on

information and belief, is the same Mark Kolaz registered as a lobbyist in Illinois. And a day later,

Ritchie SEZC made a $5,000 payment to Jar Consulting, Inc., which is also registered as a lobbyist

in Illinois. Within a few weeks, the Illinois Supreme Court received proposed *amicus* briefs from

several Illinois politicians in support of Thane Ritchie and Ritchie Capital's petition for leave to

appeal.

40.      Thane Ritchie and Ritchie Capital also received support via proposed *amicus* briefs

from multiple Delaware politicians. And on March 30, 2017, Ritchie SEZC paid $10,000 to the

"Byrd Group," which on information and belief, is The Byrd Group LLC—a lobbying firm located

in Delaware.

41.      When Thane Ritchie and Ritchie Capital filed a Petition for a Writ of Certiorari

with the U.S. Supreme Court—which the Court denied—they once again received support in the

form of an *amicus* brief from various Illinois and Delaware politicians. The *amicus* brief was dated

November 22, 2017. Two days earlier, 60 Degrees had made $7,500 payments to both the Strategic

Partnership Alliance and EOSullivan Consulting. On information and belief, these are (i) Strategic

Partnership Alliance, Ltd., which is registered as a lobbyist in Illinois, and (ii) EOSullivan Consulting, which is registered as a lobbyist in Illinois.

42.     The law firm of Potter Anderson & Corroon LLP authored the *amicus* brief filed with the U.S. Supreme Court, and in that brief, disclosed that Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors had "funded the preparation of this brief." However, on information and belief, based on the payment records summarized in paragraph 38 above, Ritchie SEZC is the actual Ritchie entity that "funded the preparation of [the] brief" for the benefit of Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors.

43.     Thane Ritchie has also used Ritchie SEZC's subordinate "service providers," along with Ritchie Capital's indirect owner, the JR Marital Trust, to make political donations in Illinois. For example, on December 7, 2017, the JR Marital Trust made an $11,100 donation to a campaign committee for a candidate for Illinois Attorney General. That candidate also happens to represent Ritchie Capital and Ritchie SEZC in ongoing Illinois litigation. That same day 60 Degrees made a $2,800 donation to that same committee. Publicly-available campaign contribution records indicate that both the JR Marital Trust and 60 Degrees are located at the same Cayman Islands address that Ritchie Capital and Ritchie SEZC list in SEC filings. According to the State-Journal Register, a newspaper based in Springfield, Illinois, the candidate later explained that "he has a Wheaton-based client with a fund in the Caymans."

44.     Thane Ritchie also used Ritchie SEZC (along with its subordinate "service providers") as a piggybank to fund his, and his family's, personal expenses, as the following examples demonstrate:

| Date | Payor | Payee | Amount | Additional Information |
|------|-------|-------|--------|------------------------|
| 4/13/2015 | Alpha Carta | Thane Ritchie | $400,000.00 | |
| 5/1/2015 | Alpha Carta | Thane Ritchie | $500,000.00 | |
| 5/6/2015 | Alpha Carta | Thane Ritchie | $700,000.00 | |

17

A-435

| 5/13/2015 | Alpha Carta | Thane Ritchie | $25,000.00 | |
| 6/8/2015 | Alpha Carta | Thane Ritchie | $25,000.00 | |
| 7/24/2015 | Alpha Carta | Thane Ritchie | $50,000.00 | |
| 8/26/2015 | Alpha Carta | Thane Ritchie | $100,000.00 | |
| 10/6/2015 | Alpha Carta | Thane Ritchie | $100,000.00 | |
| 10/6/2015 | Alpha Carta | Juleen Ritchie | $100,000.00 | |
| 12/1/2015 | Alpha Carta | Juleen Ritchie | $75,000.00 | |
| 1/22/2016 | Alpha Carta | Juleen Ritchie | $100,000.00 | |
| 2/22/2016 | Alpha Carta | Juleen Ritchie | $120,000.00 | |
| 3/17/2016 | Alpha Carta | JetSmarter, Inc. | $17,075.00 | "Aaron Ritchie Trans" |
| 3/31/2016 | Alpha Carta | Juleen Ritchie | $75,000.00 | |
| 4/8/2016 | Alpha Carta | Exclusive Resorts | $38,250.00 | "Thane Ritchie Membership 2016 Dues" |
| 6/2/2016 | 60 Degrees | Integrated Flight Resources[3] | $15,318.60 | "DuPage Quote… Thane Ritchie" |
| 6/28/2016 | Ritchie SEZC | JetSmarter, Inc. | $15,173.50 | "Transaction ID…AR Thane Ritchie" |
| 7/15/2016 | Alpha Carta | Star Sleigh Inc.[4] | $10,777.99 | "Whistler House Humming Bird" |
| 7/18/2016 | Alpha Carta | Juleen Ritchie | $100,000.00 | "Salary" |
| 8/12/2016 | Alpha Carta | Juleen Ritchie | $100,000.00 | "Salary" |
| 8/26/2016 | Alpha Carta | Juleen Ritchie | $150,000.00 | "Thane Salary" |
| 10/31/2016 | Alpha Carta | Hokukano Bayhouse LLC[5] | $40,991.57 | "Thane and Juleen Ritchie Invoice" |
| 10/31/2016 | Alpha Carta | Juleen Ritchie | $100,000.00 | "THR Salary" |
| 6/1/2017 | Alpha Carta | JLF Design Build[6] | $10,000.00 | "Retainer Ritchie Emerald" |
| 8/8/2017 | Alpha Carta | JLF Design Build | $24,160.06 | "Ritchie Emerald July 2017" |

---

[3] According to www.ifrcharter.com, Integrated Flight Resources operates chartered flights out of the DuPage airport.

[4] According to www.humminbirdwoodworks.com, Humming Bird Woodworks is a cabinetry company located in Glen Ellyn, Illinois that is a division of Star Sleigh Inc.

[5] According to www.hokukanobayhouse.com/about_us, "Hokukano Bayhouse, is a spectacular Balinese style, oceanfront estate located at Keauhou Bay, in Kailua-Kona. A luxury home with over 200' of oceanfront pleasure, boasting incredible views and romantic sunsets."

[6] According to www.jlfarchitects.com/the-evolution-of-the-house/, "Jackson Hole and Bozeman-based JLF Architects applies distinctive solutions and materials to create place-based houses marked by the influences of landscapes from the Rocky Mountains to the Eastern Seaboard."

| 8/17/2017 | Alpha Carta | Jonathan L Foote Associates Inc.[7] | $7,002.00 | "Strachan June July 2017 Waive Fees" |
|---|---|---|---|---|
| 8/28/2017 | Alpha Carta | Jonathan L Foote Associates Inc. | $2,216.84 | "Emerald and Strachan Aug 2017 Waive Fees" |
| 8/31/2017 | 60 Degrees | JetSmarter, Inc. | $54,413.44 | "AR Thane Ritchie Payments" |
| 9/27/2017 | Alpha Carta | Jonathan L Foote Associates Inc. | $3,710.55 | "Emerald and Strachan Point Sep 2017" |
| 10/30/2017 | Alpha Carta | Jonathan L Foote Associates Inc. | $11,387.12 | "Emerald Lake Oct 2017" |
| 11/24/2017 | Alpha Carta | Jonathan L Foote Associates Inc. | $11,806.94 | "Emerald Lake Nov Invoice" |
| 1/3/2018 | Alpha Carta | Jonathan L Foote Associates Inc. | $19,171.12 | "Emerald Dec Invoice" |
| 2/1/2018 | Alpha Carta | Jonathan L Foote Associates Inc. | $38,721.09 | |
| 3/2/2018 | Alpha Carta | Jonathan L Foote Associates Inc. | $8,922.83 | "Emerald Lake" |
| 3/5/2018 | Ritchie SEZC | Global Intelligence Consultants Inc. | $39,400.00 | "Service Agreement Thane Ritchie" |
| 3/22/2018 | Ritchie SEZC | Global Intelligence Consultants Inc. | $47,473.41 | |
| 3/22/2018 | 60 Degrees | Account of Frank Fernandes | $74,925.00 | "Cubs Thane" |

45.    Despite this extensive record of payments from Ritchie SEZC and its subordinate "service providers" Alpha Carta and 60 Degrees, either (i) to Thane Ritchie or Ritchie Capital, or (ii) for Thane Ritchie's and/or Ritchie Capital's benefit (including by making payments to entities in Illinois), on April 20, 2018, Ritchie SEZC and Alpha Carta filed a motion in Case No. 17-CH-14072 (represented by Thane Ritchie's attorneys at Clayborne Sabo & Wagner LLP) claiming:

> a.    "Alpha Carta, Ltd. does not have possession or control of any information concerning the property or income of, or indebtedness due to, the judgment debtor, A.R. Thane Ritchie."
>
> b.    "Alpha Carta, Ltd. does not have possession or control of any information concerning the property or income of, or indebtedness due to, the judgment debtor [Ritchie Capital]."

---

[7] According to www.jonathanfootearchitect.com/about.php., Jonathan L. Foote is a Montana-based architect.

    c.   "[Ritchie SEZC] does not transact any business within the State of Illinois."

    d.   "[Ritchie SEZC] does not have possession or control of any information concerning the property or income of, or indebtedness due to, the judgment debtor, A.R. Thane Ritchie."

    e.   "[Ritchie SEZC] does not have possession or control of any information concerning the property or income of, or indebtedness due to, the judgment debtor [Ritchie Capital]."

All of these statements were false.

46.    Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors have not been shy about their efforts to render themselves judgment proof. For example, in July 2017, after the Illinois Appellate Court affirmed the First Judgment and directed the trial court to enter what would become the Second Judgment, Huizenga received a letter from a Chicago-based attorney with McGuireWoods LLP—another law firm representing Thane Ritchie, Ritchie Capital, and the other Ritchie Debtors (but paid by Ritchie SEZC). The letter boasted to Huizenga that, "collection efforts against the Ritchie [Debtors] will be fruitless and extremely expensive." Tellingly, the attorney's website biography states: "In serving global private clients, [the attorney] offers a holistic approach aimed at addressing their particular legal and family needs, including those related to privacy, asset protection and cross-border tax structuring."

47.    Thane Ritchie's efforts to drain Ritchie Capital of its assets were apparently successful, because from the time Judge Flynn entered the Second Judgment in October 2017, to the time Clayborne Sabo & Wagner LLP paid over funds to satisfy the Second Judgment in March 2018, Ritchie Capital was either unable or unwilling to pay a dime toward the satisfaction of that judgment.

**COUNT I – Fraudulent Transfer (740 ILCS 160/5(a)(1))**
**(Against Thane Ritchie, Ritchie Capital & Ritchie SEZC)**

48.    Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

49.    Huizenga possessed claims against the Ritchie Debtors since at least 2007 when it filed the Huizenga/Ritchie Action. Huizenga's claim on the October Investment was reduced to judgment in August 2015, when Judge Flynn entered the First Judgment. Huizenga's claim on the August Investment was reduced to judgment in October 2017, when Judge Flynn entered the Second Judgment. However, Huizenga's claim for attorneys' fees and costs pursuant to the DSA has been pending continuously since at least 2007.

50.    In the first half of 2015, at Thane Ritchie's direction, Ritchie Capital voluntarily assigned its rights under advisory agreements with certain Ritchie-related funds (including its rights to management and performance fees) to Ritchie SEZC. Ritchie SEZC is a non-judgment debtor affiliate controlled by Thane Ritchie.

51.    Ritchie Capital, at Thane Ritchie's direction, assigned these rights (including rights to management and performance fees) to Ritchie SEZC with actual intent to hinder, delay, or defraud Huizenga. Among other things:

    a.    The transfer was to an insider;

    b.    Thane Ritchie and Ritchie Capital retained control of the rights and assets after the transfer;

    c.    Before the transfer, Thane Ritchie and Ritchie Capital had already been found liable via the January 2015 Memorandum Opinion in the Huizenga/Ritchie Action. Additionally, the finding of liability in the January 2015 Memorandum Opinion assured Huizenga's right to an award of attorneys' fees and costs under the DSA.

    d.    The transfer was of substantially all of Ritchie Capital's assets;

    e.    Thane Ritchie and Ritchie Capital absconded.

A-439

    f.  Thane Ritchie and Ritchie Capital removed and concealed assets;

    g.  Ritchie Capital did not receive any consideration for the transfer;

    h.  Ritchie Capital was insolvent or became insolvent shortly after the transfer;

    i.  The transfer occurred shortly after substantial debt was incurred by both Thane Ritchie and Ritchie Capital, via the January 2015 Memorandum Opinion, which among other things, assured Huizenga's right to an award of attorneys' fees and costs under the DSA.

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against Thane Ritchie, Ritchie Capital, and Ritchie SEZC, jointly and severally, as follows:

    A.  Avoiding the transfers of rights (including rights to management and performance fees) and assets from Ritchie Capital to Ritchie SEZC, to the extent necessary to satisfy Huizenga's claim for attorneys' fees and costs under the DSA; and

    B.  Awarding Huizenga such other and further relief as the Court deems just and proper.

### COUNT II – Fraudulent Transfer (740 ILCS 160/5(a)(2))
### (Against Thane Ritchie, Ritchie Capital & Ritchie SEZC)

52.    Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

53.    Huizenga possessed claims against the Ritchie Debtors since at least 2007 when it filed the Huizenga/Ritchie Action. Huizenga's claim on the October Investment was reduced to judgment in August 2015, when Judge Flynn entered the First Judgment. Huizenga's claim on the August Investment was reduced to judgment in October 2017, when Judge Flynn entered the Second Judgment. However, Huizenga's claim for attorneys' fees and costs pursuant to the DSA has been pending continuously since at least 2007.

54.    In the first half of 2015, at Thane Ritchie's direction, Ritchie Capital voluntarily assigned its rights under advisory agreements with certain Ritchie-related funds (including its

rights to management and performance fees) to Ritchie SEZC. Ritchie SEZC is a non-judgment debtor affiliate controlled by Thane Ritchie.

55.    On information and belief, Ritchie Capital did not receive reasonably equivalent value in exchange for its assignment of rights under the advisory agreements with certain Ritchie-related funds to Ritchie SEZC, and either:

    a.  Was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction; or

    b.  Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

56.    Among other things, this belief is based upon the fact that (i) Judge Flynn had already found Ritchie Capital liable on the October Investment via his January 2015 Memorandum Opinion, so it was aware that the First Judgment (and eventually, an attorneys' fee award) was forthcoming; (ii) following the May 2015 assignment, Ritchie Capital had to rely on Ritchie SEZC to pay its debts to law firms; (iii) later in 2015, Thane Ritchie announced that Ritchie Capital was unable to pay its debt to Huizenga for the October Investment/First Judgment; and (iv) Ritchie Capital's attorney wrote a letter to Huizenga warning that any efforts to collect from Ritchie Capital would be "fruitless."

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against Thane Ritchie, Ritchie Capital, and Ritchie SEZC, jointly and severally, as follows:

    A.  Avoiding the transfers of rights (including rights to management and performance fees) and assets from Ritchie Capital to Ritchie SEZC, to the extent necessary to satisfy Huizenga's claim for attorneys' fees and costs under the DSA; and

    B.  Awarding Huizenga such other and further relief as the Court deems just and proper.

**COUNT III – Fraudulent Transfer (740 ILCS 160/6(a))**
**(Against Thane Ritchie, Ritchie Capital & Ritchie SEZC)**

57.    Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

58.    Huizenga possessed claims against the Ritchie Debtors since at least 2007 when it filed the Huizenga/Ritchie Action. Huizenga's claim on the October Investment was reduced to judgment in August 2015, when Judge Flynn entered the First Judgment. Huizenga's claim on the August Investment was reduced to judgment in October 2017, when Judge Flynn entered the Second Judgment. However, Huizenga's claim for attorneys' fees and costs pursuant to the DSA has been pending continuously since at least 2007.

59.    In the first half of 2015, at Thane Ritchie's direction, Ritchie Capital voluntarily assigned its rights under advisory agreements with certain Ritchie-related funds (including its rights to management and performance fees) to Ritchie SEZC. Ritchie SEZC is a non-judgment debtor affiliate controlled by Thane Ritchie.

60.    On information and belief, Ritchie Capital did not receive reasonably equivalent value in exchange for its assignment of rights under the advisory agreements with certain Ritchie-related funds to Ritchie SEZC, and either:

a.    Was insolvent at the time; or

b.    Became insolvent as a result of the transfer.

61.    Among other things, this belief is based upon the fact that (i) following the May 2015 assignment, Ritchie Capital had to rely on Ritchie SEZC to pay its debts to law firms; (ii) later in 2015, Thane Ritchie announced that Ritchie Capital was unable to pay its debt to Huizenga for the October Investment/First Judgment; and (iii) Ritchie Capital's attorney wrote a letter to Huizenga warning that any efforts to collect from Ritchie Capital would be "fruitless."

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against Thane Ritchie, Ritchie Capital, and Ritchie SEZC, jointly and severally, as follows:

A. Avoiding the transfers of rights (including rights to management and performance fees) and assets from Ritchie Capital to Ritchie SEZC, to the extent necessary to satisfy Huizenga's claim for attorneys' fees and costs under the DSA; and

B. Awarding Huizenga such other and further relief as the Court deems just and proper.

\*        \*        \*

## *FRAUD #2: THE APPEAL BOND FRAUD*

62.    As explained above, by the time Judge Flynn issued his January 2015 Memorandum Opinion, the Ritchie Fund and Ritchie Partners were already functionally insolvent, with *de minimis* assets (if any). And although Thane Ritchie retained control over tens (if not hundreds) of millions of dollars in assets, he had long since retitled those assets in the name of his wife, the JR Marital Trust, and the dozens of eponymous corporate affiliates he controls. Then, in 2015, Thane Ritchie implemented the fraudulent transfer scheme described above to drain Ritchie Capital of its assets, funneling those assets to Ritchie SEZC and its subordinate service providers.

63.    Accordingly, after Judge Flynn entered the First Judgment in August 2015, Thane Ritchie was able to claim that the Ritchie Debtors lacked the funds to post an appeal bond in compliance with Illinois Supreme Court Rule 305(a). An appeal bond would stay enforcement of the First Judgment during the Ritchie Debtors' appeal, while ensuring Huizenga that it would receive payment on any portion of the First Judgment not overturned on appeal.

64.    The Ritchie Debtors asked the Insurers to fund the appeal bond, but the Insurers refused, claiming they had no obligation to do so under the applicable insurance policies. So, in September 2015, the Ritchie Debtors filed an action against the Insurers in the Circuit Court of

25

Cook County, designated Case No. 15-CH-13480 (the "Ritchie/Insurer Action"), seeking a ruling that the Insurers were obligated to fund the appeal bond.

65.    The Ritchie Debtors notified Huizenga that they had filed the Ritchie/Insurer Action and asked Huizenga to consent to an extension of the deadline for the Ritchie Debtors to file an appeal bond. Huizenga consented, the Ritchie Debtors filed an Unopposed Motion to Extend Time for Filing and Approval of Appeal Bond, and Judge Flynn entered an Agreed Order granting an extension until October 30, 2015.

66.    The Ritchie Debtors filed their Notice of Appeal in the Appellate Court on September 25, 2015, asking the court to reverse the judgment in favor of Huizenga on the October Investment. The Ritchie Debtors also asked Huizenga to consent to another extension of time for the Ritchie Debtors to file an appeal bond. Huizenga again consented, the Ritchie Debtors filed a Second Unopposed Motion to Extend Time for Filing and Approval of Appeal Bond, and Judge Flynn entered an Agreed Order granting an extension until November 6, 2015.

67.    When the Ritchie Debtors did not file an appeal bond in compliance with Rule 305(a) by November 6, 2015, Huizenga commenced proceedings to collect on the First Judgment. Huizenga served Citations to Discover Assets on the Ritchie Debtors, the Insurers, and others, returnable before Judge White (the "Citations"). The Citations served on the Ritchie Debtors' insurers—including the Insurer defendants here—froze the proceeds on their policies, making them unavailable to fund the Ritchie Debtors' appeal.

68.    On November 12, 2015, the Ritchie Debtors filed a Motion for Judgment on the Pleadings in the Ritchie/Insurer Action, asking Judge Atkins to enter an order declaring the Insurers obligated to obtain an appeal bond or other form of security in the Huizenga/Ritchie Action. On December 7, 2015, Judge Atkins entered an order granting the Ritchie Debtors' motion

26

and ordering that the Insurers were "obligated to pay all costs, which includes providing collateral…to secure an appeal bond in connection with the appeal of the Huizenga Action."

69.     On December 7, 2015, the Ritchie Debtors' attorneys in the Ritchie/Insurer Action, Reed Smith LLP ("Reed Smith"), emailed a copy of Judge Atkins' December 7th order to Huizenga's attorneys. With regard to all of Reed Smith's actions alleged in this Complaint, the Ritchie Debtors either (i) directed, controlled, or authorized Reed Smith's actions, or (ii) subsequently ratified Reed Smith's actions.

70.     On December 8, 2015, the Ritchie Debtors' attorneys in the Huizenga/Ritchie Action, Sidley Austin LLP ("Sidley"), emailed a copy of Judge Atkins' order to Huizenga as well, stating: "Ritchie received the attached opinion last night granting its motion for judgment on the pleadings and directing the carriers to post the collateral for the appeal bond. Can you please confirm that Huizenga will stand down on the citations?" With regard to all of Sidley's actions alleged in this Complaint, the Ritchie Debtors either (i) directed, controlled, or authorized Sidley's actions, or (ii) subsequently ratified Sidley's actions.

71.     Despite Judge Atkins' December 7th order, the Insurers still had not funded the appeal bond, which meant the Ritchie Debtors could not present Huizenga with an appeal bond in compliance with Rule 305(a). Therefore, Huizenga declined the Ritchie Debtors' request to "stand down on the citations." In a December 9, 2015 letter to Sidley, Huizenga's attorneys wrote: "We have no assurance whether or when an appropriate appeal bond will be posted sufficient to stay enforcement of the judgment. Until such bond is posted, we will proceed with our collection efforts."

72.     On December 14, 2015, the Ritchie Debtors filed a Motion for Continuance of Huizenga's Amended Citations to Discover Assets, arguing, "Judge Atkins' order effectively

27

renders these citation proceedings moot." In support of their motion, the Ritchie Debtors attached copies of the signed Undertakings they had provided to the Insurers, which stated: "The Ritchie Insureds represent and warrant that they will not assign or transfer to third parties any assets held as of the date of this Undertaking except in the ordinary course of business, or as required by law." This statement was, of course, false. As explained above, Ritchie Capital had already been fraudulently transferring assets to Ritchie SEZC for several months, and continued to do so thereafter.

73.     On December 16, 2015, attorneys for Huizenga, the Ritchie Debtors, and the Insurers appeared before Judge White. When the Ritchie Debtors argued that Judge Atkins' December 7th order rendered Huizenga's Citations moot, Huizenga's attorney explained that the Ritchie Debtors' argument was incorrect, because the Ritchie Debtors had not yet obtained an appeal bond. Huizenga's attorney further stated that Huizenga would not agree to dismiss the Citations unless and until the Ritchie Debtors provided Huizenga with an acceptable appeal bond in compliance with Rule 305(a)—i.e., a bond that ensured payment of the First Judgment so long as it was not overturned on appeal.

74.     That same day, the Ritchie Debtors filed a Motion for Enforcement in the Ritchie/Insurer Action, asking Judge Atkins to order the Insurers to comply with the December 7th order by funding the appeal bond. Two days later, the Insurers filed a Motion to Reconsider and a Motion to Stay Enforcement of the December 7th order.

75.     On December 18, 2015, the Insurers also filed a Memorandum in Opposition to the Ritchie Debtors' Motion for Enforcement. Among other things, the Insurers told the court that if they were required to fund the appeal bond, and the Ritchie Debtors then lost their appeal, the

28

Insurers could not repossess the appeal bond funds from Huizenga, and their only recourse would be to pursue repayment from the Ritchie Debtors. The Insurers stated:

    a. "[I]f Defendants are ordered to pay their full policy limits for an appellate bond now, and if Plaintiffs lose their appeal, the harm to Defendants cannot be undone by a subsequent ruling in this action that the bond was not covered. The money will be gone…."

    b. "[I]f the Order is not stayed, and Defendants are forced to put up their entire policies' limits…only for this Court or a higher court to conclude that the bond was not covered after all, Defendants will be forced to tax this Court's time and resources further with litigation to recoup from [Ritchie] Plaintiffs the payments Defendants never owed."

The Insurers knew and intended that these statements would reach Huizenga and influence its actions, which they did.

    76.    On December 21, 2015, Judge Atkins held oral argument on the Motion for Enforcement. At that hearing the Insurers again represented to the court that if they were required to post collateral for the appeal bond, and the Ritchie Debtors lost their appeal, the appeal bond money would be delivered to Huizenga and the Insurers' only recourse would be against the Ritchie Debtors. The attorneys for Arch, BatesCarey LLP ("BatesCarey") stated:

    a. "[I]f we post the bond and there's no stay, there's a danger we're just going to lose our appellate rights because the money is going to go away. They can't pay it back. So we have lost any meaningful review on appeal if we can't get a stay of the need to post a bond here."

    b. "[I]f we post a bond, and they lose on appeal, the money is gone."

The Insurers knew and intended that these statements would reach Huizenga and influence its actions, which they did.

    77.    BatesCarey represents Arch in the Ritchie/Insurer Action, and DLA Piper LLP ("DLA") represents CNA in the Ritchie/Insurer Action (which is ongoing). However, Arch and CNA effectively conduct a joint defense in that action. For example, they submit joint pleadings and make joint arguments at hearings. With regard to all of BatesCarey's actions as alleged in this

Complaint, therefore, both Arch and CNA either (i) directed, controlled, or authorized those actions, or (ii) subsequently ratified those actions.

78.     On January 15, 2016, Judge Atkins entered an order granting the Ritchie Debtors' Motion for Enforcement, which stated: "The…Insurers are hereby required to either pay all costs, including providing collateral, within their policy limits to secure an appeal bond in connection with the Huizenga Action, or alternatively to file their insurance policies as security to stay the in-progress Huizenga action." The same day, Judge Atkins also entered orders denying the Insurers' Motion to Reconsider and Motion to Stay Enforcement of the December 7th order. Separately, the Ritchie Debtors' attorneys at Sidley and Reed Smith each sent copies of these orders to Huizenga's attorneys.

79.     On January 19, 2016, the attorneys for Arch, BatesCarey, stated to Huizenga's attorneys that while the Insurers had not yet decided how they would proceed with regard to Judge Atkins' January 15th order, they had three options.

      a.  First, the Insurers could file an emergency motion with the Appellate Court, seeking a stay of Judge Atkins' January 15th order granting the Motion for Enforcement.

      b.  Second, the Insurers could secure the appeal bond as ordered and then appeal Judge Atkins' coverage ruling. As they had previously acknowledged, under this option, the Insurers' only recourse would be against the Ritchie Debtors.

      c.  Third, the Insurers could simply comply with Judge Atkins' orders and secure the appeal bond.

BatesCarey stated the Insurers would decide on a course of action before the next hearing in front of Judge White, scheduled for January 20, 2016.

80.     At the January 20, 2016 hearing before Judge White, the Insurers stated that they had selected the first option—to file an emergency motion with the Appellate Court, seeking a stay of Judge Atkins' order on the Motion for Enforcement. When Huizenga's attorneys asked Judge

30

White to order the Ritchie Debtors to begin producing documents responsive to the Citations, the Ritchie Debtors objected, arguing that if the Appellate Court denied the Insurers' emergency motion and they were required to fund the appeal bond, producing documents responsive to the Citations would be unnecessary. Persuaded by the Ritchie Debtors' argument, Judge White then continued the Citation proceedings until February 22, 2016.

81.    On January 20, 2016, the Ritchie Debtors sent a letter to the Insurers threatening to file a motion seeking a contempt finding and penalties if the Insurers did not secure the appeal bond as required by Judge Atkins' January 15th order.

82.    This left the Ritchie Debtors and the Insurers in what appeared to be diametrically opposed positions. On the one hand, the Ritchie Debtors were desperate for the Insurers to fund the appeal bond, because without it, the Ritchie Debtors claimed they had no way of financing their appeal or stopping Huizenga's collection efforts. (The truth, of course, is that Thane Ritchie had fraudulently transferred Ritchie Capital's assets to non-judgment debtor Ritchie SEZC). On the other hand, the Insurers were desperate to *avoid* funding the appeal bond, because—as they had publicly declared—once the bond was posted, there were no grounds to recoup it from Huizenga if the Ritchie Debtors lost their appeal. At the same time however, the Insurers wanted to avoid the contempt proceeding the Ritchie Debtors had threatened.

83.    Despite these conflicting interests, the Ritchie Debtors and the Insurers found common ground. They conspired to defraud Huizenga. To do so, the Insurers would obtain the appeal bond, which would allow them to avoid the threatened contempt proceeding. The Ritchie Debtors would then present the appeal bond to Huizenga, which would induce Huizenga to agree to stay enforcement efforts on the First Judgment and dismiss its pending Citations. This would unfreeze the assets of the Ritchie Debtors and the Insurers, which would allow the Ritchie Debtors

31

to pursue their appeal of the First Judgment using policy proceeds. Then, once the order was entered approving the bond, staying enforcement, and dismissing the Citations, the Insurers would immediately attempt to "cancel" the appeal bond—depriving Huizenga of the very consideration that had just induced it to agree to the transaction.

84.     Eventually, the Ritchie Debtors and the Insurers would enter into a written "Side Agreement" reflecting certain aspects of their plan. The carefully-written "Side Agreement" however, did not reflect the entirety of the plan to defraud Huizenga.

85.     The Ritchie Debtors and the Insurers knew that Huizenga would never agree to their proposal if it knew of either (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement. So, the Ritchie Debtors and the Insurers agreed to conceal their plan and Side Agreement from Huizenga, while selectively providing other information to Huizenga, to induce it to agree to their proposed entry of the appeal bond, stay of enforcement on the First Judgment, and dismissal of the Citations.

86.     For example, on January 25, 2016, the Ritchie Debtors notified Huizenga that they had reached an agreement with the Insurers, pursuant to which the Insurers would post collateral for the appeal bond. The Ritchie Debtors represented that they were "finalizing the papers" and would provide the agreement to Huizenga within days. The Ritchie Debtors did not disclose either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement.

87.     On or about February 1, 2016, one of the Ritchie Debtors' attorneys advised Huizenga's attorneys that the Insurers had selected a surety for the appeal bond, the surety was in the process of underwriting the appeal bond, and the appeal bond should be in place shortly. The Ritchie Debtors' attorneys did not disclose either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement.

32

88.    On February 1, 2016, one of the Ritchie Debtors' attorneys with Sidley emailed Huizenga's attorneys stating: "We agree to an appeal bond in the amount of $11,115,000. We'll put together an agreed motion, and send it to you for your review." The Ritchie Debtors' attorneys did not disclose either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement.

89.    By at least early February, the Ritchie Debtors and the Insurers were exchanging drafts of the Side Agreement, which, on information and belief, provided that the Insurers could attempt to "cancel" the appeal bond after it was entered. Neither the Ritchie Debtors nor the Insurers disclosed the existence of these drafts to Huizenga—much less sent the drafts to Huizenga—because they knew that if Huizenga was aware of the Side Agreement (or the larger plan to "cancel" the appeal bond), it would never agree to the entry of the appeal bond, a stay of enforcement on the First Judgment, or dismissal of the Citations.

90.    Thane Ritchie (on behalf of the Ritchie Debtors) and the Insurers executed the final Side Agreement on February 16, 2016. *See* Ex. B. Generally speaking, the Side Agreement provided that (i) the Insurers would secure the appeal bond as required by Judge Atkins' January 15th order, (ii) the Insurers would not file an emergency motion to stay Judge Atkins' January 15th order with the Appellate Court, and (iii) the Insurers could attempt to "cancel" the appeal bond after it was entered.

91.    The Side Agreement further provided that "[e]ach of the Parties to this Agreement"—including Thane Ritchie and Ritchie Capital—"hereby submits to personal jurisdiction of [the Circuit Court of Cook County or a federal court in the Northern District of Illinois] for the purposes of any action, motion, or other proceeding brought under or in connection with this Agreement…and waives any challenges to such personal jurisdiction."

33

92.    On February 16, 2016, one of the Ritchie Debtors' attorneys with Reed Smith stated to Huizenga's attorneys that (i) the Ritchie Debtors were still waiting on the surety to provide the appeal bond; (ii) all requested paperwork had been sent to the surety; and (iii) there were no more "loose ends" with respect to the Ritchie Debtors or the Insurers. The Ritchie Debtors' attorney with Reed Smith did not disclose either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement.

93.    On February 16, 2016, one of the Ritchie Debtors attorneys with Sidley emailed Huizenga's attorneys stating: "Attached is an agreed motion seeking approval of the appeal bond, and the bond paperwork signed by the carriers. We are still waiting on original signatures for the appeal bond itself (the form of which is also attached). ... After you've had a chance to review, could you please give me a call to discuss the mechanics of getting it on file?" The Ritchie Debtors' attorney attached the following documents to the email:

    a.    A draft Agreed Motion for Approval of Appeal Bond and Stay of Judgment;

    b.    A draft Appeal Bond;

    c.    A General Indemnity Agreement between Arch and the surety (*see* Ex. C);

    d.    An Inducement Letter from Arch to the surety;

    e.    A General Indemnity Agreement between CNA and the surety (*see* Ex. D);

    f.    An Inducement Letter from CNA to the surety;

    g.    A General Indemnity Agreement between Indian Harbor Insurance Company and the surety; and

    h.    An Inducement Letter from Indian Harbor Insurance Company to the surety.

94.    The Ritchie Debtors' attorney with Sidley did not disclose either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement. Sidley's claim (on the Ritchie Debtors' and Insurers' behalf) that it was providing Huizenga with "the bond paperwork signed by the carriers"

34

A-452

was false and misleading, because it omitted the most critical piece of "bond paperwork signed by the carriers"—i.e., the Side Agreement.

95.     Sidley was being paid by the Ritchie Debtors' insurance tower to defend the Huizenga/Ritchie Action (although Ritchie SEZC made supplemental payments to Sidley to pay for rates in excess of what the insurers were willing to pay). On information and belief, that is why Reed Smith began representing the Ritchie Debtors in the Ritchie/Insurer Action—i.e., Sidley was conflicted given its dual duty to the Ritchie Debtors and their insurance tower. When Sidley sent the email referenced in paragraph 93, it was therefore acting as an agent for not just the Ritchie Debtors but also their insurance tower, including the Insurer defendants. On information and belief, both the Ritchie Debtors and the Insurers either (i) directed, controlled, or authorized Sidley's actions as alleged in paragraph 93, or (ii) subsequently ratified Sidley's actions as alleged in paragraph 93.

96.     The General Indemnity Agreements between Arch and the surety and CNA and the surety, which were attached to Sidley's email, obligated Arch and CNA to provide the surety with collateral for the appeal bond upon request. They also included a representation that, "there are no other understandings or agreements…relative to this Agreement." That representation was false in light of (i) the plan to "cancel" the appeal bond, and (ii) the Side Agreement—neither of which were disclosed in the General Indemnity Agreements. On information and belief, Sidley received the General Indemnity Agreements from the Insurers—since the Ritchie Debtors were not parties to those agreements. The Ritchie Debtors and the Insurers knew and intended that this false representation would reach Huizenga via Sidley and influence Huizenga's behavior, which it did. Otherwise, there was no reason to send the agreements to Huizenga in the first place.

97.     On February 22, 2016, the attorneys for the Ritchie Debtors and the attorneys for Huizenga appeared before Judge White and orally presented an agreed motion for approval of the appeal bond and stay of enforcement of the First Judgment. The Ritchie Debtors and the Insurers had still not disclosed to Huizenga either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement—nor did they disclose them to Judge White. If Huizenga had been aware of either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement, it would have objected to the entry of the appeal bond, the stay of enforcement of the First Judgment, and the dismissal of the Citations.

98.     If Judge White had been aware of either (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement, he never would have approved the appeal bond, stayed enforcement of the First Judgment, or dismissed the Citations. Illinois Supreme Court Rule 305(a) specifically provides that appeal bonds must be "approved by…the court," and Judge White was not required to approve an appeal bond that the Insurers intended to cancel the moment it was entered (with the knowledge of the Ritchie Debtors—the appeal bond obligors). That, of course, would defeat the entire purpose of an appeal bond—i.e., to ensure that if the First Judgment was not reversed on appeal, Huizenga would promptly be paid in full—and a "cancellable" appeal bond would not comply with Rule 305(a).

99.     However, unaware of the both (i) the plan to "cancel" the appeal bond, and (ii) the Side Agreement, Judge White entered an agreed order—prepared by Sidley—approving the appeal bond, staying enforcement of the First Judgment pending appeal, and dismissing all Citations (including those directed toward the Ritchie Debtors and the Insurers).

36

100.   The Insurers proceeded to launch repeated efforts to "cancel" Huizenga's appeal bond, in the Circuit Court of Cook County, the Appellate Court of Illinois, and the Supreme Court of Illinois. For example:

a.   When the Insurers appealed Judge Atkins' decision, they asked the Appellate Court to expedite consideration of the appeal, claiming the court could permit the Insurers to repossess the collateral underlying the appeal bond. Huizenga was not a party to those proceedings and the Insurers did not serve Huizenga with their pleadings.

b.   When the Insurers filed their appeal briefs in the normal course, they asked the Appellate Court to "release…the collateral securing the appeal bond." Huizenga was not a party to those proceedings and the Insurers did not serve Huizenga with their pleadings.

c.   The Insurers filed a Motion for Supervisory Order with the Illinois Supreme Court, proposing that the Court could enter an order "releasing the bond securing the judgment in [the Huizenga/Ritchie Action]."

d.   The Insurers filed another pleading with the Illinois Supreme Court, in which they again asked the Court to "cancel" Huizenga's appeal bond. They also confirmed that they "have sought to cancel [the appeal bond] since the day it was entered on February 22, 2016." Again, Huizenga was not a party to these proceedings, and the Insurers did not serve Huizenga with their pleadings.

e.   After the initial Complaint was filed in this case, the Insurers filed a new lawsuit in the Circuit Court of Cook County, naming Huizenga as a defendant and demanding that the court "terminate" Huizenga's appeal bond. Judge Flynn described the Insurers' pursuit of that case as "more probably than not, sanctionable," and their efforts to "terminate" the bond as "silly."

101.   Although the Insurers had previously represented that they might challenge their *funding obligation* on the appeal bond—i.e., by appealing Judge Atkins' coverage ruling and pursuing repayment from the Ritchie Debtors—the Insurers had never given Huizenga any indication that they would attempt to "cancel" Huizenga's appeal bond after it was entered. Indeed, the Insurers were not even parties to the appeal bond, which was an agreement between Huizenga, the Ritchie Debtors, and the surety. In short, Huizenga had no reason to believe that the Insurers would attempt to "cancel" the appeal bond immediately after it was entered.

37

102.    Although all of these efforts failed, Huizenga was forced to incur significant expenses—including attorneys' fees and costs—defending its entitlement to the appeal bond proceeds. This includes expenses incurred in (i) opposing the Insurers' Motion for Supervisory Order, (ii) filing a petition to intervene in the Illinois Supreme Court proceedings in which the Insurers sought to "cancel" the appeal bond, (iii) defending the most recent lawsuit in which the Insurers named Huizenga as a defendant and asked the court to "terminate" the bond, and (iv) pursuing payment from the surety, which, as a result of the Insurers' threatened and pending litigation, refused to pay the appeal bond until late November 2017.

103.    Absent their undisclosed plan and "Side Agreement" with the Ritchie Debtors, the Insurers never would have embarked on their repeated attempts to "cancel" the appeal bond, because they knew the Ritchie Debtors would successfully argue that the Insurers had waived any objections to the appeal bond by funding it. Without their undisclosed plan and "Side Agreement" with the Ritchie Debtors, the Insurers would have instead either (i) requested a "friendly contempt" finding from Judge Atkins, and appealed his January 15th order, (ii) filed an emergency motion with the Appellate Court, seeking a stay of the January 15th order, or (iii) funded the appeal bond as ordered, appealed Judge Atkins' coverage ruling, and if successful, sought reimbursement from the Ritchie Debtors.

104.    Huizenga did not learn of the plan to "cancel" the appeal bond or the existence of the Side Agreement until long after the Citation proceedings before Judge White had been dismissed, nor did it have any opportunity to do so. Indeed, this was an objective of the Ritchie Debtors' and the Insurers' plan. By the time their fraud was uncovered, it would be too late for anyone to bring it to Judge White's attention.

105. In response to the motions to dismiss the initial Complaint in this action, Huizenga proposed that this Court could transfer the action to Judge White, who by that time, was presiding over another round of supplementary proceedings on the Second Judgment. In response, Reed Smith—itself a citation respondent—filed a motion for substitution of judge, preventing Judge White from learning of, and dealing with, the fraud once again.

## COUNT IV – Fraud
### (Against the Ritchie Debtors)

106. Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

107. The Ritchie Debtors made a series of material false and misleading statements to Huizenga, to induce Huizenga to (i) agree to the entry of the appeal bond, (ii) agree to a stay on enforcement of the First Judgment, and (iii) agree to the dismissal of the Citations. *See, e.g.,* ¶¶ 83-105.

108. To the extent any of the false and misleading statements the Ritchie Debtors made to Huizenga were technically true at the time they were made—and those statements were made prior to any discussions concerning (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement—those statements were still fraudulent, because the Ritchie Debtors obtained new information (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement) making their prior statements untrue or misleading and failed to disclose that new information to Huizenga.

109. To the extent any of the false and misleading statements the Ritchie Debtors made to Huizenga were technically true at the time they were made—and those statements were made after discussions began concerning (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement—they were still fraudulent, because the Ritchie Debtors failed to disclose matters

39

which materially qualified their statements (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement).

110.    By voluntarily providing Huizenga with certain documents and information concerning the appeal bond, the Ritchie Debtors assumed a responsibility not to deliberately conceal any other documents or information concerning the appeal bond (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement). The Ritchie Debtors breached this duty by concealing (i) the plan to "cancel" the appeal bond and (ii) the Side Agreement from Huizenga.

111.    Huizenga had no way of discovering the existence of the plan to "cancel" the appeal bond or the Side Agreement through reasonable inquiry.

112.    The Ritchie Debtors were aware that their statements to Huizenga were false and misleading. The Ritchie Debtors also knew that Huizenga was relying on their false and misleading statements.

113.    The fraudulent statements made by the Ritchie Debtors were wantonly and designedly made.

114.    In reliance on the false and misleading statements made by the Ritchie Debtors, on February 22, 2016, the attorneys for Huizenga appeared before Judge White and—along with the attorneys for the Ritchie Debtors—orally presented an agreed motion for approval of the appeal bond and stay of judgment. Judge White entered an agreed order, prepared by Sidley, (i) approving the appeal bond, (ii) staying enforcement of the Huizenga/Ritchie Action judgment pending appeal, and (iii) dismissing all Citations (including those directed toward the Ritchie Debtors). Huizenga never would have presented the agreed motion to Judge White if it had been aware of the truth, including (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement. Likewise, Judge White never would have entered the agreed order if he had been

40

aware of the truth, including (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement.

115.    The Ritchie Debtors' fraud fundamentally distorted the bargaining process between them and Huizenga. They knew that if Huizenga was aware of (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement, Huizenga would never negotiate with them concerning (i) the appeal bond, (ii) a stay of enforcement of the judgment, or (iii) dismissal of the Citations. So, the Ritchie Debtors chose to conceal those material facts from Huizenga.

116.    Huizenga has also been damaged by the Ritchie Debtors' fraud because in response to the Insurers' efforts to "cancel" Huizenga's appeal bond, Huizenga incurred attorneys' fees and costs in an attempt to preserve, and obtain payment on, its appeal bond.

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against the Ritchie Debtors, jointly and severally:

A. Awarding Huizenga actual, compensatory, and consequential damages in an amount to be proven at trial, but exceeding $250,000;

B. Awarding Huizenga punitive damages as a result of the Ritchie Debtors' wanton and designed fraud; and

C. Awarding Huizenga such other and further relief as the Court deems just and proper.

### COUNT V – Fraud
### (Against the Insurers)

117.    Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

118.    The Insurers made a series of material false and misleading statements to Huizenga, to induce Huizenga to (i) agree to the entry of the appeal bond, (ii) agree to a stay on enforcement of the First Judgment, and (iii) agree to the dismissal of the Citations. *See, e.g.,* ¶¶ 83-85, 89-91, 93-105.

41

119.    To the extent any of the false and misleading statements the Insurers made to Huizenga were technically true at the time they were made—and those statements were made prior to any discussions concerning (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement—those statements were still fraudulent, because the Insurers obtained new information (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement) making their prior statements untrue or misleading and failed to disclose that new information to Huizenga.

120.    To the extent any of the false and misleading statements the Insurers made to Huizenga were technically true at the time they were made—and those statements were made after discussions began concerning (i) the plan to "cancel" the appeal bond, or (ii) the Side Agreement—they were still fraudulent, because the Insurers failed to disclose matters which materially qualified their statements (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement).

121.    By voluntarily providing Huizenga with certain documents and information concerning the appeal bond, the Insurers assumed a responsibility not to deliberately conceal any other documents or information concerning the appeal bond (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement). The Insurers breached this duty by concealing (i) the plan to "cancel" the appeal bond and (ii) the Side Agreement from Huizenga.

122.    Huizenga had no way of discovering the existence of the plan to "cancel" the appeal bond or the Side Agreement through reasonable inquiry.

123.    The Insurers were aware that their statements to Huizenga were false and misleading. The Insurers also knew that Huizenga was relying on their false and misleading statements.

42

124.    The fraudulent statements made by the Insurers were wantonly and designedly made.

125.    In reliance on the false and misleading statements made by the Insurers, on February 22, 2016, the attorneys for Huizenga appeared before Judge White and—along with the attorneys for the Ritchie Debtors—orally presented an agreed motion for approval of the appeal bond and stay of judgment. Judge White entered an agreed order, prepared by Sidley, (i) approving the appeal bond, (ii) staying enforcement of the First Judgment pending appeal, and (iii) dismissing all Citations (including those directed toward the Insurers). Huizenga never would have presented the agreed motion to Judge White if it had been aware of the truth, including (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement. Likewise, Judge White never would have entered the agreed order if he had been aware of the truth, including (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement.

126.    The Insurers' fraud fundamentally distorted the bargaining process between them and Huizenga. They knew that if Huizenga was aware of (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement, Huizenga would never negotiate with them concerning (i) the appeal bond, (ii) a stay of enforcement of the judgment, or (iii) dismissal of the Citations. So, the Insurers chose to conceal those material facts from Huizenga.

127.    Huizenga has been damaged by the Insurers' fraud, because in response to the Insurers' efforts to "cancel" Huizenga's appeal bond, Huizenga incurred attorneys' fees and costs in an attempt to preserve, and obtain payment on, its appeal bond.

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against the Insurers, jointly and severally:

    A. Awarding Huizenga actual, compensatory, and consequential damages in an amount to be proven at trial, but exceeding $250,000;

43

**A-461**

B. Awarding Huizenga punitive damages as a result of the Insurers' wanton and designed fraud; and

C. Awarding Huizenga such other and further relief as the Court deems just and proper.

**COUNT VI – Conspiracy to Defraud**
**(Against the Ritchie Debtors and the Insurers)**

128.    Huizenga incorporates by reference and realleges every allegation above as if fully set forth herein.

129.    The Ritchie Debtors and the Insurers entered into an agreement to defraud Huizenga, with the intention of inducing Huizenga to (i) agree to the entry of the appeal bond, (ii) agree to a stay on enforcement of the First Judgment, and (iii) agree to the dismissal of the Citations.

130.    In furtherance of their conspiracy, the Ritchie Debtors and the Insurers engaged in a series of overt acts. Specifically, the Ritchie Debtors and the Insurers made a series of material false and misleading statements to Huizenga, to induce Huizenga to (i) agree to the entry of the appeal bond, (ii) agree to a stay on enforcement of the First Judgment, and (iii) agree to the dismissal of the Citations. *See, e.g.,* ¶¶ 83-105.

131.    To the extent any of the false and misleading statements the Ritchie Debtors and the Insurers made to Huizenga were technically true at the time they were made—and those statements were made prior to any discussions concerning (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement—those statements were still fraudulent, because the Ritchie Debtors and the Insurers obtained new information (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement) making their prior statements untrue or misleading and failed to disclose that new information to Huizenga.

132.    To the extent any of the false and misleading statements the Ritchie Debtors and the Insurers made to Huizenga were technically true at the time they were made—and those

44

A-462

statements were made after discussions began concerning (i) the plan to "cancel" the appeal bond or (ii) the Side Agreement—they were still fraudulent, because the Ritchie Debtors and the Insurers failed to disclose matters which materially qualified their statements (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement).

133.    By voluntarily providing Huizenga with certain documents and information concerning the appeal bond, the Ritchie Debtors and the Insurers assumed a responsibility not to deliberately conceal any other documents or information concerning the appeal bond (e.g., the plan to "cancel" the appeal bond and the existence of the Side Agreement). The Ritchie Debtors and the Insurers breached this duty by concealing (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement from Huizenga.

134.    Huizenga had no way of discovering the existence of the plan to "cancel" the appeal bond or the Side Agreement through reasonable inquiry.

135.    The Ritchie Debtors and the Insurers were aware that their statements to Huizenga were false and misleading. The Ritchie Debtors and the Insurers also knew that Huizenga was relying on their false and misleading statements.

136.    The fraudulent statements made by the Ritchie Debtors and the Insurers were wantonly and designedly made.

137.    In reliance on the false and misleading statements made by the Ritchie Debtors and the Insurers, on February 22, 2016, the attorneys for Huizenga appeared before Judge White and— along with the attorneys for the Ritchie Debtors—orally presented an agreed motion for approval of the appeal bond and stay of judgment. Judge White entered an agreed order, prepared by Sidley, (i) approving the appeal bond, (ii) staying enforcement of the First Judgment pending appeal, and (iii) dismissing all Citations (including those directed toward the Ritchie Debtors and the Insurers).

45

A-463

Huizenga never would have presented the agreed motion to Judge White if it had been aware of the truth, including (i) the plan to "cancel" the appeal bond or (ii) the existence of the Side Agreement. Likewise, Judge White never would have entered the agreed order if he had been aware of the truth, including (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement.

138.    The conspiracy fundamentally distorted the bargaining process between the Ritchie Debtors, the Insurers, and Huizenga. The Ritchie Debtors and the Insurers knew that if Huizenga was aware of (i) the plan to "cancel" the appeal bond and (ii) the existence of the Side Agreement, Huizenga would never negotiate with them concerning (i) the appeal bond, (ii) a stay of enforcement of the judgment, or (iii) dismissal of the Citations. So, the Ritchie Debtors and the Insurers chose to conceal those material facts from Huizenga.

139.    Huizenga has also been damaged by the conspiracy, because in response to the efforts to "cancel" Huizenga's appeal bond, Huizenga incurred attorneys' fees and costs in an attempt to preserve, and obtain payment on, its appeal bond.

WHEREFORE, Huizenga respectfully requests the entry of a judgment in its favor and against the Ritchie Debtors and the Insurers, jointly and severally:

A. Awarding Huizenga actual, compensatory, and consequential damages in an amount to be proven at trial, but exceeding $250,000;

B. Awarding Huizenga punitive damages as a result of the Ritchie Debtors' and Insurers' wanton and designed fraud; and

C. Awarding Huizenga such other and further relief as the Court deems just and proper.

**A-464**

Dated: May 25, 2018

Respectfully submitted,

/s/: *Christopher J. Barber*
Christopher J. Barber
Gary W. Garner
Jonathan D. Miller
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Phone: 312-443-3200
Fax: 312-630-8500
cjb@willmont.com
gwg@willmont.com
jm@willmont.com
Firm ID: 04933

*Attorneys for*
*Huizenga Managers Fund, LLC*

47

**A-465**

# Exhibit 30

E-FILED
Transaction ID: 1-17-2862
File Date: 6/8/2018 2:43 PM
Thomas D. Palella
Clerk of the Appellate Court
APPELLATE COURT 1ST DISTRICT

Nos. 1-17-2862 and 1-17-2863 (Consolidated)

## IN THE APPELLATE COURT OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| HUIZENGA MANAGERS FUND, LLC, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On appeal from the Circuit Court of |
| v. | ) | Cook County, Illinois, Chancery Division |
| | ) | |
| A.R. THANE RITCHIE, RITCHIE RISK- | ) | Case No. 07 CH 09626 |
| LINKED STRATEGIES, L.L.C., | ) | |
| RITCHIE PARTNERS, L.L.C., and | ) | Honorable Peter Flynn |
| RITCHIE CAPITAL MANAGEMENT, | ) | Judge Presiding |
| L.L.C., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

## PLAINTIFF-APPELLEE'S MOTION TO DISMISS
## APPEAL OF DEFENDANT-APPELLANT A.R. THANE RITCHIE

The fugitive disentitlement doctrine gives this Court discretion to dismiss the appeal of a defendant who is a "fugitive" in underlying trial court proceedings. In this case, Defendant-Appellant A.R. Thane Ritchie renounced his citizenship and fled the United States during the trial, and he has made it eminently clear that he does not intend to comply with any judgments or orders of the Illinois courts. Indeed, he has announced that, "he is not amenable to process issued by a court of this state." HSR 000150. Accordingly, this Court should invoke the fugitive disentitlement doctrine and dismiss this appeal in its entirety.[1]

---

[1] Thane Ritchie's appeal is Appeal No. 1-17-2863. The other Defendants-Appellants (Ritchie Capital Management, LLC, Ritchie Risk-Linked Strategies, LLC, and Ritchie Partners, LLC) filed a separate appeal, Appeal No. 1-17-2862.

**A-466**

## I.    **The Fugitive Disentitlement Doctrine**

"[I]llinois courts traditionally have followed the century old rule establishing that an appellate court has the discretionary power to refuse to hear a fugitive's appeal . . . ." *People v. Taylor*, 247 Ill. App. 3d 321, 323 (1st Dist. 1993); *see also United States v. Barnette*, 129 F.3d 1179, 1183 (11th Cir. 1997) ("We have the discretion to dismiss an appeal where the appellants are fugitives from prior court orders and, in effect, refuse to acknowledge the courts' authority over them—the fugitive disentitlement doctrine.").

Although Huizenga[2] has been unable to locate any reported Illinois state court decisions addressing whether the fugitive disentitlement doctrine applies in a civil context, Illinois courts, including this Court, have applied principles of disentitlement more generally in purely civil cases. *See, e.g., Chi. City Day Sch. v. City of Chi.*, 289 Ill. App. 3d 55, 681 N.E.2d 126, 128, 129 (1st Dist. 1997) (disentitling defendant to vacatur where city "provided the legal basis for the demolition" of building, thereby mooting appeal); *Burns v. Burns*, 35 Ill. App. 2d 34, 42 (1st Dist. 1962).   Several courts, including the Seventh Circuit, have similarly held that the fugitive disentitlement doctrine applies in civil cases. *See, e.g., Goya Foods, Inc. v. Unanue-Casal*, 275 F.3d 124, 128-29 (1st Cir. 2001) ("There is substantial precedent for dismissal of an appeal by one who has fled, even where the appeal is taken from a civil judgment." (citation omitted)); *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281-82 (2d Cir. 1997); *see also Maydak v. U.S. Dep't of Educ.*, 150 F.

---

[2] "Huizenga" refers to Plaintiff-Appellee Huizenga Managers Fund, LLC.

App'x 136, 138 (3d Cir. 2005) (per curiam); *Barnett v. YMCA, Inc.*, 268 F.3d 614, 618 (8th Cir. 2001); *Laparade v. Ivanova*, 116 F. App'x 100, 104 (9th Cir. 2004) (mem.) ("a court may dismiss a civil appeal where the party seeking relief is a fugitive from justice."); *Sarlund v. Anderson*, 205 F.3d 973, 975 (7th Cir. 2000) ("[T]here have been a number of cases in which civil suits or appeals were dismissed because the plaintiff's or appellant's fugitive status prejudiced his adversary and no alternative protection was feasible."); *Barnette*, 129 F.3d at 1183 ("Under certain circumstances the disentitlement doctrine may be even more applicable to civil than criminal cases: because a defendant-appellant's liberty is not at stake, less harm can come from the refusal to entertain the appeal."); *Broadway v. City of Montgomery*, 530 F.2d 657, 659 (5th Cir. 1976).[3]

Moreover, courts applying the fugitive disentitlement doctrine have held that "a fugitive from justice need not be a fugitive in a criminal matter to warrant application of the disentitlement doctrine." *Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997). Indeed, such courts have specifically applied the doctrine to judgment debtors that have fled pending their appeals of the litigation giving rise to the judgments against them. For example, the *Finkelstein* court held that "[w]e have discretion to dismiss the appeal of a civil litigant who becomes a fugitive to escape the effect of [a] civil judgment." *Id.* at 281-82 (explaining that defendants were "facing an immense

---

[3] Huizenga did locate a non-precedential, unreported Rule 23 Order in which the Appellate Court of Illinois, Second District, declined to apply the fugitive disentitlement doctrine to dismiss a civil appeal. *See In re Marriage of Chang*, 2016 IL App (2d) 150666-U. That Court relied on the parties' lack of Illinois authority for the doctrine. *Id.* ¶ 9. *But see, e.g.*, *Burns*, 35 Ill. App. 2d at 42.

3

**A-468**

judgment," "failed to show up for their properly-noticed depositions and failed to comply with a court order to appear before the district court"); *see also Goya Foods*, 275 F.3d at 129 (noting that "the [defendant's] flight grows directly out of [plaintiff's] effort to enforce its judgment in the civil proceeding which consumed years of litigation"); *Stoltenberg v. Ampton Invs., Inc.*, 159 Cal. Rptr. 3d 1, 6-8 (Cal. Ct. App. 2013).

As explained below, all of the requisite circumstances for application of the fugitive disentitlement doctrine are present here.

## II.    The Facts of This Case Merit the Application of the Fugitive Disentitlement Doctrine.

### A.    The Illinois Courts Find Thane Ritchie Liable to Huizenga for $22 Million.

In 2007, Huizenga sued Thane Ritchie, along with three of his eponymous corporate affiliates (together "Ritchie"), alleging that Ritchie sold Huizenga two investments (the "August Investment" and the "October Investment") in violation of the Delaware Securities Act ("DSA"). After a bench trial, in January 2015, Judge Flynn issued a memorandum opinion (i) finding Ritchie liable for violating the DSA in connection with the October Investment, and (ii) finding Ritchie not liable with regard to the August Investment. HSR 000001-53. In his opinion, Judge Flynn held that Thane Ritchie was "the undisputed captain of the Ritchie ship." HSR 000037. On August 25, 2015, Judge Flynn entered a judgment order, holding Thane Ritchie and his affiliates *jointly and severally* liable for $9,174,199.63 on the October Investment (the "First Judgment"). HSR 000054-95.

4

Ritchie appealed the finding of liability on the October Investment, and Huizenga cross-appealed the finding of non-liability on the August Investment. In December 2016, this Court entered an order (i) affirming the finding of liability on the October Investment, and (ii) reversing and remanding the finding of non-liability on the August Investment. *Huizenga Managers Fund, LLC v. Ritchie*, 2016 IL App (1st) 152733-U, ¶¶ 77, 79. Both the Illinois Supreme Court and the U.S. Supreme Court declined review.

Accordingly, in October 2017, Judge Flynn entered a second judgment order, holding Ritchie *jointly and severally* liable for $12,772,529.70 on the August Investment (the "Second Judgment"). HSR 000096-99. Judge Flynn also included a Rule 304(a) finding in the order and retained jurisdiction over "the assessment of attorneys' fees and costs in connection with the First Judgment and the Second Judgment." HSR 000098 at ¶¶ 8-9. Huizenga and Ritchie currently have dueling claims for attorneys' fees before Judge Flynn. Huizenga's claim for fees is pursuant to Section 73-605 of the DSA. 6 Del. C. § 73-605.

The Second Judgment is the subject of Thane Ritchie's current appeal.

**B.     Thane Ritchie Refuses to Pay the Second Judgment, Leaves the United States, Evades Service, and Ignores Court Orders in the Judgment Collection Proceedings.**

Judge Flynn's October 2017 order "sever[ed] collection matters pertaining to...the Second Judgment from the remainder of Case No. 07 CH 9626," and ordered that they be assigned a new case number, to facilitate their immediate transfer to the appropriate post-judgment calendar. HSR 000098 at ¶ 11. In a separate order, Judge Flynn ordered: "Counsel for the defendants in the new case shall be listed as John S.

Vishneski III, Paul R. Walker-Bright, Reed Smith LLP [the attorneys for the corporate Ritchie defendants in the underlying action], and Mitchell L. Marinello, Michael A. Weinberg, Elizabeth C. Wolicki, Novack and Macey LLP [the attorneys for Thane Ritchie in the underlying action]." HSR 000100 at ¶ 2.

The severed collection proceedings were assigned Case No. 17 CH 14072. Thane Ritchie refused to pay any portion of the Second Judgment. Instead, he disappeared. First, his attorneys at Novack and Macey LLP ("Novack") filed a "Notice of Non-Appearance," announcing that they "have been instructed by [Thane] Ritchie that Novack and Macey LLP and its attorneys are not authorized to appear on his behalf, or accept service on his behalf of any pleadings, motions, briefs, orders or other documents, in the new case, Case No. 17 CH 14072." HSR 000102 at ¶ 2.

Given Novack's "Notice of Non-Appearance" (perhaps more aptly referred to as Thane Ritchie's "Notice of Disappearance") Huizenga undertook extensive efforts to locate Thane Ritchie and serve him with a Citation to Discover Assets ("Citation"). Eventually, Huizenga was forced to file a Section 2-203.1 Motion for Service by Special Order of Court, in which it detailed those efforts. For example, Huizenga explained the following:

- Huizenga discovered that during the trial before Judge Flynn, Thane Ritchie had renounced his U.S. citizenship—without notifying either Judge Flynn or Huizenga. (HSR 000111);

- Huizenga discovered that Thane Ritchie had become a citizen of St. Kitts & Nevis—a country which allows individuals to purchase citizenship. (*Id.*);

- Huizenga discovered that after Judge Flynn entered his January 2015 memorandum opinion, Thane Ritchie (along with his Defendant-Appellant affiliates) had decamped for the Cayman Islands. (*Id.*);

- In July 2017, one of Thane Ritchie's attorneys sent Huizenga a letter stating that, "collection efforts against the Ritchie Parties will be fruitless and extremely expensive." (HSR 000112);

- In October 2017, one of Thane Ritchie's attorneys at Reed Smith LLP ("Reed Smith") sent Huizenga's attorneys an email stating that he did not know of any address where Thane Ritchie could be served. (*Id.*);

- In January 2018, two of Thane Ritchie's affiliate entities filed a pleading in Case No. 14 L 4675, pending in the Circuit Court of Cook County, acknowledging that Thane Ritchie was evading service of the Citation. Among other things, the pleading stated that Thane Ritchie "was unwilling to allow service to occur." (HSR 000113);

- In January and February 2018, Huizenga repeatedly attempted to serve Thane Ritchie at potential residences in (i) Whistler, British Columbia, (ii) West Vancouver, British Columbia, and (iii) the Cayman Islands. Huizenga had discovered foreign securities filings signed by Thane Ritchie in which he listed the latter two addresses as his service address. In each instance, it turned out that either (a) Thane Ritchie did not actually reside at the address, or (b) Thane Ritchie never appeared at the address, despite repeated attempts at service. (HSR 000115-119);

- By monitoring the case file in Case No. 14 L 4675, Huizenga learned that Thane Ritchie had been ordered to appear for his deposition in Chicago. When a process server attempted to serve Thane Ritchie with the Citation to Discover Assets outside the deposition site, Thane Ritchie's security team confronted the process server and announced that Thane Ritchie would not appear and would be on a chartered flight within 15 minutes. (HSR 000119-120).

Ritchie has never justified or explained his relocation outside of the United States.

In light of these facts, in February 2018, the Honorable Daniel J. Kubasiak, entered an order pursuant to Section 2-203.1, permitting Huizenga to serve Thane Ritchie with the Citation via (i) international mail, and (ii) the law firms representing him in various actions (including Reed Smith and Novack). HSR 000123.

Pursuant to Judge Kubasiak's order, on February 28, 2018 Huizenga served Thane Ritchie with a Citation, requiring him to appear before Judge Kubasiak on

March 15, 2018. HSR 000124; HSR 000125-137. Thane Ritchie did not appear as required, and Judge Kubasiak entered an order continuing the Citation and requiring Thane Ritchie to appear on April 10, 2018. HSR 00138. Thane Ritchie did not appear at the April 10th hearing either, and on April 18, 2018, Judge Kubasiak entered a Rule to Show Cause requiring Thane Ritchie to appear on June 26, 2018. HSR 000139-140.

Previously, Judge Kubasiak had entered a separate Rule to Show Cause against Thane Ritchie in his capacity as the Manager and President of Defendant-Appellant Ritchie Partners, LLC ("Ritchie Partners"), ordering him to appear before the Court on April 18, 2018, 2018. HSR 000141. Thane Ritchie did not appear at the April 18th hearing, and Judge Kubasiak entered an alias Rule to Show Cause, requiring Thane Ritchie to appear on June 26, 2018. HSR 000142.

Despite the fact that they had all been served with Citations, neither Thane Ritchie nor any of the other Ritchie Appellants-Defendants ever appeared as ordered. However, by serving dozens of Citations on third parties, Huizenga eventually learned that Thane Ritchie's lawyers at Clayborne, Sabo & Wagner LLP ("CSW") were holding millions of dollars of Thane Ritchie's assets. Specifically, in April 2018, CSW filed "Updated Responses" to a Citation, revealing that they had "possession of funds belonging to our client, A.R. Thane Ritchie, in the sum of $ 14,100,000.00." HSR 000143 ¶ 2. However, CSW further stated that, "A.R Thane Ritchie continues in his belief that this Court does not have proper jurisdiction of this matter due to defects in the record and the wrongful citations issued by the Plaintiff." HSR 000143 ¶ 3.

Notably, CSW never appeared on behalf of Thane Ritchie or any of the judgment debtors in the citation proceedings.

On April 24, 2018, Judge Kubasiak entered an order requiring CSW to turn over funds to Huizenga sufficient to satisfy the Second Judgment. HSR 000146-147.[4] CSW complied with the order later that day.

### C.    Thane Ritchie Evades Service in the Fraudulent Transfer Proceedings.

In January 2018, Huizenga filed a Complaint against Ritchie, alleging, among other things, that Thane Ritchie had orchestrated the fraudulent transfer of assets in order to avoid paying his judgment debts to Huizenga. *See Huizenga Managers Fund, LLC v. A.R. Thane Ritchie, et al.*, Case No. 17 L 9244 (Cir. Ct. Cook Cty.).

Like Judge Kubasiak in the collection proceedings (and for the same reasons), in March 2018, the Honorable John C. Griffin entered an order granting Huizenga leave to serve Thane Ritchie with the Complaint pursuant to Section 2-203.1, via (i) international mail, and (ii) the law firms representing Thane Ritchie in other matters (including Reed Smith and Novack). HSR 000148. Huizenga served Thane Ritchie pursuant to that order, but rather than answering the Complaint, he filed a Motion to Quash Service of Process, announcing that "he objects to taking part in any further proceedings in this Court on the ground that he is not amenable to process issued by a court of this state." HSR 000150.

---

[4] Huizenga had previously received payment on the First Judgment via an appeal bond financed by Ritchie's insurers.

9

Shortly after Huizenga filed an amended Complaint in the fraudulent transfer action, in June 2018, the law firm of Swanson, Martin & Bell LLP ("SMB") filed a motion for substitution of attorneys, stating that they intended to appear on Thane Ritchie's behalf "to formally object to the exercise of personal jurisdiction[.]" HSR 000159. Huizenga's attorneys emailed SMB, asking if they would either (i) accept service of the amended Complaint, or (ii) provide Huizenga with an address where Thane Ritchie could be served. SMB stated that it would not accept service, because Thane Ritchie intended to object to personal jurisdiction. As of the time this memorandum was filed, SMB had not responded to Huizenga's request for an address where Thane Ritchie could be served. HSR 000162-163.

**D.    After Fleeing Illinois and Ignoring Court Orders, Thane Ritchie Launches Collateral Litigation Against Huizenga in Delaware.**

Although he had disappeared from Illinois—and ignored the judgments and orders of the Illinois courts—Thane Ritchie eventually resurfaced in Delaware courts in order to launch collateral attacks on the Illinois courts' judgments.

**1.    *A.R. Thane Ritchie, et al. v. Huizenga Managers Fund, LLC*, Case No. N17C-05-598 MMJ CCLD (Del. Super. Ct.).**

First, in May 2017, Thane Ritchie filed a new action against Huizenga in the Superior Court of the State of Delaware, demanding that Huizenga be required to indemnify him for the judgments entered against him by the Illinois courts. *See* HSR 000164-204. Among other things, he argued that this Court had "disregarded Delaware precedent directly on point," HSR 000220, and had affirmed "a judgment that is manifestly incorrect under controlling Delaware law." HSR 000221. Thane Ritchie asked the Delaware court to "correct that fundamental injustice," HSR

10

**A-475**

000222, claiming that it could "remedy...the Illinois courts' disregard of the Delaware Supreme Court as the authoritative source of Delaware law." HSR 000216. Additionally, Thane Ritchie argued that "the Illinois courts' decisions...have...no effect at all in any other jurisdiction" HSR 000230—e.g., the jurisdictions that he had fled to.

On December 21, 2017, the Honorable Mary M. Johnston of the Delaware Superior Court entered an order staying the case pending the resolution of the underlying litigation before this Court and Judge Flynn. *See Ritchie v. Huizenga Managers Fund, LLC*, No. N17C-05-598, 2017 WL 7803924 (Del. Super. Ct. Dec. 21, 2017).

2.  ***Ritchie CT Opps, LLC, by and through its Managing Member Ritchie Partners, LLC v. Huizenga Managers Fund, LLC*, Case No. 2018-0196-SG (Del. Ct. Ch.)**

On March 19, 2018—a few days after Thane Ritchie failed to appear a required by the Citation issued in the collection proceedings—Defendant-Appellant Ritchie Partners filed another Complaint against Huizenga in Delaware, along with a motion for a temporary restraining order. Ritchie Partners asked the court to enjoin Huizenga from making any "disparaging" remarks or disclosing any "confidential information" about the Defendants-Appellants—including in court pleadings in Illinois. HSR 000245-265. According to Ritchie Partners, the "confidential information" that Huizenga should be barred from disclosing in Illinois included Thane Ritchie's "potential whereabouts." HSR 000282.

Ritchie Partners also proclaimed that, "it is no secret that the [Ritchie parties'] faith in the Illinois courts to correctly apply and enforce their contracts with

11

**A-476**

Huizenga has been greatly shaken by those courts' repeated refusal to apply decisional law of the Delaware Supreme Court." HSR 000315. And, Ritchie Partners went on to chastise this Court, claiming that it had "repeatedly ignored...case-dispositive precedent." *Id.*

This case remains pending before the Honorable Sam Glasscock III.

> **3.    *Ritchie Multi-Strategy Global, LLC v. Huizenga Managers Fund, LLC*, Case No. N18C-05-050 MMJ CCLD (Del. Super. Ct.)**

On May 3, 2018 Thane Ritchie's onshore fund—Ritchie Multi-Strategy Global, LLC—filed a Complaint against Huizenga, claiming that it wrongfully obtained the judgments entered pursuant to Judge Flynn's orders and this Court's December 29, 2016 Order.[5] In the Complaint, the onshore fund claims that it "has been damaged in that it has paid [Huizenga] at least $13,383,511.40 in judgments wrongly obtained by [Huizenga] against [Ritchie] that [Huizenga] was contractually obligated not to hold liable[,]" and "has also been damaged in that it paid at least $5,225,000.00 in attorneys' fees and other litigation costs defending [Ritchie] against claims that [Huizenga] was contractually prohibited from bringing." HSR 000333 at ¶ 47.

The case is currently pending before the Honorable Mary M. Johnston.

> **E.    Purporting to Be Beyond the Reach of the Illinois Courts Himself, Thane Ritchie Causes His Corporate Affiliates to File Harassing Lawsuits All Over Illinois.**

At the same time that he was blatantly ignoring judgments and orders entered

---

[5] According to the Office of the Illinois Secretary of State, the Manager for Ritchie Multi-Strategy Global, LLC is Defendant-Appellant Ritchie Capital Management, LLC. Additionally, Thane Ritchie signed Ritchie Multi-Strategy Global, LLC's 2017 Annual Report filed with the Illinois Secretary of State's Office. HSR 000319-320.

by the Illinois courts—and at the same time he claimed he "is not amenable to process issued by a court of this state"—Thane Ritchie began utilizing those same Illinois courts in order to harass Huizenga and its counsel.

    1.    ***John Doe Corp. 1 & John Doe Corp. 2 v. Huizenga Managers Fund, LLC, et al.***, **Case No. 18-CH-52 (Ill. Cir. Ct. Madison Cty.) – Now pending as Case No. 18-CH-236 (Ill. Cir. Ct. DuPage Cty.)**

On January 31, 2018, two of Thane Ritchie's affiliates filed a new Complaint against Huizenga in Madison County, Illinois. HSR 000337-376. They also obtained an *ex parte* temporary restraining order, which among other things, barred Huizenga and its attorneys from making any "remark," either "orally or in writing," that "indirectly" or "incidentally" "disparaged" Ritchie. HSR 000377-382.

Huizenga filed an Emergency Motion to Transfer, explaining that (i) venue in Madison County was improper; and (ii) the TRO was designed to inhibit Huizenga's ability to litigate against Ritchie (including by preventing counsel from effectively representing Huizenga at an impending hearing before Judge Flynn). The Madison County judge granted Huizenga's motion, noting that (i) "[T]here is no basis for venue that's been presented to me, to the Court, that I can determine that in fact venue is proper here[,]" and (ii) "[T]he timing of this does not escape me. [Plaintiffs'] timeliness just on the eve of a hearing in Chicago." *See* HSR 000420 at 38:2-4, 8-10. The judge also denied the plaintiffs' request to extend the *ex parte* TRO, which thereafter expired by its terms pursuant to 735 ILCS 5/11-101.

The case was transferred to DuPage County and is currently pending before the Honorable Bonnie M. Wheaton as Case No. 18-CH-000236.

**A-478**

2.    ***Ritchie Multi-Strategies Global, LLC, by and through its Managing Member Ritchie Capital Management, LLC v. Huizenga Managers Fund, LLC, et al.***, Case No. 18-CH-0135 (Ill. Cir. Ct. St. Clair Cty.) -- Now pending as Case No. 18-CH-6001 (Ill. Cir. Ct. Cook Cty.)

On March 8, 2018, Defendant-Appellant Ritchie Capital Management, LLC ("RCM") filed a Complaint in St. Clair County, Illinois, naming not just Huizenga as a defendant, but also Huizenga's undersigned counsel. HSR 000429-450. Five days later—without even notifying Huizenga or its counsel that a Complaint against them had been filed—RCM obtained another *ex parte* TRO. The TRO once again prohibited Huizenga and its lawyers from making any "disparaging" remarks about Ritchie or disclosing any "confidential" information about Ritchie, including in pleadings or at oral argument. HSR 000451-458.

Huizenga again filed a Motion to Transfer, explaining that (i) venue was improper in St. Clair County, and (ii) the TRO was intended to inhibit Huizenga's ability to litigate against Ritchie. The judge then entered an order granting Huizenga's motion, finding venue was improper in St. Clair County, and immediately transferring the case to Cook County. The *ex parte* TRO expired by its terms pursuant to 735 ILCS 5/11-101. HSR 000459.

The case was transferred to Cook County and is currently pending before the Honorable Sanjay T. Tailor as Case No. 18-CH-06001.

3.    ***Ritchie Risk Linked Strategies, LLC v. Williams Montgomery & John Ltd., et al.***, Case No. 2018-L-000507 (Ill. Cir. Ct. DuPage Cty.)

The next day, on May 4, 2018, Defendant-Appellant Ritchie Risk-Linked Strategies, LLC ("RRLS") filed a Complaint against the undersigned counsel (among

14

**A-479**

others), claiming that counsel is liable to RRLS for, among other things, "attempting to collect and/or collecting [the] judgment" affirmed by this Court in its December 29, 2016 Order. HSR 000463-464. Defendant-Appellant RRLS demanded $20,000,000.00 in damages from the undersigned counsel for this supposed wrongful conduct. HSR 000465.

On May 17, 2018, the DuPage County Circuit Court entered an order voluntarily dismissing this case without prejudice. HSR 000475.

III.    **Argument.**

This case cries out for the application of the fugitive disentitlement doctrine to dismiss Thane Ritchie's appeal. Well aware that the trial was not going well for him, he renounced his U.S. citizenship and fled the country. *See Barnette*, 129 F.3d at 1185 (applying fugitive disentitlement doctrine, and explaining that party "should not be entitled to an appeal in this court when she has repeatedly refused to abide by prior court orders, removed herself to the United Kingdom (beyond our reach), and renounced her United States citizenship"). Then, he openly evaded service and refused to show up for hearings in the collection proceedings. *See Finkelstein*, 111 F.3d at 281-82 (applying fugitive disentitlement doctrine where parties "failed to show up for their properly-noticed depositions and failed to comply with a court order to appear before the district court," and "[e]fforts failed to contact or locate defendants"). Then, he announced that he "is not amenable to process issued by a court of this state." HSR 00150; *see Barnette*, 129 F.3d at 1183 (court has discretion

15

**A-480**

to apply fugitive disentitlement doctrine where parties "refuse to acknowledge the courts' authority over them").

But perhaps most egregiously, Thane Ritchie then used the same Illinois courts that he claims have no jurisdiction over him to launch frivolous and harassing lawsuits against Huizenga and its counsel—obtaining multiple *ex parte* TROs and suing the undersigned counsel for $20,000,000.00 for daring to pursue collection efforts. *See Sarlund*, 205 F.3d at 975 (applying fugitive disentitlement doctrine, and noting, "There is nothing to prevent him from using the litigation process to harass the defendants with impunity, and no measure that we can think of short of dismissal of his suit that will protect the defendants from such harassment").

The reality is that if Thane Ritchie loses his appeal, nothing will change. He will sit wherever he is and refuse to pay any attorneys' fees assessed against him by Judge Flynn related to the Second Judgment. The only way he will reappear in Illinois is if he is somehow successful, when he will claim that the Illinois courts should award him attorneys' fees from Huizenga. That is exactly the sort of nonsense the fugitive disentitlement doctrine is designed to stop. *See id.* ("If the appellate court decides the appeal in his favor, he'll return, but if it decides against him, he won't, and the decision will have been a futility."); *see also Sapoundjiev v. Ashcroft*, 376 F.3d 727, 729 (7th Cir. 2004).

## IV.    Conclusion.

Huizenga respectfully requests that this Court apply the fugitive disentitlement doctrine and dismiss Thane Ritchie's appeal. In the alternative, if this

Court is inclined to give Thane Ritchie the opportunity to proceed, it should require a sworn representation from him and his attorneys that (i) he will submit to the jurisdiction of the Illinois courts in all related and collateral proceedings, and (ii) he will promptly comply with all orders and judgments entered by the Illinois courts.

Dated: June 8, 2018

*/s/: Christopher J. Barber*
Christopher J. Barber
Gary W. Garner
Jonathan D. Miller
WILLIAMS MONTGOMERY & JOHN LTD.
233 South Wacker Drive, Suite 6800
Chicago, Illinois 60606
Telephone: 312-443-3200
Facsimile: 312-630-8500
*Attorneys for Plaintiff-Appellee*
*Huizenga Managers Fund, LLC*

**A-482**