# Exhibit 41

TRANSCRIPT OF PROCEEDINGS                          June 29, 2018

1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

2           COUNTY DEPARTMENT - CHANCERY DIVISION

3

4    HUIZENGA MANAGERS FUND, LLC,          )

5            Plaintiff,                    )Case No.

6        vs.                              )07 CH 9626

7    A. R. THANE RITCHIE, et al.,          )

8            Defendants.                   )

9

10

11            TRANSCRIPT OF PROCEEDINGS had in the

12   above-entitled cause on the 29th day of June, A.D.

13   2018, at 9:45 a.m.

14

15

16

17

18

19

20   BEFORE:  HONORABLE PETER A. FLYNN.

21

22

23

24

TRANSCRIPT OF PROCEEDINGS                                      June 29, 2018

---

Page 2

1   APPEARANCES:

2

3        WILLIAMS, MONTGOMERY & JOHN, LTD.,

4        (233 South Wacker Drive, Suite 6100,

5        Chicago, Illinois 60606-6359,

6        312-443-3200), by:

7        MR. CHRISTOPHER J. BARBER,

8        cjb@willmont.com,

9        MR. JONATHAN MILLER,

10       jm@willmont.com,

11            appeared on behalf of the Plaintiff;

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 3

1   APPEARANCES:  (Continued)

2

3        REED SMITH, LLP,

4        (10 South Wacker Drive, 40th Floor,

5        Chicago, Illinois 60606-7507,

6        312-207-1000), by:

7        MR. PAUL R. WALKER-BRIGHT,

8        pwalkerbright@reedsmith.com,

9            -and-

10       CLAYBORNE, SABO & WAGNER LLP,

11       (525 West Main, Suite 105,

12       Belleville, Illinois 62250,

13       618-239-0187), by:

14       MR. B. JAY DOWLING,

15       jdowling@cswlawllp.com,

16            appeared on behalf of Defendant

17            Ritchie Risk-Linked Strategies, LLC.

18

19

20

21

22   REPORTED BY:

23            DINA G. MANCILLAS, CSR, RPR, CRR, CLR

24            CSR No. 84-3400

---

Page 4

1        THE COURT:  07 CH 9626, Huizenga versus

2   Ritchie.

3        MR. BARBER:  Good morning, Your Honor.

4        Chris Barber and Jonathan Miller

5   on behalf of the defendant.

6        MR. DOWLING:  Jay Dowling on behalf of

7   Ritchie Risk-Linked Strategies.

8        THE COURT:  Of the defendant?

9        MR. BARBER:  Well, it's considered a

10  new case, actually.  It should have been

11  captioned as a petition.

12       THE COURT:  It's a 2-1401.

13       MR. BARBER:  Right.

14       THE COURT:  You're not the defendant.

15  You're the plaintiff.

16       MR. BARBER:  Okay.

17       THE COURT:  The new case is a piece of

18  mysticism that exists because of -- under old

19  common law writs which are subsumed into

20  2-1401.  You did have to file a new case, but

21  the way 2-1401 is structured, if you do file

22  a new case, somebody is going to get mad at

23  you, and they shouldn't because 2-1401 sweeps

24  in all of the old stuff.

---

Page 5

1        The easier way to do it is to say

2   you're here for Huizenga, okay?

3        MR. BARBER:  I'm here for Huizenga.

4        MR. WALKER-BRIGHT:  Judge, Paul

5   Walker-Bright as well on behalf of Ritchie

6   Risk-Linked Strategies.

7        As a sort of -- --

8        THE COURT:  Now, hold on,

9   Mr. Walker-Bright.

10       MR. WALKER-BRIGHT:  Of course.

11       THE COURT:  You're here from Reed

12  Smith, right?

13       MR. WALKER-BRIGHT:  Yes.

14       THE COURT:  Is Reed Smith a party to

15  the motion or -- to, the 2-1401 petition that

16  Huizenga seeks to strike --

17       MR. WALKER-BRIGHT:  Well --

18       THE COURT:  -- or are you co-counsel on

19  it?

20       MR. WALKER-BRIGHT:  Before we get to

21  that, Judge, I --

22       THE COURT:  No.  I would like my

23  question answered before we go any further.

24       MR. WALKER-BRIGHT:  Sure.

---

TRANSCRIPT OF  PROCEEDINGS                          June 29, 2018

---

Page 6

1   THE COURT:  Are you co-counsel on this
2   or not?
3        MR. WALKER-BRIGHT:  We are co-counsel
4   for the Ritchie Risk-Linked Strategies, yes,
5   Judge.
6        THE COURT:  Okay.  Now, you were going
7   to say something else.  Go ahead.
8        MR. WALKER-BRIGHT:  Yes.  Yesterday,
9   late yesterday --
10       THE COURT:  I have that.
11       MR. WALKER-BRIGHT:  Okay.  Good.
12            So the case is essentially now
13   in -- there's a bankruptcy case that has been
14   filed by Ritchie Risk-Linked Strategies in
15   Delaware, which imposes an automatic stay on
16   this action.
17       THE COURT:  Well, wait a minute.  I
18   don't know that it imposes an automatic stay
19   on this action or, more specifically, on the
20   2-1401 petition, which is brought by the
21   debtor, not against the debtor.
22            There's extensive case law under
23   the precise scope of 362(a).  The case law
24   suggests that the precise scope of 362(a)

---

Page 7

1   differs, depending on whether we're looking
2   at a Chapter 11, a Chapter 7, a Chapter 13 or
3   something else.
4            I'm not going to jump to a
5   conclusion about what parts, if any, of this
6   proceeding are subject to an automatic stay
7   without hearing, in more detail, from all
8   parties about that.
9            I have, of course, no intention
10   whatsoever of incurring the wrath of the
11   federal bankruptcy court, but I want to be
12   sure that the stay extends to this
13   proceeding.
14            There is further an aspect of
15   this proceeding which, my sense is, would not
16   be subject to the stay, in any event.  To the
17   extent that the matters presently pending
18   before the Court include a sanctions motion
19   against counsel who are responsible for the
20   filing of the 2-1401 petition, since counsel
21   aren't in the bankruptcy, to the extent that
22   the Court considers a sanctions motion only
23   with respect to counsel, that wouldn't
24   implicate 362(a).

---

Page 8

1            What I want you to do, all of
2   you, is to work out a fairly expeditious
3   briefing schedule, the purpose of which is to
4   answer the question of, what parts of the
5   current proceeding, if any, does the 362(a)
6   stay apply to?
7            And I'll offer you a little oral
8   footnote on that score.  No matter how broad
9   a stay is, any party can go before the
10   bankruptcy court and ask that the stay be
11   lifted for purposes of proceeding with this
12   or that or the other thing.
13            The determination whether to lift
14   an applicable stay is, of course, up to the
15   bankruptcy court, not this Court, but nothing
16   stops any of you from asking the bankruptcy
17   court to sort that out.
18            So that's going to be Step 1
19   here.  As to the next steps, I've read the
20   six inches of material that Ritchie
21   Risk-Linked Strategies, LLC, has provided in
22   support of its motion to vacate void
23   judgments.
24            I do not think you can talk me

---

Page 9

1   out of my conclusion that --
2        MR. DOWLING:  Well, excuse me, Your
3   Honor, but how can we proceed with the
4   hearing if we still haven't addressed whether
5   or not the stay is --
6        THE COURT:  Why don't you let me
7   finish?
8        MR. DOWLING:  That's fine, sir.
9        THE COURT:  I very much doubt that you
10   can talk me out of my conclusion that the
11   motion to vacate void judgments is not just
12   wrong, but frivolous, for all of the reasons
13   that are stated in Huizenga's motion to
14   dismiss the motion to vacate void judgments,
15   but Huizenga's motion is not just a motion to
16   dismiss the 2-1401.  It is also a motion for
17   sanctions.
18            You're going to have to address
19   specifically in your briefing on the 362(a)
20   to what extent a sanctions motion can go
21   forward if the litigant, who is a potential
22   subject of the sanctions motion, is in
23   bankruptcy.
24            You should also address whether a

---

Page 10

1  sanctions motion, which is aimed only at a
2  law firm representing a litigant, is subject
3  to a 362(a) stay which applies only to the
4  litigant.  Off the top of my head, I'm not so
5  sure it is, but we'll see.
6        The further briefing that I am
7  going to want from you, in the event that the
8  sanctions motion is not automatically stayed
9  in its entirety -- I'm reasonably sure that
10 it isn't -- is a response by Ritchie
11 Risk-Linked Strategies and/or its counsel to
12 the sanctions motion.
13       I treat the sanctions motion very
14 serious.  The antics which have gone on in
15 this case -- most of which I can't address
16 because I have them by hearsay, but some of
17 which I can address because they're right
18 here -- rather resemble the conduct of the
19 sanctioned litigant in Teledyne versus
20 Shekar, S-h-e-k-a-r, 2018 U.S. App. LEXIS
21 17153.  I have a copy of that here.
22       (Document tendered.)
23       THE COURT:  It's very recent.  It's an
24 unpublished 7th Circuit order, but the

Page 11

1  Federal Rules of Appellate Procedure
2  specifically say that that there is no
3  prohibition on citing unpublished appellate
4  orders.  This is rather unlike our Rule 23.
5        Talk to each other about how long
6  you think it will take you to address the
7  362(a) point, which is going to be the first
8  step in the further processing of this.
9        I mentioned my views about the
10 substance of the motion to vacate void
11 judgments because I see no need to entertain
12 further briefing on that, and I don't want
13 you to waste your time or money at this
14 juncture.
15       So once I am fully equipped and
16 everybody has had a chance to consider and
17 weigh in on the scope of the 362(a) stay as
18 it applies here or doesn't apply here, as the
19 case may be, we'll have a status, and I will
20 consider, what, if anything, I ought to do
21 next.
22       The best way to do it, I think,
23 is one step at a time.
24       MR. BARBER:  So we'll brief the 362

Page 12

1  issues first?
2        THE COURT:  That's correct.
3        MR. BARBER:  And do you want those
4  simultaneously exchanged?
5        THE COURT:  Talk to each other about
6  that.
7        MR. BARBER:  Okay.
8        THE COURT:  This is a situation in
9  which a simultaneous exchange probably
10 doesn't do anybody any harm, but I'm not
11 going to get in your way in that regard.
12       MR. BARBER:  Okay.  Our position is,
13 the law is pretty clear on the questions that
14 you've asked.
15       And then we'll have a status --
16 the Court would --
17       THE COURT:  You know what that reminds
18 me of?  I can't help it.
19       Do you ever come across the
20 British barrister and humorist and member of
21 Parliament, A.P. Herbert?
22       MR. BARBER:  Yes.
23       THE COURT:  Okay.  One of my favorite
24 cases written by A.P. Herbert -- he was the

Page 13

1  law reporter for "Punch" for a very long
2  time.
3        MR. BARBER:  Yes.
4        THE COURT:  One of my favorite cases is
5  a case in which the House of Lords is
6  debating whatever the heck point it was.
7        And the first law lord got up and
8  said, "The law is clear."
9        The second law lord got up and
10 said, "The law is clear," and, of course,
11 came to a conclusion diametrically opposed to
12 what the first one said.
13       We had a series of six law lords,
14 each of whom announced that the law was
15 clear, and the result was unintelligible.
16       MR. BARBER:  I've met a couple of law
17 lords that are like that.
18       THE COURT:  I strongly suspect that I
19 will get some memoranda on 362(a) which says,
20 "The law is clear," and come to markedly
21 different conclusions.
22       MR. BARBER:  So we'll do the -- well,
23 we'll come up with a simultaneous or we'll do
24 the standard stage briefing, but the bottom

TRANSCRIPT OF PROCEEDINGS                                                    June 29, 2018

Page 14

1   line is, it's only 362(a)?
2         THE COURT:  Only 362(a), but I want you
3   to address 362(a) with respect to --
4         MR. BARBER:  To the sanctions motion.
5         THE COURT:  -- the 2-1401, the
6   sanctions motion, and within the sanctions
7   motion, whether the sanctions motion -- or,
8   whether the 362(a) effect on the sanctions
9   motion covers Ritchie, lawyers, or both.
10        MR. BARBER:  Right.
11        THE COURT:  And then, you know, figure
12  out what the next step is after I know all
13  that.
14        MR. BARBER:  So we'll set a briefing
15  schedule and then a status shortly after it's
16  completed.
17        THE COURT:  Correct.
18        MR. BARBER:  And then we'll decide
19  whether there's a need to move on to the next
20  issue, which is a response to the sanctions
21  motion.
22        THE COURT:  Correct.
23        MR. BARBER:  Got it.
24        THE COURT:  As to the sanctions motion,

Page 15

1   by the way, or just as to general
2   information, can you tell me offhand -- just
3   informationally, not because I'm making a
4   record on it -- what the status is of the
5   TROs downstate?
6         MR. BARBER:  Well, there's two of them,
7   and they are no longer downstate.  The one
8   TRO was transferred up to DuPage County,
9   Judge Wheaton.
10        We had a motion to dismiss --
11  that was the --
12        THE COURT:  DuPage?
13        MR. BARBER:  DuPage County, yes.
14        We had a motion to dismiss
15  pending, fully briefed and set to be argued
16  last week, Wednesday morning, I think.  And
17  counsel walked in that morning or the night
18  before and filed this petition to vacate
19  claiming that that motion to dismiss couldn't
20  go forward and asking for an indefinite stay.
21        Judge Wheaton basically said,
22  "There's no way I'm giving you an indefinite
23  stay.  Either nonsuit your case, or we're
24  going to decide the motion to dismiss."

Page 16

1         Counsel so chose to nonsuit, but
2   we have a pending motion to dissolve the TRO
3   because we don't want that remaining of
4   record, and the judge is going to decide that
5   issue.
6         And then in addition, we let the
7   judge know we're intending on filing a
8   Rule 137 motion with respect to all aspects
9   of that case and the pleadings in it.
10        So that's one case.  The second
11  case is in Cook County in front of Judge
12  Tailor.  And counsel, as soon as it was
13  transferred up to Cook County, tried to
14  nonsuit the case, but we had filed a motion
15  to dismiss, "we" being the law firm.  That's
16  the one where we're named individually.
17        We filed a motion to dismiss.
18  Judge Tailor exercised his discretion and
19  decided he would consider our motion to
20  dismiss at our motion to dissolve and for
21  fees in that case, and we also will be filing
22  a Rule 137 motion in that case as well once
23  he's decided the other two aspects of the
24  case.

Page 17

1         So those are the other two
2   remaining cases in Illinois, a total of
3   three, including this one.  There was a
4   fourth out in DuPage that was voluntarily
5   dismissed before we were ever served.
6         MR. DOWLING:  Your Honor, more
7   specifically, Judge Wheaton voluntarily
8   dismissed the case out there and simply
9   entered an order saying that if the --
10        THE COURT:  Judge Wheaton wouldn't
11  voluntarily dismiss a case.  A litigant
12  might.
13        Did she grant a motion
14  under 2-1009?
15        MR. DOWLING:  She granted a motion.
16  She made a suggestion on the record.  We took
17  that -- her advice, asked for it to be
18  nonsuited.  She entered the order nonsuiting
19  it.
20        She also then gave permission for
21  the respondents to file whatever motion they
22  felt was necessary.
23        THE COURT:  The respondents being
24  Huizenga?

TRANSCRIPT OF  PROCEEDINGS                    June 29, 2018

Page 18

1        MR. DOWLING:  Correct.
2        THE COURT:  Okay.  What part of this is
3  in DuPage?
4        MR. DOWLING:  There was a TRO that was
5  filed by other entities that were not
6  judgment debtors in the case before you.
7        MR. BARBER:  It was the Madison case,
8  Judge.
9        THE COURT:  Who seemed to have filed
10  everywhere but here.
11        MR. DOWLING:  There was a reasonable
12  belief that venue was proper down in the
13  counties in which they were filed based
14  upon --
15        THE COURT:  I didn't ask for reasonable
16  belief about venue.  I just made the
17  observation that they filed everywhere but
18  here.
19        MR. DOWLING:  That is true.
20        MR. BARBER:  So DuPage was the Madison
21  County case, and Judge Tailor is the
22  St. Clair County case.
23            And then we have three cases
24  ongoing in Delaware, two in law court before

Page 19

1  Judge Johnson and one in chancery before
2  Judge Glasscock.
3        MR. DOWLING:  And the one before Judge
4  Glasscock is the one in which they were
5  sanctioned for misleading the Court.
6        MR. BARBER:  That's an absolutely false
7  statement, and we will be moving for 137
8  sanctions on that as well.
9        THE COURT:  Well, feel free.  Although,
10  that has absolutely nothing to do with what
11  is before me.
12        MR. BARBER:  No.  I understand that,
13  but it's just a false statement.  It's easily
14  disproven just by reading a transcript.
15        THE COURT:  As to all of the litigation
16  that is pending in Illinois, it is not clear
17  to me whether consolidation of some or all of
18  that litigation in this or some other court
19  would be appropriate.
20        MR. DOWLING:  That was actually brought
21  up, Your Honor, by them.  That was denied.
22  They filed a motion before Judge Jacobius.
23        MR. BARBER:  We filed a motion.
24        MR. DOWLING:  And then that was denied.

Page 20

1        THE COURT:  Judge Jacobius --
2        MR. BARBER:  It was denied without
3  prejudice, and we filed a motion merely to
4  transfer Judge Tailor's case over here.  It
5  was denied without prejudice if anything
6  changed.
7            I don't know how -- what the
8  logistics are of that, particularly
9  involving -- because we've got multi-county
10  cases.
11        THE COURT:  Multi-county transfers have
12  to be done by means of a supervisory order
13  from the Illinois Supreme Court, which does
14  do these things periodically.  Although, it's
15  not the commonest thing in the world, as you
16  can imagine.
17            Whether that is something to
18  think about here or whether some combination
19  of Judge Tailor's efforts and this Court's
20  efforts is something to consider here is
21  something that everybody ought to keep in
22  mind because contrary to the view that
23  Ritchie Risk-Linked appears to take, multiple
24  lawsuits in multiple forums is generally not

Page 21

1  a judicially approved thing because it
2  creates exponentially multiplied
3  opportunities for inconsistent rulings and
4  wastes of time and money, but this Court has
5  no independent authority to consolidate
6  anything with anything.  That's going to have
7  to come from a litigant.
8            This is why Alexander Bickel
9  said, "We're the least dangerous branch.  We
10  can only react."
11            I just want to make sure that the
12  opportunity to save everybody some time and
13  money is not completely lost on the litigants
14  here.  One might think otherwise, given the
15  history of all of this.
16            So work out your schedule.  Talk
17  to Kate about a hearing date once you've
18  figured out when I'm going to get the
19  memoranda.  I'm not going to need a great
20  deal of time to look at the memoranda, but I
21  will want a little bit of time, and we'll
22  move forward.
23        MR. BARBER:  Thank you, Your Honor.
24        MR. WALKER-BRIGHT:  Thank you, Judge.

TRANSCRIPT OF  PROCEEDINGS                                    June 29, 2018

Page 22

1   (WHEREUPON, the court
2   proceedings were concluded at
3   10:15 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 23

1                    CERTIFICATE
2                        OF
3            CERTIFIED SHORTHAND REPORTER
4
5           I, DINA G. MANCILLAS, CSR, RPR, CRR, CLR,
6   a Certified Shorthand Reporter of the State of
7   Illinois, CSR License No. 084-003400, do hereby
8   certify that I stenographically reported the
9   proceedings had at the hearing, as aforesaid, and
10  that the foregoing transcript is a true and accurate
11  record of the proceedings had therein.
12          IN WITNESS WHEREOF, I do set my hand at
13  Chicago, Illinois, this 29th day of June, 2018.
14
15
16  _____
17  DINA G. MANCILLAS, CSR, RPR, CRR, CLR
18  CSR License No. 084-003400.
19
20
21
22
23
24

U.S. Legal Support, Inc.
(312) 236-8352

A-588

TRANSCRIPT OF PROCEEDINGS

June 29, 2018
Index: 07..Delaware

## 0

**07** 4:1

## 1

**1** 8:18

**10:15** 22:3

**11** 7:2

**13** 7:2

**137** 16:8,22 19:7

**17153** 10:21

## 2

**2-1009** 17:14

**2-1401** 4:12,20, 21,23 5:15 6:20 7:20 9:16 14:5

**2018** 10:20

**23** 11:4

## 3

**362** 11:24

**362(a)** 6:23,24 7:24 8:5 9:19 10:3 11:7,17 13:19 14:1, 2,3,8

## 7

**7** 7:2

**7th** 10:24

## 9

**9626** 4:1

## A

**a.m.** 22:3

**A.P.** 12:21,24

**absolutely** 19:6, 10

**action** 6:16,19

**addition** 16:6

**address** 9:18,24 10:15,17 11:6 14:3

**addressed** 9:4

**advice** 17:17

**ahead** 6:7

**aimed** 10:1

**Alexander** 21:8

**and/or** 10:11

**announced** 13:14

**antics** 10:14

**App** 10:20

**appears** 20:23

**appellate** 11:1,3

**applicable** 8:14

**applies** 10:3 11:18

**apply** 8:6 11:18

**approved** 21:1

**argued** 15:15

**aspect** 7:14

**aspects** 16:8,23

**authority** 21:5

**automatic** 6:15, 18 7:6

**automatically** 10:8

## B

**bankruptcy** 6:13 7:11,21 8:10, 15,16 9:23

**Barber** 4:3,4,9, 13,16 5:3 11:24 12:3,7,12,22 13:3, 16,22 14:4,10,14, 18,23 15:6,13 18:7, 20 19:6,12,23 20:2 21:23

**barrister** 12:20

**based** 18:13

**basically** 15:21

**behalf** 4:5,6 5:5

**belief** 18:12,16

**Bickel** 21:8

**bit** 21:21

**bottom** 13:24

**branch** 21:9

**briefed** 15:15

**briefing** 8:3 9:19 10:6 11:12 13:24 14:14

**British** 12:20

**broad** 8:8

**brought** 6:20 19:20

## C

**captioned** 4:11

**case** 4:10,17,20, 22 6:12,13,22,23 10:15 11:19 13:5 15:23 16:9,10,11, 14,21,22,24 17:8,11 18:6,7,21,22 20:4

**cases** 12:24 13:4 17:2 18:23 20:10

**CH** 4:1

**chance** 11:16

**chancery** 19:1

**changed** 20:6

**Chapter** 7:2

**chose** 16:1

**Chris** 4:4

**Circuit** 10:24

**citing** 11:3

**claiming** 15:19

**Clair** 18:22

**clear** 12:13 13:8, 10,15,20 19:16

**co-counsel** 5:18 6:1,3

**combination** 20:18

**common** 4:19

**commonest** 20:15

**completed** 14:16

**completely** 21:13

**concluded** 22:2

**conclusion** 7:5 9:1,10 13:11

**conclusions** 13:21

**conduct** 10:18

**considered** 4:9

**considers** 7:22

**consolidate** 21:5

**consolidation** 19:17

**contrary** 20:22

**Cook** 16:11,13

**copy** 10:21

**correct** 12:2 14:17,22 18:1

**counsel** 7:19,20, 23 10:11 15:17 16:1,12

**counties** 18:13

**County** 15:8,13 16:11,13 18:21,22

**couple** 13:16

**court** 4:1,8,12,14, 17 5:8,11,14,18,22 6:1,6,10,17 7:11,18, 22 8:10,15,17 9:6,9 10:23 12:2,5,8,16, 17,23 13:4,18 14:2, 5,11,17,22,24 15:12 17:10,23 18:2,9,15, 24 19:5,9,15,18 20:1,11,13 21:4 22:1

**Court's** 20:19

**covers** 14:9

**creates** 21:2

**current** 8:5

## D

**dangerous** 21:9

**date** 21:17

**deal** 21:20

**debating** 13:6

**debtor** 6:21

**debtors** 18:6

**decide** 14:18 15:24 16:4

**decided** 16:19,23

**defendant** 4:5,8, 14

**Delaware** 6:15 18:24

**denied** 19:21,24 20:2,5

**depending** 7:1

**detail** 7:7

**determination** 8:13

**diametrically** 13:11

**differs** 7:1

**discretion** 16:18

**dismiss** 9:14,16 15:10,14,19,24 16:15,17,20 17:11

**dismissed** 17:5,8

**dissolve** 16:2,20

**document** 10:22

**doubt** 9:9

**Dowling** 4:6 9:2,8 17:6,15 18:1,4,11,19 19:3,20,24

**downstate** 15:5,7

**Dupage** 15:8,12,13 17:4 18:3,20

**E**

**easier** 5:1

**easily** 19:13

**effect** 14:8

**efforts** 20:19,20

**entered** 17:9,18

**entertain** 11:11

**entirety** 10:9

**entities** 18:5

**equipped** 11:15

**essentially** 6:12

**event** 7:16 10:7

**exchange** 12:9

**exchanged** 12:4

**excuse** 9:2

**exercised** 16:18

**exists** 4:18

**expeditious** 8:2

**exponentially** 21:2

**extends** 7:12

**extensive** 6:22

**extent** 7:17,21 9:20

**F**

**fairly** 8:2

**false** 19:6,13

**favorite** 12:23 13:4

**federal** 7:11 11:1

**feel** 19:9

**fees** 16:21

**felt** 17:22

**figure** 14:11

**figured** 21:18

**file** 4:20,21 17:21

**filed** 6:14 15:18 16:14,17 18:5,9,13, 17 19:22,23 20:3

**filing** 7:20 16:7,21

**fine** 9:8

**finish** 9:7

**firm** 10:2 16:15

**footnote** 8:8

**forums** 20:24

**forward** 9:21 15:20 21:22

**fourth** 17:4

**free** 19:9

**frivolous** 9:12

**front** 16:11

**fully** 11:15 15:15

**G**

**gave** 17:20

**general** 15:1

**generally** 20:24

**giving** 15:22

**Glasscock** 19:2,4

**Good** 4:3 6:11

**grant** 17:13

**granted** 17:15

**great** 21:19

**H**

**harm** 12:10

**head** 10:4

**hearing** 7:7 9:4 21:17

**hearsay** 10:16

**heck** 13:6

**Herbert** 12:21,24

**history** 21:15

**hold** 5:8

**Honor** 4:3 9:3 17:6 19:21 21:23

**House** 13:5

**Huizenga** 4:1 5:2,3,16 17:24

**Huizenga's** 9:13,15

**humorist** 12:20

**I**

**Illinois** 17:2 19:16 20:13

**imagine** 20:16

**implicate** 7:24

**imposes** 6:15,18

**inches** 8:20

**include** 7:18

**including** 17:3

**inconsistent** 21:3

**incurring** 7:10

**indefinite** 15:20,22

**independent** 21:5

**individually** 16:16

**information** 15:2

**informationally** 15:3

**intending** 16:7

**intention** 7:9

**involving** 20:9

**issue** 14:20 16:5

**issues** 12:1

**J**

**Jacobius** 19:22 20:1

**Jay** 4:6

**Johnson** 19:1

**Jonathan** 4:4

**judge** 5:4,21 6:5 15:9,21 16:4,7,11, 18 17:7,10 18:8,21

19:1,2,3,22 20:1,4, 19 21:24

**judgment** 18:6

**judgments** 8:23 9:11,14 11:11

**judicially** 21:1

**jump** 7:4

**juncture** 11:14

**K**

**Kate** 21:17

**L**

**late** 6:9

**law** 4:19 6:22,23 10:2 12:13 13:1,7,8, 9,10,13,14,16,20 16:15 18:24

**lawsuits** 20:24

**lawyers** 14:9

**LEXIS** 10:20

**lift** 8:13

**lifted** 8:11

**litigant** 9:21 10:2, 4,19 17:11 21:7

**litigants** 21:13

**litigation** 19:15, 18

**LLC** 8:21

**logistics** 20:8

**long** 11:5 13:1

**longer** 15:7

**lord** 13:7,9

**lords** 13:5,13,17

**lost** 21:13

**M**

mad 4:22
made 17:16 18:16
Madison 18:7,20
make 21:11
making 15:3
markedly 13:20
material 8:20
matter 8:8
matters 7:17
means 20:12
member 12:20
memoranda 13:19 21:19,20
mentioned 11:9
met 13:16
Miller 4:4
mind 20:22
minute 6:17
misleading 19:5
money 11:13 21:4,13
morning 4:3 15:16,17
motion 5:15 7:18, 22 8:22 9:11,13,14, 15,16,20,22 10:1,8, 12,13 11:10 14:4,6, 7,9,21,24 15:10,14, 19,24 16:2,8,14,17, 19,20,22 17:13,15, 21 19:22,23 20:3
move 14:19 21:22
moving 19:7
multi-county 20:9,11
multiple 20:23, 24

multiplied 21:2
mysticism 4:18

**N**

named 16:16
night 15:17
nonsuit 15:23 16:1,14
nonsuited 17:18
nonsuiting 17:18

**O**

observation 18:17
offer 8:7
offhand 15:2
ongoing 18:24
opportunities 21:3
opportunity 21:12
opposed 13:11
oral 8:7
order 10:24 17:9, 18 20:12
orders 11:4

**P**

Parliament 12:21
part 18:2
parties 7:8
parts 7:5 8:4
party 5:14 8:9
Paul 5:4

pending 7:17 15:15 16:2 19:16
periodically 20:14
permission 17:20
petition 4:11 5:15 6:20 7:20 15:18
piece 4:17
plaintiff 4:15
pleadings 16:9
point 11:7 13:6
position 12:12
potential 9:21
precise 6:23,24
prejudice 20:3,5
presently 7:17
pretty 12:13
Procedure 11:1
proceed 9:3
proceeding 7:6, 13,15 8:5,11
proceedings 22:2
processing 11:8
prohibition 11:3
proper 18:12
provided 8:21
Punch 13:1
purpose 8:3
purposes 8:11

**Q**

question 5:23 8:4

questions 12:13

**R**

react 21:10
read 8:19
reading 19:14
reasonable 18:11,15
reasons 9:12
recent 10:23
record 15:4 16:4 17:16
Reed 5:11,14
regard 12:11
remaining 16:3 17:2
reminds 12:17
reporter 13:1
representing 10:2
resemble 10:18
respect 7:23 14:3 16:8
respondents 17:21,23
response 10:10 14:20
responsible 7:19
result 13:15
Risk-linked 4:7 5:6 6:4,14 8:21 10:11 20:23
Ritchie 4:2,7 5:5 6:4,14 8:20 10:10 14:9 20:23
Rule 11:4 16:8,22
Rules 11:1

rulings 21:3

**S**

S-H-E-K-A-R 10:20
sanctioned 10:19 19:5
sanctions 7:18, 22 9:17,20,22 10:1, 8,12,13 14:4,6,7,8, 20,24 19:8
save 21:12
schedule 8:3 14:15 21:16
scope 6:23,24 11:17
score 8:8
seeks 5:16
sense 7:15
series 13:13
served 17:5
set 14:14 15:15
Shekar 10:20
shortly 14:15
simply 17:8
simultaneous 12:9 13:23
simultaneously 12:4
sir 9:8
situation 12:8
Smith 5:12,14
sort 5:7 8:17
specifically 6:19 9:19 11:2 17:7
St 18:22
stage 13:24
standard 13:24

**stated** 9:13

**statement** 19:7, 13

**status** 11:19 12:15 14:15 15:4

**stay** 6:15,18 7:6, 12,16 8:6,9,10,14 9:5 10:3 11:17 15:20,23

**stayed** 10:8

**step** 8:18 11:8,23 14:12

**steps** 8:19

**stops** 8:16

**Strategies** 4:7 5:6 6:4,14 8:21 10:11

**strike** 5:16

**strongly** 13:18

**structured** 4:21

**stuff** 4:24

**subject** 7:6,16 9:22 10:2

**substance** 11:10

**subsumed** 4:19

**suggestion** 17:16

**suggests** 6:24

**supervisory** 20:12

**support** 8:22

**Supreme** 20:13

**suspect** 13:18

**sweeps** 4:23

---
**T**
---

**Tailor** 16:12,18 18:21

**Tailor's** 20:4,19

**talk** 8:24 9:10 11:5 12:5 21:16

**Teledyne** 10:19

**tendered** 10:22

**thing** 8:12 20:15 21:1

**things** 20:14

**time** 11:13,23 13:2 21:4,12,20,21

**top** 10:4

**total** 17:2

**transcript** 19:14

**transfer** 20:4

**transferred** 15:8 16:13

**transfers** 20:11

**treat** 10:13

**TRO** 15:8 16:2 18:4

**TROS** 15:5

**true** 18:19

---
**U**
---

**U.S.** 10:20

**understand** 19:12

**unintelligible** 13:15

**unlike** 11:4

**unpublished** 10:24 11:3

---
**V**
---

**vacate** 8:22 9:11, 14 11:10 15:18

**venue** 18:12,16

**versus** 4:1 10:19

**view** 20:22

**views** 11:9

**void** 8:22 9:11,14 11:10

**voluntarily** 17:4,7,11

---
**W**
---

**wait** 6:17

**walked** 15:17

**Walker-bright** 5:4,5,9,10,13,17,20, 24 6:3,8,11 21:24

**waste** 11:13

**wastes** 21:4

**Wednesday** 15:16

**week** 15:16

**weigh** 11:17

**whatsoever** 7:10

**Wheaton** 15:9, 21 17:7,10

**work** 8:2 21:16

**world** 20:15

**wrath** 7:10

**writs** 4:19

**written** 12:24

**wrong** 9:12

---
**Y**
---

**yesterday** 6:8,9

Exhibit 42

# ReedSmith

**Driving progress**
through partnership

**Kurt F. Gwynne**
Direct Phone: +1 302 778 7550
Email: kgwynne@reedsmith.com

Reed Smith LLP
1201 North Market Street
Suite 1500
Wilmington, DE 19801-1163
+1 302 778 7500
Fax +1 302 778 7575
reedsmith.com

July 5, 2018

**Via Email and Overnight Courier**

Huizenga Managers Fund, LLC
c/o Christopher J. Barber, Esquire
Williams Montgomery & John, Ltd.
233 S. Wacker
Suite 6100
Chicago, IL 60606-6350

Re:    **Violations of the Automatic Stay, 11 U.S.C. § 362(a);**
       *In re Ritchie Risk-Linked Strategies, LLC,* **Chapter 11**
       **Bankruptcy Case No. 18-11555(KJC) (Bankr. D. Del.)**

Dear Mr. Barber:

We are bankruptcy counsel to Ritchie Risk-Linked Strategies, L.L.C. (the "Debtor"), which is a debtor and debtor in possession in Case No. 18-11555 (KJC), filed on June 28, 2018 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). On behalf of your client, Huizenga Mangers Fund, LLC ("Huizenga"), you have previously received service of a "Suggestion of Bankruptcy" in *Huizenga Managers Fund, LLC v. A.R. Thane Ritchie, et al.,* Case No 07-CH-9626 (the "Delaware Blue Sky Litigation"), which was commenced by Huizenga. The Suggestion of Bankruptcy was filed with the Illinois Circuit Court overseeing the Delaware Blue Sky Litigation, and it gave you notice that the Debtor had filed the Bankruptcy Case on the Petition Date.

We have received Plaintiff-Appellee's Motion to Supplement the Records Relating to Its (1) June 8, 2018 Motion to Dismiss Appeal and (2) June 19, 2018 Opposition to Ritchie Risk-Linked Strategies, LLC's Motion to Voluntarily Dismiss filed by Huizenga in connection with an appeal of the Delaware Blue Sky Litigation in the Appellate Court of Illinois First Judicial District (the "Appeal"). I write to inform you that your efforts to continue the prosecution of the Appeal or the underlying Delaware Blue Sky Litigation following the Petition Date violates the automatic stay imposed by section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

The Debtor's bankruptcy filing gave rise to an automatic stay pursuant to which all persons are barred from, among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against [the Debtor] that was or could have been commenced before the commencement of the case under this title, or to recover a claim against [the Debtor] that arose before the commencement of the case under this title" and "any act to collect, assess, or recover a claim against [the Debtor] that arose before the commencement of the [Bankruptcy Case]." *See* 11 U.S.C. § 362(a)(1) and (6).

ABU DHABI ♦ ATHENS ♦ AUSTIN ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH
NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

US_ACTIVE-141459950.1-KFGWYNNE 07/05/2018 10:17 AM

**ReedSmith**

Huizenga Managers Fund, LLC
c/o Christopher J. Barber, Esquire
July 5, 2018
Page 2

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors." *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 6296. "The purpose of the automatic stay is to maintain the status quo that exists at the time of the debtor's bankruptcy filing." *Pardo v. Nylcare Health Plans, Inc. (In re APF Co.),* 274 B.R. 408, 417 (Bankr. D. Del. 2001).

The alleged conduct underlying the Delaware Blue Sky Litigation occurred in or around 2007. Accordingly, Huizenga's claims (with respect to which the Debtor expressly denies any aspersions of wrongdoing) in the Delaware Blue Sky Litigation constitute prepetition claims under section 362(a).

To determine whether an action falls within the purview of Section 362(a)(1), a court must consider whether the underlying claim "at its inception" was "against the debtor." *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir. 1991); *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446, 449 (3d Cir. 1982). The Delaware Blue Sky Litigation "at its inception" was asserted "against the debtor," and, therefore, the proceedings regarding dismissal of the Debtor's appeal are stayed. *See St. Croix Condominium,* 648 F.2d at 449 (debtor's filing of a notice of appeal relating to a claim against the debtor was subject to the automatic stay under Section 362(a)(1) because the underlying action, at its inception, was against the debtor); *Borman v. Raymark Indus., Inc.,* 946 F.2d 1031, 1032 (3d Cir. 1991) ("automatic stay provisions ordinarily apply to appeals in actions originally brought against Chapter 11 debtors").

"The scope of the automatic stay is undeniably broad." *Cuffee v. Atl. Bus. & Cmty. Dev, Corp. (In re Atl. Bus. & Cmty. Corp.),* 901 F.2d 325, 327 (3d Cir. 1990); *see also Maritime Elec.,* 959 F.2d at 1204. The automatic stay applies even to ministerial acts. For example, a "ministerial" act such as entering a judgment previously announced prior to the debtor's filing of its bankruptcy petition is stayed. *Constitution Bank v. Tubbs,* 68 F.3d 685, 693 (3d. Cir. 1995) (post-petition, court could not enter judgment against debtor even though judgment was announced prior to the bankruptcy filing and purported to relate back pre-petition); *cf. Makaroff v. City of Lockport, N.Y.,* 916 F.2d 890, 892 (3d Cir. 1990) (creditor could not perfect lien "even if all that remained was a ministerial act"); *Pope v. Manville Forest Products Corp.,* 778 F.2d 238, 239 (5th Cir. 1985) ("just the entry of an order of dismissal, even if entered sua sponte, constitutes a judicial act toward the disposition of the case and hence may be construed as a 'continuation' of a judicial proceeding").

In addition, the Third Circuit has recognized that the automatic stay applies to claims against a non-debtor where the debtor is the real party in interest such that a judgment or finding against the non-debtor would operate as a judgment or finding against the debtor, rendering it liable for the claim against the non-debtor. *See McCartney v. Integra Nat'l Bank N.,* 106 F.3d 506, 511 (3d Cir. 1997) ("McCartney would have been the real party defendant in a deficiency judgment action by Integra against Lamar's. Any deficiency judgment entered against Lamar's would have operated as a judgment or finding against him; an outcome clearly in tension with the purposes of the automatic stay. Accordingly, Integra was stayed from pursuing a deficiency judgment action against the nondebtor third party Lamar's because

**ReedSmith**

Huizenga Managers Fund, LLC
c/o Christopher J. Barber, Esquire
July 5, 2018
Page 3

McCartney was, in essence, the real party in interest."); *see also Kaiser Group Intl., Inc. v. Kaiser Aluminum & Chemical Corp. (In re Kaiser Aluminum Corp.)*, 315 B.R. 655, 659-60 (D. Del. 2004) ("In sum, the Court concludes that the Bankruptcy Court correctly granted Kaiser Aluminum's motion to enforce the automatic stay. As the Bankruptcy Court recognized, the Travelers Adversary Action is, in all reality, directed against Kaiser Aluminum, and Kaiser Aluminum is entitled to the protection of the automatic stay.").

As you also know, under the Operating Agreements for the Debtor, Ritchie Multi-Strategy Global, LLC ("RMSG, LLC"), and Ritchie Energy, LLC and the three corresponding sets of "Material Contracts" (as defined therein), the Debtor, RMSG, LLC and Ritchie Energy, LLC are obligated to indemnify, defend, and hold harmless the Investment Manager and certain RCM Parties from any loss, cost, expense, liability, fee, and damages suffered or sustained by such Indemnified Party in connection with or related to acts and omissions or alleged acts or omissions arising out of the Investment Manager's/Sub-Advisor's performance of its/their duties as Investment Manager or Sub-Advisor. As a result, there is an identity of interest between the Debtor and the "Indemnified Parties" with respect to Huizenga's claims asserted over the past eleven years such that the Debtor is the real party in interest. Notably, Huizenga, in nearly every pleading that it has filed, has identified the defendants with a collective label, such as "Ritchie Defendants" or "Ritchie." Huizenga has repeatedly taken the position (which the Debtor opposes) that all of the RCM-managed private investment funds are essentially a single enterprise. Furthermore, you have gone as far as arguing that RMSG, LLC and other RCM-managed private investment funds that are not parties to the Delaware Blue Sky Litigation are unable to enforce their rights against Huizenga because of some unspecified "finding" that Judge Flynn supposedly made in the Delaware Blue Sky Litigation. Accordingly, Huizenga cannot now pretend that it is entitled to continue any action or proceeding that was commenced against the Debtor prior to the Petition Date on the grounds that such action or proceeding is continuing only against a non-debtor. In short, Huizenga's claims against the non-debtors are subject to the automatic stay because the Debtor is the real party in interest.

The automatic stay "is mandatory and 'applies to all entities.'" *Maritime Elec.*, 959 F.2d at 1206. A violation of the automatic stay has several consequences:

1.   Any actions taken in violation of the automatic stay, including the commencement or pursuit of judicial or administrative proceedings, are void *ab initio* and without effect.

     *See, e.g., Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 761 (3d Cir. 2013) (stay violation is "void without any action on the part of the debtor"); *Raymark Indus., Inc. vs LAI*, 973 F.2d. 1125, 1132 (3d Cir. 1992) ("bankruptcy court has the power to vacate the decision of the California Court of Appeal dismissing Raymark's appeal because actions taken in violation of the automatic stay are void *ab initio*") (cited in the Suggestion of Bankruptcy).

**A-595**

**ReedSmith**

Huizenga Managers Fund, LLC
c/o Christopher J. Barber, Esquire
July 5, 2018
Page 4

2.    Any "willful" violation of the automatic stay is grounds for contempt sanctions, including, *inter alia*, an award of the debtor's attorneys' fees and costs incurred in responding to those actions (and punitive damages).

> *See, e.g., In re Atl. Bus. & Cmty. Corp.*, 901 F.2d at 328-29 (willful stay violations "warrant the imposition of punitive damages, attorney's fees and costs"); "Willfulness" is established when an entity "violates the stay with the knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *In re Lansaw*, 853 F.3d 657, 664 n.4 (3d Cir. 2017) (quoting *Lansdale Family Rests., Inc. v. Weis Food Serv. (In re Lansdale Family Rests., Inc.) 977 F.2d 826, 829* (3d Cir. 1992)) (internal quotation marks omitted).

3.    "Good faith" is irrelevant to whether a stay violation is willful or whether compensation must be awarded.

> *See, e.g., In re Atl. Bus. & Cmty. Corp.*, 901 F.2d at 329 ("Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.") (quoting *In re Bloom*, 875 F.2d 224, 227 (9th Cir. 1989)) (internal quotation marks omitted); *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1088 (3d Cir. 1992) ("good faith" is "not sufficient under *Atlantic Business* to escape liability" for a stay violation); *see also, e.g., In re Lansdale Family Rests., Inc. 977 F.2d at 829 (citing Atlantic Business and University Medical Center); In re Lansaw, 853 F.3d at 664 n.4 ("rationales for resorting to stay violations, including the advice of counsel, are immaterial to whether [entity] violated the stay").*

Please be advised that any further violation of the automatic stay, including any prosecution of the Delaware Blue Sky Litigation, is "willful" and will compel the Debtor to file a contempt motion compensatory damages from the Bankruptcy Court.

**ReedSmith**

Huizenga Managers Fund, LLC
c/o Christopher J. Barber, Esquire
July 5, 2018
Page 5


Your cooperation in complying with the requirements of 11 U.S.C. § 362(a) are both expected and appreciated. We suggest that Huizenga and the Debtor take advantage of the breathing spell afforded by the automatic stay to determine if the parties can resolve their mutual claims and avoid the incurring of unnecessary fees and expenses. To that end, I look forward to hearing from you.

Respectfully,

Kurt F. Gwynne
For Reed Smith LLP

Attorneys for Ritchie Risk-Linked Strategies, LLC,
as Debtor and Debtor in Possession

cc:   John S. Vishneski, Esquire (via email)
      Jeremy Ryan, Esquire (via email)

Very truly yours,


Kurt F. Gwynne

KFG:sm

A-597

# Exhibit 43

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION

| | | |
|---|---|---|
| HUIZENGA MANAGERS FUND LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 L 9244 |
| | ) | |
| A.R. THANE RITCHIE; RITCHIE RISK-LINKED | ) | |
| STRATEGIES, LLC; RITCHIE PARTNERS, LLC, | ) | |
| RITCHIE CAPITAL MANAGEMENT, LLC; | ) | |
| RITCHIE CAPITAL MANAGEMENT SEZC | ) | |
| LTD.; ARCH SPECIALTY INSURANCE | ) | |
| COMPANY; and CONTINENTAL CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS RITCHIE CAPITAL MANAGEMENT LLC, RITCHIE PARTNERS, LLC AND RITCHIE RISK-LINKED STRATEGIES, LLC'S MOTION TO STAY LITIGATION

Defendants, Ritchie Capital Management, LLC ("RCM LLC"), Ritchie Partners, LLC ("Ritchie Partners") and Ritchie Risk-Linked Strategies, LLC (the "Risk-Linked Onshore Feeder Fund"), by their attorneys, Swanson, Martin & Bell, LLP, hereby moves to stay this litigation, and in support thereof, state as follows.

### STATEMENT OF RELEVANT FACTS

In 2007, Huizenga Managers Fund, LLC ("Huizenga") filed litigation against Defendants and others alleging a myriad of causes of actions, including fraud and breach of fiduciary duty, based on two investments that Huizenga made in the Risk-Linked Offshore Feeder Fund (the "Underlying Litigation"). Huizenga dropped its fraud and breach of contract claims and the parties went to trial on four counts: Counts I, II, VII and VIII as set forth in Huizenga's Third Amended Complaint filed in January 2009.

Huizenga failed to prevail on Counts VII and Count VIII, by which it sought to recover up to $30 million in damages under Delaware common law based upon an alleged breach of fiduciary duties supposedly owed by four different RCM-related defendants. Huizenga prevailed, however, on its two claims for statutory rescission under the Delaware Blue Sky Law. The rescission claims related to two separate sales of securities by the Risk-Linked Onshore Feeder Fund to Huizenga – one sale effective in August 2005 (the "August 2005 Sale") and the second sale effective in October 2005 (the "October 2005 Sale"). Both sales were consummated in Illinois. These two Delaware Blue Sky Law statutory rescission claims were reduced to two judgments entered by the Honorable Peter Flynn, and these judgments were then fully paid. There nevertheless remains pending before the Illinois Appellate Court for the First District an appeal by Defendants concerning the judgment that was entered in October 2017 with respect to the August 2005 Sale (the "Second Appeal").

Given the pending nature of the issues presented by the Second Appeal[1], Judge Flynn has not considered any request for reimbursement of attorneys' fees incurred by either party in the Underlying Litigation. Despite this fact, Huizenga filed the present lawsuit in September 2017, asking this Court to award damages it allegedly incurred in the Underlying Litigation arising out of a dispute between the parties concerning the appeal bond posted by the Defendants' insurance companies, and also to "avoid" transfers of interests of RCM, LLC in property, that Huizenga contends were made with the actual intent to hinder, delay or defraud Huizenga in its capacity as the holder of a contingent claim against RCM, LLC for attorneys' fees under the Delaware Blue Sky Law that it *might* be awarded against the Risk-Linked Onshore Feeder Fund in the Underlying

---

[1] In the Second Appeal, the Defendants contend that Judge Flynn exceeded his authority under the Mandate such that the Second Judgment is invalid with respect to certain of the Defendants.

Litigation at some later date and as to which RCM, LLC **might** be held vicariously liable for under Section 7323(b) as of the Delaware Blue Sky Law.[2]

On June 28, 2018, the Ritchie Fund filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code [*see in Re Ritchie Risk-Linked Strategies, LLC*, No. 18-11555(KJC)(Bankr. D. Del.)]. This bankruptcy action is now pending in the United States Bankruptcy Court for the District of Delaware. It is against this backdrop that Defendants present their motion.

### I.    THIS LITIGATION IS SUBJECT TO AN AUTOMATIC BANKRUPTCY STAY

The Risk-Linked Onshore Feeder Fund's bankruptcy filing gave rise to an automatic stay pursuant to which all persons are barred from, among other things, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against [the Debtor] that was or could have been commenced before the commencement of the case under this title, or to recover a claim against [the Risk-Linked Onshore Feeder Fund] that arose before the commencement of the case under this title" and "any act to collect, assess, or recover a claim against [the Debtor] that arose before the commencement of the [Bankruptcy Case]." *See* 11 U.S.C. § 362(a)(1) and (6).

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors." *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S. CODE CONG. & ADMIN. NEWS 6296. "The purpose of the automatic stay is to maintain the status quo that exists at the time of the

---

[2] Notably, RCM, LLC will not have any "secondary" liability under the Delaware Blue Sky Law if it can meet its burden of proving that (a) it did not know about the actionable omissions by which the Risk-Linked Onshore Feeder Fund made the sale of securities effective August 1, 2005, and that with the exercise of reasonable care RCM, LLC could not have known about the actionable omissions. Judge Flynn never made any determinations on these material facts. Thus, it is possible that it will be determined in the Second Appeal that RCM, LLC had no liability to Huizenga in connection with the August 2005 Sale.

debtor's bankruptcy filing." *Pardo v. Nylcare Health Plans, Inc. (In re APF Co.)*, 274 B.R. 408,

417 (Bankr. D. Del. 2001). "The purpose of the automatic stay is to maintain the status quo that

exists at the time of the debtor's bankruptcy filing." *Pardo v. Nylcare Health Plans, Inc. (In re

APF Co.)*, 274 B.R. 408, 417 (Bankr. D. Del. 2001). "The scope of the automatic stay is undeniably

broad." *Cuffee v. Atl. Bus. & Cmty. Dev, Corp. (In re Att. Bus. & Cmty. Corp.)*, 901 F.2d 325, 327

(3d Cir. 1990); *see also Maritime Elec.*, 959 F.2d at 1204. The stay also applies to claims against

a non-debtor where the debtor is the real party in interest such that a judgment or finding against

the non-debtor would operate as a judgment or finding against the debtor, rendering it liable for

the claim against the non-debtor. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 511 (3d

Cir. 1997); *Kaiser Group Intl., Inc. v. Kaiser Aluminum & Chemical Corp. (In re Kaiser Aluminum

Corp.)*, 315 B.R. 655, 659-60 (D. Del. 2004). For these reasons, and given the interdependent and

inseparable[3] relationship between the various parties involved in this litigation, this proceeding is

subject to the automatic bankruptcy stay pursuant to U.S.C. § 362(a)(1) and (6), and this Court

should therefore place this matter on its bankruptcy calendar.

## II.    IN THE ALTERNATIVE, THIS LITIGATION SHOULD BE STAYED FOR PURPOSES OF JUDICIAL ECONOMY

"The circuit court may stay proceedings as part of its inherent authority to control the

disposition of cases before it" and "may consider factors such as the orderly administration of

justice and judicial economy in determining whether to stay proceedings." *Philips Elecs., N.V. v.

New Hampshire Ins. Co.*, 295 Ill.App.3d 895, 901 (1st Dist. 1998); *see also Vasa North Atlantic

Ins. Co. v. Selcke*, 261 Ill.App.3d 626 (1st Dist. 1994); *Disciplined Inv. Advisors, Inc. v. Schweihs*,

---

[3] All claims being asserted by the Huizenga parties, and any related indemnity claims belonging to other Defendants that would be invoked as a result of the Huizenga claims, inherently concern and impact the debtor and the bankruptcy estate of the Risk-Linked Onshore Feeder Fund and therefore should be litigated in the bankruptcy court.

272 Ill.App.3d 681 (1st Dist. 1995) ("Because the stay order improve[d] judicial economy, we hold that the trial court did not abuse its discretion" in granting it.).

As raised by this Court several times during its June 13, 2018 hearing, this matter should be stayed, at a minimum, for purposes of judicial economy. The relief sought by Huizenga is contingent in large part on whether Judge Flynn, in an entirely separate matter, awards Huizenga attorney's fees and costs. If Judge Flynn decides against awarding attorney's fees and costs (which is completely probable given that Huizenga was unsuccessful on a number of its counts against Defendants), then this matter is mooted.  If Judge Flynn decides to award an amount certain in attorney's fees that is paid, then this matter is again mooted.  Thus, there exist numerous likely scenarios that would cause litigation in this matter to be a complete waste of judicial resources.

In addition to the substantial risk that further litigation in this matter would waste judicial resources, further litigation would also severely prejudice all of the defendants. They will have to incur additional attorney's fees in defending themselves in a matter that is not ripe, which may become moot, and which likely should not proceed in any event because any order entered by this court in violation of the automatic bankruptcy stay is void ab ignition. *Raymark Industries, Inc. v. Lai*, 973 F.2d 1125 (3d Cir. 1992). There will be no way for this Court or Huizenga to repair that damage after it happens. For all of these reasons, if this Court decides not to stay this litigation based on the existence of any automatic bankruptcy stay, Defendants respectfully request that this litigation be stayed until the Bankruptcy Court resolves the dispute regarding whether or not Huizenga has an enforceable right to payment from the Debtor (the Risk-Linked Onshore Feeder

Fund) in an amount equal to attorney's fees and costs allegedly recoverable under the Delaware Blue Sky Law.[4]

WHEREFORE, Defendants, Ritchie Capital Management, LLC, Ritchie Partners, LLC and Ritchie Risk-Linked Strategies, LLC respectfully request that the Court enter an order staying this litigation, either pursuant to the automatic bankruptcy stay invoked upon the Risk-Linked Onshore Feeder Fund's filing for Chapter 11 relief, or based upon this Court's discretion to do so for purposes of judicial economy, and for any further relief this Court deems just and proper.

Respectfully Submitted,

SWANSON, MARTIN & BELL, LLP

By:    /s/ T. Allon Renfro_____
       Defendants Ritchie Risk-Linked Strategies, LLC,
       Ritchie Partners, LLC and Ritchie Capital
       Management, LLC

Dated: July 10, 2018

Joseph P. Kincaid
Jeffrey S. Becker
William D. Patterson
T. Allon Renfro
**SWANSON, MARTIN & BELL, LLP**
330 N. Wabash, Suite 3300
Chicago, IL 60611
(321) 321-9100
jkincaid@smbtrials.com/jbecker@smbtrials.com
wpatterson@smbtrials.com/trenfro@smbtrials.com
Attorney No. 29558

---

[4] Huizenga will have to file a timely proof of claim with the bankruptcy court in order to establish a right to payment from the Debtor as the person who has primary liability under the Delaware Blue Sky Law. *See, e.g., Access Cardiosystens v. Fincke*, 460 B.R. 67 (Bankr. C.D. Ma. 2010).

# Exhibit 44

## IN THE CIRCUIT COURT
## OF THE EIGHTEENTH JUDICIAL DISTRICT
### DUPAGE COUNTY, ILLINOIS

|  |  |
|---|---|
| JOHN DOE CORP. 1 and JOHN DOE CORP. 2,<br><br>    Plaintiffs,<br><br>v.<br><br>HUIZENGA MANAGERS FUND, LLC and HUIZENGA CAPITAL MANAGEMENT, LLC<br><br>    Defendants. | No. 18-CH-000236<br><br>Hon. Bonnie M. Wheaton |

*Chris Kachiroubas*
e-filed in the 18th Judicial Circuit Court
DuPage County
TRAN# : 170431024499/( 4323563 )
2018CH000236
FILEDATE : 07/19/2018
*Date Submitted : 07/19/18 12:13 PM*
*Date Accepted : 07/19/18 02:25 PM*
TEELING,AMY

**DEFENDANTS' BRIEF IN FURTHER SUPPORT OF MOTION TO DISSOLVE
TEMPORARY RESTRAINING ORDER & FOR DAMAGES AND
IN SUPPORT OF MOTION FOR SANCTIONS**

Christopher J. Barber, ARDC#6192190
Gary W. Garner, ARDC#6197552
Jonathan D. Miller, ARDC#6297204
WILLIAMS MONTGOMERY & JOHN LTD.
Firm ID No. 24006
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Phone: 312-443-3200
Fax: 312-630-8500
cjb@willmont.com
gwg@willmont.com
jm@willmont.com

July 19, 2018                Attorneys for Defendants

A-604

Huizenga Managers Fund, LLC and Huizenga Capital Management, LLC (together "Huizenga") respectfully submit this brief in further support of their motion to dissolve the *ex parte* TRO and award damages related thereto, and in support of their Motion for Sanctions. At this Court's May 22 hearing, the Court invited further discussion of whether the *ex parte* TRO was improvidently granted and whether provisions of the Ritchie Risk-Linked Strategies, LLC ("RRLS") Operating Agreement rendered the TRO appropriate. In short, the *ex parte* TRO was improvidently granted, and the Operating Agreement does not offer Plaintiffs any relief. The Plaintiffs' *ex parte* TRO and the entirety of this action—aided by misrepresentations through their counsel—involved conduct that merits sanctions.

## I.    This Court Has Jurisdiction to Consider the Motions to Dissolve and for Sanctions

RRLS recently filed for Chapter 11 bankruptcy in Delaware—on the eve of a hearing before Judge Flynn in Cook County to consider whether RRLS and its counsel, including Plaintiffs' counsel here (Clayborne, Sabo & Wagner LLP (the "Clayborne Firm")), should be sanctioned. Huizenga raises RRLS's bankruptcy because RRLS's bankruptcy filings actually state that RRLS is a plaintiff in this case.[1] If true, this case might be subject to the bankruptcy stay.

This Court may consider whether the bankruptcy stay applies to this case. Indeed, the "best system" is that "[n]onbankruptcy forums in both the state and federal systems have jurisdiction to at least initially determine whether pending litigation is stayed . . . ." *See In re Mid-City Parking, Inc.*, 332 B.R. 798, 803–04 (Bankr. N.D. Ill. 2005); *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 215–16 (Bankr. D. Del. 1995).

The bankruptcy stay does not extend to Plaintiffs, who—as they identified themselves to

---

[1] *See* Debtor's Statement of Financial Affairs at app.a, *In re Ritchie Risk-Linked Strategies, LLC*, Case No. 18-11555 (Bankr. D. Del. July 12, 2018), Dkt. No. 18 (last page of filing) (Ex. 1).

1

**A-605**

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

Huizenga—are not debtor RRLS.  *See* MTD at 3; MTD Opp. at 3 (citing Am. Compl. ¶ 9) ("Plaintiffs are third-party beneficiaries of the Subscription Agreement.").  As such, Plaintiffs are not covered by the bankruptcy stay, which applies only to actions "against the debtor."  *See* 11 U.S.C. § 362(a)(1).  That provision "by its terms only stays proceedings against the debtor."  *See Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982). Therefore, "actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue."  *See Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205, 1206 (3d Cir. 1991) (debtor's counterclaim not stayed); *My Baps Constr. Corp. v. City of Chi.*, 2017 IL App (1st) 161020, ¶¶ 26–30, 78–81.  Accordingly, the bankruptcy stay offers Plaintiffs no relief.  *See Maritime Elec.*, 959 F.2d at 1205; *Alpern v. Lieb*, 11 F.3d 689, 690 (7th Cir. 1993).

The bankruptcy stay does not apply even if Plaintiffs are closely related to RRLS.  That is because Chapter 11 "unlike Chapter 13, contains no provision to protect non-debtors who are jointly liable on a debt with the debtor."  *See Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) (citation omitted).  Consistent with this, courts have allowed actions filed against entities related to the debtor to proceed.  *See, e.g.*, *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1249, 1252 (9th Cir. 2010) (action against sole shareholders of bankrupt corporation); *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1362, 1364–65 (Fed. Cir. 1999) (proceedings continue as to debtor's manufacturing affiliate); *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 230 n.4 (5th Cir. 1986).

Nor can Plaintiffs invoke the bankruptcy stay to prevent this Court from considering Huizenga's request for sanctions.  Under 11 U.S.C. § 362(b)(4), such requests are exempt from a bankruptcy stay.  *See, e.g.*, *In re Grigg*, 619 F. App'x 195, 199–200 (3d Cir. 2015) (contempt); *In re Berg*, 230 F.3d 1165, 1167–68 (9th Cir. 2000); *Alpern*, 11 F.3d at 690.

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

Even if Plaintiffs can invoke the stay, they must do so to the bankruptcy court, not here. *See In re Hart*, 530 B.R. 293, 308–09 (Bankr. E.D. Pa. 2015) (collecting cases); *Conference of African Union*, 184 B.R. at 214–15 (expansion of stay requires "specific order by the bankruptcy judge following a hearing on notice"). To allow otherwise would create a "tortured expansion of the automatic stay." *See In re Panther Mtn. Land Dev., LLC*, 686 F.3d 916, 927 (8th Cir. 2012);

## II.    Huizenga Should Receive Damages Arising from the Wrongful *Ex Parte* TRO

### A.    Huizenga's Motion to Dissolve the *Ex Parte* TRO Relates to a Counterclaim for Damages and Is Not Mooted by Plaintiffs' Voluntary Dismissal

This Court already ruled that Huizenga's Motion to Dissolve is not moot by virtue of the TRO expiring by its terms. Nor is it mooted by Plaintiffs' oral motion to voluntarily dismiss their action. For one thing, Huizenga's Motion to Dissolve amounts to a counterclaim that Plaintiffs cannot voluntarily dismiss. *See Marion Metal & Roofing Co. v. Wood*, 243 Ill. App. 3d 890, 894 (5th Dist. 1993). For another, Plaintiffs failed to provide notice of their oral motion to voluntarily dismiss their claims, as Section 2-1009(a) requires. *See, e.g.*, *Lewis ex rel. Lewis v. Collinsville Unit #10 Sch. Dist.*, 311 Ill. App. 3d 1021, 1027–28 (5th Dist. 2000); *In re Marriage of Tieman*, 237 Ill. App. 3d 847, 853–54 (3d Dist. 1992); *Vaughn v. Nw. Mem'l Hosp.*, 210 Ill. App. 3d 253, 257–58 (1st Dist. 1991). Huizenga objected (and continues to object) to the voluntary dismissal, which was made available to Plaintiffs when RRLS filed a (frivolous) Petition to Vacate before Judge Flynn in Cook County and asked to stay this action. That Petition to Vacate is subject to a motion for sanctions before Judge Flynn, who ordered briefing as to whether RRLS and its counsel, including the Clayborne Firm, may be sanctioned notwithstanding the bankruptcy stay.

Moreover, Plaintiffs' voluntary dismissal would prejudice Huizenga's existing rights. By failing to provide notice, Plaintiffs cannot foreclose Huizenga from continuing to pursue its TRO counterclaim damages as asserted in its Motion to Dissolve. In this way, any mootness argument

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

is a fiction of Plaintiffs' own creation.[2]

## B.      The Madison County *Ex Parte* TRO Was Improvidently Granted

The Plaintiffs obtained the *ex parte* TRO in Madison County without any basis. Based on Huizenga's investigation, it appears as though Plaintiffs had already attempted (and failed) to obtain the TRO in St. Clair County. Specifically, the only affidavit that Plaintiffs filed in *Madison County* in support of their request for an *ex parte* TRO in this action actually had a *St. Clair County* caption and stated, on information and belief, that Huizenga transacted business in St. Clair County. Indeed, the Madison County Court recognized that there were "no references . . . to Madison County" in Plaintiffs' affidavit.[3] Plaintiffs also failed to advise the issuing judge that the TRO was sought just before there would be a hearing in front of Judge Flynn as to Huizenga's recovery of attorneys' fees and costs related to Huizenga's judgments. The Madison County judge noted later that the "timing of this [TRO] does not escape me." *Id.* at 38:2–3.

And, it gets worse for Plaintiffs. The Madison County TRO refers to two exhibits that were never served on Huizenga. The Plaintiffs' counsel later represented that he never presented those exhibits in Madison County.[4] Based on these events, Huizenga believes the following occurred: Mr. Dowling first sought an *ex parte* TRO in St. Clair County by presenting (as exhibits) pleadings in which he claimed Huizenga made "disparaging" statements. The St. Clair County Court rebuffed him, because Huizenga's statements in pleadings are protected by Illinois's absolute litigation privilege. So, Mr. Dowling went to Madison County and obtained an *ex parte* TRO without presenting those exhibits or telling Judge Dugan that the "disparaging" statements

---

[2] Rule 137(b) expressly provides that a sanctions motion may be filed within 30 days of entry of final judgment, or, if a post-judgment motion is filed, within 30 days of a ruling on such motion.

[3] *See* Hr'g Tr. at 14:20–23, *John Doe Corp. 1 v. Huizenga Managers Fund, LLC*, Case No. 18-CH-52 (Madison County, Feb. 6, 2018) (Ex. 2); *see also id.* at 5:21–6:5.

[4] *See* E-Mail from J. Dowling to R. Scott (Feb. 6, 2018) (Ex. 3).

4

**A-608**

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

appeared in pleadings. Indeed, it is clear from the Madison County transcript that Mr. Dowling did not tell Judge Dugan about Huizenga's pending litigation in Chicago or that the Ritchie Defendants there publicly filed the very documents that he claimed were "confidential."

Even without this background, Plaintiffs' *ex parte* TRO contravened Illinois law. Indeed, "[w]hen injunctive relief is granted without notice where notice should have been given," the TRO will be "reverse[d] *without regard to any other question*." *See Bd. of Educ. of Cmty. Sch. Dist. # 101 v. Parlor*, 81 Ill. App. 3d 667, 671 (5th Dist. 1980) (emphasis added), *aff'd*, 85 Ill. 2d 397 (1981); *Schaefer v. Stephens-Adamson Mfg. Co.*, 36 Ill. App. 2d 310, 315 (1st Dist. 1962) (same); *see also Pearson v. Behrens*, 350 Ill. App. 254, 258 (2d Dist. 1953). As such, an *ex parte* TRO without notice is in contravention per se of Illinois law if notice should have been given.

There was no basis to grant an *ex parte* TRO without any notice—formal or informal—to Huizenga. An *ex parte* TRO without notice is only available where "it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon." 735 ILCS 5/11-101. Here, there was no basis to conclude that those requirements were met. Indeed, there were no facts warranting *ex parte* relief included in Plaintiffs' affidavit, which is nothing more than a boilerplate recitation of the unverified complaint and relevant legal standards.[5] And there was no discussion of "the critical inquiry," which is "whether in the minutes or hours necessary to procure defendant's appearance, defendant could and would take such action as to obstruct seriously the court from dealing justly and effectively with the issues in dispute." *Parlor*,

---

[5] Section 11-101 requires an affidavit or verified complaint in support of a request for a TRO without notice. Plaintiffs did not submit a verified complaint, so they must rely on their affidavit alone. In light of the wrongful TRO and sanctionable conduct here, *see infra* Section III, Huizenga intends to seek the deposition of Plaintiffs' affiant, Mr. Michael Cilento, as well as the attorneys at the Clayborne Firm, including Mr. Sabo and Mr. Dowling.

5

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

81 Ill. App. 3d at 669; *see also Miollis v. Schneider*, 77 Ill. App. 2d 420, 426–27 (2d Dist. 1966).

Plaintiffs never discuss why their request was so urgent. In fact, they appear to have concealed

their (improper) reason for "urgency," i.e. the then-upcoming hearing before Judge Flynn, likely

to avoid the fact that their claims are barred under the absolute litigation privilege.

### C.    RRLS's Operating Agreement Offers No Relief to Plaintiffs

At the Court's May 22 hearing, the Court also invited briefing as to whether Huizenga's

agreements with RRLS bar Huizenga from seeking TRO damages, as Plaintiffs would have it.

Plaintiffs' argument relies upon Section 9.21(f) of RRLS's Operating Agreement, which relates to

remedies for breaches of the contract's confidentiality provisions, i.e. not any disparagement

provision. As such, Plaintiffs' argument would only apply to a discrete portion of the *ex parte*

TRO they sought. Moreover, the Operating Agreement only states that a breach would subject

Plaintiffs "to potentially irreparable injury." *See id.* Thus, Huizenga never even stipulated that

one of the requirements for an injunction, let alone all of the requirements, were met, and never

stipulated to any other relief, much less an *ex parte* TRO.

Even if Huizenga had stipulated to such relief, the stipulation would not entitle Plaintiffs

to automatic relief. Illinois courts do not treat stipulations of irreparable harm or "consents to

entry" of injunctive relief as dispositive, and, instead, they require factual allegations and proof

before finding irreparable harm (and considering the other required elements for injunctive relief

on their own terms). *See Best Coin-Op, Inc. v. Old Willow Falls Condo. Ass'n*, 120 Ill. App. 3d

830, 833–35 (1st Dist. 1983).[6] That is because "the decision whether to grant or deny injunctive

---

[6] *See also, e.g., TopstepTrader, LLC v. OneUp Trader, LLC*, Civ. No. 17-4412, 2017 WL 2798397, at *1, *4 (N.D. Ill. June 28, 2017); *David White Instruments, LLC v. TLZ, Inc.*, Civ. No. 02-7156, 2003 WL 103014, at *6 (N.D. Ill. Jan. 9, 2003); *Motorola, Inc. v. DBTEL, Inc.*, Civ. No. 02-3336, 2002 WL 1610982, at *15 n.36 (N.D. Ill. July 22, 2002).

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

relief rests within the equitable discretion" of the courts, not private parties. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006); *see also* MTD Reply at 2–3.

## III.    Plaintiffs and Their Counsel Should Be Sanctioned

Huizenga seeks sanctions against Plaintiffs and their counsel—under Rule 137 and this Court's inherent authority to sanction litigants and their counsel—for obtaining an *ex parte* TRO based on concocted papers, misrepresenting court orders, and filing a baseless complaint in a baseless venue and for "improper purposes, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *See* Ill. S. Ct. R. 137(a).

### A.    Plaintiffs, Through Their Counsel, Requested an *Ex Parte* TRO with a Manufactured Basis[7]

Huizenga seeks sanctions precisely because the *ex parte* TRO should have never issued. The Madison County court was presented with nothing more than papers (i) that were insufficient to lay venue in Madison County, (ii) that failed to disclose the existence of other litigation that triggered the absolute litigation privilege, (iii) that misrepresented the urgency of relief (which

---

[7] As to this Section, Huizenga seeks sanctions against Plaintiffs and John E. Sabo, Esq. of the Clayborne Firm (as the attorney who signed the papers initiating Plaintiffs' action), as well as the Clayborne Firm itself. *See* Ill. S. Ct. R. 137(a). Courts in the Second District generally only permit sanctions against "the person who signed the document and/or the client." *See Med. Alliances, LLC v. Health Care Serv. Corp.*, 371 Ill. App. 3d 755, 757 (2d Dist. 2007). However, Huizenga respectfully submits that *Medical Alliances* unduly limits courts' ability to impose sanctions. *E.g., Brubakken v. Morrison*, 240 Ill. App. 3d 680, 686–87 (1st Dist. 1992) (applying agency principles to sanction law firm for its attorney's conduct). Indeed, courts have an "inherent authority" independent of Rule 137 to impose sanctions, such that the *Medical Alliances* Court misplaced reliance on a reading of Rule 137 by its plain terms. *See Kennedy v. Miller*, 197 Ill. App. 3d 785, 788 (2d Dist. 1990) (exercising "inherent jurisdiction" where Rule 137's appellate equivalent invoked); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 42–43 (1991) (federal analog to Rule 137 does not displace court's inherent authority to sanction); *Ritacca Laser Ctr. v. Brydges*, 2018 IL App (2d) 160989, ¶ 26 (inherent authority to sanction for violation of procedural rule). Thus, *Medical Alliances*—the case applying a plain reading of Rule 137—misplaces reliance on pre-*Chambers* authority that did not recognize courts' inherent authority to sanction. *See* 371 Ill. App. 3d at 757–58 (citing *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989)).

7

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

Plaintiffs, by voluntarily dismissing their claims, admit was not urgent at all), and (iv) that apparently followed a rebuffed attempt to obtain relief in St. Clair County. *See supra* Section II(B). And, it gets worse. Plaintiffs have maintained that they are "members and managers" of RRLS as the basis for their standing. *See* MTD Opp. at 3. They are neither. Ex. 1 (not identifying Plaintiffs as managers; nowhere else are Plaintiffs identified as members of RRLS in bankruptcy papers). Filing such briefs, based on falsities, is sanctionable. *See Sterdjevich v. RMK Mgmt. Corp.*, 343 Ill. App. 3d 1, 20–21 (1st Dist. 2003) (knowingly false allegations).

### B. Plaintiffs' Pleadings and Briefs Are Riddled with Misstatements, Including a Groundless Attack on Other Courts' Judgments

Plaintiffs should be sanctioned for their attacks on the judgments of the Illinois courts and misrepresentation of court orders, for which sanctions are appropriate. *See, e.g., ADO Fin., AG v. McDonnell Douglas Corp.*, 938 F. Supp. 590, 594–95 (C.D. Cal. 1996); *Taylor v. Wagner*, 117 F.R.D. 121, 122–23 (N.D. Ill. 1987) ("deliberately misrepresenting" basis for court's ruling).

*Amended Complaint.*[8] For starters, the Amended Complaint attacks the Cook County Court's judgments. Indeed, it purports to identify the following so-called "problems" with the judgments: "(a) the securities transaction sued upon has no nexus to Delaware (and thus is not a viable action under the DSA in any state or federal court); and (b) instead of awarding rescission as the remedy authorized under the applicable DSA provision sued upon, the Illinois court awarded monetary damages." *See* Am. Compl. ¶ 31. Neither basis is actually a "problem[]," as Ritchie now admits. In fact, Ritchie raised neither of the "problems" in its merits brief on appeal.[9] Against

---

[8] As to this paragraph and for the reasons discussed above, Huizenga seeks sanctions against Plaintiffs and Mr. Sabo of the Clayborne Firm (as the attorney who signed the Amended Complaint), as well as the Clayborne Firm itself.

[9] *See* Opening Brief of Defs.-Appellants, *Huizenga Managers Fund, LLC v. Ritchie*, Case No. 17-2862 (1st Dist. June 14, 2018) (Ex. 4).

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

this backdrop, RRLS now asserts in bankruptcy, contrary to Plaintiffs' statement in their Amended Complaint, that RRLS waived the DSA argument as a matter of law (and has a malpractice claim against its counsel for the same).[10]   For the same reasons, Plaintiffs' statement that Huizenga "fear[ed]" reversal of its judgments lacks any basis in fact and is sanctionable.

*Opposition to Motion to Dismiss and the Court's May 22, 2018 Hearing.*[11]   In their Opposition to Huizenga's Motion to Dismiss and at this Court's May 22 hearing, Plaintiffs' counsel misrepresented the Delaware Chancery Court's Order as a sanction. *See, e.g.*, Hr'g Tr. at 28:3–6; MTD Opp. at 11. The Delaware judge did award attorneys' fees and costs to the Ritchie entity.  But, that was not a sanction.  Indeed, the court simply exercised its "equitable authority" to make the Ritchie entity whole. *See Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421–22 (Del. 1994), and never used the term *sanction* or accused counsel of bad faith (quite the opposite).[12] And, at the May 22 hearing, Mr. Dowling further exclaimed that Huizenga's counsel was somehow ordered to tell Judge Griffin in Cook County, who was then presiding over Huizenga's fraud claims, that Huizenga's counsel "lied to the court." *See* Hr'g Tr. at 28:10–18.[13]  Not so.  Mr. Dowling's inaccurately piles on and, in doing so, misrepresents a court's order to damage the credibility of Huizenga's counsel and prejudice Huizenga.  Such conduct is sanctionable.

---

[10] *See* Debtor's Schedules of Assets and Liabilities at 16, *In re Ritchie Risk-Linked Strategies, LLC*, Case No. 18-11555 (Bankr. D. Del. July 12, 2018), Dkt. No. 19 (Ex. 5).

[11] As to this paragraph and for the reasons discussed above, Huizenga seeks sanctions against Plaintiffs, B. Jay Dowling, Esq. (who uttered the comments at issue), and his Firm, the Clayborne Firm, as well as Jeffrey E. Crane, Esq. (who signed Plaintiffs' Opposition), and his Firm, The Law Office of Jeffrey E. Crane, LLC.

[12] Hr'g Tr. at 27:1–7, 27:16–21, *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, Case No. 2018-196 (Del. Ch. Apr. 26, 2018) (Glasscock, J.) (Ex. 6).

[13] Mr. Dowling also argued at the May 22 hearing that Huizenga's counsel "essentially lied" to the Delaware Vice Chancellor. *See* Hr'g Tr. at 28:6–10.  As such, Mr. Dowling misrepresented what occurred in Delaware and should be sanctioned, along with his Firm.

9

**A-613**

**C.    Plaintiffs and Their Counsel Should Be Sanctioned for Lacking Factual and Legal Bases for Their Claims**[14]

The misstatements of Plaintiffs and their counsel do not end there.  Plaintiffs allege that Huizenga "disclosed confidential auditor reports to third parties and filed same in the public record." *See, e.g.*, Am. Compl. ¶ 41(b).  Plaintiffs never identify where such disclosures were made or to whom.  Because they cannot.  And, Plaintiffs similarly assert, without any basis or reference, that Huizenga used confidential information in judgment collection. *Id.* ¶ 46. Plaintiffs' misrepresentations of fact should be sanctioned.

Furthermore, as set forth in Huizenga's motion to dismiss briefs, Plaintiffs' complaint also was barred by (i) the Delaware Securities Act, MTD at 9–11, MTD Reply at 4–6, and (ii) Illinois's absolute litigation privilege.  MTD at 11–13; MTD Reply at 6–8.  And Huizenga was never judicially estopped from defending itself here, as Plaintiffs argued in opposition to Huizenga's Motion to Dismiss (at 9–11). *See* MTD Reply at 8–10.  Therefore, they should be sanctioned for their lack of a good faith basis for Plaintiffs' claims, which were all asserted for the improper purpose of multiplying litigation.

**IV.    Conclusion**

For the foregoing reasons, Huizenga respectfully requests that this Court dissolve Plaintiffs' improper *ex parte* TRO and permit Huizenga to seek statutory damages related thereto and further sanction Plaintiffs and their counsel.

Dated: July 19, 2018                          Respectfully submitted,

                                                    */s/:  Christopher J. Barber*
                                                    Christopher J. Barber, ARDC#6192190

---

[14] To the extent this Section relates to the Motion to Dismiss briefing, Huizenga seeks sanctions against Plaintiffs, Jeffrey E. Crane, Esq. (who signed Plaintiffs' Opposition), and his Firm, The Law Office of Jeffrey E. Crane, LLC.  Otherwise, this Section seeks sanctions against the Clayborne Firm and Mr. Sabo.

Document received on 7/19/18 12:13 PM  Document accepted on 07/19/2018 14:24:40 # 4323563/170431024499

Gary W. Garner, ARDC#6197552
Jonathan D. Miller, ARDC#6297204
WILLIAMS MONTGOMERY & JOHN LTD.
Firm ID No. 24006
233 S. Wacker Drive, Suite 6100
Chicago, IL 60606
Phone: 312-443-3200

***Attorneys for Defendants***

11

**A-615**

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused copies of this **Defendants' Brief in Further Support of Dissolving Temporary Restraining Order and for TRO Damages and in Support of Motion for Sanctions** and the exhibits thereto to be served on this 19th day of July, 2018, by email to the following counsel:

| | |
|---|---|
| John E. Sabo<br>B. Jay Dowling<br>James F. Clayborne<br>CLAYBORNE, SABO & WAGNER LLP<br>525 West Main Street, Suite 105<br>Belleville, IL 62220<br>jsabo@cswlawllp.com<br>jdowling@cswlawllp.com<br>jclayborne@cswlawllp.com<br>*Attorneys for Plaintiffs* | Jeffrey E. Crane<br>The Law Office of Jeffrey E. Crane, LLC<br>105 West Madison Street, Suite 1500<br>Chicago, Illinois 60602<br>jeff@jeffcranelaw.com<br>*Additional Attorneys for Plaintiffs* |
| Robert J. Schillerstrom<br>Ice Miller LLP<br>2300 Cabot Dr., Suite 455<br>Lisle, IL 60532<br>Robert.schillerstrom@icemiller.com<br>*Additional Attorneys for Plaintiffs* | |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Dated: July 19, 2018                    Respectfully submitted,

                                        */s/: Christopher J. Barber*
                                        Christopher J. Barber, ARDC#6192190
                                        Gary W. Garner, ARDC#6197552
                                        Jonathan D. Miller, ARDC#6297204
                                        WILLIAMS MONTGOMERY & JOHN LTD.
                                        Firm ID No. 24006
                                        233 S. Wacker Drive, Suite 6100
                                        Chicago, IL 60606
                                        Phone: 312-443-3200
                                        Fax: 312-630-8500
                                        cjb@willmont.com
                                        gwg@willmont.com
                                        jm@willmont.com

12

**A-616**

# Exhibit 45

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RITCHIE MULTI-STRATEGY GLOBAL, LLC, f/k/a RAM CAPITAL, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No.: N18C-05-050-MMJ-CCLD |
| HUIZENGA MANAGERS FUND, LLC, | ) ) | |
| Defendant. | ) ) | |

## AMENDED COMPLAINT

Plaintiff Ritchie Multi-Strategy Global, LLC, formerly known as RAM Capital, LLC, for its Amended Complaint against Defendant Huizenga Managers Fund, LLC, states as follows:

### The Parties

1.    Ritchie Multi-Strategy Global, LLC (the "MSG Fund of Funds") is a Delaware limited liability company with its principal place of business in the Cayman Islands.

2.    Huizenga Managers Fund LLC (the "Huizenga Fund") is a Delaware limited liability company.  On information and belief, its principal place of business is in the City of Oak Brook, County of DuPage, State of Illinois.

**Factual Background**

3.    The MSG Fund of Funds was originally formed with the name of "RAM Capital LLC."

4.    RAM Capital, LLC changed its name to "Ritchie Multi-Strategy Global, LLC" in 2005.

5.    The MSG Fund of Funds caters to the needs of high-net-worth families, qualified purchasers, and institutions that desire to deploy their capital in currencies, commodities, and hard and soft assets.  These sophisticated investors typically desire to achieve an acceptable risk-adjusted rate of return on investment through the global deployment of their wealth, using a variety of investment strategies in conjunction with tax-efficient vehicles to diversify their investments.

**The MSG Fund of Funds' Investment Structure**

6.    The MSG Fund of Funds accepts and pools investments of certain qualified purchasers and invests the majority of that capital into an offshore pooled investment vehicle (the "MSG Master Fund").  The MSG Master Fund then invests that capital in a variety of other pooled investment vehicles that are committed to a particular class of investments or an investment strategy ("Strategy Funds") that are located in the United States and in numerous jurisdictions worldwide.

7.    This master/feeder fund structure, organization and arrangement has become standard in the alternative investment industry since the late 1990's due to

2

the unique competitive environment among investment managers and the demands of qualified purchasers around the globe for investment products that consistently achieve the desired risk-adjusted rate of return while at the same time minimizing tax liabilities and efficiently managing associated risk profiles.

8.     As a limited liability company, the MSG Fund of Funds is governed by an LLC operating agreement (the "Operating Agreement") that governs the relationship between the MSG Fund of Funds and its members, establishes the arrangements under which the MSG Fund of Funds is managed by its managers, and grants certain rights to and imposes certain obligations on its members.  The rights and obligations granted to and imposed upon the members of the MSG Fund of Funds are the subject of this litigation.

9.     The MSG Fund of Funds is itself a member of various other companies that it has invested in.  Accordingly, it possesses contractual rights under the operating agreements or articles of association of those companies, including without limitation the MSG Master Fund, various Strategy Funds, and one particular Strategy Fund named Ritchie Risk-Linked Strategies, LLC ("RRLS, LLC").

10.     As illustrated above, the contractual rights and obligations of members of the MSG Fund of Funds intentionally are interrelated with the contractual rights and obligations of the members of the MSG Master Fund and the Strategy Funds in a master/feeder fund structure.  This structure is managed and maintained by Ritchie

3

Capital Management SEZC, Ltd., a Cayman Islands company with its principal place of business in the Cayman Islands ("RCM, Ltd.")

11.    This interrelated contractual relationship extends the MSG Fund of Funds' contractual rights and the obligations of its members to the contractual relations by and among the members, investment managers and other parties in interest, including the "RCM Parties" as defined in the organizational documents and material contracts of each of the MSG Master Fund, the Strategy Funds, and other pooled investment vehicles managed by RCM, Ltd. for the benefit of investors.

12.    These interrelated contracts include, but are not limited to, subscription agreements, operating agreements and investment management agreements of the MSG Master Fund and the Strategy Funds (the "Material Contracts").

### The Huizenga Fund Invests in the MSG Fund of Funds

13.    The Huizenga Fund is a private investment fund that was organized as a limited liability company under Delaware law in June 2002.

14.    The Huizenga Fund is managed by Huizenga Capital Management, LLC ("HCM").  HCM typically invests the capital of the Huizenga Fund in other private investment funds, such as the MSG Fund of Funds, instead of pursuing its own direct investment and/or trading strategy.

15.    On or about September 30, 2002, the Huizenga Fund purchased limited liability company interests in the MSG Fund of Funds (then named RAM Capital)

4

pursuant to the terms of a Subscription Agreement dated September 30, 2002 (the "RMSG, LLC Subscription Agreement").

16.    In the RMSG, LLC Subscription Agreement, the Huizenga Fund represented that it was a "qualified purchaser" as that term is defined in the RMSG, LLC Subscription Agreement.

17.    Thereafter, the Huizenga Fund became a party to and bound by the terms of the MSG Fund of Funds Operating Agreement, including the terms relating to the RCM Parties and other pooled investment vehicles within the RCM, Ltd.-managed master/feeder fund structure.

18.    In March 2004, the MSG Fund of Funds promulgated and delivered a Supplemental Confidential Information Memorandum (the "RMSG, LLC Supp. CIM") to the Huizenga Fund.   The RMSG, LLC Supp. CIM described in detail RCM, Ltd.'s plans for expanding its financial base in the Cayman Islands.

19.    In July or August 2005, the Huizenga Fund and a majority of members of the MSG Fund of Funds, after notice and an opportunity to be heard, voted to accept certain changes to the MSG Fund of Funds Operating Agreement, including without limitation material changes to its confidentiality provisions.   Effective September 2, 2005 the Fourth Amended and Restated Operating Agreement of the MSG Fund of Funds was executed, delivered and became binding on all members (the "RMSG, LLC Amended Operating Agreement").

20.    Before investing in the MSG Fund of Funds, the Huizenga Fund, through its investment manager, HCM, was offered the opportunity to request certain documents and information that would enable it to conduct its due diligence and evaluate the suitability of the MSG Fund of Funds and the RCM, Ltd.-managed master/feeder fund structure's many innovative and unique investment strategies.

21.    Before executing the RMSG, LLC Subscription Agreement, HCM and Peter Huizenga, HCM's controlling member, read and understood the RMSG Supp. CIM, which clearly disclosed the material facts relating to the onshore and offshore "feeder fund" and "master fund" structure that was the essence of the MSG Fund of Funds' investment procedures.

### The Huizenga Fund's Contractual Obligations

22.    The investment opportunity that was made available to the Huizenga Fund was expressly conditioned on the Huizenga Fund making the representations and warranties contained in the Subscription Agreement.  As an inducement for the manager of the MSG Fund of Funds to allow Huizenga to purchase interests in the MSG Fund of Funds, the Huizenga Fund executed the RMSG, LLC Subscription Agreement and made the numerous representations and warranties to the MSG Fund of Funds and its manager set forth therein.[1]

---

[1] Huizenga also represented and warranted that all of the information it provided in connection with signing the RMSG, LLC Subscription Agreement was true and

23.   In signing the RMSG, LLC Subscription Agreement, the Huizenga Fund agreed to indemnify and hold harmless the MSG Fund of Funds, its Managing Member, and their members, officers, directors and employees from and against any and all losses, damages, expenses, liabilities or reasonable attorneys' fees arising from the Huizenga Fund's breach of the representations and warranties and other terms of the Subscription Agreement and/or the Operating Agreement.

24.   The Huizenga Fund also expressly agreed in the RMSG, LLC Subscription Agreement that it was "to be bound by all of the terms and conditions of [the Operating Agreement].... Moreover, the undersigned agrees to be bound by the terms and conditions of all modifications or amendments to the [Operating Agreement] in accordance with the terms thereof."

25.   In reliance on the representations and warranties made by the Huizenga Fund, including but not limited to its representation and warranty that the Huizenga Fund was a "qualified purchaser" as defined in the RMSG, LLC Subscription Agreement, the MSG Fund of Funds accepted the Huizenga Fund's investment on or about September 30, 2002.  On that date, Huizenga Fund invested $1,500,000 in exchange for an equity interest in the MSG Fund of Funds, and it retains a beneficial interest in the MSG Fund of Funds today.

---

correct as of signing and agreed to immediately notify RCM of any changes in that information.

26.   Upon the Huizenga Fund becoming a member in the MSG Fund of Funds, it became bound by not only the MSG Fund of Funds' Material Contracts but also by all of the applicable Material Contracts of the Strategy Funds that the MSG Fund of Funds invested in.

27.   The Huizenga Fund has admitted on multiple occasions the interrelationship of the MSG Fund of Funds Operating Agreement with the Material Contracts of the other three RCM, Ltd.-managed Strategy Funds it invested in between 2001 and 2005, including those Material Contracts of Ritchie Energy, LLC and RRLS, LLC.

28.   Due to the interconnected relationships of the MSG Fund of Funds and the Strategy Funds they invested in, those Strategy Funds' respective Material Contracts have substantively identical terms and conditions as those that are at issue in this case. (Unless stated otherwise, the terms referenced herein shall jointly refer to the Material Contracts of the MSG Fund of Funds and the terms of the Material Contracts of the Strategy Funds that the MSG Fund of Funds invested in).

29.   The Definitions section of the Material Contracts' Operating Agreements contains the following definitions:

> **"RCM Party"** is defined as (a) RCM, (b) any Affiliate of RCM, and (c) any owner, principal, director, officer or employee of the foregoing.
>
> **"RCM"** is broadly defined as the Managing Member, the Investment Manager, the Sub-Adviser, and any of their respective Affiliates, which

8

will, collectively, manage the trading and investing of the Company and the Master Fund, and any of their successors or assigns.

**"Affiliate"** of a Person means a Person controlling, controlled or under common control with, that Person, either directly or indirectly through one or more intermediaries. (For purposes of this definition, the direct or indirect ownership of more than 50% of the voting or equity interests of a Person shall be conclusively presumed to constitute control.) The RCM Funds shall not be considered to constitute Affiliates of RCM.

**"Person"** means any individual, partnership, Limited Liability Company, joint venture, corporation, trust, unincorporated organization, government (or any agency or political subdivision thereof) or other entity, whether or not having legal personality.

30.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable except by reason of acts or omissions of an RCM Party finally determined to constitute fraud, bad faith, gross negligence or reckless or intentional misconduct.

31.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable for the performance by an RCM Party of, or the omission by an RCM Party to perform, any act which such RCM Party reasonably believed to be consistent with the advice of attorneys, accountants or other professional advisers or to such RCM Party with respect to matters relating to the MSG Fund of Funds.

32.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would not hold any RCM Party liable for conduct finally determined to have

9

constituted a violation of law, provided that such RCM Party reasonably believed such conduct to be in the interest of the Fund at the time of such conduct.

33.    Under the terms of the Material Contracts, the Huizenga Fund agreed that the business and assets of the MSG Fund of Funds and the RCM Parties are confidential and involve a wide range of proprietary information, including trade secrets and financial or commercial information, and that disclosure of any such information would cause competitive harm to the MSG Fund of Funds and/or the RCM Parties.

34.    Under the terms of the Material Contracts, the Huizenga Fund agreed that all information with respect to such business and assets would be presumed confidential and proprietary unless the Managing Member otherwise indicated in writing.

35.    Under the terms of the Material Contracts, the Huizenga Fund agreed that, except with the prior written consent of the Managing Member, it had and would at all times keep confidential and not, directly or indirectly, disclose, divulge, proprietary information to which the Huizenga Fund became privy relating to the business or assets of the MSG Fund of Funds or of any of the RCM Parties.

36.    Under the terms of the Material Contracts, the Huizenga Fund agreed that if it contended that confidential information had otherwise become public or is required by law, the Huizenga Fund was required to inform the Managing Member

prior to disclosing or using it and would give the Managing Member, to the greatest extent reasonably practicable, an opportunity to contest whether such information had in fact otherwise been made public.

37.    Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential information would not become public for the purpose of the Material Contracts if the Huizenga Fund was the party that published or disseminated that information.

38.    Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential and proprietary information included the identities of the personnel of the MSG Fund of Funds and the RCM Parties.

39.     Under the terms of the Material Contracts, the Huizenga Fund agreed that confidential and proprietary information included the performance record of the MSG Fund of Funds and the Strategy Funds, and any other financial results or data of the MSG Fund of Funds or the Strategy Funds.

40.    Under the terms of the Material Contracts, the Huizenga Fund agreed that while it could share such confidential information with its investment advisers, beneficial owners, accountants, attorneys, and spouses ("Permitted Confidants") it would not share such information with a Permitted Confidant if it would be used in any manner or respect for personal gain.

41.    Under the terms of the Material Contracts, the Huizenga Fund agreed that it would accept full liability for any unauthorized use or disclosure of confidential information by its Permitted Confidants, including its attorneys.

42.    The Huizenga Fund agreed to indemnify and hold harmless the MSG Fund of Funds from and against any and all losses, damages, expenses, liabilities or reasonable attorneys' fees (including attorneys' fees and expenses incurred in a securities or other action in which a judgment in favor of the undersigned is rendered) due to or arising out of a breach of any representation or warranty in its Subscription Agreement to the MSG Fund to Funds and the MSG Fund of Funds Operating Agreement.

43.    Despite those promises, including its commitments to indemnify and hold the RCM Parties harmless, the Huizenga Fund sued eight RCM Parties in Illinois (the "Ritchie Party Defendants") and eventually obtained a judgment against some of them (the "Huizenga Litigation"). That judgment has now been satisfied and paid to Huizenga.

44.    Pursuant to the MSG Fund of Funds Operating Agreement, the MSG Fund of Funds is required to indemnify, defend, and hold harmless all RCM Parties. Huizenga has admitted that the MSG Fund of Funds is contractually obligated to indemnify the parties who paid the judgment to Huizenga.

45.     On April 19, 2018, in collection proceedings in Illinois, Huizenga filed a motion for the assignment of certain contractual indemnity rights (the "Indemnity Motion") of the Ritchie Party Defendants and of, among other entities, the MSG Fund of Funds.  In the Indemnity Motion, Huizenga admitted that the MSG Fund of Funds Operating Agreement's indemnity provisions covered its judgment, and admitted that the Ritchie Party Defendants could invoke those provisions to receive indemnity from MSG Fund of Funds.    Accordingly, Huizenga has admitted, and is judicially estopped from denying, that the MSG Fund of Funds can be held liable for the satisfaction of the Huizenga judgment.

## The Material Contract Terms

46.     Under the terms of the Material Contracts, the Managing Member may amend the MSG Fund of Funds Operating Agreement in any respect that does not materially adversely affect the rights of the Members as a whole, without obtaining the consent of any Member of the MSG Fund of Funds.

47.     Accordingly, the MSG Fund of Funds executed a series of resolutions by written consent (the "Written Consents") that do not materially adversely affect the rights of the Members as a whole.   The Written Consents effected several changes to MSG Fund of Funds' Operating Agreement.

48.     First, the Written Consents amended the choice of forum provision, vesting the MSG Fund of Funds' Managing Member with the sole discretion to bring

any action to enforce the provisions of the Operating Agreement in State Court in New Castle County, Delaware. Relatedly, all members of the MSG Fund of Funds, including the Huizenga Fund, irrevocably waived any objections to venue being laid in the State Court for New Castle County, Delaware.

49. Second, the Written Consents amended the confidentiality and disparagement provisions in Section 9.21 and 9.22. 9.21(f) was amended to provide that each member "waives notice of any hearing and right to participate in any hearing on any emergency or temporary restraining order brought to prohibit any breach of Section 9.21" and that, for any legal action brought by the Managing Member to enforce this subpart, "the Member shall be required to pay all attorneys' fees, litigation expenses and pre-judgment interest."

50. The Written Consents clarify that the term 'Publicly Available' in Section 9.21(h) "does not include confidential or proprietary information recited within or provided with any pleading, exhibit, affidavit, declaration, statement, testimony or other document filed in any court or administrative hearing, trial or [proceeding]…" and set forth additional information about the notice and consent procedures applicable to the release and disclosure of confidential information. The Written Consents also restate each member's non-disparagement obligations under Section 9.22 and the members' waiver of any immunity as a defense to disparagement.

14

51.     The Written Consents further provide that, in the event that any provision of the Written Consent is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that the provision, as modified, may be enforced to achieve the expressed intent.

## COUNT I
### (Breach of Contract – Violation of Non-Liability Provisions)

52.     Plaintiff realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

53.     The Subscription Agreement and Operating Agreement of the MSG Fund of Funds are valid and enforceable contracts as are the Material Contracts of the Strategy Funds that the MSG Fund of Funds invested in.    Plaintiff has substantially and fully performed pursuant to all of these Material Contracts.

54.     By seeking to enforce the final judgments it obtained in Illinois, the Huizenga Fund breached the Material Contracts by committing the following acts:

a. holding one or more RCM Parties liable for conduct that did not constitute fraud, bad faith, gross negligence, or reckless or intentional misconduct;

b. holding one or more RCM Parties liable for their performance when RCM Parties reasonably believed their conduct to be consistent with the advice of attorneys, accountants or other professional advisers to the Fund or to such RCM Party with respect to matters relating to the MSG Fund of Funds or the Strategy Funds it invested in; and

A-631

    c. holding one or more RCM Parties liable for conduct finally determined to have constituted a violation of law, when such RCM Parties reasonably believed such conduct to be in the interest of the Fund at the time of such conduct.

55.    As a result of the Huizenga Fund's breaches of the Operating Agreement, Plaintiff has incurred liability for damages and attorneys' fees of at least $13,383,511.40 associated with the satisfaction of judgments wrongly obtained by the Huizenga Fund against RCM Parties that the Huizenga Fund was contractually obligated not to hold liable. Plaintiff has also incurred liability of at least $5,225,000.00 in attorneys' fees and other litigation costs associated with the defense of RCM Parties against claims that the Huizenga Fund was contractually prohibited from bringing.

56.    The amount in controversy as a result of the Huizenga Fund's breaches of the Operating Agreement exceeds $1 million.

**COUNT II**
**(Breach of Contract – Violation of Confidentiality Terms)**

57.    On or about April 16, 2018, the Huizenga Fund served a citation to discover assets (the "Citation") on a third-party securities broker, Interactive Brokers, LLC, arising out of the Huizenga Litigation.

58.    The Huizenga Fund used confidential information to identify Interactive Brokers, LLC as a target for the Citation in violation of the Material Contract provisions against using confidential information for personal gain.

59.     The Huizenga Fund's use of the confidential information to identify Interactive Brokers, LLC as a target for the Citation also violated the Material Contract provisions against using confidential information without obtaining the written permission of the Managing Member.

60.     The Huizenga Fund misled Interactive Brokers, LLC into freezing the trading account of a Connecticut non-judgment debtor in an effort to obtain the leverage it needed to force the Ritchie Party Defendants to pay the judgment.

61.     The freezing of the brokerage account disrupted trade transactions worth millions of dollars and prevented the use of millions of dollars held on account with Interactive Brokers, LLC.

62.     The Huizenga Fund is contractually obligated to indemnify Plaintiff for the losses incurred as the proximate cause of its decision to use confidential information in violation of the Material Contracts.

63.     On or about March 28, 2018, the Huizenga Fund served an information subpoena upon Millennium Technology Value Partners (RCM) L.P. ("Millennium").

64.     The Huizenga Fund used confidential information to identify Millennium as a target for the information subpoena in violation of the Material Contract provisions against using confidential information for personal gain.

17

65.    The Huizenga Fund's use of the confidential information to identify Millennium as a target for the information subpoena also violated the Material Contract provisions against using confidential information without obtaining the written permission of the Managing Member.  Millennium was not a party to the Huizenga Litigation and is not a Ritchie Party Defendant.

66.    The information subpoena requested information on other non-parties to the Huizenga Fund Litigation and their assets.  The Huizenga Fund threatened Millennium with paying the entire amount of the judgment in the Huizenga Fund Litigation when Millennium responded to the subpoena saying it did not possess any assets of any of the Ritchie Party Defendants.

67.    The amount in controversy as a result of Huizenga Fund's breaches of the Operating Agreement exceeds $1 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against the Huizenga Fund as follows:

A.    An order that the Huizenga Fund is obligated to compensate Plaintiff for all losses, liabilities, costs, and expenses that Plaintiff has incurred and will incur as a result of the Huizenga Fund's contractual breaches;

A-634

B.     An order that Plaintiff receive its costs and disbursements in this action, including reasonable attorneys' fees, accountants' and experts' fees, pre- and post-judgment interest, costs, and expenses; and

C.     Any such other relief as this Court may deem just and proper.

POTTER ANDERSON & CORROON LLP


By:   */s/ John A. Sensing*_____
      John A. Sensing (No. 5232)
      Ryan C. Cicoski (No. 5466)
      Dominique A. Meyer (No. 6440)
      Hercules Plaza, Sixth Floor
      1313 North Market Street
      P.O. Box 1150
      Wilmington, DE 19801
      (302) 984-6000 – Telephone
      (302) 658-1192 – Facsimile
      jsensing@potteranderson.com
      rcicoski@potteranderson.com
      dmeyer@potteranderson.com

Dated:  July 20, 2018          *Attorneys for Plaintiff Ritchie Multi-Strategy*
5769489 / 43942-005            *Global, LLC, f/k/a RAM Capital, LLC*

19

# Exhibit 46

Nos. 1-17-2862 and 1-17-2863 (consol.)

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| HUIZENGA MANAGERS FUND, LLC, | ) On appeal from the Circuit |
| | ) Court of Cook County, Illinois, |
| Plaintiff-Appellee, | ) County Department, Chancery |
| | ) Division. |
| v. | ) |
| | ) |
| A.R. THANE RITCHIE; RITCHIE RISK- | ) No. 07 CH 9626 |
| LINKED STRATEGIES, LLC; RITCHIE | ) |
| PARTNERS LLC and RITCHIE CAPITAL | ) |
| MANAGEMENT, LLC, | ) The Honorable |
| | ) PETER FLYNN, |
| Defendants-Appellants. | ) Judge Presiding. |

**ORDER**

This cause coming to be heard on the motion of Defendant-Appellant RITCHIE RISK-LINKED STRATEGIES, LLC to voluntarily dismiss appeal of RITCHIE RISK-LINKED STRATEGIES, LLC, *and Response thereto,*

IT IS HEREBY ORDERED:

**ORDER ENTERED**

JUL 24 2018

**APPELLATE COURT, FIRST DISTRICT**

The motion is GRANTED / DENIED.

_____
JUSTICE

_____
JUSTICE

_____
JUSTICE

John S. Vishneski III
Paul Walker-Bright
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606-7507
Telephone: 312.207.1000
Facsimile: 312.207.6400
jvishneski@reedsmith.com
pwalker-bright@reedsmith.com

A-636

# Exhibit 47

Order                                                    (Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Huizenga Managers Fund, LLC

v.                                          No. 17 L 9344

Ritchie Risk-Linked Strategies, et al.

### ORDER

This matter coming before the Court on Ritchie Capital Management, LLC, Ritchie Partners, LLC, and Ritchie Partners, LLC's Motion to Stay Litigation, due Notice having been given and the Court being fully advised, IT IS HEREBY ORDERED:

1. This litigation is stayed against Ritchie Risk-Linked Strategies, LLC pursuant to the Automatic Bankruptcy Stay in accordance with 11 USC §362.

2. Plaintiffs and the insurance defendants shall file their respective Responses to the Motion to Stay on or before August 15, 2018 to address their position on the scope of the Automatic Stay with respect to all other parties.

3. The parties shall file a joint status report (1-2 pgs) concerning pending procedural matters in all related litigation on or before August 6, 2018.

4. The current status date of August 31, 2018 at 9:45am shall stand.

Attorney No.: 24558

Name: Swanson, Martin & Bell, LLP

Atty. for: RRLS, Ritchie Partners & Plaintergnt

Address: 330 N. Wabash, #3300

City/State/Zip: Chicago, IL 60611

Telephone: 312·321·9100

ENTERED:

Dated: _____

_____
Judge                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

A-637

Order                                                    (Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Huizenga

v.                                    No. _____ 17 L 1294

PRLS et al                                        (21)

**ORDER**

5. Briefing on RNA and Price's motions to
dismiss (pursuant to the Court's 6/13/18 order) is
stayed pending further notice

Judge Daniel J. Kubasiak

JUL 25 2018

Circuit Court - 2072

Attorney No.: _____               ENTERED:

Name: _____

Atty. for: _____

Address: _____               Dated: _____

City/State/Zip: _____

Telephone: _____               _____
                                          Judge            Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

A-638

# Exhibit 48

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
DISTRICT OF DELAWARE
J. CALEB BOGGS FEDERAL BUILDING
844 KING STREET, SUITE 2207, LOCKBOX 35
WILMINGTON, DELAWARE 19801

DEBTOR: Ritchie Risk-Linked Strategies, L.L.C.
CASE NO: 18-11555 (KJC)
DATE: July 31, 2018
TIME: 1:00 p.m.
LOCATION: J. Caleb Boggs Federal Building
844 King Street
3rd Floor, Room 3209
Wilmington, DE 19801

Audio Transcription
ATTENTION: 341(a) NOTICE CLERK - CHAPTER 11

Transcribed by:
Jackie Mentecky
Court Reporter/Transcriptionist

Page 2

1     MR. HACKMAN:  All right.  Good afternoon.
2  We are here on July 31st, 2018 at 1:00 p.m. for
3  the initial 341 meeting for Ritchie Risk-Linked
4  Strategies, L.L.C., case number 18-11555.
5        The case is pending before Judge Carey.
6  The petition was filed on June 28th, 2018.
7        My name is Ben Hackman.  I'm a trial
8  attorney in the U.S. Trustee's Office here in
9  Wilmington, Delaware.  This is a meeting of
10  creditors; so Creditee -- Creditors will have an
11  opportunity to ask questions of the witness about
12  the Debtor's assets, liabilities and financial
13  affairs at the conclusion of my examination.
14        The meeting is being recorded, so I ask
15  that you please verbalize all responses to the
16  questions posed.  At this time I would ask
17  Debtor's counsel to introduce himself and the
18  witness please.
19     MR. GWYNNE:  Kurt Gwynne wind from Reed
20  Smith in Wilmington, Delaware.  And the witness is
21  Michael Ciliento, C-I-L-I-E-N-T-O.  Who is the COO
22  of Ritchie Partners, L.L.C., the managing member
23  of the debtor.
24     MR. HACKMAN:  Thank you.
25     MR. GWYNNE: You're welcome.

Page 3

1     MR. HACKMAN:  At this time I would ask
2  Creditors who are in attendance to enter their
3  appearance please.
4     SPEAKER: Joe Rosales (phonetic) here for
5  Continental Casualty.
6     MR. HACKMAN:  Thank you.  Anyone else?  All
7  right.
8        So Mr. Ciliento, at this time I would like
9  to administer the oath; if you could please raise
10  your right hand.  Do you swear or affirm that the
11  testimony you are about to give will be the truth,
12  the whole truth and nothing but the truth under
13  the penalty of perjury?
14     MR. CILIENTO:  I do.
15     MR. HACKMAN:  Thank you.
16        Could you please -- you are the COO of
17  Ritchie Partners, L.L.C., and that's the managing
18  member of the Debtor --
19     MR. CILIENTO:  Correct.
20     MR. HACKMAN:  -- is that right?  How long
21  have you held that position?
22     MR. CILIENTO:  Since June 26th or 27th of
23  2018.
24     MR. HACKMAN:  Had you held any positions
25  with the Debtor before that?

Page 4

1     MR. CILIENTO:  No.
2     MR. HACKMAN:  Okay.  Can you please
3  describe what your duties are in your current
4  position?
5     MR. CILIENTO:  Sure.  I was appointed as
6  COO to assist with the bankruptcy filling, to
7  facilitate document collection and -- and
8  signature gathering.  And as an interim officer
9  until the CRO could be appointed.
10     MR. HACKMAN:  Do you have familiarity with
11  the Debtor's assets, financial affairs?
12     MR. CILIENTO:  Yes, I do.
13     MR. HACKMAN:  Okay.  Do you own any equity
14  interests in the Debtor?
15     MR. CILIENTO:  No; I do not.
16     MR. HACKMAN:  Had you guaranteed any of the
17  Debtor's debts?
18     MR. CILIENTO:  No, I have not.
19     MR. HACKMAN:  Can you please verify what
20  the Debtor's corporate address is?
21     MR. CILIENTO:  I don't have that up from
22  memory.   Is it --
23     MR. GWYNNE: Do you mean the principal place
24  of business  --
25     MR. CILIENTO:  (Inaudible) principal place

Page 5

1  of business.
2     MR. HACKMAN:   I'm sorry.  We can't both
3  talk at the same time.  The principal place of
4  business or the mailing address --
5     MR. CILIENTO:  That is correct.
6     MR. HACKMAN:  The address -- for the
7  addresses -- the two addresses listed on the
8  petition, are the books and records of the Debtor
9  kept at either one of these locations?
10     MR. CILIENTO:  Yes, I believe they are kept
11  at the Cayman Islands address.
12     MR. HACKMAN:  Okay.
13     MR. GWYNNE: And Ben, just the 200
14  Continental Drive address, that is an agreement to
15  use office space.
16     MR. HACKMAN:  Okay.
17     MR. GWYNNE: It's not technically a lease.
18  There's no personnel there.  The debtor just
19  rented -- I say rented -- but licensed that space
20  so that if it had settlement negotiations or
21  meetings in Delaware, they would have a place to
22  go because the Debtor doesn't have offices here
23  otherwise.
24     MR. HACKMAN:  Understood.  Thank you.
25     MR. GWYNNE: You're welcome.

Page 6

1      MR. HACKMAN:  Do you -- Mr. Ciliento, do
2  you know when the Debtor was established?
3      MR. CILIENTO:  I believe 2004.
4      MR. HACKMAN:  Okay.  And what does the
5  Debtor do?
6      MR. CILIENTO:  The Debtor is an investment
7  fund.
8      MR. HACKMAN:  Can you describe for me
9  please -- so does -- so do investors put money
10 into the fund and then the fund will in turn
11 invest it to --
12     MR. CILIENTO:  My understanding at the --
13 the fund is -- receives capital from different
14 feeder funds.  Those -- that fund then invests in
15 other entities who buy investments or -- or the
16 fund buys the investment directly.
17     The -- this particular fund invested in
18 life settlements, among other things.
19     MR. HACKMAN:  So --
20     MR. CILIENTO:  However -- however, I was
21 going to say -- however, the -- the fund doesn't
22 do it specifically.  The managing member of which
23 I'm the COO does the -- advises and purchases the
24 securities.
25     MR. GWYNNE:  And Ben, just to clarify, if

Page 7

1  you're okay with me clarifying; this is what the
2  Debtor did and how the Debtor did operate its
3  business.
4      Currently, the Debtor doesn't have those
5  life settlement assets after the collapse of
6  Coventry First entity and then the collapse of
7  some related entities -- when I say related
8  entities, those were entities in which the funds
9  were actually invested.  I think one was a Ritchie
10 Ireland I, Ritchie Ireland II.  We mentioned those
11 in the application to employ Reed Smith and go
12 through the history.  But after they filed
13 bankruptcy in New York, the Debtors asset was
14 really an investment with them.  At this point
15 what the Debtor has is the little bit of cash its
16 holding and litigation claims.  It's not taking
17 investments and life settlement assets anymore.
18 That's the business it was in.
19     MR. HACKMAN:  Mr. Ciliento, would you adopt
20 to what Mr. Gwynne just indicated as your
21 testimony?
22     MR. CILIENTO:  Yes.
23     MR. HACKMAN:  Is that consistent with your
24 knowledge?
25     MR. CILIENTO:  Yes.

Page 8

1      MR. HACKMAN:  All right.
2      So -- so presently the Debtor does not have
3  any business operations; is that right?
4      MR. CILIENTO:  Correct.  And the only asset
5  of the Debtor is the litigation at -- proceeds in
6  asset (inaudible) the proceeds from current and
7  potential litigation, and we value that to be
8  about approximately $40 million.
9      MR. HACKMAN:  So the Debtor doesn't own any
10 real estate?
11     MR. CILIENTO:  The Debtor owns no real
12 estate.
13     MR. HACKMAN:  Okay.  Does the Debtor have
14 any employees?
15     MR. CILIENTO:  It -- it does not.  However,
16 the -- the application Mr. Varga to be CRO is
17 pending.
18     MR. HACKMAN:  The Coventry First entities,
19 can you describe for me please how they relate to
20 the Debtor?
21     MR. CILIENTO:  My recollection is Coventry
22 First was a broker of life settlement policies
23 that the fund utilized to obtain these life
24 settlement policies.
25     MR. HACKMAN:  Okay.  So there was -- there

Page 9

1  was an arm's length business relationship between
2  the two?  There was no --
3      MR. CILIENTO:  Yes.
4      MR. HACKMAN:  -- affiliate --
5      MR. CILIENTO:  Correct.
6      MR. HACKMAN:  -- relationship; is that
7  fair?
8      MR. CILIENTO:  It is my understanding that
9  the fund invested in -- well, purchased shares of
10 the two Irish entities and then those Irish
11 entities contracted with Coventry First.
12     MR. HACKMAN:  What are the names of the
13 Irish entities; do you recall?  If you don't,
14 that's okay.
15     MR. CILIENTO:  Do -- do you have them?
16 I -- I -- you know, there were -- there were so
17 many similar names and whatever, I -- I don't want
18 to give you misinformation; but --
19     MR. GWYNNE:  Do you want me to
20 (inaudible) --
21     MR. HACKMAN:  Sure.  If you don't mind.
22     MR. GWYNNE:  The names are Ritchie
23 Risk-Linked Strategies Trading, open paren,
24 Ireland, closed parenthesis, comma, Limited; and
25 Ritchie Risk-Linked Strategies Trading, open

**Page 10**

1  paren, Ireland, closed paren, II.  And that's
2  Roman numeral two, comma, Limited.
3      MR. HACKMAN:  Okay.  Thank you.  Do you
4  know if the Debtor has -- if there are any claims
5  that exist between the Debtor and either of those
6  two Irish entities or the Coventry First entity?
7      MR. CILIENTO:  I'm not aware of any.
8      MR. HACKMAN:  Okay.  Why -- why did the
9  Debtor file for bankruptcy?
10      MR. CILIENTO:  The -- the Debtor filed for
11  bankruptcy protection to preserve the value of its
12  assets, namely the 40 million in litigation
13  claims, the current and potential.  And also to
14  stop the frivolous lawsuits from the other
15  entities which would erode -- which could
16  potentially erode the value of the asset.
17  Obviously, to protect the value of the asset and
18  return as much as possible to the Creditors,
19  ultimately.
20      MR. HACKMAN:  The -- the lawsuits by third
21  parties that you referred to, where are they
22  pending?
23      MR. CILIENTO:  I don't have the list in
24  front of me.
25      MR. HACKMAN:  Okay.

**Page 11**

1      MR. CILIENTO:  I don't have that by memory.
2      MR. GWYNNE:  Ben, there's a form -- I think
3  it's 206 attached to the schedules that list some
4  pending claims.  There's also a form 207 attached
5  to the statement of financial affairs that lists
6  litigation the Debtor was involved with within one
7  year prior to the filing.  At least one of those
8  cases is -- has been dismissed.
9      MR. HACKMAN:  Okay.  Who made the decision
10  for the Debtor to file for bankruptcy?
11      MR. CILIENTO:  Ultimately, all decisions
12  are made by the sole director of the fund manager,
13  which would be Mr. Asparti.  But in -- in this
14  case I think he -- I believe he was -- he
15  consulted with service providers to the managing
16  member of the fund.
17      MR. HACKMAN:  Mr. Asparti was the sole
18  director of which entity again?  I'm -- I'm sorry.
19      MR. CILIENTO:  Ritchie Capital Management,
20  L.L.C., the fund manager.
21      MR. GWYNNE:  And Ben, just to clarify that
22  the -- there's the managing manager, which is the
23  Ritchie Partners, L.L.C., Ritchie Capital
24  Management, L.L.C., is the manager of the managing
25  member.  So when he just was saying manager of the

**Page 12**

1  fund, I think he was referring to the -- the
2  managing member of the Debtor.
3      MR. CILIENTO:  Correct.  Thank you.
4      MR. HACKMAN:  Thank you.  Has the Debtor
5  filed for bankruptcy bank before?
6      MR. CILIENTO:  Not that I'm aware of, no.
7      MR. HACKMAN:  Does the Debtor have any
8  affiliates that are currently in bankruptcy?
9      MR. CILIENTO:  Not that I'm aware of, no.
10      MR. HACKMAN:  Has the Debtor used a previous
11  name other than Ritchie Risk-Linked Strategies
12  L.L.C.?
13      MR. CILIENTO:  No.
14      MR. HACKMAN:  What does the Debtor intend
15  to do in this bankruptcy case?
16      MR. CILIENTO:  Well, the value -- the --
17  primarily to put an end to frivolous litigation to
18  allow them to pursue their current claims against
19  several entities, and I could detail what those
20  are, if you wish.
21      MR. HACKMAN:  Yes, please.
22      MR. CILIENTO:  Okay.  So the -- the bulk of
23  the claim is we have, approximately, $9 million in
24  pre-judgment legal fees paid to Sidney Austin.
25  Approximately --

**Page 13**

1      MR. HACKMAN:  I'm sorry.  What was the name
2  of that firm?
3      MR. CILIENTO:  Sidney Austin.
4      MR. HACKMAN:  Sidney Austin.  Sorry.  Thank
5  you.
6      MR. CILIENTO:  Yeah.  You're welcome.
7  Approximately -- at least 11 million in bad faith
8  claim against two insurance companies.  Tell me
9  when you're ready, I'll keep going.
10      MR. HACKMAN:  Sure.  Go ahead.
11      MR. CILIENTO:  Approximately, $13.3 million
12  that was seized from an account of Mr. Thane
13  Ritchie.  And, approximately, 7 million in
14  post-judgment legal fees paid to primarily all law
15  firms, including Reed Smith, Claiborne Sabbo
16  Wagner, Potter Anderson and McGuire Woods.
17      MR. HACKMAN:  So -- so the Sidney Austin
18  firm, the Reed Smith firm, Potter Anderson,
19  McGuire Woods; what was the other firm you had
20  mentioned?
21      MR. CILIENTO:  Well, Sidney Austin was
22  prior to the first judgment.
23      MR. HACKMAN:  Okay.
24      MR. CILIENTO:  And after the judgment, I
25  think we used -- the Debtor used -- what did I say

Page 14

1  Potter Anderson --
2        MR. HACKMAN:  Right.
3        MR. CILIENTO:  -- McGuire Woods --
4        MR. HACKMAN:  Right.
5        MR. CILIENTO:  -- Claiborne Sabo Wagner and
6  --
7        MR. HACKMAN:  That's right.
8        MR. CILIENTO:  -- and Reed Smith.
9        MR. GWYNNE:  Hey, Ben, do you mind if I
10  just clarify?  This is not changing --
11        MR. HACKMAN:  Okay.
12        MR. GWYNNE:  -- witness testimony, but I
13  just want to make sure you understand.  He
14  described all of that as the claim; which, you
15  know, gave you different numbers.  I think the
16  claim he's describing, which was not specifically
17  stated, was that the indemnification claim that
18  the Debtor believes it has against Tie Zinga.
19        MR. HACKMAN:  Okay.
20        MR. GWYNNE:  It includes with respect to the
21  11 million that he had mentioned on the bad faith
22  claim, that's the amount the insurers paid to
23  satisfy the first judgment.
24        But the Debtor believes because the insured
25  didn't provide coverage early on, the Debtor lost

Page 15

1  opportunity to settle the case for much, much less
2  than it cost and that claim is at least is 11
3  million, it could be 20 million.  If you look at
4  the first, second judgment, all the attorney's
5  fees spent post-judgement and the ones that were
6  prejudgment post-opportunity to settle.
7        But the indemnification claim itself was
8  the one I think he was focusing on that we think
9  we have indemnification against Tie Zinga for
10  that.
11        MR. CILIENTO:  Thank --
12        MR. HACKMAN:  Is there --
13        MR. CILIENTO:  Thank you for clarifying.
14        MR. HACKMAN:  Would you adopt that as your
15  testimony?
16        MR. CILIENTO:  Yes, I would.
17        MR. HACKMAN:  So is there -- can you
18  describe for me please what the nature of the
19  Debtor's relationship is to Huizenga -- I would
20  assume if there's indemnification claim, there's
21  some sort of contractual relationship between the
22  parties; is that correct?
23        MR. CILIENTO:  Yes.  Huizenga invested in
24  the fund by a -- two subscription agreements.  And
25  the indemnification relates to the violation of

Page 16

1  terms of the subscription agreement.
2        MR. HACKMAN:  Do you recall when the -- the
3  Huizenga investment was made in the funds?
4        MR. CILIENTO:  Yes.  There were -- there
5  were two investments.  One of approximately six --
6  $6 million was made in approximately August 1st of
7  2005.  The second one was made in -- around
8  October 1st, 2005 and actually was a -- a transfer
9  from investment in another Ritchie fund.  Huizenga
10  had invested in other Ritchie funds prior to
11  investing in the RRLS fund.
12        MR. HACKMAN:  And do you know -- do you
13  recall the amount of the second --
14        MR. CILIENTO:  Yeah, it was --
15        MR. HACKMAN:  -- transfer?
16        MR. CILIENTO:  -- it was a -- it was about
17  4.4 million.  It was an uneven number because it
18  was conversion from one fund to another.
19        MR. HACKMAN:  Okay.  And is there -- okay.
20  So -- so -- so there are two subscription
21  agreement between Huizenga and the Debtor and --
22        MR. CILIENTO:  Actually, there were
23  amended -- I'm sorry.
24        MR. HACKMAN:  -- and -- the Debtor's -- the
25  Debtor believes that Huizenga breached those

Page 17

1  agreements, is that accurate?
2        MR. CILIENTO:  Yes.  You know, I -- I'm --
3  I'm not an attorney.  My understanding of the case
4  is that -- the grounds for Huizenga to bring a
5  suit against the Debtor was on the basis of fraud
6  or gross negligence.
7        The fraud claim was dropped prior to the
8  case (inaudible) -- prior to the trial.  And
9  therefore, based on the subscription agreement,
10  even though Huizenga was granted judgment, they
11  had no right under the subscription agreement to
12  bring action in the first place.
13        MR. HACKMAN:  So -- so Huizenga had brought
14  a claim in court against Huizenga for --
15        MR. CILIENTO:  Huizenga brought a claim
16  in -- against Ritchie Risk-Linked Strategies I
17  think --
18        MR. GWYNNE: And other Defendants.
19        MR. CILIENTO:  And other Defendants.
20        MR. GWYNNE:  An Illinois state court.
21  (Inaudible) --
22        MR. CILIENTO:  Yeah.  There were four
23  Defendants, I believe.
24        MR. HACKMAN:  But the Debtor was not one of
25  them?

Page 18

1    MR. CILIENTO:  No.  Yeah.  The --
2    MR. HACKMAN:  It -- it was one?
3    MR. CILIENTO:  Yes.
4    MR. HACKMAN:  And that was Illinois state
5  court --
6    MR. CILIENTO:  Yes.
7    MR. HACKMAN:  -- is that correct?  Are --
8  is that matter still pending?
9    MR. CILIENTO:  Is that matter still
10  pending?
11    MR. GWYNNE:  I believe there's an appeal of
12  the second judgment that's pending.
13    MR. HACKMAN:  Okay.  Okay.  Does the Debtor
14  have an intention at this point of filing a
15  Chapter 11 plan of reorganization or liquidation?
16    MR. CILIENTO:  That -- the -- that will be
17  the responsibility of the CRO.
18    MR. GWYNNE:  Yes.
19    MR. CILIENTO:  Yeah.  Yes.
20    MR. GWYNNE:  We do.  Yeah.
21    MR. CILIENTO:  Sorry.
22    MR. HACKMAN:  Okay.  And -- and does the
23  proposed CRO's name again please.  Can you repeat
24  that for me?
25    MR. CILIENTO:  Geff Vargas.

Page 19

1    MR. GWYNNE: It's G-E-O --
2    MR. CILIENTO:  G-E-O --
3    MR. GWYNNE: F-F-R-E-Y, V-A-R-G-A --
4    MR. HACKMAN:  V-A-R-G-A.  Okay.
5    MR. GWYNNE:  Yeah.
6    MR. HACKMAN:  And does Mr. Varga have any
7  connection or relationship with the Debtor
8  prepetition?
9    MR. CILIENTO:  Not that I'm aware of.
10    MR. HACKMAN:  Any connection with any of
11  the Debtors -- any connection with any other
12  entities under the Ritchie name?
13    MR. CILIENTO:  I don't -- I am not sure of
14  the answer.
15    MR. HACKMAN:  And do you know if -- you
16  had -- you had mentioned Mr. Thane Ritchie before.
17  Is there any connection between Mr. Ritchie and
18  Mr. Varga?
19    MR. CILIENTO:  I believe they worked -- I
20  -- I am uncertain of the relationship, so instead
21  of being incorrect, I will not answer.
22    MR. GWYNNE:  Geff, we filed the application
23  to employ Duff and Phelps (phonetic) as CRO and
24  Mr. Varga would act in that capacity in that
25  application.  We've attached the names that he

Page 20

1  searched and any connections with those entities.
2    With respect to the Debtors, I don't
3  believe he has any.  With respect to another
4  entity which used the name Ritchie, I believe he
5  was adverse to that entity in the Lancelot
6  bankruptcy or insolvency proceedings.
7    MR. HACKMAN:  Okay.  Next I would like to
8  authenticate the petition and the schedules --
9  schedules assets and liabilities in the statement
10  of financial affairs.
11    MR. CILIENTO:  Okay.
12    MR. HACKMAN:  Do you have a copy to refer
13  to?
14    MR. CILIENTO:  No; I do not.
15    MR. GWYNNE:  I gave you three (inaudible).
16    MR. HACKMAN:  Actually, here.  I have a
17  copy here of the -- I believe this is the amended
18  petition that was filed July 12th, I believe.  If
19  you could --
20    MR. CILIENTO:  But you filed an amendment
21  after this, correct?
22    MR. GWYNNE:  No.
23    MR. CILIENTO:  Okay.
24    MR. HACKMAN:  Is that what you recognize
25  the document to be?

Page 21

1    MR. CILIENTO:  Well, I believe Marco
2  (phonetic) as a party signed this.
3    MR. HACKMAN:  Right.  But -- but the -- the
4  document itself is the amended petition that the
5  Debtor filed; is that right?
6    MR. CILIENTO:  I believe so, yes.
7    MR. HACKMAN:  And on the page just before
8  that, I believe it's Page 4 of 6, there are --
9  there are signature blocks on that page; do you
10  see them?
11    MR. CILIENTO:  Yes.
12    MR. HACKMAN:  And Mr. Asparti appears to
13  have signed it?
14    MR. CILIENTO:  Yes.
15    MR. HACKMAN:  Are you familiar with what
16  his signature looks like?
17    MR. CILIENTO:  Yes, that looks -- that
18  appears -- that is his signature.
19    MR. HACKMAN:  All right.  Thank you.  Did
20  you help to -- did you participate in preparing
21  the petition in any way?
22    MR. CILIENTO:  This petition?  No.
23    MR. HACKMAN:  All right.  Have you had a
24  chance to review the contents of the petition?
25    MR. CILIENTO:  Yes.

Page 22

1      MR. HACKMAN:  Are the contents of it true
2  and correct, to the best of your knowledge?
3      MR. CILIENTO:  To the best of my knowledge,
4  yes.
5      MR. HACKMAN:  Are there any amendments that
6  you believe would need to be made to it at this
7  time?
8      MR. CILIENTO:  Not at this time.
9      MR. HACKMAN:  Thank you.
10     MR. CILIENTO:  You're welcome.
11     MR. HACKMAN:  I have -- I'm going to skip
12 to the amended schedules of the statements.
13     MR. CILIENTO:  Okay.
14     MR. HACKMAN:  So docket item 25, and I
15 believe this was filed yesterday.
16     MR. CILIENTO:  Okay.
17     MR. HACKMAN:  There's the Debtor's
18 amendment statement of financial affairs, which
19 I've printed out.  You can just take a minute
20 please to look at it.
21     MR. CILIENTO:  Yeah, this looks correct.
22     MR. HACKMAN:  Never mind the highlighted
23 parts.
24     MR. CILIENTO:  No.  No.  That's fine.
25 That's fine.

Page 23

1      MR. HACKMAN:  I believe towards the end
2  there's going to be the signature line.
3      MR. CILIENTO:  Yes.
4      MR. HACKMAN:  So this is the second-to-last
5  page at the bottom there's a signature block.  Is
6  that your signature?
7      MR. CILIENTO:  Yes, it is.
8      MR. HACKMAN:  Did you participate in
9  preparing the amended statement of financial
10 affairs?
11     MR. CILIENTO:  I reviewed the numbers.
12 I -- the statement itself was prepared by a fund
13 accountant of a service provider to the manager.
14     MR. HACKMAN:  Did you review the contents
15 before you signed it?
16     MR. CILIENTO:  Yes, I did.  Actually, I --
17 (inaudible) extensive time with that accountant
18 reviewing invoices, promissory notes, et cetera,
19 to validate these numbers to the best of my
20 ability.
21     And in particular the invoices that were
22 directed -- that were addressed directly to RRLS
23 and some of the invoices came to -- that were
24 addressed to a generic RCM, the details of those
25 invoices were listed and they were RRLS-related.

Page 24

1  So yes, these numbers are correct.
2      MR. GWYNNE:  I think he's talking about the
3  schedules, not the statement of financial affairs.
4      MR. CILIENTO:  Okay.
5      MR. HACKMAN:  Okay.
6      MR. CILIENTO:  Sorry.
7      MR. HACKMAN:  That's -- that's fine.  As --
8  as -- do you believe the information in the
9  amended statement of the financial affairs is a
10 true and correct --
11     MR. CILIENTO:  Yes, I do.
12     MR. HACKMAN:  -- to the best of your
13 knowledge?
14     MR. CILIENTO:  Yes, I do.
15     MR. HACKMAN:  Are there any amendments that
16 you believe would need to be made at this time?
17     MR. CILIENTO:  At this time, no.  I believe
18 this was the last one we filed yesterday.
19     MR. HACKMAN:  All right.  Thank you.
20     MR. CILIENTO:  You're welcome.
21     MR. HACKMAN:  Well, then finally, we
22 would -- we'll turn the amended schedules --
23     MR. CILIENTO:  Yes.
24     MR. HACKMAN:  -- of assets and
25 liabilities --

Page 25

1      MR. CILIENTO:  Sorry.
2      MR. HACKMAN:  -- docket item 26.  That's
3  all right.  If you wouldn't mind --
4      MR. CILIENTO:  Yeah.
5      MR. HACKMAN:  -- if you could please look
6  at that and confirm that's what the document is.
7      MR. CILIENTO:  I just want to -- yeah.
8  That -- that was one change.  Sorry, I just wanted
9  to make sure.
10     MR. HACKMAN:  Take your time.
11     MR. CILIENTO:  That appears to be correct.
12 Okay.  Okay.  Yes.
13     MR. HACKMAN:  Did you help to prepare the
14 amended schedule of assets and liabilities?
15     MR. CILIENTO:  As I said, I worked -- a
16 fund accountant to the service -- of the service
17 provider of the manager prepared the schedules.  I
18 reviewed the information with her to -- in my
19 opinion these are correct --
20     MR. HACKMAN:  Okay.
21     MR. CILIENTO:  -- to the best of my
22 knowledge.
23     MR. HACKMAN:  And what's the accountant's
24 name please .
25     MR. CILIENTO:  I know her as Laurie Spoola.

Page 26

1  (Phonetic) I believe she was married and her name
2  is Shulman.
3      MR. HACKMAN:  Is she with an accounting
4  firm?
5      MR. CILIENTO:  She is with the service
6  provider to the manager, which is 60 -- which is a
7  company called 60 Degrees.
8      MR. HACKMAN:  Okay.
9      MR. GWYNNE: Ben, I don't know if you've --
10  you're familiar with a lot of investment funds,
11  but often that's the way they're run by service
12  providers that provide the back office accounting
13  and those types of services for the entity, that
14  doesn't have employees itself.
15      MR. HACKMAN:  Okay.  Did you review the
16  information in the amended schedules -- actually,
17  let's -- what I should do is turn to the back.  On
18  the final page there is a signature block there.
19      MR. CILIENTO:  Yes, I did.
20      MR. HACKMAN:  Is that your signature?
21      MR. CILIENTO:  Yes, it is.
22      MR. HACKMAN:  And you reviewed the
23  information in the amended schedules before you
24  signed it?
25      MR. CILIENTO:  Yes, I did.

Page 27

1      MR. HACKMAN:  And is the information true
2  and correct to the best of your knowledge?
3      MR. CILIENTO:  To the best of my knowledge,
4  it is.
5      MR. HACKMAN:  Are you aware of any
6  amendments that would need to be made to the
7  amended schedules at this time?
8      MR. CILIENTO:  At this point -- at this
9  time, no.
10      MR. HACKMAN:  All right.  Thank you.
11      MR. CILIENTO:  You're welcome.
12      MR. GWYNNE: Ben, there are a couple of
13  things I would like to mention to you about the
14  schedules and statement of financial affairs.
15      First of all, with respect to payments made
16  within 90 days on the statement of financial
17  affairs, you know, Debtor has checked none.  I
18  just want to explain to you the way the funds
19  flow -- funds flowed and why we believe that none
20  was the proper answer.
21      MR. HACKMAN:  Okay.  Sure.
22      MR. GWYNNE: The -- let's say the Debtor
23  received an invoice for legal services.  That
24  would be paid by Ritchie Capital Management,
25  L.L.C., which is the manager of the managing

Page 28

1  manager.  And then the -- it would -- the claim
2  against the Debtor for payment of that, but the
3  way that was actually paid was through the
4  financing provided by Ritchie Multi-Strategy
5  Global, L.L.C.
6      So Ritchie Multi-Strategy Global, L.L.C.,
7  would reimburse Ritchie Capital Management.  So
8  it's not -- the Debtor didn't have its own source
9  of funds.
10      MR. CILIENTO:  Excuse me.  It is my belief
11  that the invoices were paid by Ritchie Capital
12  Management, LTD.
13      MR. GWYNNE: Okay.
14      MR. CILIENTO:  Not -- not L.L.C..  LTD
15  being the Cayman entity.
16      MR. GWYNNE: No, the -- one exception to
17  that is with respect to the portion of the
18  retainer paid to Reed Smith on June 28th, that did
19  flow directly through an RRLS bank account.  But
20  that's not on the account of (inaudible) debt
21  which is -- we explained that in the application
22  to employ, but I just wanted to explain that
23  answer to you in the statement of financial
24  affairs.
25      And also, the second thing I wanted to

Page 29

1  mention is that through the operating agreement
2  with the Debtor, the Debtor has the right to use
3  the Ritchie name, has the right to use that
4  intellectual property, but that's in the operating
5  agreement, it's not in a separate licensing
6  agreement.
7      We did list the operating agreement in the
8  schedules, but I just wanted to mention that to
9  you with respect to the intellectual property,
10  which isn't separately listed.
11      MR. HACKMAN:  Okay.  Mr. Ciliento, is that
12  a fair characterization --
13      MR. CILIENTO:  Yes.
14      MR. HACKMAN:  -- that you --
15      MR. CILIENTO:  That's correct.
16      MR. HACKMAN: The -- the LTD entity you
17  referenced, could you remind me again of what its
18  relationship is to the Debtor?
19      MR. CILIENTO:  I don't -- I am not aware of
20  their relationship at this time.
21      MR. HACKMAN:  Okay.  But it made
22  disbursements more or less on behalf of the Debtor
23  prepetition -- for certain expenses?
24      MR. CILIENTO:  Yes, that is my
25  understanding and it was -- there was a credit

Page 30

1   facility between the Debtor and Ritchie
2   Multi-Strategy Global Trading, LTD.  The Debtor
3   instructed Ritchie Multi -- Ritchie Multi-Strategy
4   Global Trading, LTD, to reimburse Ritchie Capital
5   Management, LTD, on behalf of RRLS, Ritchie
6   Risk-Linked Strategies, L.L.C.
7        Therefore -- thereby, you know, satisfying
8   the obligation and increasing the amount owed on
9   the credit facility.
10       MR. GWYNNE:  The -- the credit facility,
11  Ben, that's the debt listed on schedule D.
12       MR. CILIENTO:  Yes, the five --
13       MR. HACKMAN:  Okay.
14       MR. CILIENTO:  -- million or so.
15       MR. HACKMAN:  Okay.
16       MR. HACKMAN:  Does the Debtor have
17  insurance in place?
18       MR. CILIENTO:  Not that I'm aware of.
19       MR. HACKMAN:  Okay.
20       MR. CILIENTO:  It had obviously --
21       MR. GWYNNE:  I think , Ben, in connection
22  with the initial Debtor interview, it provided a
23  copy of the policy that would cover the directors
24  and officers, but there's not like casualty
25  insurance if there are no operations.

Page 31

1        MR. HACKMAN:  Is the -- is the DNO --
2        MR. GWYNNE:  No employees.
3        MR. HACKMAN:  Is the DNO policy still in
4   effect?
5        MR. GWYNNE:  Yes.
6        MR. HACKMAN:  Is that your understanding,
7   Mr. Ciliento?
8        MR. GWYNNE:  If you don't know, say you
9   don't know.
10       MR. CILIENTO:  I -- I don't know.
11       MR. HACKMAN:  Okay.
12       MR. CILIENTO:  I don't know.
13       MR. HACKMAN:  Is the Debtor current on all
14  of its tax liabilities?
15       MR. CILIENTO:  I do not know.
16       MR. HACKMAN:  Did the debtor receive a copy
17  of the U.S. Trustee guidelines?
18       MR. CILIENTO:  I do not know.
19       MR. HACKMAN:  Do you understand the
20  Debtor's obligation to file operating reports and
21  to pay U.S. Trustee quarterly fees during the
22  bankruptcy case in Chapter 11?
23       MR. CILIENTO:  Yes.
24       MR. HACKMAN:  All right.  If I could look
25  at this please.

Page 32

1        MR. CILIENTO:  Sure.
2        MR. HACKMAN:  So in the original Chapter 11
3   petition that was filed, there was a written
4   consent of the managing manager that was attached
5   to the petition.  And in part three of that
6   consent there's a statement that the company would
7   be authorized to obtain postpetition Debtor in
8   possession financing from Ritchie Multi-Strategy
9   Global Trading LTD or its designees; do you see
10  where that is?
11       MR. CILIENTO:  Yes.
12       MR. HACKMAN:  Does the Debtor intend to
13  obtain debt financing from that entity or its
14  designees at this point?
15       MR. CILIENTO:  That -- that is my
16  understanding at this time.
17       MR. HACKMAN:  Do you know what approximate
18  amount of financing the Debtor would seek to
19  obtain?
20       MR. CILIENTO:  Yes.  $1.5 million.
21       MR. HACKMAN:  And do you know what expenses
22  that financing would go to fund?
23       MR. CILIENTO:  It was in the -- the
24  schedule monthly operating -- I don't have it with
25  me.

Page 33

1        MR. GWYNNE:  It was in the initial monthly
2   operating report, Ben.
3        MR. HACKMAN:  Does the Debtor intend to
4   file a motion for debt financing?
5        MR. CILIENTO:  I believe so.
6        MR. HACKMAN:  Okay.  And I -- I believe --
7   I had asked before about the -- the LTD entity and
8   I think you had said you weren't sure what the
9   relationship was between it and the Debtor.
10       Is -- is this a different LTD entity or is
11  it the same --
12       MR. CILIENTO:  That is a different entitiy.
13  Ritchie Capital Management, LTD --
14       MR. HACKMAN:  Okay.
15       MR. CILIENTO:  -- paid some invoices on
16  behalf the RRLS, L.L.C.
17       MR. HACKMAN:  The Ritchie Multi-Strategy
18  Global Trading, LTD, entity, the potential debt
19  financier, what relationship does it have to the
20  Debtor?
21       MR. CILIENTO:  It -- it currently has a
22  credit facility -- there's a credit facility
23  between the -- the Ritchie Multi-Strategy Global
24  Trading, LTD, entity and the Ritchie Risk-Linked
25  Strategies, L.L.C., entity.  That is my only

Page 34

1  knowledge of their relationship at this time.
2       MR. HACKMAN:  But the Ritchie
3  Multi-Strategy Global Trading, LTD, entity; is it
4  part of the same overall corporate structure as
5  the Debtor -- as the Debtor's partners --
6       MR. CILIENTO:  You know --
7       MR. GWYNNE:  Excuse me (inaudible) -- I'm
8  going to have to object to the form of that
9  question, Ben, because I don't think overall
10  corporate structure applies with respect to
11  investment funds.  So I don't know if you can
12  rephrase it.  Do you want to ask him if
13  (inaudible) is one an equity holder of the other
14  or something like that, because this -- when you
15  have funds that have, you know, different
16  investors --
17       MR. CILIENTO:  Sorry.
18       MR. GWYNNE:  -- it's -- it's -- there's a
19  different structure than a corporation.  I mean,
20  we do have members -- entities do have members and
21  things like that, but these can be different than
22  the investors.
23       MR. HACKMAN:  Sure.
24       Does the Debtor and the Ritchie
25  Multi-Strategy Global Trading, LTD, have any

Page 35

1  indirect equity owners in common?
2       MR. GWYNNE:  If you know what that means,
3  but --
4       MR. CILIENTO:  I -- I do not know exact --
5  I do not know what that means, nor do I know of
6  any.
7       MR. HACKMAN:  Okay.  If I could look at
8  this again please.  In the amended schedule D,
9  Creditors who have claims secured by property, the
10  Ritchie Multi-Strategy Global Trading, LTD entity
11  is listed as having a -- just over a $5.1 million
12  secured claim for indemnification.
13       MR. CILIENTO:  Right.  Wasn't that
14  modified?
15       MR. GWYNNE:  Where are you looking at here?
16       MR. CILIENTO:  This is --
17       MR. HACKMAN:  The amended schedule D.
18       MR. GWYNNE:  Where -- where are you talking
19  about, Ben?  You said 1.5 million?
20       MR. HACKMAN:  The 5.1 million -- just over
21  1.5 million secured claim for indemnification.  I
22  just wanted to confirm that that's --
23       MR. CILIENTO:  Right.  But it -- it is
24  disputed and I believe there was a note --
25       MR. HACKMAN:  That's where I was going to

Page 36

1  go next.
2       MR. CILIENTO:  Yeah.  Yeah.  Right.
3       MR. GWYNNE:  I think, Ben, if that's the
4  same amount of the note, I think what it's saying
5  is it it intended to say that it paid litigation
6  expenses.  And therefore, the Debtor may have an
7  indemnification claim for it, but the loan
8  facility was for that purpose to pay the
9  litigation expenses.
10       MR. HACKMAN:  Okay.  It asks here is the
11  creditor an insider or related party and the box
12  yes is checked.  So there obviously must be a
13  connection between Ritchie Multi-Strategy Global
14  Trading, LTD, and the Debtor.
15       MR. CILIENTO:  I -- I --
16       MR. HACKMAN:  I guess --
17       MR. CILIENTO:  Yeah, I don't recall what
18  that relationship is at the time -- at this time.
19       MR. HACKMAN:  Maybe we can follow up --
20       MR. CILIENTO:  Okay.
21       MR. HACKMAN:  -- after the meeting about
22  that.
23       MR. CILIENTO:  Okay.
24       MR. HACKMAN:  In the Global notes to -- I
25  guess we can stick with the schedules.  I can't

Page 37

1  read upside down.
2       MR. CILIENTO:  Yeah.  Okay.  Sure.
3       MR. HACKMAN:  In Global note 2-C to the
4  amended schedules --
5       MR. CILIENTO:  Right.
6       MR. HACKMAN:  -- there's a statement that
7  the Debtor believes the security interest granted
8  to Ritchie Multi-Strategy Global Trading, LTD, is
9  avoidable under section 547(b) of the bankruptcy
10  code as a preferential transfer because the
11  financing statement was not filed until June 21st,
12  2018; do you see where that is?
13       MR. CILIENTO:  Yes.
14       MR. HACKMAN:  So the Debtor -- this is the
15  same entity that the Debtor would be obtaining
16  postpetition financing from, correct?
17       MR. CILIENTO:  Correct.
18       MR. HACKMAN:  All right.  Sticking with the
19  Global notes, part two, subpart D.
20       MR. CILIENTO:  Okay.
21       MR. HACKMAN:  There's a statement that
22  says:  The Debtor believes that the $1 million
23  judgment in favor of Ritchie Risk-Linked
24  Opportunities, L.L.C., and the $20 million
25  judgment in favor of Swansea Beneficiary Trust,

Page 38

1  L.L.C., are avoidable and/or otherwise
2  unenforceable.  Can you please expand on what that
3  means?
4        MR. CILIENTO:  Sure.  Can you just --
5        MR. HACKMAN:  Sure.
6        MR. CILIENTO:  I do not recall the details
7  of the million dollar judgment.  However, the --
8  the $20 million judgment was Swansea claimed that
9  the Debtor used insurance proceeds to pay for
10  litigation expenses in -- I am sorry -- litigation
11  expenses in defense of Huizenga suits.  So it used
12  the $20 million proceeds to pay for the Defense.
13        MR. GWYNNE:  Is that somewhat of a legal
14  question, Ben, if I can supplement that?  The
15  Debtor believes that the judgments which were
16  obtained on or around the petition date would be
17  unenforceable; they were default judgments.
18        The counsel for the Plaintiffs was counsel
19  for the Debtors in other litigation, and we think
20  that the Debtor believes those judgments were --
21  while they were taken to protect the Debtor
22  because of concerns that Huizenga was trying to
23  execute on the Debtor's claims and, therefore, the
24  Debtor thought -- believed that if these entities
25  also had claims and judgments that perhaps they

Page 39

1  could defend the Debtor's assets from execution or
2  act first potentially.
3        But from the Debtor's perspective, we
4  believe that those judgments are disputed and
5  subject to attack by the Debtor.
6        MR. HACKMAN:  So the Swansea Beneficiary
7  Trust, L.L.C., what relationship does that entity
8  have to the Debtor?
9        MR. CILIENTO:  I do not know that.
10        MR. HACKMAN:  Is it a counterparty to the
11  Debtor in litigation?
12        MR. CILIENTO:  I am --
13        MR. GWYNNE:  Well, it is in that
14  litigation; you mean other than that?
15        MR. HACKMAN:  I'm not sure.
16        MR. GWYNNE:  Well, it's a counterparty that
17  was suing the Debtor in that case.
18        MR. HACKMAN:  Do you know what claims it
19  was asserting against the Debtor in that
20  litigation?
21        MR. CILIENTO:  My understanding is that the
22  claim was for using the insurance proceeds to pay
23  for defense.
24        MR. HACKMAN:  So did -- so does the --
25  the -- does -- would that mean that the Swansea

Page 40

1  Beneficiary Trust, L.L.C., and the Debtor are both
2  covered by the same insurance policy?
3        MR. CILIENTO:  I don't know the answer to
4  that.
5        MR. GWYNNE:  These -- these were default
6  judgments.  These weren't litigated judgments.
7        MR. HACKMAN:  Right.  I -- I guess I'm -- I
8  don't understand what the basis would be for a
9  third party -- an unrelated third party to have a
10  right above the Debtor to receive insurance
11  proceeds.
12        MR. GWYNNE:  I think the complaint itself
13  asserts a right or interest in those proceeds on
14  behalf of Swansea; but like I said, the Debtor
15  doesn't believe that the claim has any merit.
16        MR. HACKMAN:  Now, was this litigation also
17  in Illinois state court?
18        MR. CILIENTO:  I don't recall.  I believe
19  so, yeah.  If I had the schedule in front of me, I
20  could --
21        MR. HACKMAN:  It's all right.
22        MR. CILIENTO:  Yeah.
23        MR. GWYNNE:  You asked to both of those, it
24  was -- if you look at schedule 207 to the
25  statement of financial affairs.

Page 41

1        MR. HACKMAN:  Okay.  So this is 7.7 --
2        MR. GWYNNE:  Yeah.  There's the two default
3  judgments listed there.
4        MR. CILIENTO:  That's the amended schedule,
5  correct?
6        MR. HACKMAN:  Yes.
7        MR. CILIENTO:  Right.  Okay.  Thank you.
8        MR. HACKMAN:  So in the creditor matrix
9  that was filed with the original petition it
10  appeared to me that the Ritchie Risk-Linked
11  Opportunities, L.L.C., entity and the Swansea
12  Beneficiary Trust, L.L.C., entity have the same
13  address.  Do you know why that is?
14        MR. CILIENTO:  No; I do not.
15        MR. HACKMAN:  Okay.
16        MR. GWYNNE:  And Ben, that's not saying that
17  he -- he's not saying he knows they do or don't,
18  he's just saying --
19        MR. CILIENTO:  Correct.
20        MR. GWYNNE:  -- he doesn't know why --
21        MR. CILIENTO:  I don't --
22        MR. GWYNNE:  -- whether they're at the same
23  address or not.  I mean, a lot of these entities
24  are -- can be operated or managed from similar
25  address or the same addresses.

Page 42

1    MR. HACKMAN: Okay.
2         Would anybody know -- would anybody be in a
3    position to know if there were some sort
4    commonality of ownership or interest in the
5    Swansea -- the Swansea Beneficiary Trust, L.L.C.,
6    entity and the other Ritchie branded entities?
7         MR. GWYNNE: I would think I can find out
8    for you and get back --
9         MR. HACKMAN:  Okay.
10        MR. GWYNNE: --  and send you something in
11   writing.
12        MR. HACKMAN:  Okay.  Sorry to jump around
13   here.
14        MR. CILIENTO: That's fine.
15        I just need to stand up.  My knee is
16   killing me.  I pulled --
17        MR. HACKMAN: Please.
18        MR. CILIENTO: -- my MCL two weeks ago and
19   it's --
20        MR. GWYNNE: Do you want to take a break
21   or --
22        MR. CILIENTO: No.  No.  I'm fine.  I just
23   want to -- I just want to take a walk.  Okay.
24        MR. HACKMAN:  Any time you need to take a
25   break --

Page 43

1    MR. CILIENTO: Yeah.  No.  I'm --
2         MR. HACKMAN: -- please let me know.
3         MR. CILIENTO: I'm fine.  Thank you..
4         MR. HACKMAN:  The amended schedules,
5    appendix A, itemizes causes of action against
6    third parties.
7         MR. CILIENTO: Yes.
8         MR. HACKMAN: And there's a reference to
9    legal malpractice claims against the Debtor's
10   external counsel for failure to timely raise a
11   choice of law issue.
12        MR. CILIENTO: Okay.
13        MR. HACKMAN: Do you see where that is?
14        MR. CILIENTO: Yeah.
15        MR. HACKMAN: Who is the external counsel?
16        MR. CILIENTO:  I am not familiar with that.
17        MR. HACKMAN: Do you know of the --
18        MR. CILIENTO: I believe it -- I believe
19   that was Sidney Austin.
20        MR. HACKMAN: Okay.  Do you mind if I
21   turn --
22        MR. CILIENTO: Sure.
23        MR. HACKMAN: Sorry.
24        In the form 207 would -- do you know if
25   that legal malpractice claim is associated with

Page 44

1    any of the pieces of litigation listed here?
2         MR. GWYNNE:  What do you mean by
3    associated -- do you mean --
4         MR. HACKMAN:  Does it arise out of --
5         MR. GWYNNE: Arise out of -- okay.
6         MR. HACKMAN:  -- any of these lawsuits?
7         MR. CILIENTO:  I -- I can't answer that.
8         MR. HACKMAN:  Okay.  In -- in the form 207,
9    this is sticking with the amended appendix A, at
10   7.8, there's a suit involving Ritchie Risk-Linked
11   Opportunities, L.L.C., and the Debtor.  So there
12   are -- appears there is a Ritchie branded entity
13   on both sides of the litigation; are you familiar
14   with the nature of -- of that lawsuit?
15        MR. CILIENTO:  No; I am not.
16        MR. GWYNNE:  That is the one of the defaults
17   judgment that we talked about in the schedules.
18        MR. HACKMAN:  Okay.  That the Debtor may be
19   in a position to contest.
20        MR. GWYNNE: The Debtor -- yeah, does
21   contest.
22        MR. HACKMAN:  Okay.  One of the things I
23   had found in just doing very brief research was a
24   press release from the SEC in 2008 that refers to
25   charges of illegal late trading involving -- it

Page 45

1    looks look like Ritchie Multi-Strategy Global
2    Trading, LTD, the Ritchie Capital Management,
3    L.L.C., entity, Ritchie Capitals founder and CEO
4    (inaudible) A.R. Thane Ritchie, and employees
5    Warren D'Myo (phonetic) and Michael Marello.
6    Marello.  Marello.  (Phonetic)
7         MR. CILIENTO:  Okay.  I'm sorry.  I was
8    agreeing with your pronunciation.
9         MR. HACKMAN:  Thank you.  Are you familiar
10   with -- with -- if you want to take a minute to
11   look at this.
12        MR. CILIENTO:  I'm familiar in a very
13   cursory way.
14        MR. HACKMAN:  The impression I get from
15   leading this document was that there was a $40
16   million -- $40 million in -- whether it would be
17   discorgement or fines or whatever that were agreed
18   to by the Ritchie entities to be paid in this
19   case, a settlement of the allegations.
20        Do you know if there are any remaining
21   amounts that are -- that remain to be paid arising
22   out of this?
23        MR. GWYNNE:  First of all, Ben, let me --
24   I'm not sure why you're asking him about whether
25   there are remaining amounts to be paid out of this

Page 46

1  order, which I think you said was 40 million, but
2  looking at this it looks like it says 30.  And
3  also, I haven't had a chance to read it.  But this
4  doesn't appear to involve the Debtor, so why are
5  we asking about it?
6       MR. HACKMAN:  Ritchie Capital Management,
7  L.L.C. --
8       MR. GWYNNE:  Is the manager of the managing
9  manager.
10      MR. HACKMAN:  Right.
11      MR. GWYNNE:  But what -- what does it matter
12  if any amounts are unpaid or not, it's not an
13  obligation of the Debtor.
14      MR. HACKMAN:  So the Debtor has no
15  liability for any of these amounts as far as you
16  know, is that correct?
17      MR. CILIENTO:  I -- I -- I am not going to
18  say yes or no.  I'm not qualified to answer that
19  question.  I don't know.
20      MR. HACKMAN:  Okay.
21      MR. GWYNNE:  Well, it's not listed on our
22  schedules and the article doesn't mention the
23  Debtor.  So -- I mean, unless it relates to the
24  Debtor, I don't think we should be inquiring about
25  other entities' obligations, because I am not sure

Page 47

1  this is the witness for that.
2       MR. HACKMAN:  There's -- it also references
3  the CEO Mr. Thane Ritchie in this document, and I
4  believe Mr. Ritchie is also listed as having a
5  $13.3 million indemnification claim against the
6  Debtor.
7       MR. GWYNNE:  Right.  But that means we --
8  we're going to look at whether the Creditors owe
9  people money in this case?
10      MR. HACKMAN:  Does Mr. Ritchie have any
11  involvement in the Debtor's business affairs,
12  directly or incorrectly?
13      MR. CILIENTO:  To the extent that the RCM
14  brand is licensed to the fund, that would be an
15  indirect -- in my opinion, an indirect
16  involvement.
17      However, no, the -- the sole director of
18  RCM, L.L.C., Mr. Asparti, makes the decision --
19  the final decision.
20      MR. HACKMAN:  And he -- Mr. Asparti does
21  not answer to Mr. Ritchie in any way?
22      MR. CILIENTO:  I -- I don't know the answer
23  to that.
24      MR. HACKMAN:  Do you know if Warren D'Myo
25  or Michael Morello have any any involvement with

Page 48

1  the Debtor?
2       MR. CILIENTO:  I -- I -- you -- I do
3  have -- I have no knowledge yes or no.  Those --
4  that was ten years ago.  I don't -- I have no
5  information on that.
6       MR. HACKMAN:  Okay.  Has there ever been
7  any securities litigation pending against the
8  Debtor?
9       MR. GWYNNE:  Well, I mean, Huizenga's
10  litigation was securities litigation; what do you
11  mean by that?  Do you mean an enforcement
12  proceeding?
13      MR. HACKMAN:  Yes.
14      MR. CILIENTO:  Would you ask the question
15  again please.
16      MR. HACKMAN:  Has there ever been any
17  enforcement litigation involves securities brought
18  against the Debtor -- for example, by the
19  Securities and Exchange Commission?
20      MR. HACKMAN:  Not that I'm aware of.
21      MR. HACKMAN:  Okay.
22      Do you know when -- I believe the statement
23  of financial affairs indicated that the Debtor has
24  not had income since beginning of 2016.  Do you
25  know when the last time was that the Debtor had

Page 49

1  income?
2       MR. GWYNNE:  Can you show us, Ben, where it
3  says the Debtor last had income in 2016, just so
4  we're on the same page.
5       MR. HACKMAN:  Sure.
6       MR. GWYNNE:  Where are you looking at?
7       MR. HACKMAN:  So this is the amended
8  statement of financial affairs.  It's docket item
9  number 25.
10      MR. GWYNNE:  What page are you on, 7 of 21?
11      MR. HACKMAN:  Right.  7 of 21.
12      MR. GWYNNE:  Okay.
13      MR. HACKMAN:  And part one asks about
14  income.  It asks about from the beginning of this
15  year -- the current year to the date of filing.
16  Also for the prior year and for the year before
17  that.
18      MR. GWYNNE:  Okay.  But this doesn't say
19  the Debtor had income in 2016; which is what I
20  thought you had asked.
21      MR. HACKMAN:  I misspoke if I said that.
22      MR. GWYNNE:  Okay.
23      MR. HACKMAN:  My understanding was that the
24  Debtor has not had income since the beginning of
25  2016 based on --

Page 50

1     MR. GWYNNE: Or -- or earlier.

2     MR. HACKMAN:  Or potentially earlier.  Do

3  you know when the last time was that the Debtor

4  had income?

5     MR. CILIENTO:  No; I do not.

6     MR. HACKMAN:  Okay.  Does the Debtor have a

7  physical office?

8     MR. CILIENTO:  The Debtor pays for

9  nonexclusive office space in Delaware as the place

10  for meetings and conference calls, et cetera; but

11  that's is not their principal place of business.

12     MR. GWYNNE: That's the address in the

13  amended petition was listed as the mailing

14  address. That agreement was entered into I believe

15  mid-June.  You know, a couple of weeks before the

16  petition date.  The Debtor does not have employees

17  there or assets.  And to my knowledge, hasn't used

18  that address, but it's an address that the Debtor

19  wanted to have available potentially to have

20  meetings or settlement discussions, because the

21  Debtor doesn't have a physical premise anywhere

22  else, certainly in the -- in this area.

23     MR. HACKMAN: So there's -- is it correct

24  then that there is no physical office that is its

25  principal place of business?

Page 51

1     MR. GWYNNE: Object to the question

2  question.  Are you talking about the legal

3  question principal place of business -- that's --

4  I mean, that's a legal question.  By the way, not

5  an uncomplicated one in the fun context, and we

6  did deal with that in the amended petition as well

7  as the attachment and the amended petition

8  explained why --

9     MR. HACKMAN:  Sorry.  I'll rephrase.

10     MR. GWYNNE:  Okay.

11     MR. HACKMAN:  Does the Debtor have a

12  physical office in the Cayman islands?

13     MR. CILIENTO:  The principal place of

14  business is listed in the Cayman islands.  I do

15  not know if RRLS, L.L.C., has a physical -- a

16  space in Cayman Islands.  I do know that the

17  service provider has a physical presence in the

18  Cayman Islands.

19     MR. HACKMAN:  And what is the name the of

20  service provider again please.

21     MR. CILIENTO:  60 Degrees Group.

22     MR. HACKMAN:  60 Degrees Group.  Thank you.

23     MR. CILIENTO:  You're welcome.

24     MR. GWYNNE:  Remember, Ben, the Debtor has

25  no employees or operations; so it doesn't really

Page 52

1  need an address to operate.

2     MR. HACKMAN:   In the amendment schedule E,

3  F --

4     MR. CILIENTO:  Uh-huh.

5     MR. HACKMAN:  -- docket item 26, entry 3.1

6  lists a $13.3/.4 million claim I believe of

7  indemnification is being being held by A.R. Thane

8  Ritchie.

9     MR. CILIENTO:  Yes.

10     MR. HACKMAN:  What do you know about that

11  claim?

12     MR. CILIENTO:  It is a potential

13  indemnification claim by Mr. Ritchie on the

14  Debtor.

15     MR. HACKMAN: Do you know what gave rise to

16  his claim?

17     MR. CILIENTO:  It is my belief that funds

18  were seized from his account to satisfy the

19  judgment.

20     MR. GWYNNE: What judgment?

21     MR. CILIENTO:  The -- the second judgment

22  pertaining to the first high investment of August

23  1st, 2005.

24     MR. HACKMAN:  Do you know why that judgment

25  would have been satisfied for Mr. Ritchie's

Page 53

1  account?

2     MR. CILIENTO:  No, I do not.

3     MR. HACKMAN:  Do you know if there's a

4  contractual relationship between Mr. Ritchie and

5  the Debtor?

6     MR. CILIENTO:  I -- I don't know.  I know

7  the funds were seized from his account which --

8     MR. HACKMAN:  But you believe potentially

9  that the -- that Mr. Ritchie may have an

10  indemnification claim against the Debtor in.

11     MR. CILIENTO:  Sure because Mr. -- there --

12  the subscription agreement specifically

13  indemnifies Mr. Ritchie and the other -- you know,

14  and any -- the the -- the subscription agreement

15  specifically indemnifies Mr. Ritchie from that

16  claim.

17     MR. HACKMAN:  Do you know if the Debtor has

18  a copy of the -- these subscription agreements

19  that involved the Debtor and Huizenga.

20     MR. GWYNNE:  Yes.

21     MR. CILIENTO:  Yes.  Oh --

22     MR. HACKMAN:  Are you aware of any fraud or

23  mismanagement that's occurring at the Debtor --

24     MR. CILIENTO:  Absolutely not.  I -- I am

25  not aware of -- of any fraud or mismanagement.

Page 54

1      MR. HACKMAN:  Okay.  I believe those are
2  the questions that I have.
3      MR. CILIENTO:  Okay.
4      MR. HACKMAN:  Are there any creditors in
5  attendance wish to ask questions of Mr. Ciliento?
6      SPEAKER:  We do.
7      MR. HACKMAN:  If you can come forward
8  please.  If you could -- I don't know if you had
9  gotten the sign-in sheet.
10     SPEAKER:  I don't think we did.  Sorry
11  we're late.
12     MR. HACKMAN:  That's fine.
13     SPEAKER:  Had some plane issues this
14  morning.
15     SPEAKER:  So --
16     MR. HACKMAN:  And if you would please fill
17  this out and fill out your appearance.
18     SPEAKER:  Shake your hand first.
19     SPEAKER:  Kurt (inaudible), Jacob, John
20  Miller.
21     SPEAKER:  Mike Ciliento.
22     (Talking simultaneously.)
23     SPEAKER:  Ben.
24     MR. JAKUBOWKSI:  So my name is Steven
25  Jakubowksi, J-A-K-U-B-O-W-S-K-I, it's a long A.

Page 55

1  So I'm here for Huizenga various entities that
2  we've all been discussing.  I have with me John
3  Miller, he's an attorney also for Huizenga
4  entities.
5      SPEAKER:  Did you say you're in-house
6  counsel?
7      MR. JAKUBOWKSI:  No, I'm with -- I'm sorry.
8  I'm with Robin Solomon and Pat (phonetic) out of
9  Chicago.
10     MR. GWYNNE:  Do you have a card?
11     MR. JAKUBOWKSI:  I do.
12     MR. GWYNNE:  Thanks.
13     MR. CILIENTO:  Thank you.
14     MR. JAKUBOWKSI:  Sure.
15     MR. HACKMAN:  Thank you.
16     MR. JAKUBOWKSI:  Sure.
17     So Mr. Ciliento, you're on LinkedIn, right?
18  Are you on LinkedIn?
19     MR. CILIENTO:  Yes, I am.
20     MR. JAKUBOWKSI:  And it says here that
21  you're a managing director of 60 Degrees Group; is
22  that correct?
23     MR. CILIENTO:  Not at present.
24     MR. JAKUBOWKSI:  Okay.
25     SPEAKER:  I'm sorry?

Page 56

1      MR. JAKUBOWKSI:  What is it that you do
2  now?
3      MR. CILIENTO:  I am currently chief
4  operating officer of Ritchie Partners, L.L.C.,
5  and I also work for the 60 Degrees Group, the 60
6  Degrees Group, L.L.C. and chief technology
7  officer.
8      MR. JAKUBOWKSI:  And that's in Wheaton?
9      MR. CILIENTO:  Actually, I -- the entity
10  I -- I do not know the -- the address of 60
11  Degrees Group, L.L.C..  Yes, I believe it's in
12  Wheaton.
13     MR. JAKUBOWKSI:  Okay.
14     MR. CILIENTO:  Liberty Drive.  I work from
15  my home.
16     MR. JAKUBOWKSI:  Okay.  And you've been
17  working with the Ritchie group basically since
18  2002, right?
19     MR. GWYNNE:  Objection.  What is the --
20     MR. JAKUBOWKSI:  I just want to make
21  sure --
22     (Talking simultaneously.)
23     MR. GWYNNE: -- No, I understand (inaudible)
24  --
25     MR. JAKUBOWKSI:  I just want to understand

Page 57

1  the relationship to the Ritchie group.  That's
2  all.
3      MR. GWYNNE: Well, I understand that; but
4  I'm saying I want to understand what you mean by
5  the Ritchie group.
6      MR. JAKUBOWKSI:  Okay.  That's fair.
7      You've been with -- and -- and you've been
8  the Ritchie Capital Management since 2007,
9  correct?
10     MR. GWYNNE:  What do you mean by been with
11  Ritchie Capital --
12     MR. JAKUBOWKSI:  In other words, you worked
13  for them, employed by them?
14     MR. CILIENTO:  Well, Ritchie -- define --
15  I -- I would like to address one thing I stated
16  before.
17     MR. JAKUBOWKSI:  Okay.
18     MR. CILIENTO:  I am not a director of the
19  60 Degrees Group.
20     MR. JAKUBOWKSI:  Okay.  But you are the
21  chief technology officer?
22     MR. CILIENTO:  I am the chief technology
23  officer.
24     MR. JAKUBOWKSI:  Okay.
25     MR. CILIENTO:  There are --

Page 58

1      MR. JAKUBOWKSI:  But you're not an
2  investment manager, correct?
3      MR. CILIENTO:  No, I'm not.
4      MR. JAKUBOWKSI:  You were appointed as the
5  chief operating officer for the Debtor, correct?
6      MR. CILIENTO:  Yes.  No.  No.  For the
7  managing member of the Debtor.
8      MR. JAKUBOWKSI:  For the managing manager
9  of the Debtor?
10     MR. CILIENTO:  Yes.
11     MR. JAKUBOWKSI:  Okay.  And the managing
12 member of the Debtor is Ritchie Capital -- excuse
13 me -- Ritchie Capital Management, LTD?
14     MR. CILIENTO:  No.
15     MR. JAKUBOWKSI:  Who -- who is the managing
16 manager of the Debtor?
17     MR. GWYNNE:  Didn't we' already cover this,
18 Ben?
19     MR. JAKUBOWKSI:   I just want to make sure
20 I understand --
21     MR. GWYNNE:  Yeah, but we're going to be
22 doing the same thing twice.  We've been here an
23 hour and 15 minutes.  He already testified to
24 this --
25     MR. JAKUBOWKSI:  He won't do it twice.

Page 59

1  Don't worry about it.
2      MR. CILIENTO:  Could you ask the question
3  again please.
4      MR. JAKUBOWKSI:  Yeah.  Who is the managing
5  member?  You said you're the chief (inaudible)
6  manager, who is the managing manager?
7      MR. CILIENTO:  Of what entity?
8      MR. JAKUBOWKSI:  Of the Debtor.
9      MR. CILIENTO:  The -- Ritchie Partners,
10 L.L.C., --
11     MR. JAKUBOWKSI:  Okay.
12     MR. CILIENTO:  -- is a managing manager --
13     MR. JAKUBOWKSI:  And you're (inaudible)  of
14 the Debtor?
15     MR. CILIENTO:  I'm -- I'm sorry?
16     MR. JAKUBOWKSI:  Of the Debtor.  Ritchie
17 Partners, L.L.C., is the managing manager of the
18 Debtor?
19     MR. CILIENTO:  Of Ritchie Risk-Linked
20 Strategy, L.L.C.; the Debtor yes.
21     MR. JAKUBOWKSI:  Okay.  And Mr. Asparti is
22 the sole director and he's the one who makes the
23 ultimate decision with respect to the Debtor,
24 correct?
25     MR. CILIENTO:  Mr. Asparti is the sole

Page 60

1  director of Ritchie Capital Management, L.L.C.,
2  the manager.
3      MR. JAKUBOWKSI:  Okay. But he's --
4      MR. GWYNNE: Manager of what?
5      MR. CILIENTO:  The manager of the managing
6  member Ritchie Partners, L.L.C.,, which in turn is
7  the managing manager of Ritchie Risk-Linked
8  Strategies L.L.C.
9      MR. JAKUBOWKSI:  But I thought I had heard
10 you say that Mr. Asparti is the guy who makes the
11 final decision with respect to the Debtor's
12 affairs;; is that correct?
13     MR. CILIENTO:  Yes.  Mr. Asparti is the
14 sole director of the management of -- of the
15 manager of the managing member of the Debtor;
16 therefore, he makes decisions on behalf of the
17 managing member and thus the --
18     MR. JAKUBOWKSI:  Okay.
19     MR. CILIENTO:  -- I -- I don't
20 know (inaudible) --
21     (Talking simultaneously.)
22     MR. JAKUBOWKSI:  Okay.  That's fine.
23     MR. CILIENTO:  I don't know what we're
24 getting at, quite frankly, because this is --
25     (Talking simultaneously.)

Page 61

1      MR. JAKUBOWKSI:  So therefore --
2      MR. CILIENTO:  -- this is black and white
3  said it it ten times.
4      MR. GWYNNE:  For the record, I just want to
5  put out, we filed an application to employ Mr.
6  Varga as the CRO who would have --
7      MR. JAKUBOWKSI:  Okay.
8      MR. GWYNNE:  -- independent decision-making
9  authority.  That application has been filed.  We
10 had asked for nunc pro tunc approval.  So in terms
11 of who has authority, I just want to point that
12 out.
13     MR. JAKUBOWKSI:  Okay.
14     MR. GWYNNE:  (Inaudible) --
15     MR. JAKUBOWKSI:  And did you meet with Mr.
16 Varga?
17     MR. CILIENTO:  Yes.
18     MR. JAKUBOWKSI:  Okay.  And what did he say
19 he was going to do for the Debtor?
20     MR. GWYNNE:  (Inaudible) to the extent that
21 these discussions were with me as counsel,
22 involving advise given to the Debtor, I would
23 instruct you not to answer.  Also, counsel, I
24 would refer you to the application to employ Mr.
25 Varga (inaudible) specifically says what he will

Page 62

1  do.
2       So you can answer if you can answer other
3  than in discussions where I was providing advise
4  to the Debtor with Mr. Varga --
5       MR. JAKUBOWKSI: Well, I'm not asking for
6  legal advice --
7       MR. GWYNNE: -- and you in attendance --
8       MR. CILIENTO: I -- I --
9       MR. HACKMAN: I just want to know what do
10 you understand he's going to do for the Debtor,
11 what benefit is he going to bring to the Debtor?
12 From your business perspective.
13      MR. GWYNNE: That's a different question.
14 You can answer that.
15      MR. CILIENTO: It -- my business
16 understanding with a chief risk -- restructuring
17 officer does is that he -- he prepares -- and I
18 state again that I am not a lawyer, I'm a
19 businessman and I'm not an accountant or a finance
20 person. I am a technology person.
21      The chief restructuring officer will, I
22 guess, file the reorganization plan, will put
23 together cash flow plans, will approve
24 expenditures, what have you.
25      MR. JAKUBOWKSI: Okay. What expenditures

Page 63

1  are you anticipating during the bankruptcy case,
2  other than professional fees?
3       MR. CILIENTO: They were listed in the --
4       MR. JAKUBOWKSI: Monthly operating report?
5       MR. CILIENTO: Yes.
6       MR. JAKUBOWKSI: And you stand by those
7  projections still?
8       MR. CILIENTO: Subject to -- subject to
9  change. That's a preliminary report --
10      MR. JAKUBOWKSI: Okay.
11      MR. CILIENTO: -- and the CRO will have the
12 ability to modify the (inaudible) --
13      MR. JAKUBOWKSI: And who created those
14 projections for you?
15      MR. CILIENTO: The -- the -- the
16 projections were put together from the -- I
17 believe they were put together using the service
18 providers to the managing member.
19      MR. JAKUBOWKSI: Okay. And -- and was that
20 also Laura -- what's her name, Laura? Was she the
21 one who did that?
22      MR. CILIENTO: Ms. Spoola was on -- was --
23 there were several people. I don't recall all of
24 them. She could have been one of them.
25      MR. JAKUBOWKSI: Okay. So several people

Page 64

1  you say put together the projections?
2       MR. CILIENTO: Yes.
3       MR. JAKUBOWKSI: Okay. And did you have
4  discussions with them about any details with
5  respect to the objections?
6       MR. CILIENTO: Yes.
7       MR. JAKUBOWKSI: Okay. What discussions
8  did you have regarding the payment of professional
9  fees?
10      MR. CILIENTO: We -- we estimated the
11 amount of professional fees, legal fees, et
12 cetera, that would be reasonable.
13      MR. JAKUBOWKSI: And who -- who gave -- and
14 what basis did you determine that $670,000 is
15 reasonable professional fees for this case?
16      MR. CILIENTO: After consultation with the
17 service providers who had experience in dealing
18 with legal counsel.
19      MR. JAKUBOWKSI: Okay. So they were the
20 ones who told you to estimate or -- excuse me --
21 strike that question.
22      Is there any additional expenditures that
23 you anticipate in the next 12 months that are not
24 listed on this schedule, this doc 20, Page 3 of 5.
25      MR. CILIENTO: Well, you know, this only

Page 65

1  goes go to February 19. At the time of schedule
2  formation this was my opinion, fairly accurate.
3       MR. JAKUBOWKSI: Any changes as you sit
4  here today?
5       MR. CILIENTO: Did -- there's a small
6  (inaudible) on this schedule -- on the fact that
7  this number -- this is just transposed. This
8  number makes no sense.
9       MR. JAKUBOWKSI: Which one is that?
10      MR. CILIENTO: It's a typo. I mean, you
11 don't have a -- you don't have a sum of cash flows
12 at the end of the month. It's -- okay.
13      MR. GWYNNE: The bottom right-hand corner?
14      MR. JAKUBOWKSI: The $18,000 --
15      (Talking simultaneously.)
16      MR. CILIENTO: Yeah. Yeah. Yeah.
17      MR. JAKUBOWKSI: Yeah.
18      MR. CILIENTO: Eight hundred and --
19      MR. JAKUBOWKSI: Understand. Yeah, I
20 understand. Thank you.
21      MR. CILIENTO: You're welcome.
22      MR. JAKUBOWKSI: When did you first learn
23 about all the litigation that's going on in this
24 case?
25      MR. GWYNNE: Objection to the form. You

Page 66

1  mean all the litigation going on in this case or
2  are you talking about the bankruptcy --
3     MR. JAKUBOWKSI:  Yeah, well --
4     MR. GWYNNE: -- where we don't have any
5  litigation?  Are you talking about litigation in
6  Illinois or elsewhere --
7     (Talking simultaneously.)
8     MR. JAKUBOWKSI:  I admit, it's not a great
9  question.  Let me see if I can rephrase that.  I
10 agree with you.
11    Your -- you're contemplating from the
12 Debtor's perspective of your organization plan,
13 correct?
14    MR. CILIENTO:  The CRO will formulate the
15 reorganization plan.
16    MR. JAKUBOWKSI:  Okay.  But so --
17    MR. CILIENTO:  I am not --
18    MR. JAKUBOWKSI:  So --
19    MR. CILIENTO:  -- contemplating anything at
20 this point.
21    MR. JAKUBOWKSI:  Okay.  So then I won't ask
22 you anything about your reorganization plan.
23    MR. CILIENTO:  Good.
24    MR. JAKUBOWKSI:  In your discussions with
25 Mr. Varga, did he give you a sense of what that

Page 67

1  reorganization plan might entail?
2     MR. GWYNNE:  I'm going to object to the
3  question to the extent it involves discussions --
4     MR. JAKUBOWKSI:  Out -- without -- without
5  lawyers present --
6     MR. GWYNNE:  -- (inaudible) between me and
7  Mr. Varga and you regarding the plan.  You can
8  discuss -- if you have an answer about those
9  discussions without the lawyer present,
10 assuming -- assuming those discussions weren't
11 discussing the privilege advise (inaudible) --
12    MR. CILIENTO:  Yeah, I have not had a -- I
13 have not had a conversation with Mr. Varga without
14 counsel present; nor did I have any conversations
15 with Mr. Varga pertaining to information discussed
16 while counsel was present.
17    MR. JAKUBOWKSI:  Okay.
18    MR. CILIENTO:  Other than him being a damn
19 Yankee fan and me being a Met fan, which is -- you
20 know.
21    MR. JAKUBOWKSI:  Understandable.
22    MR. CILIENTO:  Yeah, it's --
23    MR. JAKUBOWKSI:  Get that.
24    MR. CILIENTO:  It's sort of a joke, it's --
25    MR. JAKUBOWKSI:  I'm from Chicago, so it's

Page 68

1  not the White Sox and (inaudible) --
2     (Talking simultaneously.)
3     MR. CILIENTO:  Oh, sorry.  So (inaudible) a
4  safe -- sorry.  What happened to Bartman, is he
5  gone?  Okay.
6     MR. JAKUBOWKSI:  True enough.
7     So I want to understand the Creditors list.
8  Okay.  So do you have a copy of the schedules?
9  Actually, I don't even have the amended schedule,
10 they didn't (inaudible) right now, but I'm looking
11 at them right now; so maybe if you have a copy of
12 the amended schedules.  Thank you very much, Ben.
13    MR. HACKMAN:  Sure.
14    MR. JAKUBOWKSI:  So -- and I'm sorry for
15 missing this, but did you explain yet what the
16 changes are from the draft -- or from the
17 schedules that were filed on the 12th of July to
18 the ones that were filed yesterday?  Did you
19 explain those?  And if you did, I'll just listen
20 to the --
21    MR. GWYNNE:  I mean, Ben, I think we went
22 over this (inaudible) --
23    MR. HACKMAN:  Yeah, he did.
24    MR. CILIENTO:  Yes.
25    MR. JAKUBOWKSI:  Okay.  Can you just in

Page 69

1  very -- and briefly say, you know, I fixed some
2  (inaudible) whatever the answer is, can you tell
3  me just quickly what you did to change this?
4  Because it doesn't look -- just slipping through
5  it like you did very much.
6     MR. GWYNNE:  If -- if you can remember all
7  the changes that were made in these -- I know it's
8  not a lot, but if you can remember them all --
9     MR. CILIENTO:  I mean, one of the schedule
10 I believe there was a typo and we changed 40,000
11 to 40 million.
12    MR. JAKUBOWKSI:  Okay.
13    MR. CILIENTO:  We changed -- I believe we
14 changed -- we included -- we changed principal
15 place of business from a mailing address --
16    MR. GWYNNE:  They're talking about the
17 schedules, not the petition.
18    MR. CILIENTO:  Yeah, the schedule, I think
19 there was a comma instead of a period.
20    MR. JAKUBOWKSI:  Okay.
21    MR. CILIENTO:  I mean, it's in the
22 schedule.
23    MR. JAKUBOWKSI:  Is there anything material
24 that you think is -- you know, a creditor would
25 care about?

Page 70

1    MR. GWYNNE: I'm going to object to the form
2  of that as a legal conclusion to what we're
3  doing --
4    MR. JAKUBOWKSI:  I don't mean it as a legal
5  conclusion.  Just -- is there anything that --
6  that jumps out at you as you sit here today as a
7  kind of change that is material, whatever that
8  means?
9    MR. GWYNNE:  (Inaudible) object again.
10  That's a legal conclusion.  If you think you can
11  answer the question, you can --
12    MR. GWYNNE:  (Inaudible) I -- I tell you
13  quite frankly, my mind is fried now.  And no,
14  nothing comes to mind.  It doesn't mean that I
15  won't recall it later.  But --
16    MR. JAKUBOWKSI:  Okay.  Are you feeling
17  okay, do you want to take a break?
18    MR. CILIENTO:  I'm fine.
19    MR. JAKUBOWKSI:  I just don't to be fried
20  --
21    MR. CILIENTO:   Yeah, I just don't
22  understand this --
23    MR. JAKUBOWKSI:  Okay.
24    MR. CILIENTO:  -- line of questioning.
25    MR. JAKUBOWKSI:  Okay.  I'll move on.

Page 71

1    MR. CILIENTO:  Okay.
2    MR. JAKUBOWKSI:  So let's look at the
3  schedules in terms of the Creditors.  I just want
4  to understand the Creditors, because you said
5  before, I think -- and correct me if I'm wrong --
6  but I think what you said was that you had
7  actually worked with people internally at 60
8  Degrees or some other back of the house group to
9  obtain a -- a -- a comfort that the Creditors that
10  you were listing were properly scheduled, correct?
11  Am I right on that?
12    MR. CILIENTO:  I worked with the fund
13  accountant who worked -- worked with the service
14  provider and I verified invoices and other
15  statements to -- to the best of my knowledge those
16  obligations appear accurate.
17    MR. JAKUBOWKSI:  Okay.
18    MR. CILIENTO:  And -- and those of -- of
19  RRLS.
20    MR. JAKUBOWKSI:  Uh-huh.  So --
21    MR. CILIENTO:  L.L.C.
22    MR. JAKUBOWKSI:  Let me just take as an
23  example, the -- the obligation to Frank
24  Fernandez -- (phonetic)
25    MR. CILIENTO:  Okay.

Page 72

1    MR. JAKUBOWKSI:  What -- what exactly did
2  you look at to determine that he was owed $24,983?
3    MR. CILIENTO:  I looked at the promissory
4  note.
5    MR. JAKUBOWKSI:  Dated July -- June 25th,
6  2018?
7    MR. CILIENTO:  Thereabouts, yes.
8    MR. JAKUBOWKSI:  Okay.  So it was basically
9  three or four days before the filing that they
10  entered into that note?
11    MR. CILIENTO:  Yes.  They entered --
12    MR. JAKUBOWKSI:  And what was it for?  I
13  mean, Ritchie just paid $13 million, where does
14  he --
15    MR. CILIENTO:  Yeah.
16    MR. JAKUBOWKSI:  -- owe somebody $24,000?
17    MR. GWYNNE: Objection, counsel
18  (inaudible) --
19    MR. JAKUBOWKSI:  That's a little
20  argumentative.  I'm sorry.
21    MR. GWYNNE: No.  Also, we're not here about
22  what Mr. Ritchie paid somebody or him paying
23  somebody 13 million --
24    MR. JAKUBOWKSI:   Okay.
25    MR. GWYNNE:  This is about the Debtor --

Page 73

1    (Talking simultaneously.).
2    MR. GWYNNE:  -- and what the Debtor has
3  and what Debtor paid, what the Debtor's
4  liabilities are, not Mr. Ritchie's.
5    MR. JAKUBOWKSI:  Well, Mr. Ritchie says
6  he's owed 13 million by the --
7    MR. GWYNNE:  Right.  But you said --
8    MR. JAKUBOWKSI:  For (inaudible) --
9    MR. GWYNNE:  -- Mr. Ritchie just paid
10  someone $13 million, why would he owe someone
11  25,000?  There's 25,000 is not a loan to Mr.
12  Ritchie.  All right?  It was a loan to Ritchie
13  Risk-Linked the Debtor.
14    MR. JAKUBOWKSI:  No, my question is if --
15  if he's got $13 million lying around -- well,
16  just -- forget that.  Strike that.
17    What was that for?  What did Mr. Fernandez
18  do for Debtor that has no assets, no business, no
19  employees, no income?
20    MR. CILIENTO:  It is my understanding that
21  RRLS -- RRLS was short of cash.  Mr. Hernandez --
22  who I'm not familiar with -- signed a promissory
23  note for his $25,000 and gave the proceeds to
24  (inaudible) RRLS.
25    MR. JAKUBOWKSI:  At (inaudible) before the

Page 74

1 filing?
2     MR. GWYNNE:  The witness has already
3 answered that, counsel --
4     MR. JAKUBOWKSI:  No, I just asked when it
5 was executed --
6     (Talking simultaneously.)
7     MR. JAKUBOWKSI:  He said around that time.
8     MR. CILIENTO:  Around that time.
9     MR. JAKUBOWKSI:  Around that time, cash was
10 transferred to the Debtor; that's what you're
11 answer is, correct?
12     MR. CILIENTO:  I -- I don't know how the
13 cash arrived, how the -- the bank balance was
14 increased, but --
15     MR. JAKUBOWKSI:  Okay.
16     MR. CILIENTO:  -- yes, it is my
17 understanding that the account (inaudible) bank
18 received the proceeds.
19     MR. JAKUBOWKSI:  Okay.  And -- okay.  And
20 what did the Debtor do -- what did -- what did --
21 what did -- strike that.
22     So I understand that there has been a loan
23 from Multi-Strategy Global Trading Limited to the
24 Debtor that's somehow reflected in some type of an
25 agreement; is that correct?

Page 75

1     MR. CILIENTO:  I believe I discussed that
2 before.
3     MR. JAKUBOWKSI:   I heard that, but I
4 didn't hear there was an agreement.  Was there
5 actually a written agreement reflecting that loan?
6     MR. CILIENTO:   I said there was a credit
7 facility.  I did not view the credit facility.
8     MR. JAKUBOWKSI:  Uh-huh.  You never seen
9 the documentation relating to that credit
10 facility, have you?
11     MR. CILIENTO:  No, I have not.
12     MR. JAKUBOWKSI:  Is there interest that
13 accrues on this?
14     MR. CILIENTO:   I am not aware.
15     MR. JAKUBOWKSI:  Because it doesn't exist
16 or because you're not -- you don't snow.
17     MR. GWYNNE:  I think he just told you,
18 counsel.
19     MR. HACKMAN:  He said I'm not aware --
20     (Talking simultaneously.)
21     MR. GWYNNE::  He's not aware.
22     MR. JAKUBOWKSI:  But not aware of what.
23     MR. GWYNNE:  Not -- not aware means I don't
24 know.  It doesn't -- he can't be saying --
25     (Talking simultaneously.).

Page 76

1     MR. GWYNNE:   -- (inaudible) doesn't
2 exist --
3     MR. JAKUBOWKSI:  Then I -- then I'll --
4     MR. CILIENTO:  -- if he didn't know.  He
5 doesn't know if it exists or not.
6     MR. JAKUBOWKSI:  Yes or no:  Do you have an
7 understanding that there's an interest rate of
8 associated with this loan?
9     MR. GWYNNE:  Objection.  Asked and answered.
10 .  You can answer it again.
11     MR. CILIENTO:  I do not know if there's a
12 interest rate and (inaudible) --
13     MR. JAKUBOWKSI:  All right.  I -- I got it.
14 And you don't know whether there's a formal
15 written agreement reflecting that loan?
16     MR. GWYNNE:  Objection.  This is the second
17 time you asked that, counsel.
18     MR. JAKUBOWKSI:  Okay.
19     MR. GWYNNE:  He's already told you he does
20 not know.
21     MR. JAKUBOWKSI:  Okay.  He doesn't know.
22 Who would know?  Mr. Asparti, would he know?
23     MR. CILIENTO:  I'm not -- I'm not going to
24 answer that question.  I don't know.
25     MR. JAKUBOWKSI:  Okay.  So you don't know

Page 77

1 who -- you don't know who would know, but you
2 prepared a schedule that has a number that says
3 that it's a secured creditor?
4     MR. GWYNNE:  Is that a question or a
5 comment?
6     MR. JAKUBOWKSI:  No, I'm just commenting to
7 myself.  Sorry.
8     MR. GWYNNE:  Okay.  Save them.
9     MR. JAKUBOWKSI:  All right.
10     MR. HACKMAN:  Sorry.  I'm sorry.  I didn't
11 mean to --
12     MR. JAKUBOWKSI:  Are these yours?
13     MR. HACKMAN:  I am trying to figure out --
14     MR. JAKUBOWKSI:  Oh, this is all --
15     MR. HACKMAN:  Oh, this is it.  I'm sorry.
16     MR. JAKUBOWKSI:  Yeah.
17     MR. HACKMAN:  Okay.  Sorry.  Thank you.
18     SPEAKER:  Yeah.
19     MR. JAKUBOWKSI:  What did -- is Alias
20 Gunster Spicer (phonetic) a law firm?
21     MR. CILIENTO:  May I -- may I look at the
22 schedule, please .
23     MR. GWYNNE:  If he gives it to you, he gives
24 it to you.  Do you (inaudible) all day.  How much
25 longer, Ben, do we got to go here?  This is not a

Page 78

1  deposition, it's a 341 meeting.
2      MR. JAKUBOWKSI:  No, I know.  But I'm just
3  asking him --
4      (Talking simultaneously.)
5      MR. GWYNNE: I just asked Ben --
6      MR. JAKUBOWKSI: -- about the schedules.
7      MR. GWYNNE: -- not you.  Mr. Hackman, how
8  much longer are we going to go here?
9      MR. HACKMAN:  I'm okay with the questioning
10 so far.
11     MR. JAKUBOWKSI:  Okay.  Thank you.
12     MR. HACKMAN: But if anybody needs to take a
13 break at any point --
14     MR. CILIENTO:  No, let's keep going please.
15     MR. HACKMAN:  I'm fine with that.
16     MR. JAKUBOWKSI:  So this would be on page
17 19 of 27.
18     MR. GWYNNE:  Why don't you show him the
19 document.
20     MR. CILIENTO:  Yeah, show me the document.
21     MR. JAKUBOWKSI:  All right.  Here you go.
22     MR. GWYNNE:  Ask them to show you document.
23 (Inaudible).  You know what?  Let's take a break
24 for five minutes.
25     MR. HACKMAN:  Okay.

Page 79

1      MR. GWYNNE: (Inaudible) take a break.
2      (Off the record.)
3      MR. HACKMAN:  All right.  We're back on the
4  record.  It is 2:47 p.m.
5      MR. CILIENTO:  Is that -- I think that's
6  our binder.  One of the them, the top one I think.
7      MR. GWYNNE: The top?
8      MR. CILIENTO: Just the top one.
9      SPEAKER:  This one --
10     SPEAKER:  That's ours, yeah.  This one is
11 probably yours.  Can we let him look at it though?
12 Thanks.  Here you go.
13     MR. JAKUBOWKSI:  Okay.  And can we get back
14 here on the record, so to speak.
15     MR. HACKMAN: Yes, we're recording again.
16     MR. JAKUBOWKSI:  Okay.  Great.
17     So -- now, with respect to this $13 million
18 claim for Mr. Ritchie, you see that on Page 19 of
19 27, if you could look at that page 19 of 27,
20 please.  In this book right here.
21     MR. CILIENTO:  Okay.
22     MR. JAKUBOWKSI:  Thank you.
23     (Talking simultaneously.)
24     MR. GWYNNE: You -- you know what?  Just
25 show him.  Open it up.

Page 80

1      MR. JAKUBOWKSI:  Yeah.  Yeah.  Yeah.
2      MR. GWYNNE: Yeah, because you got a bunch
3  of different --
4      MR. JAKUBOWKSI:  I understand.  Here you
5  go.  19 to 27.  Do you see that number right
6  there, 13 million?
7      MR. CILIENTO:  Yes.
8      MR. JAKUBOWKSI:  (Inaudible) that is the
9  claim for indemnification by Thane Ritchie, is
10 what you had said, correct -- and that's correct,
11 right?
12     MR. GWYNNE:   He's already answered that,
13 counsel --
14     MR. JAKUBOWKSI:  Right.  So I'm just --
15     MR. GWYNNE: But now -- I mean, if you're
16 asking the same things, especially from
17 potentially from the time you weren't here, I
18 think that's inappropriate.  Ask him new
19 questions --
20     MR. JAKUBOWKSI:  Okay.
21     MR. GWYNNE: -- (inaudible) we've already
22 been here for an hour and 35 minutes.
23     MR. JAKUBOWKSI:  Isn't it true that Mr.
24 Ritchie was jointly and severely liable for that
25 $13 million claim?

Page 81

1      MR. GWYNNE:  Objection, calls for a legal
2  conclusion.
3      MR. JAKUBOWKSI:  Okay.  But you still can
4  answer.
5      MR. CILIENTO:  I don't know, so I'm not
6  going to answer.
7      MR. JAKUBOWKSI:  Okay.  If that were the
8  case, would that change your view of the -- of
9  that claim?
10     MR. GWYNNE:  Objection, calls -- asking the
11 witness to speculate, as well as another legal
12 conclusion.
13     MR. JAKUBOWKSI:  Explain to me the Armco
14 Unlimited Claim (phonetic) please.  June 1,
15 through June 30, 2017.
16     MR. GWYNNE:  That (inaudible) right here --
17     MR. GWYNNE:  What number claim is it?
18     MR. JAKUBOWKSI:  73.3.
19     MR. CILIENTO:  I don't recall the details
20 other than it is professional services.
21     MR. JAKUBOWKSI:  And you're saying they
22 have not been paid by a Ritchie entity; is that
23 correct?
24     MR. CILIENTO:  To the best of my knowledge,
25 no.

Page 82

1     MR. JAKUBOWKSI: No, they have not been
2 paid?
3     MR. CILIENTO: They have not been paid.
4     MR. JAKUBOWKSI: Okay. And you said you
5 looked at the invoice with respect to this
6 particular claim or no?
7     MR. GWYNNE: Objection, misstates his
8 testimony.
9     MR. CILIENTO: I said I reviewed multiple
10 invoices, not every invoice due to the limited
11 (inaudible) due diligence.
12    MR. JAKUBOWKSI: Okay. Well, on the
13 petition date, which was 6/28, the company
14 represented -- the Debtor represented that Armco
15 was owed $26,009.80. Okay. That's -- you can
16 just take that as a fact. In your -- in your list
17 of 20 largest. And when you filed your schedules
18 on July 12th, you had Armco at 26,009.80. And at
19 the end of the day you say that the number is the
20 same.
21    So at any point from the time filing until
22 today, yesterday, did you look at the invoice with
23 respect to Armco?
24    MR. CILIENTO: I -- I don't recall if I
25 looked --

Page 83

1     MR. JAKUBOWKSI: Okay.
2     MR. CILIENTO: -- specifically at an Armco
3 invoice, no.
4     MR. JAKUBOWKSI: Claiborne Sabo (phonetic)
5 is your counsel, correct?
6     MR. GWYNNE: Objection. What do you mean
7 by his counsel --
8     MR. JAKUBOWKSI: Debtor's counsel.
9     MR. CILIENTO: Yes. They've been utilized.
10    MR. JAKUBOWKSI: And they -- so did you
11 look at their invoice and determine that 1,365 was
12 owed?
13    MR. CILIENTO: I do not recall looking at
14 specific invoices. However, at the time that
15 these invoices were reviewed, I was confident that
16 these numbers were accurate based on a sampling of
17 invoices.
18    MR. JAKUBOWKSI: So you're saying you did
19 not look at any invoices in particular?
20    MR. GWYNNE: Objection.
21    (Talking simultaneously.)
22    MR. CILIENTO: Come on --
23    MR. GWYNNE: That's not what he said. He
24 said he can't remember which ones he looked at in
25 particular, but that he looked at invoices.

Page 84

1     MR. JAKUBOWKSI: Okay. Who has all of
2 these invoices, Where are they?
3     MR. CILIENTO: Define -- define invoices.
4 Physical paper? Electronic records? What --
5     MR. JAKUBOWKSI: Whatever evidences the
6 existence of this claim of each of these claims.
7     MR. CILIENTO: It is my understanding that
8 they exist in electronic form and the service
9 providers to the managing member has access to
10 those invoices.
11    MR. JAKUBOWKSI: Okay. Is that
12 something that can be turned over to us that we
13 can look at? The basis for --
14    MR. GWYNNE: If you --
15    MR. JAKUBOWKSI: -- legal basis for this?
16    MR. GWYNNE: If -- if -- with this, this
17 isn't -- not only is this not a deposition, it's
18 not a (inaudible) request, if you want to when
19 we're done talk to me about if there are invoices,
20 (inaudible)  you want to see --
21    MR. JAKUBOWKSI: Okay.
22    MR. GWYNNE: -- you know, we can try and
23 work something out with you.
24    MR. JAKUBOWKSI: Sounds good. We'll figure
25 something out.

Page 85

1     Now, I notice for example with Global
2 Intelligence Consultants they have a claim for
3 $1600; do you see that number 3.8?
4     MR. CILIENTO: Yes, I see 3.8.
5     MR. JAKUBOWKSI: Okay. Are you familiar
6 with who Global Intelligence Consultants is?
7     MR. CILIENTO: I'm not familiar who they
8 are.
9     MR. JAKUBOWKSI: So you don't know -- okay.
10 Fine.
11    And -- and therefore I think it's fair to
12 say that you don't know what they did for the
13 Debtor, correct?
14    MR. CILIENTO: I do not recall.
15    MR. JAKUBOWKSI: Okay.
16    MR. CILIENTO: I -- I do not recall at this
17 time.
18    MR. JAKUBOWKSI: Okay. So Swansea
19 Beneficiary Trust is listed as disputed at 20
20 million, isn't it the case that one of the Ritchie
21 entities owns Swansea Beneficiary Trust.
22    MR. GWYNNE: When you say one of the
23 Ritchie entities --
24    MR. JAKUBOWKSI: Any -- any --
25    MR. GWYNNE: Well, let me finish -- when

Page 86

1  you say one of the Ritchie entities, who do you
2  mean?
3       MR. JAKUBOWKSI:  Any entity that has the
4  name Ritchie in it.
5       MR. GWYNNE:  If you --
6       MR. CILIENTO:  I -- I am not aware of the
7  ownership structure of -- of Swansea.
8       MR. JAKUBOWKSI:  Okay.  Around that's
9  not -- okay.  Fine.
10      Who is the Valtera Holding (phonetic) out
11  of Durham, North Carolina?
12      MR. CILIENTO:  A creditor of RRLS.
13      MR. JAKUBOWKSI:  I see that under the
14  schedules.  Why are they purported a creditor of
15  RRLS?
16      MR. CILIENTO:  Where is that please.  An
17  unsecured note --
18      MR. JAKUBOWKSI:  Okay.
19      MR. CILIENTO:  -- to RRLS.
20      MR. JAKUBOWKSI:  And that was for $25,124,
21  it came in three days before the filing, correct?
22      MR. CILIENTO:  Yes.
23      MR. JAKUBOWKSI:  Okay.  Did you see the
24  promissory note?
25      MR. CILIENTO:  I believe so, yes.

Page 87

1       MR. JAKUBOWKSI:  Okay.  And -- okay.
2  And who signed it?
3       MR. CILIENTO:  I do not recall who signed
4  the note.
5       MR. JAKUBOWKSI:  Okay.  It wasn't you know,
6  obviously, so you don't know.  Okay.
7       So I noticed that a lot of these claims, if
8  you look through the date of occurrence are -- a
9  lot of them are in July and July alone.  Do you
10  see that, like Global (inaudible) was -- excuse
11  me -- June -- June 1 to June 28.  Iron Shore
12  (phonetic) -- okay.  It's a month earlier.  5/1 to
13  5/30.  Larson was for professional service
14  provided on 6/28 at --
15      MR. GWYNNE:  Objection, counselor.
16  You're -- are you asking him the document --
17      MR. JAKUBOWKSI:  Yeah, so --
18      MR. GWYNNE:  The document says what it says.
19  I don't think we need to waste your time or his
20  time with that.  The document says what it says.
21  If that means to you that's a lot --
22      MR. JAKUBOWKSI:  Well --
23      MR. GWYNNE:  -- debts were --
24      (Talking simultaneously.)
25      MR. CILIENTO:  I'm just --

Page 88

1       MR. JAKUBOWKSI:  -- or occurred in June,
2  then that's what it means to you.
3       MR. JAKUBOWKSI:  Okay.  Well, do you want
4  me to go through every one of them, I will.
5       MR. GWYNNE:  No, I don't think it's
6  necessary to.  I think that the documents speaks
7  for itself --
8       MR. JAKUBOWKSI:  Speaks for itself.
9       MR. GWYNNE:  -- and --
10      MR. JAKUBOWKSI:  Okay.  Fine.  Knew -- it's
11  a waste of time --
12      MR. GWYNNE:  Okay.
13      MR. GWYNNE:  -- ask him to document says
14  what it says.
15      MR. JAKUBOWKSI:  I -- I concur these are
16  done under penalties of perjury and therefore I
17  have to assume unless I hear otherwise that
18  they're correct.  I agree with that.  Now, my
19  question to you is: Given the number and recency
20  and number of the claims to creditor claims, why
21  is there nothing postpetition with respect to any
22  of these Creditors?  They're not listed in the
23  projections.  There's not a single one of these
24  Creditors, that's listed in the projections, is
25  there?

Page 89

1       MR. CILIENTO:  Not that I'm aware of.
2       MR. JAKUBOWKSI:  And, in fact, there's no
3  transfers ever made to them prepetition within 90
4  dais of the filing, correct?
5       MR. CILIENTO:  I don't know how to answer
6  that question.
7       MR. JAKUBOWKSI:  Okay.  Well, you don't
8  have to.
9       Is it possible that some of these
10  Creditors -- so-called Creditors have already been
11  paid by another Ritchie entity and they're just
12  being reflected here as amount that are due?
13      MR. GWYNNE:  Objection, calls for
14  speculation.
15      MR. JAKUBOWKSI:  It does, but it also calls
16  for speculation grounded in fact.  If you want to
17  speculate and guess, you can guess.  But the fact
18  that you don't --
19      MR. JAKUBOWKSI:  The grounded in fact --
20      MR. GWYNNE:  -- have to speculate.
21      MR. CILIENTO:  I already stated that I
22  reviewed these open balances with a fund
23  accountant familiar with the RRLS L.L.C. entity.
24  And she conveyed to me that these were truly RRLS
25  obligations and opened invoices.

Page 90

1    MR. JAKUBOWKSI:  Let me ask you this, did
2  she confirm to you that they were only RRLS
3  invoices, and that there's no other party that is
4  co-liable with the Debtor on any of these claims?
5    MR. CILIENTO:  I did not ask for that
6  validation.  I asked if they were RRL --
7    MR. GWYNNE: Yeah, you can answer his
8  question --
9    MR. CILIENTO:  No.
10    MR. GWYNNE: -- yes or no, Mike.  Don't
11  argue, just answer --
12    MR. CILIENTO:  I'm sorry.
13    MR. GWYNNE: -- yes or no.  Sorry, I'm
14  just --
15    MR. CILIENTO:  No, that's okay.
16    MR. JAKUBOWKSI:  So -- do you have the
17  (inaudible) application?
18    This is the Reed Smith application.  If you
19  don't mind, I'll just pull this apart so you don't
20  have (inaudible) do this.  There you you go.  I
21  was wondering why it was so thick.
22    So do you recognize this document?
23    MR. CILIENTO:  Yes, my signature is on the
24  first one.
25    MR. GWYNNE:  Take your time.

Page 91

1    MR. CILIENTO:  Okay.  Yes.
2    MR. JAKUBOWKSI:  Okay.  And you recognize
3  it as the reeds only -- is the application to
4  retain Reed Smith as counsel to the Debtor?
5    MR. CILIENTO:  Yes.
6    MR. JAKUBOWKSI:  Okay.  And if you would
7  please -- if you could turn -- and I'll do it for
8  you.  If you could please look at Exhibit A to the
9  application, which I'm now handing you; and that
10  it is a two-page exhibit.
11    Does this schedule look familiar to you?
12    MR. CILIENTO:  Yes.
13    MR. JAKUBOWKSI:  Okay.  Did you assist in
14  this preparation?
15    MR. CILIENTO:  No, I did not.
16    MR. JAKUBOWKSI:  Do you -- and is it still
17  complete to the best of your -- to the best of
18  your knowledge as you sit here today?
19    MR. GWYNNE:  Objection.  And what you --
20  (inaudible) objection, you (inaudible) --
21    MR. CILIENTO:  Sorry.
22    MR. GWYNNE: I don't know the witness ever
23  said it was complete.  Would you ask him complete
24  today still to the best of his knowledge, that
25  implies at some point that he said it was

Page 92

1  complete.  You know, I object the -- the
2  question --
3    MR. JAKUBOWKSI:  Okay.
4    MR. GWYNNE: -- as I don't think it's --
5    MR. JAKUBOWKSI:  Who -- do you know who
6  represents the Co-Defendants in pre-petition
7  litigation, do you know if reeds -- let me strike
8  that.  Let's strike that please.
9    Do you know if Reed Smith represents any of
10  Co-Defendants in the litigation?
11    MR. CILIENTO:  No, I do not know.
12    MR. JAKUBOWKSI:  Okay.  So I take it that
13  no one had a discussion with you about potential
14  conflicts related to that representation; is that
15  correct?
16    MR. CILIENTO:  I don't recall.  N.
17    MR. GWYNNE:  Ben, I'm going to object to
18  this line of inquiry.  Now we're going into an
19  application to empty.  And don't think that's
20  appropriate used to.  Like you said, it's not a
21  deposition.  It's not a 2004.  If they have issues
22  with our employment application, they can take it
23  in that context.
24    MR. HACKMAN:  I think I would tend to agree
25  with counsel --

Page 93

1    MR. JAKUBOWKSI:  Okay.
2    MR. HACKMAN:  -- and if there are --
3    MR. JAKUBOWKSI:  I'll ask a specific -- a
4  very specific question related to the application
5  that I think affects the issue we've been talking
6  about today, which is the -- which is indemnity.
7    It says in the -- in the petition at page
8  paragraph 67, which is on page 19 of 21 of the
9  application.  Could you just please read through
10  paragraph 67.
11    MR. CILIENTO:  As of the petition date --
12    MR. JAKUBOWKSI:  And I'm going to tell you
13  what I'm going to ask you, so you can think about
14  it as you're reading it.
15    MR. CILIENTO:  Okay.
16    MR. JAKUBOWKSI:  So my question is:  How
17  sit --
18    MR. GWYNNE: Now, what -- I don't want you
19  doing two different things at once.
20    MR. JAKUBOWKSI:  Yeah.
21    MR. GWYNNE:  If he's going to --
22    MR. JAKUBOWKSI:  Please listen to my
23  question --
24    MR. GWYNNE: If he wants you to read it, you
25  can read it first or he can ask you a question and

Page 94

1  then you can read it; but I don't think you
2  showed --
3       MR. JAKUBOWKSI:  Don't do both --
4       MR. GWYNNE: -- don't do both at the same
5  time.  Yeah.
6       MR. JAKUBOWKSI:  So why don't you listen to
7  my question so I can give you a context of why I'm
8  asking you this -- I'm asking you to read this.
9  Okay.
10      So my question is:  Who immediate the
11 decision, if you look towards the middle of the
12 paragraph, that as of -- of the petition date RRLS
13 owed 30,000 of the 250,000 to resubmit.  Who made
14 that determination?  And you can read the
15 paragraph and take your time, whatever you need to
16 do to answer that question.
17      MR. CILIENTO:  Okay.
18      MR. JAKUBOWKSI:  So my question is:  Who
19 made the determination that as of petition date
20 RRLS owed $30,351.81 of the $250,913.85
21 (inaudible)?
22      MR. CILIENTO:  According to this reed --
23 Reed Smith reviewed invoice and separated out fees
24 of claim solely to RRS and (inaudible) other
25 clients other than RRLS.

Page 95

1       MR. JAKUBOWKSI:  Okay.  So -- so Reed Smith
2  made that decision?
3       MR. CILIENTO:  I -- I read the line.
4       MR. JAKUBOWKSI:  Okay.  You didn't take
5  that decision, correct?
6       MR. CILIENTO:  No, I did not make that
7  decision.
8       MR. JAKUBOWKSI:  Okay.  Were you ever asked
9  to waive any conflicts (inaudible) any
10 professional of the estate may have?
11      MR. CILIENTO:  To the best of my knowledge,
12 no.
13      MR. JAKUBOWKSI:  Okay.  Do you recall
14 receive any writing from your counsel that --
15 seeking and providing you with informed consent
16 with respect to any potential conflict that is
17 arise?
18      MR. GWYNNE: I'm going to object, Ben.  I
19 think you agreed that we can deal with this in the
20 context of the (inaudible) application if they
21 want to object --
22      MR. JAKUBOWKSI:  Just say yes or no.
23      MR. GWYNNE: Yeah, I'm going to instruct him
24 the witness not to answer.  I think the trustee
25 agreed, you said you had one more question and now

Page 96

1  you're asking more --
2       MR. JAKUBOWKSI:  I didn't say I had more
3  one question.
4       MR. GWYNNE: -- about the retention --
5       MR. CILIENTO:
6       MR. JAKUBOWKSI:  I never said I have one
7  more question.
8       MR. GWYNNE:  I believe -- I believe you
9  said you had one more question about the
10 application that related to the indemnification
11 after --
12      MR. JAKUBOWKSI:  Yeah.
13      MR. GWYNNE:  Mr. Hackman said he agreed with
14 me, that this wasn't the appropriate inquiry for
15 the 341.  You asked that one question, now you're
16 asking more.
17      MR. JAKUBOWKSI:  All right.  Fine.  I'll
18 withdraw the question.  No reason to fight over
19 it.  In the statement of financial affairs, which
20 is -- Ben, could you please show them where the
21 exhibit -- or where the statement of financial
22 affairs is?
23      Okay.  Could you turn the last page please.
24 (Inaudible) you're welcome to use this.
25      Have you had any discussions with Mr. Varga

Page 97

1  about any of the claim -- causes of action cases
2  listed on appendix A, Page 21 of 21 of statement
3  of financial affairs.
4       MR. GWYNNE:  I'm going to ask you not to
5  answer to the extent those conversations were --
6  including not just Mr. Varga, but me as counsel
7  and providing you legal advice in connection with
8  any of those claims.  If you had discussions other
9  than those discussions with me and Mr. Varga --
10      MR. JAKUBOWKSI:  Well, can ask him --
11      MR. GWYNNE:  Then you can -- then you can
12 answer the question.
13      MR. JAKUBOWKSI:  So I can him if he had
14 conversations.
15      MR. GWYNNE: That's true.  You can ask him
16 if he had conversations --
17      MR. JAKUBOWKSI:  (Inaudible) that's what I
18 wanted to know.
19      MR. GWYNNE: -- not the subject matter.
20      MR. JAKUBOWKSI:  Yeah, that's what I wanted
21 to know.
22      MR. GWYNNE: Okay.
23      MR. JAKUBOWKSI:  Did you have conversations
24 with Mr. Varga about these cases that are listed
25 on Exhibit A -- or appendix A?

Page 98

1    MR. CILIENTO: Not without Mr. --
2    MR. JAKUBOWKSI: Gwynne. (Phonetic).
3    MR. CILIENTO: Yeah. Not without Mr.
4 Gwynne present.
5    MR. JAKUBOWKSI: Okay.
6    MR. CILIENTO: And do not -- I do not
7 recall specific conversations.
8    MR. JAKUBOWKSI: Okay.
9    MR. GWYNNE: You answered his question.
10    MR. JAKUBOWKSI: Okay.
11    MR. CILIENTO: Sorry.
12    MR. JAKUBOWKSI: Okay. Fine.
13    Do you have any comments as you sit here
14 today, the likelihood of success of any of these
15 claims as the -- as chief operating officer of the
16 managing member?
17    MR. GWYNNE: (Inaudible.) I think -- I think
18 that calls for a legal conclusion, but if you
19 think you can answer; you can. But you don't need
20 to make legal conclusions as a non-lawyer as the
21 likelihood of success of litigation.
22    MR. CILIENTO: I -- sure, I have an
23 opinion, but I am not going to render it at this
24 point.
25    MR. JAKUBOWKSI: Okay. Why not?

Page 99

1    MR. CILIENTO: I don't believe I have to
2 answer that. I told you I --
3    MR. GWYNNE: He doesn't have to give
4 legal -- make legal conclusions. And if the
5 witness is saying he doesn't want to answer
6 because it's a legal conclusion, he doesn't have
7 to.
8    MR. JAKUBOWKSI: Well, as I understand it,
9 you said before I came in that the purpose of
10 Chapter 11 is to preserve the value of litigation.
11 Right? You said that?
12    MR. GWYNNE: Objection. I don't believe he
13 said that's the purpose of Chapter 11.
14    MR. JAKUBOWKSI: Well --
15    MR. GWYNNE: I think when he was asked about
16 this case --
17    MR. JAKUBOWKSI: Yes, this case --
18    MR. GWYNNE: -- that was part of the purpose
19 of this case.
20    MR. JAKUBOWKSI: I stand corrected. Thank
21 you.
22    MR. CILIENTO: It's -- can you repeat that
23 question please.
24    MR. JAKUBOWKSI: Yeah. The purpose -- as I
25 understand it, you told everyone here that the

Page 100

1 purpose of this case is to preserve the value of
2 the litigation --
3    MR. CILIENTO: It was a purpose, he said.
4 Not the purpose.
5    MR. JAKUBOWKSI: Okay. And another purpose
6 you said was to stop frivolous lawsuits that you
7 said were eroding the (inaudible) state, correct?
8    MR. CILIENTO: I believe that -- that is
9 the gist of my statement, yes.
10    MR. JAKUBOWKSI: Is there anything else
11 that is being done in this -- or that represent
12 the purpose of this case's reorganization or
13 rehabilitation?
14    MR. GWYNNE: Filing the plan? Making a
15 distribution to Creditors? He said that earlier,
16 too. Listen, why don't you answer this question,
17 we're over two hours. Ben, we've had at most a
18 five-minute break. I had a conference call at
19 3:30, so I need to go make arrangement, figuring
20 I'm going to (inaudible) miss that. So I would
21 ask that we take a 20 minutes break and -- you
22 know, that we can come back.
23    MR. JAKUBOWKSI: How about if I ask two
24 more questions and then we're done -- we're done.
25    MR. GWYNNE: That -- that is --

Page 101

1    MR. JAKUBOWKSI: Okay?
2    MR. GWYNNE: That is a superior
3 alternative.
4    MR. JAKUBOWKSI: I'll give you that. As
5 well as everybody else in this room, I think,
6 including you U.S. Trustee's Office.
7    All right. Do you know whether any Ritchie
8 entities -- any entity name with the name Ritchie
9 in it that's not the Debtor, do you know any of
10 those entities that have an obligation to
11 indemnify the Debtor?
12    MR. CILIENTO: I'm going to object to that as
13 a legal conclusion, but if you know, you can
14 answer.
15    MR. CILIENTO: Yes. I know -- I -- I
16 believe there -- there are entities that  are
17 required to indemnify the Debtor. Well, wait a
18 second. I know that -- ask the question again
19 please.
20    MR. JAKUBOWKSI: Okay. Knew this is why
21 you don't answer --
22    MR. CILIENTO: Okay. I'm not going to
23 answer --
24    MR. GWYNNE: -- legal questions.
25    MR. CILIENTO: Well, you -- okay. Then

Page 102

1  I'm -- then I'm not going to answer.  No; I do not
2  know the answer to that question.
3       MR. JAKUBOWKSI:  When did the Debtor become
4  aware of the Swansea Beneficiary Trust litigation?
5       MR. CILIENTO:  I do not know the answer to
6  that question.
7       MR. JAKUBOWKSI:  Do you know who would
8  know?
9       MR. CILIENTO:  One of the representatives
10  of the service provider.  Pan man do you know
11  if --
12       MR. CILIENTO:  That's two questions.
13       MR. GWYNNE:  It was actually three, but --
14       MR. JAKUBOWKSI:  All right.  Thank you.  I
15  owe you one.
16       So -- okay.  Last question.
17       MR. CILIENTO:  Okay, this is (inaudible)
18  but go ahead.
19       MR. JAKUBOWKSI:  All right.  Did you find
20  out about it or after the judgment?  If you know.
21       MR. CILIENTO:   Find --
22       MR. JAKUBOWKSI:  Swansea litigation.
23  Swansea litigation.  Did you find out about it
24  before or after the judgment was entered?
25       MR. CILIENTO:  After.

Page 103

1       MR. JAKUBOWKSI:  Okay.  Anything else?
2  Anything else?  We're done.
3       MR. GWYNNE:  Thank you.
4       MR. JAKUBOWKSI:  You're welcome.
5       MR. CILIENTO:  Thank you.
6       MR. JAKUBOWKSI:  You're welcome, too.
7  Thank you.
8       SPEAKER:  Guys, you have one question in
9  total.
10       MR. HACKMAN:  Any other Creditors.
11       MR. JAKUBOWKSI:  I'm sorry.  I wasn't
12  speaking for everybody else.
13       MR. HACKMAN:   Any other Creditors in
14  attendance who have questions.  I hear no
15  response.  I will note on the record that our
16  office has received some questionnaires in
17  response to a letter solicitations we sent out
18  about the formation of a Creditors committee in
19  the case.  My client has not made a decision about
20  whether to appoint; and if so, who to appointment
21  and so at this time I'm going to continue the 341
22  meeting to an open state so that the meeting can
23  be reconvened, if necessary, by a committee -- an
24  official committee if we appoint one and they deem
25  it necessary  to ask questions.

Page 104

1       MR. GWYNNE:  And I just want to put on the
2  record that the Debtor reserves its right with
3  respect to that continuation and objects as we've
4  been here for almost two hours and favor minutes
5  already.  And the largest Creditors are
6  represented in this room today by their own
7  counsel.
8       MR. HACKMAN:  Very well.  Thank you.  And I
9  reserve all of my client's rights on that subject
10  as well.
11       Thank you-all for being here.
12       MR. GWYNNE:   Thank you.
13       MR. HACKMAN:  We'll conclude now.
14       (End of recording.)
15
16
17
18
19
20
21
22
23
24
25

Page 105

1            C E R T I F I C A T E.
2
3       I, JACKIE MENTECKY, do hereby certify that
4  I was authorized to transcribe the foregoing recorded
5  proceeding, and that the transcript is a true and
6  accurate transcription of my shorthand notes to the best
7  of my ability taken while listening to the provided
8  recording.
9
10  Dated this 2nd day of August, 2018.
11
12
13
14
15
16            _____
               JACKIE MENTECKY
17
18
19
20
21
22
23
24
25

Ritchie Risk
July 31, 2018                                    1

---

**$**

$1   37:22
$1.5   32:20
$13   72:13
  73:10,15
  79:17 80:25
$13.3   13:11
  47:5
$13.3/.4   52:6
$1600   85:3
$18,000   65:14
$20   37:24
  38:8,12
$24,000   72:16
$24,983   72:2
$25,000   73:23
$25,124   86:20
$250,913.85
  94:20
$26,009.80
  82:15
$30,351.81
  94:20
$40   8:8
  45:15,16
$5.1   35:11
$6   16:6
$670,000
  64:14
$9   12:23

---

**1**

1   81:14 87:11
1,365   83:11
1.5   35:19,21
11   13:7 14:21
  15:2 18:15
  31:22 32:2
  99:10,13
12   64:23
12th   20:18
  68:17 82:18

13   72:23 73:6
  80:6
15   58:23
18-11555   2:4
19   65:1 78:17
  79:18,19 80:5
  93:8
1:00   2:2
1st   16:6,8
  52:23

---

**2**

2-C   37:3
20   15:3 64:24
  82:17 85:19
  100:21
200   5:13
2002   56:18
2004   6:3
  92:21
2005   16:7,8
  52:23
2007   57:8
2008   44:24
2016   48:24
  49:3,19,25
2017   81:15
2018   2:2,6
  3:23 37:12
  72:6
206   11:3
207   11:4
  40:24 43:24
  44:8
21   49:10,11
  93:8 97:2
21st   37:11
25   22:14 49:9
25,000   73:11
250,000   94:13
25th   72:5
26   25:2 52:5
26,009.80
  82:18

26th   3:22
27   78:17
  79:19 80:5
27th   3:22
28   87:11
28th   2:6
  28:18
2:47   79:4

---

**3**

3   64:24
3.1   52:5
3.8   85:3,4
30   46:2 81:15
30,000   94:13
31st   2:2
341   2:3 78:1
  96:15 103:21
35   80:22
3:30   100:19

---

**4**

4   21:8
4.4   16:17
40   10:12 46:1
  69:11
40,000   69:10

---

**5**

5   64:24
5.1   35:20
5/1   87:12
5/30   87:13
547(b)   37:9

---

**6**

6   21:8
6/28   82:13
  87:14
60   26:6,7
  51:21,22

55:21 56:5,10
  57:19 71:7
67   93:8,10

---

**7**

7   13:13
  49:10,11
7.7   41:1
7.8   44:10
73.3   81:18

---

**9**

90   27:16 89:3

---

**A**

A.R.   45:4
  52:7
ability   23:20
  63:12
about   2:11
  3:11 8:8
  16:16 24:2
  27:13 33:7
  35:19 36:21
  44:17 45:24
  46:5,24
  49:13,14 51:2
  52:10 59:1
  64:4 65:23
  66:2,5,22
  67:8 69:16,25
  72:21,25 78:6
  84:19 92:13
  93:6,13 96:4,
  9 97:1,24
  99:15 100:23
  102:20,23
  103:18,19
above   40:10
Absolutely
  53:24
access   84:9
According
  94:22

---

Ritchie Risk
July 31, 2018
2

account   13:12
  28:19,20
  52:18 53:1,7
  74:17
accountant
  23:13,17
  25:16 62:19
  71:13 89:23
accountant's
  25:23
accounting
  26:3,12
accrues   75:13
accurate   17:1
  65:2 71:16
  83:16
act   19:24
  39:2
action   17:12
  43:5 97:1
actually   7:9
  16:8,22 20:16
  23:16 26:16
  28:3 56:9
  68:9 71:7
  75:5 102:13
additional
  64:22
address   4:20
  5:4,6,11,14
  41:13,23,25
  50:12,14,18
  52:1 56:10
  57:15 69:15
addressed
  23:22,24
addresses   5:7
  41:25
administer
  3:9
admit   66:8
adopt   7:19
  15:14
adverse   20:5
advice   62:6
  97:7
advise   61:22

  62:3 67:11
advises   6:23
affairs   2:13
  4:11 11:5
  20:10 22:18
  23:10 24:3,9
  27:14,17
  28:24 40:25
  47:11 48:23
  49:8 60:12
  96:19,22 97:3
affects   93:5
affiliate   9:4
affiliates
  12:8
affirm   3:10
after   7:5,12
  13:24 20:21
  36:21 64:16
  96:11 102:20,
  24,25
afternoon   2:1
again   11:18
  18:23 29:17
  35:8 48:15
  51:20 59:3
  62:18 70:9
  76:10 79:15
  101:18
against   12:18
  13:8 14:18
  15:9 17:5,14,
  16 28:2 39:19
  43:5,9 47:5
  48:7,18 53:10
ago   42:18
  48:4
agree   66:10
  88:18 92:24
agreed   45:17
  95:19,25
  96:13
agreeing   45:8
agreement
  5:14 16:1,21
  17:9,11 29:1,
  5,6,7 50:14
  53:12,14

  74:25 75:4,5
  76:15
agreements
  15:24 17:1
  53:18
ahead   13:10
  102:18
Alias   77:19
all   2:1,15
  3:6 8:1 11:11
  13:14 14:14
  15:4 21:19,23
  24:19 25:3
  27:10,15
  31:13,24
  37:18 40:21
  45:23 55:2
  57:2 63:23
  65:23 66:1
  69:6,8 73:12
  76:13 77:9,
  14,24 78:21
  79:3 84:1
  96:17 101:7
  102:14,19
  104:9
allegations
  45:19
allow   12:18
almost   104:4
alone   87:9
already
  58:17,23 74:2
  76:19 80:12,
  21 89:10,21
  104:5
also   10:13
  11:4 28:25
  38:25 40:16
  46:3 47:2,4
  49:16 55:3
  56:5 61:23
  63:20 72:21
  89:15
alternative
  101:3
am   19:13,20
  29:19 38:10

  39:12 43:16
  44:15 46:17,
  25 53:24
  55:19 56:3
  57:18,22
  62:18,20
  66:17 71:11
  75:14 77:13
  86:6 98:23
amended   16:23
  20:17 21:4
  22:12 23:9
  24:9,22 25:14
  26:16,23 27:7
  35:8,17 37:4
  41:4 43:4
  44:9 49:7
  50:13 51:6,7
  68:9,12
amendment
  20:20 22:18
  52:2
amendments
  22:5 24:15
  27:6
among   6:18
amount   14:22
  16:13 30:8
  32:18 36:4
  64:11 89:12
amounts
  45:21,25
  46:12,15
and   2:12,17,
  20 3:12,17
  4:7,8 5:8,13
  6:4,10,23,25
  7:2,6,11,16,
  17 8:4,6,7
  9:10,17,24
  10:1,5,13,17
  11:21 12:19
  13:13,16,24
  14:5,8 15:2,
  5,24 16:8,12,
  19,21,24
  17:8,18,19
  18:4,22 19:6,
  15,17,23

20:1,8,9
21:7,12 22:2,
14 23:21,23,
25 24:10,24
25:6,14,23
26:1,13,22
27:1,2,14,19
28:1,25 29:25
30:1,8,24
31:20 32:5,21
33:6,7,9,24
34:20,24
35:24 36:6,
11,14 37:24
38:19,23,25
39:4 40:1
41:11,16
42:6,8,10,18
43:8 44:11
45:3,4,5
46:2,22 47:3,
20 48:19
49:13,16
50:10,17
51:5,7,19
53:4,13,14,19
54:16,17
55:8,20 56:5,
6,8,16 57:7
58:11,23
59:13,21,22
60:17 61:2,
15,18 62:7,
17,19 63:6,
11,13,19
64:3,13 65:18
67:6,7,19
68:1,14,19
69:1,10 70:13
71:5,14,18
72:12 73:2,3,
23 74:19
76:9,12,14
79:13 80:10,
22,24 81:21
82:4,17,18
83:10,11
84:8,22 85:11
86:20 87:1,2,

9 88:9,16,19,
20 89:2,11,
17,24,25 90:3
91:2,6,7,9,
16,19 92:19
93:2,12,25
94:14,15,23,
24 95:15,25
97:7,9 98:6
99:4 100:5,
21,24 103:20,
21,24 104:1,
3,4,5,8
and/or  38:1
Anderson
13:16,18 14:1
another  16:9,
18 20:3 81:11
89:11 100:5
answer  19:14,
21 27:20
28:23 40:3
44:7 46:18
47:21,22
61:23 62:2,14
67:8 69:2
70:11 74:11
76:10,24
81:4,6 89:5
90:7,11 94:16
95:24 97:5,12
98:19 99:2,5
100:16
101:14,21,23
102:1,2,5
answered  74:3
76:9 80:12
98:9
anticipate
64:23
anticipating
63:1
any  3:24
4:13,16 8:3,
9,14 10:4,7
12:7 19:6,10,
11,17 20:1,3
21:21 22:5
24:15 27:5

34:25 35:6
40:15 42:24
44:1,6 45:20
46:12,15
47:10,21,25
48:7,16
53:14,22,25
54:4 64:4,22
65:3 66:4
67:14 78:13
82:21 83:19
85:24 86:3
88:21 90:4
92:9 95:9,14,
16 96:25
97:1,8 98:13,
14 101:7,8,9
103:10,13
anybody  42:2
78:12
anymore  7:17
Anyone  3:6
anything
66:19,22
69:23 70:5
100:10 103:1,
2
anywhere
50:21
apart  90:19
appeal  18:11
appear  46:4
71:16
appearance
3:3 54:17
appeared
41:10
appears
21:12,18
25:11 44:12
appendix  43:5
44:9 97:2,25
application
7:11 8:16
19:22,25
28:21 61:5,9,
24 90:17,18
91:3,9 92:19,

22 93:4,9
95:20 96:10
applies  34:10
appoint
103:20,24
appointed
4:5,9 58:4
appointment
103:20
appropriate
92:20 96:14
approval
61:10
approve  62:23
approximate
32:17
approximately
8:8 12:23,25
13:7,11,13
16:5,6
are  2:2 3:2,
11,16 4:3
5:8,10 9:12,
22 10:4,21
11:12 12:8,20
16:20 18:7
21:8,9,15
22:1,5 24:1,
15 25:19
27:5,12 30:25
35:15,18 38:1
39:4 40:1
41:24 44:12,
13 45:9,20,
21,25 46:4,12
49:6,10 51:2
53:22 54:1,4
55:18 57:20,
25 63:1 64:23
66:2,5 68:16
70:16 73:4
77:12 78:8
84:2,19 85:5,
8 86:14 87:8,
9,16 88:15
89:12 93:2
97:24 101:16
104:5

area  50:22
argue  90:11
argumentative
  72:20
arise  44:4,5
  95:17
arising  45:21
arm's  9:1
Armco  81:13
  82:14,18,23
  83:2
around  16:7
  38:16 42:12
  73:15 74:7,8,
  9 86:8
arrangement
  100:19
arrived  74:13
article  46:22
as  4:5,8 7:20
  10:18 14:14
  15:14 19:23
  21:2 24:7,8
  25:15,25
  34:4,5 35:11
  37:10 46:15
  47:4 50:9,13
  51:6,7 58:4
  61:6,21 65:3
  70:2,4,6
  71:22 81:11
  82:16 85:19
  89:12 91:3,4,
  18 92:4
  93:11,14
  94:12,19 97:6
  98:13,15,20
  99:8,24
  101:4,5,12
  104:3,10
ask  2:11,14,
  16 3:1 34:12
  48:14 54:5
  59:2 66:21
  78:22 80:18
  88:13 90:1,5
  91:23 93:3,
  13,25 97:4,

10,15 100:21,
  23 101:18
  103:25
asked  33:7
  40:23 49:20
  61:10 74:4
  76:9,17 78:5
  90:6 95:8
  96:15 99:15
asking  45:24
  46:5 62:5
  78:3 80:16
  81:10 87:16
  94:8 96:1,16
asks  36:10
  49:13,14
Asparti
  11:13,17
  21:12 47:18,
  20 59:21,25
  60:10,13
  76:22
asserting
  39:19
asserts  40:13
asset  7:13
  8:4,6 10:16,
  17
assets  2:12
  4:11 7:5,17
  10:12 20:9
  24:24 25:14
  39:1 50:17
  73:18
assist  4:6
  91:13
associated
  43:25 44:3
  76:8
assume  15:20
  88:17
assuming
  67:10
at  2:2,13,16
  3:1,8 5:3,9,
  11 6:12 7:14
  8:5 11:7 13:7
  15:2,3 18:14

22:6,8,20
  23:5 24:16,17
  25:6 27:7,8
  29:20 31:25
  32:14,16 34:1
  35:7,15 36:18
  40:24 41:22
  44:9 45:11
  46:2 47:8
  49:6 53:23
  55:23 60:24
  65:1,12 66:19
  68:11 70:6
  71:2,7 72:2,3
  73:25 77:21
  78:13 79:11,
  19 82:5,18,
  21,22 83:2,
  11,13,14,19,
  24,25 84:13
  85:16,19
  87:14 91:8,25
  93:7,19 94:4
  98:23 100:17,
  18 103:21
attached
  11:3,4 19:25
  32:4
attachment
  51:7
attack  39:5
attendance
  3:2 54:5 62:7
  103:14
attorney  2:8
  17:3 55:3
attorney's
  15:4
August  16:6
  52:22
Austin  12:24
  13:3,4,17,21
  43:19
authenticate
  20:8
authority
  61:9,11

authorized
  32:7
available
  50:19
avoidable
  37:9 38:1
aware  10:7
  12:6,9 19:9
  27:5 29:19
  30:18 48:20
  53:22,25
  75:14,19,21,
  22,23 86:6
  89:1 102:4

―――――――――

B

back  26:12,17
  42:8 71:8
  79:3,13
  100:22
bad  13:7
  14:21
balance  74:13
balances
  89:22
bank  12:5
  28:19 74:13,
  17
bankruptcy
  4:6 7:13
  10:9,11 11:10
  12:5,8,15
  20:6 31:22
  37:9 63:1
  66:2
Bartman  68:4
based  17:9
  49:25 83:16
basically
  56:17 72:8
basis  17:5
  40:8 64:14
  84:13,15
because  5:22
  14:24 16:17
  34:9,14 37:10
  38:22 46:25

Ritchie Risk
July 31, 2018
5

50:20 53:11
60:24 69:4
71:4 75:15,16
80:2 99:6
**become** 102:3
**been** 11:8
48:6,16 52:25
55:2 56:16
57:7,10 58:22
61:9 63:24
74:22 80:22
81:22 82:1,3
83:9 89:10
93:5 104:4
**before** 2:5
3:25 12:5
19:16 21:7
23:15 26:23
33:7 49:16
50:15 57:16
71:5 72:9
73:25 75:2
86:21 99:9
102:24
**beginning**
48:24 49:14,
24
**behalf** 29:22
30:5 33:16
40:14 60:16
**being** 2:14
19:21 28:15
52:7 67:18,19
89:12 100:11
104:11
**belief** 28:10
52:17
**believe** 5:10
6:3 11:14
17:23 18:11
19:19 20:3,4,
17,18 21:1,6,
8 22:6,15
23:1 24:8,16,
17 26:1 27:19
33:5,6 35:24
39:4 40:15,18
43:18 47:4
48:22 50:14

52:6 53:8
54:1 56:11
63:17 69:10,
13 75:1 86:25
96:8 99:1,12
100:8 101:16
**believed**
38:24
**believes**
14:18,24
16:25 37:7,22
38:15,20
**Ben** 2:7 5:13
6:25 11:2,21
14:9 26:9
27:12 30:11,
21 33:2 34:9
35:19 36:3
38:14 41:16
45:23 49:2
51:24 54:23
58:18 68:12,
21 77:25 78:5
92:17 95:18
96:20 100:17
**Beneficiary**
37:25 39:6
40:1 41:12
42:5 85:19,21
102:4
**benefit** 62:11
**best** 22:2,3
23:19 24:12
25:21 27:2,3
71:15 81:24
91:17,24
95:11
**between** 9:1
10:5 15:21
16:21 19:17
30:1 33:9,23
36:13 53:4
67:6
**binder** 79:6
**bit** 7:15
**black** 61:2
**block** 23:5
26:18

**blocks** 21:9
**book** 79:20
**books** 5:8
**both** 5:2
40:1,23 44:13
94:3,4
**bottom** 23:5
65:13
**box** 36:11
**brand** 47:14
**branded** 42:6
44:12
**breached**
16:25
**break** 42:20,
25 70:17
78:13,23 79:1
100:18,21
**brief** 44:23
**briefly** 69:1
**bring** 17:4,12
62:11
**broker** 8:22
**brought**
17:13,15
48:17
**bulk** 12:22
**bunch** 80:2
**business** 4:24
5:1,4 7:3,18
8:3 9:1 47:11
50:11,25
51:3,14
62:12,15
69:15 73:18
**businessman**
62:19
**but** 3:12 5:19
7:12 9:18
11:13 14:12,
24 15:7 17:24
20:20 21:3
26:11 28:2,
19,22 29:4,8,
21 30:24
34:2,21 35:3,
23 36:7 39:3

40:14 46:1,3,
11 47:7 49:18
50:10,18 53:8
57:3,20 58:1,
21 60:3,9
66:16 68:10,
15 69:8 70:15
71:6 73:7
74:14 75:3,22
77:1 78:2,12
80:15 81:3
83:25 89:15,
17 94:1 97:6
98:18,19,23
101:13
102:13,18
**buy** 6:15
**buys** 6:16
**by** 10:20
11:1,12 15:24
23:12 26:11
27:24 28:4,11
35:9 39:5
40:2 44:2
45:18 48:11,
18 51:4 52:7,
13 57:4,10,13
63:6 73:6
80:9 81:22
83:7 89:11
103:23 104:6

---

C

**C-I-L-I-E-N-T-
O** 2:21
**call** 100:18
**called** 26:7
**calls** 50:10
81:1,10
89:13,15
98:18
**came** 23:23
86:21 99:9
**can** 4:2,19
6:8 8:19
15:17 18:23
22:19 34:11,

21 36:19,25
38:2,4,14
41:24 42:7
49:2 54:7
62:2,14 66:9
67:7 68:25
69:2,6,8
70:10,11
76:10 79:11,
13 81:3 82:15
84:12,13,22
89:17 90:7
92:22 93:13,
25 94:1,7,14
95:19 97:10,
11,13,15
98:19 99:22
100:22 101:13
103:22
can't  5:2
36:25 44:7
75:24 83:24
capacity
19:24
capital  6:13
11:19,23
27:24 28:7,11
30:4 33:13
45:2 46:6
57:8,11
58:12,13 60:1
Capitals  45:3
card  55:10
care  69:25
Carey  2:5
Carolina
86:11
case  2:4,5
11:14 12:15
15:1 17:3,8
31:22 39:17
45:19 47:9
63:1 64:15
65:24 66:1
81:8 85:20
99:16,17,19
100:1 103:19

case's  100:12
cases  11:8
97:1,24
cash  7:15
62:23 65:11
73:21 74:9,13
casualty  3:5
30:24
causes  43:5
97:1
Cayman  5:11
28:15 51:12,
14,16,18
CEO  45:3 47:3
certain  29:23
certainly
50:22
cetera  23:18
50:10 64:12
chance  21:24
46:3
change  25:8
63:9 69:3
70:7 81:8
changed
69:10,13,14
changes  65:3
68:16 69:7
changing
14:10
Chapter  18:15
31:22 32:2
99:10,13
characterizati
on  29:12
charges  44:25
checked  27:17
36:12
Chicago  55:9
67:25
chief  56:3,6
57:21,22 58:5
59:5 62:16,21
98:15
choice  43:11
Ciliento  2:21
3:8,14,19,22

4:1,5,12,15,
18,21,25 5:5,
10 6:1,3,6,
12,20 7:19,
22,25 8:4,11,
15,21 9:3,5,
8,15 10:7,10,
23 11:1,11,19
12:3,6,9,13,
16,22 13:3,6,
11,21,24
14:3,5,8
15:11,13,16,
23 16:4,14,
16,22 17:2,
15,19,22
18:1,3,6,9,
16,19,21,25
19:2,9,13,19
20:11,14,20,
23 21:1,6,11,
14,17,22,25
22:3,8,10,13,
16,21,24
23:3,7,11,16
24:4,6,11,14,
17,20,23
25:1,4,7,11,
15,21,25
26:5,19,21,25
27:3,8,11
28:10,14
29:11,13,15,
19,24 30:12,
14,18,20
31:7,10,12,
15,18,23
32:1,11,15,
20,23 33:5,
12,15,21
34:6,17 35:4,
13,16,23
36:2,15,17,
20,23 37:2,5,
13,17,20
38:4,6 39:9,
12,21 40:3,
18,22 41:4,7,
14,19,21

42:14,18,22
43:1,3,7,12,
14,16,18,22
44:7,15 45:7,
12 46:17
47:13,22
48:2,14,20
50:5,8 51:13,
21,23 52:4,9,
12,17,21
53:2,6,11,21,
24 54:3,5,21
55:13,17,19,
23 56:3,9,14
57:14,18,22,
25 58:3,6,10,
14 59:2,7,9,
12,15,19,25
60:5,13,19,23
61:2,17 62:8,
15 63:3,5,8,
11,15,22
64:2,6,10,16,
25 65:5,10,
16,18,21
66:14,17,19,
23 67:12,18,
22,24 68:3,24
69:9,13,18,21
70:18,21,24
71:1,12,18,
21,25 72:3,7,
11,15 73:20
74:8,12,16
75:1,6,11,14
76:4,11,23
77:21 78:14,
20 79:5,8,21
80:7 81:5,19,
24 82:3,9,24
83:2,9,13,22
84:3,7 85:4,
7,14,16 86:6,
12,16,19,22,
25 87:3,25
89:1,5,21
90:5,9,12,15,
23 91:1,5,12,
15,21 92:11,

16 93:11,15
94:17,22
95:3,6,11
96:5 98:1,3,
6,11,22 99:1,
22 100:8
101:15,22,25
102:5,9,12,
17,21,25
103:5
**Claiborne**
13:15 14:5
83:4
**claim** 12:23
13:8 14:14,
16,17,22
15:2,7,20
17:7,14,15
28:1 35:12,21
36:7 39:22
40:15 43:25
47:5 52:6,11,
13,16 53:10,
16 79:18
80:9,25 81:9,
14,17 82:6
84:6 85:2
94:24 97:1
**claimed** 38:8
**claims** 7:16
10:4,13 11:4
12:18 35:9
38:23,25
39:18 43:9
84:6 87:7
88:20 90:4
97:8 98:15
**clarify** 6:25
11:21 14:10
**clarifying**
7:1 15:13
**client** 103:19
**client's**
104:9
**clients** 94:25
**closed** 9:24
10:1

**Co-defendants**
92:6,10
**co-liable**
90:4
**code** 37:10
**collapse** 7:5,
6
**collection**
4:7
**come** 54:7
83:22 100:22
**comes** 70:14
**comfort** 71:9
**comma** 9:24
10:2 69:19
**comment** 77:5
**commenting**
77:6
**comments**
98:13
**Commission**
48:19
**committee**
103:18,23,24
**common** 35:1
**commonality**
42:4
**companies**
13:8
**company** 26:7
32:6 82:13
**complaint**
40:12
**complete**
91:17,23 92:1
**concerns**
38:22
**conclude**
104:13
**conclusion**
2:13 70:2,5,
10 81:2,12
98:18 99:6
101:13
**conclusions**
98:20 99:4

**concur** 88:15
**conference**
50:10 100:18
**confident**
83:15
**confirm** 25:6
35:22 90:2
**conflict**
95:16
**conflicts**
92:14 95:9
**connection**
19:7,10,11,17
30:21 36:13
97:7
**connections**
20:1
**consent** 32:4,
6 95:15
**consistent**
7:23
**Consultants**
85:2,6
**consultation**
64:16
**consulted**
11:15
**contemplating**
66:11,19
**contents**
21:24 22:1
23:14
**contest**
44:19,21
**context** 51:5
92:23 94:7
95:20
**Continental**
3:5 5:14
**continuation**
104:3
**continue**
103:21
**contracted**
9:11
**contractual**
15:21 53:4

**conversation**
67:13
**conversations**
67:14 97:5,
14,16,23 98:7
**conversion**
16:18
**conveyed**
89:24
**COO** 2:21 3:16
4:6 6:23
**copy** 20:12,17
30:23 31:16
53:18 68:8,11
**corner** 65:13
**corporate**
4:20 34:4,10
**corporation**
34:19
**correct** 3:19
5:5 8:4 9:5
12:3 15:22
18:7 20:21
22:2,21 24:1,
10 25:11,19
27:2 29:15
37:16,17
41:5,19 46:16
50:23 55:22
57:9 58:2,5
59:24 60:12
66:13 71:5,10
74:11,25
80:10 81:23
83:5 85:13
86:21 88:18
89:4 92:15
95:5 100:7
**corrected**
99:20
**cost** 15:2
**could** 3:9,16
4:9 10:15
12:19 15:3
20:19 25:5
29:17 31:24
35:7 39:1
40:20 54:8

59:2 63:24
79:19 91:7,8
93:9 96:20,23
**counsel** 2:17
38:18 43:10,
15 55:6
61:21,23
64:18 67:14,
16 72:17 74:3
75:18 76:17
80:13 83:5,7,
8 91:4 92:25
95:14 97:6
104:7
**counselor**
87:15
**counterparty**
39:10,16
**couple** 27:12
50:15
**court** 17:14,
20 18:5 40:17
**Coventry** 7:6
8:18,21 9:11
10:6
**cover** 30:23
58:17
**coverage**
14:25
**covered** 40:2
**created** 63:13
**credit** 29:25
30:9,10 33:22
75:6,7,9
**Creditee** 2:10
**creditor**
36:11 41:8
69:24 77:3
86:12,14
88:20
**creditors**
2:10 3:2
10:18 35:9
47:8 54:4
68:7 71:3,4,9
88:22,24
89:10 100:15
103:10,13,18

104:5
**CRO** 4:9 8:16
18:17 19:23
61:6 63:11
66:14
**CRO's** 18:23
**current** 4:3
8:6 10:13
12:18 31:13
49:15
**currently** 7:4
12:8 33:21
56:3
**cursory** 45:13

———————————

**D**

———————————

**D'MYO** 45:5
47:24
**dais** 89:4
**damn** 67:18
**date** 38:16
49:15 50:16
82:13 87:8
93:11 94:12,
19
**Dated** 72:5
**day** 77:24
82:19
**days** 27:16
72:9 86:21
**deal** 51:6
95:19
**dealing** 64:17
**debt** 28:20
30:11 32:13
33:4,18
**debtor** 2:23
3:18,25 4:14
5:8,18,22
6:2,5,6 7:2,
4,15 8:2,5,9,
11,13,20
10:4,5,9,10
11:6,10 12:2,
4,7,10,14
13:25 14:18,

24,25 16:21,
25 17:5,24
18:13 19:7
21:5 27:17,22
28:2,8 29:2,
18,22 30:1,2,
16,22 31:13,
16 32:7,12,18
33:3,9,20
34:5,24 36:6,
14 37:7,14,
15,22 38:9,
15,20,21,24
39:5,8,11,17,
19 40:1,10,14
44:11,18,20
46:4,13,14,
23,24 47:6
48:1,8,18,23,
25 49:3,19,24
50:3,6,8,16,
18,21 51:11,
24 52:14
53:5,10,17,
19,23 58:5,7,
9,12,16 59:8,
14,16,18,20,
23 60:15
61:19,22
62:4,10,11
72:25 73:2,3,
13,18 74:10,
20,24 82:14
85:13 90:4
91:4 101:9,
11,17 102:3
104:2
**Debtor's**
2:12,17 4:11,
17,20 15:19
16:24 22:17
31:20 34:5
38:23 39:1,3
43:9 47:11
60:11 66:12
73:3 83:8
**Debtors** 7:13
19:11 20:2
38:19

**debts** 4:17
87:23
**decision** 11:9
47:18,19
59:23 60:11
94:11 95:2,5,
7 103:19
**decision-
making** 61:8
**decisions**
11:11 60:16
**deem** 103:24
**default** 38:17
40:5 41:2
**defaults**
44:16
**defend** 39:1
**Defendants**
17:18,19,23
**defense**
38:11,12
39:23
**define** 57:14
84:3
**Degrees** 26:7
51:21,22
55:21 56:5,6,
11 57:19 71:8
**Delaware** 2:9,
20 5:21 50:9
**deposition**
78:1 84:17
92:21
**describe** 4:3
6:8 8:19
15:18
**described**
14:14
**describing**
14:16
**designees**
32:9,14
**detail** 12:19
**details** 23:24
38:6 64:4
81:19

**determination**
  94:14,19
**determine**
  64:14 72:2
  83:11
**did**   7:2 10:8
  13:25 21:19,
  20 23:8,14,16
  25:13 26:15,
  19,25 28:18
  29:7 31:16
  39:24 51:6
  54:10 55:5
  61:15,18
  63:21 64:3,8,
  14 65:5,22
  66:25 67:14
  68:15,18,19,
  23 69:3,5
  72:1 73:17
  74:20,21 75:7
  77:19 82:22
  83:10,18
  85:12 86:23
  90:1,5 91:13,
  15 95:6 97:23
  102:3,19,23
**didn't**   14:25
  28:8 58:17
  68:10 75:4
  76:4 77:10
  95:4 96:2
**different**
  6:13 14:15
  33:10,12
  34:15,19,21
  62:13 80:3
  93:19
**diligence**
  82:11
**directed**
  23:22
**directly**   6:16
  23:22 28:19
  47:12
**director**
  11:12,18
  47:17 55:21
  57:18 59:22

  60:1,14
**directors**
  30:23
**disbursements**
  29:22
**discorgement**
  45:17
**discuss**   67:8
**discussed**
  67:15 75:1
**discussing**
  55:2 67:11
**discussion**
  92:13
**discussions**
  50:20 61:21
  62:3 64:4,7
  66:24 67:3,9,
  10 96:25
  97:8,9
**dismissed**
  11:8
**disputed**
  35:24 39:4
  85:19
**distribution**
  100:15
**DNO**   31:1,3
**do**   3:10,14
  4:10,12,13,
  15,23 6:1,5,
  9,22 9:13,15,
  19 10:3 12:15
  14:9 16:2,12
  18:20 19:15
  20:12,14 21:9
  24:8,11,14
  26:17 31:15,
  18,19 32:9,
  17,21 34:12,
  20 35:4,5
  37:12 38:6
  39:9,18
  41:13,14,17
  42:20 43:13,
  17,20,24
  44:2,3 45:20
  47:24 48:2,

  10,11,22,24
  50:2,5 51:14,
  16 52:10,15,
  24 53:2,3,17
  54:6 55:10,11
  56:1,10 57:10
  58:25 61:19
  62:1,9,10
  68:8 70:17
  73:18 74:20
  76:6,11
  77:24,25 80:5
  83:6,13 85:3,
  14,16 86:1
  87:3,9 88:3
  90:16,20,22
  91:7,16 92:5,
  7,9,11 94:3,
  4,16 95:13
  98:6,13
  101:7,9
  102:1,5,7,10
**doc**   64:24
**docket**   22:14
  25:2 49:8
  52:5
**document**   4:7
  20:25 21:4
  25:6 45:15
  47:3 78:19,
  20,22 87:16,
  18,20 88:13
  90:22
**documentation**
  75:9
**documents**
  88:6
**does**   6:4,9,23
  8:2,13,15
  12:7,14
  18:13,22 19:6
  30:16 32:12
  33:3,19 34:24
  39:7,24,25
  44:4,20 46:11
  47:10,20
  50:6,16 51:11
  62:17 72:13
  76:19 89:15

  91:11
**doesn't**   5:22
  6:21 7:4 8:9
  26:14 40:15
  41:20 46:4,22
  49:18 50:21
  51:25 69:4
  70:14 75:15,
  24 76:1,5,21
  99:3,5,6
**doing**   44:23
  58:22 70:3
  93:19
**dollar**   38:7
**don't**   4:21
  9:13,17,21
  10:23 11:1
  19:13 20:2
  26:9 29:19
  31:8,9,10,12
  32:24 34:9,11
  36:17 40:3,8,
  18 41:17,21
  46:19,24
  47:22 48:4
  53:6 54:8,10
  59:1 60:19,23
  63:23 65:11
  66:4 68:9
  70:4,19,21
  74:12 75:16,
  23 76:14,24,
  25 77:1 78:18
  81:5,19 82:24
  85:9,12 87:6,
  19 88:5 89:5,
  7,18 90:10,19
  91:22 92:4,
  16,19 93:18
  94:1,3,4,6
  98:19 99:1,12
  100:16 101:21
**done**   84:19
  88:16 100:11,
  24 103:2
**down**   37:1
**draft**   68:16
**Drive**   5:14
  56:14

Ritchie Risk
July 31, 2018

10

dropped  17:7
due  82:10,11
  89:12
Duff  19:23
Durham  86:11
during  31:21
  63:1
duties  4:3

---

**E**

---

each  84:6
earlier  50:1,
  2 87:12
  100:15
early  14:25
effect  31:4
Eight  65:18
either  5:9
  10:5
electronic
  84:4,8
else  3:6
  50:22 100:10
  101:5 103:1,
  2,12
elsewhere
  66:6
employ  7:11
  19:23 28:22
  61:5,24
employed
  57:13
employees
  8:14 26:14
  31:2 45:4
  50:16 51:25
  73:19
employment
  92:22
empty  92:19
end  12:17
  23:1 65:12
  82:19 104:14
enforcement
  48:11,17

enough  68:6
entail  67:1
enter  3:2
entered  50:14
  72:10,11
  102:24
entities  6:15
  7:7,8 8:18
  9:10,11,13
  10:6,15 12:19
  19:12 20:1
  34:20 38:24
  41:23 42:6
  45:18 55:1,4
  85:21,23 86:1
  101:8,10,16
entities'
  46:25
entitiy  33:12
entity  7:6
  10:6 11:18
  20:4,5 26:13
  28:15 29:16
  32:13 33:7,
  10,18,24,25
  34:3 35:10
  37:15 39:7
  41:11,12 42:6
  44:12 45:3
  56:9 59:7
  81:22 86:3
  89:11,23
  101:8
entry  52:5
equity  4:13
  34:13 35:1
erode  10:15,
  16
eroding  100:7
especially
  80:16
established
  6:2
estate  8:10,
  12 95:10
estimate
  64:20

estimated
  64:10
even  17:10
  68:9
ever  48:6,16
  89:3 91:22
  95:8
every  82:10
  88:4
everybody
  101:5 103:12
everyone
  99:25
evidences
  84:5
exact  35:4
exactly  72:1
examination
  2:13
example  48:18
  71:23 85:1
exception
  28:16
Exchange
  48:19
excuse  28:10
  34:7 58:12
  64:20 87:10
execute  38:23
executed  74:5
execution
  39:1
exhibit  91:8,
  10 96:21
  97:25
exist  10:5
  75:15 76:2
  84:8
existence
  84:6
exists  76:5
expand  38:2
expenditures
  62:24,25
  64:22
expenses
  29:23 32:21

  36:6,9 38:10,
  11
experience
  64:17
explain  27:18
  28:22 68:15,
  19 81:13
explained
  28:21 51:8
extensive
  23:17
extent  47:13
  61:20 67:3
  97:5
external
  43:10,15

---

**F**

---

F-F-R-E-Y
  19:3
facilitate
  4:7
facility
  30:1,9,10
  33:22 36:8
  75:7,10
fact  65:6
  82:16 89:2,
  16,17,19
failure  43:10
fair  9:7
  29:12 57:6
  85:11
fairly  65:2
faith  13:7
  14:21
familiar
  21:15 26:10
  43:16 44:13
  45:9,12 73:22
  85:5,7 89:23
  91:11
familiarity
  4:10
fan  67:19

far  46:15
78:10
favor  37:23,
25 104:4
February  65:1
feeder  6:14
feeling  70:16
fees  12:24
13:14 15:5
31:21 63:2
64:9,11,15
94:23
Fernandez
71:24 73:17
fight  96:18
figure  77:13
84:24
figuring
100:19
file  10:9
11:10 31:20
33:4 62:22
filed  2:6
7:12 10:10
12:5 19:22
20:18,20 21:5
22:15 24:18
32:3 37:11
41:9 61:5,9
68:17,18
82:17
filing  11:7
18:14 49:15
72:9 74:1
82:21 86:21
89:4 100:14
fill  54:16,17
filling  4:6
final  26:18
47:19 60:11
finally  24:21
finance  62:19
financial
2:12 4:11
11:5 20:10
22:18 23:9
24:3,9 27:14,

16 28:23
40:25 48:23
49:8 96:19,21
97:3
financier
33:19
financing
28:4 32:8,13,
18,22 33:4
37:11,16
find  42:7
102:19,21,23
fine  22:24,25
24:7 42:14,22
43:3 54:12
60:22 70:18
78:15 85:10
86:9 88:10
96:17 98:12
fines  45:17
finish  85:25
firm  13:2,18,
19 26:4 77:20
firms  13:15
first  7:6
8:18,22 9:11
10:6 13:22
14:23 15:4
17:12 27:15
39:2 45:23
52:22 54:18
65:22 90:24
93:25
five  30:12
78:24
five-minute
100:18
fixed  69:1
flow  27:19
28:19 62:23
flowed  27:19
flows  65:11
focusing  15:8
follow  36:19
for  2:2,3 3:4
5:6 6:8 8:19
10:9,10 11:10

12:5 15:1,9,
13,18 17:4,14
18:24 26:13
27:23 28:2
29:23 33:4
35:12,21
36:7,8 38:9,
12,18,19
39:22,23 40:8
42:8 43:10
46:15 47:1
48:18 49:16
50:8,10 52:25
55:1,3 56:5
57:13 58:5,6,
8 61:4,10,19
62:5,10 63:14
64:15 68:14
72:12 73:8,
17,18,23
78:24 79:18
80:9,22,24
81:1 84:13,15
85:1,2,12
86:20 87:13
88:7,8 89:13,
16 90:5 91:7
96:14 98:18
103:12 104:4,
11
forget  73:16
form  11:2,4
34:8 43:24
44:8 65:25
70:1 84:8
formal  76:14
formation
65:2 103:18
formulate
66:14
forward  54:7
found  44:23
founder  45:3
four  17:22
72:9
Frank  71:23
frankly  60:24
70:13

fraud  17:5,7
53:22,25
fried  70:13,
19
frivolous
10:14 12:17
100:6
from  2:19
4:21 6:13 8:6
10:14 13:12
16:9,18 32:8,
13 37:16
39:1,3 41:24
44:24 45:14
49:14 52:18
53:7,15 56:14
62:12 63:16
66:11 67:25
68:16 69:15
74:23 80:16,
17 82:21
95:14
front  10:24
40:19
fun  51:5
fund  6:7,10,
13,14,16,17,
21 8:23 9:9
11:12,16,20
12:1 15:24
16:9,11,18
23:12 25:16
32:22 47:14
71:12 89:22
funds  6:14
7:8 16:3,10
26:10 27:18,
19 28:9
34:11,15
52:17 53:7

_____

G

_____

G-E-O  19:1,2
gathering  4:8
gave  14:15
20:15 52:15
64:13 73:23

Ritchie Risk
July 31, 2018                                    12

**Geff**  18:25
  19:22
**generic**  23:24
**get**  42:8
  45:14 67:23
  79:13
**getting**  60:24
**gist**  100:9
**give**  3:11
  9:18 66:25
  94:7 99:3
  101:4
**given**  61:22
  88:19
**gives**  77:23
**Global**  28:5,6
  30:2,4 32:9
  33:18,23
  34:3,25 35:10
  36:13,24
  37:3,8,19
  45:1 74:23
  85:1,6 87:10
**go**  5:22 7:11
  13:10 32:22
  36:1 65:1
  77:25 78:8,21
  79:12 80:5
  88:4 90:20
  100:19 102:18
**goes**  65:1
**going**  6:21
  13:9 22:11
  23:2 34:8
  35:25 46:17
  47:8 58:21
  61:19 62:10,
  11 65:23 66:1
  67:2 70:1
  76:23 78:8,14
  81:6 92:17,18
  93:12,13,21
  95:18,23 97:4
  98:23 100:20
  101:12,22
  102:1 103:21
**gone**  68:5

**good**  2:1
  66:23 84:24
**got**  73:15
  76:13 77:25
  80:2
**gotten**  54:9
**granted**  17:10
  37:7
**great**  66:8
  79:16
**gross**  17:6
**grounded**
  89:16,19
**grounds**  17:4
**group**  51:21,
  22 55:21
  56:5,6,11,17
  57:1,5,19
  71:8
**guaranteed**
  4:16
**guess**  36:16,
  25 40:7 62:22
  89:17
**guidelines**
  31:17
**Gunster**  77:20
**guy**  60:10
**Guys**  103:8
**Gwynne**  2:19,
  25 4:23 5:13,
  17,25 6:25
  7:20 9:19,22
  11:2,21 14:9,
  12,20 17:18,
  20 18:11,18,
  20 19:1,3,5,
  22 20:15,22
  24:2 26:9
  27:12,22
  28:13,16
  30:10,21
  31:2,5,8 33:1
  34:7,18 35:2,
  15,18 36:3
  38:13 39:13,
  16 40:5,12,23
  41:2,16,20,22

  42:7,10,20
  44:2,5,16,20
  45:23 46:8,
  11,21 47:7
  48:9 49:2,6,
  10,12,18,22
  50:1,12 51:1,
  10,24 52:20
  53:20 55:10,
  12 56:19,23
  57:3,10
  58:17,21 60:4
  61:4,8,14,20
  62:7,13
  65:13,25 66:4
  67:2,6 68:21
  69:6,16 70:1,
  9,12 72:17,
  21,25 73:2,7,
  9 74:2 75:17,
  21,23 76:1,9,
  16,19 77:4,8,
  23 78:5,7,18,
  22 79:1,7,24
  80:2,12,15,21
  81:1,10,16,17
  82:7 83:6,20,
  23 84:14,16,
  22 85:22,25
  86:5 87:15,
  18,23 88:5,9,
  13 89:13,20
  90:7,10,13,25
  91:19,22
  92:4,17
  93:18,21,24
  94:4 95:18,23
  96:4,8,13
  97:4,11,15,
  19,22 98:2,4,
  9,17 99:3,12,
  15,18 100:3,
  14,25 101:2,
  12,24 102:13
  103:3 104:1,
  12

_____

**H**

**Hackman**  2:1,
  7,24 3:1,6,
  15,20,24 4:2,
  10,13,16,19
  5:2,6,12,16,
  24 6:1,4,8,19
  7:19,23 8:1,
  9,13,18,25
  9:4,6,12,21
  10:3,8,20,25
  11:9,17 12:4,
  7,10,14,21
  13:1,4,10,17,
  23 14:2,4,7,
  11,19 15:12,
  14,17 16:2,
  12,15,19,24
  17:13,24
  18:2,4,7,13,
  22 19:4,6,10,
  15 20:7,12,
  16,24 21:3,7,
  12,15,19,23
  22:1,5,9,11,
  14,17,22
  23:1,4,8,14
  24:5,7,12,15,
  19,21,24
  25:2,5,10,13,
  20,23 26:3,8,
  15,20,22
  27:1,5,10,21
  29:11,14,16,
  21 30:13,15,
  16,19 31:1,3,
  6,11,13,16,
  19,24 32:2,
  12,17,21
  33:3,6,14,17
  34:2,23 35:7,
  17,20,25
  36:10,16,19,
  21,24 37:3,6,
  14,18,21 38:5
  39:6,10,15,
  18,24 40:7,

Ritchie Risk
July 31, 2018                                    13

16,21 41:1,6,
8,15 42:1,9,
12,17,24
43:2,4,8,13,
15,17,20,23
44:4,6,8,18,
22 45:9,14
46:6,10,14,20
47:2,10,20,24
48:6,13,16,21
49:5,7,11,13,
21,23 50:2,6,
23 51:9,11,
19,22 52:2,5,
10,15,24
53:3,8,17,22
54:1,4,7,12,
16 55:15 62:9
68:13,23
75:19 77:10,
13,15,17
78:7,9,12,15,
25 79:3,15
92:24 93:2
96:13 103:10,
13 104:8,13

**had** 3:24 4:16
5:20 13:19
14:21 16:10
17:11,13
19:16 21:23
30:20 33:7,8
38:25 40:19
44:23 46:3
48:24,25
49:3,19,20,24
50:4 54:8,13
60:9 61:10
64:17 67:12,
13 71:6 80:10
82:18 92:13
95:25 96:2,9,
25 97:8,13,16
100:17,18

**hand** 3:10
54:18

**handing** 91:9

**happened** 68:4

**has** 7:15 10:4
11:8 12:4,10
14:18 20:3
27:17 29:2,3
33:21 40:15
46:14 48:6,
16,23 49:24
51:15,17,24
53:17 61:9,11
73:2,18 74:2,
22 77:2 84:1,
9 86:3
103:16,19

**hasn't** 50:17

**have** 2:10
3:21 4:10,18,
21 5:21,22
7:4 8:2,13
9:15 10:23
11:1 12:7,23
15:9 18:14
19:6 20:12,16
21:13,23
22:11 26:14
28:8 30:16
32:24 33:19
34:8,15,20,25
35:9 36:6
39:8 40:9
41:12 47:10,
25 48:3,4
50:6,16,19,21
51:11 52:25
53:9 54:2
55:2,10 61:6
62:24 63:11,
24 64:3,8
65:11 66:4
67:8,12,13,14
68:8,9,11
75:10,11 76:6
81:22 82:1,3
85:2 88:17
89:8,10,20
90:16,20
92:21 95:10
96:6,25 97:23
98:13,22
99:1,3,6

101:10 103:8,
14

**haven't** 46:3

**having** 35:11
47:4

**he** 11:14,25
12:1 14:13,21
15:8 19:25
20:3,4 41:17,
20 47:20
58:23,25
60:16 61:18,
19,25 62:11,
17 66:25
68:4,23 72:2,
14 73:10 74:7
75:17,19,24
76:4,19,21,22
77:23 83:23,
24,25 91:25
93:24,25
96:13 97:13,
16 99:3,5,6,
12,15 100:3,
15

**he's** 14:16
24:2 41:17,18
55:3 59:22
60:3 62:10
73:6,15 75:21
76:19 80:12
93:21

**hear** 75:4
88:17 103:14

**heard** 60:9
75:3

**held** 3:21,24
52:7

**help** 21:20
25:13

**her** 25:18,25
26:1 63:20

**here** 2:2,8
3:4 5:22
20:16,17
35:15 36:10
42:13 44:1
55:1,20 58:22

65:4 70:6
72:21 77:25
78:8,21
79:12,14,20
80:4,17,22
81:16 89:12
91:18 98:13
99:25 104:4,
11

**Hernandez**
73:21

**Hey** 14:9

**high** 52:22

**highlighted**
22:22

**him** 34:12
45:24 67:18
72:22 78:3,18
79:11,25
80:18 87:16
88:13 91:23
95:23 97:10,
13,15

**himself** 2:17

**his** 21:16,18
52:16,18 53:7
73:23 82:7
83:7 87:19
90:7 91:24
98:9

**history** 7:12

**holder** 34:13

**holding** 7:16
86:10

**home** 56:15

**hour** 58:23
80:22

**hours** 100:17
104:4

**house** 71:8

**how** 3:20 7:2
8:19 74:12,13
77:24 78:7
89:5 93:16
100:23

**however** 6:20,
21 8:15 38:7
47:17 83:14

**Huizenga**
15:19,23
16:3,9,21,25
17:4,10,13,
14,15 38:11,
22 53:19
55:1,3
**Huizenga's**
48:9
**hundred** 65:18

---

**I**

---

**I'LL** 13:9
51:9 68:19
70:25 76:3
90:19 91:7
93:3 96:17
101:4
**I'M** 2:7 5:2
6:23 10:7
11:18 12:6,9
13:1 16:23
17:2,3 19:9
22:11 30:18
34:7 39:15
40:7 42:22
43:1,3 45:7,
12,24 46:18
48:20 55:1,7,
8,25 57:4
58:3 59:15
62:5,18,19
67:2,25
68:10,14
70:1,18 71:5
72:20 73:22
75:19 76:23
77:6,10,15
78:2,9,15
80:14 81:5
85:7 87:25
89:1 90:12,13
91:9 92:17
93:12,13
94:7,8 95:18,
23 97:4
100:20
101:12,22

102:1 103:11,
21
**I'VE** 22:19
**if** 3:9 5:20
6:25 9:13,21
10:4 12:20
14:9 15:3,20
19:15 20:18
25:3,5 26:9
30:25 31:8,24
34:11,12
35:2,7 36:3
38:14,24
40:19,24 42:3
43:20,24
45:10,20
46:12 47:24
49:21 51:15
53:3,17 54:7,
8,16 62:2
66:9 67:8
68:11,19
69:6,8 70:10
71:5 73:14,15
76:4,5,11
77:23 78:12
79:19 80:15
81:7 82:24
84:14,16,18,
19 86:5 87:7,
21 89:16
90:6,18 91:6,
7,8 92:7,9,21
93:2,21,24
94:11 95:20
97:8,13,16
98:18 99:4
100:23 101:13
102:11,20
103:20,23,24
**II** 7:10 10:1
**illegal** 44:25
**Illinois**
17:20 18:4
40:17 66:6
**immediate**
94:10
**implies** 91:25

**impression**
45:14
**in** 2:8,20 3:2
4:3,14 5:21
6:10,14,17
7:8,11,13,18
8:5 9:9
10:12,23
11:13 12:8,
15,23 13:7,13
15:23 16:3,6,
7,9,10,11
17:12,14,16
19:24 20:5,9
21:20,21
23:8,21 24:8
25:18 26:16,
23 28:21,23
29:4,5,7
30:17,21
31:3,22 32:2,
5,7,23 33:1
35:1,8 36:24
37:3,23,25
38:10,11,19
39:11,13,17,
19 40:13,17,
19 41:8 42:2,
4,10 43:24
44:8,17,19,
23,24 45:12,
16,18 47:3,9,
11,15,21
49:3,19 50:9,
12,22 51:5,6,
12,14,16,17
52:2 53:10
54:4 56:8,11
57:12 60:6
61:10 62:3,7
63:3 64:17,23
65:23 66:1,5,
24 68:25
69:7,21 71:3
74:24 79:20
82:16 83:19,
24 84:8 86:4,
21 87:9 88:1,
22,24 89:2,

16,19 91:13
92:6,10,23
93:7 95:19
96:19 97:7
99:9 100:11
101:5,9
103:8,13,16,
18 104:6
**in-house** 55:5
**inappropriate**
80:18
**inaudible**
4:25 8:6 9:20
17:8,21 20:15
23:17 28:20
34:7,13 45:4
54:19 56:23
59:5,13 60:20
61:14,20,25
63:12 65:6
67:6,11 68:1,
3,10,22 69:2
70:9,12 72:18
73:8,24,25
74:17 76:1,12
77:24 78:23
79:1 80:8,21
81:16 82:11
84:18,20
87:10 90:17,
20 91:20
94:21,24
95:9,20 96:24
97:17 98:17
100:7,20
102:17
**included**
69:14
**includes**
14:20
**including**
13:15 97:6
101:6
**income** 48:24
49:1,3,14,19,
24 50:4 73:19
**incorrect**
19:21

**incorrectly**
47:12
**increased**
74:14
**increasing**
30:8
**indemnificatio**
**n** 14:17 15:7,
9,20,25
35:12,21 36:7
47:5 52:7,13
53:10 80:9
96:10
**indemnifies**
53:13,15
**indemnify**
101:11,17
**indemnity**
93:6
**independent**
61:8
**indicated**
7:20 48:23
**indirect** 35:1
47:15
**information**
24:8 25:18
26:16,23 27:1
48:5 67:15
**informed**
95:15
**initial** 2:3
30:22 33:1
**inquiring**
46:24
**inquiry** 92:18
96:14
**insider** 36:11
**insolvency**
20:6
**instead** 19:20
69:19
**instruct**
61:23 95:23
**instructed**
30:3

**insurance**
13:8 30:17,25
38:9 39:22
40:2,10
**insured** 14:24
**insurers**
14:22
**intellectual**
29:4,9
**Intelligence**
85:2,6
**intend** 12:14
32:12 33:3
**intended** 36:5
**intention**
18:14
**interest** 37:7
40:13 42:4
75:12 76:7,12
**interests**
4:14
**interim** 4:8
**internally**
71:7
**interview**
30:22
**into** 6:10
50:14 72:10
92:18
**introduce**
2:17
**invest** 6:11
**invested** 6:17
7:9 9:9 15:23
16:10
**investing**
16:11
**investment**
6:6,16 7:14
16:3,9 26:10
34:11 52:22
58:2
**investments**
6:15 7:17
16:5
**investors** 6:9
34:16,22

**invests** 6:14
**invoice** 27:23
82:5,10,22
83:3,11 94:23
**invoices**
23:18,21,23,
25 28:11
33:15 71:14
82:10 83:14,
15,17,19,25
84:2,3,10,19
89:25 90:3
**involve** 46:4
**involved** 11:6
53:19
**involvement**
47:11,16,25
**involves**
48:17 67:3
**involving**
44:10,25
61:22
**Ireland** 7:10
9:24 10:1
**Irish** 9:10,13
10:6
**Iron** 87:11
**is** 2:5,7,9,
14,20,21 3:20
4:20,22 5:5,
14 6:6,13
7:1,15,23
8:3,5,16,21
9:6,8 11:8,
22,24 12:23
14:10 15:2,
12,17,19,22
16:19 17:1,4
18:7,8,9
19:17 20:17,
24 21:4,5,18
23:4,5,7 24:9
25:6 26:2,3,
5,6,17,18,20,
21 27:1,4,25
28:10,17,21
29:1,11,18,24
31:1,3,6,13

32:10,15
33:10,12,25
34:3,13
35:11,16,23
36:5,10,12,18
37:8,12,14
38:13 39:10,
13,21 41:1,13
42:15 43:13,
15,25 44:9,
12,16 46:8,16
47:1,4,14
49:7,19
50:11,23,24
51:14,19
52:7,12,17
54:24 55:21
56:1,19
58:12,15
59:4,6,12,17,
21,25 60:6,
10,12,13,24
61:2 62:11,17
64:14,22
65:7,9 67:19
68:4 69:2,23,
24 70:5,7,13
72:25 73:11,
14,20 74:11,
16,25 75:12
76:16 77:4,
14,15,19,25
79:4,5,10
80:8,9 81:17,
20,22 82:19
83:5 84:7,11,
17 85:6,19
86:10,16
88:19,21,24
89:9 90:3,18,
23 91:3,10,16
92:14 93:6,8,
16 94:10,18
95:16 96:20,
22 99:5,10
100:1,8,10,
11,25 101:2,
20 102:17

islands 5:11
51:12,14,16,
18
isn't 29:10
80:23 84:17
85:20
issue 43:11
93:5
issues 54:13
92:21
it 4:22 5:20
6:11,22 7:18
8:15 9:8
14:18,20
15:2,3 16:14,
16,17 18:2
21:13 22:1,6,
20 23:7,15
26:21,24 27:4
28:1,10
29:21,25
30:20,22
32:23,24
33:1,9,11,19,
21 34:3,12
35:23 36:5,7,
10 38:11
39:10,13,18
40:23 41:9
43:18 44:4,25
45:16 46:2,3,
5,11,23 47:2
49:2,14 50:23
51:25 52:12,
17 55:20 56:1
58:25 59:1
61:3 62:15
67:3 69:4,5
70:4,14,15
72:8,12
73:12,20
74:4,16
75:15,24
76:5,10,13
77:15,23,24
79:4,11,25
80:23 81:17,
20 84:7 85:20
86:4,21 87:2,

5,18,20 88:2,
14 89:9,15
90:21 91:3,7,
10,16,23,25
92:12,22
93:7,14,24,25
94:1 96:19
98:23 99:8,25
100:3 101:9
102:13,20,23
103:25
it's 5:17
7:16 11:3
19:1 21:8
28:8 29:5
34:18 36:4
39:16 40:21
42:19 46:12,
21 49:8 50:18
54:25 56:11
65:10,12 66:8
67:22,24,25
69:7,21 77:3
78:1 84:17
85:11 87:12
88:5,10 92:4,
20,21 99:6,22
item 22:14
25:2 49:8
52:5
itemizes 43:5
its 7:2,15
10:11 28:8
29:17 31:14
32:9,13 50:24
104:2
itself 15:7
21:4 23:12
26:14 40:12
88:7,8

———————————

J

———————————

J-A-K-U-B-O-W-
S-K-I 54:25
Jacob 54:19
Jakubowksi
54:24,25

55:7,11,14,
16,20,24
56:1,8,13,16,
20,25 57:6,
12,17,20,24
58:1,4,8,11,
15,19,25
59:4,8,11,13,
16,21 60:3,9,
18,22 61:1,7,
13,15,18
62:5,25 63:4,
6,10,13,19,25
64:3,7,13,19
65:3,9,14,17,
19,22 66:3,8,
16,18,21,24
67:4,17,21,
23,25 68:6,
14,25 69:12,
20,23 70:4,
16,19,23,25
71:2,17,20,22
72:1,5,8,12,
16,19,24
73:5,8,14,25
74:4,7,9,15,
19 75:3,8,12,
15,22 76:3,6,
13,18,21,25
77:6,9,12,14,
16,19 78:2,6,
11,16,21
79:13,16,22
80:1,4,8,14,
20,23 81:3,7,
13,18,21
82:1,4,12
83:1,4,8,10,
18 84:1,5,11,
15,21,24
85:5,9,15,18,
24 86:3,8,13,
18,20,23
87:1,5,17,22
88:1,5,8,10,
12,15 89:2,7,
15,19 90:1,16
91:2,6,13,16

92:3,5,12
93:1,3,12,16,
20,22 94:3,6,
18 95:1,4,8,
13,22 96:2,6,
12,17 97:10,
13,17,20,23
98:2,5,8,10,
12,25 99:8,
14,17,20,24
100:5,10,23
101:1,4,20
102:3,7,14,
19,22 103:1,
4,6,11
Joe 3:4
John 54:19
55:2
jointly 80:24
joke 67:24
Judge 2:5
judgment
13:22,24
14:23 15:4
17:10 18:12
37:23,25
38:7,8 44:17
52:19,20,21,
24 102:20,24
judgments
38:15,17,20,
25 39:4 40:6
41:3
July 2:2
20:18 68:17
72:5 82:18
87:9
jump 42:12
jumps 70:6
June 2:6 3:22
28:18 37:11
72:5 81:14,15
87:11 88:1
just 5:13,18
6:25 7:20
11:21,25
14:10,13 21:7
22:19 25:7,8

27:18 28:22
29:8 35:11,
20,22 38:4
41:18 42:15,
22,23 44:23
49:3 56:20,25
58:19 61:4,11
62:9 65:7
68:19,25
69:3,4 70:5,
19,21 71:3,22
72:13 73:9,16
74:4 75:17
77:6 78:2,5
79:8,24 80:14
82:16 87:25
89:11 90:11,
14,19 93:9
95:22 97:6
104:1

---

**K**

keep  13:9
  78:14
kept  5:9,10
killing  42:16
kind  70:7
knee  42:15
Knew  88:10
  101:20
know  6:2 9:16
  10:4 14:15
  16:12 17:2
  19:15 25:25
  26:9 27:17
  30:7 31:8,9,
  10,12,15,18
  32:17,21
  34:6,11,15
  35:2,4,5
  39:9,18 40:3
  41:13,20
  42:2,3 43:2,
  17,24 45:20
  46:16,19
  47:22,24
  48:22,25

50:3,15
51:15,16
52:10,15,24
53:3,6,13,17
54:8 56:10
60:20,23 62:9
64:25 67:20
69:1,7,24
74:12 75:24
76:4,5,11,14,
20,21,22,24,
25 77:1 78:2,
23 79:24 81:5
84:22 85:9,12
87:5,6 89:5
91:22 92:1,5,
7,9,11 97:18,
21 100:22
101:7,9,13,
15,18 102:2,
5,7,8,10,20
knowledge
  7:24 22:2,3
  24:13 25:22
  27:2,3 34:1
  48:3 50:17
  71:15 81:24
  91:18,24
  95:11
knows  41:17
Kurt  2:19
  54:19

---

**L**

L.l.c  28:14
  56:11
L.L.C.  2:4,22
  3:17 11:20,
  23,24 12:12
  27:25 28:5,6
  30:6 33:16,25
  37:24 38:1
  39:7 40:1
  41:11,12 42:5
  44:11 45:3
  46:7 47:18
  51:15 56:4,6
  59:10,17,20

60:1,6,8
71:21 89:23
Lancelot  20:5
largest  82:17
  104:5
Larson  87:13
last  24:18
  48:25 49:3
  50:3 96:23
  102:16
late  44:25
  54:11
later  70:15
Laura  63:20
Laurie  25:25
law  13:14
  43:11 77:20
lawsuit  44:14
lawsuits
  10:14,20 44:6
  100:6
lawyer  62:18
  67:9
lawyers  67:5
leading  45:15
learn  65:22
lease  5:17
least  11:7
  13:7 15:2
legal  12:24
  13:14 27:23
  38:13 43:9,25
  51:2,4 62:6
  64:11,18
  70:2,4,10
  81:1,11 84:15
  97:7 98:18,20
  99:4,6
  101:13,24
length  9:1
less  15:1
  29:22
let  43:2
  45:23 66:9
  71:22 79:11
  85:25 90:1
  92:7

let's  26:17
  27:22 71:2
  78:14,23 92:8
letter  103:17
liabilities
  2:12 20:9
  24:25 25:14
  31:14 73:4
liability
  46:15
liable  80:24
Liberty  56:14
licensed  5:19
  47:14
licensing
  29:5
life  6:18
  7:5,17 8:22,
  23
like  3:8 20:7
  21:16 27:13
  30:24 34:14,
  21 40:14 45:1
  46:2 57:15
  69:5 87:10
  92:20
likelihood
  98:14,21
limited  9:24
  10:2 74:23
  82:10
line  23:2
  70:24 92:18
  95:3
Linkedin
  55:17,18
liquidation
  18:15
list  10:23
  11:3 29:7
  68:7 82:16
listed  5:7
  23:25 29:10
  30:11 35:11
  41:3 44:1
  46:21 47:4
  50:13 51:14
  63:3 64:24

85:19 88:22,
24 97:2,24
**listen** 68:19
93:22 94:6
100:16
**listing** 71:10
**lists** 11:5
52:6
**litigated**
40:6
**litigation**
7:16 8:5,7
10:12 11:6
12:17 36:5,9
38:10,19
39:11,14,20
40:16 44:1,13
48:7,10,17
65:23 66:1,5
92:7,10 98:21
99:10 100:2
102:4,22,23
**little** 7:15
72:19
**loan** 36:7
73:11,12
74:22 75:5
76:8,15
**locations** 5:9
**long** 3:20
54:25
**longer** 77:25
78:8
**look** 15:3
22:20 25:5
31:24 35:7
40:24 45:1,11
47:8 69:4
71:2 72:2
77:21 79:11,
19 82:22
83:11,19
84:13 87:8
91:8,11 94:11
**looked** 72:3
82:5,25
83:24,25

**looking** 35:15
46:2 49:6
68:10 83:13
**looks** 21:16,
17 22:21 45:1
46:2
**lost** 14:25
**lot** 26:10
41:23 69:8
87:7,9,21
**LTD** 28:12,14
29:16 30:2,4,
5 32:9 33:7,
10,13,18,24
34:3,25 35:10
36:14 37:8
45:2 58:13
**lying** 73:15

_____

**M**

_____

**made** 11:9,12
16:3,6,7 22:6
24:16 27:6,15
29:21 69:7
89:3 94:13,19
95:2 103:19
**mailing** 5:4
50:13 69:15
**make** 14:13
25:9 56:20
58:19 95:6
98:20 99:4
100:19
**makes** 47:18
59:22 60:10,
16 65:8
**Making** 100:14
**malpractice**
43:9,25
**man** 102:10
**managed** 41:24
**management**
11:19,24
27:24 28:7,12
30:5 33:13
45:2 46:6
57:8 58:13

60:1,14
**manager**
11:12,20,22,
24,25 23:13
25:17 26:6
27:25 28:1
32:4 46:8,9
58:2,8,16
59:6,12,17
60:2,4,5,7,15
**managing** 2:22
3:17 6:22
11:15,22,24
12:2 27:25
32:4 46:8
55:21 58:7,8,
11,15 59:4,6,
12,17 60:5,7,
15,17 63:18
84:9 98:16
**many** 9:17
**Marco** 21:1
**Marello** 45:5,
6
**married** 26:1
**material**
69:23 70:7
**matrix** 41:8
**matter** 18:8,9
46:11 97:19
**may** 36:6
44:18 53:9
77:21 95:10
**maybe** 36:19
68:11
**Mcguire**
13:16,19 14:3
**MCL** 42:18
**me** 6:8 7:1
8:19 9:19
10:24 13:8
15:18 18:24
28:10 29:17
32:25 34:7
40:19 41:10
42:16 43:2
45:23 55:2
58:13 61:21

64:20 66:9
67:6,19 69:3
71:5,22 78:20
81:13 84:19
85:25 87:11
88:4 89:24
90:1 92:7
96:14 97:6,9
**mean** 4:23
34:19 39:14,
25 41:23
44:2,3 46:23
48:9,11 51:4
57:4,10 65:10
66:1 68:21
69:9,21 70:4,
14 72:13
77:11 80:15
83:6 86:2
**means** 35:2,5
38:3 47:7
70:8 75:23
87:21 88:2
**meet** 61:15
**meeting** 2:3,
9,14 36:21
78:1 103:22
**meetings** 5:21
50:10,20
**member** 2:22
3:18 6:22
11:16,25 12:2
58:7,12 59:5
60:6,15,17
63:18 84:9
98:16
**members** 34:20
**memory** 4:22
11:1
**mention** 27:13
29:1,8 46:22
**mentioned**
7:10 13:20
14:21 19:16
**merit** 40:15
**Met** 67:19
**Michael** 2:21
45:5 47:25

mid-june
  50:15
middle  94:11
might  67:1
Mike  54:21
  90:10
Miller  54:20
  55:3
million  8:8
  10:12 12:23
  13:7,11,13
  14:21 15:3
  16:6,17 30:14
  32:20 35:11,
  19,20,21
  37:22,24
  38:7,8,12
  45:16 46:1
  47:5 52:6
  69:11 72:13,
  23 73:6,10,15
  79:17 80:6,25
  85:20
mind  9:21
  14:9 22:22
  25:3 43:20
  70:13,14
  90:19
minute  22:19
  45:10
minutes  58:23
  78:24 80:22
  100:21 104:4
misinformation
  9:18
mismanagement
  53:23,25
miss  100:20
missing  68:15
misspoke
  49:21
misstates
  82:7
modified
  35:14
modify  63:12
money  6:9
  47:9

month  65:12
  87:12
monthly  32:24
  33:1 63:4
months  64:23
more  29:22
  95:25 96:1,2,
  7,9,16 100:24
Morello  47:25
morning  54:14
most  100:17
motion  33:4
move  70:25
Mr  2:1,19,24,
  25 3:1,6,8,
  14,15,19,20,
  22,24 4:1,2,
  5,10,12,13,
  15,16,18,19,
  21,23,25 5:2,
  5,6,10,12,13,
  16,17,24,25
  6:1,3,4,6,8,
  12,19,20,25
  7:19,20,22,
  23,25 8:1,4,
  9,11,13,15,
  16,18,21,25
  9:3,4,5,6,8,
  12,15,19,21,
  22 10:3,7,8,
  10,20,23,25
  11:1,2,9,11,
  13,17,19,21
  12:3,4,6,7,9,
  10,13,14,16,
  21,22 13:1,3,
  4,6,10,11,12,
  17,21,23,24
  14:2,3,4,5,7,
  8,9,11,12,19,
  20 15:11,12,
  13,14,16,17,
  23 16:2,4,12,
  14,15,16,19,
  22,24 17:2,
  13,15,18,19,
  20,22,24

18:1,2,3,4,6,
  7,9,11,13,16,
  18,19,20,21,
  22,25 19:1,2,
  3,4,5,6,9,10,
  13,15,16,17,
  18,19,22,24
  20:7,11,12,
  14,15,16,20,
  22,23,24
  21:1,3,6,7,
  11,12,14,15,
  17,19,22,23,
  25 22:1,3,5,
  8,9,10,11,13,
  14,16,17,21,
  22,24 23:1,3,
  4,7,8,11,14,
  16 24:2,4,5,
  6,7,11,12,14,
  15,17,19,20,
  21,23,24
  25:1,2,4,5,7,
  10,11,13,15,
  20,21,23,25
  26:3,5,8,9,
  15,19,20,21,
  22,25 27:1,3,
  5,8,10,11,12,
  21,22 28:10,
  13,14,16
  29:11,13,14,
  15,16,19,21,
  24 30:10,12,
  13,14,15,16,
  18,19,20,21
  31:1,2,3,5,6,
  7,8,10,11,12,
  13,15,16,18,
  19,23,24
  32:1,2,11,12,
  15,17,20,21,
  23 33:1,3,5,
  6,12,14,15,
  17,21 34:2,6,
  7,17,18,23
  35:2,4,7,13,
  15,16,17,18,
  20,23,25

36:2,3,10,15,
  16,17,19,20,
  21,23,24
  37:2,3,5,6,
  13,14,17,18,
  20,21 38:4,5,
  6,13 39:6,9,
  10,12,13,15,
  16,18,21,24
  40:3,5,7,12,
  16,18,21,22,
  23 41:1,2,4,
  6,7,8,14,15,
  16,19,20,21,
  22 42:1,7,9,
  10,12,14,17,
  18,20,22,24
  43:1,2,3,4,7,
  8,12,13,14,
  15,16,17,18,
  20,22,23
  44:2,4,5,6,7,
  8,15,16,18,
  20,22 45:7,9,
  12,14,23
  46:6,8,10,11,
  14,17,20,21
  47:2,3,4,7,
  10,13,18,20,
  21,22,24
  48:2,6,9,13,
  14,16,20,21
  49:2,5,6,7,
  10,11,12,13,
  18,21,22,23
  50:1,2,5,6,8,
  12,23 51:1,9,
  10,11,13,19,
  21,22,23,24
  52:2,4,5,9,
  10,12,13,15,
  17,20,21,24,
  25 53:2,3,4,
  6,8,9,11,13,
  15,17,20,21,
  22,24 54:1,3,
  4,5,7,12,16,
  24 55:7,10,
  11,12,13,14,

15,16,17,19,
20,23,24
56:1,3,8,9,
13,14,16,19,
20,23,25
57:3,6,10,12,
14,17,18,20,
22,24,25
58:1,3,4,6,8,
10,11,14,15,
17,19,21,25
59:2,4,7,8,9,
11,12,13,15,
16,19,21,25
60:3,4,5,9,
10,13,18,19,
22,23 61:1,2,
4,5,7,8,13,
14,15,17,18,
20,24 62:4,5,
7,8,9,13,15,
25 63:3,4,5,
6,8,10,11,13,
15,19,22,25
64:2,3,6,7,
10,13,16,19,
25 65:3,5,9,
10,13,14,16,
17,18,19,21,
22,25 66:3,4,
8,14,16,17,
18,19,21,23,
24,25 67:2,4,
6,7,12,13,15,
17,18,21,22,
23,24,25
68:3,6,13,14,
21,23,24,25
69:6,9,12,13,
16,18,20,21,
23 70:1,4,9,
12,16,18,19,
21,23,24,25
71:1,2,12,17,
18,20,21,22,
25 72:1,3,5,
7,8,11,12,15,
16,17,19,21,
22,24,25

73:2,4,5,7,8,
9,11,14,17,
20,21,25
74:2,4,7,8,9,
12,15,16,19
75:1,3,6,8,
11,12,14,15,
17,19,21,22,
23 76:1,3,4,
6,9,11,13,16,
18,19,21,22,
23,25 77:4,6,
8,9,10,12,13,
14,15,16,17,
19,21,23
78:2,5,6,7,9,
11,12,14,15,
16,18,20,21,
22,25 79:1,3,
5,7,8,13,15,
16,18,21,22,
24 80:1,2,4,
7,8,12,14,15,
20,21,23
81:1,3,5,7,
10,13,16,17,
18,19,21,24
82:1,3,4,7,9,
12,24 83:1,2,
4,6,8,9,10,
13,18,20,22,
23 84:1,3,5,
7,11,14,15,
16,21,22,24
85:4,5,7,9,
14,15,16,18,
22,24,25
86:3,5,6,8,
12,13,16,18,
19,20,22,23,
25 87:1,3,5,
15,17,18,22,
23,25 88:1,3,
5,8,9,10,12,
13,15 89:1,2,
5,7,13,15,19,
20,21 90:1,5,
7,9,10,12,13,
15,16,23,25

91:1,2,5,6,
12,13,15,16,
19,21,22
92:3,4,5,11,
12,16,17,24
93:1,2,3,11,
12,15,16,18,
20,21,22,24
94:3,4,6,17,
18,22 95:1,3,
4,6,8,11,13,
18,22,23
96:2,4,5,6,8,
12,13,17,25
97:4,6,9,10,
11,13,15,17,
19,20,22,23,
24 98:1,2,3,
5,6,8,9,10,
11,12,17,22,
25 99:1,3,8,
12,14,15,17,
18,20,22,24
100:3,5,8,10,
14,23,25
101:1,2,4,12,
15,20,22,24,
25 102:3,5,7,
9,12,13,14,
17,19,21,22,
25 103:1,3,4,
5,6,10,11,13
104:1,8,12,13
Ms  63:22
much  10:18
15:1 68:12
69:5 77:24
78:8
Multi  30:3
Multi-strategy
28:4,6 30:2,3
32:8 33:17,23
34:3,25 35:10
36:13 37:8
45:1 74:23
multiple  82:9
must  36:12
my  2:7,13
6:12 8:21 9:8

17:3 22:3
23:19 25:18,
21 27:3 28:10
29:24 32:15
33:25 39:21
42:15,18
47:15 49:23
50:17 52:17
54:24 56:15
62:15 65:2
70:13 71:15
73:14,20
74:16 81:24
84:7 88:18
90:23 93:16,
22 94:7,10,18
95:11 100:9
103:19 104:9
myself  77:7

---

**N**

---

name  2:7
12:11 13:1
18:23 19:12
20:4 25:24
26:1 29:3
51:19 54:24
63:20 86:4
101:8
namely  10:12
names  9:12,
17,22 19:25
nature  15:18
44:14
necessary
88:6 103:23,
25
need  22:6
24:16 27:6
42:15,24 52:1
87:19 94:15
98:19 100:19
needs  78:12
negligence
17:6
negotiations
5:20

never  22:22
75:8 96:6
new  7:13
80:18
next  20:7
36:1 64:23
no  4:1,15,18
5:18 8:11 9:2
12:6,9,13
17:11 18:1
20:14,22
21:22 22:24
24:17 27:9
28:16 30:25
31:2 41:14
42:22 43:1
44:15 46:14,
18 47:17
48:3,4 50:5,
24 51:25 53:2
55:7 56:23
58:3,6,14
65:8 70:13
72:21 73:14,
18,19 74:4
75:11 76:6
77:6 78:2,14
81:25 82:1,6
83:3 88:5
89:2 90:3,9,
10,13,15
91:15 92:11,
13 95:6,12,22
96:18 102:1
103:14
non-lawyer
98:20
none  27:17,19
nonexclusive
50:9
nor  35:5
67:14
North  86:11
not  4:15,18
5:17 7:16
8:2,15 10:7
12:6,9 14:10,
16 17:3,24

19:9,13,21
20:14 22:8
24:3 28:8,14,
20 29:5,19
30:18,24
31:15,18
35:4,5 37:11
38:6 39:9,15
41:14,16,17,
23 43:16
44:15 45:24
46:12,17,18,
21,25 47:21
48:20,24
49:24 50:5,
11,16 51:4,15
53:2,24,25
55:23 56:10
57:18 58:1,3
61:23 62:5,
18,19 64:23
66:8,17
67:12,13 68:1
69:8,17 72:21
73:4,11,22
75:7,11,14,
16,19,21,22,
23 76:5,11,
20,23 77:25
78:7 81:5,22
82:1,3,10
83:13,19,23
84:17,18
85:7,14,16
86:6,9 87:3
88:22,23 89:1
90:5 91:15
92:11,20,21
95:6,24 97:4,
6,19 98:1,3,
6,23,25 100:4
101:9,22
102:1,5
103:19
note  35:24
36:4 37:3
72:4,10 73:23
86:17,24 87:4
103:15

notes  23:18
36:24 37:19
nothing  3:12
70:14 88:21
notice  85:1
noticed  87:7
now  40:16
56:2 68:10,11
70:13 79:17
80:15 85:1
88:18 91:9
92:18 93:18
95:25 96:15
104:13
number  2:4
16:17 49:9
65:7,8 77:2
80:5 81:17
82:19 85:3
88:19,20
numbers  14:15
23:11,19 24:1
83:16
numeral  10:2
nunc  61:10

---

O

oath  3:9
object  34:8
51:1 67:2
70:1,9 92:1,
17 95:18,21
101:12
objection
56:19 65:25
72:17 76:9,16
81:1,10 82:7
83:6,20 87:15
89:13 91:19,
20 99:12
objections
64:5
objects  104:3
obligation
30:8 31:20
46:13 71:23
101:10

obligations
46:25 71:16
89:25
obtain  8:23
32:7,13,19
71:9
obtained
38:16
obtaining
37:15
obviously
10:17 30:20
36:12 87:6
occurred  88:1
occurrence
87:8
occurring
53:23
October  16:8
of  2:9,11,13,
22,23 3:13,
16,18,22
4:16,24 5:1,
3,8,9 6:22
7:5,6,15 8:5,
22 9:9,12
10:5,7,11,16,
17,24 11:5,7,
12,16,18,24,
25 12:2,6,9,
22 13:2,12
14:14 15:18,
21,25 16:1,5,
6,13 17:3,5,
24 18:11,14,
15,17 19:9,
10,13,20,21
20:10,17
21:8,24 22:1,
2,3,12,18
23:9,13,19,
23,24 24:3,9,
12,24 25:14,
16,17,21
26:10,13
27:2,3,5,12,
14,15,16,25
28:2,9,17,20,

23 29:17,19,
22 30:5,18,23
31:14,17
32:4,5,18
34:1,4,8,13
35:5 36:4
37:9,23,25
38:7,11,13,22
40:14,19,23,
25 41:23 42:4
43:5,11,17
44:1,4,5,6,
13,14,16,22,
25 45:19,22,
23,25 46:8,
13,15 47:17
48:20,23,24
49:8,10,11,
14,15,24
50:11,15,25
51:3,13,19
52:6,22
53:18,22,25
54:5 55:8,21
56:4,10 57:18
58:7,9,12,16
59:7,8,13,16,
17,19 60:1,4,
5,7,14,15,16
61:11 63:23,
24 64:8,11,24
65:1,11,12
66:12,25
67:24 68:8,
11,17 69:9,
15,19 70:2,7,
24 71:3,8,15,
18 73:21
74:24 75:22
76:7 78:17
79:6,18,19
80:3 81:8,24
82:17,19
83:16 84:1,6
85:20,22
86:1,6,7,11,
12,14 87:7,8,
9 88:4,11,16,
20,22,23

89:1,4,9 90:4
91:17,24
92:9,18 93:8,
11 94:7,11,
12,13,19,20,
24 95:10,11,
20 96:19,21
97:1,2,3,8
98:14,15,21
99:9,10,13,
18,19 100:1,
9,12 101:9
102:4,9,10
103:18 104:9,
14
off  79:2
office  2:8
5:15 26:12
50:7,9,24
51:12 101:6
103:16
officer  4:8
56:4,7 57:21,
23 58:5
62:17,21
98:15
officers
30:24
offices  5:22
official
103:24
often  26:11
Oh  53:21 68:3
77:14,15
okay  4:2,13
5:12,16 6:4
7:1 8:13,25
9:14 10:3,8,
25 11:9 12:22
13:23 14:11,
19 16:19
18:13,22 19:4
20:7,11,23
22:13,16
24:4,5 25:12,
20 26:8,15
27:21 28:13
29:11,21

30:13,15,19
31:11 33:6,14
35:7 36:10,
20,23 37:2,20
41:1,7,15
42:1,9,12,23
43:12,20
44:5,8,18,22
45:7 46:20
48:6,21
49:12,18,22
50:6 51:10
54:1,3 55:24
56:13,16
57:6,17,20,24
58:11 59:11,
21 60:3,18,22
61:7,13,18
62:25 63:10,
19,25 64:3,7,
19 65:12
66:16,21
67:17 68:5,8,
25 69:12,20
70:16,17,23,
25 71:1,17,25
72:8,24
74:15,19
76:18,21,25
77:8,17 78:9,
11,25 79:13,
16,21 80:20
81:3,7 82:4,
12,15 83:1
84:1,11,21
85:5,9,15,18
86:8,9,18,23
87:1,5,6,12
88:3,10,12
89:7 90:15
91:1,2,6,13
92:3,12 93:1,
15 94:9,17
95:1,4,8,13
96:23 97:22
98:5,8,10,12,
25 100:5
101:1,20,22,
25 102:16,17

103:1
on  2:2,6 5:7
14:21,25 15:8
17:5,9 21:7,9
26:17 27:16
28:18,20
29:22 30:5,8,
11 31:13
33:15 38:2,
16,23 40:13
44:13 46:21
48:5 49:4,10,
25 52:13
55:17,18
60:16 63:22
64:24 65:6,23
66:1 68:17
70:25 71:11
75:13 78:16
79:3,14,18
82:12,18
83:16,22
87:14 90:4,23
93:8 97:2,25
103:15 104:1,
9
once  93:19
one  5:9 7:9
11:6,7 15:8
16:5,7,18
17:24 18:2
24:18 25:8
28:16 34:13
44:16,22
49:13 51:5
57:15 59:22
63:21,24 65:9
69:9 79:6,8,
9,10 85:20,22
86:1 88:4,23
90:24 92:13
95:25 96:3,6,
9,15 102:9,15
103:8,24
ones  15:5
64:20 68:18
83:24
only  8:4
33:25 64:25

84:17 90:2
91:3
**open**  9:23,25
79:25 89:22
103:22
**opened**  89:25
**operate**  7:2
52:1
**operated**
41:24
**operating**
29:1,4,7
31:20 32:24
33:2 56:4
58:5 63:4
98:15
**operations**
8:3 30:25
51:25
**opinion**  25:19
47:15 65:2
98:23
**Opportunities**
37:24 41:11
44:11
**opportunity**
2:11 15:1
**or**  3:10,22
5:4,20 6:15
10:6 17:6
18:15 19:7
20:6 29:22
30:14 32:9,13
33:10 34:14
36:11 38:16
39:1 40:13
41:17,23,24,
25 42:4,21
45:17 46:12,
18 47:12,25
48:3 50:1,2,
17,20 51:25
53:22,25
62:19 64:20
66:1,6 68:16
71:8 72:9,22
75:16 76:5,6
77:4 82:6

87:19 88:1
90:10,13
93:25 95:22
96:21 97:25
100:11,12
102:20,24
**order**  46:1
**organization**
66:12
**original**  32:2
41:9
**other**  6:15,18
10:14 12:11
13:19 16:10
17:18,19
19:11 34:13
38:19 39:14
42:6 46:25
53:13 57:12
62:2 63:2
67:18 71:8,14
81:20 90:3
94:24,25 97:8
103:10,13
**otherwise**
5:23 38:1
88:17
**our**  46:21
79:6 92:22
103:15
**ours**  79:10
**out**  22:19
42:7 44:4,5
45:22,25
54:17 55:8
61:5,12 67:4
70:6 77:13
84:23,25
86:10 94:23
102:20,23
103:17
**over**  35:11,20
68:22 84:12
96:18 100:17
**overall**  34:4,
9
**owe**  47:8
72:16 73:10

102:15
**owed**  30:8
72:2 73:6
82:15 83:12
94:13,20
**own**  4:13 8:9
28:8 104:6
**owners**  35:1
**ownership**
42:4 86:7
**owns**  8:11
85:21

———————————

**P**

———————————

**p.m.**  2:2 79:4
**page**  21:7,8,9
23:5 26:18
49:4,10 64:24
78:16 79:18,
19 93:7,8
96:23 97:2
**paid**  12:24
13:14 14:22
27:24 28:3,
11,18 33:15
36:5 45:18,
21,25 72:13,
22 73:3,9
81:22 82:2,3
89:11
**Pan**  102:10
**paper**  84:4
**paragraph**
93:8,10
94:12,15
**paren**  9:23
10:1
**parenthesis**
9:24
**part**  32:5
34:4 37:19
49:13 99:18
**participate**
21:20 23:8
**particular**
6:17 23:21

82:6 83:19,25
**parties**  10:21
15:22 43:6
**partners**  2:22
3:17 11:23
34:5 56:4
59:9,17 60:6
**parts**  22:23
**party**  21:2
36:11 40:9
90:3
**Pat**  55:8
**pay**  31:21
36:8 38:9,12
39:22
**paying**  72:22
**payment**  28:2
64:8
**payments**
27:15
**pays**  50:8
**penalties**
88:16
**penalty**  3:13
**pending**  2:5
8:17 10:22
11:4 18:8,10,
12 48:7
**people**  47:9
63:23,25 71:7
**perhaps**  38:25
**period**  69:19
**perjury**  3:13
88:16
**person**  62:20
**personnel**
5:18
**perspective**
39:3 62:12
66:12
**pertaining**
52:22 67:15
**petition**  2:6
5:8 20:8,18
21:4,21,22,24
32:3,5 38:16
41:9 50:13,16

51:6,7 69:17
82:13 93:7,11
94:12,19
**Phelps** 19:23
**phonetic** 3:4
19:23 21:2
26:1 45:5,6
55:8 71:24
77:20 81:14
83:4 86:10
87:12 98:2
**physical**
50:7,21,24
51:12,15,17
84:4
**pieces** 44:1
**place** 4:23,25
5:3,21 17:12
30:17 50:9,
11,25 51:3,13
69:15
**Plaintiffs**
38:18
**plan** 18:15
62:22 66:12,
15,22 67:1,7
100:14
**plane** 54:13
**plans** 62:23
**please** 2:15,
18 3:3,9,16
4:2,19 6:9
8:19 12:21
15:18 18:23
22:20 25:5,24
31:25 35:8
38:2 42:17
43:2 48:15
51:20 54:8,16
59:3 77:22
78:14 79:20
81:14 86:16
91:7,8 92:8
93:9,22
96:20,23
99:23 101:19
**point** 7:14
18:14 27:8

32:14 61:11
66:20 78:13
82:21 91:25
98:24
**policies**
8:22,24
**policy** 30:23
31:3 40:2
**portion** 28:17
**posed** 2:16
**position** 3:21
4:4 42:3
44:19
**positions**
3:24
**possession**
32:8
**possible**
10:18 89:9
**post-judgement**
15:5
**post-judgment**
13:14
**post-opportunity**
15:6
**postpetition**
32:7 37:16
88:21
**potential** 8:7
10:13 33:18
52:12 92:13
95:16
**potentially**
10:16 39:2
50:2,19 53:8
80:17
**Potter** 13:16,
18 14:1
**pre-judgment**
12:24
**pre-petition**
92:6
**preferential**
37:10
**prejudgment**
15:6

**preliminary**
63:9
**premise** 50:21
**preparation**
91:14
**prepare** 25:13
**prepared**
23:12 25:17
77:2
**prepares**
62:17
**preparing**
21:20 23:9
**prepetition**
19:8 29:23
89:3
**presence**
51:17
**present** 55:23
67:5,9,14,16
98:4
**presently** 8:2
**preserve**
10:11 99:10
100:1
**press** 44:24
**previous**
12:10
**primarily**
12:17 13:14
**principal**
4:23,25 5:3
50:11,25
51:3,13 69:14
**printed** 22:19
**prior** 11:7
13:22 16:10
17:7,8 49:16
**privilege**
67:11
**pro** 61:10
**probably**
79:11
**proceeding**
48:12
**proceedings**
20:6

**proceeds** 8:5,
6 38:9,12
39:22 40:11,
13 73:23
74:18
**professional**
63:2 64:8,11,
15 81:20
87:13 95:10
**projections**
63:7,14,16
64:1 88:23,24
**promissory**
23:18 72:3
73:22 86:24
**pronunciation**
45:8
**proper** 27:20
**properly**
71:10
**property**
29:4,9 35:9
**proposed**
18:23
**protect** 10:17
38:21
**protection**
10:11
**provide** 14:25
26:12
**provided** 28:4
30:22 87:14
**provider**
23:13 25:17
26:6 51:17,20
71:14 102:10
**providers**
11:15 26:12
63:18 64:17
84:9
**providing**
62:3 95:15
97:7
**pull** 90:19
**pulled** 42:16
**purchased** 9:9

purchases
  6:23
purported
  86:14
purpose  36:8
  99:9,13,18,24
  100:1,3,4,5,
  12
pursue  12:18
put  6:9 12:17
  61:5 62:22
  63:16,17 64:1
  104:1

_____

            Q

_____

qualified
  46:18
quarterly
  31:21
question  34:9
  38:14 46:19
  48:14 51:1,2,
  3,4 59:2
  62:13 64:21
  66:9 67:3
  70:11 73:14
  76:24 77:4
  88:19 89:6
  90:8 92:2
  93:4,16,23,25
  94:7,10,16,18
  95:25 96:3,7,
  9,15,18 97:12
  98:9 99:23
  100:16 101:18
  102:2,6,16
  103:8
questioning
  70:24 78:9
questionnaires
  103:16
questions
  2:11,16 54:2,
  5 80:19
  100:24 101:24
  102:12
  103:14,25

quickly  69:3
quite  60:24
  70:13

_____

            R

_____

raise  3:9
  43:10
rate  76:7,12
RCM  23:24
  47:13,18
read  37:1
  46:3 93:9,24,
  25 94:1,8,14
  95:3
reading  93:14
ready  13:9
real  8:10,11
really  7:14
  51:25
reason  96:18
reasonable
  64:12,15
recall  9:13
  16:2,13 36:17
  38:6 40:18
  63:23 70:15
  81:19 82:24
  83:13 85:14,
  16 87:3 92:16
  95:13 98:7
receive  31:16
  40:10 95:14
received
  27:23 74:18
  103:16
receives  6:13
recency  88:19
recognize
  20:24 90:22
  91:2
recollection
  8:21
reconvened
  103:23
record  61:4
  79:2,4,14

103:15 104:2
recorded  2:14
recording
  79:15 104:14
records  5:8
  84:4
reed  2:19
  7:11 13:15,18
  14:8 28:18
  90:18 91:4
  92:9 94:22,23
  95:1
reeds  91:3
  92:7
refer  20:12
  61:24
reference
  43:8
referenced
  29:17
references
  47:2
referred
  10:21
referring
  12:1
refers  44:24
reflected
  74:24 89:12
reflecting
  75:5 76:15
regarding
  64:8 67:7
rehabilitation
  100:13
reimburse
  28:7 30:4
relate  8:19
related  7:7
  36:11 92:14
  93:4 96:10
relates  15:25
  46:23
relating  75:9
relationship
  9:1,6 15:19,
  21 19:7,20

29:18,20
  33:9,19 34:1
  36:18 39:7
  53:4 57:1
release  44:24
remain  45:21
remaining
  45:20,25
remember
  51:24 69:6,8
  83:24
remind  29:17
render  98:23
rented  5:19
reorganization
  18:15 62:22
  66:15,22 67:1
  100:12
repeat  18:23
  99:22
rephrase
  34:12 51:9
  66:9
report  33:2
  63:4,9
reports  31:20
represent
  100:11
representation
  92:14
representative
s  102:9
represented
  82:14 104:6
represents
  92:6,9
request  84:18
required
  101:17
research
  44:23
reserve  104:9
reserves
  104:2
respect  14:20
  20:2,3 27:15
  28:17 29:9

34:10 59:23
60:11 64:5
79:17 82:5,23
88:21 95:16
104:3
**response**
103:15,17
**responses**
2:15
**responsibility**
18:17
**restructuring**
62:16,21
**resubmit**
94:13
**retain** 91:4
**retainer**
28:18
**retention**
96:4
**return** 10:18
**review** 21:24
23:14 26:15
**reviewed**
23:11 25:18
26:22 82:9
83:15 89:22
94:23
**reviewing**
23:18
**right** 2:1
3:7,10,20
8:1,3 14:2,4,
7 17:11 21:3,
5,19,23 24:19
25:3 27:10
29:2,3 31:24
35:13,23 36:2
37:5,18 40:7,
10,13,21 41:7
46:10 47:7
49:11 55:17
56:18 68:10,
11 71:11
73:7,12 76:13
77:9 78:21
79:3,20 80:5,
11,14 81:16

96:17 99:11
101:7 102:14,
19 104:2
**right-hand**
65:13
**rights** 104:9
**rise** 52:15
**risk** 62:16
**Risk-linked**
2:3 9:23,25
12:11 17:16
30:6 33:24
37:23 41:10
44:10 59:19
60:7 73:13
**Ritchie** 2:3,
22 3:17 7:9,
10 9:22,25
11:19,23
12:11 13:13
16:9,10 17:16
19:12,16,17
20:4 27:24
28:4,6,7,11
29:3 30:1,3,
4,5 32:8
33:13,17,23,
24 34:2,24
35:10 36:13
37:8,23 41:10
42:6 44:10,12
45:1,2,3,4,18
46:6 47:3,4,
10,21 52:8,13
53:4,9,13,15
56:4,17 57:1,
5,8,11,14
58:12,13
59:9,16,19
60:1,6,7
72:13,22
73:5,9,12
79:18 80:9,24
81:22 85:20,
23 86:1,4
89:11 101:7,8
**Ritchie's**
52:25 73:4

**Robin** 55:8
**Roman** 10:2
**room** 101:5
104:6
**Rosales** 3:4
**RRL** 90:6
**RRLS** 16:11
23:22 28:19
30:5 33:16
51:15 71:19
73:21,24
86:12,15,19
89:23,24 90:2
94:12,20,25
**RRLS-RELATED**
23:25
**RRS** 94:24
**run** 26:11

─────────

**S**

**Sabbo** 13:15
**Sabo** 14:5
83:4
**safe** 68:4
**said** 25:15
33:8 35:19
40:14 46:1
49:21 59:5
61:3 71:4,6
73:7 74:7
75:6,19 80:10
82:4,9 83:23,
24 91:23,25
92:20 95:25
96:6,9,13
99:9,11,13
100:3,6,7,15
**same** 5:3
33:11 34:4
36:4 37:15
40:2 41:12,
22,25 49:4
58:22 80:16
82:20 94:4
**sampling**
83:16

**satisfied**
52:25
**satisfy** 14:23
52:18
**satisfying**
30:7
**Save** 77:8
**say** 5:19 6:21
7:7 13:25
27:22 31:8
36:5 46:18
49:18 55:5
60:10 61:18
64:1 69:1
82:19 85:12,
22 86:1 95:22
96:2
**saying** 11:25
36:4 41:16,
17,18 57:4
75:24 81:21
83:18 99:5
**says** 37:22
46:2 49:3
55:20 61:25
73:5 77:2
87:18,20
88:13,14 93:7
**schedule**
25:14 30:11
32:24 35:8,17
40:19,24 41:4
52:2 64:24
65:1,6 68:9
69:9,18,22
77:2,22 91:11
**scheduled**
71:10
**schedules**
11:3 20:8,9
22:12 24:3,22
25:17 26:16,
23 27:7,14
29:8 36:25
37:4 43:4
44:17 46:22
68:8,12,17
69:17 71:3

78:6 82:17
86:14
**searched** 20:1
**SEC** 44:24
**second** 15:4
  16:7,13 18:12
  28:25 52:21
  76:16 101:18
**second-to-last**
  23:4
**section** 37:9
**secured** 35:9,
  12,21 77:3
**securities**
  6:24 48:7,10,
  17,19
**security** 37:7
**see** 21:10
  32:9 37:12
  43:13 66:9
  79:18 80:5
  84:20 85:3,4
  86:13,23
  87:10
**seek** 32:18
**seeking** 95:15
**seen** 75:8
**seized** 13:12
  52:18 53:7
**send** 42:10
**sense** 65:8
  66:25
**sent** 103:17
**separate** 29:5
**separated**
  94:23
**separately**
  29:10
**service** 11:15
  23:13 25:16
  26:5,11
  51:17,20
  63:17 64:17
  71:13 84:8
  87:13 102:10
**services**
  26:13 27:23

81:20
**settle** 15:1,6
**settlement**
  5:20 7:5,17
  8:22,24 45:19
  50:20
**settlements**
  6:18
**several** 12:19
  63:23,25
**severely**
  80:24
**Shake** 54:18
**shares** 9:9
**she** 26:1,3,5
  63:20,24
  89:24 90:2
**sheet** 54:9
**Shore** 87:11
**short** 73:21
**should** 26:17
  46:24
**show** 49:2
  78:18,20,22
  79:25 96:20
**showed** 94:2
**Shulman** 26:2
**sides** 44:13
**Sidney** 12:24
  13:3,4,17,21
  43:19
**sign-in** 54:9
**signature** 4:8
  21:9,16,18
  23:2,5,6
  26:18,20
  90:23
**signed** 21:2,
  13 23:15
  26:24 73:22
  87:2,3
**similar** 9:17
  41:24
**simultaneously**
  54:22 56:22
  60:21,25
  65:15 66:7

68:2 73:1
74:6 75:20,25
78:4 79:23
83:21 87:24
**since** 3:22
  48:24 49:24
  56:17 57:8
**single** 88:23
**sit** 65:3 70:6
  91:18 93:17
  98:13
**six** 16:5
**skip** 22:11
**slipping** 69:4
**small** 65:5
**Smith** 2:20
  7:11 13:15,18
  14:8 28:18
  90:18 91:4
  92:9 94:23
  95:1
**snow** 75:16
**so** 2:10,14
  3:8 5:20 6:9,
  19 8:2,9,25
  9:16 11:25
  12:22 13:17
  15:17 16:20
  17:13 19:20
  21:6 22:14
  23:4 24:1
  28:6,7 30:14
  32:2 33:5
  34:11 36:12
  37:14 38:11
  39:6,24 40:19
  41:1,8 44:11
  46:4,14,23
  49:3,7 50:23
  51:25 54:15,
  24 55:1,17
  61:1,10 62:2
  63:25 64:19
  66:16,18,21
  67:25 68:3,7,
  8,11,14 71:2,
  20 72:8 74:22
  76:25 78:10,

16 79:14,17
80:14 81:5
82:21 83:10,
18 85:9,18
86:25 87:6,7,
17 90:16,19,
21,22 92:12
93:13,16
94:6,7,10,18
95:1 97:13
100:19,20
102:16
103:20,21,22
**so-called**
  89:10
**sole** 11:12,17
  47:17 59:22,
  25 60:14
**solely** 94:24
**solicitations**
  103:17
**Solomon** 55:8
**some** 7:7 11:3
  15:21 23:23
  33:15 42:3
  54:13 69:1
  71:8 74:24
  89:9 91:25
  103:16
**somebody**
  72:16,22,23
**somehow** 74:24
**someone** 73:10
**something**
  34:14 42:10
  84:12,23,25
**somewhat**
  38:13
**sorry** 5:2
  11:18 13:1,4
  16:23 18:21
  24:6 25:1,8
  34:17 38:10
  42:12 43:23
  45:7 51:9
  54:10 55:7,25
  59:15 68:3,4,
  14 72:20

77:7,10,15,17
90:12,13
91:21 98:11
103:11
sort  15:21
42:3 67:24
Sounds  84:24
source  28:8
Sox  68:1
space  5:15,19
50:9 51:16
speak  79:14
SPEAKER  3:4
54:6,10,13,
15,18,19,21,
23 55:5,25
77:18 79:9,10
103:8
speaking
103:12
speaks  88:6,8
specific
83:14 93:3,4
98:7
specifically
6:22 14:16
53:12,15
61:25 83:2
speculate
81:11 89:17,
20
speculation
89:14,16
spent  15:5
Spicer  77:20
Spoola  25:25
63:22
stand  42:15
63:6 99:20
state  17:20
18:4 40:17
62:18 100:7
103:22
stated  14:17
57:15 89:21
statement
11:5 20:9

22:18 23:9,12
24:3,9 27:14,
16 28:23 32:6
37:6,11,21
40:25 48:22
49:8 96:19,21
97:2 100:9
statements
22:12 71:15
Steven  54:24
stick  36:25
sticking
37:18 44:9
still  18:8,9
31:3 63:7
81:3 91:16,24
stop  10:14
100:6
Strategies
2:4 9:23,25
12:11 17:16
30:6 33:25
60:8
Strategy
59:20
strike  64:21
73:16 74:21
92:7,8
structure
34:4,10,19
86:7
subject  39:5
63:8 97:19
104:9
subpart  37:19
subscription
15:24 16:1,20
17:9,11
53:12,14,18
success
98:14,21
suing  39:17
suit  17:5
44:10
suits  38:11
sum  65:11

superior
101:2
supplement
38:14
sure  4:5 9:21
13:10 14:13
19:13 25:9
27:21 32:1
33:8 34:23
37:2 38:4,5
39:15 43:22
45:24 46:25
49:5 53:11
55:14,16
56:21 58:19
68:13 98:22
Swansea  37:25
38:8 39:6,25
40:14 41:11
42:5 85:18,21
86:7 102:4,
22,23
swear  3:10

———————————

T

take  22:19
25:10 42:20,
23,24 45:10
70:17 71:22
78:12,23 79:1
82:16 90:25
92:12,22
94:15 95:4
100:21
taken  38:21
taking  7:16
talk  5:3
84:19
talked  44:17
talking  24:2
35:18 51:2
54:22 56:22
60:21,25
65:15 66:2,5,
7 68:2 69:16
73:1 74:6
75:20,25 78:4

79:23 83:21
87:24 93:5
tax  31:14
technically
5:17
technology
56:6 57:21,22
62:20
tell  13:8
69:2 70:12
93:12
ten  48:4 61:3
tend  92:24
terms  16:1
61:10 71:3
testified
58:23
testimony
3:11 7:21
14:12 15:15
82:8
than  12:11
15:2 34:19,21
39:14 62:3
63:2 67:18
81:20 94:25
97:9
Thane  13:12
19:16 45:4
47:3 52:7
80:9
Thank  2:24
3:6,15 5:24
10:3 12:3,4
13:4 15:11,13
21:19 22:9
24:19 27:10
41:7 43:3
45:9 51:22
55:13,15
65:20 68:12
77:17 78:11
79:22 99:20
102:14 103:3,
5,7 104:8,11,
12
Thanks  55:12
79:12

Ritchie Risk
July 31, 2018                                    29

**that** 2:15
3:10,20,21,25
4:21 5:5,14,
19,20 6:14
7:23 8:3,7,23
9:6,8 10:5,21
11:1,3,5,21
12:6,8,9
13:2,12
14:14,17,21
15:2,5,8,10,
14,22 16:25
17:1,4 18:4,
7,8,9,16,24
19:9,24,25
20:5,18,24
21:4,5,8,9,
17,18 22:5
23:6,17,21,
22,23 24:15
25:6,8,11
26:12,13,20
27:6,19,23
28:2,3,11,17,
18,21,22
29:1,3,8,11,
14,24 30:18,
23 31:6 32:3,
4,5,6,10,13,
15,22 33:12,
25 34:8,14,
15,21 35:2,5,
13,22 36:5,8,
18,22 37:6,
12,15,21,22
38:2,8,13,14,
15,20,22,24,
25 39:4,7,9,
13,14,16,17,
19,21,25
40:4,15 41:9,
10,13,16
43:13,16,19,
25 44:7,14,
16,17,18,24
45:15,17,21
46:16,18
47:1,7,13,14,
23 48:4,5,11,

20,23,25
49:17,21,23
50:3,14,18,24
51:6,16
52:10,17,24
53:9,15,19
54:2 55:1,20,
22 56:1 57:3
60:10,12
61:9,11,20
62:14,17,18
63:19,21
64:12,14,21,
22,23 65:6,9
66:9,25 67:23
68:17,18
69:7,24 70:2,
5,6,7,14
71:6,9,11
72:2,9,10
73:16,17,18,
20 74:3,7,8,
9,17,21,22,25
75:1,3,5,9,12
76:7,15,17,24
77:2,3,4
78:15 79:5,
18,19 80:5,8,
12,23,24
81:7,8,9,16,
22 82:14,16,
19 83:11,14,
15,25 84:7,
11,12 85:3,
12,20 86:3,
13,16,20
87:7,10,20,21
88:6,17,18
89:1,6,9,12,
18,21,24
90:2,3,5
91:9,24,25
92:8,12,14,23
93:5 94:12,
14,16,19
95:2,5,6,14,
16,19 96:10,
14,15 97:24
98:18 99:2,9,

11,18,22,25
100:6,8,11,
15,20,21,22,
25 101:2,4,
10,12,16,18
102:2,6
103:15,22
104:2,3,9
**that's** 3:17
7:18 9:14
10:1 14:7,22
18:12 22:24,
25 24:7 25:2,
6 26:11 28:20
29:4,15 30:11
35:22,25 36:3
41:4,16 42:14
50:11,12
51:3,4 53:23
54:12 56:8
57:1,6 60:22
62:13 63:9
65:23 70:10
72:19 74:10,
24 79:5,10
80:10,18
82:15 83:23
86:8 87:21
88:2,24 90:15
92:19 97:15,
17,20 99:13
101:9 102:12
**their** 3:2
12:18 29:20
34:1 50:11
83:11 104:6
**them** 7:14
9:15 12:18
17:25 21:10
57:13 63:24
64:4 68:11
69:8 77:8
78:22 79:6
87:9 88:4
89:3 96:20
**then** 6:10,14
7:6 9:10
24:21 28:1
50:24 66:21

76:3 88:2
94:1 97:11
100:24 101:25
102:1
**there** 5:18
8:25 9:2,16
10:4 15:12,17
16:4,19,20,22
17:22 19:17
21:8,9 22:5
24:15 26:18
27:12 29:25
30:25 32:3
35:24 36:12
41:3 42:3
44:11,12
45:15,20,25
48:6,16
50:17,24
53:11 54:4
57:25 63:23
64:22 69:10,
19,23 70:15
74:22 75:4,6,
12 80:6 84:19
88:21,25
90:20 93:2
100:10 101:16
**there's** 5:18
11:2,4,22
15:20 18:11
22:17 23:2,5
30:24 32:6
33:22 34:18
37:6,21 41:2
43:8 44:10
47:2 50:23
53:3 65:5
73:11 76:7,
11,14 88:23
89:2 90:3
**Thereabouts**
72:7
**thereby** 30:7
**therefore**
17:9 30:7
36:6 38:23
60:16 61:1
85:11 88:16

**these** 5:9
8:23 23:19
24:1 25:19
34:21 38:24
40:5,6 41:23
44:6 46:15
53:18 61:21
69:7 77:12
83:15,16
84:2,6 87:7
88:15,22,23
89:9,22,24
90:4 97:24
98:14
**they** 5:10,21
7:12 8:19
10:21 17:10
19:19 23:25
38:17,21,25
41:17 63:3,17
64:19 68:10
72:9,11 81:21
82:1,3 83:10
84:2,8 85:2,
7,12 86:14
90:2,6 92:21,
22 95:20
103:24
**they're** 26:11
41:22 69:16
88:18,22
89:11
**They've** 83:9
**thick** 90:21
**thing** 28:25
57:15 58:22
**things** 6:18
27:13 34:21
44:22 80:16
93:19
**think** 7:9
11:2,14 12:1
13:25 14:15
15:8 17:17
24:2 30:21
33:8 34:9
36:3,4 38:19
40:12 42:7
46:1,24 54:10

68:21 69:18,
24 70:10
71:5,6 75:17
79:5,6 80:18
85:11 87:19
88:5,6 92:4,
19,24 93:5,13
94:1 95:19,24
98:17,19
99:15 101:5
**third** 10:20
40:9 43:6
**this** 2:9,16
3:1,8 6:17
7:1,14 11:13
12:15 14:10
18:14 20:17,
21 21:2,22
22:6,8,15,21
23:4 24:16,
17,18 27:7,8
29:20 31:25
32:14,16
33:10 34:1,14
35:8,16 36:18
37:14 40:16
41:1 44:9
45:11,15,18,
22,25 46:2,3
47:1,3,9
49:7,14,18
50:22 54:13,
17 58:17,24
60:24 61:2
64:15,24,25
65:2,6,7,23
66:1,20
68:15,22 69:3
70:22 72:25
75:13 76:8,16
77:14,15,25
78:16 79:9,
10,17,20 82:5
84:6,15,16,17
85:16 90:1,
18,19,20,22
91:11,14
92:18 94:8,22
95:19 96:14,

24 98:23
99:16,17,19
100:1,11,12,
16 101:5,20
102:17 103:21
104:6
**those** 6:14
7:4,8,10 9:10
10:5 11:7
12:19 16:25
20:1 23:24
26:13 38:20
39:4 40:13,23
48:3 54:1
63:6,13 67:8,
10 68:19
71:15,18
84:10 97:5,8,
9 101:10
**though** 17:10
79:11
**thought** 38:24
49:20 60:9
**three** 20:15
32:5 72:9
86:21 102:13
**through** 7:12
28:3,19 29:1
69:4 81:15
87:8 88:4
93:9
**thus** 60:17
**Tie** 14:18
15:9
**time** 2:16
3:1,8 5:3
22:7,8 23:17
24:16,17
25:10 27:7,9
29:20 32:16
34:1 36:18
42:24 48:25
50:3 65:1
74:7,8,9
76:17 80:17
82:21 83:14
85:17 87:19,
20 88:11
90:25 94:5,15

103:21
**timely** 43:10
**times** 61:3
**to** 2:11,15,17
3:2,9,11 4:6
5:14,21 6:11,
21,25 7:11,20
8:7,16,19,23
9:18,19
10:11,13,17,
18,21 11:3,5,
7,10,15,21
12:1,15,17,
18,24 13:14,
22 14:13,20,
22 15:1,6,19,
25 16:10,18
17:4,7,8,11
19:23 20:2,3,
5,7,12,13,25
21:12,20,24
22:2,3,6,11,
12,20 23:2,
13,19,22,23,
24 24:12,16
25:7,9,11,13,
16,18,21
26:6,17 27:2,
3,6,13,15,18
28:16,17,18,
22,23,25
29:2,3,8,9,18
30:4 31:20,21
32:5,7,12,18,
22 33:3,19
34:8,10,12
35:22,25
36:5,8,24
37:3,8 38:9,
12,21,22
39:5,8,10,22
40:3,9,10,23,
24 41:10
42:3,12,15,
20,23,24
43:8,10
44:19,24
45:10,18,21,
25 46:3,4,17,

18,23 47:8,
13,14,21,23
49:15 50:17,
19 51:1 52:1,
15,18,22 54:5
56:20,25
57:1,4,15
58:19,21,23
59:23 60:11
61:4,5,11,19,
20,22,23,24
62:4,9,10,11
63:8,12,18
64:5,20 65:1,
25 67:2,3,15
68:4,7,17,20
69:3,11 70:1,
2,14,17,19
71:4,8,15,23
72:2 73:11,
12,23 74:10,
23 75:9 76:23
77:6,11,13,
23,24,25
78:8,12,22
79:14,17 80:5
81:6,11,13,24
82:5,10,23
84:9,12,18,
19,20 85:11
86:19 87:11,
12,19,21
88:2,4,6,13,
17,19,20,21
89:3,5,8,16,
20,24 90:2
91:3,4,8,11,
17,24 92:14,
17,19,20,24
93:4,12,13,
21,22,24
94:6,8,13,15,
16,22,24
95:9,11,16,
18,21,23,24
96:10,18,24
97:4,5,18,21
98:20,23
99:1,3,5,7,10

100:1,6,15,
19,20 101:10,
12,17,22
102:1,2,5
103:17,20,21,
22,25 104:1,3
**today** 65:4
70:6 82:22
91:18,24 93:6
98:14 104:6
**together**
62:23 63:16,
17 64:1
**told** 64:20
75:17 76:19
99:2,25
**too** 100:16
103:6
**top** 79:6,7,8
**total** 103:9
**towards** 23:1
94:11
**trading** 9:23,
25 30:2,4
32:9 33:18,24
34:3,25 35:10
36:14 37:8
44:25 45:2
74:23
**transfer**
16:8,15 37:10
**transferred**
74:10
**transfers**
89:3
**transposed**
65:7
**trial** 2:7
17:8
**true** 22:1
24:10 27:1
68:6 80:23
97:15
**truly** 89:24
**Trust** 37:25
39:7 40:1
41:12 42:5
85:19,21

102:4
**trustee**
31:17,21
95:24
**Trustee's** 2:8
101:6
**truth** 3:11,12
**try** 84:22
**trying** 38:22
77:13
**tunc** 61:10
**turn** 6:10
24:22 26:17
43:21 60:6
91:7 96:23
**turned** 84:12
**twice** 58:22,
25
**two** 5:7 9:2,
10 10:2,6
13:8 15:24
16:5,20 37:19
41:2 42:18
93:19 100:17,
23 102:12
104:4
**two-page**
91:10
**type** 74:24
**types** 26:13
**typo** 65:10
69:10

_____

U

_____

**U.S.** 2:8
31:17,21
101:6
**Uh-huh** 52:4
71:20 75:8
**ultimate**
59:23
**ultimately**
10:19 11:11
**uncertain**
19:20

**uncomplicated**
51:5
**under** 3:12
17:11 19:12
37:9 86:13
88:16
**understand**
14:13 31:19
40:8 56:23,25
57:3,4 58:20
62:10 65:19,
20 68:7 70:22
71:4 74:22
80:4 99:8,25
**Understandable**
67:21
**understanding**
6:12 9:8 17:3
29:25 31:6
32:16 39:21
49:23 62:16
73:20 74:17
76:7 84:7
**Understood**
5:24
**unenforceable**
38:2,17
**uneven** 16:17
**unless** 46:23
88:17
**Unlimited**
81:14
**unpaid** 46:12
**unrelated**
40:9
**unsecured**
86:17
**until** 4:9
37:11 82:21
**up** 4:21 36:19
42:15 79:25
**upside** 37:1
**us** 49:2 84:12
**use** 5:15
29:2,3 96:24
**used** 12:10
13:25 20:4

Ritchie Risk
July 31, 2018                                            32

38:9,11 50:17
92:20
**using** 39:22
  63:17
**utilized** 8:23
  83:9

---

### V

**V-A-R-G-A**
  19:3,4
**validate**
  23:19
**validation**
  90:6
**Valtera** 86:10
**value** 8:7
  10:11,16,17
  12:16 99:10
  100:1
**Varga** 8:16
  19:6,18,24
  61:6,16,25
  62:4 66:25
  67:7,13,15
  96:25 97:6,9,
  24
**Vargas** 18:25
**various** 55:1
**verbalize**
  2:15
**verified**
  71:14
**verify** 4:19
**very** 44:23
  45:12 68:12
  69:1,5 93:4
  104:8
**view** 75:7
  81:8
**violation**
  15:25

---

### W

**Wagner** 13:16
  14:5

**wait** 101:17
**waive** 95:9
**walk** 42:23
**want** 9:17,19
  14:13 25:7
  27:18 34:12
  42:20,23
  45:10 56:20,
  25 57:4 58:19
  61:4,11 62:9
  68:7 70:17
  71:3 84:18,20
  88:3 89:16
  93:18 95:21
  99:5 104:1
**wanted** 25:8
  28:22,25 29:8
  35:22 50:19
  97:18,20
**wants** 93:24
**Warren** 45:5
  47:24
**was** 2:6 4:5
  6:2,20 7:9,
  13,18 8:22,25
  9:1,2 11:6,
  14,17,25 12:1
  13:1,12,19,21
  14:16,17
  15:7,8 16:3,
  6,7,8,14,16,
  17,18 17:5,7,
  10,24 18:2,4
  20:5,18 22:15
  23:12 24:18
  25:8 26:1
  27:20 28:3
  29:25 32:3,4,
  23 33:1,9
  35:24,25 36:8
  37:11 38:8,
  18,22 39:17,
  19,22 40:16,
  24 41:9 43:19
  44:23 45:7,15
  46:1 48:4,10,
  25 49:23
  50:3,13,14
  61:19 62:3

63:19,20,22
  65:2 67:16
  69:10,19 71:6
  72:2,8,12
  73:12,17,21
  74:5,9,13
  75:4,6 80:24
  82:13,15
  83:11,15
  86:20 87:10,
  13 90:21
  91:23,25
  99:15,18
  100:3,6
  102:13,24
**wasn't** 35:13
  87:5 96:14
  103:11
**waste** 87:19
  88:11
**way** 21:21
  26:11 27:18
  28:3 45:13
  47:21 51:4
**we** 2:2 5:2
  7:10 8:7
  12:23 13:25
  15:8,9 18:20
  19:22 24:18,
  21 27:19
  28:21 29:7
  34:20 36:19,
  25 38:19 39:3
  44:17 46:5,24
  47:7 51:5
  54:6,10 61:5,
  9 64:10 66:4
  68:21 69:10,
  13,14 77:25
  78:8 79:11,13
  84:12,22
  87:19 95:19
  100:21,22
  103:17,24
**we'** 58:17
**we'll** 24:22
  84:24 104:13
**we're** 47:8
  49:4 54:11

58:21 60:23
  70:2 72:21
  79:3,15 84:19
  92:18 100:17,
  24 103:2
**we've** 19:25
  55:2 58:22
  80:21 93:5
  100:17 104:3
**weeks** 42:18
  50:15
**welcome** 2:25
  5:25 13:6
  22:10 24:20
  27:11 51:23
  65:21 96:24
  103:4,6
**well** 9:9
  12:16 13:21
  21:1 24:21
  39:13,16
  46:21 48:9
  51:6 57:3,14
  62:5 64:25
  66:3 73:5,15
  81:11 82:12
  84:16 85:25
  87:22 88:3
  89:7 97:10
  99:8,14
  101:5,17,25
  104:8,10
**went** 68:21
**were** 7:8,9
  9:16 15:5
  16:4,5,22
  17:22 23:21,
  22,23,25
  28:11 38:15,
  17,20,21 40:5
  42:3 45:17
  52:18 53:7
  58:4 61:21
  63:3,16,17,23
  64:19 68:17,
  18 69:7 71:10
  81:7 83:15,16
  87:23 89:24
  90:2,6 95:8

97:5 100:7
**weren't** 33:8
  40:6 67:10
  80:17
**what** 4:3,19
  6:4 7:1,15,20
  9:12 12:14,19
  13:1,19,25
  15:18 20:24
  21:15 25:6
  26:17 29:17
  32:17,21
  33:8,19 35:2,
  5 36:4,17
  38:2 39:7,18
  40:8 44:2
  46:11 48:10
  49:10,19
  51:19 52:10,
  15,20 56:1,19
  57:4,10 59:7
  60:4,23
  61:18,25
  62:9,11,24,25
  64:7,14 66:25
  68:4,15 69:3
  70:2 71:6
  72:1,12,22
  73:2,3,17
  74:10,20,21
  75:22 77:19
  78:23 79:24
  80:10 81:17
  83:6,23 84:4
  85:12 87:18,
  20 88:2,14
  91:19 93:13,
  18 97:17,20
**what's** 25:23
  63:20
**whatever** 9:17
  45:17 69:2
  70:7 84:5
  94:15
**Wheaton** 56:8,
  12
**when** 6:2 7:7
  11:25 13:9
  16:2 34:14

48:22,25 50:3
65:22 74:4
82:17 84:18
85:22,25
99:15 102:3
**where** 10:21
  32:10 35:15,
  18,25 37:12
  43:13 49:2,6
  62:3 66:4
  72:13 84:2
  86:16 96:20,
  21
**whether** 41:22
  45:16,24 47:8
  76:14 101:7
  103:20
**which** 6:22
  7:8 10:15
  11:13,18,22
  14:14,16 20:4
  22:18 26:6
  27:25 28:21
  29:10 38:15
  46:1 49:19
  53:7 60:6
  65:9 67:19
  82:13 83:24
  91:9 93:6,8
  96:19
**while** 38:21
  67:16
**white** 61:2
  68:1
**who** 2:21 3:2
  6:15 11:9
  35:9 43:15
  58:15 59:4,6,
  22 60:10
  61:6,11
  63:13,21
  64:13,17,20
  71:13 73:22
  76:22 77:1
  84:1 85:6,7
  86:1,10 87:2,
  3 92:5 94:10,
  13,18 102:7
  103:14,20

**whole** 3:12
**why** 10:8
  27:19 41:13,
  20 45:24 46:4
  51:8 52:24
  73:10 78:18
  86:14 88:20
  90:21 94:6,7
  98:25 100:16
  101:20
**will** 2:10
  3:11 6:10
  18:16 19:21
  61:25 62:21,
  22,23 63:11
  66:14 88:4
  103:15
**Wilmington**
  2:9,20
**wind** 2:19
**wish** 12:20
  54:5
**with** 3:25
  4:6,10 7:1,
  14,23 9:11
  11:6,15 14:20
  19:7,10,11
  20:1,2,3
  21:15 23:17
  25:18 26:3,5,
  10 27:15
  28:17 29:2,9
  30:22 32:24
  34:10 36:25
  37:18 41:9
  43:16,25
  44:9,14 45:8,
  10 47:25 51:6
  55:2,7,8
  56:17 57:7,10
  59:23 60:11
  61:15,21
  62:4,16 64:4,
  16,18 66:10,
  24 67:13,15
  71:7,12,13
  73:22 76:8
  78:9,15 79:17
  82:5,22 84:23

85:1,6 87:20
88:18,21
89:22,23 90:4
92:13,22,25
95:15,16,19
96:13,25
97:7,9,24
101:8 104:2
**withdraw**
  96:18
**within** 11:6
  27:16 89:3
**without** 67:4,
  9,13 98:1,3
**witness** 2:11,
  18,20 14:12
  47:1 74:2
  81:11 91:22
  95:24 99:5
**won't** 58:25
  66:21 70:15
**wondering**
  90:21
**Woods** 13:16,
  19 14:3
**words** 57:12
**work** 56:5,14
  84:23
**worked** 19:19
  25:15 57:12
  71:7,12,13
**working** 56:17
**worry** 59:1
**would** 2:16
  3:1,8 5:21
  7:19 10:15
  11:13 15:14,
  16,19 19:24
  20:7 22:6
  24:16,22
  27:6,13,24
  28:1,7 30:23
  32:6,18,22
  37:15 38:16
  39:25 40:8
  42:2,7 43:24
  45:16 47:14
  48:14 52:25

54:16 57:15
61:6,22,24
64:12 69:24
73:10 76:22
77:1 78:16
81:8 91:6,23
92:24 100:20
102:7
**wouldn't**  25:3
**writing**  42:11
  95:14
**written**  32:3
  75:5 76:15
**wrong**  71:5

———————————
          Y
———————————

**Yankee**  67:19
**yeah**  13:6
  16:14 17:22
  18:1,19,20
  19:5 22:21
  25:4,7 36:2,
  17 37:2
  40:19,22 41:2
  43:1,14 44:20
  58:21 59:4
  65:16,17,19
  66:3 67:12,22
  68:23 69:18
  70:21 72:15
  77:16,18
  78:20 79:10
  80:1,2 87:17
  90:7 93:20
  94:5 95:23
  96:12 97:20
  98:3 99:24
**year**  11:7
  49:15,16
**years**  48:4
**yes**  4:12 5:10
  7:22,25 9:3
  12:21 15:16,
  23 16:4 17:2
  18:3,6,18,19
  21:6,11,14,
  17,25 22:4

23:3,7,16
24:1,11,14,23
25:12 26:19,
21,25 29:13,
24 30:12
31:5,23
32:11,20
36:12 37:13
41:6 43:7
46:18 48:3,13
52:9 53:20,21
55:19 56:11
58:6,10 59:20
60:13 61:17
63:5 64:2,6
68:24 72:7,11
74:16 76:6
79:15 80:7
83:9 85:4
86:22,25
90:10,13,23
91:1,5,12
95:22 99:17
100:9 101:15
**yesterday**
  22:15 24:18
  68:18 82:22
**yet**  68:15
**York**  7:13
**you**  2:15,24
  3:6,9,10,11,
  15,16,21,24
  4:2,10,13,16,
  19,23 5:24
  6:1,2,8 7:19
  8:19 9:13,15,
  16,18,19,21
  10:3,21 12:3,
  4,20 13:5,19
  14:9,13,14,15
  15:3,13,14,17
  16:2,12 17:2
  18:23 19:15,
  16 20:12,15,
  19,20,24
  21:9,15,19,
  20,23 22:6,9,
  19 23:8,14,15
  24:8,16,19

25:3,5,13
26:15,22,23
27:5,10,13,
17,18 28:23
29:9,14,16,17
30:7 31:8,19
32:9,17,21
33:8 34:6,11,
12,14,15
35:2,15,18,19
37:12 38:2,4
39:14,18
40:23,24
41:7,13 42:8,
10,20,24
43:3,13,17,
20,24 44:2,3,
13 45:9,10,20
46:1,15 47:24
48:2,10,11,
14,22,24
49:2,6,10,20
50:3,15 51:2,
22 52:10,15,
24 53:3,8,13,
17,22 54:7,8,
16 55:5,10,
13,15,18 56:1
57:4,10,12,20
58:4 59:2,5
60:10 61:15,
23,24 62:2,7,
10,14,24
63:1,6,14
64:1,3,8,14,
20,23,25
65:3,10,11,
20,22,25
66:2,5,10,22,
25 67:7,8,19
68:8,11,12,
15,18,19,25
69:1,2,3,5,6,
8,24 70:6,10,
11,12,16,17
71:4,6,10
72:2 73:7
75:8,10,16,17
76:6,10,14,

17,19,25
77:1,17,23,24
78:7,11,18,
21,22,23
79:12,18,19,
22,24 80:2,4,
5,10,17 81:3
82:4,15,17,
18,19,22
83:6,10,18
84:14,18,20,
22,23 85:3,5,
9,12,22 86:1,
5,23 87:5,6,
8,9,16,21
88:2,3,19
89:7,16,17,18
90:1,2,7,16,
18,19,20,22
91:2,6,7,8,9,
11,13,16,18,
19,20,23
92:1,5,7,9,
13,20 93:9,
12,13,18,24,
25 94:1,6,7,
8,11,14,15
95:4,8,13,15,
19,25 96:8,9,
15,20,23,25
97:4,7,8,11,
15,23 98:9,
13,18,19
99:2,9,11,21,
22,25 100:6,
16,21 101:4,
6,7,9,13,21,
25 102:7,10,
14,15,19,20,
23 103:3,5,7,
8 104:8,12
**you're**  2:25
  5:25 7:1
  13:6,9 22:10
  24:20 26:10
  27:11 45:24
  51:23 55:5,
  17,21 58:1
  59:5,13 65:21

```
     66:11 74:10
     75:16 80:15
     81:21 83:18
     87:16 93:14
     96:1,15,24
     103:4,6
you've  26:9
     56:16 57:7
you-all
     104:11
your  3:10 4:3
     7:20,23 15:14
     22:2 23:6
     24:12 25:10
     26:20 27:2
     31:6 45:8
     54:17,18
     62:12 66:11,
     12,22,24 81:8
     82:16,17 83:5
     87:19 90:25
     91:17,18
     94:15 95:14
yours  77:12
     79:11

_____
         Z
_____

Zinga  14:18
     15:9
```

# Exhibit 49

Page 1

```
 1            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - CHANCERY DIVISION
 2
      - - - - - - - - - - - - - - - -
 3    HUIZENGA MANAGERS FUND, LLC,  :
                                     :
 4                                   :
              Plaintiff,            :
 5                                   :
         vs.                        :   Case No. 07 CH 9626
 6                                   :
      A.R. THANE RITCHIE, et al.,   :
 7                                   :
              Defendants.           :
 8    - - - - - - - - - - - - - - - -

 9            REPORT OF PROCEEDINGS at the hearing of the

10    above-entitled cause before the Honorable PETER

11    FLYNN, Judge of the said court, on August 3rd, 2018,

12    at 9:39 a.m.

13

14

15

16

17

18

19

20

21

22

23

24
```

TRANSCRIPT OF PROCEEDINGS                    August 03, 2018

Page 2

1   APPEARANCES:
2   WILLIAMS MONTGOMERY & JOHN, LTD.
    BY:  MR. CHRISTOPHER BARBER
3        MR. GARY GARNER
    233 South Wacker Drive
4   Suite 6100
    Chicago, Illinois , 60606
5   (312) 443-3200
    gwg@willmont.com
6        Appearing on behalf of the Plaintiff;
7   REED SMITH
    BY:  MR. PAUL WALKER-BRIGHT
8        MR. JOHN S. VISHNESKI, III
    10 South Wacker Drive
9   Suite 4000
    Chicago, Illinois 60606
10  (312) 521-5400
    pwalkerbrigh@reedsmith.com
11       Appearing on behalf of Defendant Ritchie Risk
         Link Strategies;
12
    CLAYBORNE SABO WAGNER, LLP
13  BY:  MR. B. JAY DOWLING
    525 West Main Street
14  Suite 105
    Belleville, Illinois 62220
15  (618) 239-0187
    jdowling@cswlawllp.com
16       Appearing on behalf of the Defendant.
17  SWANSON, MARTIN & BELL
    BY:  MR. T. ALLON RENFRO
18  330 North Wabash Avenue
    Suite 3300
19  Chicago, Illinois 60611
    (312) 321-9100
20  trenfro@smbtrials.com
         Appearing on behalf of the Defendant.
21
22
23
24

Page 3

1        MR. BARBER:  Good morning, your Honor
2   Chris Barber and John Miller on behalf of
3   Huizenga.
4        MR. VISHNESKI:  Good morning, your
5   Honor, John Vishneski and Paul Walker-Bright
6   on behalf of Ritchie Risk Link Strategies and
7   Reed Smith.
8        MR. DOWLING:  Jay Dowling on behalf of
9   Clayborne Sabo Wagner.
10       MR. RENFRO:  Allon Renfro on behalf of
11  Swanson Martin and Bell and Mr. Ritchie.
12       THE COURT:  I have a variety of filings
13  before me.  The most recent of which, from
14  Plaintiff's counsel, was received at
15  approximately 3:40 p.m. yesterday.
16       The briefing on the two broad
17  issues, which are presently before the Court,
18  is a lot denser than the nature of the issues
19  themselves.  The two issues are, first --
20  actually, I guess there are three issues and
21  I'll refer to them as three issues.
22       The first in time of the three
23  issues, is an assertion by some counsel, at
24  least, on behalf of Ritchie Risk Link

Page 4

1   Strategies, that judgment orders in this case
2   are void.  They are said to be void for want
3   of subject matter jurisdiction.
4        Two problems exist with regard to
5   that issue.  The first is, whether the
6   assertion is correct.  And the second is,
7   whether this court, as a opposed to the
8   Appellate Court, has any authority to rule on
9   the motion either way because the records
10  which are said to be void, are orders which
11  have been affirmed by the Court of Appeals
12  and in at least one case, sent all the way up
13  through the denial cert.
14       It was famously said by the 7th
15  Circuit Court of Appeals and our courts
16  picked it up, although not quite so
17  colorfully, that Appellate rulings are not
18  suggestions.  The Appellate Court rules in a
19  case and then issues a mandate to the circuit
20  court.  The mandate directs the circuit court
21  in terms of what the circuit court is
22  supposed to do.  And the circuit court can't
23  deviate from that.  Literally, the circuit
24  court has no authority to deviate from that.

Page 5

1        Whether the circuit court has
2   jurisdiction to deviate from that is a
3   different question, of course, because the
4   term jurisdiction is used in a lot of senses,
5   not all of which are really accurate.  That's
6   question one.
7        Question two is, is the conduct
8   of Ritchie in filing what it styles as a
9   214.01 motion or motions, sanctionable.
10  Question three is, whether either of those
11  questions can be acted upon by virtue of the
12  June 29, 2018 -- I'm sorry, I've got the date
13  wrong it's June 28, 2018 bankruptcy filing by
14  Ritchie Risk Link in the United States
15  Bankruptcy Court for the District of
16  Delaware.
17       Although I have raised those
18  questions, in consecutive timing order, in
19  dealing with the questions, we would have to
20  go the other way around, because obviously
21  the first question this court should ask is
22  whether the court can properly address either
23  of the other two questions, given the
24  bankruptcy stay, the automatic stay under the

Page 6

1  bankruptcy code.
2         I have multiple assertions about
3  the applicability or otherwise of the
4  bankruptcy stay, including a very scholarly,
5  almost mini treatise by Huizenga on that
6  point.
7         As to the first issue, that is to
8  say, the 214.01, the raising of the 214.01
9  argument was, of course, by Ritchie Risk Link
10 Strategy, not against Ritchie Risk Link
11 Strategy.  What is the party's position on
12 whether the 214.01 petition is stopped by the
13 stay?  Let me ask first ask Ritchie Risk
14 Link's counsel.  What do you think?
15        MR. VISHNESKI:  Your Honor, John
16 Vishneski, I'll take that question.  We cited
17 in our brief a couple of Third Circuit cases
18 that talk about whether an appeal, which is
19 like a new proceeding, it's a challenge to
20 the court -- it's actually in a different
21 court.  And these cases are Association of
22 Saint Croix 648 F2nd 449 and Foreman versus
23 Remore Industries 946 F2d 1031, both in the
24 third circuit.

Page 7

1         Of course, we had simultaneous
2  briefing, so, we did not realize that the --
3         THE COURT:  I called for an answer to
4  the question.  If your position is that you
5  can't the question, just say so, and we'll
6  move on.
7         MR. VISHNESKI:  That's not my position.
8         THE COURT:  Then what is the answer to
9  the question that I asked, in your view?
10        MR. PALL:  Rule 214.01 proceeding is
11 not a new proceeding for all purposes.  There
12 are cases that say, like the Third Circuit
13 Appellate cases we cited that motions to
14 vacate under the bankruptcy stay law are the
15 same action and relate back to the original
16 proceeding.
17        The original proceeding here was
18 brought by Huizenga against Ritchie Risk Link
19 Strategies and so, therefore, it is not a new
20 proceeding brought by Ritchie Risk Link
21 Strategies.
22        THE COURT:  It would appear to follow,
23 from what you have said, that Ritchie Risk
24 Link Strategies, chose to shoot its own

Page 8

1  motion in the head by filing the Chapter 11
2  petition; is that correct?
3         MR. VISHNESKI:  That was a known
4  consequence.  It was obviously not the sole
5  purpose for filing bankruptcy.
6         THE COURT:  If it was a known
7  consequence, then it was a choice.
8         MR. VISHNESKI:  It was a choice in this
9  the context of the filing of the bankruptcy,
10 which is not motivated solely by that point.
11        THE COURT:  It seems to be difficult to
12 a simple straight answer here, but I'll forge
13 ahead anyway.  What is your position,
14 Mr. Barber?
15        MR. BARBER:  Set forth on Page 6 of our
16 papers, Judge, it's our position that the
17 petition to vacate is the initial pleading
18 that commences a new and separate cause of
19 action, subject to the usual rules of civil
20 procedure, citing Price versus Philip Morris.
21 And that as an action by the debtor, under
22 the applicable case law, it is not stayed.
23        THE COURT:  The second question is
24 whether the sanctions or motions presently

Page 9

1  pending before this court, which if memory
2  serves me correctly are aimed at counsel for
3  RRLS, rather than RRLS itself, are also
4  stayed by reason of the automatic stay in the
5  bankruptcy proceeding.  I take it your answer
6  to that is yes?
7         MR. VISHNESKI:  Correct.
8         MR. BARBER:  Our answer is no.
9         THE COURT:  Why not?
10        MR. BARBER:  For the reasons set forth
11 on Pages 7 through 9.  There is exceptions
12 under the bankruptcy code, express exceptions
13 and also common law exceptions, that
14 basically allow the court to proceed on a
15 sanctions motion, against both the debtor and
16 debtor's counsel, unless, and this is really
17 it's actually broader than the Federal level,
18 there are a couple of out-of-district state
19 court decisions that stand for the
20 proposition that where a debtor -- if the
21 sanctions motion is aimed at collecting a
22 judgment from a debtor, it would be stayed.
23        But otherwise, this court, as we
24 set forth in these papers, is quite free to

Page 10

1  move forward with sanctions both counsel and
2  debtor.  If you sanction the debtor, with a
3  monetary award, it would literally just be a
4  claim in bankruptcy for us.  It's not
5  something that we could act on, other than
6  through the bankruptcy proceeding.  Although
7  I would tell the Court it is our intention to
8  file a motion to dismiss the bankruptcy
9  proceeding as a bad faith filing early next
10 week.
11         We were waiting to hear how the
12 creditors meeting went and that was the
13 purpose of the letter yesterday.
14     THE COURT:  You were waiting to hear
15 how the?
16     MR. BARBER:  The creditors meeting
17 went, wanted to attend the creditors meeting
18 and question the person who signed the
19 petition under oath.
20     THE COURT:  The occasional bankruptcy
21 judge in the Northern District of Illinois
22 has taken the position that judges of the
23 Circuit Court of Cook County can, and in a
24 proper circumstance will, be held in contempt

Page 11

1  for violating, in the view of bankruptcy
2  judges, the purview of the 362(a) stay.
3         Whether that is appropriate or
4  not, it certainly occasions even more than
5  the normal level of caution on the part of
6  the court, considering an argument that the
7  stay applies to a particular motion or
8  proceeding.
9         What puzzles me in this
10 situation, is that the sanctions motions are
11 not matter of emergency, as far as I can see.
12 And although it doesn't happen
13 instantaneously, there is a simple and
14 dispositive answer to the question of whether
15 the automatic stay applies, one asks the
16 bankruptcy court.
17         And the bankruptcy court then
18 decides whether a particular proceeding
19 should be allowed to go forward or not.  This
20 is clearly a preferable way to address a
21 situation such as the situation here, in
22 which the parties cannot agree on whether the
23 issues pending in the non-bankruptcy court
24 should go forward or not.

Page 12

1         The reason it's clearly
2  preferable, apart from getting a dispositive
3  answer from the bankruptcy court, is that the
4  bankruptcy court can and does make decisions
5  about the automatic stay based on the
6  bankruptcy court's view of what ought to take
7  place within the bankruptcy court and what
8  can safely be left to other jurisdictions.
9         The bankruptcy court's view is
10 almost always more sophisticated than a
11 non-bankruptcy court's view.  Because unlike
12 the bankruptcy court, we don't ordinarily sit
13 with copies of Collier at our elbows, trying
14 to figure out how things fit best.
15         As I indicated up front, the
16 bankruptcy court's view is also greatly
17 comforting to the non-bankruptcy tribunal,
18 because if the bankruptcy court says, okay,
19 go ahead, then there is no question of the
20 non-bankruptcy tribunal being held in
21 contempt.
22         It is also helpful from the
23 standpoint of everybody involved, to give the
24 bankruptcy tribunal the opportunity to say,

Page 13

1  okay, you can go ahead with this issue over
2  there, but not that.  And when you're done
3  with this issue, then you're coming back here
4  for further proceedings.  Something along
5  those lines.  Which not only enables the
6  bankruptcy court much more effectively to
7  manage the entire bankruptcy administrative
8  process, but also tells everybody involved
9  what arguments they ought to be making where.
10        I decline to take the risk that a
11 bankruptcy court in Delaware would find that
12 I am acting in contempt of the automatic stay
13 by addressing this or that or the other
14 argument.  I decline to take that risk
15 because, as I just indicated, there is
16 absolutely no need for me to volunteer for
17 that risk.
18        All of you can go talk to the
19 bankruptcy court and figure out what the
20 bankruptcy court considers appropriate to do.
21 From the standpoint of all of the various
22 disputes among the parties, which surface
23 here as part of the sanctions dispute, I
24 happen to think that that's actually an

Page 14

1  advantage for Huizenga.  So, that Huizenga
2  has an opportunity to tell the bankruptcy
3  court what is really going on, in Huizenga's
4  view.
5          And I take it Huizenga is already
6  doing that, because Mr. Barber mentioned a
7  bad faith motion.
8      MR. BARBER:  A motion to dismiss the
9  bankruptcy as a bad faith filing.
10     THE COURT:  Okay.  And that obviously
11 is part of the same overall analysis that
12 Huizenga brings to the sanctions motions
13 here.
14         So, I feel very comfortable in
15 declining to pass upon the sanctions motions,
16 pending a determination by the bankruptcy
17 court as to whether I should or it should or
18 we both should or what.  Those motions will,
19 therefore, be entered and continued and any
20 further proceedings on them stayed until the
21 bankruptcy court has advised whether the
22 automatic stay applies to them or not.
23         This brings me back to the
24 primary issue.  There are two reasons that I

Page 15

1  am going to dismiss the 214.01 petition.  The
2  first reason is that I lack jurisdiction to
3  consider it in the first place.  I have no
4  authority, whatsoever, to overturn decisions
5  of the Appellate Court.  And to entertain the
6  petition would be for me to entertain an
7  argument that I should overturn decisions of
8  the Appellate Court.  I can't do that.
9          The second reason is that as
10 counsel for Risk Link Strategies has said
11 this morning, Risk Link Strategies itself is
12 of the view that its 214.01 can't proceed.
13 If a movant is of the opinion that its motion
14 it dead in the water, it is the rare court
15 that will disagree.
16         So, the 214.01 petition is
17 stricken for the two reasons that I gave you
18 and the sanctions motions are entered and
19 continued and stayed pending a determination
20 by the bankruptcy court in Delaware as to
21 whether those motions can proceed.
22         Rather than give you a status
23 date now, I think what would be preferable is
24 for me to ask you within two weeks, you being

Page 16

1  Huizenga in this instance, to provide the
2  Court with a letter status about the
3  proceedings in the bankruptcy court,
4  including whatever information you may then
5  have about the timing, likely timing, of the
6  bankruptcy court determination on the 362(a)
7  stay's applicability.
8          Armed with that, I can then set a
9  status that doesn't have you all coming back
10 here simply in order for me to say, oops,
11 sorry, too early, which I don't want to do.
12 So, that's the ruling of the Court this
13 morning.
14     MR. BARBER:  Thank you, your Honor.
15     MR. VISHNESKI:  We'll draw an order.

16         (Ending Time:  9:58 a.m.)

Page 17

1            REPORTER'S CERTIFICATE
2          I, BARBARA PERKOVICH, CSR No.
3  84-004070, Certified Shorthand Reporter,
4  certify:
5          That the foregoing proceedings
6  were taken before me at the time and place
7  therein set forth.
8          That the proceedings were
9  recorded stenographically by me and were
10 thereafter transcribed;
11         That the foregoing is a true and
12 correct transcript of my shorthand notes so
13 taken.
14         I further certify that I am not a
15 relative or employee of any attorney of the
16 parties, nor financially interested in the
17 action.
18         I declare under penalty of
19 perjury under the laws of Illinois that the
20 foregoing is true and correct.
21 Dated this 5th day of August, 2018.
22
23  _Barbara Perkovich_
    _____
    BARBARA PERKOVICH, C.S.R. No. 84-004070
24

## 1

**1031** 6:23
**11** 8:1

## 2

**2018** 5:12,13
**214.01** 5:9 6:8,12 7:10 15:1,12,16
**28** 5:13
**29** 5:12

## 3

**362(a)** 11:2 16:6
**3:40** 3:15

## 4

**449** 6:22

## 6

**6** 8:15
**648** 6:22

## 7

**7** 9:11
**7th** 4:14

## 9

**9** 9:11
**946** 6:23
**9:58** 16:17

## A

**a.m.** 16:17
**absolutely** 13:16
**accurate** 5:5
**act** 10:5
**acted** 5:11
**acting** 13:12
**action** 7:15 8:19, 21
**address** 5:22 11:20
**addressing** 13:13
**administrative** 13:7
**advantage** 14:1
**advised** 14:21
**affirmed** 4:11
**agree** 11:22
**ahead** 8:13 12:19 13:1
**aimed** 9:2,21
**Allon** 3:10
**allowed** 11:19
**analysis** 14:11
**appeal** 6:18
**Appeals** 4:11,15
**Appellate** 4:8, 17,18 7:13 15:5,8
**applicability** 6:3 16:7
**applicable** 8:22
**applies** 11:7,15 14:22
**approximately** 3:15
**argument** 6:9

**11:6 13:14 15:7
**arguments** 13:9
**Armed** 16:8
**asks** 11:15
**assertion** 3:23 4:6
**assertions** 6:2
**Association** 6:21
**attend** 10:17
**authority** 4:8,24 15:4
**automatic** 5:24 9:4 11:15 12:5 13:12 14:22
**award** 10:3

## B

**back** 7:15 13:3 14:23 16:9
**bad** 10:9 14:7,9
**bankruptcy** 5:13,15,24 6:1,4 7:14 8:5,9 9:5,12 10:4,6,8,20 11:1,16, 17 12:3,4,6,7,9,12, 16,18,24 13:6,7,11, 19,20 14:2,9,16,21 15:20 16:3,6
**Barber** 3:1,2 8:14,15 9:8,10 10:16 14:6,8 16:14
**based** 12:5
**basically** 9:14
**behalf** 3:2,6,8,10, 24
**Bell** 3:11
**briefing** 3:16 7:2
**brings** 14:12,23
**broad** 3:16
**broader** 9:17

**brought** 7:18,20

## C

**called** 7:3
**case** 4:1,12,19 8:22
**cases** 6:17,21 7:12,13
**caution** 11:5
**cert** 4:13
**challenge** 6:19
**Chapter** 8:1
**choice** 8:7,8
**chose** 7:24
**Chris** 3:2
**circuit** 4:15,19, 20,21,22,23 5:1 6:17,24 7:12 10:23
**circumstance** 10:24
**cited** 6:16 7:13
**citing** 8:20
**civil** 8:19
**claim** 10:4
**Clayborne** 3:9
**code** 6:1 9:12
**collecting** 9:21
**Collier** 12:13
**colorfully** 4:17
**comfortable** 14:14
**comforting** 12:17
**commences** 8:18
**common** 9:13
**conduct** 5:7
**consecutive** 5:18

**consequence** 8:4,7
**considers** 13:20
**contempt** 10:24 12:21 13:12
**context** 8:9
**continued** 14:19 15:19
**Cook** 10:23
**copies** 12:13
**correct** 4:6 8:2 9:7
**correctly** 9:2
**counsel** 3:14,23 6:14 9:2,16 10:1 15:10
**County** 10:23
**couple** 6:17 9:18
**court** 3:12,17 4:7, 8,11,15,18,20,21, 22,24 5:1,15,21,22 6:20,21 7:3,8,22 8:6,11,23 9:1,9,14, 19,23 10:7,14,20,23 11:6,16,17,23 12:3, 4,7,12,18 13:6,11, 19,20 14:3,10,17,21 15:5,8,14,20 16:2,3, 6,12
**court's** 12:6,9,11, 16
**courts** 4:15
**creditors** 10:12, 16,17
**Croix** 6:22

## D

**date** 5:12 15:23
**dead** 15:14
**dealing** 5:19
**debtor** 8:21 9:15, 20,22 10:2

**debtor's** 9:16

**decides** 11:18

**decisions** 9:19
12:4 15:4,7

**decline** 13:10,14

**declining** 14:15

**Delaware** 5:16
13:11 15:20

**denial** 4:13

**denser** 3:18

**determination**
14:16 15:19 16:6

**deviate** 4:23,24
5:2

**difficult** 8:11

**directs** 4:20

**disagree** 15:15

**dismiss** 10:8
14:8 15:1

**dispositive**
11:14 12:2

**dispute** 13:23

**disputes** 13:22

**District** 5:15
10:21

**Dowling** 3:8

**draw** 16:15

———————
**E**
———————

**early** 10:9 16:11

**effectively** 13:6

**elbows** 12:13

**emergency**
11:11

**enables** 13:5

**ending** 16:17

**entered** 14:19
15:18

**entertain** 15:5,6

**entire** 13:7

**exceptions**
9:11,12,13

**exist** 4:4

**express** 9:12

———————
**F**
———————

**F2d** 6:23

**F2nd** 6:22

**faith** 10:9 14:7,9

**famously** 4:14

**Federal** 9:17

**feel** 14:14

**figure** 12:14
13:19

**file** 10:8

**filing** 5:8,13 8:1,5,
9 10:9 14:9

**filings** 3:12

**find** 13:11

**fit** 12:14

**follow** 7:22

**Foreman** 6:22

**forge** 8:12

**forward** 10:1
11:19,24

**free** 9:24

**front** 12:15

———————
**G**
———————

**gave** 15:17

**give** 12:23 15:22

**Good** 3:1,4

**greatly** 12:16

**guess** 3:20

———————
**H**
———————

**happen** 11:12
13:24

**head** 8:1

**hear** 10:11,14

**held** 10:24 12:20

**helpful** 12:22

**Honor** 3:1,5 6:15
16:14

**Huizenga** 3:3
6:5 7:18 14:1,5,12
16:1

**Huizenga's**
14:3

———————
**I**
———————

**Illinois** 10:21

**including** 6:4
16:4

**Industries** 6:23

**information**
16:4

**initial** 8:17

**instance** 16:1

**instantaneousl
y** 11:13

**intention** 10:7

**involved** 12:23
13:8

**issue** 4:5 6:7
13:1,3 14:24

**issues** 3:17,18,
19,20,21,23 4:19
11:23

———————
**J**
———————

**Jay** 3:8

**John** 3:2,5 6:15

**judge** 8:16 10:21

**judges** 10:22
11:2

**judgment** 4:1
9:22

**June** 5:12,13

**jurisdiction** 4:3
5:2,4 15:2

**jurisdictions**
12:8

———————
**L**
———————

**lack** 15:2

**law** 7:14 8:22 9:13

**left** 12:8

**letter** 10:13 16:2

**level** 9:17 11:5

**lines** 13:5

**Link** 3:6,24 5:14
6:9,10 7:18,20,24
15:10,11

**Link's** 6:14

**literally** 4:23 10:3

**lot** 3:18 5:4

———————
**M**
———————

**make** 12:4

**making** 13:9

**manage** 13:7

**mandate** 4:19,20

**Martin** 3:11

**matter** 4:3 11:11

**meeting** 10:12,
16,17

**memory** 9:1

**mentioned** 14:6

**Miller** 3:2

**mini** 6:5

**monetary** 10:3

**morning** 3:1,4
15:11 16:13

**Morris** 8:20

**motion** 4:9 5:9
8:1 9:15,21 10:8
11:7 14:7,8 15:13

**motions** 5:9 7:13
8:24 11:10 14:12,
15,18 15:18,21

**motivated** 8:10

**movant** 15:13

**move** 7:6 10:1

**multiple** 6:2

———————
**N**
———————

**nature** 3:18

**non-
bankruptcy**
11:23 12:11,17,20

**normal** 11:5

**Northern** 10:21

———————
**O**
———————

**oath** 10:19

**occasional**
10:20

**occasions** 11:4

**oops** 16:10

**opinion** 15:13

**opportunity**
12:24 14:2

**opposed** 4:7

**order** 5:18 16:10,
15

**orders** 4:1,10

**ordinarily** 12:12

**original** 7:15,17

**out-of-district** 9:18

**overturn** 15:4,7

**P**

**p.m.** 3:15

**Pages** 9:11

**PALL** 7:10

**papers** 8:16 9:24

**part** 11:5 13:23 14:11

**parties** 11:22 13:22

**party's** 6:11

**pass** 14:15

**Paul** 3:5

**pending** 9:1 11:23 14:16 15:19

**person** 10:18

**petition** 6:12 8:2, 17 10:19 15:1,6,16

**Philip** 8:20

**picked** 4:16

**place** 12:7 15:3

**Plaintiff's** 3:14

**pleading** 8:17

**point** 6:6 8:10

**position** 6:11 7:4,7 8:13,16 10:22

**preferable** 11:20 12:2 15:23

**presently** 3:17 8:24

**Price** 8:20

**primary** 14:24

**problems** 4:4

**procedure** 8:20

**proceed** 9:14 15:12,21

**proceeding** 6:19 7:10,11,16,17, 20 9:5 10:6,9 11:8, 18

**proceedings** 13:4 14:20 16:3

**process** 13:8

**proper** 10:24

**properly** 5:22

**proposition** 9:20

**provide** 16:1

**purpose** 8:5 10:13

**purposes** 7:11

**purview** 11:2

**puzzles** 11:9

**Q**

**question** 5:3,6,7, 10,21 6:16 7:4,5,9 8:23 10:18 11:14 12:19

**questions** 5:11, 18,19,23

**R**

**raised** 5:17

**raising** 6:8

**rare** 15:14

**realize** 7:2

**reason** 9:4 12:1 15:2,9

**reasons** 9:10 14:24 15:17

**received** 3:14

**recent** 3:13

**records** 4:9

**Reed** 3:7

**refer** 3:21

**regard** 4:4

**relate** 7:15

**Remore** 6:23

**Renfro** 3:10

**risk** 3:6,24 5:14 6:9,10,13 7:18,20, 23 13:10,14,17 15:10,11

**Ritche** 3:6

**Ritchie** 3:11,24 5:8,14 6:9,10,13 7:18,20,23

**RRLS** 9:3

**rule** 4:8 7:10

**rules** 4:18 8:19

**ruling** 16:12

**rulings** 4:17

**S**

**Sabo** 3:9

**safely** 12:8

**Saint** 6:22

**sanction** 10:2

**sanctionable** 5:9

**sanctions** 8:24 9:15,21 10:1 11:10 13:23 14:12,15 15:18

**scholarly** 6:4

**senses** 5:4

**separate** 8:18

**serves** 9:2

**set** 8:15 9:10,24 16:8

**shoot** 7:24

**signed** 10:18

**simple** 8:12 11:13

**simply** 16:10

**simultaneous** 7:1

**sit** 12:12

**situation** 11:10, 21

**Smith** 3:7

**sole** 8:4

**solely** 8:10

**sophisticated** 12:10

**stand** 9:19

**standpoint** 12:23 13:21

**state** 9:18

**States** 5:14

**status** 15:22 16:2, 9

**stay** 5:24 6:4,13 7:14 9:4 11:2,7,15 12:5 13:12 14:22

**stay's** 16:7

**stayed** 8:22 9:4, 22 14:20 15:19

**stopped** 6:12

**straight** 8:12

**Strategies** 3:6 4:1 7:19,21,24 15:10,11

**Strategy** 6:10,11

**stricken** 15:17

**styles** 5:8

**subject** 4:3 8:19

**suggestions** 4:18

**supposed** 4:22

**surface** 13:22

**Swanson** 3:11

**T**

**talk** 6:18 13:18

**tells** 13:8

**term** 5:4

**terms** 4:21

**things** 12:14

**time** 3:22 16:17

**timing** 5:18 16:5

**treatise** 6:5

**tribunal** 12:17, 20,24

**U**

**United** 5:14

**unlike** 12:11

**usual** 8:19

**V**

**vacate** 7:14 8:17

**variety** 3:12

**versus** 6:22 8:20

**view** 7:9 11:1 12:6,9,11,16 14:4 15:12

**violating** 11:1

**virtue** 5:11

**Vishneski** 3:4,5 6:15,16 7:7 8:3,8 9:7 16:15

**void** 4:2,10

**volunteer** 13:16

---
**W**
---

**Wagner** 3:9

**waiting** 10:11,14

**Walker-bright**
   3:5

**wanted** 10:17

**water** 15:14

**week** 10:10

**weeks** 15:24

**whatsoever**
   15:4

**wrong** 5:13

---
**Y**
---

**yesterday** 3:15
   10:13

# Exhibit 50

**Order**                                                    (2/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Huizenga Managers Fund, LLC,
                    Plaintiff

                    v.                          No. _07 CH 09626_

A.R. Thane Ritchie, et al                          Judge Peter Flynn
                    Defendants

### ORDER

This matter coming to be heard on Ritchie Risk Linked Strategies, LLC's Motion to Vacate and Huizenga's Motions to Dismiss the Motion to Vacate and for Sanctions, due notice having been given, the Parties present, and the Court fully advised: IT IS HEREBY ORDERED THAT:

1. The Motion to Vacate is dismissed for the reasons stated by the Court on the record.

2. Huizenga's motions for sanctions are entered and stayed and continued pending ruling by the bankruptcy court as to the scope of the automatic stay for the reasons stated by the Court on the record.

3. Huizenga shall provide the Court with a status as to the bankruptcy proceeding on August 17, 2018

Atty. No.: __44486__

Name: __John S. Vishneski III__          ENTERED:

Atty. for: __Ritchie Risk Linked Strategies, LLC__

Address: __10 S. Wacker Dr.; Reed Smith LLP__          Dated: _____

City/State/Zip: __Chicago, IL  60606__

Telephone: __(312) 207-2404__

```
ENTERED
JUDGE PETER FLYNN -1784
AUG 03 2018
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK
```

Judge                          Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Copy Distribution - White: 1. ORIGINAL - COURT FILE  Canary: 2. COPY  Pink: 3. COPY          A-710