## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RITCHIE RISK-LINKED STRATEGIES, L.L.C., | Case No. 18-11555 (KJC) |
| Debtor. | **Objection Due: August 13, 2018, at 4:00 p.m. (Eastern)**<br>**Hearing Date: September 4, 2018, at 1:30 p.m. (Eastern)** |

**HUIZENGA MANAGERS FUND, LLC'S OBJECTION TO DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF REED SMITH LLP AS BANKRUPTCY COUNSEL**

**K&L GATES LLP**
Steven L. Caponi, Esq. (No. 3484)
600 N. King Street
Suite 901
Wilmington, DE 19801
Tel: (302) 416-7000
Email: steven.caponi@klgates.com

*Counsel To Huizenga Managers Fund, LLC*

Of counsel:

Christopher J. Barber, Esq.
Gary W. Garner, Esq.
Jonathan D. Miller, Esq.
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Email: cjb@willmont.com
       gwg@willmont.com
       jm@willmont.com

-and-

Steve Jakubowski, Esq.
ROBBINS SALOMON & PATT, LTD.
180 N. La Salle Street, Suite 3300
Chicago, IL 60601
Email: SJakubowski@rsplaw.com

Date: August 13, 2018

# **TABLE OF CONTENTS**

I.     JURISDICTION AND VENUE ........................................................................... 1

II.    FACTUAL BACKGROUND ............................................................................. 2

    A.    Events Leading to RRLS's Chapter 11 Bankruptcy Petition That Bear on Reed Smith's Application .................................................................................. 2

    B.    As the Debtor's Multi-Venue Campaign of "Piecemeal" Litigation Has Unraveled, Reed Smith Has Developed a Position at Odds with the Debtor ........ 4

        1.    Reed Smith's Conflicts with Creditors ....................................................... 4

        2.    Conflicts Arising from the DSA Action ...................................................... 6

        3.    Conflicts Arising from the Insider Actions to Which the Debtor Acquiesced ..................................................................................................... 7

        4.    Conflicts Arising from the Debtor's Frivolous Petition to Vacate, Including Apparent Conflicts within Reed Smith Itself ............................ 9

III.    ARGUMENT ..................................................................................................... 11

    A.    Reed Smith's Ongoing Representation of the Debtor's Creditors Is Disqualifying ...................................................................................................... 11

    B.    Reed Smith's Ongoing Representation of the Debtor's Members and Affiliates Is Disqualifying ................................................................................ 14

    C.    The Debtor's Financing of Reed Smith's Legal Fees through Ritchie Multi-Strategy Global, LLC Is Disqualifying ................................................. 15

    D.    The Debtor's Colorable Claims Against Reed Smith Are Disqualifying ............ 18

    E.    Reed Smith's Conflicts as a Witness to the Debtor's Proposed Claims Against Third Parties Are Disqualifying ............................................................ 20

    F.    *Nunc Pro Tunc* Approval Is Inappropriate........................................................ 22

IV.    CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arkansas Co.*,
798 F.2d 645 (3d Cir. 1986)........................................................................22, 23, 24

*In re B.E.S. Concrete Prods., Inc.*,
93 B.R. 228 (Bankr. E.D. Cal. 1988) ..............................................................17

*In re BH & P Inc.*,
949 F.2d 1300 (3d Cir. 1991)......................................................................11, 14

*In re Cantu*,
784 F.3d 253 (5th Cir. 2015) ......................................................................18, 20

*Cellular Eng'g, Ltd. v. O'Neill*,
820 P.2d 941 (Wash. 1991)..............................................................................13

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005)........................................................................11, 12

*Conn. Nat'l Bank v. Giacomi*,
699 A.2d 101 (Conn. 1997) ..............................................................................13

*Crown v. Kobrick Offshore Fund, Ltd.*,
8 N.E.3d 281 (Mass. App. Ct. 2014) ................................................................13

*Darnall Kemna & Co. v. Heppinstall*,
851 P.2d 73 (Alaska 1993)................................................................................13

*In re Diamond Mortg. Corp. of Ill.*,
135 B.R. 78 (Bankr. N.D. Ill. 1990) ................................................................12

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005) ................................................................12

*In re F/S Airlease II, Inc.*,
844 F.2d 99 (3d Cir. 1988)................................................................................22

*In re Filene's Basement, Inc.*,
239 B.R. 850 (Bankr. D. Mass. 1999) ..............................................................20

*In re First Jersey Sec., Inc.*,
180 F.3d 504 (3d Cir. 1999).............................................................................11

*In re Fleming Cos.*,
305 B.R. 389 (Bankr. D. Del. 2004) ................................................................17

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010)..................................................................20

*In re Harris Agency, LLC*,
  462 B.R. 514 (E.D. Pa. 2011) ..............................................................16

*In re Hathaway Ranch P'ship*,
  116 B.R. 208 (Bankr. C.D. Cal. 1990)...................................................16

*In re Jeep Eagle 17, Inc.*,
  2009 WL 2132428 (Bankr. D.N.J. July 13, 2009) .................................14

*In re Keller Financial Services of Florida, Inc.*,
  248 B.R. 859 (Bankr. M.D. Fla. 2000) ..................................................22

*In re Marvel Entm't Grp., Inc.*,
  140 F.3d 463 (3d Cir. 1998)............................................................11, 22

*In re Nat'l Distribs. Warehouse Co.*,
  148 B.R. 558 (Bankr. E.D. Ark. 1992) ......................................14, 15, 16

*Peregrine Fin. Grp., Inc. v. Trademaven, L.L.C.*,
  909 N.E. 2d 837 (Ill. App. Ct. 2009) ....................................................19

*In re Phila. Athletic Club, Inc.*,
  20 B.R. 328 (E.D. Pa. 1982) ...........................................................15, 22

*In re Pillowtex, Inc.*,
  304 F.2d 246 (3d Cir. 2002)...................................................................17

*In re Project Orange Assocs., LLC*,
  431 B.R. 363 (Bankr. S.D.N.Y. 2010) ..............................................12, 14

*Ritchie v. Huizenga Managers Fund, LLC*,
  2017 WL 7803924 (Del. Super. Ct. Dec. 21, 2017) ...........................3, 19

*In re S. Kitchens, Inc.*,
  216 B.R. 819 (Bankr. D. Minn. 1998) ...................................................20

*In re Tamojira, Inc.*,
  210 B.R. 702 (Bankr. E.D. Va. 1996) ....................................................16

*In re Twinton Props. P'ship*,
  27 B.R. 817 (Bankr. M.D. Tenn. 1983) .................................................22

*In re United Cos. Fin. Corp.*,
  241 B.R. 521 (Bankr. D. Del. 1999) ......................................................23

iii

*In re Woodworkers Warehouse, Inc.,*
   303 B.R. 740 (Bankr. D. Del. 2004) ......................................................................................11

**Statutes**

11 U.S.C. § 101.................................................................................................................................11

11 U.S.C. § 327.................................................................................................................................11

6 Del. C. § 73-605.............................................................................................................13, 14, 19, 20

Ill. Comp. Stat. 5/2-1402....................................................................................................................8

Ill. Comp. Stat. 5/13-214.3.................................................................................................................7

Now comes Huizenga Managers Fund, LLC ("Huizenga"), an unsecured creditor herein, for its objection to Ritchie Risk-Linked Strategies, LLC's (the "Debtor") Application for an Order authorizing the Debtor to retain Reed Smith LLP ("Reed Smith") as bankruptcy counsel. *See* D.I. 22 (the "Application").    In short, the Application's boilerplate nature and faux verisimilitude glosses over Reed Smith's serious conflicts that prevent it from serving as a disinterested representative of the Debtor.  Reed Smith represents creditors of the Debtor.  Reed Smith represents a member of the Debtor.  Reed Smith gets paid through the Debtor's largest member (with more than 95% ownership over the Debtor).  Reed Smith is likely to be a witness in any action involving the malpractice claim that the Debtor now seeks to pursue against its trial counsel.    In short, by representing the Debtor and its affiliates, Reed Smith has become hopelessly tied up in conflicts among those entities. *See* MTD at 5–6, D.I. 32-1; *see also* Ex. 19, B-229 ¶ 10 (Ritchie's structure depends upon entities have offsetting "rights and obligations").

Huizenga submits this objection to the Application, on the grounds that Reed Smith is not "disinterested" and, indeed, has interests that are adverse to the Debtor (the "Objection").   In support of its Objection, Huizenga respectfully states the following:

## I.    <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction to consider Huizenga's objection pursuant to 28 U.S.C. §§ 157 and 1334.  Reed Smith's Application, D.I. 22, presents a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

Venue for Reed Smith's Application, D.I. 22, is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    FACTUAL BACKGROUND

### A.    Events Leading to the Debtor's Chapter 11 Bankruptcy Petition That Bear on Reed Smith's Application

On August 8, 2018, Huizenga filed a Motion to Dismiss this case for cause under Sections 305(a) and 1112(b), including, but not limited to, the requirement that Chapter 11 petitions be filed in good faith. *See* D.I. 32. Huizenga incorporates the factual background and terminology contained in its Motion to Dismiss filing as if fully set forth herein.

The Motion to Dismiss chronicles the Debtor and Affiliated Judgment Parties' outright abuse of and contempt for the judicial system—through (i) improperly transferring assets, including via sham default judgments pursued (and, in one case, obtained) during the pendency of citations to discover assets, *see* MTD at 10–14, D.I. 32-1, (ii) manufacturing frivolous claims in six separate fora against Huizenga—with the knowledge, and often assistance, of Reed Smith, *see generally id.* at 16–22—and (iii) selective use of the bankruptcy stay as a litigation tactic. *See id.* at 33. That abuse continues in this Court with a bankruptcy filing that lacks any indicia of good faith. *See id.* at 30–35.

The Motion to Dismiss reveals numerous circumstances that bear on Reed Smith's Application:

- Reed Smith currently represents (i) the Debtor and two of the Debtor's purported creditors, Ritchie Partners (which is also a member of the Debtor, *id.* at 5), and RCM (Amended Schedules at 22, D.I. 26), in the Debtor and Affiliated Judgment Parties' appeal of the Second Judgment in the DSA Action, MTD at 4–5, D.I. 32-1, (ii) the Debtor, those same purported creditors, and creditor Thane Ritchie (Amended Schedules at 19, D.I. 26), in the First Delaware Action, MTD at 16, D.I. 32-1, and (iii) the same parties in their action against their litigation insurers (also creditors here). *See id.* at 12;

2

*see also* Decl. ¶¶ 13(b)–(c), 13(e), D.I. 22-2.  (And, Reed Smith previously represented those same Ritchie-creditors and the Debtor in Huizenga's fraud proceedings.  Decl. ¶13(d), D.I. 22-2.)  The Debtor's Application glosses over these clear conflicts, as if they were all cured long ago, stating that "Reed Smith also *represented* the Debtor and certain other defendants affiliates in connection with litigation matters."  *See* App. ¶ 43, D.I. 22 (emphasis added).

- Far from being some policeman of "piecemeal litigation," *see id.* ¶ 42, Reed Smith has actively supported the Debtor and its affiliates' claim-splitting campaign.  *See* MTD at 16–22, D.I. 32-1.  Reed Smith's Delaware office filed the First Delaware Action, which should have been filed in the DSA Action.  *Accord First Delaware Action*, 2017 WL 7803924, at *2–3 (imposing stay).  In doing so, Reed Smith transformed claims that the Debtor (mistakenly) views as having value up to $40 million into a virtual nullity.  *See* Amended Schedules at 16, D.I. 26 (duplicative "unfiled" claims).  The Application then ignores the other five actions that the Debtor or its affiliates have launched.  *See* MTD at 17–22, D.I. 32-1.[1]

- More recently, Reed Smith has been a knowing bystander to—and, at times, willing participant in—the Debtor's untoward efforts to circumvent the Illinois courts' current and impending judgments.  Indeed, Reed Smith knew of at least one of the sham default

---

[1] At other times, the Application misrepresents prior proceedings.  The Debtor complains about "a great deal of collection matters."  *See* App. ¶ 41, D.I. 32-1.  However, Huizenga initiated a single collection proceeding against the Debtor and Affiliated Judgment Parties in Cook County, Illinois, *see* MTD at 11, D.I. 32-1, after the trial judge ordered that collection proceedings be severed from the underlying DSA litigation.  And those proceedings could not have been burdensome to the Debtor.  Indeed, the Debtor refused to comply with a Court order by refusing to appear or produce any documents related to its assets.  Rather, Reed Smith filed a Notice of Non-Appearance on behalf of the Debtor, Ex. 15, B-177–78, months before the Debtor would then institute the Second DuPage County Action in Illinois.  *See* MTD at 21–22, D.I. 32-1.

judgment actions, i.e. the Swansea Trust Action, that the Debtor's insiders instituted against the Debtor (i.e. Reed Smith's longtime client) but apparently did nothing to stop it, even as the Debtor now seeks to avoid such transfers as untoward. *See* MTD at 12–14, D.I. 32-1.

These proceedings were long in the making for the Debtor.  Indeed, as Mr. Gwynne's Declaration discloses, Reed Smith received a retainer as early as May 26, 2017, i.e. more than one year in advance of these bankruptcy proceedings, to plan for the Debtor's potential bankruptcy.  Decl. ¶ 29, D.I. 22-2.  When it did so, Reed Smith consulted directly with Thane Ritchie.  *See, e.g.*, Ex. 9, B-93 (directing message to Thane Ritchie regarding $50,000 bankruptcy retainer to Thane Ritchie); Ex. 11, B-95 (referencing "discussion with Kurt," presumably Mr. Gwynne).  Rather than file for bankruptcy then, when the Debtor had a mere $97 in assets, *see* MTD at 7, D.I. 32-1, it waited to do so until it faced serious sanctions for polluting court dockets and flouting the Illinois courts' judgments. *See id.* at 23–24, 35–39.

> **B.**    **As the Debtor's Multi-Venue Campaign of "Piecemeal" Litigation Has Unraveled, Reed Smith Has Developed a Position at Odds with the Debtor**

As the Debtor and its affiliates' "piecemeal" litigation unraveled, *see id.* at 22–24, the finger pointing began in this bankruptcy, with Reed Smith seemingly in the crossfire and actively involved in the Debtor's and its affiliates' disturbing conduct.  As set forth below, Reed Smith, during the course of representing the Debtor, now stands in conflict with the Debtor.

> **1.**    **Reed Smith's Conflicts with Creditors**

Reed Smith's conflicts do not end with its ongoing representation of RCM, Ritchie Partners, and Thane Ritchie in litigation.  *See supra* Section II(A).  Specifically, the Debtor now posits that Ritchie Multi-Strategy Global Trading, Ltd., an offshore creditor, financed the fees that the Debtor owed to Reed Smith.  *See* App. ¶¶ 66–67, D.I. 22; *see also* Decl. ¶ 16, D.I. 22-2.

4

Of course, this glosses over that Ritchie Multi-Strategy Global Trading, Ltd. apparently did not have anything to do with payments of Reed Smith's invoices. Contrary to his own Declaration (at ¶ 16), Debtor's counsel stated at the Section 341 meeting that invoices for the Debtor's legal services were "paid by [RCM], which is the manager of [Ritchie Partners]. And then the—it would—*the claim against the Debtor for payment of that*, but the way that was actually paid was through the financing provided by *Ritchie Multi-Strategy Global, L.L.C.*" Ex. 23, B-289 at 27:22–28:9 (emphasis added).[2] In other words, there might not be the financing through Ritchie Multi-Strategy Global Trading, Ltd. that the Debtor's Application—and Mr. Gwynne's declaration—claims existed. Rather, Reed Smith appears to have been a beneficiary of financing obtained through the Debtor's largest member, Ritchie Multi-Strategy Global, LLC. Petition at 12, D.I. 1.[3]

What's more, Ritchie Multi-Strategy Global, LLC now pursues a claim against Huizenga in the Third Delaware Action to recover for "liability" that it allegedly "incurred" on account of

---

[2] Mr. Cilento, the Debtor's representative at the Section 341 Meeting, then corrected counsel as to whether RCM even paid Reed Smith's fees: "Excuse me. It is my belief that the invoices were paid by Ritchie Capital Management, Ltd." Ex. 23, B-289 at 28:10–12. This distinction between RCM, i.e. an onshore entity, and Ritchie Capital Management, Ltd., an offshore entity, is significant, given the Debtor and Affiliated Judgment Parties' efforts to offshore their assets to avoid judgment collection. *See* MTD at 14–15, D.I. 32-1.

Mr. Cilento's understanding is partially correct, as wire transfer records confirm that such offshore entity paid at least some of Reed Smith's fees. At one point, the Debtor actually paid the invoices, through its "service provider," 60 Degrees. *See* Ex. 2, B-86; Ex. 3, B-87; Ex. 4, B-88. Then came payment directly by then-Illinois-based RCM. *See* Ex. 5, B-89. Then came direct payment from Ritchie Multi-Strategy Global Trading, Ltd., the offshore Master Fund. *See* Ex. 6, B-90. Then came payment from Ritchie Capital Management Ltd., i.e. RCM's offshore affiliate. *See* Ex. 7, B-91; Ex. 8, B-92; Ex. 10, B-94 (bankruptcy retainer); Ex. 13, B-136. Then came a new offshore affiliate (a successor to Ritchie Capital Management Ltd.), Ritchie Capital Management SEZC Ltd. *See* Ex. 18, B-222.

[3] Huizenga does not rule out the possibility that Ritchie Multi-Strategy Global, LLC then sought to nullify its liability to the Debtor, i.e. the litigation financing, by seeking indemnity from Ritchie Multi-Strategy Global Trading, Ltd. Such would be par for the course. *See, e.g.*, Ex. 19, B-229 ¶ 10.

its indemnification of the Debtor and Affiliated Judgment Parties (who are otherwise represented by Reed Smith).[4]  *See* MTD at 20, D.I. 32-1. not "financing" through Ritchie Multi-Strategy Global Trading Ltd.[5]  As such, Reed Smith's financer, i.e. the Debtor's indemnitor, is adverse to the Debtor.

### 2.    Conflicts Arising from the DSA Action

The Debtor now lays blame for the Illinois courts' judgments with "external counsel," *see* Amended Schedules at 16, D.I. 26, for their failure to timely raise and preserve an argument that the Delaware Securities Act does not apply "to transactions occurring outside of Delaware."[6] *See id.*  Even while the Debtor, through Reed Smith, scrupulously identifies the non-Ritchie entities and non-Ritchie lawyers against whom it may file claims,[7] the Debtor omits any detail about the "external counsel" in its sights.  *See id.*  However, the Debtor's representative at the Section 341 Meeting, after disclaiming any familiarity with the proposed malpractice claim, testified that the Debtor may have such claims against its trial counsel, Sidley, *see* Ex. 23, B-293 at 43:8–19, at the very least.

---

[4] RCM and Ritchie Partners might also have a parallel indemnification claim against the Debtor, which its Schedules fail to disclose.  *But see, e.g.*, App. ¶ 64 (identifying such claims).  Indeed, the Debtor's Operating Agreement indemnifies the Debtor's Managing Member (i.e. Ritchie Partners) and RCM.  *See* Ex. 1, B-31 at 27 § 2.9(a).  In related litigation, the Debtor, through Reed Smith, has argued that the DSA would not bar such an action.  *See* Ex. 12, B-119–34.

[5] Ritchie Multi-Strategy Global, LLC previously alleged that it actually paid these fees, but upon reflection, it withdrew that allegation in favor of the notional allegation that it "incurred liability."  *See* MTD at 20, D.I. 32-1.  If Ritchie Multi-Strategy Global Trading Ltd. actually financed the Debtor's fees, there is no claim for Ritchie Multi-Strategy Global LLC to pursue, as its "liability" has already been extinguished.  And if the Debtor did not actually request the financing from Ritchie Multi-Strategy Global, LLC, it never suffered any loss.

[6] The Affiliated Judgment Parties would have similar claims, which they too have not yet filed.

[7] The Debtor even names Scott Church, Esq. (Amended Schedules at 16, D.I. 26), an Associate at Williams Montgomery & John Ltd., who was still in law school when the Debtor was held to have violated the DSA.

For its part, Reed Smith appears to think otherwise.  Indeed, on August 30, 2017, long after the Illinois Supreme Court denied the Debtor and Affiliated Judgment Parties' petition for leave to appeal, Reed Smith was in Delaware attacking the Illinois courts' judgments as "problematic" and "manifestly incorrect."  *See* MTD at 16, D.I. 32-1.  Steadfast in its position, Reed Smith devoted an entire section of the Debtor's Petition for a Writ of Certiorari to argue "[u]nder Illinois state law, Petitioner has not waived the argument that the Illinois courts must apply the *A&R Logistics* holding."  Ex. 14, B-171–75.  In other words, there was something left for Sidley (or Reed Smith) to do from Reed Smith's perspective before any malpractice claim could accrue.  In Reed Smith's apparent view, therefore, the Debtor's proposed malpractice claim has no merit at all.  As such, in any malpractice proceedings brought by the Debtor against Sidley, Sidley could be expected to call lawyers from Reed Smith in its own defense and mark Reed Smith's cert petition as Exhibit 1 at trial.[8]

### 3. Conflicts Arising from the Insider Actions to Which the Debtor Acquiesced

As this bankruptcy approached, the Debtor acquiesced to two default judgments against itself totaling $21,000,000.00 that it now seeks to void in bankruptcy.  Yet, Reed Smith, through John Vishneski, Esq. of its Chicago office, had knowledge of at least one of these actions, the Swansea Trust action, well in advance of default judgment.  *See* MTD at 12, D.I. 32-1.  That action sought to recover $20 million from the Debtor for alleged waste of insurance proceeds in litigating the DSA Action.  *Id.* at 11–12.  Despite Reed Smith's knowledge of the action, Ritchie insiders continued to pursue claims against themselves, and the Swansea Trust action proceeded

---

[8] Huizenga has been unable to fully assess the value of the Debtor's proposed malpractice action, in part because the Debtor has not provided any valuation or assessment of it.  But, Huizenga notes that Illinois has a two year statute of limitations for legal malpractice claims, *see* 735 Ill. Comp. Stat. 5/13-214.3(b), and a six year statute of repose.  *Id.* (c).  Absent a tolling agreement, that limitations period likely expired long ago—trial in the DSA Action ended in 2011 after all.

to default judgment.  *See id.* at 12–13.  While Reed Smith stood silent, it was pursuing an action against the Debtor's insurers seeking insurance funds (that the Swansea Trust considered, and the Debtor did not dispute, wasted) for its defense of the DSA Action—the merits of which are now clouded by the Debtor's default judgment on the Swansea Trust's claim that the Debtor wasted insurance proceeds.  *See id.* at 12.

Then came an unprompted admission from Mr. Gwynne of Reed Smith's Delaware office at the Section 341 Meeting.  When asked about the Swansea Trust default judgment, Mr. Gwynne admitted on behalf of the Debtor that the default judgment was "taken to protect the Debtor because of concerns that Huizenga was trying to execute on the Debtor's claims" and so "perhaps they could defend the Debtor's assets from execution or act first potentially."  Ex. 23, B-292 at 38:13–39:5.  Meanwhile, the Debtor, the Clayborne Firm (which filed the Swansea Trust action against the Debtor and then simultaneously represented the Debtor as to its petition to vacate), and Reed Smith were each subject to citations to discover assets.  *See* MTD at 11, D.I. 32-1; *see also* Ex. 17, B-213–21.  Such citations were issued by order of the Illinois courts and contained a restraining provision prohibiting the transfer of the Debtor's assets.  Violations of such provision are potentially punishable as criminal contempt.  *See* 735 Ill. Comp. Stat. 5/2-1402(f)(1).  Despite this, the Debtor acquiesced to the default judgments in the RRLO action and Swansea Trust action (in which judgment was entered after the collection proceeding ended).  Accordingly, Huizenga has since raised Mr. Gwynne's admission to point out that the sanctionable conduct may trigger Section 362(b)(1), the criminal prosecution exception to the bankruptcy stay.  *See* Ex. 24, B-344–45; *see also* Ex. 21, B-263 n.12.

### 4.    Conflicts Arising from the Debtor's Frivolous Petition to Vacate, Including Apparent Conflicts within Reed Smith Itself

Huizenga's concerns with Reed Smith's ability to serve as the Debtor's bankruptcy counsel do not end there.  Indeed, on June 14, 2018, the Debtor, through Reed Smith, filed a mysterious motion to voluntarily dismiss its own appeal of the DSA Action—nevermind the DSA issue or any other issue that it complained about in the First Delaware Action—thus beginning frantic weeks that culminated in Reed Smith's admission that the Debtor filed this bankruptcy, in part, to jettison a petition to vacate Huizenga's judgments that the Debtor had filed in the interim.  MTD at 24, D.I. 32-1.

The petition to vacate itself raises significant issues with Reed Smith's ability to represent the Debtor here.  Even while Reed Smith has appeared to adopt the petition to vacate filed by the Clayborne Firm on behalf of the Debtor, *see* Ex. 20, B-244–45 at 5:8–6:5, and argue its merits, *see* Ex. 25, B-352 at 6:7–7:21 (suggesting petition to vacate is direct appeal), the Debtor has never listed its action to vacate the judgments as an asset in bankruptcy, even though the Debtor's "main assets are litigation claims."  Amended Petition at 5, D.I. 17.  As such, the Debtor's bankruptcy papers have become a basis to argue that the Debtor's petition to vacate is frivolous and worthless and should subject the Debtor and its counsel, including the Clayborne Firm and Reed Smith, to sanctions.[9]  *E.g.*, Ex. 21, B-255 n.1.

But, the Illinois state court proceedings on the Debtor's petition to vacate have transformed into a forum where the Debtor's post-judgment conduct—for which it has paid (or caused to be paid) its lawyers approximately $7 million (and counting), MTD at 38 n.12, D.I. 32-

---

[9] The Debtor's list of liabilities is problematic for the same reason—it does not disclose the sanctions that Huizenga seeks against the Debtor (or that the Court might impose in its own right).  Indeed, the Debtor pays no more than a passing mention to Huizenga's Motion for Sanctions in its Application.  *See* App. ¶ 41, D.I. 22 (generally referring to "motions for sanction [sic] filed by Huizenga").

1—would be under the microscope.  Indeed, Judge Flynn noted that he "treat[s] [Huizenga's] sanctions motion very serious[ly]" in light of "[t]he antics which have gone on in this case."  Ex. 20, B-246 at 10:13–21.  In doing so, he tendered a Seventh Circuit case to the parties in which the Court made a criminal referral.  *Id.* (citing *Teledyne Techs. Inc. v. Shekar*, Case No. 17-2171, 2018 WL 3098949 (7th Cir. June 25, 2018)).  Presaging his dismissal of the petition to vacate weeks later, Judge Flynn stated an initial conclusion that the Petition to Vacate "is not just wrong, but frivolous."  *See* Ex. 20, B-245 at 9:9–17.

After the Debtor and its counsel invoked the bankruptcy stay to stop these proceedings, the parties filed briefs as to the merits of that proposal on July 18, 2018.  *See* Exs. 21 & 22.  In its brief, Reed Smith again did not disavow or withdraw the Petition to Vacate.  Instead, Reed Smith—on behalf of the Debtor and itself—invoked its own client's bankruptcy to argue that non-debtor Reed Smith could not be sanctioned without running afoul of the bankruptcy stay. *See* Ex. 22 at B-279–80.

Then came another unprompted admission, this time from Mr. Vishneski of Reed Smith's Chicago office.  Specifically, Mr. Vishneski admitted that attempting to stay its petition to vacate "was a choice in . . . the context of the filing of the bankruptcy, which is not motivated solely by that point."  Ex. 25, B-352 at 7:22–8:10.  Since then, Huizenga has raised this admission in support of its Motion to Dismiss the bankruptcy for cause.  MTD at 2, D.I. 32-1.

For these reasons and the reasons that follow, Reed Smith is inextricably tangled up in the Ritchie Rube Goldberg machine where all assets and liabilities appear to be reciprocal.  The conflicts that have resulted, including the Debtor's potential unfiled litigation claims against Reed Smith, and the liabilities that the Debtor continues to accrue on account of its litigation

conduct through Reed Smith, render Reed Smith utterly incapable of adequately representing the Debtor.

## III.   ARGUMENT

### A.   Reed Smith's Ongoing Representation of the Debtor's Creditors Is Disqualifying

The trustee may only employ counsel that "do[es] not hold or represent an interest adverse to the estate, and that are disinterested persons." *See* 11 U.S.C. § 327(a).   Such a "disinterested person[]" must not "have an interest materially adverse to the interest of the estate or of any class of creditors . . . , by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." *See id.* § 101(14)(C).   Proposed bankruptcy counsel may be rejected for an actual or potential conflict of interest.   Where such a conflict is "actual," there is a per se rule disqualifying bankruptcy counsel. *See In re First Jersey Sec., Inc.*, 180 F.3d 504, 509 (3d Cir. 1999) ("Where there is an actual conflict of interest, . . . disqualification is mandatory."); *In re BH & P Inc.*, 949 F.2d 1300, 1315–17 (3d Cir. 1991); *see also In re Woodworkers Warehouse, Inc.*, 303 B.R. 740, 742 (Bankr. D. Del. 2004).   Where such a conflict is "potential," the court has "wide discretion" to disqualify counsel based on the circumstances of a case. *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998); *see also Woodworkers*, 303 B.R. at 742.   Indeed, "[t]he court should generally disapprove employment of a professional with a potential conflict." *BH & P*, 949 F.2d at 1316 (affirming quoted standard from District Court); *see also Marvel*, 140 F.3d at 476; *Woodworkers*, 303 B.R. at 742 ("In most instances a potential conflict should be the basis for disqualification . . . .").

Courts in this Circuit have disqualified proposed bankruptcy counsel where such counsel has represented the Debtor's creditors.   In *In re Congoleum Corp.*, the Third Circuit reversed the approval of Chapter 11 bankruptcy counsel that concurrently represented plaintiffs with creditor

claims against the bankruptcy estate.  426 F.3d 675, 683 (3d Cir. 2005).  The Third Circuit did not identify whether this conflict was "actual" or "potential," but reasoned that counsel's "status as co-counsel with Weitz . . . represent[s] [a] factor[] which prevent[s] Gilbert from being completely loyal to Congoleum's interests" in bankruptcy.  *See id.* at 692 (conflict not waivable). Judge Walrath's opinion in *In re eToys, Inc.* is similarly instructive.  331 B.R. 176 (Bankr. D. Del. 2005).  There, a law firm simultaneously represented Chapter 11 debtors and a third party against whom the debtors had claims.  Such an arrangement was an "actual conflict of interest" and disqualified the firm from representing the debtors.  *See id.* at 192; *see also In re Project Orange Assocs., LLC*, 431 B.R. 363, 371–72, 374–75 (Bankr. S.D.N.Y. 2010) (collecting cases; "Both commentators and courts conclude that disabling adverse interests may exist where the professional to be retained also represents creditors of the debtor."); *In re Diamond Mortg. Corp. of Ill.*, 135 B.R. 78, 90 (Bankr. N.D. Ill. 1990) (conflict arising from simultaneous representation of debtor and creditor not waivable).

Similarly here, each of the Affiliated Judgment Parties that Reed Smith represents also has claims against the Debtor.  This simultaneous representation is already prejudicing the Debtor.  Unbelievably, the Debtor apparently does not intend to dispute any of the Affiliated Judgment Parties' creditor claims.  *See* Amended Schedules at 19, 22, D.I. 26 (not identifying such claims as disputed).  But, those creditor claims for indemnification, management fees, and professional services/expenses, identified in the Debtor's Amended Schedules, *id.*, arise under the Debtor's Operating Agreement.  *See* Ex. 1, B-31 (indemnification rights of Affiliated Judgment Parties); *id.*, B-69–70 (rights of same to management fees and expenses).  To enforce those obligations, the Debtor's creditors would need to file breach of contract claims against the Debtor under the Operating Agreement for the Debtor's failure to provide the monies owed.

That is where the creditors' claims get murky.  Since those creditors, i.e. Reed Smith's clients, violated the DSA (as the Illinois courts held), they may not base any suit, e.g., a suit to pursue their creditor claims for indemnification, on the Operating Agreement.  *See 6 Del. C.* § 73-605(f); *see also, e.g.*, *Darnall Kemna & Co. v. Heppinstall*, 851 P.2d 73, 78 (Alaska 1993); *Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101, 127–29 (Conn. 1997); *Crown v. Kobrick Offshore Fund, Ltd.*, 8 N.E.3d 281, 292 (Mass. App. Ct. 2014); *Cellular Eng'g, Ltd. v. O'Neill*, 820 P.2d 941, 952 (Wash. 1991).  So, far from not disputing the creditor claims of RCM, Ritchie Partners, and Thane Ritchie, the Debtor should oppose them with full force.  Were it to do so, however, the Debtor would be admitting that the basis for its proposed indemnification claim against Huizenga, *see* Amended Schedules at 16, D.I. 26, which is also the subject of the First Delaware Action (in which Reed Smith represents the Debtor and Affiliated Judgment Parties), is frivolous.  But, by not disputing the creditor claims, the Debtor would acquiesce to yet more debt that is entirely avoidable under applicable law.  Nor does the Debtor ever propose how it might resolve various contribution rights that the Debtor and Affiliated Judgment Parties could invoke against each other.  The Debtor's apparent unwillingness to invoke the DSA (or address the intercreditor conflicts), for its benefit while represented by Reed Smith is disqualifying.[10]

Apparently admitting to this conflict, Reed Smith buries its proposed fix—conflicts counsel—deep within its papers.  *See, e.g.*, App. at 18 n.6, D.I. 22; Decl. at 6 n.3, D.I. 22-2.  *But see* App. ¶ 32 ("[T]o the best of Debtor's knowledge, Reed Smith does not hold or represent any interest adverse to the Debtor's estate . . . .").  The Debtor cites nothing that supports such a fix in these circumstances.  Of course, such a fix is unworkable, where, as here, such claims are

---

[10]  It gets worse still because the Debtor failed to fully disclose the claims of the Affiliated Judgment Parties against the Debtor.  While the Debtor identifies Thane Ritchie's proposed indemnification claim, it ignores that RCM and Ritchie Partners, i.e. Reed Smith's clients, have parallel claims under the Operating Agreement.  *See supra.*

"central" to the bankruptcy. *See Project Orange*, 431 B.R. at 376. Indeed, the indemnification claims against the Debtor would determine whether the Debtor and Affiliated Judgment Parties can properly invoke the Debtor's Operating Agreement, notwithstanding the Illinois court's finding of liability under the DSA and the DSA's bar provision in Section 73-605(f). *See supra*. This would also determine whether the Debtor's proposed contract claims against Huizenga, paralleling its claims in the First Delaware Action, have the value (up to $40 million) that the Debtor asserts,[11] and whether the Debtor has any liability to the Affiliated Judgment Parties. There could be no issue more central than this.[12] *See Project Orange*, 431 B.R. at 376.

### B.   Reed Smith's Ongoing Representation of the Debtor's Members and Affiliates Is Disqualifying

Reed Smith is more conflicted still, as it currently represents shareholders of the Debtor. Ritchie Partners is the Debtor's managing member and, in that capacity, owns approximately 1% of the Debtor's membership interests. *See* MTD at 5, D.I. 32-1. Yet, while Reed Smith represents the Debtor, it also represents Ritchie Partners, including in the First Delaware Action, the Debtor's insurer action, and underlying DSA Action. Such representation is disqualifying under the law of the circuit. *See BH & P*, 949 F.2d at 1307–08, 1315, 1317 (finding actual conflict where proposed counsel simultaneously represented shareholder-creditors of the bankruptcy estate and bankruptcy estate); *see also, e.g., In re Jeep Eagle 17, Inc.*, Civ. No. 09-23708, 2009 WL 2132428, at *4 (Bankr. D.N.J. July 13, 2009) (collecting cases, and finding actual conflict where debtors sought to retain counsel that would also represent shareholder-creditor); *In re Nat'l Distribs. Warehouse Co.*, 148 B.R. 558, 563–64 (Bankr. E.D. Ark. 1992)

---

[11] In the Third Delaware Action, Ritchie has identified such value as more than $18 million. *See* Ex. 19, B-239 ¶ 47.

[12] Indeed, Reed Smith would be left to represent the Debtor as to mere crumbs, like its faux intellectual property claims. *See* MTD at 24, D.I. 32-1.

(disqualifying attorneys that represented debtor's shareholder in litigation where the debtor, principal, and others had "entanglement of interests"); *In re Phila. Athletic Club, Inc.*, 20 B.R. 328, 337–38 (E.D. Pa. 1982) (finding adverse interest where proposed counsel previously represented partners with ownership interest).

Indeed, the *National Distributors* court could have been anticipating a Debtor such as Ritchie Risk-Linked Strategies, LLC:

> The disqualification of the debtor's attorneys does not, however, entirely cure the conflict of interest situation. The chief executive officer and shareholder has acted in disregard of the corporate entities to the detriment of the debtor corporation. The claims of and against the alter-egos are numerous and large. It does not appear that it will be sufficient for each person, natural and corporate, to have its own attorney while O'Neal acts for the debtor-in-possession.

148 B.R. at 563–64; *see also Phila. Athletic*, 20 B.R. at 337 ("The record shows that [the debtor] is merely a straw corporation, a 'shell' for the true owner of the business, SRI. [Purported partners of SRI] claim SRI is a general partnership and for present purposes we will assume this to be true. The interests of a partnership often conflict with the interests of its general partners." (citation omitted)).

So too here, where the Debtor and its affiliates have overlapping contractual relationships, *see* MTD at 22 n.9, D.I. 32-1, purporting to enforce those relationships through untoward claims against themselves and claims against their affiliates, and then foisting their contractual liabilities upon Huizenga in contravention of the DSA.

## C.    The Debtor's Financing of Reed Smith's Legal Fees through Ritchie Multi-Strategy Global, LLC Is Disqualifying

Reed Smith's receipt of payments of over $2.2 million (Decl. ¶ 16, D.I. 22-2) through financing provided by Ritchie Multi-Strategy Global, LLC, i.e. the Debtor's largest member, Pet. at 11, D.I. 1, is alone disqualifying. Indeed, "[a]s a general rule, an attorney representing a

debtor should not receive compensation from any of the creditors, directly or indirectly." *See Nat'l Distribs.*, 148 B.R. at 561. As *National Distributors* recognized:

> A professional, including an attorney, who accepts payment from [a] third party to represent the debtor-in-possession has an actual conflict of interest that disqualifies that professional from being employed by the debtor-in-possession, absent a showing that the interests of a third party and the bankruptcy estate are identical.

*Id.* at 561–62; *see also In re Tamojira, Inc.*, 210 B.R. 702, 706 (Bankr. E.D. Va. 1996) ("Th[e] guaranty put Ballard in a conflict situation as between the debtor and Pritchard . . . ."); *In re Hathaway Ranch P'ship*, 116 B.R. 208, 219 (Bankr. C.D. Cal. 1990) ("Thus by accepting payment from a third party, the proposed counsel for the debtor in possession necessarily has a conflict of interest in that counsel is serving two masters—the one who paid counsel and the one counsel is paid to represent."). Similarly, in *In re Harris Agency, LLC*, the Court affirmed the disqualification of counsel that represented Union One, which financed counsel's legal fees for representing the debtor. 462 B.R. 514, 518, 523, 524 (E.D. Pa. 2011) (finding actual conflict). Far from being "identical," *Nat'l Distribs.*, 148 B.R. at 561, the interests of the Debtor and Ritchie Multi-Strategy Global, LLC are adverse. Indeed, Ritchie Multi-Strategy Global, LLC filed the Third Delaware Action to recover the alleged indemnity it owed to the Debtor and the Affiliated Judgment Parties. *See* MTD at 20, D.I. 32-1. That indemnity obligation appears nowhere on the Debtor's Schedules as an asset of the Debtor. As such, that this conflict would taint Reed Smith's judgment appears from the face of the Debtor's bankruptcy petition.

Meanwhile, the Debtor's approach of allocating legal fees among the Debtor and Affiliated Judgment Parties presents additional problems for Reed Smith. Indeed, Reed Smith, not the Debtor, purports to have apportioned such fees, in part, on a pro rata basis among the Debtor and Affiliated Judgment Parties. *See* App. ¶ 67, D.I. 22; *see also* Decl. ¶ 17, D.I. 22-2. The Debtor (and Reed Smith) discloses no basis for apportioning the fees in this way (or any

other past practice concerning any apportionment of fees, let alone the approach that Reed Smith now adopts). Nonetheless, the Debtor commissioned Reed Smith to conduct the apportionment, even as Reed Smith also represented the Affiliated Judgment Parties.

This approach presents inherent problems. Whether the apportionment was fair to the creditors, we'll never know, for Reed Smith represents those creditors too. As a result of the arrangement, the Debtor may have been charged for services that Reed Smith actually rendered to one of the Affiliated Judgment Parties, thus diminishing the Debtor's estate and resulting in a preferential transfer. Or, the Affiliated Judgment Parties may have been charged for services that Reed Smith actually rendered to the Debtor, thus diminishing the Debtor's estate. Such an avoidable payment, whether preferential or fraudulent, creates an actual conflict that disqualifies Reed Smith. *Accord In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 234–35 (Bankr. E.D. Cal. 1988) ("There is no allocation of the bill among the various clients. Some services were rendered for the ultimate benefit of persons other than the debtor. Since it is impossible to determine on this record what portion, if any, of the fees and expenses are properly attributable to the debtor, the request should be denied for that reason alone."); *see In re Fleming Cos.*, 305 B.R. 389, 393–94 (Bankr. D. Del. 2004) (Debtor's case cited at 19 n.8) (denying retention application; advisor's receipt of avoidable payment contrary to past practice constituted actual conflict of interest mandating disqualification of such advisor); *see also In re Pillowtex, Inc.*, 304 F.2d 246, 253–255 (3d Cir. 2002) (remanding for determination of whether payments to bankruptcy counsel were preferential).

The Debtor cannot now switch gears by allegedly obtaining financing through Ritchie Multi-Strategy Global Trading Ltd. Indeed, that entity is a purported creditor of the Debtor and purports to have a lien on the Debtor's property. *See* Amended Schedules at 17, D.I. 26. As

such, the Debtor and Ritchie Multi-Strategy Global Trading Ltd. are adverse. Nowhere does the Debtor disclose in its schedules that this litigation financing, which is being described as a "credit facility," Ex. 23, B-289–90 at 29:21–30:9, is an asset (then offset by Ritchie Multi-Strategy Global Trading Ltd.'s purported creditor claim, which the Debtor now disputes).

### D. The Debtor's Colorable Claims Against Reed Smith Are Disqualifying

Far from not "hold[ing] or represent[ing] an interest adverse" to the Debtor, App. ¶ 52(a), D.I. 22, Reed Smith has assumed an adverse position to the Debtor as the Debtor's litigation strategy, crafted by Reed Smith, has unraveled. Indeed, Reed Smith is adverse to the Debtor as to at least two colorable malpractice claims.

The first potential malpractice claim arises from Reed Smith's failure to impede the Swansea Trust action before default judgment. That $20 million debt alone represents more than one half of the Debtor's liabilities. Reed Smith, by virtue of its close connections to the Debtor and Affiliated Judgment Parties, was in a position to stop the Swansea Trust action, but chose to do nothing. Such failure added to the Debtor's liabilities and demonstrates its lack of good faith in filing for bankruptcy, thus giving rise to colorable malpractice claims against Reed Smith. *Accord In re Cantu*, 784 F.3d 253, 261 (5th Cir. 2015) ("[S]tone's misconduct led to the depletion of assets that could have otherwise gone to pay creditors. . . . In addition, transferring assets away from the estate made it more difficult to confirm a plan of reorganization, which requires a sufficient corpus of cash to make necessary payments upon confirmation." (citations omitted)). Moreover, by not contesting the Swansea Trust default judgment, the Debtor has indisputably clouded its pursuit of insurance proceeds in its action against its litigation insurers. *See supra* Section II(B)(3).

The second potential malpractice claim arises from Reed Smith's filing the First Delaware Action in an improper venue. Because Reed Smith filed in an improper venue, the

First Delaware Action remains stayed pending the DSA Action, 2017 WL 7803924, at *4, and unlikely to emerge as a claim with any value.  Indeed, the DSA Action is res judicata on the First Delaware Action because the Debtor could have raised its indemnification claim in the DSA Action.  *See id.*; *Peregrine Fin. Grp., Inc. v. Trademaven, L.L.C.*, 909 N.E. 2d 837, 841–42, 843, 846 (Ill. App. Ct. 2009).  As such, an action that the Debtor's largest member values at more than $18 million in the Third Delaware Action, *see* Ex. 19, B-239 ¶ 47, has become a nullity.[13]

But, the Debtor's claims against Reed Smith might not end there.  Indeed, in attacking the Illinois courts' decisions as "problematic" and "manifestly incorrect," MTD at 16, D.I. 32-1, Reed Smith distracted from the alleged malpractice of the Debtor's trial counsel that the Debtor now believes exists.  *See* Amended Schedules at 16, D.I. 26.  Of course, Reed Smith should have known of the waiver issue when it was attacking the Illinois courts.  Huizenga had raised it in its opposition to the Debtor and Affiliated Judgment Parties' cert petition.  *See* Ex. 16, B-201–08.  Nonetheless, Reed Smith proceeded to incur fees, later paid by the Debtor (or its indemnitor(s)), to argue in Delaware Superior Court that the Illinois courts' judgments were "problematic" or "manifestly incorrect."  *See* MTD at 16, D.I. 32-1.  But, the injury might not end there.  (After all, Huizenga was forced to expend fees to argue against Reed Smith's straw man in both the First Delaware Action and U.S. Supreme Court.)  And, to the extent the Debtor lacks a tolling agreement as to the malpractice claim that it now proposes against Sidley, such claim might be waived, with the Debtor's longtime counsel at Reed Smith to blame.

---

[13] Huizenga doubts that the Debtor could allege an injury arising from this result because DSA § 73-605(f) would bar the Debtor from recovering any contractual indemnity owed by Huizenga even if it had brought the action in Illinois state court.

That Reed Smith would decline to pursue such claims on behalf of the Debtor (or for its creditor-clients) is obvious.  Nonetheless, such claims have accrued to the bankruptcy estate.  *See In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (en banc); *Cantu*, 784 F.3d at 263.

Against this backdrop of apparent malpractice, Reed Smith has multiplied the Debtor's liabilities.  Because of the petition to vacate adopted by Reed Smith, the Debtor now faces the serious threat of sanctions for an unnecessary filing in Illinois state court that it would then jettison via bankruptcy.  *See* MTD at 24, D.I. 32-1.  Because of Reed Smith's characterization of the Illinois courts' decisions as "problematic" and "manifestly incorrect," Huizenga will also seek sanctions against the Debtor and Affiliated Judgment Parties in the First Delaware Action.  But, Huizenga's request in Delaware will not end there.  Indeed, the First Delaware Action is founded upon a request for indemnification under the Debtor's Operating Agreement, i.e. the basis of the Debtor's violation of the DSA.  The Debtor cannot now invoke that agreement against Huizenga under DSA § 73-605(f).  *See supra* Section III(A).  The Debtor, through Reed Smith, thus attempted to manufacture a claim, i.e. an asset, in Delaware court out of nothing.

### E.    Reed Smith's Conflicts as a Witness to the Debtor's Proposed Claims Against Third Parties Weighs Against Its Application

Reed Smith is further conflicted because, by previously arguing that the DSA issue was not waived, Reed Smith could be called as a witness adverse to the Debtor pursuing malpractice claims founded upon the waiver of that issue.  And, such conflicts weigh against Reed Smith's application in any event.  *Accord, e.g.*, *In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999); *In re S. Kitchens, Inc.*, 216 B.R. 819, 833–34 (Bankr. D. Minn. 1998).[14]

---

[14] To the extent Reed Smith now asserts a belief that the Debtor's trial counsel was negligent for waiving the DSA issue at trial, then the Debtor may have claims against Reed Smith for filing a cert petition to the contrary and, possibly, charging the Debtor fees—now more than $2 million, Decl. ¶ 16, D.I. 22-2—to boot.

Taken together with the aforementioned conflicts, Reed Smith is hopelessly conflicted. If the Debtor has an indemnification liability, Reed Smith's clients have the asset. If Reed Smith represents and is paid through an entity liable to the Debtor, i.e. the Debtor's indemnitor, the Debtor has the asset. But, that indemnitor also has an asset because of the "interrelated" contractual rights of the Ritchie entity.[15] *See* Ex. 19, B-229 ¶ 9 (asserting that RMSG LLC "possesses contractual rights under the operating agreements or articles of association" of various Ritchie funds, including the Debtor). It gets worse still:

> [T]he contractual rights and obligations of members of [Ritchie Multi-Strategy Global, LLC] intentionally are interrelated with the contractual rights and obligations of the members of the MSG Master Fund and the Strategy Funds [i.e. the Debtor] in a master/feeder structure.

*Id.* ¶ 10. In that structure, every entity appears to be a master and a feeder.[16] The indemnitor could simply seek indemnification from the Debtor (a liability not disclosed in bankruptcy), *see id.*, or some other affiliate. With the failure of the Ritchie Rube Goldberg machine to add any value to the Debtor through claims it manufactured in Delaware and Illinois state court, the machine now sets its sights on federal bankruptcy court, where it now seeks to convert a moneyless, investment-less investment fund, with $97 of actual value, into some $40 million litigation behemoth. To do so, it proposes largely valueless claims arising from assets that it does not even own, *see, e.g.*, MTD at 24, D.I. 32-1 (intellectual property),[17] or that its affiliates

---

[15] Despite admitting this in court filings through its cohorts, *e.g.*, Ex. 19, B-229 ¶ 9, the Debtor now somehow (unbelievably) seeks to portray its network as containing "separate legal entities." App.¶ 12, D.I. 22.

[16] Now, through its litigation financing, the Debtor, which describes itself as a "feeder," *see* App. ¶ 9, D.I. 22, is anything but.

[17] The Debtor's intellectual property charade continues in its Application, where it purports to have a "license to . . . intellectual property" related to Thane Ritchie's name, *see* App. ¶ 12, D.I. 22, a purported asset that appears nowhere on the Debtor's Schedules. *See* Amended Schedules at 13, D.I. 26.

also claim in related litigation.  The Debtor's scheme of concocting value out of nothing need not continue in these courts through Reed Smith.

Reed Smith's close relationship with the Affiliated Judgment Parties and Thane Ritchie's network affects its independence and impartiality.  In *In re Keller Financial Services of Florida, Inc.*, the court found that although the debtor's attorneys did not hold "a direct economic interest that tended to lessen the value of the bankruptcy estate or that created a dispute in which the estate was a rival claimant," "the multiple transactions and relationships between the [attorneys] and insiders of the Debtors, and also between the [attorneys] and related nondebtor companies, caused the [attorneys] to possess an interest that colored the independence and impartial attitude required by the Bankruptcy Code."  248 B.R. 859, 895 (Bankr. M.D. Fla. 2000) (citing *In re Benjamin's-Arnolds, Inc.*, Case No. 90-6127, 1997 WL 86463, at *4 (Bankr. D. Minn. Feb. 28, 1997)); *Phila. Athletic*, 20 B.R. at 338 (firm that withdrew from representation of debtor's creditors could not serve as bankruptcy counsel because of appearance of conflict).  While this appearance of impropriety is not independently disqualifying, *Marvel*, 140 F.3d at 477, taken together with the other circumstances discussed herein, it weighs heavily against Reed Smith's Application.

### F.     *Nunc Pro Tunc* **Approval Is Inappropriate**

As if the above were not alone disqualifying, Reed Smith somehow seeks this Court's approval of its retention *nunc pro tunc* to the petition date.  This Court has the equitable discretion to consider whether such approval is appropriate.  *In re Arkansas Co.*, 798 F.2d 645, 650, 650–51 (3d Cir. 1986); *see also In re F/S Airlease II, Inc.*, 844 F.2d 99, 105–06 (3d Cir. 1988).  Such approval is only warranted under "extraordinary circumstances."  *Arkansas*, 798 F.2d at 650; *see also In re Twinton Props. P'ship*, 27 B.R. 817, 819 (Bankr. M.D. Tenn. 1983) ("*Nunc pro tunc* applications must be the extraordinary exception rather than an accepted

practice."). In considering whether such circumstances are present, courts consider whether "the applicant was under time pressure to begin service without approval" and "the amount of delay" before an application, among other reasons. *Arkansas*, 798 F.2d at 650.

No circumstance justifying *nunc pro tunc* approval is present here. Here, there was no time pressure to begin any bankruptcy-related services, much less on the eve of a hearing to consider whether the Debtor and its counsel could be sanctioned. *See id.* In the 29 days between the Debtor's initial Chapter 11 Petition and Reed Smith's Application, there was virtually no pressing activity to speak of. Was Reed Smith somehow hand-holding the Debtor through its business affairs? Of course not, because the Debtor has no business. *See* MTD at 6–7, D.I. 32-1. Was Reed Smith engaging in a public relations campaign to maintain investor confidence? Of course not, because the Debtor has very few, if any, investors. Instead, Reed Smith was filing amended bankruptcy papers to correct obvious errors,[18] of which several remain. But, it gets worse. Reed Smith had been planning the Debtor's bankruptcy since it was retained to do so on May 26, 2017. *See* Decl. ¶ 29, D.I. 22-2. In the more than 14 months since then, Reed Smith did not prepare and finalize any application to serve as the Debtor's counsel—even though such application should be an off-the-shelf item for a sophisticated bankruptcy practice. And, in that time, Reed Smith has been unable to properly schedule the Debtor's assets and liabilities.

This cannot be a basis to approve a professional *nunc pro tunc*. *Accord, e.g.*, *In re United Cos. Fin. Corp.*, 241 B.R. 521, 527 (Bankr. D. Del. 1999) (rejecting 27-day delay in light of "unusual terms of its engagement" where applicant Ernst & Young was a "sophisticated bankruptcy professional"). And, as set forth above, Reed Smith is far from the disinterested

---

[18] Perhaps the worst of which is the Debtor's false assertion in its original petition that the Madison/DuPage County action is one of its own—an error that has since been corrected, *see* MTD at 17 n.7, D.I. 32-1, after Huizenga's prompting.

counsel that the Bankruptcy Code requires. *Arkansas*, 798 F.2d at 650. There is thus no reason to approve Reed Smith's Application *nunc pro tunc*.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Huizenga respectfully requests entry of an order (i) denying the Application in its entirety, and (ii) granting such other relief to Huizenga as is just and appropriate.

Dated:  August 13, 2018

**K&L GATES LLP**

/s/ Steven L. Caponi
Steven L. Caponi, Esq. (No. 3484)
600 N. King Street, Suite 901
Wilmington, DE 19801
Tel: (302) 416-7000
Email: steven.caponi@klgates.com

Of counsel:

Christopher J. Barber, Esq.
Gary W. Garner, Esq.
Jonathan D. Miller, Esq.
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6800
Chicago, IL 60606
Tel:  (312) 443-3200
Email:  cjb@willmont.com
           gwg@willmont.com
           jm@willmont.com

-and-

Steve Jakubowski, Esq.
ROBBINS SALOMON & PATT, LTD.
180 N. La Salle Street, Suite 3300
Chicago, IL 60601
Tel: (312) 456-0191
Email: SJakubowski@rsplaw.com

*Counsel to Huizenga Managers Fund, LLC*