**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RITCHIE RISK-LINKED STRATEGIES, L.L.C,[1] | Case No. 18-11555 (KJC) |
| Debtor. | |

**COMBINED DISCLOSURE STATEMENT AND**
**CHAPTER 11 LIQUIDATING PLAN OF REORGANIZATION**

August 13, 2018

**REED SMITH LLP**

Kurt F. Gwynne (No. 3951)
Jason D. Angelo (No. 6009)
1201 North Market Street
Suite 1500
Wilmington, DE 19801
Telephone:  (302)778-7500
Facsimile:  (302) 778-7575
Email: kgwynne@reedsmith.com
        jangelo@reedsmith.com

*Proposed Counsel to the*
*Debtor in Possession*

---

[1]    The last four digits of the Debtor's tax identification number are 0458.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.          INTRODUCTION ...........................................................................................3

II.         DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION
           OF TIME ......................................................................................................3

   A.    Defined Terms ...............................................................................................3

   B.    Rules of Interpretation and Computation of Time....................................15

        1.    Rules of Interpretation ....................................................................15

        2.    Computation of Time ......................................................................16

III.        BACKGROUND ..........................................................................................16

   A.    THE DEBTOR'S BUSINESS .....................................................................16

        1.    The Purpose of the Debtor's Formation..........................................16

        2.    Ritchie Risk-Linked Structure .......................................................18

   B.    EVENTS LEADING TO THE CHAPTER 11 BANKRUPTCY CASE.................21

        1.    The New York Attorney General Lawsuit Against Coventry First...........21

        2.    The RRLS (Ireland) I and RRLS (Ireland) II Bankruptcy Cases..............22

        3.    Prepetition Litigation Involving the Debtor....................................23

   C.    THE DEBTOR'S PRE-PETITION LOAN FACILITY ...........................34

   D.    THE CHAPTER 11 CASE ..........................................................................34

        1.    Generally.........................................................................................34

        2.    Retention of Professionals ..............................................................35

        3.    Huizenga's Motion to Dismiss........................................................35

        4.    Post-Petition Financing....................................................................36

IV.        CONFIRMATION AND VOTING ..............................................................37

   A.    Confirmation Procedures ............................................................................37

        1.    Plan Confirmation Hearing..............................................................37

        2.    Requirements for Confirmation .......................................................37

        3.    Cram Down ......................................................................................38

        4.    Best Interests of Creditors Test.......................................................39

        5.    Feasibility........................................................................................40

        6.    Classification of Claims and Interests.............................................40

        7.    Impaired Claims or Interests............................................................40

        8.    Eligibility to Vote on this Combined Plan and Disclosure
             Statement.........................................................................................41

US_ACTIVE-142061116.12

9.     Procedure/Voting Deadlines ...................................................41

10.   Releases.................................................................................42

11.   Acceptance of this Combined Plan and Disclosure Statement .................42

V.       TREATMENT OF UNCLASSIFIED CLAIMS.......................................43

A.   Payment of Administrative Claims .................................................43

1.   Administrative Claims in General ...............................................43

2.   Statutory Fees..................................................................43

3.   Priority Tax Claims...............................................................43

4.   Bar Dates for Administrative Claims..........................................44

VI.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......45

A.   Summary ...............................................................................45

B.   Classification and Treatment of Classified Claims and Interests ..............47

1.   Class 1 – Secured Claim of the Pre-Petition Lenders ..............47

2.   Class 2 – Other Priority Claims ...............................................48

3.   Class 3 – General Unsecured Claims .......................................48

4.   Class 4 – Subordinated Unsecured Claims ..............................49

5.   Class 5 – Interests .................................................................49

VII.    MEANS FOR IMPLEMENTATION OF THE PLAN........................................50

A.   Corporate Existence .................................................................50

B.   Reports to be Filed by the Liquidating Trust ..................................50

C.   Indemnification .......................................................................50

D.   Liquidating Trust .....................................................................50

E.   Preservation of Causes of Action.................................................50

1.   Preservation of Causes of Action...........................................50

2.   Exculpation .......................................................................51

F.   Consensual Releases by Holders of Claims or Interests .......................51

G.   Injunction Related to Releases....................................................52

H.   Effectuating Documents and Further Transactions; Exemption from Certain Transfer Taxes .........................................................................52

1.   Effectuating Documents and Further Transactions....................52

I.   Substitution in Pending Legal Actions ..........................................52

VIII.   PROVISIONS REGARDING THE LIQUIDATING TRUST.............................53

A.   Execution of Liquidating Trust Agreement ...................................53

B.   Purposes of the Liquidating Trust.................................................53

C.   Beneficiaries of the Liquidating Trust ..........................................53

            US_ACTIVE-142061116.12

|     | D.  | Liquidating Trust Assets ........................................................................ | 53 |
|     | E.  | Administration of the Liquidating Trust ................................................... | 54 |
|     | F.  | Termination of the Liquidating Trust ....................................................... | 54 |
|     | G.  | Transfer of Available Cash to the Disbursing Agent ................................ | 54 |
| IX. |     | PROVISIONS GOVERNING DISTRIBUTIONS ................................. | 54 |
|     | A.  | Distributions for Claims Allowed as of the Effective Date ...................... | 54 |
|     | B.  | Method of Distributions to Holders of Claims and Interests .................... | 54 |
|     | C.  | Compensation and Reimbursement for Services Related to Distributions .............. | 54 |
|     | D.  | Investment of Trust Accounts ................................................................. | 55 |
|     | E.  | Delivery of Distributions and Undeliverable or Unclaimed Distributions .............. | 55 |
|     |     | 1. Delivery of Distributions ............................................................ | 55 |
|     |     | 2. Undeliverable or Unclaimed Distributions ................................... | 55 |
|     | F.  | Distributions on Account of Allowed Claims and Allowed Interests....... | 56 |
|     |     | 1. *De Minimis* Distributions ........................................................... | 56 |
|     | G.  | Other Provisions Applicable to Distributions in All Classes.................... | 56 |
|     |     | 1. Post-petition Interest ................................................................... | 56 |
|     |     | 2. Compliance with Tax Requirements............................................. | 57 |
|     |     | 3. Allocation of Distributions ......................................................... | 57 |
|     | H.  | Distribution Record Date ....................................................................... | 57 |
|     | I.  | Means of Cash Payments ....................................................................... | 58 |
|     | J.  | Disputed Claims and Interest Reserves................................................... | 58 |
|     | K.  | Surrender of Canceled Instruments or Securities.................................... | 59 |
|     | L.  | Distributions Free and Clear .................................................................. | 59 |
|     | M.  | Setoffs .................................................................................................... | 59 |
| X.  |     | PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS ............................................................. | 59 |
|     | A.  | Treatment of Disputed Claims and Disputed Interests ............................ | 59 |
|     |     | 1. No Distributions Pending Allowance ......................................... | 59 |
|     | B.  | Objections to Claims.............................................................................. | 60 |
|     |     | 1. Authority to Prosecute ................................................................ | 60 |
|     |     | 2. Debtor's Authority to Amend Schedules..................................... | 60 |
|     |     | 3. Request for Extension of Claims Objection Bar Date ................. | 60 |
|     | C.  | Distributions on Account of Disputed Claim or Disputed Interest That Becomes Allowed.................................................................................. | 60 |
| XI. |     | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 61 |

US_ACTIVE-142061116.12

A. Rejection of Executory Contracts and Unexpired Leases ........................................61

   1. Rejection ................................................................................................61

   2. Notice of Rejection ................................................................................61

   3. Bar Date for Rejection Damages .........................................................61

B. Contracts and Leases Entered Into After the Petition Date .....................................61

C. Pre-existing Obligations to the Debtor Under Executory Contracts and Unexpired Leases ......................................................................................................61

XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN .......................................................................62

A. General ...........................................................................................................62

B. U.S. Federal Income Tax Consequences to the U.S. Holders of Claims or Interests 63

C. Certain Other Tax Considerations for U.S. Holders of Claims ..............................63

   1. Accrued but Unpaid Interest ................................................................63

   2. Post-Effective Date Distributions ........................................................64

   3. Bad Debt Deduction and/or Worthless Securities Deduction ...................64

   4. Medicare Tax .......................................................................................64

   5. Information Reporting and Backup Withholding ......................................64

D. Importance of Obtaining Professional Tax Assistance .............................................65

XIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN; EFFECT OF CONFIRMATION .................................................65

A. Conditions Precedent to Confirmation .....................................................................65

B. Conditions to the Effective Date ...............................................................................65

C. Effect of Nonoccurrence of Conditions to the Effective Date ..................................66

D. Request for Waiver of Stay of Confirmation Order ...................................................66

E. Compliance with Local Bankruptcy Rule 3022-1 ....................................................66

XIV. RETENTION OF JURISDICTION ........................................................................66

XV. MISCELLANEOUS PROVISIONS .......................................................................68

A. Modification of the Combined Plan and Disclosure Statement ................................68

B. Revocation of the Combined Plan and Disclosure Statement ...................................68

C. Severability of Plan Provisions .................................................................................68

D. Successors and Assigns ..............................................................................................69

E. Reservation of Rights .................................................................................................69

F. Service of Documents .................................................................................................69

   1. Counsel to the Debtor ...........................................................................69

US_ACTIVE-142061116.12

|   | 2. | Chief Restructuring Officer, Liquidating Trust, or Liquidating Trustee.................................................................................69 |
|   | 3. | United States Trustee ..............................................................................70 |
| G. | Waiver or Estoppel ........................................................................................................70 |
| H. | Entire Agreement ...........................................................................................................70 |
| I. | Inconsistency...................................................................................................................70 |
| XVI. | RISKS AND OTHER CONSIDERATIONS........................................................70 |
| A. | Risk of Non-Confirmation of the Combined Plan and Disclosure Statement ..........71 |
| B. | Nonconsensual Confirmation........................................................................................71 |
| C. | Delays in Confirmation or Effective Date .................................................................71 |
| D. | Litigation Risks...............................................................................................................71 |
| XVII. | RECOMMENDATIONS AND CONCLUSIONS ..............................................72 |

US_ACTIVE-142061116.12

**Each Holder of a Claim or Interest against the Debtor that is entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Combined Plan and Disclosure Statement may be made except under the terms hereof and section 1125 of the Bankruptcy Code. If you are entitled to vote to approve the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Debtor urges you to vote to accept the Plan.**

**This Combined Plan and Disclosure Statement has been prepared in accordance with sections 1125 and 1129 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3017, and Local Rule 3017-2, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against, or Interests in, the Debtor should evaluate this Combined Plan and Disclosure Statement in light of the purpose for which it was prepared. This Combined Plan and Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of this Combined Plan and Disclosure Statement as to Holders of Claims against or Interests in the Debtor.**

**There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Debtor's knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell, or the solicitation of an offer to buy, securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.**

**Any projected recoveries to Creditors set forth in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtor and its advisors. Although the Debtor and its advisors have made every effort to verify the accuracy of the information presented herein, the Debtor and its advisors cannot make any representations or warranties regarding the accuracy of the information. Nothing herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party (except to the extent**

US_ACTIVE-142061116.12

necessary to enforce the terms hereof).  The statements contained herein are made as of the date hereof, unless another time is specified.  The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the Debtor's opinion that the treatment of Creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the Debtor.  Accordingly, the Debtor believes that confirmation of the Plan is in the best interests of Holders of Claims and Interests, and the Debtor recommends that Holders of Claims and Interests support and vote to accept the Plan.

US_ACTIVE-142061116.12

## I.    INTRODUCTION

Ritchie Risk-Linked Strategies, L.L.C., a Delaware limited liability company (the "Debtor" or "RRLS"), Debtor in this Chapter 11 Case proposes this Combined Disclosure Statement and Chapter 11 Liquidating Plan of Reorganization (the "Combined Plan and Disclosure Statement") under sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.  The Debtor is the proponent of the Plan within the meaning of 11 U.S.C. § 1129.  This Combined Plan and Disclosure Statement contemplates the creation of a Liquidating Trust from which, under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, Distributions shall be made for the benefit of Holders of Allowed Claims and Allowed Interests.

ALL CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND IN THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## II.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.    Defined Terms

1.    As used in this Combined Plan and Disclosure Statement, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

2.    "Administrative Claim" means a Claim against the Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Case that is entitled to priority or superpriority under sections 364(c)(1), 365, 503(b), 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving or disposing of the Debtor's Estate; and (ii) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims.

3.    "Allowed [    ] Claim" means a Claim (a) listed by the Debtor on its Schedules other than as disputed, contingent or unliquidated and is not a Disputed Claim; (b) for which a Proof of Claim or request for payment of Administrative Claim (or similar request) has been Filed by the applicable Bar Date or otherwise has been deemed timely Filed under applicable law and that is not a Disputed Claim; (c) that is expressly allowed: (i) in any Stipulation Regarding a Claim or Interest executed by the Debtor or the Liquidating Trustee and the Claim Holder; (ii) in any contract, instrument or other agreement entered into in connection with this Combined Plan and Disclosure Statement and, if prior to the

US_ACTIVE-142061116.12

Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of this Combined Plan and Disclosure Statement; or (d) that the Reorganized Debtor or the Liquidating Trustee determines as of the Claims Objection Bar Date (i) will not be subject to an objection or to an amendment to the Schedules and (ii) will be treated in accordance with the terms of this Combined Plan and Disclosure Statement.

4.    "Allowed Interest" means, with reference to any Interest (a) an Interest registered in the membership interest register or any similar register or schedule maintained by or on behalf of the Debtor as of the Distribution Record Date that is not a Disputed Interest or (b) any Interest expressly deemed allowed by this Combined Plan and Disclosure Statement or by a Final Order and (c) that is not a disputed or subject to offset, recoupment or counterclaim by the Debtor, Reorganized Debtor, or the Liquidating Trustee.

5.    "Assets" means all property of the Debtor's Estate within the meaning of section 541(a) of the Bankruptcy Code including, without limitation, the Litigation Claims.

6.    "August 25, 2015 Judgment" means the judgment entered by the Illinois Circuit Court for Cook County in the Illinois DSA Action on August 25, 2015, on account of the October 2005 Sale.

7.    "August 2005 Sale" means Huizenga's purchase of an interest in the Debtor pursuant to the First Subscription Agreement.

8.    "Available Cash" means all Cash held by or for the benefit of the Debtor on the Effective Date plus all Cash that the Liquidating Trustee makes available to the Reorganized Debtor or the Liquidating Trust, and all Cash realized by the Reorganized Debtor or the Liquidating Trust after the Effective Date from the sale, collection or other disposition of Assets of the Estate, including, without limitation, the Litigation Claims, but excluding the amount of Cash for the Reorganized Debtor or the Liquidating Trust (a) necessary to pay Holders of Allowed Administrative Claims in accordance with this Combined Plan and Disclosure Statement; (b) necessary to pay Holders of Allowed Other Priority Claim (if any); and (c) estimated and reserved by the Reorganized Debtor or Liquidating Trust to (i) pay all U.S. Trustee Fees, (ii) fund the prosecution of the Litigation Claims through trial and (iii) fund and maintain any other post-petition reserves in connection with any agreements or otherwise.

9.    "Ballot" means the applicable form of ballot on which a Holder of a Claim or Interest entitled to vote on the acceptance or rejection of this Combined Plan and Disclosure Statement casts (or may cast) such vote.

10.    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to this Chapter 11 Case.

11.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

US_ACTIVE-142061116.12

12.     "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as now in effect or hereafter amended, as applicable to this Chapter 11 Case.

13.     "<u>Bar Date</u>" means a bar date established (solely for purposes of the Chapter 11 Case) by the Bar Date Order, other applicable order of the Bankruptcy Court, or this Combined Plan and Disclosure Statement.

14.     "<u>Bar Date Order</u>" means the Bankruptcy Court's Order establishing Bar Dates for Filing Proofs of Claim in the Chapter 11 Case and approving form and manner of notice thereof, which was entered by the Bankruptcy Court on [_____, 2018] [Dkt. # ___].

15.     "<u>Beneficiaries</u>" means Holders of Allowed Claims and Interests entitled to Distributions in accordance with this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

16.     "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.     "<u>Cash</u>" means legal tender of the United States of America and equivalents thereof.

18.     "<u>Chapter 11 Case</u>" means the case commenced under chapter 11 of the Bankruptcy Code by the Debtor in the Bankruptcy Court and designated Case No 18-11555 (KJC).

19.     "<u>Chief Restructuring Officer</u>" means Geoff Varga of D&P.

20.     "<u>Claim</u>" means a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtor.

21.     "<u>Claims Objection Bar Date</u>" means, for each Claim, the latest of (a) 120 days after the Effective Date (or such later date as the Bankruptcy Court may approve upon request of the Liquidating Trustee); (b) 90 days after the Filing and service upon the Liquidating Trustee (and its counsel of record) of a Proof of Claim (or an amendment thereto) relating to such Claim; and (c) such other time as may be fixed by a Final Order or an agreement of the Liquidating Trustee and the Entity asserting such Claim.

22.     "<u>Class</u>" means a class of Claims or Interests, as described in Article VI of this Combined Plan and Disclosure Statement.

23.     "<u>Combined Plan and Disclosure Statement</u>" or "<u>Plan</u>" means this Combined Disclosure Statement and Chapter 11 Liquidating Plan of Reorganization, as may be modified or amended, and including the exhibit(s) to the Combined Plan and Disclosure Statement, as may be modified or amended.

24.     "<u>Confirmation</u>" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

US_ACTIVE-142061116.12

25.     "<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

26.     "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court on Confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned from time to time.

27.     "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

28.     "<u>Coventry First</u>" means Coventry First, LLC, Montgomery Capital, Inc. and LST I, LLC.

29.     "<u>Coventry Litigation</u>" means that certain litigation commenced in the name of RRLS (Ireland) I and RRLS (Ireland) II against Coventry First, LLC in the United States District Court for the Southern District of New York, Case No. 09-cv-1086.

30.     "<u>Creditor</u>" means any Entity holding a Claim against the Debtor.

31.     "<u>D&P</u>" means Duff & Phelps, LLC.

32.     "<u>DE Indemnity Action</u>" means the action (as amended) titled *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Huizenga Managers Fund, LLC*, filed in the Superior Court of the State of Delaware (Case No.N17C-05-598 MMJ CCLD), including any refiling, counterclaim, appeal, settlement or enforcement action.

33.     "<u>DIP Lender</u>" means Ritchie Multi-Strategy Global Trading, Ltd.

34.     "<u>DIP Loan</u>" means the post-petition financing provided to the Debtor pursuant to section 364 of the Bankruptcy Code in the principal amount of up to $1,750,000, plus accrued interest and other charges.

35.     "<u>Disbursing Agent</u>" means the Liquidating Trustee, in its capacity as disbursing agent, or any Third Party Disbursing Agent.

36.     "<u>Disputed Claim</u>" means any Claim:

   a.     if no Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, (i) a Claim that is listed on the Debtor's Schedules (as may be amended at any time) as disputed, contingent or unliquidated or (ii) a Claim that is not listed on the Debtor's Schedules;

   b.     prior to and on the Claims Objection Bar Date, if a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, all Claims that have not been expressly Allowed (i) in any Stipulation Regarding Claim or Interest executed by the Debtor, the Reorganized

Debtor or the Liquidating Trustee and Claim Holder; (ii) in any contract, instrument or other agreement entered into in connection with this Combined Plan and Disclosure Statement and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of this Combined Plan and Disclosure Statement; or

    c.    any Claim that is subject to an adversary proceeding or contested matter in which the Debtor, the Reorganized Debtor, or the Liquidating Trustee seeks to reduce, change the priority of, or disallow the Claim, subordinate the Claim under section 510 of the Bankruptcy Code, or to recharacterize the Claim; or

    d.    after the Claims Objection Bar Date, if a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, any Claim for which the Debtor, the Reorganized Debtor, or the Liquidating Trustee has Filed an objection (or counterclaim), a request to estimate under section 502 of the Bankruptcy Code, a request to subordinate the Claim under section 510 of the Bankruptcy Code, or a request to recharacterize the Claim, and such objection, counterclaim, or request has not been resolved in its entirety by a Final Order or withdrawn (and for which there is no agreement with the Claim Holder to treat the Claim as a Disputed Claim for a period of time after the Claims Objection Bar Date).

Notwithstanding the above, if a Claim is a Disputed Claim under the definition set forth herein, it shall not also be considered an Allowed Claim.

37.    "Disputed Claims and Interests Reserve Amount" means and amount equal to the Distributions to which Holders of Disputed Claims and Disputed Interests would be entitled under this Combined Plan and Disclosure Statement if such Disputed Claims and Disputed Interests were Allowed Claims (in the Filed amount of such Disputed Claims or such lesser amount as required by an order of the Bankruptcy Court) or Allowed Interests.

38.    "Disputed Interest" means any Interest of the Debtor (until it is Allowed): (a) as to which an objection, request for estimation in accordance with section 502 of the Bankruptcy Code, request for subordination pursuant to section 510 of the Bankruptcy Code, or adversary proceeding has been Filed and which objection, request for estimation, request for subordination or adversary proceeding has not been withdrawn, overruled, or otherwise disposed of by a Final Order of the Bankruptcy Court, (b) to which the Debtor, the Reorganized Debtor, or the Liquidating Trustee intends to assert such an objection, request for estimation, request for subordination, or adversary proceeding.

39.    "Distribution" means, as the context requires: (i) the Available Cash or other property or consideration to be provided under this Combined Plan and Disclosure Statement to the Holders of Allowed Claims and Allowed Interests; or (ii) the payment, transfer, or delivery of Available Cash or other property to Creditors and Interest Holders pursuant to this Combined Plan and Disclosure Statement.

US_ACTIVE-142061116.12

40.  "<u>Distribution Date</u>" means, from time to time, a date selected by the Liquidating Trustee, in its discretion, in accordance with the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement to make Distributions on account of Allowed Claims and Allowed Interests.

41.  "<u>Distribution Record Date</u>" means the close of business on the Confirmation Date.

42.  "<u>DSA</u>" means the Delaware Securities Act, Del. Code Ann. tit. 6, § 7301 *et seq.*

43.  "<u>Effective Date</u>" means a day, as determined by the Debtor, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section XIII.B have been met or waived.

44.  "<u>Entity</u>" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

45.  "<u>Estate</u>" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

46.  "<u>Excess Insurers</u>" means Arch Specialty Insurance Company and Continental Casualty Company.

47.  "<u>Executory Contract or Unexpired Lease</u>" means (a) a contract to which the Debtor is a party and for which substantial performance is due from the Debtor and the non-Debtor counterparty to the contract or (b) an unexpired lease, that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda schedules, or supplements thereto, and any ancillary agreements related thereto that constitute part of a single integrated agreement.

48.  "<u>Face Amount</u>" means (a) if a Proof of Claim has been filed: (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the Holder of such Claim in any Proof of Claim filed by the applicable Bar Date, (ii) if a portion of the Claim is unliquidated, an amount proposed by the Reorganized Debtor or the Liquidating Trustee in their reasonable estimation if they were unsuccessful in litigating the Claims to a Final Order, such amount to not be less than the liquidated amount of the Claim, in each case, however, if a party requests that the amount of the Claim be estimated for purposes of calculating Distributions, the Face Amount shall be the amount (if any) so estimated by the Bankruptcy Court; or (b) if a Proof of Claim has not been filed: (i) the amount set forth in the Schedules, if such amount is liquidated; or (ii) an amount reasonably estimated, in the sole discretion of the Reorganized Debtor or the Liquidating Trustee, to account for Proofs of Claim not yet Filed that potentially could be Filed on or before an applicable Bar Date.

49.  "<u>Fee Claim</u>" means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional for services rendered or expenses incurred in the Chapter 11 Case.

US_ACTIVE-142061116.12

50.     "Fee Order" means any order establishing procedures for interim compensation and reimbursement of expenses of Professionals that may be entered by the Bankruptcy Court.

51.     "File," "Filed" or "Filing" means file, filed or filing with the clerk of the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

52.     "Final Distribution Date" for a particular Class of Claims means the Distribution Date upon which final Distributions to claimants in the Class are to be made.

53.     "Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction, that has been docketed and has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023, Rule 59 of the Federal Rules of Civil Procedure, or similar rule, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

54.     "First Subscription Agreement" means that Subscription Agreement pursuant to which the August 2005 Sale was effectuated.

55.     "General Unsecured Claim" means any Claim against the Debtor that arose or is deemed or determined by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) a Secured Claim, (ii) an Administrative Claim, (iii) a Fee Claim, (iv) a U.S. Trustee Fee Claim, (v) a Priority Tax Claim, (vi) an Other Priority Claim or any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, (vii) a Subordinated Unsecured Claim, or (viii) any Claim that constitutes an Interest.  For the avoidance of doubt, General Unsecured Claims shall include Rejection Damages Claims and any deficiency claims.

56.     "Holder" means an Entity holding a Claim or Interest, as the context requires.

57.     "Huizenga" means Huizenga Managers Fund, LLC a limited liability company formed pursuant to the laws of the State of Delaware.

58.     "Huizenga Appeal Bond Action" means the action titled *Huizenga Managers Fund, LLC v. A.R. Thane Ritchie, et al.,* filed in the Circuit Court of Cook Country, Illinois County Department (Case No. 17-L-009244, including any refiling, counterclaim, appeal, settlement or enforcement action.

59.     "Illinois DSA Action" means the action (as amended) titled *Huizenga Managers Fund, LLC, Plaintiff, v. A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LLC and Ritchie Capital Management,* filed in the Circuit Court of Cook

US_ACTIVE-142061116.12

Country, Illinois County Department, Chancery Division (Case No. 07 CH 9626), including any refiling, counterclaim, appeal, settlement or enforcement action.

60.  "Impaired" means, with respect to any Class of Claims or Interests, a Claim or equity interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

61.  "Insurance Recovery Action" means that action (as amended or as may be amended) titled *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Arch Specialty Insurance Company and Continental Casualty Company*, Defendants, filed in the Circuit Court of Cook Country, Illinois County Department, Chancery Division (Case No. 2015 CH 13480), including any refiling, counterclaim, appeal, settlement or enforcement action, and all related claims and causes of action.

62.  "Insurance Team" means the team of insurance experts, comprised of David Govrin, Brian Murphy, Elliot Lem, and Jeff Mullholland, which provided the Debtor with technical expertise in insurance-related investment opportunities.

63.  "Interest" means all Interests in the Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares of membership interests together with any warrants, options or contract rights to purchase or acquire such interests at any time.

64.  "Interim Distribution Bar Date" is the date, if any, selected by the Liquidating Trustee (in its discretion and without notice) prior to each Distribution Date for which any Claims that become Allowed Claims or any Interests that become Allowed Interests prior to such date will be entitled to receive a Distribution on the Distribution Date.

65.  "Investment Manager" means Ritchie Capital Management SEZC, Ltd. (or other Entity appointed by the Managing Member), as investment manager of the RRL Master Fund, Multi-Strategy Master Fund or RMSG Trading, Ltd.

66.  "Liabilities" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place, occurring, accruing, or entered into on or prior to the Effective Date.

67.  "Liens" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

68.  "Life Strategies Trusts" means RRL Strategies Trust and Ritchie Life Strategies Master Trust.

69.  "Litigation Claims" means all claims, actions, causes of action, choses in action, avoidance actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills,

US_ACTIVE-142061116.12

specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and cross-claims including, but not limited to, the DE Indemnity Action, the Insurance Recovery Action, the claims or causes of action listed on Exhibit VII.F.1 to this Combined Plan and Disclosure Statement, together with any and all claims and actions under the Bankruptcy Code, and all other claims or causes of action held by, or for the benefit of, the Debtor or its Estate.

70.    "Liquidating Trust" means the grantor trust created as of the Effective Date in accordance with the terms of the Liquidating Trust Agreement and the provisions of Article VIII of this Combined Plan and Disclosure Statement.

71.    "Liquidating Trust Agreement" means the trust agreement, to be dated prior to or as of the Effective Date, between the Debtor and the Liquidating Trustee, governing the Liquidating Trust, which shall be substantially in the form of Exhibit II.A.71.

72.    "Liquidating Trust Assets" means the Litigation Claims and other Assets of the Debtor, all of which shall be assigned and transferred by the Debtor directly to the Liquidating Trust under the Liquidating Trust Agreement.

73.    "Liquidating Trustee" means Geoff Varga or such other person or entity appointed pursuant to the terms of the Liquidating Trust Agreement (including all successors or assigns) to administer the Liquidating Trust.

74.    "Local Rules" means the local rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to this Chapter 11 Case.

75.    "Manager" means Ritchie Capital Management, L.L.C, in its capacity as the manager of the Managing Member.

76.    "Managing Member" means Ritchie Partners, L.L.C.

77.    "Multi-Strategy Master Fund" means Ritchie Multi-Strategy Trading, Ltd.

78.    "NYAG Complaint" means that certain complaint (as may have been amended) filed on October 26, 2006 by the New York State Attorney General against Coventry First, LLC, Montgomery Capital, Inc., The Coventry Group, Inc., and Reid S. Buerger, alleging that Coventry First, LLC and its affiliates, as purchasers of life insurance settlement policies, engaged in various improper practices in their acquisition of policies from owners and insureds, styled *New York Attorney General v. Coventry First, LLC, et al.*, Index. No. 404620-06 (October 26, 2006, N.Y. Sup. Ct.).

79.    "October 2005 Sale" means Huizenga's purchase of an interest in the Debtor pursuant to the Second Subscription Agreement.

80.    "Operating Agreement" means that Third Amended and Restated Limited Liability Company Operating Agreement, dated as of November 1, 2005, by and among the

Debtor, the Managing Member, the Sub-Advisors, and those persons admitted as members of Debtor.

81. "Order" means an order, opinion, or judgment of the Bankruptcy Court as entered on the docket.

82. "Other Priority Claims" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), that is not otherwise a Priority Tax Claim, a U.S. Trustee Fee Claim, or an Administrative Claim.

83. "Petition Date" means June 28, 2018, the date on which the Debtor Filed the voluntary petition for relief commencing the Chapter 11 Case.

84. "PPM" means private placement memorandum.

85. "Pre-Petition Lender" means Ritchie Multi-Strategy Global Trading, Ltd.

86. "Pre-Petition Revolver" means that certain pre-petition loan facility pursuant to the Revolving Loan Agreement, dated as of September 28, 2017, between Debtor, as borrower, and Pre-Petition Lender, as lender, as more fully described at Section III.C.

87. "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

88. "Professional" means any professional employed in the Chapter 11 Case pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

89. "Proof of Claim" means a proof of claim Filed against Debtor in this Chapter 11 Case in accordance with Official Form B410.

90. "Pro Rata Share" means, when used with reference to a Distribution of property to Holders of Allowed Claims or Allowed Interests in a particular Class or other specified group of Claims or Interests pursuant to Article IV, proportionately so that with respect to a particular Allowed Claim or Allowed Interest in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim or Interest to (ii) the amount of such Claim or Interest, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims or Allowed Interests in such Class or group of Claims or Interests to (ii) the amount of all Allowed Claims or Allowed Interests, as the case may be, in such Class or group of Claims or Interests. Absent an Order of the Bankruptcy Court to the contrary, until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata Distribution of property to Holders of Allowed Claims in such Class. Disputed Interests also shall be treated as Allowed Interests for purposes of calculating Pro Rata Distribution of property to Holders of Allowed Interests in such Class.

91.    "RCM (Bermuda)" means Ritchie Capital Management (Bermuda), Ltd.

92.    "Rejection Damages Claim" means a Claim for damages arising out of the rejection of an Executory Contract.

93.    "Released Parties" means, collectively and individually, the Debtor, the Chief Restructuring Officer, the DIP Lender (in such capacity) and, in their respective capacity as counsel or financial advisor to the Debtor or Chief Restructuring Officer, Reed Smith LLP, Potter Anderson LLP, and D&P, and each of their respective partners, members, employees, and agents, all in their capacities as such.

94.    "Reorganized Debtor" means the Debtor on and after the Effective Date.

95.    "RMSG, LLC" means Ritchie Multi-Strategy Global, L.L.C., the holder of 95.49% of the Interests in the Debtor.

96.    "RMSG Trading, Ltd." means Ritchie Multi-Strategy Global Trading, Ltd.

97.    "RRL Consolidating Feeder" means Ritchie Risk-Linked Strategies (Bermuda), Ltd.

98.    "RRL Master Fund" means Ritchie Risk-Linked Strategies Trading, Ltd.

99.    "RRL Offshore Feeder Fund" means Ritchie Risk-Linked Strategies, Ltd.

100.   "RRLS (Ireland) I" means Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.

101.   "RRLS (Ireland) II" means Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.

102.   "RRL Strategies Trust" means Ritchie Risk-Linked Life Strategies Trust I.

103.   "Schedules" means the schedules of Assets and Liabilities and the statement of financial affairs as required by section 521 of the Bankruptcy Code Filed by the Debtor on or about July 12, 2018, as amended on July 30, 2018, and as the same may thereafter be amended, modified or supplemented.

104.   "SDNY Court" means The United States Bankruptcy Court for the Southern District of New York.

105.   "Second Money Judgment" means the judgment entered on or about October 13, 2017, by the Illinois Circuit Court for Cook County in the Illinois DSA Action on account of the August 2005 Sale.

106.   "Second Subscription Agreement" means that Subscription Agreement pursuant to which the October 2005 Sale was effectuated.

107.   "Secured Claim" means Claim that is secured (a) by a Lien that is valid, perfected, enforceable and unavoidable, under the Bankruptcy Code and applicable non-bankruptcy law or by reason of an Order, or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value determined in

accordance with section 506(a) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in such property (unless an election has been made under section 1111(b) of the Bankruptcy Code on or prior to the Plan Confirmation Date) or to the extent of an amount subject to such setoff, as applicable.

108.   "SEZC Ltd." means Ritchie Capital Management SEZC, Ltd.

109.   "Stipulation Regarding Claim or Interest" means a stipulation or other agreement between the Debtor or the Liquidating Trustee and a Holder of a Claim or Interest, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest; any such stipulation or other agreement between the Liquidating Trustee and a Holder of a Claim or Interest executed after the Effective Date may be effectuated without approval of the Bankruptcy Court.

110.   "Sub-Advisor" means Ritchie Capital Management, L.L.C, in its capacity as sub-advisor to the Managing Member and the RRL Master Fund.

111.   "Sub-Advisors" means the Sub-Advisor and RCM (Bermuda), in their capacities as sub-advisors to the Managing Member and the RRL Master Fund.

112.   "Subordinated Unsecured Claims" means General Unsecured Claims against the Debtor that have been subordinated pursuant to section 510(b) of the Bankruptcy Code as the same arise from rescission of a purchase or sale of a security of the Debtor and/or for damages arising from the purchase or sale of such a security.  Subordinated Unsecured Claims include, without limitation, the following:  (i) Huizenga's Claim against the Debtor for attorneys' fees, expenses, costs, or sanctions; (ii) the Excess Insurers' Claim for reimbursement, contribution or indemnity from the Debtor; (iii) and the Claims of Entities subject to subordination under section 510(b) of the Bankruptcy Code for indemnification from the Debtor under the Operating Agreement, any other agreement, common law, or otherwise.

113.   "Subscription Agreements" means, collectively, the First Subscription Agreement and the Second Subscription Agreement.

114.   "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

115.   "Third Party Disbursing Agent" means one or more Entities retained by the Liquidating Trustee, in its sole discretion, to make Distributions required under this Combined Plan and Disclosure Statement.

US_ACTIVE-142061116.12

116.   "Trust Accounts" means the bank accounts to be held in the name of the Liquidating Trustee that are created pursuant to the Liquidating Trust Agreement and any subaccounts thereof.  Such Trust Accounts shall not be subject to garnishment, execution or similar process.

117.   "Trust Expense" means the reasonable and necessary fees, costs and expenses incurred by the Liquidating Trustee or its professionals pursuant to, and otherwise in connection with, the Liquidating Trustee's performance of its duties under the Liquidating Trust Agreement.

118.    "Unsecured Claim" means any Claim that is unpaid as of the Effective Date that is not an Administrative Claim or a Secured Claim.

119.   "U.S. Trustee Fees" means the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

120.   "Voting Deadline" means [_____, 2018] at 5:00 p.m. (Eastern), which is the deadline for submitting ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

**B.     Rules of Interpretation and Computation of Time**

**1.      Rules of Interpretation**

For purposes of this Combined Plan and Disclosure Statement, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Combined Plan and Disclosure Statement, any reference herein to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless the context indicates otherwise, any reference in this Combined Plan and Disclosure Statement to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Combined Plan and Disclosure Statement, Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in this Combined Plan and Disclosure Statement to Sections, Articles and exhibits are references to Sections, Articles and exhibits of or to this Combined Plan and Disclosure Statement; (f) the words "herein," "hereunder" and "hereto" refer to this Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of this Combined Plan and Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Combined Plan and Disclosure Statement; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Combined Plan and Disclosure Statement, the rights and obligations arising under this Combined Plan and Disclosure Statement will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the

US_ACTIVE-142061116.12

Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section II.B.1.

### 2.     Computation of Time

In computing any period of time prescribed or allowed hereby, Bankruptcy Rule 9006(a) shall apply.

## III.     BACKGROUND

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code initiating this Chapter 11 Case.  Following the Petition Date, the Debtor remained in possession of its Assets as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

## A.     THE DEBTOR'S BUSINESS

### 1.     The Purpose of the Debtor's Formation

The Debtor is an open-ended "onshore feeder" investment fund organized as a limited liability company under the laws of the State of Delaware on October 20, 2004.  A classic investment "strategy fund" provides investors with the opportunity to invest in a particular asset or class of assets through either an onshore or an offshore investment vehicle—in general, U.S.-taxable investors would invest in an onshore feeder fund and U.S. tax-exempt and foreign investors would invest through an offshore feeder fund.  The general configuration of such an investment fund structure is as follows:

US_ACTIVE-142061116.12



In the early 2000s, there was a strong appetite in the investing world to create additional pooled or securitized asset classes beyond real estate and residential mortgages. There existed a large inventory of insurance policies to be acquired, pooled, and securitized. The "risk-linked" group of strategy funds was created to securitize "life settlements."[2]  A "life settlement" is the sale of a life insurance policy to a third party for a value in excess of the policy's cash surrender value, but less than its face value, or death benefit. A policy owner receives a cash payment, while the purchaser of the policy assumes all future premium payments and receives the death benefit upon the death of the insured.

The Debtor's investment objective was to achieve capital appreciation through investments in a number of risk-linked opportunities. A team of experts in insurance, comprising David Govrin, Brian Murphy, Elliot Lem, and Jeff Mullholland (the "Insurance Team"), provided technical expertise in insurance-related investment opportunities. The Insurance Team believed that if it could complete the securitization of life settlements, there could be tremendous financial reward. The Insurance Team also recognized that there was a higher than usual risk associated with this strategy because no other firm had successfully securitized life settlements.

---

[2]    The life settlement strategy, of which the Debtor's proposed business was a component, represented an expansion of an existing risk-linked investment strategy in the property-casualty insurance sector.

US_ACTIVE-142061116.12

2.       **Ritchie Risk-Linked Structure**

As of the Petition Date, Ritchie Multi-Strategy Global, L.L.C. ("RMSG, LLC") holds 95.49% of the equity in the Debtor.  Joseph and Jeanne Scoby hold 3.54% of the equity in the Debtor.  The Managing Member holds 0.97% of the equity in the Debtor.[3]  As a result of the investment fund structure of which it is a part, the approximately sixty (60) investors of RMSG, LLC are indirect investors in the Debtor.

The Debtor has no officers or directors.[4]  As is common for investment funds (especially those without active investment operations), the Debtor is managed by its Managing Member, the Manager, and its service providers.  Michael Cilento was appointed chief operating officer of the Managing Member on or about June 28, 2018.  Mark Azzopardi is the director of the Manager.  60 Degrees Group SEZC, Ltd. is a service provider to the Manager, and other affiliated entities.

The Debtor was the "onshore feeder fund" in a master-feeder investment fund structure comprised of a number of separate entities, including Ritchie Risk-Linked Strategies, Ltd. ("RRL Offshore Feeder Fund"), Ritchie Risk-Linked Strategies (Bermuda), Ltd. ("RRL Consolidating Feeder"), Ritchie Multi-Strategy Trading, Ltd. (the "Multi-Strategy Master Fund") and Ritchie Risk-Linked Strategies Trading, Ltd. (the "RRL Master Fund"), that invested their capital in a variety of insurance-related assets.[5]

---

[3] Huizenga purchased equity Interests in the Debtor in the August 2005 Sale and the October 2005 Sale. In August 2006, Huizenga submitted to the Managing Member a notice of withdrawal of all of its capital in the Debtor to the Managing Member requesting withdrawal of all Huizenga's capital—with an "Effective Date" of December 31, 2006.  In all five complaints that Huizenga filed in the Illinois DSA Action, Huizenga alleged that it was still the owner of the securities it purchased from the Debtor and that it was ready and able to tender those securities to the Debtor or the court in the event the court granted Huizenga's request for rescission of the Subscription Agreements by which Huizenga purchased the equity Interests in the August 2005 Sale and the October 2005 Sale.  Notably, however, despite the entry of the August 25, 2015 Judgment and the Second Judgment, Huizenga has not tendered to the Debtor or the court the equity Interests it purchased from the Debtor in 2005.

[4] The Managing Member of the Debtor is Ritchie Partners, L.L.C. ("Managing Member").  Until their departure sometime in 2007, members of the Insurance Team advised the Managing Member.  The manager of the Managing Member is Ritchie Capital Management, L.L.C. ("Manager" or "Sub-Advisor").  The Managing Member appointed the Manager and Ritchie Capital Management (Bermuda), Ltd. ("RCM (Bermuda)" and together with the Sub-Advisor, the "Sub-Advisors") as sub-advisors to the Managing Member and the RRL Master Fund.  In addition, Ritchie Capital Management SEZC, Ltd. served as the "Investment Manager" to the Multi-Strategy Master Fund.  RCM (Bermuda) has been dissolved.

[5] Prior to the Petition Date, Thane Ritchie was an officer or director of the Manager and later, in 2015, of the Managing Member.  He resigned from those positions on January 9, 2018, and December 10, 2017, respectively.  On January 9, 2018, Thane Ritchie also resigned as a director of SEZC Ltd., a current sub-advisor to the Manager.  Thane Ritchie, however, serves as an informal advisor to the Debtor and is an instrumental source of knowledge regarding the litigation described herein.

US_ACTIVE-142061116.12

The RRL Master Fund made the direct investments in insurance products, including property-casualty and "life settlement" assets. The three "feeder funds," the Debtor and its offshore counterparts, the RRL Offshore Feeder Fund, the RRL Consolidating Feeder and the Multi-Strategy Master Fund, invested capital in the RRL Master Fund that was used to fund the purchase of life settlements from an originator (Coventry First), who acquired them from the original, individual policy holders. Ownership of the 1085 life settlements were purchased from Coventry First and were then transferred to two "special purpose entities," Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. and Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. (respectively, "RRLS (Ireland) I" and "RRLS (Ireland) II"), which were established solely to hold the life settlement policies pending the contemplated securitization. The Managing Member of the Debtor, among other things, was authorized (at the direction of the Insurance Team) to invest the Debtor's capital into either the RRL Master Fund or more directly with RRLS (Ireland) I or RRLS (Ireland) II, which entities held life settlement assets for securitization.

The Debtor, through the Ritchie Risk-Linked Life Strategies Trust I ("RRL Strategies Trust"), purchased subordinated notes from RRLS (Ireland) I and RRLS (Ireland) II. Thereafter, the Debtor contributed its interest in the subordinated notes to the RRL Strategies Trust in exchange trust units of equivalent value.

The RRL Offshore Feeder Fund, through the Ritchie Life Strategies Master Trust (together with the RRL Strategies Trust, the "Life Strategies Trusts"), purchased junior notes and subordinated securities from RRLS (Ireland) I and RRLS (Ireland) II. The RRL Offshore Fund contributed its interests in the junior notes and subordinated securities to the Ritchie Life Strategies Master Trust in exchange for trust units of equivalent values.[6]

Key entities in the Ritchie Risk-Linked Strategy Fund structure included:

- RRL Master Fund;
- Debtor – the onshore feeder fund;
- The RRL Consolidating Fund;
- Managing Member;
- Manager of the Managing Member;
- Investment Manager and Sub-Advisors;
- RMSG, LLC – the majority equity holder in Debtor;
- Multi-Strategy Master Fund;
- RRLS (Ireland) I - a holder of life settlements for securitization;
- RRLS (Ireland) II - a holder of life settlements for securitization; and
- The Life Strategies Trusts.

---

[6]     Sandy Run, Ltd., an entity affiliated with Coventry First, and certain of its affiliates also purchased subordinated securities from RRLS (Ireland) I and RRLS (Ireland) II.

US_ACTIVE-142061116.12

The following chart depicts the structure of the "risk-linked strategy" complex of funds when it was accepting subscriptions:



An investor interested in participating in the risk-linked fund structure had the option of investing through either the onshore or offshore multi-strategy feeder funds, or directly into the Debtor (the onshore feeder fund) or its offshore variant.  Each of these investment alternatives provided a different risk/return profile and tax treatment (as set forth in each fund's Confidential Information Memorandum).  These investments were designed exclusively for sophisticated, "accredited" and "qualified" investors who were able to understand the relative risk, rewards, and tax implications of each investment alternative.  The risk-linked fund structure was not a single investment strategy.  Rather, by choosing their investment route from among multiple alternatives, individual investors were able to match the potential upside of each strategy with their tolerance for risk.

On June 30, 2005, RRLS (Ireland) I signed a purchase agreement with Coventry First to acquire life settlements, with the goal of creating the first successful securitization of this asset class.  On December 15, 2005, RRLS (Ireland) II signed a purchase agreement with Coventry First for the same purpose.  Between July 1, 2005 and September 2006, RRLS (Ireland) I and RRLS (Ireland) II used the proceeds from their sale of securities to the Debtor and the RRL Master Fund, as well as the proceeds from loans made by a senior secured lender, to purchase approximately 1,000 life settlement assets originated by Coventry First for $700 million.

The largest investment risk was the potential inability to securitize these life settlements after having purchased them—in which case investors would end up having to hold these assets (the policies) and pay the associated premiums along the way.  Previous securitization efforts had failed because no major ratings agency had provided an institutional quality investment rating on life settlement assets.

Duncan Goldie-Morrison, an investment professional affiliated with the Manager, worked alongside the Insurance Team, Ernst and Young, insurance specialists at the former Dewey & LeBoeuf law firm, Lehman Brothers, UBS, and Coventry First (the largest originator of life settlements in the United States) in an effort to obtain an institutional quality investment rating for securitization of the life settlement assets in which the Debtor had invested.

On June 2, 2006, Huizenga submitted a formal request to withdraw its investment in the Debtor.  However, in light of the forthcoming Moody's investment-grade rating and Huizenga's anticipated $3 million profit from the resulting securitization, on June 9, 2006, Huizenga formally requested to rescind its withdrawal.  The Debtor allowed Huizenga to reinstate its Interest.

## B.    EVENTS LEADING TO THE CHAPTER 11 BANKRUPTCY CASE

### 1.    The New York Attorney General Lawsuit Against Coventry First

On October 26, 2006, the New York State Attorney General filed a complaint against Coventry First, Montgomery Capital, Inc., The Coventry Group, Inc., and Reid S. Buerger, alleging that Coventry First and its affiliates, as purchasers of life insurance settlement policies, engaged in various improper practices in their acquisition of policies from owners and insureds (the "NYAG Complaint").  *See* NYAG Complaint, *New York Attorney General v. Coventry First, LLC,* et al., No. 404620-06 (N.Y. Sup. Ct. October 26, 2006).  The Debtor was not a party to the NYAG Complaint.

The NYAG Complaint alleged claims against Coventry First, certain of its principals and certain affiliates for fraudulent business practices, anti-competitive behavior, securities violations, common law fraud, unjust enrichment and breach of fiduciary duty.  The NYAG Complaint alleged that Coventry First paid undisclosed compensation to brokers who, in exchange, undermined the bidding process and corrupted the broker-seller relationship by undermining the broker's duties to the seller.  The NYAG Complaint sought damages from the defendants, including, among other things, rescission of the sale transactions between the insureds and Coventry First.

US_ACTIVE-142061116.12

Because of the NYAG Complaint, RRLS (Ireland) I and RRLS (Ireland) II no longer held marketable title to the life settlements they had acquired from Coventry First. Consequently, Moody's withdrew the preliminary rating that it had issued in connection with the prospective securitization. Without a rating from Moody's, the ability to complete the proposed securitization was doomed. RRLS (Ireland) I and RRLS (Ireland) II were unable to complete the planned securitization transaction, their financial status and ability to obtain additional funding deteriorated significantly, and they were forced to initiate efforts to restructure their obligations and to sell the Policies. Worse yet, to maintain the value of the life settlements, RRLS (Ireland) I and RRLS (Ireland) II had to continue paying the premiums on the underlying life insurance policies that were the subject of the NYAG Complaint.

### 2. The RRLS (Ireland) I and RRLS (Ireland) II Bankruptcy Cases

To maximize the value of their interest in the life settlements, RRLS (Ireland) I and RRLS (Ireland) II filed petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the "SDNY Court") on June 20, 2007 bearing case numbers 1:07-BK-11906-cgm and 1:07-BK-11907-cgm. On January 17, 2008, the SDNY Court approved the sale of the underlying life settlement assets free and clear of liens and the cloud on title arising from the NYAG Complaint pursuant to section 363 of the Bankruptcy Code. *See In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, Case No.1:07-BK-11906-cgm, D.I. 176-177. After the sale and satisfaction of secured claims, there were insufficient liquid assets to pay the allowed unsecured claims or make any distributions to the holders of equity securities. Thane Ritchie and his family lost $25.6 million, and Huizenga lost $11.6 million.

On September 18, 2008, the SDNY Court entered orders confirming the Joint Plan of Liquidation filed by RRLS (Ireland) I and RRLS (Ireland) II. *See In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, Case No.1:07-BK-11906-cgm, D.I. 329-330. The confirmed plan provided for the prosecution of certain causes of action against Coventry First and related parties in the name of RRLS (Ireland) I and RRLS (Ireland) II (the "Coventry Litigation") and, in the event of a recovery of damages, for the distribution of a share of the net proceeds from the Coventry Litigation to the holders of allowed unsecured claims (including the Life Strategies Trusts) against the estates of RRLS (Ireland) I and RRLS (Ireland) II.

The United States District Court for the Southern District of New York dismissed the Coventry Litigation, *Ritchie Risk-Linked Strategies Trading (Ireland), Limited* et al. *v. Coventry First L.L.C.* et al., Case no. 09-cv-1086, with prejudice on October 20, 2014 [D.I. 216]. Plaintiffs filed a timely motion for reconsideration, which the District Court denied in late 2015. Plaintiffs filed a timely notice of appeal [D.I. 226]. By Order entered in December 2016, the Second Circuit Court of Appeals affirmed the decision of the District Court. Thus, the holders of unsecured claims (including the Life Strategies Trusts) against the bankruptcy estates of RRLS (Ireland) I and RRLS (Ireland) II have received no distribution.

- 22 -

### 3.    Prepetition Litigation Involving the Debtor

#### a.    The Illinois DSA Action

On or about June 29, 2005, Huizenga executed (and subsequently delivered to the Debtor) a Subscription Agreement (the "First Subscription Agreement"), by which it subscribed to purchase an interest in the Debtor.  By "Confirmation of Subscription," dated August 27, 2005, the Debtor notified Huizenga that the Debtor "hereby accepts the subscription as described above [effective August 1, 2005] in reliance on the representations, warranties and covenants contained in the Subscription Agreement" (the "August 2005 Sale").  On or about August 1, 2005, Huizenga directed its bank to transfer electronically $6 million to a deposit account held in the name of the Debtor.

On or about September 28, 2005, Huizenga signed an Additional Investment Subscription Form (the "Second Subscription Agreement" and together with the First Subscription Agreement, the "Subscription Agreements"), by which it subscribed to purchase additional interests in the Debtor.  The Second Subscription Agreement provided that Huizenga's subscription of the additional interests was subject to all of the representations, warranties and covenants contained in the First Subscription Agreement.  The funds for these additional interests, in the amount of $4,664,542, were proceeds from Huizenga's withdrawal of its capital in another private investment fund named Ritchie Energy, LLC that Huizenga had purchased in 2004.  On or about October 1, 2005, at Huizenga's request and in reliance on the Second Subscription Agreement, the Managing Member caused the proceeds of the redemption of Huizenga's interests in Ritchie Energy, LLC to be transferred directly to the Debtor, in consideration for the purchase of additional interests in the Debtor, which were issued to Huizenga effective October 1, 2005 (the "October 2005 Sale").

On April 6, 2007, Huizenga commenced a lawsuit in Illinois Circuit Court for Cook County (the "Illinois Circuit Court") (#07-CH-9626 ("Illinois DSA Action")) against the Debtor and seven other defendants, including the Managing Member, the Sub-Advisors, Thane Ritchie, Douglas R. Rothschild, Duncan Goldie-Morrison, and Paul Wolfe.  Huizenga sought rescission and damages relating to alleged violations of the Illinois Securities Law of 1953, as amended, 815 ILCS 5/1 *et seq.*, the Delaware Securities Act ("DSA"), Del. Code Ann. tit. 6, § 7301 *et seq.,* and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.,* and alleged fraud, breach of fiduciary duties and an accounting, all of which allegedly arose from Huizenga's purchase of interests in the Debtor in the August 2005 Sale and the October 2005 Sale.  Specifically, Huizenga asserted the following nine counts:

- Count 1 sought rescission under the Illinois Securities Act against the Debtor for offering securities pursuant to material misrepresentations and omissions;

- Count 2 sought rescission under the Illinois Securities Act against the Managing Member, the Sub-Advisors, Thane Ritchie, Rothschild, Goldie-Morrison, and Wolfe as "control persons" of the Debtor;

- Count 3 sought rescission under the DSA against the Debtor for the sale of securities by omission or misrepresentation;

US_ACTIVE-142061116.12

- Count 4 sought rescission under the DSA against the Managing Member, the Sub-Advisors, Thane Ritchie, Rothschild, Goldie-Morrison, and Wolfe as sellers of securities and as control persons of the Debtor;

- Count 5 alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act against all defendants;

- Count 6 alleged Common Law Fraud against all defendants for making materially false promises in inducing Huizenga to invest in the Debtor;

- Count 7 alleged Breach of Fiduciary Duties against all defendants for providing materially false and misleading reports and information to Huizenga about the Fund post-sale;

- Count 8 alleged breach of fiduciary duties against all defendants for failure to invest the assets of the fund in a diversified range of risk-linked investments; and

- Count 9 sought an accounting against the "Ritchie Defendants."

Although alleged across nine counts, the theme of the Illinois DSA Action was that Huizenga had been deceived into believing that the Debtor was investing in a balanced, diverse portfolio of risk-linked assets – and that the "life settlement" portion of the investment was to represent only a third of the asset class.

On September 12, 2007, the Illinois Circuit Court dismissed Counts 1, 2, 5 and 9 with prejudice and permitted amendment of the complaint within 30 days. On October 12, 2007, Huizenga filed an Amended Complaint for Rescission pursuant to the DSA and Damages. On October 2, 2008, Huizenga filed a Second Amended Complaint for Rescission and Damages.

On January 15, 2009, Huizenga filed a Third Amended Complaint for Rescission and Damages, which alleged twelve counts as follows:

- Count 1 sought rescission under the DSA against the Debtor based upon pre-purchase communications in the private placement memorandum ("PPM") and outside of the PPM and offered to tender the securities purchased from the Debtor;

- Count 2 sought rescission under the DSA against the Managing Member, the Sub-Advisors, Thane Ritchie, Rothschild, Goldie-Morrison and Wolfe based upon pre-purchase communications in the PPM and outside of the PPM;

- Count 3 alleged common law fraud against the Debtor, Thane Ritchie, the Managing Member, and the Sub-Advisor based upon a false and misleading PPM;

- Count 4 alleged common law fraud against the Debtor, Thane Ritchie, the Managing Member, and the Sub-Advisor based upon post-purchase misrepresentations and omissions;

- Count 5 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for providing false and misleading reports about the fund;

US_ACTIVE-142061116.12

- Count 6 alleged breach of contract against the Debtor, Thane Ritchie, the Managing Member, and the Sub-Advisor for providing false and misleading reports about the fund – specifically in the monthly reports, the audited annual report and in investor updates;

- Count 7 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for fraudulent and reckless conduct in investing the Fund's assets; and

- Count 8 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for fraudulent and reckless conduct in charging excessive management fees.

The Third Amended Complaint additionally alleged, as Counts 9 through 12, Counts 1, 2, 5 and 9 from the April 6, 2007 Complaint, which had previously been dismissed.

On April 1, 2010, Huizenga moved voluntarily to dismiss its claims for common law fraud and breach of contract (Counts 3, 4 and 6).[7]

On available dates on the court's calendar from around July 2010 to September 2011, the Illinois Circuit Court conducted a bench trial on the remaining counts under the DSA (Counts 1 and 2) and the three counts (5, 7 and 8) seeking to recover damages allegedly caused by breaches of fiduciary duty.

Over three years after the trial concluded (and almost eight years after commencement of the Illinois DSA Action), on January 27, 2015, the Illinois Circuit Court entered judgment as follows:

- Judgment in favor of defendants RCM (Bermuda), Rothschild, Goldie-Morrison, and Wolfe on all counts;

- Judgment in favor of all defendants on Counts 5, 7 and 8 (the breach of fiduciary duty – direct and derivative counts);

- Judgment in favor of all defendants on Counts 1 and 2 under the DSA with respect to the August 2005 Sale;

- Judgment against the Debtor and the Managing Member on Count I with respect to the October 2005 Sale; and

- Judgment against non-selling defendants the Managing Member, the Sub-Advisor, and Thane Ritchie on Count 2 for "secondary liability" with respect to the October 2005 Sale.

The Illinois Circuit Court's January 27, 2015, judgment adopted a strict liability standard to hold that "Huizenga is entitled to rescission of its October 1, 2005 investment." The Illinois Circuit Court recognized there were over 50 failed attempts to securitize life settlement assets,

_____

[7] Between April 2007 and January 2009, the defendants were required to produce over 1 million pages and to participate in dozens of depositions.

and that by obtaining a preliminary Moody's rating in anticipation of such a securitization, the Debtor's attempt had advanced much further than any prior attempt.  The Debtor's attempt ultimately failed, but it was always known to be a high risk investment.  The Debtor was held liable to Huizenga without any required showing of scienter, reliance or causation.  The court found that the Delaware Supreme Court "would not find reliance, *scienter,* or loss causation necessary to recovery."

Other defendants were found secondarily liable as "non-sellers" without any scienter, reliance or loss causation.  The Manager was found secondarily liable because it did not "remove itself" from any of the communications with Huizenga.  The Managing Member was found secondarily liable because of a duty to take reasonable steps to know of the communications to Huizenga.  Thane Ritchie was held liable to Huizenga because he was an officer of the Debtor involved in the sale of interests to Huizenga even though "he was no more expert than any other Ritchie personnel at unravelling the complexities of the [life settlement] model."  The Illinois Circuit Court specifically stated that it "does not find that Thane Ritchie knew the information given to Huizenga was inadequate."  The court also found that Huizenga "has not met [its] burden" of proving "fraud, bad faith, gross negligence, or reckless or intentional misconduct."  The court "does not find that defendants acted intentionally or recklessly.  Rather, the causes appear to have been a combination of complex and rapidly evolving investment project and [the Debtor's] internal turmoils."  Moreover, in rejecting Huizenga's derivative claims, the court held that the defendants were entitled to the benefit of the business judgment rule because "[t]he basic timing of events prevents the Court from concluding that defendants engaged in deliberate wrongdoing, or in a way that no rational person could possibly accept."  The court also found that there was *no* self-dealing, noting the Coventry First deal may have been signed "incautiously, perhaps, but not in a way which evidenced fraud or self-dealing by Ritchie personnel."

The judgment also set the matter for a hearing on March 3, 2015 to consider "implementation of the rescission."  The trial court never declared any particular contract to be invalid and never ordered Huizenga to tender the securities it acquired in its "October 1, 2005 investment."  In the first quarter of 2015, Huizenga filed a motion for pre-judgment interest and Illinois Supreme Court Rule 304(a) Certification.

On July 1, 2015, Huizenga filed post-trial a Fourth Amended Complaint for Rescission and Damages[8] alleging:

- Count 1 sought rescission under the DSA against the Debtor based upon pre-purchase communications in the PPM and outside of the PPM;

- Count 2 sought rescission under the DSA against the Managing Member, the Sub-Advisors, Thane Ritchie, Rothschild, Goldie-Morrison and Wolfe based upon pre-purchase communications in the PPM and outside of the PPM;

- Count 3 – not alleged;

---

[8] Over the defendants' objections and almost four years after the conclusion of the trial, the Illinois Circuit Court permitted Huizenga to file the Fourth Amended Complaint for Rescission and Damages.

US_ACTIVE-142061116.12

- Count 4 – not alleged;

- Count 5 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for providing false and misleading reports about the fund;

- Count 6 – not alleged;

- Count 7 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for fraudulent and reckless conduct in investing the fund's assets; and

- Count 8 alleged breach of fiduciary duty against Thane Ritchie, the Managing Member, and the Sub-Advisor for fraudulent and reckless conduct in charging excessive management fees.

On July 7, 2015, in granting Huizenga's motion for reconsideration of the judgment entered on January 27, 2015, the Illinois Circuit Court struck the words "for rescission of Huizenga's October 1, 2005 investment" in the first sentence of the "Conclusions" on page 53 of the January 27, 2015, judgment.  The court replaced those words with "for $4,664,542.00, which the Court concludes was the amount paid for plaintiff's second investment and the return of which therefore effects rescission of that investment."  On August 25, 2015, the trial court amended the Judgment to include prejudgment interest in the amount of $4,509,657.63 and certified the judgment for appeal (the "August 25, 2015 Judgment").[9]

The Debtor, the Managing Member, the Sub-Advisor, and Thane Ritchie appealed to the Illinois Court of Appeals.  Huizenga did not appeal the January 27, 2015 judgment in favor of all eight defendants on Counts 5, 7 and 8.  Huizenga did, however, file a timely notice of cross-appeal from the trial court's January 27, 2015 judgment in defendants' favor on Counts 1 and 2 as related to the August 2005 Sale.

In the interim, the Delaware Supreme Court affirmed the Delaware Chancery Court's ruling in which the court held that the DSA does not automatically apply to matters in which a contract contains a Delaware choice of law provision.  *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016).  In dismissing a counterclaim for violations of the DSA, the Chancery Court determined that the statute permitting parties to a contract to utilize choice of law provisions is not "a mechanism for the wholesale importation of every provision of Delaware statutory law [including the DSA] into the commercial relationship of contracting parties.  *Id.* at 855.  To hold otherwise "would lead to the bizarre result of allowing contractual parties to convert a blue-sky law that was intended to regulate *intrastate* commerce into one that would apply to *interstate* commerce."  *Id.* at 856.

On December 29, 2016, the Illinois Court of Appeals affirmed the Illinois Circuit Court's judgments with respect to the October 2005 Sale, but reversed the Illinois Circuit Court's ruling with respect to the August 2005 Sale.  *Huizenga Managers Fund, LLC v. Ritchie*, 2016 IL App

---

[9] Notably, the August 25, 2015 Judgment does not address Huizenga's alleged entitlement to an award of attorneys' fees under the DSA.

US_ACTIVE-142061116.12

(1st) 152733-U, *appeal denied*, 84 N.E.3d 364 (Ill. 2017), and c*ert. denied sub nom. A.R. Thane Ritchie v. Huizenga Managers Fund, LLC*, 138 S. Ct. 739 (2018).  The Illinois Court of Appeals concluded that the trial court should enter judgment in Huizenga's favor "on the initial investment in the amount of $6 million," but "remand[ed], however, for the trial court to calculate any prejudgment interest it sees fit."  Thus, the Illinois Court of Appeals did not (i) expressly declare any contract to be invalid, (ii) otherwise hold that "rescission of any contract" was granted, (iii) declare that the trial court should order Huizenga to tender the securities it purchased in the August 2005 Sale to the Debtor, or (iv) otherwise impose any civil liability "against" any of the non-selling defendants (*e.g.*, the Managing Member, the Sub-Advisor, and Thane Ritchie) with respect to the August 2005 Sale.  Moreover, the Illinois Court of Appeals did not hold that Huizenga was entitled to any award of attorneys' fees under the DSA for the August 2005 Sale or the October 2005 Sale.

The Debtor filed an Appeal as a Matter of Right, or, in the Alternative, Leave to Appeal with the Illinois Supreme Court.  On May 24, 2017, the Illinois Supreme Court denied leave to appeal.  On October 20, 2017, the Debtor filed a Petition for Writ of *Certiorari* with the United States Supreme Court, which was denied on January 16, 2018.

On November 20, 2017, the Illinois Circuit Court ordered the surety to pay the $11,026,885.14 judgment on the October 2005 Sale by November 22, 2017, and the surety complied and paid such judgment amount.  Accordingly, on or about November 22, 2017, the first money judgment entered in August 2015 was satisfied with funds obtained from the surety.  The full amount of the August 25, 2015 Judgment including post-judgment interest was $11,026,885.14.

On or about October 13, 2017, upon remand, the Illinois Circuit Court entered judgment for damages in the amount of $12,772,529.70 (including prejudgment interest in the amount of $6,772,529.70) on account of the August 2005 Sale (the "Second Money Judgment").  On or about April 24, 2018, an attorney for Thane Ritchie notified the trial court that $14,100,000 was in a trust account for Mr. Ritchie at the law firm of Clayborn, Sabo & Wagner, LLP, which had been served with a citation to discover assets.  The notification created an opportunity for Huizenga to obtain a turnover order for the balance of the judgment on the August 2005 Sale ($13,383,511.36 with post-judgment interest), which it did, and with which Clayborn, Sabo & Wagner, LLP complied.  The effect was to satisfy the Second Money Judgment.

The defendant-appellants have filed their opening brief in their appeal of the Second Money Judgment.  Huizenga filed its response brief on July 19, 2018.  The defendant-appellants' reply brief was due August 2, 2018, but they have filed a motion to extend that filing deadline to August 23, 2018, which Huizenga has opposed.  The key argument in the appeal of the judgment for the August 2005 Sale is that neither the trial court nor the appellate court declared that any contract related to the August 2005 Sale was invalid or ordered Huizenga to tender the securities it purchased in the August 2005 Sale.  Furthermore, neither the trial court nor the appellate court made any specific findings concerning the secondary liability under the DSA, if any, of the Managing Member, the Sub-Advisor, or Thane Ritchie.

US_ACTIVE-142061116.12

The Debtor, which was found primarily liable under the DSA with respect to the October 2005 Sale, and did not assert any arguments for reversal on appeal, filed a motion to dismiss its appeal voluntarily, which was opposed by Huizenga and denied by the appellate court.  Thus, all defendants' second appeal is currently pending before the Illinois Appellate Court.

A significant amount of collateral litigation has ensued with respect to the August 25, 2015 Judgment and the Second Money Judgment.  Huizenga has sought sanctions against the Debtor and its counsel for allegedly filing a frivolous motion to vacate the Illinois Circuit Court's judgments for lack of subject matter jurisdiction and noting the change of law created by the Delaware Supreme Court's *Fdg* decision.  The Illinois Circuit Court certified both the August 25, 2015 Judgment and the Second Money Judgment for appeal without resolving Huizenga's claim for attorneys' fees under the DSA.  Huizenga's claim for attorneys' fees remains stayed in the Illinois Circuit Court pending resolution of the appeal of the Second Money Judgment.  The Debtor and other defendants have their own contractual claims for attorneys' fees against Huizenga under the Subscription Agreements with respect to the counts and claims on which they prevailed.  Also, as discussed *infra,* the Debtor asserted an indemnification claim against Huizenga with respect to the Illinois Circuit Court's judgments and the Debtor's liability for attorneys' fees and expenses.

In addition, as discussed *infra* in more detail, the Debtor also has commenced an action against its excess insurers for specific performance, declaratory judgment relating to defenses costs, declaratory judgment relating to indemnity, and bad faith (or negligence) in not providing insurance coverage for claims asserted by Huizenga.  Huizenga has asserted a claim against the Debtor and its insurers for alleged fraud in relation to the posting of the appeal bond.  Pursuant to the Operating Agreement, the Debtor has an obligation to indemnify the Managing Member, the Sub-Advisors and their affiliates for the losses, damages, expenses, liabilities, and attorney fees and expenses of such parties incurred in connection with the actions of such parties taken on behalf of the Debtor or in furtherance of the interests of the Debtor.

### b.    The Insurance Recovery Action

On September 10, 2015, the Debtor, the Managing Member, the Sub-Advisor, and Thane Ritchie, as plaintiffs, filed an action in Illinois State Court (Case #15 CH 13480) (the "Insurance Recovery Action") against Arch Specialty Insurance Company and Continental Casualty Company (collectively, the "Excess Insurers") to force them to fund the appeal bond in the Illinois DSA Action based on their duty to defend.  The Illinois Circuit Court ruled in favor of the plaintiffs, and the Excess Insurers provided security for the appeal bond.  The ruling requiring the Excess Insurers to fund the appeal bond *as part of their duty to defend* was reversed on appeal based on non-exhaustion of the primary insurance coverage.  As noted above, the appeal bond has already been utilized to satisfy the August 25, 2015 Judgment in the Illinois DSA Action.  The Excess Insurers may seek reimbursement from the Debtor, but the Debtor believes that they face a significant obstacle (i) because the primary insurance policy had, by the time the appeal bond was used to satisfy the August 25, 2015 Judgment, been exhausted by payments to Sidley Austin LLP for fees and expenses relating to the Illinois DSA Action and (ii) because the judgment is covered *under the indemnity provisions* of their policies.  The Excess Insurers policy limits effectively are exhausted by the surety's payment of the $11,026,885.14 judgment.

On January 17, 2018, the plaintiffs filed a First Amended Complaint, adding a count seeking an above-policy-limits bad faith judgment against the Excess Insurers to pay for the Second Money Judgment.    The First Amended Complaint included the following counts: specific performance, declaratory judgment relating to defenses costs, declaratory judgment relating to indemnity, bad faith failure to settle, and (alternatively) negligent failure to settle. The bad faith claim is based on the Excess Insurers' refusal to settle with Huizenga in or around July 2015, when a settlement opportunity arose that would have necessarily involved payment for far less than the Excess Insurers' policy limits.    As a result of the Excess Insurers' refusal to settle with respect to the liability incurred for the October 2015 Sale, the Illinois DSA Action continued and the Debtor also incurred additional liabilities that it otherwise would not have incurred, including without limitation, the $12,772,529.70 amount of the Second Money Judgment in respect of the August 2005 Sale (which judgment resulted from the first appeal that commenced after the Excess Insurers' refusal to settle).

The Excess Insurers filed a motion to dismiss the First Amended Complaint.    The parties completed briefing on the Excess Insurers' motion on April 24, 2018.    At a status hearing on May 9, 2018, the judge determined that he would decide the motion to dismiss on the papers and issue an order.

### c.    The Debtor's Delaware Indemnification Case Against Huizenga

On May 24, 2017, the Debtor, the Managing Member, the Sub-Advisor, and Thane Ritchie filed an action against Huizenga in the Superior Court of the State of Delaware (case #N17C-05-598-MMJ) (the "DE Indemnity Action").    The plaintiffs seek indemnity under the Subscription Agreements for attorneys' fees and expenses and the judgments that Huizenga obtained in the Illinois DSA Action.    This lawsuit alleges that Huizenga violated several representations and warranties in the Subscription Agreements by asserting claims in the Illinois Circuit Court based on alleged omissions of fact.    This suit also alleges that Huizenga pursued and obtained a judgment against the Debtor, the Managing Member, the Sub-Advisor, and Thane Ritchie in the absence of fraud or gross negligence in violation of a covenant not to do so.    In addition, the suit alleges that Huizenga is obligated under the Subscription Agreements to indemnity the plaintiffs for any and all loss liability, liability, claim, damage and expense incurred by the plaintiffs as a result of any false representation or warranty or misinformation by the subscriber, any breach or default by the subscriber under the Subscription Agreements, or any unsuccessful securities proceeding brought by the subscriber.

The Operating Agreement contains a "claim-based" provision for assessment of legal fees and costs against the non-prevailing party in any proceeding.

In the Illinois DSA Action, Huizenga asserted claims against the Debtor and seven additional defendants.    From the initial Complaint through its Fourth Amended Complaint, Huizenga asserted 14 causes of action against various combinations of defendants.

With respect to RCM (Bermuda), Goldie-Morrison, Rothschild and Wolfe, Huizenga either voluntary dismissed – or lost on – *every* claim.

US_ACTIVE-142061116.12

With respect to the remaining four defendants in the Illinois DSA Action, Huizenga voluntarily dismissed or lost on all but one claim against three of the defendants (the Debtor, the Sub-Advisor, and Thane Ritchie) and two claims against one defendant (the Managing Member). Specifically, Huizenga prevailed only on its (i) DSA claim against the Debtor and the Managing Member as "sellers" and (ii) DSA claim against the Managing Member, the Sub-Advisor and Thane Ritchie as "secondarily" liable parties.   The partially-prevailing defendants and the various claims with their respective dates of filing and dismissal, voluntary dismissal or other resolution against Huizenga are as follows[10]:

| Claim | Debtor | Managing Member | Sub-Advisor | Thane Ritchie |
|---|---|---|---|---|
| Illinois Securities Act as Seller | 4/6/2007; dismissed 9/12/2007 | N/A | N/A | N/A |
| Illinois Securities Act for Secondary Liability | N/A | 4/6/2007; voluntarily dismissed 9/12/2007 | 4/6/2007; voluntarily dismissed 9/12/2007 | 4/6/2007; voluntarily dismissed 9/12/2007 |
| Delaware Securities Act against as Seller | Huizenga Prevailed | Huizenga Prevailed | N/A | N/A |
| Delaware Securities Act for Secondary Liability | N/A | Huizenga Prevailed | Huizenga Prevailed | Huizenga Prevailed |
| Illinois Consumer Fraud and Deceptive Business Practices Act | 4/6/2007; voluntarily dismissed 9/12/2007 | 4/6/2007; voluntarily dismissed 9/12/2007 | 4/6/2007; voluntarily dismissed 9/12/2007 | 4/6/2007; voluntarily dismissed 9/12/2007 |
| Common Law Fraud in the inducement to invest in RRLS | 4/6/2007; voluntarily dismissed 4/1/2010 | 4/6/2007; voluntarily dismissed 4/1/2010 | 4/6/2007; voluntarily dismissed 4/1/2010 | 4/6/2007; voluntarily dismissed 4/1/2010 |
| Breach of Fiduciary Duties for providing false post-sale information about RRLS | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 |
| Breach of Fiduciary Duties for failure to diversify the RRLS investment | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 | 4/6/2007; judgment certified on 8/25/2015 |

---

[10] All dates are subject to the exhaustion of appellate rights and completion of the Illinois DSA Action. Therefore, some judgments may not yet be final.

| | | | | |
|---|---|---|---|---|
| Accounting | 4/6/2007; dismissed 9/12/2007 | 4/6/2007; dismissed 9/12/2007 | 4/6/2007; dismissed 9/12/2007 | N/A |
| Common Law Fraud based on post-purchase misrepresentations regarding Debtor's investments | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 |
| Breach of Contract for providing false and misleading post-sale reports regarding Debtor's investments | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 | 10/12/2007; voluntarily dismissed 4/1/2010 |
| Breach of Contract for providing false and misleading post-sale reports regarding Debtor's investments | 10/12/2007; voluntarily dismissed 10/2/2008 | 10/12/2007; voluntarily dismissed 10/2/2008 | 10/12/2007; voluntarily dismissed 10/2/2008 | 10/12/2007; voluntarily dismissed 10/2/2008 |
| Breach of Fiduciary Duty for Fraudulent and Reckless Conduct in investing the Debtor's assets | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 |
| Breach of Fiduciary Duty for Fraudulent and Reckless Conduct in charging excessive management fees | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 | 10/2/2008; judgment certified on 8/25/2015 |

Huizenga disputes any obligation to indemnify the Debtor (or any other defendant). Huizenga argues that the Subscription Agreement and/or the Operating Agreement are unenforceable because Huizenga prevailed on certain of its claims in the Illinois DSA Action. Huizenga filed a motion to dismiss or stay the DE Indemnity Action. On December 21, 2017, the Illinois Circuit Court stayed the case pending resolution of the Illinois DSA Action, which is in the midst of a second appeal with respect to the Second Money Judgment.

### d.    The Huizenga Appeal Bond Action

In November of 2015, Huizenga issued a series of Citations to Discover Assets. The Court dismissed the Citations upon the posting and acceptance of an appeal bond. The dismissal of these Citations to Discover assets following the posting of the appeal bond and the corresponding "liens" purportedly granted against the property of the defendants through those

US_ACTIVE-142061116.12

Citations, forms the basis for Huizenga's subsequent claims for damages based in their "fraud and conspiracy" suit as described below.

On September 26, 2017, Huizenga filed a lawsuit against the Debtor, the Managing Member, the Sub-Advisor, Thane Ritchie and the Excess Insurers, alleging fraud and conspiracy to commit fraud.  Huizenga alleges that the defendants misrepresented that they had obtained an "irrevocable" appeal bond for the appeal of the August 25, 2015 Judgment in the Illinois DSA Action to induce Huizenga to agree to a stay of enforcement pending the appeal.  Huizenga alleges that that representation was false because the defendants did not disclose the existence of a "side agreement" between the defendants and the Excess Insurers in which such parties allegedly agreed that the Excess Insurers could attempt to "cancel" the bond after it was entered.  Huizenga alleges that it would not have agreed to entry of the "Agreed Order" that was entered on February 22, 2016 in supplementary proceedings to enforce the August 25, 2015 Judgment that provided for the dismissal of all Citations to Discover Assets and a stay of enforcement of the August 25, 2015 Judgment had it known of the "side agreement."  Huizenga has alleged and that it has lost the ability to enforce alleged "liens" that were created by the service of Citations to Discover Assets before February 22, 2016 that it contends would have enabled it to satisfy the August 25, 2015 Judgment because the Debtor is now insolvent.  Huizenga seeks damages in the amount of the judgment and the attorneys' fees it incurred in disputing the Excess Insurers' attempts to convince the Illinois courts to "cancel" the appeal bond.  The Debtor believes that this action lacks merit and, in any event, has been undermined by the surety's payment on the bond on November 22, 2017.

On January 16, 2018, Huizenga filed a First Amended Complaint, adding a count for fraudulent conveyance and adding SEZC, Ltd. as a defendant.  The new count alleges that the Sub-Advisor assigned sub-advisor rights to SEZC Ltd. in May 2015 to place beyond Huizenga's reach as an alleged creditor of the Sub-Advisor an alleged "asset" belonging to the Sub-Advisor in the form of sub-advisory rights.

The appearing defendants substantively moved to dismiss the appeal bond fraud cause of action of the First Amended Complaint, and the Sub-Advisor substantively moved to dismiss the cause of action for avoidance of an allegedly fraudulent conveyance made by the Sub-Advisor.  Thane Ritchie and SEZC Ltd. filed motions contesting the effectiveness of service of process and disputing the existence of personal jurisdiction.  On May 4, 2018, the Illinois Circuit Court granted the substantive motions to dismiss without prejudice and ordered Huizenga to replead in a second amended complaint if it wished to do so by May 25, 2018.  The court found that the "side agreement" had not caused any of Huizenga's alleged damages.  With respect to the fraudulent conveyance counts, the court found that payment of the August 25, 2015 Judgment and the Second Money Judgment rendered those counts moot on the grounds that the plaintiff was no longer a "creditor" of the Sub-Advisor, unless Huizenga could plead additional allegations of specific fact that would support a reasonable inference that Huizenga was the holder of an enforceable right to the payment of money from the Sub-Advisor or some other loss.

On May 25, 2018, Huizenga filed a Second Amended Complaint.  For the appeal bond claim, Huizenga essentially realleged its prior causes of action with some additional facts.  Huizenga sought to replead the fraudulent conveyance counts by alleging that it had a pending

claim for attorneys' fees in the Illinois DSA Action that should have prevented the Sub-Advisor from transferring any assets to SEZC Ltd.  On July 10, 2018, the Managing Member, Sub-Advisor and the Debtor filed a motion to stay the litigation based on the automatic stay and judicial economy.  Excess Insurer defendants Arch and Continental filed a substantive motion to dismiss.  Upon agreement of the parties, on July 25, 2018, the Court entered an order continuing until further notice by the Court briefing on the Insurer defendants' motion to dismiss until the Court addressed the issues raised in the Debtor's stay motion.  Responses to the Debtor's stay motion are due by August 15, 2018.  The court has set a "clerk's status" for August 31, 2018.

## C.    THE DEBTOR'S PRE-PETITION LOAN FACILITY

The Debtor and Ritchie Multi-Strategy Global Trading, Ltd. ("RMSG Trading, Ltd.") entered into a Revolving Loan Agreement dated as of September 28, 2017, under which the Debtor could request advances up to $8,000,000 in principal[11] at 6% annual interest solely to fund costs and expenses of litigation relating to the DE Indemnity Action, the Illinois DSA Action, and the Insurance Recovery Action.

The collateral for advances under the Revolving Loan Agreement includes the DE Indemnity Action, the Illinois DSA Action, and the Insurance Recovery Action.  The Revolving Loan Agreement is a non-recourse loan, and RMSG Trading, Ltd.'s sole source of recovery is the collateral.  As of the Petition Date, the Debtor scheduled the outstanding balance under the Revolving Loan Agreement in the amount of $5,157,217.49.  The outstanding balance under the Revolving Loan Agreement is due on December 31, 2018.

On June 21, 2018, a financing statement was filed in the Office of the Delaware Secretary of State to perfect the security interested in the collateral securing the Pre-Petition Revolver.  The Debtor, however, believes that the security interest is avoidable as a preferential transfer under section 547 of the Bankruptcy Code.

## D.    THE CHAPTER 11 CASE

### 1.    Generally

On the Petition Date, the Debtor filed a voluntary petition (as subsequently amended) for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  The case is pending before the Honorable Kevin J. Carey.  Since the Petition Date, the Debtor, via the Managing Member, has continued to manage its assets as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code and subject to the supervision of the Bankruptcy Court.

On July 12, 2018, the Debtor filed its Schedules of Assets and Liabilities and its Statement of Financial Affairs.  On July 30, 2018, the Debtor filed its Amended Schedules of Assets and Liabilities and its Statement of Financial Affairs.

---

[11] Approximately $223,000 of the $8 million principal balance was advanced in November and December 2016.

US_ACTIVE-142061116.12

On July 31, 2018, the Office of the United States Trustee commenced the "first meeting of creditors" under section 341 of the Bankruptcy Code.

All documents filed in the Chapter 11 Case may be reviewed on the Court's website at http://www.deb.uscourts.gov.

### 2.    Retention of Professionals

On July 27, 2018, the Debtor filed applications to retain (a) Reed Smith LLP as the Debtor's general chapter 11 bankruptcy counsel under section 327(a) of the Bankruptcy Code and (b) Potter Anderson & Corroon LLP as the Debtor's special litigation counsel under section 327(e) of the Bankruptcy Code.

On July 30, 2018, the Debtor filed an application to retain Geoffrey Varga, a managing director of Duff & Phelps ("D&P"), as the Debtor's chief restructuring officer pursuant to section 363 of the Bankruptcy Code. Mr. Varga is a Managing Director in D&P's Governance, Risk, Investigations and Disputes business unit and the head of D&P's Offshore Restructuring practice. He was previously the global head of Kinetic Partner's Corporate Recovery and Restructuring practice, having built the practice from its inception in 2005. Prior to joining Kinetic Partners, he was a Vice President within PriceWaterhouseCooper's Business Recovery Services group in Calgary, Alberta, Canada. He is a Canadian Chartered Accountant (since 1994) and holds a Canadian Chartered Insolvency & Restructuring Professional designation.

Mr. Varga has over 22 years of professional experience in insolvency, corporate recovery and restructuring, including the liquidation of multiple distressed or insolvent offshore and onshore funds and asset management structures. He has been engaged in insolvency proceedings in jurisdictions such as (a) the Caribbean, (the Cayman Islands, the Bahamas and the British Virgin Islands); (b) the United States; and (c) Europe. Mr. Varga has been involved in the following, among other, engagements: Aramid Entertainment Fund, Ltd.; Soundview Elite Ltd. *et al*; Palm Beach Offshore Ltd. / Palm Beach Offshore II Ltd. / Lancelot Investors Fund; Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.; Spectrum Galaxy Fund Ltd.; Himelsein Mandel Offshore Fund; Commonwealth Funds / Sand Springs Funds; Mariah Re Ltd.; Saad Investment Finance Company (No. 5) Limited; Mezzanine Financing Ltd. / Consistent Return Ltd. / Silverback Fund Ltd. / Nauticus Fund Ltd.; Ariel Fund Limited; Tarchon Fund of Funds SPC; Security Capital Ltd.; ThreeAM SPC Ltd.; Parmalat Capital Finance Limited; and SPhinX Strategy Fund.

### 3.    Huizenga's Motion to Dismiss

On August 8, 2018, Huizenga filed a *Motion to Dismiss the Case Pursuant to 11 U.S.C. §§ 1112(b) and 305(a)* [D.I. 32]. In its motion to dismiss, Huizenga alleges that the Chapter 11 Case was filed in bad faith[12] solely to obtain a tactical litigation advantage. Specifically,

---

[12] The Subscription Agreements provide that as an inducement to the Managing Member to accept the subscription, the subscriber agrees to the Material Contracts (as defined in the Subscription Agreement) including the Debtor's Operating Agreement. Article II, § 2.1(d) and Subsection xvi of the Operating

Huizenga alleges that the Debtor filed the Chapter 11 Case merely to "find another forum in which to relitigate the Debtor's decade-old, multi-jurisdictional fight with Huizenga" in order to "nullify the judgments of the Illinois state court and short-circuit entry of an award of attorneys' fees."[13]  Huizenga asks the Bankruptcy Court dismiss the Chapter 11 Case under Bankruptcy Code section 1112(b) for being allegedly filed in bad faith and without any rehabilitative purpose, as well as under Bankruptcy Code section 305 because dismissal allegedly "will better serve the interests of the Debtor's only real creditors as well as those of the Debtor" by foregoing the need to incur up to $1,500,000 in debt, which Huizenga claims is solely to fuel more litigation against it.

The Debtor, however, believes that dismissal is not in the best interest of its creditors and equity holders.  Upon dismissal, the unperfected security interest relating to the Revolving Loan Agreement would be enforceable against the Debtor.  Moreover, Huizenga's alleged (disputed) claim for attorneys' fees would not be subject to subordination under section 510(b) of the Bankruptcy Code.  Similarly, the indemnification claims of the Excess Insurers, Thane Ritchie, and any other Entity seeking indemnification under the Operating Agreement (or otherwise) relating to the Illinois DSA Action or the facts involved in such litigation would not be subject to subordination under section 510(b) of the Bankruptcy Code.  In short, holders of Interests would likely receive no distribution if the Chapter 11 Case is dismissed.  Therefore, the Debtor intends to oppose the motion to dismiss.

### 4.       Post-Petition Financing

On or about August 13, 2018, the Debtor filed a motion for approval of post-petition financing from RMSG Trading, Ltd. in the principal amount of $1,750,000 at 4% per annum pursuant to section 364 of the Bankruptcy Code.  The post-petition financing will be provided on a superpriority administrative priority basis.  The Debtor seeks post-petition financing for the purposes of (i) paying the costs and expenses of administering its Chapter 11 Case, (ii) paying the costs and expenses of litigating its claims and causes of action, and (iii) funding a distribution to General Unsecured Creditors under the Plan.  The proceeds of the DIP Loan are to be used to fund the Litigation Claims and to make a Distribution up to 75% to Holders of Allowed Class General Unsecured Claims.

If approved by the Bankruptcy Court, the DIP Loan would mature (subject to earlier termination) on or about December 31, 2018.  To the extent that the Debtor lacks the liquidity to pay the DIP Loan upon its maturity or termination, the DIP Loan would be payable thereafter when the Debtor obtained such liquidity.

---

Agreement provides in part that, "[T]he  Managing Member is expressly authorized to . . . commence . . . a voluntary case under Bankruptcy Law on behalf of the Fund."

[13] Both of Huizenga's judgments against the Debtor have been satisfied in full.  The Debtor believes that Huizenga's legal fee claim is overstated, disputed and subject to setoffs and counterclaims.

                                            US_ACTIVE-142061116.12

## IV.    CONFIRMATION AND VOTING

### A.    Confirmation Procedures

#### 1.    Plan Confirmation Hearing

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of this Combined Plan and Disclosure Statement.  On [_____,] 2018, the Bankruptcy Court entered an order scheduling the Confirmation Hearing for [_____,] 2018 at [_____ ].m. (Eastern), to consider, among other things, final approval of this Combined Plan and Disclosure Statement under section 1125 of the Bankruptcy Code and confirmation of this Combined Plan and Disclosure Statement under section 1129 of the Bankruptcy Code.  Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Interests, and other parties in interest.

Any objection to confirmation of this Combined Plan and Disclosure Statement must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be Filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than [_____,] 2018 at 4:00 p.m. (Eastern): (i) proposed counsel to the Debtor, Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE 19801 (Attn: Kurt F. Gwynne, Esq. and Jason Angelo, Esq.); and (ii) the Debtor's proposed Chief Restructuring Office, Geoff Varga, c/o Duff & Phelps, LLC, 55 East 52nd Street, FL 31, New York, NY 10055.

Bankruptcy Rule 9014 governs objections to Confirmation of this Combined Plan and Disclosure Statement.  **UNLESS AN OBJECTION TO CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

#### 2.    Requirements for Confirmation

The Bankruptcy Court will confirm this Plan only if the Plan meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in this Chapter 11 Case is that this Plan (i) is accepted by at least one impaired Class of Claims and, if not accepted by all Classes of Claims of Interests, this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to a rejecting Class; and (ii) is feasible.  The Bankruptcy Court must also find, among other things, that:

a.    this Plan has classified Claims and Interests in a permissible manner;

b.    this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

US_ACTIVE-142061116.12

c.      this Plan has been proposed in good faith.

**3.     Cram Down**

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtor reserves the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both.   The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

The Bankruptcy Code contains provisions for confirmation of a plan even if not all impaired classes accept the plan if at least one impaired class of claims has accepted the plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non-accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class of claims has accepted the plan.

These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the Holders of each type of Claim or Interest and by treating each Holder of a Claim or Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims or unsecured claims.  In general, section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule.  This rule requires that the dissenting class be paid in full before a junior class may receive anything under

US_ACTIVE-142061116.12

the plan on account of its junior claims or interests.  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

- <u>Secured Creditors</u>.  Either: (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- <u>Unsecured Creditors</u>.  Either: (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- <u>Interests</u>.  Either: (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims.  If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims have failed to accept the Plan under section 1129(a)(8) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with section 1129(b) of the Bankruptcy Code.  The Debtor believes that this Combined Plan and Disclosure Statement satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that this Combined Plan and Disclosure Statement meets the requirements of section 1129(b) of the Bankruptcy Code or that at least one impaired class of Claims will vote to accept the Plan, as required for confirmation of a Plan under the "cram down" procedures.

### 4.    Best Interests of Creditors Test

The Bankruptcy Code requires that, with respect to an impaired Class of Claims or Interests, each Holder of an impaired Claim or Interest in such Class either (i) accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such Holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The costs of a chapter 7 liquidation would necessarily include fees payable to a chapter 7 trustee, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out its duties under the

US_ACTIVE-142061116.12

Bankruptcy Code.  Other costs of liquidating the Debtor's Estate would include the expenses incurred during the bankruptcy case and allowed by the Bankruptcy Court in the chapter 7 case. The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims.  Without the ability to successfully confirm a plan and avoid or limit seemingly endless, piecemeal litigation with certain third parties, any recoveries for Holders of Allowed General Unsecured Claims in a chapter 7 liquidation would be significantly diluted.  The Debtor's liquidation analysis is attached as Exhibit IV.A.4.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims and Interests would receive less than such Holders would receive under this Combined Plan and Disclosure Statement.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 5.      Feasibility

Under section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan.  Under this Combined Plan and Disclosure Statement, the Litigation Claims are being transferred to the Liquidating Trust for prosecution, liquidation and distribution in accordance with the Liquidating Trust Agreement.  Therefore, as this is a liquidating Plan, the Debtor believes that the Bankruptcy Court's confirmation of this Combined Plan and Disclosure Statement will not be followed by unanticipated liquidation or the need for any further reorganization.

### 6.      Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that the proponent of this Combined Plan and Disclosure Statement may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtor believes that this Combined Plan and Disclosure Statement's classification scheme places substantially similar Claims or Interests in the same Class and, thus, meets the requirements of section 1122 of the Bankruptcy Code.

### 7.      Impaired Claims or Interests

Under section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "impaired" by this Combined Plan and Disclosure Statement and receiving a Distribution under this Combined Plan and Disclosure Statement may vote to accept or reject this Combined Plan and Disclosure Statement.  Under section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if this Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class.  The Holders of Claims (if any) not impaired by this Combined Plan and Disclosure Statement are deemed to accept this Combined Plan and Disclosure Statement and do not have the right to vote on this

US_ACTIVE-142061116.12

Combined Plan and Disclosure Statement.  The Holders of Claims or Interests in any Class that will not receive any Distribution or retain any property under this Combined Plan and Disclosure Statement are deemed to reject this Combined Plan and Disclosure Statement and do not have the right to vote.

### 8.    Eligibility to Vote on this Combined Plan and Disclosure Statement

Unless otherwise ordered by the Bankruptcy Court, all Holders of Allowed Claims and Interests in Classes 1, 2, 3, 4, and 5 (discussed below) may vote on this Combined Plan and Disclosure Statement.  In order to vote on this Combined Plan and Disclosure Statement, you must hold an Allowed Claim or an Allowed Interest in a voting Class or be the Holder of a Claim or Interest that has been temporarily Allowed only for voting purposes under Bankruptcy Rule 3018(a).

### 9.    Procedure/Voting Deadlines

In order for your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at the following address: Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE 19801 (Attn: John B. Lord).

The Balloting Agent must RECEIVE original ballots on or before [_____], **2018 at 5:00 p.m.** (Eastern), the Voting Deadline.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the Creditor or Holder of an Interest, and the amount of its Claim or Interest, and that is cast as an acceptance or rejection of this Combined Plan and Disclosure Statement will be counted and cast as an acceptance or rejection, as the case may be, of this Combined Plan and Disclosure Statement.

Any Ballot cast for a Claim designated or determined as unliquidated, contingent, disputed, or in an unknown amount and for which no Bankruptcy Rule 3018(a) motion has been Filed by the Bankruptcy Rule 3018(a) motion deadline, will be allowed only for voting purposes as a Claim in the amount of $1.00.

Absent the prior agreement of the Debtor, the following Ballots will not be counted or considered for any purpose in determining whether this Combined Plan and Disclosure Statement has been accepted or rejected by the class in which such Holder holds a Claim or Interest:

a.    any Ballot submitted that is received after the Voting Deadline, unless the Debtor or the Bankruptcy Court grants an extension of the Voting Deadline with respect to such Ballot;

b.    any Ballot that is illegible or contains insufficient information to permit the identification of the claimant or holder of an Interest;

US_ACTIVE-142061116.12

  c.  any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject this Combined Plan and Disclosure Statement;

  d.  any Ballot cast by a Person or Entity that does not hold an Interest in a Class that is entitled to vote to accept or reject this Combined Plan and Disclosure Statement;

  e.  any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of this Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of this Combined Plan and Disclosure Statement;

  f.  any Ballot not bearing an original signature; or

  g.  any Ballot that is submitted by facsimile or electronic mail.

## 10. Releases

  **All Holders of Claims and Interests are urged to read carefully the release, exculpation and injunction provisions set forth in Sections VII.F.2, VII.G and VII.H of this Combined Plan and Disclosure Statement. The Debtor believes that the release, exculpation and injunction provisions are important parts of this Combined Plan and Disclosure Statement and are appropriate under Third Circuit case law. Such releases are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtor, the Estate, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) bar all Persons or Entities (as set forth in this Combined Plan and Disclosure Statement) from asserting any Claims or causes of action released under the Plan in favor of the Released Parties.**

  **The release of Creditors' and Interest Holders' own Claims is entirely consensual, and every voting Creditor and Interest Holder has the right to "opt out" of the release of such Claims. Only a Creditor of Interest Holder voting in favor of the Plan and not "opting out" of the release on its Ballot is deemed to release its own Claims.**

## 11. Acceptance of this Combined Plan and Disclosure Statement

  As a Creditor or Holder of an Interest, your acceptance of this Plan is important. In order for this Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept this Plan. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Plan.

  In order for this Plan to be accepted by an impaired Class of Interests, at least two-thirds in amount of the Allowed Interests of such Class must vote to accept this Plan.

US_ACTIVE-142061116.12

The Debtor urges you to vote to accept this Plan.  **YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR OR THE EXACT AMOUNT OF YOUR INTEREST AND THE NAME OF THE INTEREST HOLDER**.

## V.   TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section V.A, are unclassified Claims.

### A.   Payment of Administrative Claims

#### 1.   Administrative Claims in General

Except as otherwise specified in this Section V.A.1, and subject to the Bar Date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the Debtor, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim will receive from the Debtor or the Liquidating Trustee, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

Notwithstanding the foregoing or any other provision of the Plan, the DIP Loan shall be treated and satisfied in accordance with the terms of any order approving the DIP Loan.

#### 2.   Statutory Fees

On or before the Effective Date, U.S. Trustee Fees, together with interest, if any, pursuant to 31 U.S.C. § 3717, will be paid by the Debtor or the Liquidating Trustee in Cash equal to the amount of such Claims.  The Liquidating Trust will pay U.S. Trustee Fees accruing after the Effective Date until the closing of the Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

#### 3.   Priority Tax Claims

The Debtor does not believe that it owes any Priority Tax Claims.  To the extent that any such Claim exists, however, each Holder of an Allowed Priority Tax Claim, shall receive in full satisfaction of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, payment in Cash equal to the Allowed amount of such Priority Tax Claim, on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, or such other treatment as may be agreed upon by any such Holder of a Priority Tax Claim and the Debtor (prior to the Effective Date) and the Liquidating Trustee (after the Effective Date).  The Liquidating Trustee reserves the right to prepay such Allowed Priority Tax Claim at any time.  On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and

US_ACTIVE-142061116.12

extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.

### 4.    Bar Dates for Administrative Claims

#### a.    General Administrative Claim Bar Date Provisions

Unless previously Filed, motions for payment of Administrative Claims must be Filed and served on the parties identified in Section XV.F no later than 30 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve a motion requesting payment of such Administrative Claims by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtor, the Reorganized Debtor, the Liquidating Trust, or the Assets (or the proceeds thereof), and such Administrative Claims will be deemed disallowed and extinguished as of the Effective Date.  Objections to the requests for payment of Administrative Claims must be Filed and served on the parties identified in Section XV.F and the requesting party within 60 days after the Effective Date.

#### b.    Bar Dates for Certain Administrative Claims

##### i.    Professional Compensation

Professionals or other entities, including, without limitation, the Chief Restructuring Officer, asserting a Fee Claim (excluding ordinary course professionals, if any) for services rendered before the Effective Date must File and serve on the parties identified in Section XV.F and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 120 days after the Effective Date  (or such later date as the Reorganized Debtor and such Professional may agree).  Objections to any Fee Claim must be Filed and served on the parties identified in Section XV.F and the requesting party by 21 days after the date upon which such Fee Claim is Filed or such date as a Professional and the Liquidating Trustee may agree.

##### i.    Ordinary Course Administrative Liabilities

Holders of Administrative Claims arising from Liabilities incurred by the Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid within 30 days of the Effective Date, File with the Bankruptcy Court and serve on the parties identified in Section XV.F no later than 60 days after the Effective Date an application for allowance and payment of such Administrative Claims asserted or the Holder of such Claims shall be forever barred from asserting such Claims against the Debtor, the Reorganized Debtor, the Liquidating Trust, or the Assets (or the proceeds thereof) and such Administrative Claim will be deemed disallowed and extinguished as of the Effective Date.

US_ACTIVE-142061116.12

## VI.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Summary

The categories of Claims and Interests listed below classify Claims against and Interests in the Debtor for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.   A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests in Debtor**

| Class | Type | Status | Voting Right | Potential Recovery |
|---|---|---|---|---|
| 1 | Secured Claim of Pre-Petition Lender | Impaired | Entitled to vote | After payment in full of Allowed Class 2 Other Priority Claims (if any), and Allowed Class 3 General Unsecured Claims, up to 100% from the proceeds of Litigation Claims[14] |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote; presumed to accept | 100% (if any) |

---

[14] As discussed in Section III.C. hereof, the Debtor believes that the Lien securing the Secured Claim of the Pre-Petition Lender is avoidable as a preferential transfer under section 547 of the Bankruptcy Code. The Pre-Petition Lender has agreed, subject to the occurrence of the Effective Date of this Plan, to the treatment of its Claim as set forth in the Plan.  The agreed treatment of the Pre-Petition Lender's Secured Claim is more advantageous than avoidance of the Secured Claim.  Instead of receiving a Pro Rata Share with Class 3 General Unsecured Claims, the Pre-Petition Lender has agreed to receive a distribution on account of its Class 1 Claim only *after* payment *in full* of the Class 3 General Unsecured Claims.  If the Effective Date does not occur, the rights of the Debtor and the Pre-Petition Lender regarding the validity, enforceability and avoidability of the Lien securing the Secured Claim are preserved in all respects.

US_ACTIVE-142061116.12

| Class | Type | Status | Voting Right | Potential Recovery |
|---|---|---|---|---|
| 3 | General Unsecured Claims | Impaired | Entitled to vote | After payment in full of Allowed Class 2 Other Priority Claims (if any), up to 75% of the Allowed amount of General Unsecured Claims (without interest) to be made available from up to $220,000 of proceeds of the DIP Loan, plus Allowed General Unsecured Claims Pro Rata Share of the net recovery on the Litigation Claims up to an aggregate recovery of 100% (without interest).  Estimated aggregate recovery of at least $216,881.01 and up to $289,184.01.[15] |
| 4 | Subordinated Unsecured Claims | Impaired | Entitled to vote | After payment in full of the Allowed Class 2 Other Priority Claims, Allowed Class 3 General Unsecured Claims and Allowed Class 1 Secured Claim of the Prepetition Lender, up to 100% from the Allowed Subordinated Unsecured Claims' total Pro Rata Share of one-half of the net recovery on the Litigation Claims.  Potential aggregate recovery of $0 to approximately $19,621,692 (which may be 52.2% of Subordinated Unsecured Claims).[16] |

---

[15] Class 3 General Unsecured Claims shall not include Claims subject to subordination under section 510(b), which are Class 4 Subordinated Unsecured Claims.  In addition, the General Unsecured Claims of the Managing Member, the Manager, Swansea Beneficiary Trust, LLC, and Ritchie Risked-Link Opportunities, LLC shall not receive any Class 3 distribution on account of their respective Claims listed on Schedule F.  Thus, the Debtor estimated that there are approximately $289,184.01 in General Unsecured Claims.

[16] As indicated in the Debtor's liquidation analysis (attached as Exhibit IV.A.4), the net proceeds of the Litigation Claims in a "best case" scenario is estimated to be $39,243,385, one half of which is $19,621,692.50.  Total Class 4 Subordinated Unsecured Claims, including Disputed Claims, may total approximately $37,583,000, including (a) Huizenga's $11 million attorneys' fee claims, (b) Thane Ritchie's $13.383 million indemnification claim, (c) the Excess Insurers' claim in the amount of $11.2 million relating to the First Judgment, and (c) claims for indemnification relating to approximately $2 million in post-judgment attorneys' fees and expenses.

US_ACTIVE-142061116.12

| Class | Type | Status | Voting Right | Potential Recovery |
|-------|------|--------|--------------|--------------------|
| 5 | Interests | Impaired | Entitled to vote | After payment in full of the Allowed Class 2 Other Priority Claims, Allowed Class 3 General Unsecured Claims and Allowed Class 1 Secured Claim of the Prepetition Lender, the Interest Holders will receive one-half of the net recovery on the Litigation Claims.  Potential aggregate recovery of $0 to approximately $19,621,692. |

No distributions shall be made on account of any classified Claims against (or Interests in) the Debtor, as set forth below, until payment in full or adequate reserve on account of all Allowed Administrative Claims against the Debtor and the payment or establishment of a reserve for any Priority Tax Claims.  Any reserves for Administrative Claims and Priority Tax Claims shall be established in amounts in the Liquidating Trustee's discretion.

**B.    Classification and Treatment of Classified Claims and Interests**

**1.    Class 1 – Secured Claim of the Pre-Petition Lenders**

a.    Classification.  Class 1 consists of the asserted Secured Claim of the Pre-Petition Lender in connection with the Debtor's obligations under the Pre-Petition Revolver, which obligations are purportedly secured by Liens on, inter alia, the proceeds of the DE Indemnity Action and the Insurance Recovery Action.

b.    Impairment and Voting.  Class 1 is impaired.  Holders of Allowed Class 1 Secured Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    Treatment.   Except to the extent that the Holder of the Pre-Petition Lender's Secured Claim agrees to less favorable treatment, and whether or not the Lien securing the Secured Claim of the Pre-Petition Lender is avoidable, in full settlement and release of the Secured Claim of the Pre-Petition Lender, the Holder of such Claim shall receive, after payment in full or other satisfaction of Allowed Class 2 Other Priority Claims and Allowed Class 3 General Unsecured Claims, and as soon as reasonably practicable after the Effective Date and the liquidation of the Assets, from time to time thereafter in accordance with Article IX of this Combined Plan and Disclosure Statement, its Pro Rata Share of Debtor's Available Cash until the Secured Claim of the Pre-Petition Lender is paid in full or otherwise satisfied.

US_ACTIVE-142061116.12

2.      **Class 2 – Other Priority Claims**

a.      <u>Classification</u>.  Class 2 consists of all Other Priority Claims, if any, against the Debtor.

b.      <u>Impairment and Voting</u>.  Class 2 is unimpaired.  Holders of Allowed Class 2 Other Priority Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.      <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Class 2 Other Priority Claim agrees to less favorable treatment, in settlement and release of each Class 2 Other Priority Claim, each Holder of such Claim shall receive, on account of its Allowed Class 2 Other Priority Claim, payment in full in Cash as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Class 2 Other Priority Claim.

3.      **Class 3 – General Unsecured Claims**

a.      <u>Classification</u>.  Class 3 consists of all General Unsecured Claims.

b.      <u>Impairment and Voting</u>.  Class 3 is impaired.  Holders of Allowed Class 3 General Unsecured Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.      <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Class 3 General Unsecured Claim agrees to less favorable treatment, in settlement and release of each Class 3 General Unsecured Claim, each Holder of an Allowed Class 3 General Unsecured Claim shall receive, after satisfaction of Allowed Class 2 Other Priority Claims, and as soon as reasonably practicable after the Effective Date,

     i.      such Holder's Pro Rata Share up to 75% of the amount of such Holder's Allowed Class 3 General Unsecured Claim (without interest) from up to Two Hundred Twenty Thousand ($220,000) of the proceeds of the DIP Loan, and

     ii.     after the liquidation of the Assets, from time to time thereafter in accordance with Article IX of this Combined Plan and Disclosure Statement, its Pro Rata Share of Debtor's Available Cash until each Holder receives up to one hundred percent (100%) of its Allowed Class 3 General Unsecured Claim (without interest).

Notwithstanding the foregoing treatment of Class 3 General Unsecured Claims set forth above, the General Unsecured Claims of the Managing Member, the Manager, Swansea Beneficiary Trust, LLC, and Ritchie Risked-Link

Opportunities, LLC shall not receive any Class 3 distribution on account of their respective Claims listed on Schedule F.

**4.      Class 4 – Subordinated Unsecured Claims**

a.    <u>Classification</u>.  Class 4 consists of Subordinated Unsecured Claims.

b.    <u>Impairment and Voting</u>.  Class 4 is impaired.  Holders of Allowed Class 4 Subordinated Unsecured Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>.  A Holder of an Allowed Class 4 Subordinated Unsecured Claim shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims other than Allowed Class 4 Subordinated Unsecured Claims are satisfied in full pursuant to the treatment afforded such Classes in this Article IV.  Thereafter, except to the extent that a Holder of an Allowed Class 4 Subordinated Unsecured Claim agrees to less favorable treatment, in settlement and release of each Class 4 Subordinated Unsecured Claim, each Holder of an Allowed Class 4 Subordinated Claim shall receive as soon as reasonably practicable after the Effective Date and the liquidation of the Assets, from time to time thereafter in accordance with Article IX of this Combined Plan and Disclosure Statement, its Pro Rata Share of one-half of the Available Cash until each Holder receives up to one hundred percent (100%) of its Allowed Class 4 Subordinated Unsecured Claim.

**5.      Class 5 – Interests**

a.    <u>Classification</u>.  Class 5 consists of Interests in the Debtor.

b.    <u>Impairment and Voting</u>.  Class 5 is impaired.  Holders of Allowed Class 5 Interests are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    <u>Treatment</u>.  Holders of Allowed Class 5 Interests and Holders of Allowed Class 4 Subordinated Unsecured Claims shall have equal priority with respect to Distributions of Available Cash from the Liquidating Trust with respect to such Claims and Interests.  After the payment in full of, or reserve for, Allowed Class 1, 2, and 3 Claims, and *pari passu* with Allowed Class 4 Subordinated Unsecured Claims, in settlement and release of each Class 5 Interest, each Holder of an Allowed Class 5 Interest shall receive its Pro Rata Share of one-half of the Available Cash; *provided, however,* that if the Allowed Class 4 Subordinated Unsecured Claims are paid in full, each Holder of an Allowed Interest shall receive its Pro Rata Share of one hundred percent (100%) of Available Cash.

US_ACTIVE-142061116.12

## VII.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Corporate Existence

The Debtor will continue to exist, as the Reorganized Debtor, unless and until the Liquidating Trustee has dissolved the Reorganized Debtor.

### B.    Reports to be Filed by the Liquidating Trust

In addition to any other reports that may be required by order of the Bankruptcy Court, until the Chapter 11 Case is closed, the Liquidating Trust shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Bankruptcy Code and the Bankruptcy Rules), no later than 60 days after December 31 of each calendar year ending after the Effective Date, an annual report regarding the administration of the Assets pursuant to the Combined Plan and Disclosure Statement, Distributions made by it and other matters relating to the implementation of the Combined Plan and Disclosure Statement.

### C.    Indemnification

To the extent permitted by law, the Reorganized Debtor and the Liquidating Trust shall indemnify the Liquidating Trust and the Liquidating Trustee, and their respective professionals, from all claims and causes of action, except to the extent such claims and causes of action are judicially determined by a Final Order to have resulted primarily from gross negligence, fraud, or willful misconduct.

### D.    Liquidating Trust

As further described in Article VIII of this Combined Plan and Disclosure Statement, the Liquidating Trust shall be established as of the Effective Date to (i) liquidate the Liquidating Trust Assets and (ii) transfer, consistent with the terms of the Liquidating Trust Agreement, Cash or Available Cash to the Disbursing Agent for Distribution pursuant to the Combined Plan and Disclosure Statement.  The Liquidating Trust shall be governed by the terms of the Liquidating Trust Agreement.

### E.    Preservation of Causes of Action

#### 1.    Preservation of Causes of Action

In accordance with sections 1141(b) and 1123(b)(3) of the Bankruptcy Code, the Assets (including the Litigation Claims and any other causes of action whether described herein or otherwise) that the Debtor may hold against any Entity shall on the Effective Date be transferred to the Liquidating Trust, and the Liquidating Trustee and/or the Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such claims and causes of action (whether such claims and such causes of action are disputed, contingent, fixed, unliquidated, or unmatured, and whether such claims and cases of action arise under any oral or written agreement, the Bankruptcy Code, other federal or state statutory law, or

common law) and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**The Liquidating Trustee, as applicable, may pursue all such causes of action. No Entity may rely on the absence of a specific reference in the Schedules or Exhibit VII.F.1 to this Combined Plan and Disclosure Statement, to any cause of action against it as any indication that the Liquidating Trustee will not pursue any available cause of action against such Entity. Unless any claims and causes of action against an Entity are expressly and unambiguously waived, relinquished, exculpated, released, compromised, or settled herein or in an Order, the Debtor, Reorganized Debtor, or the Liquidating Trustee, as applicable, expressly reserve all causes of action for later prosecution, settlement, or adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such causes of action upon, after, or as a consequence of Confirmation, the Effective Date, or consummation of the Plan.**

Solely to the extent (and during the time) that applicable law precludes the Debtor from transferring any claim or cause of action to the Liquidating Trust, the Debtor shall retain such claims and causes of action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically described in the Debtor's Schedules, this Combined Plan and Disclosure Statement or Exhibit VII.F.1 to this Combined Plan and Disclosure Statement, regardless of whether such claims and such causes of action are disputed, contingent, fixed, unliquidated, or unmatured, and whether such claims and cases of action arise under any oral or written agreement, the Bankruptcy Code, other federal or state statutory law, or common law. Such retained claims and causes of action shall be prosecuted or settled for the sole benefit of the Liquidating Trust, which shall have the right to all proceeds of such claims or causes of action.

2.      **Exculpation**

**To the extent permitted by law, from and after the Effective Date, the Released Parties (excluding the DIP Lender) shall neither have nor incur any liability to any Entity for any act taken or omitted, or to be taken or omitted, in connection with the Chapter 11 Case, the Debtor's post-petition liquidation activity, including the filing and prosecution of any claims or causes of action, and the formulation, preparation, dissemination, implementation, Confirmation or approval of the Combined Plan and Disclosure Statement (and exhibits to the same), or any other contract, instrument, release or other agreement or document provided in connection therewith; provided, however, that the foregoing provisions shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that the act or omission is determined in a Final Order to have resulted from gross negligence, fraud, or willful misconduct.**

F.      **Consensual Releases by Holders of Claims or Interests**

**Without limiting any other applicable provisions of or releases contained in the Plan or provided under the Bankruptcy Code, as of the Effective Date, in exchange for the consideration provided under the Plan, each Holder of a Claim or Interest that (a) votes in favor of the Plan *and* (b) does not opt out of the release on such Holder's Ballot, will be**

US_ACTIVE-142061116.12

deemed to forever release, waive and discharge all Liabilities in any way relating to the Debtor, the Chapter 11 Case, the Estate, or the Combined Plan and Disclosure Statement (and exhibits to the same) that such Holder has, had or may have against any Released Party; **provided**, **however**, that the foregoing provisions shall not affect the liability of any Entity that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have resulted from gross negligence, fraud, or willful misconduct.

**G.    Injunction Related to Releases**

The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Combined Plan and Disclosure Statement, including pursuant to the releases in this Article VII.

**H.    Effectuating Documents and Further Transactions; Exemption from Certain Transfer Taxes**

**1.    Effectuating Documents and Further Transactions**

Prior to the Effective Date, the Chief Restructuring Officer (or, in the absence of a Chief Restructuring Officer, Michael Cilento as Chief Operating Office of the Managing Member, or Mark Azzopardi as the Director of the Manager) and after the Effective Date, the Liquidating Trustee, as appropriate, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Combined Plan and Disclosure Statement.

**2.    Exemption From Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax: (a) any transfer of Assets made by the Debtor or the Reorganized Debtor to the Liquidating Trust; (b) any sales (including, without limitation, private or public foreclosure sales) of Liquidating Trust Assets made by the Liquidating Trustee to liquidate such Liquidating Trust Assets and convert such assets into Cash; (c) any sales of Liquidating Trust Assets made by the Liquidating Trustee under section 363 of the Bankruptcy Code or otherwise, to the extent that title to the Liquidating Trust Assets being sold transfers after the Confirmation Date; and (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Combined Plan and Disclosure Statement, including any disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to this Combined Plan and Disclosure Statement.

**I.    Substitution in Pending Legal Actions**

On the Effective Date, the Liquidating Trustee or, at the Liquidating Trustee's election, the Liquidating Trustee shall be deemed to be substituted as the party to any litigation

US_ACTIVE-142061116.12

in federal or state courts of the United States in which the Debtor is a party, including (but not limited to) pending contested matters or adversary proceedings in the Bankruptcy Court. The Liquidating Trustee, the Liquidating Trust, and its professionals, are not required to, but may take such steps as are appropriate to provide notice of such substitution.

## VIII.    PROVISIONS REGARDING THE LIQUIDATING TRUST

### A.    Execution of Liquidating Trust Agreement

On or as of the Effective Date, the Debtor and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all other necessary steps to establish the Liquidating Trust, which shall be for the benefit of the Holders of Allowed Claims and Holders of Allowed Interests in the Chapter 11 Case.

**IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS SECTION VIII.A AND THE TERMS OF THE LIQUIDATING TRUST AGREEMENT, THE TERMS OF THIS SECTION VIII.A SHALL GOVERN TO THE EXTENT SUCH CONFLICT RELATES TO THE ESTABLISHMENT OF THE LIQUIDATING TRUST. IN THE EVENT OF AN INCONSISTENCY BETWEEN THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND THE LIQUIDATING TRUST AGREEMENT, THE LIQUIDATING TRUST AGREEMENT SHALL CONTROL TO THE EXTENT SUCH CONFLICT RELATES TO ANYTHING OTHER THAN THE ESTABLISHMENT OF THE LIQUIDATING TRUST.**

### B.    Purposes of the Liquidating Trust

The Liquidating Trust shall be established for the purpose of liquidating the Liquidating Trust Assets and transferring Cash or Available Cash, subject to the terms of the Liquidating Trust Agreement, to the Disbursing Agent for the benefit of Holders of Allowed Claims and Allowed Interests. The Liquidating Trust shall have no objective to, and shall not, continue or engage in the conduct of a trade or business.

### C.    Beneficiaries of the Liquidating Trust

The Holders of Allowed Claims and Interests entitled to Distributions hereunder shall be the Beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and transferable only in accordance with the terms and priorities set forth in this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

### D.    Liquidating Trust Assets

The Debtor shall transfer all Liquidating Trust Assets directly to the Liquidating Trust as provided by the Liquidating Trust Agreement. Such assignment or transfer shall be exempt from any Tax to which the exemption under section 1146 of the Bankruptcy Code applies. Moreover, the transfer of Liquidating Trust Assets to the Liquidating Trust shall be a deemed transfer to the Beneficiaries followed by a deemed transfer by those Beneficiaries to the Liquidating Trust.

US_ACTIVE-142061116.12

E.      **Administration of the Liquidating Trust**

The Liquidating Trustee shall administer the Liquidating Trust pursuant to the Liquidating Trust Agreement and this Combined Plan and Disclosure Statement.

F.      **Termination of the Liquidating Trust**

The Liquidating Trust shall continue for a term of five (5) years from the Effective Date. The Liquidating Trustee may extend such term (before or after its expiration) for one or more additional finite terms provided that the Liquidating Trust does not become subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended) and provided further that the Bankruptcy Court approves an extension based upon a finding that an extension is necessary for the Liquidating Trust to reduce all Liquidating Trust Assets to Cash.

G.      **Transfer of Available Cash to the Disbursing Agent**

The Liquidating Trustee shall transfer to the Disbursing Agent, when and as necessary to make Distributions, all Liquidating Trust Assets constituting Available Cash.

IX.     **PROVISIONS GOVERNING DISTRIBUTIONS**

A.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article IX, as soon as reasonably practicable after the Effective Date and, as applicable, the liquidation of the Assets, the Disbursing Agent shall make Distributions on behalf of the Debtor to each Holder of an Allowed Claim against or Interest in the Debtor to the extent provided for in this Combined Plan and Disclosure Statement.

All Distributions shall be made pursuant to the terms and conditions of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, and, where applicable, shall be subject to the Liquidating Trustee's defenses and counterclaims, including without limitation, rights of recoupment, setoff or other deduction.

B.      **Method of Distributions to Holders of Claims and Interests**

The Liquidating Trustee, in its capacity as Disbursing Agent, or such Third Party Disbursing Agents as the Liquidating Trustee may employ in its sole discretion, will make all Distributions required under this Combined Plan and Disclosure Statement. Each Disbursing Agent may serve and litigate without bond or security, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Combined Plan and Disclosure Statement if approved by the Liquidating Trustee.

C.      **Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Combined Plan and Disclosure Statement will receive from the Liquidating Trustee, without further Bankruptcy Court approval, reasonable compensation for such services

and reimbursement of reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with such services, to be paid as a Trust Expense.

**D.     Investment of Trust Accounts**

To assist in making Distributions under the Combined Plan and Disclosure Statement, the applicable Trust Accounts may be held in the name of the Liquidating Trustee or in the name of one or more Third Party Disbursing Agents for the benefit of Holders of Allowed Claims and Allowed Interests under the Plan, and one or more secondary Trust Accounts may be created in the name of the Liquidating Trustee or Third Party Disbursing Agent for the purpose of making disbursements.   The Liquidating Trustee may invest, or direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Liquidating Trust Agreement; provided, however, that should such Liquidating Trustee determine, in its sole discretion, that the administrative costs or risks associated with such investment may exceed the return on such investment, it may choose not to invest, and may direct the Third Party Disbursing Agent not to invest, such Cash.  Distributions of Cash from accounts held by the Liquidating Trustee or Third Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable by the Liquidating Trust with respect thereto.

**E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.     Delivery of Distributions**

Distributions to Holders of Allowed Claims and Allowed Interests will be made by a Disbursing Agent to the addresses (a) set forth on the respective Proofs of Claim Filed by Holders of such Claims or request for payment of Administrative Claim, as applicable; (b) for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related Proof of Claim; (d) reflected in the Debtor's Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) set forth in the Debtor's books and records.

Unless a Holder of an Allowed Interest has provided written notice of a different address to the Debtor's stock transfer agent prior to the Distribution Record Date or the first Distribution Date, Distributions may be mailed to such Holders at the addresses shown on the records of the Debtor or the transfer agent (if any) for Interests as of the Distribution Record Date.  This means that if your Interests are held in the name of a third party, such as a broker or agent, the Distribution will be sent to the broker or agent identified on the Debtor's books and records or the transfer agent (if any) for Interests as of the Distribution Record Date.

**2.     Undeliverable or Unclaimed Distributions**

**a.     Holding of Undeliverable or Unclaimed Distributions**

Subject to Section XI.E.2.c, any Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the Disbursing Agent pursuant to this

US_ACTIVE-142061116.12

Section XI.E.2.a until such time as a Distribution becomes deliverable.  Any Disbursing Agent holding undeliverable Cash may (but is not required to) invest such Cash in a manner consistent with the Liquidating Trust Agreement.  Notwithstanding the foregoing, any Distributions that remain unclaimed or any related instruments that are not cashed within one hundred and twenty (120) days following Distribution will be maintained in the applicable Trust Account for redistribution to other Creditors or Interest Holders entitled to Distribution from the Trust Account; provided, however, that the Disbursing Agent, in its sole discretion, may (but is not required to) seek to reissue or redeliver the Distribution to the original intended recipient.

### b.    After Distributions Become Deliverable

On each Distribution Date, the Disbursing Agent will make all Distributions that became deliverable to Holders of Allowed Claims and Allowed Interests after the most recent Distribution Date but prior to the Interim Distribution Bar Date.

### c.    Failure to Claim Undeliverable or Unclaimed Distributions

Any Holder of an Allowed Claim or Allowed Interest that does not assert its right to an undeliverable or unclaimed Distribution within one hundred twenty (120) following a Distribution will be forever barred from asserting any such Claim or Interest against the Debtor, the Reorganized Debtor, the Disbursing Agent, the Liquidating Trustee, the Liquidating Trust, their respective property (including, without limitation, the Liquidating Trust Assets and the Trust Accounts).  In such cases, unclaimed or undeliverable Distributions will be maintained in the applicable Trust Account for redistribution to other Creditors or Interest Holders entitled to Distribution from such Trust Account; provided, however, that the Disbursing Agent, in its sole discretion, may (but is not required to) seek to reissue or redeliver the Distribution to the original intended recipient.

## F.    Distributions on Account of Allowed Claims and Allowed Interests

### 1.    *De Minimis* Distributions

On each Distribution Date prior to the Final Distribution Date, the Disbursing Agent shall not distribute cash to the Holder of an Allowed Claim or Allowed Interest if the amount of Cash to be distributed on account of such Claim or Interest is less than Twenty Five U.S. Dollars ($25).  Such amount shall be redistributed to other Holders of Allowed Claims or Allowed Interests, and the Holder of an Allowed Claim or Allowed Interest whose Distribution is *de minimis* will be forever barred from asserting its Claim or Interest for such Distribution against the Liquidating Trust or the Trust Assets.

## G.    Other Provisions Applicable to Distributions in All Classes

### 1.    Post-petition Interest

Unless required by the Bankruptcy Code with respect to Allowed Claims and as otherwise provided in this Combined Plan and Disclosure Statement, no interest will accrue on any Claims on and after the Petition Date.

US_ACTIVE-142061116.12

### 2.    Compliance with Tax Requirements

a.    Each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Combined Plan and Disclosure Statement will be subject to such withholding and reporting requirements. The Liquidating Trustee and any Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements.

b.    Notwithstanding any other provision of the Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, each Entity receiving or deemed to receive a Distribution pursuant to the Combined Plan and Disclosure Statement will have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution. The Liquidating Trustee or Disbursing Agent may require that a Holder of a Claim or Interest provide a Form W-9 or applicable Form W-8 (or such other document as the Liquidating Trustee or Disbursing Agent may require) as a condition to receipt of any Distribution. If a Holder of a Claim or Interest fails to provide a Form W-9 or applicable Form W-8 (or such other document as the Liquidating Trustee or Disbursing Agent may require) within thirty (30) days after the Liquidating Trustee's or Disbursing Agent's request therefor, such Holder (in the Liquidating Trustee's or Disbursing Agent's sole discretion) may be deemed to waive its right to all Distributions made prior to the date such Holder provides the Form W-9 or Form W-8, as applicable (or such other document as the Liquidating Trustee or Disbursing Agent may require).

### 3.    Allocation of Distributions

All Distributions to a Holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under this Combined Plan and Disclosure Statement.

## H.    Distribution Record Date

1.    As of the close of business on the Distribution Record Date, the Disbursing Agent will have no obligation to recognize the transfer or sale of any Claim or Interest that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those Holders who are record Holders of such Claims or Interests as of the close of business on the Distribution Record Date.

2.    Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed and delivered to the Liquidating Trustee on or prior to the Distribution Record Date may be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. Neither the Liquidating Trustee nor any Disbursing Agent will be required to recognize any transfers after the Distribution Record Date.

US_ACTIVE-142061116.12

3.     The Liquidating Trustee and Disbursing Agent shall have the authority, but no obligation, to recognize transfers of Claims or Interests made after the deadlines set forth above in their respective sole and absolute discretion.

## I.     Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by check or, at the option of the Liquidating Trustee, by wire transfer, electronic funds or ACH; provided, however, that Cash payments to foreign Holders of Allowed Claims and Allowed Interests, at the option of the Liquidating Trustee, may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## J.     Disputed Claims and Interest Reserves

On and after the Effective Date, until such time as all Disputed Claims and Disputed Interests have been compromised and settled or determined by Final Order and before making any Distributions, the Liquidating Trustee, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, shall establish and maintain one or more Cash reserve equal to the Distributions to which Holders of Disputed Claims and Disputed Interests would be entitled under this Combined Plan and Disclosure Statement if such Disputed Claims and Disputed Interests were Allowed Claims (in the Filed amount of such Disputed Claims or such lesser amount as required by an order of the Bankruptcy Court) or Allowed Interests (the "Disputed Claims and Interests Reserve Amount").

On the first Distribution Date that is at least thirty (30) days (or such fewer days as may be determined by the Liquidating Trustee in its sole discretion) after the date on which a Disputed Claim or Disputed Interest becomes, as applicable, an Allowed Claim or Allowed Interest, the Disbursing Agent shall remit to the Holder of such Allowed Claim or Allowed Interest any Distributions such Holder would have been entitled to under this Combined Plan and Disclosure Statement on account of such Allowed Claim or Allowed Interest had such Claim or Interest been Allowed as of the Effective Date.

If a Disputed Claim or Disputed Interest is disallowed by Final Order, the amount reserved on account of such Disputed Claim or Disputed Interest shall become (net of Trust Expenses) Available Cash. To the extent that a Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest in an amount less than the amount reserved with respect to such Claim or Interest, the difference between the amount reserved on account of such Disputed Claim or Disputed Interest and the amount actually distributed on account of such Disputed Claim or Disputed Interest, as applicable, shall become (net of Trust Expenses) Available Cash.

Nothing in this Section IX.J shall preclude any Holder of a Disputed Claim or Disputed Interest from seeking, on notice to the Liquidating Trustee, an Order of the Bankruptcy Court to increase the amount reserved for such Holder's Disputed Claim or Disputed Interest.

Unless otherwise ordered by the Bankruptcy Court, the Disputed Claims and Interests Reserve Amount shall not be used for Trust Expenses or any purpose other than as set forth in this Section IX.J.

US_ACTIVE-142061116.12

K.      **Surrender of Canceled Instruments or Securities**

The Liquidating Trustee shall determine, in its sole discretion, if any requirement for surrendering canceled instruments or securities shall be applicable to the holders of canceled instruments or securities and, if so determined, shall advise in writing all known holders of canceled instruments or securities of such requirements and how they may comply with such requirements.  Absent such written notice, holders of canceled instruments or securities need not surrender their canceled instruments in order to be entitled to Distributions under the Combined Plan and Disclosure Statement.

L.      **Distributions Free and Clear**

Except as otherwise provided herein, any Distributions under this Combined Plan and Disclosure Statement shall be free and clear of any Liens, Claims and encumbrances, and no other Entity, including the Debtor, the Reorganized Debtor, the Liquidating Trustee, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise) in Liquidating Trust Assets distributed pursuant to this Combined Plan and Disclosure Statement.  In addition, the Liquidating Trust Assets (including, without limitation, the Trust Accounts) shall not be subject to execution, garnishment, or other process.

M.      **Setoffs**

Except with respect to claims of the Debtor expressly released pursuant to the Combined Plan and Disclosure Statement or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Combined Plan and Disclosure Statement, the Liquidating Trustee or the Disbursing Agent (as instructed by the Liquidating Trustee) pursuant to section 558 of the Bankruptcy Code or applicable non-bankruptcy law, may setoff or recoup against any Allowed Claim and Allowed Interest or Distribution on account of an Allowed Claim or Allowed Interest (before any Distribution is made on account of such Claim or Interest) the claims, defenses, rights, and causes of action of any nature that the Debtor or the Liquidating Trust may hold against the Holder (or prior Holder) of such Allowed Claim or Allowed Interest; provided, however, that neither the failure to effect a setoff, recoupment, or other deduction, nor the allowance of any Claim or Interest hereunder will constitute a waiver or release by the Debtor or the Liquidating Trust of any claims, rights and causes of action that the Debtor or the Liquidating Trust may possess against such a Claim or Interest Holder, which are expressly preserved under Section VII.F.1 of this Combined Plan and Disclosure Statement.

X.      **PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS**

A.      **Treatment of Disputed Claims and Disputed Interests**

1.      **No Distributions Pending Allowance**

Notwithstanding any other provision of this Combined Plan and Disclosure Statement, no payments or Distributions will be made on account of a Disputed Claim or Disputed Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest.

US_ACTIVE-142061116.12

**B.      Objections to Claims**

**1.      Authority to Prosecute**

The Liquidating Trustee may object to Claims or Interests that the Liquidating Trustee believes warrant the Filing of an objection prior to the Claims Objection Bar Date.  After the Effective Date, only the Liquidating Trustee will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim or Disputed Interest or any objection or controversy relating to any Claim or Interest without notice, motion, or approval of the Bankruptcy Court.

**2.      Debtor's Authority to Amend Schedules**

The Debtor and the Liquidating Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim or Interest and to make Distributions based on such amended Schedules (if no Proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the undisputed, noncontingent, and liquidated amount of a Claim, changes the nature or characterization of a Claim, or adds a new Claim to the Schedules, the Holder of such Claim shall have the later of (a) 5:00 p.m. (Eastern) on the twenty first (21st) day after service of a notice on such Holder of the amendment to the Schedules or (b) the applicable Bar Date, to file a Proof of Claim with respect to such Claim.

**3.      Request for Extension of Claims Objection Bar Date**

From time to time, and regardless of whether the Claims Objection Bar Date has expired, upon motion to the Bankruptcy Court, the Liquidating Trustee may request, and the Bankruptcy Court may grant, extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims or Interests.  Any extension granted by the Bankruptcy Court will not be considered a Plan modification under section 1127 of the Bankruptcy Code.

**C.      Distributions on Account of Disputed Claim or Disputed Interest That Becomes Allowed**

On each Distribution Date, the Disbursing Agent will make all Distributions on account of any Disputed Claim and Disputed Interest that has become an Allowed Claim or Allowed Interest since the most recent Distribution Date.  The timing and amount of such Distribution shall be determined in accordance with Article IX above.

US_ACTIVE-142061116.12

## XI.   TREATMENT OF EXECUTORY CONTRACTS
##        AND UNEXPIRED LEASES

### A.   Rejection of Executory Contracts and Unexpired Leases

#### 1.   Rejection

On the Effective Date, all Executory Contracts or Unexpired Leases not previously assumed and/or assigned, not subject to a pending motion to assume and/or assign as of the Effective Date or not rejected before the Effective Date, will be deemed rejected.  The Confirmation Order shall constitute an Order approving such rejection as of the Effective Date. Parties that desire to object to the rejection of a specific Executory Contract or Unexpired Lease must File an objection to the Combined Plan and Disclosure Statement by the deadline for filing objections to the Combined Plan and Disclosure Statement.  Rejection does not terminate, void, or extinguish an Executory Contract or Unexpired Lease.

Nothing herein constitutes an admission that any particular contract or lease is an Executory Contract or Unexpired Lease.  For the avoidance of doubt, the Subscription Agreements shall not be considered Executory Contracts.

#### 2.   Notice of Rejection

Service of the Combined Plan and Disclosure Statement constitutes notice of rejection to all known counterparties to Executory Contracts or Unexpired Leases that are to be rejected pursuant to the Combined Plan and Disclosure Statement.

#### 3.   Bar Date for Rejection Damages

In accordance with the Bar Date Order, and except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court on or before the later of (a) the thirtieth (30th) day after the Effective Date or (b) the applicable Bar Date.  Any Claims not Filed by such deadline will be forever barred from receiving a Distribution from the Debtor or the Liquidating Trust on account of any Claim for rejection of such Executory Contract or Unexpired Lease.

### B.   Contracts and Leases Entered Into After the Petition Date

Contracts and leases that the Debtor entered into after the Petition Date are not subject to assumption or rejection.

### C.   Pre-existing Obligations to the Debtor Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Combined Plan and Disclosure Statement or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such Executory Contracts or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtor expressly

US_ACTIVE-142061116.12

reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance previously purchased by the Debtor from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases, and any such rights shall vest in the Liquidating Trust as of the Effective Date.

**XII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

**A.   General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM COUNSEL TO THE DEBTOR CONCERNING ANY TAX CONSEQUENCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; AND NO TAX OPINION IS GIVEN BY THIS COMBINED PLAN AND DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, AND TAX EXEMPT ORGANIZATIONS, AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTOR. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED

**TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      U.S. Federal Income Tax Consequences to the U.S. Holders of Claims or Interests**

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed Claim or Allowed Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate, the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury regulations to be treated as a United States person.  The discussion below assumes that the U.S. Holders of Allowed Claims and Allowed Interest against the Debtor are treated as receiving property from the Debtor in satisfaction of their Allowed Claims or Allowed Interests, as applicable, and the Debtor intends to treat distributions under the Plan as such.

The U.S. federal income tax consequences of the Plan to a U.S. Holder will depend, in part, on the tax characterization of the exchanges of Allowed Claims for other property, whether the Allowed Claims relate to "tax securities" for U.S. federal income tax purposes, what type of consideration was received in exchange for an Allowed Claim or Allowed Interest, whether the U.S. Holder reports income on the accrual or cash basis, whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to an Allowed Claim or Allowed Interest and whether the U.S. Holder receives distributions under the Combined Plan and Disclosure Statement in more than one taxable year.

Each U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the amount realized in respect of its Allowed Claim and its adjusted tax basis in such Claim.  The amount realized for this purpose should generally equal the amount of Cash and the fair market value of any other assets (net of any applicable Liabilities) received for U.S. federal income tax purposes under the Combined Plan and Disclosure Statement in respect of such U.S. Holder's Allowed Claim.

**C.      Certain Other Tax Considerations for U.S. Holders of Claims**

**1.      Accrued but Unpaid Interest**

In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Combined Plan and Disclosure Statement.  A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Combined Plan and Disclosure Statement.  The Combined Plan and Disclosure Statement provides that, to the extent applicable, all Distributions to a Holder of an Allowed

Claim will apply first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Allowed Claim. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder and attributable to principal under the Combined Plan and Disclosure Statement is properly allocable to interest. Each U.S. Holder of an Allowed Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Combined Plan and Disclosure Statement and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### 2. Post-Effective Date Distributions

Because certain U.S. Holders of Allowed Claims may receive distributions subsequent to the Effective Date, the imputed interest provisions of the IRC may treat a portion of any post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain U.S. Holders, accrue over time using the constant interest method, in which event the U.S. Holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a post-Effective Date distribution. Additionally, to the extent U.S. Holders may receive distributions in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. U.S. Holders should consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Allowed Claims or Allowed Interest.

### 3. Bad Debt Deduction and/or Worthless Securities Deduction

A U.S. Holder who, under the Combined Plan and Disclosure Statement, receives, in respect of an Allowed Claim, an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

### 4. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Combined Plan and Disclosure Statement.

### 5. Information Reporting and Backup Withholding

A U.S. Holder may be subject to backup withholding, currently at the rate of 24%, with respect to any "reportable" payments received pursuant to the Plan unless (i) such U.S. Holder is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no

US_ACTIVE-142061116.12

loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules.  A U.S. Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS.  Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the IRS.

The Liquidating Trustee will report annually to each beneficiary, and to the IRS, such beneficiary's share of any income, gains and losses of the Liquidating Trust during the calendar year to the extent required by law.

## D.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES, INCLUDING WHETHER SUCH HOLDER IS SUBJECT TO TAXATION BY THE UNITED STATES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

## XIII.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN; EFFECT OF CONFIRMATION

## A.    Conditions Precedent to Confirmation

The Bankruptcy Court will not be requested to enter the Confirmation Order, unless and until the following condition has been satisfied:

1.    The Plan will not have been materially amended, altered or modified unless such material amendment, alteration or modification has been made in accordance with Section XV.A of this Combined Plan and Disclosure Statement.

2.    The proposed Confirmation Order shall be reasonably acceptable in form and substance to the Debtor.

3.    Exhibits or schedules incorporated as part of this Combined Plan and Disclosure Statement are in form and substance reasonably acceptable to the Debtor.

## B.    Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied.

1.     The Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance reasonably acceptable to the Debtor, unless waived by the Debtor.

2.     The Combined Plan and Disclosure Statement and all exhibits thereto shall have been Filed and shall not have been materially amended, altered or modified from the forms confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section XV.A hereof.

3.     All actions, documents and agreements necessary to implement the Combined Plan and Disclosure Statement shall have been effectuated or executed.

## C.     Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied within 60 days of the entry of the Confirmation Order, then upon motion by the Debtor or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied (or, as applicable, waived by the Debtor) before the Bankruptcy Court enters an order granting such motion, unless the order is vacated as provided in section 1144 of the Bankruptcy Code.  If the Confirmation Order is vacated pursuant to this Section XIII.C, then the Combined Plan and Disclosure Statement will be null and void in all respects.

## D.     Request for Waiver of Stay of Confirmation Order

This Combined Plan and Disclosure Statement will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served on the parties listed in Section XV.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

## E.     Compliance with Local Bankruptcy Rule 3022-1

The Reorganized Debtor will comply with Rule 3022-1 of the Local Rules of the Bankruptcy Court.

## XIV.   RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Case after the Effective Date to the full extent legally permissible, including jurisdiction to:

1.     Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the

resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

2.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.      Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4.      Ensure that Distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

5.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any motions or applications involving the Debtor or its Estate that may be pending on the Effective Date or brought thereafter (whether or not any of the foregoing are stayed as of the Effective Date or the closing of the Chapter 11 Case);

6.      Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Combined Plan and Disclosure Statement and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Combined Plan and Disclosure Statement or the Confirmation Order, including the Liquidating Trust Agreement;

7.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Combined Plan and Disclosure Statement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Combined Plan and Disclosure Statement, including the Liquidating Trust Agreement, or any Entity's rights arising from or obligations incurred in connection with the Combined Plan and Disclosure Statement or such documents;

8.      Modify the Combined Plan and Disclosure Statement before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Combined Plan and Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court Order, the Combined Plan and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Combined Plan and Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      Issue injunctions, enforce the injunctions contained in the Combined Plan and Disclosure Statement and the Confirmation Order, enter and implement other Orders or take

such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

10.     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Combined Plan and Disclosure Statement are enjoined or stayed;

11.     Determine any other matters that may arise in connection with or relate to the Combined Plan and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Combined Plan and Disclosure Statement or the Confirmation Order;

12.     Enforce or clarify any Orders previously entered by the Bankruptcy Court in the Chapter 11 Case;

13.     Enter a final decree closing the Chapter 11 Case;

14.     Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims and Disputed Interests for Taxes; and

15.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

## XV.   MISCELLANEOUS PROVISIONS

### A.   Modification of the Combined Plan and Disclosure Statement

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtor reserves the right to alter, amend or modify the Combined Plan and Disclosure Statement before the Effective Date.

### B.   Revocation of the Combined Plan and Disclosure Statement

The Debtor reserves the right to revoke or withdraw the Combined Plan and Disclosure Statement prior to the Effective Date.  If the Debtor revokes or withdraws the Combined Plan and Disclosure Statement, or if Confirmation does not occur, then the Combined Plan and Disclosure Statement will be null and void in all respects, and nothing contained in the Combined Plan and Disclosure Statement will: (1) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor; (2) prejudice in any manner the rights of the Debtor or any other party in interest; or (3) constitute an admission by the Debtor or any other party in interest.

### C.   Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Combined Plan and Disclosure Statement is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Combined Plan and Disclosure Statement will

                                          US_ACTIVE-142061116.12

remain in full force and effect and will in no way be affected, impaired or invalidated by such holding. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**D.      Successors and Assigns**

The rights, benefits and obligations of the Debtor, the Liquidating Trust, the Liquidating Trustee, any Holder of a Claim, Holder of an Interest, or any other Entity named or referred to in the Combined Plan and Disclosure Statement will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**E.      Reservation of Rights**

Except as expressly set forth herein, this Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of this Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights or causes of action of the Debtor, Holders of Claims, or Interests before the Effective Date.

**F.      Service of Documents**

Any pleading, notice or other document required by the Combined Plan and Disclosure Statement or the Confirmation Order to be served on or delivered to counsel to the parties identified below must be sent by overnight delivery service, facsimile transmission, courier service or messenger (with a copy by email, as provided, which shall not constitute service or notice) to:

**1.      Counsel to the Debtor**

Kurt F. Gwynne, Esq.
Jason D. Angelo, Esq.
1201 Market Street
Suite 1500
Wilmington, DE 19801
Telephone:  (302)778-7500
Facsimile:  (302) 778-7575
Email:    kgwynne@reedsmith.com
            jangelo@reedsmith.com

**2.      Chief Restructuring Officer, Liquidating Trust, or Liquidating Trustee**

Geoff Varga
c/o Duff & Phelps, LLC
55 East 52nd Street, FL 31

> New York, NY 10055
> Telephone: (646) 867-7833
> Email:   geoff.varga@duffandphelps.com

**3.      United States Trustee**

> Hannah McCollum, Esq.
> Benjamin A. Hackman, Esq.
> Trial Attorneys
> Office of the United States Trustee
> U. S. Department of Justice
> 844 King Street, Suite 2207
> Lockbox #35
> Wilmington, DE 19801

## G.      Waiver or Estoppel

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Combined Plan and Disclosure Statement or an agreement executed by the Debtor and Filed before the Confirmation Date.

## H.      Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Combined Plan and Disclosure Statement.

## I.      Inconsistency

Except as other provided herein, in the event of any inconsistency among this Combined Plan and Disclosure Statement, or any other instrument or document created or executed under this Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall govern; *provided* that in the event of any inconsistency among this Combined Plan and Disclosure Statement and the Confirmation Order, the provisions of the Confirmation Order shall govern.

## XVI.   RISKS AND OTHER CONSIDERATIONS

Prior to voting on this Combined Plan and Disclosure Statement, each holder of a Claim or Interest entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Combined Plan and Disclosure Statement, including the exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Combined Plan and Disclosure Statement and its implementation.  See Article XII for a discussion of certain tax considerations.

US_ACTIVE-142061116.12

A.    **Risk of Non-Confirmation of the Combined Plan and Disclosure Statement**

Even if all impaired Classes accept or could be deemed to accept this Combined Plan and Disclosure Statement, the Bankruptcy Court may not confirm the Plan.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (1) that confirmation not be followed by a need for further reorganization or liquidation not contemplated by the plan (i.e., that the plan is "feasible"); (2) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the debtor was liquidated under chapter 7 of the Bankruptcy Code; and (3) that the plan and the debtor otherwise comply with the applicable provisions of the Bankruptcy Code.  Although the Debtor believes that the Combined Plan and Disclosure Statement will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  See Section IV.A of this Combined Plan and Disclosure Statement for additional information regarding the requirements for Confirmation.

B.    **Nonconsensual Confirmation**

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Combined Plan and Disclosure Statement at the Debtor's request if, excluding the acceptance of any "insider" (as defined in section 101 of the Bankruptcy Code), at least one impaired Class of impaired Claims has accepted the Combined Plan and Disclosure Statement and the Bankruptcy Court determines that the Combined Plan and Disclosure Statement "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Combined Plan and Disclosure Statement.  See Section IV.A of this Combined Plan and Disclosure Statement for additional information regarding the requirements for Confirmation.

The Debtor reserves the right to modify (as necessary) the terms of the Combined Plan and Disclosure Statement, to seek Confirmation without the acceptance of all impaired Classes.  Such modification could result in less favorable treatment than the treatment currently provided for in the Combined Plan and Disclosure Statement.  Further, in the event an impaired Class of Claims or Interests fails to approve the Combined Plan and Disclosure Statement, the Debtor may determine, in its sole discretion, not to seek Confirmation of the Combined Plan and Disclosure Statement.

C.    **Delays in Confirmation or Effective Date**

Any delay in Confirmation or the effectiveness of the Combined Plan and Disclosure Statement could result in, among other things, additional Administrative Claims. Additional Administrative Claims and any other negative effects of a delay in Confirmation or the effectiveness of the Combined Plan and Disclosure Statement could endanger the ultimate approval of the Combined Plan and Disclosure Statement by the Bankruptcy Court or reduce the potential Distributions to Holders of Allowed Claims or Allowed Interests.

D.    **Litigation Risks**

The ultimate amount of Available Cash available for distribution to Holders of Allowed Claims also will be affected by the success of the Liquidating Trustee (or, as applicable,

the Reorganized Debtor) in pursuing claims and causes of action, including without limitation, the Litigation Claims, which are vigorously contested.  If the Liquidating Trustee (or, as applicable, the Reorganized Debtor) is unsuccessful, in whole or in part, in pursuing the Litigation Claims, there will less (or no) Available Cash available for distribution to Holders of Allowed Claims and Allowed Interests.

In addition, if the Debtor or the Liquidating Trustee is unsuccessful in objecting to Claims or Interests, there will less (or no) Available Cash available for distribution to Holders of other Allowed Claims or Allowed Interests.

## XVII.  RECOMMENDATIONS AND CONCLUSIONS

For all of the reasons set forth in this Combined Plan and Disclosure Statement, the Debtor believes that this Combined Plan and Disclosure Statement is in the best interests of the Estate and the Creditors and urges all holders of Claims and Interests in Classes entitled to vote to accept this Combined Plan and Disclosure Statement Plan and to evidence their acceptance by duly completing and returning their original Ballots so that they are received on or before the Voting Deadline.

[signature page follows]

US_ACTIVE-142061116.12

**RITCHIE RISK-LINK STRATEGIES, LLC**
By:  Ritchie Partners, L.L.C.,
    its Managing Member

By: /s/ Michael Cilento
    Michael Cilento
    Chief Operating Officer


**RITCHIE RISK-LINK STRATEGIES, LLC**


By: /s/ Geoffrey Varga
    Geoffrey Varga
    Proposed Chief Restructuring Officer

US_ACTIVE-142061116.12

# EXHIBIT II.A.71
## (Liquidating Trust Agreement)

US_ACTIVE-142061116.12

**LIQUIDATING TRUST AGREEMENT**

**dated as of [_____, 2018]**

**by and between**


**RITCHIE RISK-LINKED STRATEGIES, LLC**
**as Settlor**


**and**

**GEOFF VARGA**
**as Trustee**

# TABLE OF CONTENTS

**Page**

RECITALS ................................................................................................................ 1

AGREEMENT .......................................................................................................... 1

ARTICLE I Establishment of the Liquidating Trust ............................................... 2

Section 1.1    Creation and Name ......................................................................... 2

Section 1.2    Declaration of Trust; Transfer of the Trust Assets and Privileges..... 2

Section 1.3    Purposes of Trust ........................................................................... 2

Section 1.4    Trustee's Acceptance ...................................................................... 3

Section 1.5    Appointment as Representative ...................................................... 3

Section 1.6    Relationship .................................................................................. 3

Section 1.7    Vesting of Causes of Action .......................................................... 3

Section 1.8    Assumption of Certain Liabilities ................................................. 3

Section 1.9    Incorporation of the Plan and the Confirmation Order ..................... 3

ARTICLE II Funding of the Trust ........................................................................... 4

Section 2.1    Trust Funding ................................................................................ 4

Section 2.2    Trust Expenses .............................................................................. 4

ARTICLE III Trust Assets ....................................................................................... 4

Section 3.1    Liquidation of the Trust Assets ....................................................... 4

Section 3.2    Intervention ................................................................................... 5

Section 3.3    Distribution of the Trust Assets ..................................................... 5

ARTICLE IV General Powers, Rights and Obligations of the Trustee ..................... 5

Section 4.1    Appointment of Trustee ................................................................. 5

Section 4.2    Legal Title .................................................................................... 5

Section 4.3    General Powers. ............................................................................ 5

Section 4.4    Retention of Attorneys, Accountants and Other Professionals.......... 7

Section 4.5    Co-Trustees or Separate Trustees .................................................. 8

Section 4.6    Compensation of Trustee and his Professionals. ............................. 8

Section 4.7    Standard of Care; Indemnification; Exculpation ............................. 9

Section 4.8    Reliance by Trustee........................................................................ 9

Section 4.9    Investment Obligations .................................................................. 10

Section 4.10    No Bond or Other Security Required............................................. 10

Section 4.11    Compliance with Tax Laws .......................................................... 10

i

Section 4.12    Compliance with Securities Laws................................................................ 10

Section 4.13    Resignation and Removal. ....................................................................... 11

Section 4.14    Reporting; Books and Records ................................................................ 11

ARTICLE V Jurisdiction ............................................................................................... 12

Section 5.1    Retention of Jurisdiction ........................................................................ 12

Section 5.2    Aid and Recognition .............................................................................. 12

ARTICLE VI Termination .............................................................................................. 12

Section 6.1    Termination ............................................................................................ 12

ARTICLE VII Taxes ...................................................................................................... 13

Section 7.1    Income Tax Treatment ............................................................................ 13

Section 7.2    Tax Returns and Payments...................................................................... 13

Section 7.3    Tax Withholding and Reporting; Liability for Taxes ................................ 13

Section 7.4    Valuation of Trust Assets........................................................................ 14

Section 7.5    Section 1146(a) Exemption..................................................................... 14

ARTICLE VIII Miscellaneous ........................................................................................ 14

Section 8.1    Notices ................................................................................................... 14

Section 8.2    Investment Company Act ........................................................................ 15

Section 8.3    Counterparts ........................................................................................... 15

Section 8.4    Governing Law ....................................................................................... 15

Section 8.5    Headings ................................................................................................ 15

Section 8.6    Interpretative Provisions. ........................................................................ 15

Section 8.7    Severability ............................................................................................ 15

Section 8.8    Amendments ........................................................................................... 16

Section 8.9    Beneficiaries. .......................................................................................... 16

Section 8.10    Successors .............................................................................................. 16

Section 8.11    No Suits by Claimholders ....................................................................... 16

Section 8.12    Irrevocability.......................................................................................... 16

Section 8.13    Trust Continuance ................................................................................... 16

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (the "Trust Agreement"), dated and effective as of [_____, 2018] (the "Effective Date"), by and between Ritchie Risk-Linked Strategies, L.L.C. (the "Debtor"), as settlor, and Geoff Varga (the "Trustee"), as trustee, executed in connection with the *Combined Disclosure Statement and Chapter 11 Liquidating Plan of Reorganization* dated [_____, 2018] (as the same has been or may be amended, the "Plan"), as confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to the confirmation order dated [_____, 2018], (the "Confirmation Order"), provides for the establishment of a liquidating trust evidenced hereby (the "Trust") in accordance with the Plan.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## RECITALS

WHEREAS, the Effective Date of the Plan is occurring on the date hereof.

WHEREAS, this Trust Agreement is executed to facilitate the implementation of the Plan and the retention and preservation of the Assets (the "Trust Assets") by the Trustee for the benefit of the holders of Allowed Claims against and Allowed Interests in the Debtor who are entitled to receive Distributions from Available Cash under the Plan (the "Beneficiaries") by establishing the Trust;

WHEREAS, the Trust is organized for the purposes set forth in the Plan, and the Trustee's activities, powers and duties are those determined to be reasonably necessary to, and consistent with, accomplishment of these purposes;

WHEREAS, under the terms of the Plan and the Confirmation Order, effective as of the Effective Date, the Debtor on behalf of the Estate shall be deemed to have irrevocably assigned, granted, transferred, conveyed and delivered to the Trust, on behalf of and for the benefit of the Beneficiaries, control of, and all the rights, title and interests in and to, the Trust Assets with no reversionary interest therein in favor of the Debtor or Reorganized Debtor;

WHEREAS, the Trustee has agreed to act as Trustee of the Trust with the rights, powers, privileges and obligations specified in the Plan and this Trust Agreement; and

WHEREAS, the Trust is intended to be treated, for United States federal income tax purposes, as a "liquidating trust" within the meaning of Treasury Regulations § 301.7701-4(d), except to the extent otherwise provided in this Trust Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

## Establishment of the Liquidating Trust

**Section 1.1    Creation and Name.** In accordance with the Plan, there is hereby created the "RRLS Liquidating Trust."

**Section 1.2    Declaration of Trust; Transfer of the Trust Assets and Privileges**. In consideration of the confirmation of the Plan under the Bankruptcy Code, the Debtor and the Trustee have executed this Trust Agreement and, effective on the Effective Date, the Debtor on behalf of the Estate hereby irrevocably assigns, transfers and conveys to the Trust (i) all the right, title and interests of the Debtor and the Estate in and to the Trust Assets, with no reversionary interest whatsoever therein of the Debtor, to hold in trust, whereupon title will irrevocably vest in the Trust, free and clear of Claims, Liens and Interests except to the extent provided in the Plan or in this Trust Agreement, under and subject to the terms and conditions set forth in this Trust Agreement and in the Plan for the benefit of the Beneficiaries and their successors and assigns permitted under the Plan and this Trust Agreement and (ii) without waiver, the Debtor's evidentiary privileges, including the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Trust Assets,[1] and all of the books and records relating to the foregoing, in trust, and, consistent with section 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Beneficiaries.  The use and distribution of the Trust Assets shall be made in accordance with this Trust Agreement and the Plan.  None of the foregoing assignments or transfers to the Trust will constitute a merger or consolidation of the Estate or any of the Trust Assets, each of which will retain his separateness following the assignment or transfer for all purposes herein, except as otherwise provided in the Plan and the Confirmation Order.  The Trust Assets are held *in custodia legis* and (except as provided in section 7.2 below) shall not be subject to attachment, garnishment, levy, execution or other legal or equitable process until such times as the funds have actually been paid or otherwise distributed to or for the benefit of the Beneficiaries.

**Section 1.3    Purposes of Trust**. The Trust is organized for the primary purposes of (a) investigating, pursuing, litigating, and, as applicable, settling or prosecuting the Litigation Claims in the Trustee's discretion, subject to any relevant provisions of this Trust Agreement, without Bankruptcy Court approval, (b) collecting, receiving, holding, maintaining, administering and liquidating the Trust Assets, (c) paying all reasonable and necessary fees, costs and expenses incurred by the Trustee or his professionals pursuant to, and otherwise in connection with the Trustee's performance of his duties under this Trust Agreement (the "Trust Expenses"), and (d) transferring Available Cash to the Disbursing Agent for the benefit of the Beneficiaries as provided for in the Plan and this Trust Agreement (herein, the "Trust Purposes"). The Trust has no objective to, and shall not, engage in a trade or business; shall conduct its activities consistent with the Confirmation Order, the Plan, and this Trust Agreement; and shall terminate upon the completion of its liquidation and distribution duties.  The Trust and the Trustee shall conduct all of their activities pursuant to and in accordance with this Trust

---

[1] Absent the Trustee's written consent, no Beneficiary shall have access to any such privileged materials.  In addition, nothing herein shall transfer any other Entity's attorney-client privilege, work-product privilege or other privilege or immunity to the Trust.

Agreement, the Confirmation Order, and the Plan.  In furtherance of these objectives, the Trustee, in his business judgment, will make continuing efforts not to unduly prolong the duration of the Trust.

**Section 1.4     Trustee's Acceptance.** The Trustee hereby (a) accepts the responsibilities imposed on him by the Plan and this Trust Agreement and agrees to observe and perform under the Plan and this Trust Agreement, (b) acknowledges and accepts the creation of the Trust and the assignment and transfer of the Trust Assets to the Trust, subject to the provisions of the Confirmation Order, the Plan, and this Trust Agreement, and (c) agrees to assume, undertake, and effectuate the Trust Purposes on behalf of the Trust.

**Section 1.5     Appointment as Representative.** The Trust and the Trustee will each be a "representative" of the Estate under section 1123(b)(3)(B) of the Bankruptcy Code as provided in the Plan, and the Trustee will be the trustee of the Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and, as such, the Trustee succeeds to all of the rights, powers, and obligations of a trustee in bankruptcy with respect to collecting, maintaining, administering, and liquidating the Trust Assets for the benefit of the Beneficiaries.

**Section 1.6     Relationship.** This Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustee or the Beneficiaries, or any of them, for any purpose be, or be deemed to be, or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Beneficiaries to the Trust shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Trust Agreement.

**Section 1.7     Vesting of Causes of Action.** Subject to the provisions of this Trust Agreement, on the Effective Date, the Trustee, in his own name as Trustee or in the name of the Trust, shall have the exclusive right to investigate, institute, prosecute, abandon, settle or compromise any Litigation Claims, subject to the provisions of this Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed or to be filed in the Chapter 11 Case.  The Trustee and the Trust shall not be required to post any bond, security for costs, or other security for costs or expenses (including attorneys' fees and expenses) in the filing or prosecution of Litigation Claims on behalf of the Trustee or the Trust.

**Section 1.8     Assumption of Certain Liabilities.** Subject to the provisions of this Trust Agreement, the Plan, and the Confirmation Order, on the Effective Date, the Trustee, on behalf of the Debtor and the Trust, as applicable, shall assume the obligation to pay all Trust Expenses and to make periodic transfers of Available Cash, consistent with the terms of this Trust Agreement, to the Disbursing Agent for the benefit of the Beneficiaries.

**Section 1.9     Incorporation of the Plan and the Confirmation Order**. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan, and the Trustee shall comply with the terms of the Plan and the Confirmation Order.  To that end, the Trustee shall

have full power and authority to take any action consistent with the purpose and provisions of the Plan, the Confirmation Order, and this Trust Agreement.  To the extent that there is conflict between the provisions of this Trust Agreement, and the provisions of the Plan or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) this Trust Agreement; and (3) the Plan; *provided, however,* that, in the event of any conflict between the terms of Section VIII.A of the Plan and the terms of this Trust Agreement, the terms of Section VIII.A of the Plan shall govern to the extent such conflict relates to the establishment of the Liquidating Trust.

## ARTICLE II

### Funding of the Trust

**Section 2.1     Trust Funding.** On the Effective Date, the Trust shall be funded with the Trust Assets and, from time to time, by the proceeds of the Trust Assets, including recoveries from Litigation Claims. On or after the Effective Date, the Trustee may establish and fund from the Trust Assets one or more funds, reserves, or accounts (or sub-accounts) within the Trust as determined by the Trustee, in his reasonable discretion, to be necessary, appropriate or desirable in carrying out the Trust Purposes and consistent with the Plan and this Trust Agreement.

**Section 2.2     Trust Expenses.** The Trust Expenses shall be paid in the ordinary course by the Trustee from the Trust Assets as set forth herein and in the Plan without further order of the Bankruptcy Court.  The Trustee and his retained professionals shall have no personal liability in the event there are insufficient funds to pay Trust Expenses.  The Trustee shall account for Trust Expenses.

## ARTICLE III

### Trust Assets

**Section 3.1     Liquidation of the Trust Assets.**

(a)     The Trustee shall take such steps as the Trustee deems necessary to investigate, pursue, litigate, settle, compromise, transfer, sell, dispose of and/or abandon all or any of the Trust Assets to reduce the Trust Assets to Cash proceeds and to transfer all Trust Assets constituting Available Cash to the Disbursing Agent for the benefit of the Beneficiaries as required under the Plan and this Trust Agreement.  The Trustee's actions with respect to disposition of the Trust Assets in all events, to the extent permitted by the Confirmation Order, the Plan, this Trust Agreement and other applicable law, shall be taken in a manner so as reasonably to maximize the value of the Trust Assets and the Distributions to the Beneficiaries.

(b)     The Debtor's counsel shall provide to the Trustee (or such professionals designated by the Trustee) documents and other information gathered, and relevant work product developed, during the Chapter 11 Case in connection with the Debtor's investigation of potential Litigation Claims, <u>provided</u> that the provision of any such documents and information shall be without waiver of the Debtor's, the Trust's, common interest party's, or co-client's, as the case

- 4 -

may be, evidentiary privileges, including the attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any such documents or information (whether written or oral).

**Section 3.2    Intervention.** On the Effective Date, and without having to obtain any further order of the Bankruptcy Court, the Trustee and/or the Trust are authorized to intervene or substitute as plaintiff, movant or additional party, as appropriate, in any action or proceeding where the subject matter of any such action or proceeding involves a Trust Asset or where the Debtor or the Estate is a party thereto.

**Section 3.3    Distribution of the Trust Assets.** The Trustee shall transfer, on a quarterly basis, all Trust Assets constituting Available Cash (subject to reduction as deemed necessary in the reasonable discretion of the Trustee for a reserve for Trust Expenses), in the following order of priority:

(a)    First, to the extent any amounts due remain outstanding, to (i) the Trustee in accordance with Section 4.6(a) herein, and (ii) the Trustee's professionals in accordance with Section 4.6(a) herein; provided, however, that any distributions made pursuant to this Section 3.3(a) shall be made in proportion to the total amounts due to each such party pursuant to this Section 3.3(a).

(b)    Second, to the Disbursing Agent for distribution in accordance with and subject to the terms and conditions of the Plan and this Trust Agreement, including with respect to the Beneficiaries in accordance with their priorities under the Plan.

## ARTICLE IV

### General Powers, Rights and Obligations of the Trustee

**Section 4.1    Appointment of Trustee.** On and as of the Effective Date, the Trustee shall be deemed to be duly appointed as the Trustee of the Trust.

**Section 4.2    Legal Title.** The Trust shall hold legal title to the Trust Assets except that the Trustee may cause legal title or evidence of title to any of the Trust Assets to be held by any nominee or person on such terms, in such manner and with such power as the Trustee may determine advisable.

**Section 4.3    General Powers.**

(a)    Except as otherwise provided in the Confirmation Order, the Plan or in this Trust Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for herein, in the Plan or the Confirmation Order, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the affairs of the Trust to the same extent as if the Trustee were the sole owner of the Trust Assets in his own right; provided, however, that such control and authority over the Trust Assets shall be subject to the provisions of Section 4.3(c) of this Trust Agreement. No Person dealing with the Trust shall be obligated to inquire into the Trustee's authority in connection with the acquisition,

management or disposition of the Trust Assets.  The Trustee shall execute all agreements and other documents in his capacity as Trustee.

(b)    With respect to Trust Assets, each of the Trustee and the Trust (separately or together) shall be a representative of the Estate under section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth herein, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and the right to seek testimony and the production of documents pursuant to Bankruptcy Rule 2004, including, without limitation, the right to (1) effect all actions and execute all agreements, instruments, and other documents necessary to implement the provisions of the Plan and this Trust Agreement; (2) investigate and, if appropriate, pursue, commence, litigate, prosecute, appeal, settle, abandon, compromise, or otherwise dispose of, any Litigation Claims; (3) collect, receive, hold, maintain, invest, administer, and liquidate the Trust Assets; (4) pay Trust Expenses pursuant to the Plan and this Trust Agreement; (5) retain, employ and compensate professionals and other agents; (6) file all federal, state and local tax returns and pay taxes of the Trust required to be filed by applicable law; and (7) otherwise implement the Plan and this Trust Agreement; all pursuant to the terms of the Plan and this Trust Agreement.

(c)    In connection with the management and use of the Trust Assets, and except as otherwise expressly limited in this Trust Agreement, the Plan or the Confirmation Order, the Trustee shall have, in addition to any powers conferred on the Trustee by the Plan or any other provision of this Trust Agreement, the power to take any and all actions as are necessary or advisable to effectuate the purposes of the Trust (subject to the terms of the Plan and this Trust Agreement), including, without limitation, the power and authority:

(i)    to accept and administer the Trust Assets assigned, transferred, and provided to the Trust under this Trust Agreement and the Plan;

(ii)    to engage in all acts that would constitute ordinary course of business in performing the obligations of a trustee under a trust of this type;

(iii)    to establish the funds, reserves, and accounts (and sub-accounts) within the Trust as deemed by the Trustee, in his sole discretion, as may be necessary, appropriate or desirable in carrying out the Trust Purposes and as consistent with the Plan and this Trust Agreement, including, without limitation, a reserve for future Trust Expenses; provided, however, that such funds, reserves, and accounts (and sub-accounts) may be invested only in accordance with the investment guidelines prescribed in Section 4.9 of this Trust Agreement;

(iv)    to sue and be sued (subject to the releases, exculpations and injunctions in the Plan and the Confirmation Order) and participate, as a party or otherwise, in any judicial, administrative, arbitration or other proceeding;

(v)    to delegate any or all of the discretionary power and authority herein conferred at any time with respect to all or any portion of the Trust to any one or more reputable individuals or to recognized institutional advisors or investment managers, in each case

without liability for any action taken or omission made because of such delegation, except for such liability as is expressly provided for in this Trust Agreement;

(vi)  to determine the manner of ascertainment of income and principal of the Trust Assets, and the apportionment of income and principal among such assets;

(vii)  to perform such other acts and undertake such other conduct as the Trustee believes is necessary to carry out the purposes and intent of the Trust;

(viii)  to sell, convey, transfer, assign, liquidate, collect, investigate, or abandon Trust Assets, or any part thereof or any interest therein, on such terms and for such consideration as the Trustee deems desirable or appropriate;

(ix)  to prosecute all Litigation Claims and such other suits as may be necessary, appropriate, or incident to the Trust Purposes, and raise defenses in connection with and settle any actions or claims, including counterclaims adverse to the Trust;

(x)  to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto;

(xi)  to remove all or any of the Trust Assets or the situs of administration of the Trust from one jurisdiction to another jurisdiction at any time or from time to time;

(xii)  to borrow sums of money, at any time and from time to time, for periods of time and on terms and conditions from Persons or Entities (including any fiduciary hereunder) for purposes as may be deemed advisable, and secure such loans by the pledge or hypothecation of any property held under this Trust Agreement; and

(xiii)  to purchase insurance indemnifying the Trustee and to indemnify (and purchase insurance indemnifying) the employees, agents and representatives of the Trust or the Trustee to the fullest extent that a corporation organized under the laws of the Trust's domicile is from time to time entitled to indemnify his directors, officers, employees, agents and representatives; provided, however that any such insurance shall not provide for the indemnification of such parties in cases of fraud, willful misconduct, gross negligence, or criminal conduct, as determined by Final Order of a court of competent jurisdiction;

(d)  The Trustee shall not at any time, on behalf of the Trust or any Beneficiaries, enter into or engage in any trade or business, and the Trustee shall not use or dispose of any part of the Trust Assets in furtherance of any trade or business.

**Section 4.4    Retention of Attorneys, Accountants and Other Professionals.** The Trustee may retain the following professionals to aid in the performance of his responsibilities pursuant to the terms of the Plan and this Trust Agreement, including, without limitation, the litigation of Litigation Claims:

- 7 -

(a)     The Trustee may retain such law firm(s) as the Trustee determines necessary to liquidate the Trust Assets and to perform such other functions as may be appropriate to carry out the primary purposes of the Trust.

(b)     The Trustee may commit the Trust to and shall pay such law firm(s) reasonable compensation from the Trust Assets for services rendered and expenses incurred, which expenses may include, without limitation, the fees and expenses of Persons retained by such counsel to perform any services, including, without limitation, expert witnesses and consultants.  The Trustee may also engage such law firm(s) on an hourly-rate or contingent fee basis (or some combination thereof) as permitted by applicable law.

(c)     The Trustee may retain an independent public accounting firm to, if necessary, audit the financial books and records of the Trust, to prepare and file all federal, state and local tax returns and related tax forms on behalf of the Trust that the Trustee is obligated to prepare, provide and file pursuant to this Trust Agreement, including Article VII regarding Taxes, and to perform such other reviews and/or audits as the Trustee may deem advisable to carry out the primary purposes of the Trust.  The Trustee may commit the Trust to and shall pay such accounting firm reasonable compensation from the Trust Assets for services rendered and expenses incurred.

(d)     The Trustee may retain such accountants, experts, advisors, consultants, investigators, appraisers, auctioneers, claims, and disbursing agents or other professionals as are advisable to carry out the purposes of the Trust.

(e)     The Trustee may commit the Trust to and shall pay all such Persons reasonable compensation from the Trust Assets for services rendered and expenses incurred as Trust Expenses in accordance with the Plan and this Trust Agreement.

**Section 4.5     Co-Trustees or Separate Trustees.** In order to (and only to the extent necessary to) meet any legal requirements of any jurisdiction in which any of the Trust Assets may be located from time to time, the Trustee shall have the power to appoint one or more Persons either to act as co-trustee jointly with the Trustee of all or any part of the Trust Assets or to act as separate trustee of all or any part of the Trust Assets and to vest in such Person or Persons, in such capacity, such title to the Trust Assets or any part thereof solely to the extent required to meet any such legal requirements.  Such co-trustee or separate trustee shall act under the supervision, and at the direction of, the Trustee.

**Section 4.6     Compensation of Trustee and his Professionals.**

(a)     The Trustee (and any co-trustee or separate trustee that may be appointed pursuant to Section 4.5 above) shall be entitled to the reimbursement of reasonable and necessary expenses incurred while carrying out his or her duties as Trustee, co-trustee, or separate trustee.

(b)     On or before the last day of each month following the month for which compensation is sought, each of the Trustee's professionals seeking compensation shall deliver a monthly statement to the Trustee; provided, however, that failure of any of the professionals to deliver a monthly statement to the Trustee for any one or more months shall not waive or impair the right of such professionals to subsequently seek compensation for all or any number of such

months in a later statement delivered to the Trustee.  The Trustee will have twenty (20) days from the date such statement is received to review the statement and object to such statement by serving a written objection on such professional setting forth the precise nature of the objection and the amount at issue.  At the expiration of the twenty (20) day period, the Trustee shall promptly pay out of the Trust Assets, to the extent available, 100% of the amounts requested, except for the portion of such fees and disbursements to which an objection has been made.  The parties shall attempt consensually to resolve objections, if any, to any monthly statement.  If the parties are unable to reach a consensual resolution of any such objection, the party that received an objection to his fees may seek payment of such fees by filing a motion with the Bankruptcy Court following notice to the Trustee.

 Section 4.7    Standard of Care; Indemnification; Exculpation.  The Trustee shall perform the duties and obligations imposed on the Trustee by this Trust Agreement with reasonable diligence and care under the circumstances.  The Trustee shall not be liable to the Trust, to any Beneficiary, to any holder of a Claim or to any other Person (or any predecessor or successor thereto) for any reason whatsoever, except for such of his own acts as shall constitute fraud, willful misconduct, gross negligence, or criminal conduct as determined by a Final Order of a court with competent jurisdiction.  Except as aforesaid, the Trustee shall, to the fullest extent permitted by applicable law, be defended, held harmless and indemnified from time to time from the Trust Assets (but not from or by the Beneficiaries or any of the parties released in the Plan) against any and all losses, claims, costs, expenses, and liabilities to which the Trustee may be subject by reason of the Trustee's execution of the Trustee's duties under this Trust Agreement; provided, however, that the Trustee shall not be entitled to indemnification if and to the extent the Trustee is found by a Final Order of a court with competent jurisdiction to have committed fraud, willful misconduct, gross negligence, or criminal conduct.  If the Trustee becomes involved in any action, proceeding or investigation in connection with any matter arising out of or in connection with the Plan, this Trust Agreement or the affairs of the Trust, the Trust shall periodically advance or otherwise reimburse on demand the Trustee's reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, expert fees, disbursements and related expenses) incurred in connection therewith, but the Trustee shall be required to repay promptly to the Trust the amount of any such advanced or reimbursed expenses to the extent that it is determined by Final Order of a court of competent jurisdiction that the Trustee engaged in fraud, willful misconduct, gross negligence, or criminal conduct in connection with the affairs of the Trust with respect to the specific matters as to which such expenses were incurred.  The Trustee's members, stockholders, officers, employees, agents, independent contractors (if any), professionals, and any co-trustees or separate trustees appointed pursuant to Section 4.5 above, shall be likewise defended, held harmless and indemnified in the same manner and to the same extent.  Without limiting the generality of the foregoing, the Trustee shall have no liability to any Beneficiary or holder of a Claim against the Reorganized Debtor on account of the Trustee's investment or non-investment of any Trust Assets or any losses with respect to any such investments of the Trust Assets, provided that such investments are made, or the Trustee's decision not to invest any Trust Assets in any case is made, in accordance with the terms of this Trust Agreement.

 Section 4.8    Reliance by Trustee.  The Trustee may rely, and shall be fully protected personally in acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document that the Trustee has no

reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission, or receipt. In the absence of the Trustee's willful misconduct, gross negligence, willful disregard of the Trustee's duties or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting thereon. The Trustee may consult with legal counsel and shall be, in the absence of the Trustee's willful misconduct, gross negligence, willful disregard of the Trustee's duties, or material breach of this Trust Agreement, fully protected in respect of any action taken or suffered by the Trustee in accordance with the opinion of legal counsel (whether or not written). The Trustee may at any time seek instructions from the Bankruptcy Court concerning the acquisition, management, or disposition of the Trust Assets.

**Section 4.9    Investment Obligations.** If the Trustee determines (in its discretion) to invest the Trust Assets, the Trustee shall invest and reinvest the liquid Trust Assets consistent with the obligations of a trustee under section 345 of Bankruptcy Code. The Trustee shall not be liable in any way for any loss or other liability arising from any investment, or the sale or other disposition of any investment, made in accordance with this Section 4.9, except for any such loss or liability arising from the Trustee's gross negligence or willful misconduct. However, the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d) may be permitted to hold, as set forth in IRS Revenue Procedure 94-45 and any successor guidance, pursuant to any amendment or addition to the Internal Revenue Code or to the Treasury Regulations or any modification in IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. Any investment purchased with the Trust Assets shall be deemed a part of the Trust Assets. All interest distributions and proceeds received by the Trustee in respect to such investments shall be a part of the Trust Assets.

**Section 4.10    No Bond or Other Security Required.** Notwithstanding any law or rule to the contrary, the Trustee (including any successor Trustee under Section 4.13 hereof) shall not be required to give any bond, surety, or other security in any jurisdiction for the performance of any of his duties, including, if necessary, litigation.

In addition, notwithstanding any law or rule to the contrary, the Trustee (including any successor) and the Disbursing Agent shall be exempt from giving any bond or other security in any jurisdiction, for any purpose.

**Section 4.11    Compliance with Tax Laws.** The Trustee shall comply with all tax laws and shall act in accordance with Article VII regarding income tax treatment, tax returns and payments, tax withholding and reporting, liability for taxes, valuation of the Trust Assets, and § 1146(a) exemption and any other tax matters addressed in this Trust Agreement or in the Plan.

**Section 4.12    Compliance with Securities Laws.** If and to the extent required by applicable federal and/or state securities laws, the Trustee shall file with the SEC and other

applicable federal and state governmental agencies the reports and other documents and take any other actions necessary to comply with such federal or state securities laws.

### Section 4.13    Resignation and Removal.

(a)    **Resignation**. The Trustee may resign and be discharged from any future obligations and liabilities hereunder by giving written notice thereof to the Bankruptcy Court at least thirty (30) days prior to the effective date of such resignation.  Such resignation shall become effective on the date specified in such notice.

(b)    **Removal**. The Trustee may be removed at any time by order of the Bankruptcy Court upon motion by any party in interest, pursuant to the standard under applicable law for removal of a Chapter 7 trustee.  Upon any such removal, such removed Trustee shall be entitled to any reimbursement and indemnification set forth in this Trust Agreement that remain due and owing to such Trustee at the time of such removal.

(c)    **Appointment of a Successor Trustee**. If, at any time, the Trustee shall give notice of his intent to resign pursuant to Section 4.13(a) hereof or be removed or shall become incapable of acting, counsel to the Trustee shall provide notice thereof to the Bankruptcy Court.  The Reorganized Debtor shall designate a successor Trustee to act under this Trust Agreement.  If the Reorganized Debtor is unable to designate a successor, the Reorganized Debtor shall file a motion for the appointment of a successor trustee.

(d)    **Acceptance of Appointment by Successor Trustee**. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall deliver counterparts thereof to the Bankruptcy Court.  Thereupon, such successor Trustee shall, without any further act, become vested with all of the estates, properties, rights, powers, trusts, and duties of his predecessor in the Trust hereunder with like effect as if originally named herein.

(e)    **Trust Continuance.** The death, dissolution, resignation, incompetency or removal of the Trustee shall not operate to terminate the Trust created by this Trust Agreement or to revoke any existing agency created under the terms of this Trust Agreement or invalidate any action theretofore taken by the Trustee.  In the event of the resignation or removal of the Trustee, such departing Trustee shall promptly (a) execute and deliver such documents, instruments and other writings as may be requested by the Bankruptcy Court or reasonably requested by a successor Trustee to effect the termination of such departing Trustee's capacity under this Trust Agreement and the conveyance of the Trust Assets then held by such departing Trustee to his successor, (b) deliver to the Bankruptcy Court or the successor Trustee all documents, instruments, records and other writings related to the Trust as may be in the possession of the Trustee, and (c) otherwise assist and cooperate in effecting the assumption of his obligations and functions by such successor Trustee.

### Section 4.14    Reporting; Books and Records.

(a)    <u>Semi-Annual Reports</u>**.**  Until the closing of the Chapter 11 Case, within thirty (30) days after June 30 and December 31, the Trustee shall file a report of any Distributions under the Plan and this Trust Agreement.

(b)     <u>Books and Records</u>. The Trustee will maintain books and records containing a description of all property from time to time constituting the Trust Assets, taking into account any changes to the Trust Assets existing immediately prior to the Effective Date, and an accounting of all receipts and disbursements.

(c)     <u>Fiscal Year</u>. The fiscal year of the Trust will be the calendar year.

## ARTICLE V

### Jurisdiction

**Section 5.1     Retention of Jurisdiction.** The Bankruptcy Court shall retain such jurisdiction as is legally permissible as set forth in this Trust Agreement, the Plan and in the Confirmation Order, including, but not limited to, jurisdiction to hear and determine disputes arising in connection with the interpretation, implementation, administration, or enforcement of this Trust Agreement.

**Section 5.2     Aid and Recognition.** The Trust shall, as needed to effect the terms hereof, request the aid and recognition of the Bankruptcy Court, or any court or judicial, regulatory or administrative body located in the United States or any other nation or state.

## ARTICLE VI

### Termination

**Section 6.1     Termination.** The Trust shall continue for a term of five (5) years from the Effective Date.  Notwithstanding the foregoing, the Trustee may extend such term for one or more additional finite term(s) provided that Trust does not become subject to the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>") and provided further that the Bankruptcy Court approves the extension(s) based upon a finding that the extension(s) is(are) necessary for the Trust to reduce all Trust Assets to Cash and to liquidate.  The Trustee shall at all times endeavor to liquidate the Trust Assets expeditiously, and in no event shall the Trustee unduly prolong the duration of the Trust.  Notwithstanding the foregoing, after the termination of the Trust, the Trustee shall have the power to exercise all the powers, authorities, and discretions herein conferred solely for the purpose of winding up the affairs of the Trust.  The Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee. Except as provided in <u>section 7.2(a)</u> below, at the Trustee's discretion, all of such records and documents may be destroyed at any time not less than two (2) years from the date (a) of an order of the Bankruptcy Court terminating the Trust or (b) upon which the Trust has fully administered the Trust Assets.

## ARTICLE VII

### Taxes

**Section 7.1    Income Tax Treatment.** For United States federal income tax purposes and any comparable provision of state or local law, the Debtor, the Reorganized Debtor, the Trustee, and the Beneficiaries will treat the Trust as follows:

(a)    <u>Liquidating Trust</u>. Except to the extent otherwise provided in this Trust Agreement, the Trust will be treated as a "liquidating trust" within the meaning of Treasury Regulations § 301.7701-4(d).

(b)    <u>Taxable Entity</u>. All of the Trust Assets held in the Trust comprise a fund which is subject to competing or disputed claims and, accordingly, the Trustee may elect, in the Trust's first taxable year, to treat such fund as a "disputed ownership fund" pursuant to Treasury Regulations section 1.468B-9(c)(2)(ii).

**Section 7.2    Tax Returns and Payments.**

(a)    The Trustee will be responsible for: (i) the preparation and timely filing of all required federal, state, local and foreign tax returns required under Treasury Regulations § 1.468B-9 and any other applicable law for the Trust; (ii) the timely payment of any taxes shown on such returns as owing by the Trust from the Trust Assets; and (iii) the preparation and timely distribution to the Disbursing Agent for the benefit of the Beneficiaries of any necessary federal, state, local, or foreign information returns.  The Trustee will retain all tax returns and supporting documentation until the expiration of the applicable statute of limitations.  The Trustee may request an expedited determination of any tax matter of the Trust under section 505 of the Bankruptcy Code for which such determination may be requested thereunder.

**Section 7.3    Tax Withholding and Reporting; Liability for Taxes.** Pursuant to the Plan, to the extent applicable, the Trustee or the Disbursing Agent will comply with all applicable tax withholding and reporting requirements imposed on it or on the Trust by any governmental unit, and all Distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  The Trustee or Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such tax withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanism the Trustee or Disbursing Agent believes is reasonable and appropriate, including, without limitation, requiring Beneficiaries to submit appropriate tax and withholding certifications.  To the extent any Beneficiary fails to submit appropriate tax and withholding certifications as required by the Trustee or Disbursing Agent, such Claim Holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable and be subject to the provisions of the Plan and this Trust Agreement with respect to undeliverable Distributions. Each Person or Entity receiving (or deemed to receive) a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of the Distribution, including income, withholding and other tax obligations.

- 13 -

**Section 7.4     Valuation of Trust Assets.** As soon as reasonably practicable after the Effective Date, the Trustee will determine the fair market value of the Trust Assets (other than Cash) as of the Effective Date, based on a good faith determination and the advice of any professional retained by the Trustee for such purpose, and the Reorganized Debtor and the Trust shall use such value consistently for all federal income tax purposes.

**Section 7.5     Section 1146(a) Exemption.** The parties to this Trust Agreement intend that, as provided in the Plan, pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, filing fee, sales or use tax or similar tax: (a) the execution and implementation of this Trust Agreement, including the creation of the Trust and any transfers of the Trust Assets or other assets (if any) to, by or from the Trust, including the settlement or other disposition of the Trust Assets; or (b) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan and this Trust Agreement, including bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

## ARTICLE VIII

### Miscellaneous

**Section 8.1     Notices.** All notices, requests, or other communications required or permitted to be made in accordance with this Trust Agreement shall be in writing and shall be delivered personally or by facsimile transmission or mailed by first class mail or by overnight delivery service:

> If to the Trustee, at:
>
> > Geoff Varga
> > c/o Duff & Phelps, LLC
> > 55 East 52nd Street, FL 31
> > New York, NY 10055
> > Telephone:  (646) 867-7833
> > Email:    geoff.varga@duffandphelps.com
>
> with copies to:
>
> > Kurt F. Gwynne, Esq.
> > Jason D. Angelo, Esq.
> > REED SMITH LLP
> > 1201 Market Street; Suite 1500
> > Wilmington, DE 19801
> > Telephone:  (302)778-7500
> > Facsimile:  (302) 778-7575
> > Email:    kgwynne@reedsmith.com
> >            jangelo@reedsmith.com

Notices sent out by facsimile transmission shall be deemed delivered when actually received, and notices sent by first-class mail shall be deemed delivered three (3) Business Days after mailing and notices sent by overnight delivery service shall be deemed delivered the next Business Day after mailing.

Section 8.2    **Investment Company Act.** The Trust is organized as a liquidating entity in the process of liquidation, and therefore should not be considered, and the Trust does not and will not hold itself out as, an "investment company" or an entity "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended (as now in effect or hereafter amended).

Section 8.3    **Counterparts.** This Trust Agreement may be executed in one or more counterparts (via facsimile, "pdf" or otherwise), each of which shall be deemed an original but which together shall constitute but one and the same instrument.

Section 8.4    **Governing Law.** This Trust Agreement shall be governed by, construed under, and interpreted in accordance with the laws of the State of Delaware.

Section 8.5    **Headings.** Sections, subheadings, and other headings used in this Trust Agreement are for convenience only and shall not affect the construction of this Trust Agreement.

Section 8.6    **Interpretative Provisions.**

(a)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural, unless the context otherwise requires.

(b)    All references to the Debtor, the Reorganized Debtor, and the Trustee pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns.

(c)    The words "hereof," "herein," "hereunder," "this Trust Agreement" and words of similar import when used in this Trust Agreement shall refer to this Trust Agreement as a whole and not any particular provision of this Trust Agreement and as this Trust Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, or replaced.

(d)    The word "including," when used in this Trust Agreement, shall mean "including, without limitation."

(e)    The verbs "will" and "shall" have a mandatory connotation, indicating the parties' respective obligations hereunder.

Section 8.7    **Severability.**  Any provision of this Trust Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions of this Trust Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable any such provision in any other jurisdiction.

**Section 8.8     Amendments.** This Trust Agreement may be amended from time to time, in a manner that shall not be materially inconsistent with the terms of the Plan, by written instrument executed by the Trustee.

**Section 8.9     Beneficiaries.**

(a)     Beneficial Interest. Ownership of a beneficial interest in the Trust will not be evidenced by any certificate, security or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.  No claimant will have a beneficial interest in the Trust Assets until such time as the claimant's related Claim against or Interest in the Debtor becomes an Allowed Claim or Allowed Interest, as applicable, pursuant to the Plan.  Except as expressly provided in Article VII of this Trust Agreement, neither beneficial interests in the Trust nor payments under this Trust Agreement on account of such beneficial interests may be assigned, alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal or equitable process.  The ownership of a beneficial interest hereunder shall not entitle any Beneficiary to (i) any title in or to the Trust Assets as such (which title shall be vested in the Trust) or to any right to call for a partition or division of the Trust Assets or to require an accounting, or (ii) any voting rights with respect to the administration of the Trust and the actions of the Trustee in connection therewith.

(b)     Exemption From Registration. The parties hereto intend that the rights of the Beneficiaries arising under the Trust will not be "securities" under applicable laws, but none of the parties hereto represents or warrants that such rights will not be securities or that their issuance under the Plan will be entitled to exemption from registration under applicable securities laws.  If such rights constitute securities, the parties hereto intend for the exemptions from registration provided by section 1145 of the Bankruptcy Code and by other applicable law to apply to their issuance under the Plan.

(c)     No Transfer of Beneficial Interests. Except as otherwise expressly provided in the Plan or this Trust Agreement, it is understood and agreed that the beneficial interests in the Trust will be non-transferable during the term of this Trust Agreement except with respect to a transfer by will or under the laws of descent and distribution.  Such transfers will not be effective until appropriate written notification and proof thereof is submitted to the Trustee, and the Trustee may continue to pay all amounts to or for the benefit of the Beneficiaries until receipt of proper written notification and proof of any such transfer.  The Trustee may rely upon such written proof without the requirement of any further investigation.

**Section 8.10   Successors.** This Trust Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns hereunder.

**Section 8.11   No Suits by Claimholders.** No Beneficiary shall have any right by virtue of any provision of this Trust Agreement to institute any action or proceeding in law or in equity against any party other than the Trustee on or under or with respect to the Trust Assets.

**Section 8.12   Irrevocability.** The Trust is irrevocable, but is subject to amendment as provided for herein.

*[Signature page follows.]*

- 16 -

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized as of the date first above written.

By: ___*[Draft]*_____

Geoff Varga, *Chief Restructuring Officer and Authorized Signor of the Debtor, settlor*

By: ___*[Draft]*_____

Name: Geoff Varga

Title: *Trustee*

# EXHIBIT IV.A.4
## (Liquidation Analysis)

US_ACTIVE-142061116.12

## Ritchie Risk-Linked Strategies, L.L.C. Hypothetical Liquidation Analysis*
### 10-Aug-18

| | Potential Chapter 11 Recovery[1] | | Potential Chapter 7 Liquidation Recovery | |
| --- | --- | --- | --- | --- |
| Assets | Low | High | Low | High |
| Litigation Claims | | | | |
| DE Indemnity Action[2] | - | 29,300,000 | - | 29,300,000 |
| Insurance Recovery Action[3] | - | 13,443,511  [4] | - | 13,443,511 |
| Total Litigation Claims[5] | - | 42,743,511 | - | 42,743,511 |
| **TOTAL ASSETS:** | **-** | **42,743,511** | **-** | **42,743,511** |
| | | | | |
| **Less Costs:** | | | | |
| Administrative Claims as of the Effective Date[6] | 781,826 | 781,826 | 781,826 | 781,826 |
| Reorganized Debtor's Professional Fees through trial[7] | 2,500,000 | 2,500,000 | | |
| U.S. Trustee's fees[8] | 3,300 | 3,300 | 1,625 | 1,625 |
| Chapter 7 Trustee Statutory Commission[9] | | | - | 1,305,555 |
| Chapter 7 Legal Fees (Estimated)[10] | | | 3,500,000 | 3,500,000 |
| | | | | |
| **TOTAL COSTS:** | **3,285,126** | **3,285,126** | **4,283,451** | **5,589,007** |
| | | | | |
| **AMOUNT AVAILABLE FOR DISTRIBUTION ON ALLOWED CLAIMS:** | **(3,285,126)  -** | **39,458,385** | **(4,283,451)  -** | **37,154,505** |

*Capitalized terms not defined herein shall have the meaning given such terms in the Combined Plan and Disclosure Statement

Note 1: The analysis is presented in two columns: low and high, which represents potential liquidation values of the Debtor's Assets. The amounts reported in the low column represent the least favorable outcome that would occur if the Liquidating Trustee were unsuccessful in the assertion of a Litigation Claim. The amounts reported in the high column represent the most favorable outcome that would occur if the Liquidating Trustee prevailed on a Litigation Claim and collected in full the amounts sought in such action.

Note 2: *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Huizenga Managers Fund, LLC* , filed in the Superior Court of the State of Delaware (Case No. N17C-05-598 MMJ CCLD). The $29.3 million is based upon the Debtor's liability or potential liability for the Second Money Judgment ($13.3 million), the cost to defend the Illinois DSA Action ($9 million), and the cost of post-judgment legal services ($7 million). In addition, the $11.2 million paid by the Excess Insurers could also be a liability of the Debtor if insurance company prevailed on its claims against the Debtor with respect to the August 25, 2015 Judgment. Thus, in the most favorable litigation outcome, it is assumed that the Debtor is not liable for the $11.2 million paid by the Excess Insurers with respect to the August 25, 2015 Judgment. If the Debtor were liable to the Excess Insurers with respect to the August 25, 2015 Judgment, the indemnification claim against Huizenga would be approximately $40.5 million. In addition, Huizenga may be obligated to indemnify the Debtor, pursuant to the terms of the Operating Agreement and Subscription Agreements, for the professional fees and expenses incurred by the Debtor in connection with the commencement and prosecution of this Chapter 11 Case. The Debtor also has potential malpractice claims against pre-petition counsel. As any such claim would reflect an alternate potential source of recovery, it would be duplicative of the potential recoveries set forth herein and is for that reason not reflected above as a separate Litigation Claim. The Debtor reserves the right to assert any of the foregoing claims as well as any other claims it may have, regardless of whether same are referenced in this Liquidation Analysis.

Note 3: *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Arch Specialty Insurance Company and Continental Casualty Company, Defendants* , filed in the Circuit Court of Cook Country, Illinois County Department, Chancery Division (Case No. 2015 CH 13480).

Note 4: This amount reflects the Second Money Judgment plus post-judgment interest accrued at the time the Second Money Judgment was entered, together with $60,000.00 punitive damages available under Illinois law.  In addition, the Debtor has an undetermined, and accruing, claim for attorneys' fees and costs incurred.

Note 5:  In addition, the Debtor continues to investigate other claims it may have against third-parties including, without limitation, those described at Exhibit VII.F.1 of the Combined Plan and Disclosure Statement.  The Debtor expressly reserves all rights to preserve any and all claims it may have against any party, whether or not expressly identified in Exhibit VII.F.1 of the Combined Plan and Disclosure Statement.

Note 6: Administrative Claims as of the Effective Date including holdback and other amounts earned but not paid to the Debtor's Professionals and estimated professional fees through an estimated Effective Date of November 30, 2018, in the amount of $1,205,000 *minus*  the retainer ($188,173.60) held by Reed Smith and the retainer ($10,000) held by Potter Anderson LLP.

Note 7: Estimate of fees and expenses from the Effective Date through and including trial of the Litigation Claims.

Note 8: Assumes two (2) quarters post-Effective Date fees pursuant to 28 U.S.C. § 1930(a)(6) at $1,625/quarter (i.e., disbursements greater than or equal to $150,000, but less than $225,000).  The Debtor anticipates that the Reorganized Debtor will seek to have the Chapter 11 Case closed promptly, with the Bankruptcy Court retaining jurisdiction over the Litigation Claims.  In the event the Reorganized Debtor is unable to obtain an order closing the Chapter 11 Case, the Reorganized Debtor shall remain responsible for U.S. Trustee Fees until the Chapter 11 Case is closed or dismissed.

Note 9: The Chapter 7 trustee's fees are calculated pursuant to 11 U.S.C. § 326(a).

Note 10: This estimate assumes that the Chapter 7 Trustee's professional fees will be the same as those incurred by the Liquidating Trustee for prosecuting the Litigation Claims ($2,500,000), plus approximately $1,000,000 in aggregate fees and expenses for the Chapter 7 Trustee and its professionals to surmount what would be a relatively steep learning curve with respect to factual and legal issues, so that the Chapter 7 Trustee and its counsel obtained the knowledge currently possessed by the Debtor and the Debtor's Professionals with respect to the factual and legal issues involved in the Chapter 11 Case and the Litigation Claims.

# EXHIBIT VII.F.1
## (Nonexclusive List of Retained Causes of Action)

- **DE Indemnity Action**. The action (as amended or as may be amended) titled *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Huizenga Managers Fund, LLC*, filed in the Superior Court of the State of Delaware (Case No.N17C-05-598 MMJ CCLD), including any refiling, counterclaim, appeal, settlement, or enforcement action, and all related claims and causes of action.

- **Insurance Recovery Action.** The action (as amended or as may be amended) titled *A.R. Thane Ritchie, Ritchie Risk-Linked Strategies, LLC, Ritchie Partners, LC and Ritchie Capital Management, Plaintiffs, v. Arch Specialty Insurance Company and Continental Casualty Company*, Defendants, filed in the Circuit Court of Cook Country, Illinois County Department, Chancery Division (Case No. 2015 CH 13480), including any refiling, counterclaim, appeal, settlement or enforcement action, and all related claims and causes of action.

- **Breach of Contract.**  Claims against Huizenga for failure to adhere to adhere to contractual representations, warranties, and indemnity obligations in the Operating Agreement.

- **Legal Malpractice.** Legal malpractice claims against Debtor's external pre-petition counsel for failure to timely raise that the DSA cannot applied outside of Delaware based upon a choice of law provision when the securities transactions occur outside of Delaware.  Only Delaware common law may be applied.

- **Tortious Interference with Contract.** Claims against Huizenga, Peter H. Huizenga Sr., Coventry First whereby the value of Debtor's interest in the proceeds of litigation claims against Coventry First were damaged.

- **Tortious Interference with Contract.** Claims against Peter Huizenga Jr., Williams Montgomery & John Ltd., Williams Montgomery & John, Ltd, Chris Barber, Gary Garner, Scott Church, and Jonathan Miller whereby the individuals and entities embarked upon an assault of the "Ritchie" name in violation of contractual obligations.

- **Breach of Contract.** Claims against the estate of Peter H. Huizenga Sr. in his personal capacity (and/or his probate estate) due to his direct and indirect relationship with the Debtor.  Breach of contract / violation of confidentiality / indemnification claims for failure to adhere to adhere to contractual obligations.

 US_ACTIVE-142061116.12

- Any counterclaims or other requests for relief of the Debtor in the Huizenga Appeal Bond Action or the Illinois DSA Action.

- All other rights, claims, and causes of action of the Debtor related to, or arising out of, the facts and circumstances involved in any or all of the actions described above.