## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RITCHIE RISK-LINKED STRATEGIES, L.L.C., | Case No. 18-11555 (KJC) |
| Debtor. [1] | **Objection Deadline:  August 27, 2018, at 4:00 p.m. (ET)**<br>**Hearing Date:  September 4, 2018, at 1:30 p.m. (ET)** |

### MOTION OF THE DEBTOR FOR AN ORDER UNDER
### 11 U.S.C. §§ 105, 361, 362, 364 AND 507 (I) AUTHORIZING THE DEBTOR TO
### (A) OBTAIN POSTPETITION FINANCING, (II) PROVIDING SUPER-PRIORITY
### ADMINISTRATIVE EXPENSE STATUS, AND (III) GRANTING RELATED RELIEF

Ritchie Risk-Linked Strategies, L.L.C., as debtor in possession (the "Debtor"), by and through its proposed counsel, Reed Smith LLP, hereby submits this motion (the "Motion") under sections 105, 362, 364, and 507 title 11 of the Unites States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, substantially in the form attached to this Motion as **Exhibit A** (the "DIP Order"), authorizing the Debtor to:

(i)       obtain a post-petition financing facility (the "DIP Facility"), in an aggregate original principal amount of up to $1,750,000.00 (plus interest, and certain other expenses as provided for in the DIP Term Sheet) under the terms and conditions set forth in that certain DIP

---

[1]       The last four digits of the Debtor's federal tax identification number are 0458.

Term Sheet attached as **Exhibit B** (the "DIP Term Sheet")[2] by and between the Debtor and Ritchie Multi-Strategy Global Trading, Ltd. ("RMSG Trading, Ltd." or the "DIP Lender");

(ii)    execute, deliver and perform such other and further acts as may be required in furtherance of the DIP Facility and the DIP Term Sheet;

(iii)    draw on the DIP Facility, as needed up to an aggregate original principal amount of $1,750,000.00, subject to the conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the DIP Facility solely (a) to the extent required to pay those expenses enumerated in the budget attached as **Exhibit C** (the "Budget" and, together with the DIP Term Sheet, the DIP Order, and any other document or instrument executed and delivered in connection with the DIP Facility, collectively the "DIP Documents") as and when such expenses become due and payable, including as reflected in any orders of the Bankruptcy Court and (b) to fund up to a 75% distribution to holders of Allowed General Unsecured Claims under a chapter 11 plan;

(iv)    grant to the DIP Lender super-priority administrative expense claims with priority in this Chapter 11 Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever, subject only to the Carve-Out (as defined herein); and

(v)    modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet.

---

[2]    Capitalized terms used in this Motion but not defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet or, as applicable, the Debtor's *Combined Disclosure Statement and Chapter 11 Liquidating Plan of Reorganization*.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested in this Motion are sections 105(a), 105(d)(2)(B)(vi), 361, 362, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## BACKGROUND

### I.    The Debtor's Chapter 11 Case

4.    On June 28, 2018 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.    The Debtor remains in possession of its assets pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.    On July 12, 2018, the Debtor filed its *Schedules of Assets and Liabilities* and *Statement of Financial Affairs* with the Court [D.I. 18 and 19].  On July 30, 2018, the Debtor filed its *Amended Schedules of Assets and Liabilities* and *Amended Statement of Financial Affairs* [D.I. 25 and 26].

7.      A meeting pursuant to section 341 of the Bankruptcy Code was commenced on July 31, 2018.

## II.    **The Debtor's Business**

8.      The Debtor is an open-ended "onshore feeder" investment fund, organized as a limited liability company under the laws of the State of Delaware on October 20, 2004, in a master-feeder investment fund structure comprising a number of separate entities, including Ritchie Risk-Linked Strategies, Ltd. ("RRL Offshore Feeder Fund"), Ritchie Risk-Linked Strategies (Bermuda), Ltd. ("RRL Consolidating Feeder"), Ritchie Multi-Strategy Trading, Ltd. (the "Multi-Strategy Master Fund") and Ritchie Risk-Linked Strategies Trading, Ltd. (the "RRL Master Fund"), that invested their capital in a variety of insurance-related assets.

9.      The RRL Master Fund made the direct investments in insurance products, including property-casualty and "life settlement" assets.  The three "feeder funds," the Debtor and its offshore counterparts, the RRL Offshore Feeder Fund, the RRL Consolidating Feeder and the Multi-Strategy Master Fund, invested capital in the RRL Master Fund with which to fund the purchase of life settlements from an originator (Coventry First), who acquired them from the original, individual policy holders.  Ownership of the 1085 life settlements were purchased from Coventry First and were then transferred to two "special purpose entities," Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. and Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd. (respectively, "RRLS (Ireland) I" and "RRLS (Ireland) II"), which were established solely to hold the life settlement policies pending the contemplated securitization.  The Managing Member of the Debtor, among other things, was authorized (at the direction of the Insurance Team) to invest the Debtor's capital into either the RRL Master Fund or more directly with RRLS (Ireland) I or RRLS (Ireland) II, which entities held life settlement assets for securitization.

10.     The Debtor, through the Ritchie Risk-Linked Life Strategies Trust I ("RRL Strategies Trust"), purchased subordinated notes from RRLS (Ireland) I and RRLS (Ireland) II. Thereafter, the Debtor contributed its interest in the subordinated notes to the RRL Strategies Trust in exchange trust units of equivalent value.

## III.    Events Leading to the Chapter 11 Bankruptcy Case

### A.    The New York Attorney General Lawsuit Against Coventry First

11.     On October 26, 2006, the New York State Attorney General filed a complaint against Coventry First, Montgomery Capital, Inc., The Coventry Group, Inc., and Reid S. Buerger, alleging that Coventry First and its affiliates, as purchasers of life insurance settlement policies, engaged in various improper practices in their acquisition of policies from owners and insureds (the "NYAG Complaint").  *See* NYAG Complaint, *New York Attorney General v. Coventry First, LLC,* et al., No. 404620-06 (N.Y. Sup. Ct. October 26, 2006).  The Debtor was not a party to the NYAG Complaint.

12.     The NYAG Complaint alleged claims against Coventry First, certain of its principals and certain affiliates for fraudulent business practices, anti-competitive behavior, securities violations, common law fraud, unjust enrichment and breach of fiduciary duty.  The NYAG Complaint alleged that Coventry First paid undisclosed compensation to brokers who, in exchange, undermined the bidding process and corrupted the broker-seller relationship by undermining the broker's duties to the seller.  The NYAG Complaint sought damages from the defendants, including, among other things, rescission of the sale transactions between the insureds and Coventry First.

13.     Because of the NYAG Complaint, RRLS (Ireland) I and RRLS (Ireland) II no longer held marketable title to the life settlements they had acquired from Coventry First. Consequently, Moody's withdrew the preliminary rating that it had issued in connection with the

prospective securitization.  Without a rating from Moody's, the ability to complete the proposed securitization was doomed.  RRLS (Ireland) I and RRLS (Ireland) II were unable to complete the planned securitization transaction, their financial status and ability to obtain additional funding deteriorated significantly, and they were forced to initiate efforts to restructure their obligations and to sell the Policies.  Worse yet, to maintain the value of the life settlements, RRLS (Ireland) I and RRLS (Ireland) II had to continue paying the premiums on the underlying life insurance policies that were the subject of the NYAG Complaint.

B.    **The RRLS (Ireland) I and RRLS (Ireland) II Bankruptcy Cases**

14.    To maximize the value of their interest in the life settlements, RRLS (Ireland) I and RRLS (Ireland) II filed petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (the "SDNY Court") on June 20, 2007 bearing case numbers 1:07-BK-11906-cgm and 1:07-BK-11907-cgm.  On January 17, 2008, the SDNY Court approved the sale of the underlying life settlement assets free and clear of liens and the cloud on title arising from the NYAG Complaint pursuant to section 363 of the Bankruptcy Code.  *See In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, Case No.1:07-BK-11906-cgm, D.I. 176-177.

15.    On September 18, 2008, the SDNY Court entered orders confirming the Joint Plan of Liquidation Plan filed by RRLS (Ireland) I and RRLS (Ireland) II.  *See In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, Case No.1:07-BK-11906-cgm, D.I. 329-330.  The confirmed plan provided for the prosecution of certain causes of action against Coventry First and related parties in the name of RRLS (Ireland) I and RRLS (Ireland) II (the "Coventry Litigation") and, in the event of a recovery of damages, for the distribution of a share of the net proceeds from the

Coventry Litigation to the holders of allowed unsecured claims (including the Life Strategies Trusts) against the estates of RRLS (Ireland) I and RRLS (Ireland) II.

16.    The United States District Court for the Southern District of New York dismissed the Coventry Litigation, *Ritchie Risk-Linked Strategies Trading (Ireland), Limited* et al. *v. Coventry First L.L.C.* et al., Case no. 09-cv-1086, with prejudice on October 20, 2014 [D.I. 216]. Plaintiffs filed a timely motion for reconsideration, which the District Court denied in late 2015. Plaintiffs filed a timely notice of appeal [D.I. 226].  By Order entered in December 2016, the Second Circuit Court of Appeals affirmed the decision of the District Court.  Thus, as of December 2016, the holders of unsecured claims (including the Life Strategies Trusts) against the bankruptcy estates of RRLS (Ireland) I and RRLS (Ireland) II received no distribution.

C.    **Pre-Petition Litigation**

17.    In addition, the Debtor is party to a significant amount of prepetition litigation, including numerous lawsuits involving the Debtor's excess insurers and litigation involving Huizenga Managers Fund, LLC., as more fully described in the Debtor's *Combined Disclosure Statement and Chapter 11 Liquidating Plan of Reorganization* (the "Plan"), filed on August 13, 2018, contemporaneously herewith.  In order to preserve the value of the Debtor's claims and causes of action for the benefit of all of its creditors and investors, the Debtor (which is not an operating entity) requires funding.

IV.    **The Debtor's Prepetition Financing**

18.    The Debtor, as borrower, and RMSG Trading, Ltd., as lender, entered into a Revolving Loan Agreement dated as of September 28, 2017, under which the Debtor could request

advances up to $8,000,000 in principal[3] at 6% annual interest solely to fund costs and expenses of prosecuting or defending prepetition litigation.

19.     The collateral for advances under the Debtor's prepetition financing was the Debtor's prepetition litigation claims.  The Revolving Loan Agreement is a non-recourse loan, and RMSG Trading, Ltd.'s sole source of recovery is the collateral.  As of the Petition Date, the Debtor scheduled the outstanding balance under the Revolving Loan Agreement in the approximate amount of $5,157,217.49.  The outstanding balance under the Revolving Loan Agreement is due on December 31, 2018.[4]

## V.     The Need for Post-Petition Financing

20.     The Debtor seeks post-petition financing for the purposes of (i) paying the costs and expenses of administering its Chapter 11 Case, (ii) paying the costs and expenses of litigating its claims and causes of action; and (iii) funding a distribution to General Unsecured Creditors under the Plan.

21.     The Debtor believes that the $1,750,000 post-petition financing will meet the Debtor's financing needs during the Chapter 11 Case, enable the Debtor preserve its causes of action, and ensure a distribution to holders of General Unsecured Claims.

## VI.     Concise Statement Under Bankruptcy Rule 4001 and Local Rule 4001-2

22.     The Debtor submits this concise statement listing certain material terms set forth in the DIP Term Sheet and the proposed DIP Order.  Specifically, the Debtor identifies the terms of

---

[3]     Approximately $223,000 of the $8 million principal balance was advanced in November and December 2016.

[4]     On June 21, 2018, a financing statement was filed in the Office of the Delaware Secretary of State to perfect the security interested in the collateral securing the Pre-Petition Revolver.  The Debtor, however, believes that the security interest is avoidable as a preferential transfer under section 547 of the Bankruptcy Code.

the proposed financing (as required under Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2), as follows:[5]

| Material Term: | Summary Description: |
|---|---|
| **Parties to DIP Facility**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **Borrower:** Ritchie Risk-Linked Strategies, L.L.C.<br><br>**DIP Lender:** Ritchie Multi-Strategy Global Trading, Ltd. |
| **DIP Facility and Borrowing Limits:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | Up to $1,750,000 in a Delayed Draw, Non-revolving Term Loan Debtor in Possession Credit Facility (the "**DIP Facility**"). Advances under the DIP Facility would be subject to the Budget and are made on an unsecured, superpriority administrative claim basis.<br><br>*See* DIP Term Sheet, at p. 1; DIP Order, at ¶¶ 1-2. |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | Non-Default Interest Rate: 4.0% per annum.<br><br>Default Interest Rate: In the event of a default, the interest rate increases to 6.0% percent per annum.<br><br>No interest payments shall be required to be made during the term of the DIP Facility, all such interest accrued on the outstanding balance of the DIP Facility shall be included in the DIP Obligations to be repaid in accordance herewith.<br><br>*See* DIP Term Sheet, at p. 3; DIP Order, at ¶ 1(c). |

---

[5]    The terms and conditions set forth in the Motion are qualified in their entirety by reference to the provisions of the DIP Term Sheet, and the DIP Orders. The descriptions of the terms of the DIP Term Sheet, and the DIP Orders set forth in this Motion are provided for the convenience of the Court and the parties in interest. In the event of any inconsistency between the description of the terms of the DIP Term Sheet, and the DIP Orders contained in this Motion and the actual terms of the DIP Term Sheet, or DIP Orders, the terms of the DIP Term Sheet or the DIP Orders, as applicable, shall govern.

| | |
|---|---|
| **Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | There are no fees for the DIP Facility.<br><br>The Debtor shall not be obligated to pay the DIP Lender's out-of-pocket costs and expenses, including without limitation the fees and expenses of counsel) in connection with the negotiation, administration, or monitoring of the DIP Facility.  The Debtor, however, shall be obligated to pay the DIP Lender's reasonable out-of-pocket costs and expenses, including without limitation, the reasonable fees and expenses of counsel, in enforcing the terms of the DIP Facility upon the occurrence of an Event of Default.<br><br>Subject to entry of the DIP Order, no costs or expenses of administration shall be imposed upon the DIP Lender under the equities of the case provisions of Section 552(b) of the Bankruptcy Code.<br><br>*See* DIP Term Sheet, at pp. 1 and 5. |
| **Budget and Permitted Variances:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The use of the proceeds of the DIP Facility shall be strictly in compliance with the Budget.  There are no variances for permitted Budget items.<br><br>*See* DIP Term Sheet, at p. 1; DIP Order, at ¶ 1(a), (e), and (f). |
| **Use of Proceeds and Cash Collateral:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | Under the DIP Facility, the Debtor shall incur advances and use the proceeds thereof solely to the extent required to pay those expenses enumerated in the Budget as and when such expenses become due and payable.  In addition, up to Two Hundred Twenty Thousand ($220,000) of the DIP Facility proceeds may be used to fund a 75% distribution to holders of Allowed General Unsecured Claims under a chapter 11 plan.<br><br>*See* DIP Term Sheet, at p. 1; DIP Order, at ¶ 1(e). |

| | |
|---|---|
| **Termination Date and Maturity Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001- 2 (a)(ii)* | At the DIP Lender's election, the earliest to occur of: (a) the date on which the DIP Lender provides, via facsimile or overnight mail, written notice to the Debtor, counsel for the Debtor and counsel for any official committee of unsecured creditors of the occurrence of an Event of Default (as set forth herein); (b) the date of entry of an order confirming a plan of reorganization or liquidation to which the DIP Lender objects; (c) the effective date of a confirmed plan agreeable to the DIP Lender in the Debtor's Bankruptcy Case; (d) the entry of an order converting the Debtor's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; (e) the entry of an order dismissing the Debtor's Bankruptcy Case; (f) the entry of an order appointing a chapter 11 trustee or examiner in the Debtor's Bankruptcy Case; (g) the failure of the Debtor to obtain entry of the Final Order or (if requested) an Interim Order, each of which must be in a form acceptable to the DIP Lender in accordance herewith; (h) the obtaining of credit or the incurring of indebtedness by the Debtor that is secured by a security interest, or other lien on all or any portion of the Debtor's assets or that is entitled to priority administrative status which is *pari passu* with or senior to that granted to the DIP Lender herein; (i) the entry of an order by the Bankruptcy Court vacating, amending, supplementing or otherwise modifying any Interim Order or the Final Order without the written consent of the DIP Lender, and (j) December 31, 2018 (the "**DIP Maturity Date**").  All accrued and outstanding DIP Obligations shall be repaid by the Borrower on the DIP Maturity Date, provided however, that in the event the Debtor monetizes any of its assets during the Bankruptcy Case, including any recovery from or in respect of any of its causes of action, then the net proceeds therefrom shall be used to repay the DIP Obligations.<br><br>Notwithstanding the foregoing, the DIP Lender acknowledges that if the Debtor does not have the liquidity to pay the DIP Obligations on December 31, 2018, and assuming no other Maturity Date event has occurred, then the DIP Obligations will be payable from the monetization of the Debtor's assets, including any recovery from or in respect of any of its causes of action, then the net proceeds therefrom as and when such proceeds become available to the Debtor.<br><br>*See* DIP Term Sheet, at p. 4; DIP Order, at ¶ 4(a). |

| | |
|---|---|
| **No Security Interest or Lien; Super Priority Administrative Claim Status:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | All obligations of the Debtor to the DIP Lender under the DIP Facility at all times will be entitled to, be authorized and allowed under Section 364(c)(1) of the Bankruptcy Code as super-priority administrative expense claims with priority in the Chapter 11 Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code, provided, however that such Super-priority Claim shall be subject only to the Carve-Out (as defined below).<br><br>The DIP Obligations shall not be secured by a lien on or security interest in any assets of the Debtor.<br><br>*See* DIP Term Sheet, at p. 2; DIP Order, at ¶ 2. |
| **Milestones:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vi)* | The Debtor shall comply with the following milestones:<br><br>a) file a motion (the **"DIP Motion"**) seeking approval of the DIP Facility in a form acceptable to the DIP Lender in its reasonable discretion;<br><br>b) obtain approval from the Bankruptcy Court of the DIP Facility on an interim basis, as necessary, following the filing of the DIP Motion;<br><br>c) obtain approval from the Bankruptcy Court of the DIP Facility on a final basis prior to October 10, 2018;<br><br>d) obtain approval from the Bankruptcy Court of a disclosure statement as soon as practicable;<br><br>e) obtain confirmation and approval from the Bankruptcy Court of a plan as soon as practicable thereafter that provides for the proposed treatment of the DIP Facility as provided herein; and<br><br>f) the satisfaction or waiver of all conditions to effectiveness under and the effective date of the plan occurring on or prior to November 30, 2018.<br><br>*See* DIP Term Sheet, at p. 4; DIP Order, at ¶ 7. |

| | |
|---|---|
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | Any one or more of the following events shall constitute an event of default: (a) if the Debtor fails to pay when due and payable, or when declared due and payable, all or any portion of the DIP Obligations (consisting of principal, interest, or charges due to the DIP Lender under the DIP Facility, reimbursement of the DIP Lender's expenses, or other amounts); (b) if the Debtor: (i) substantially fails to comply with any of the Chapter 11 Milestones; (ii) fails to perform or observe any covenant or other agreement contained in the Interim Order or the Final Order; and (iv) breaches or fails to comply with any provision of the Interim Order or Final Order entered by the Bankruptcy Court.<br><br>*See* DIP Term Sheet, at p. 5; DIP Order, at ¶ 5. |
| **Carve-Out:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The Super-priority Claims shall be subject and subordinate to the following expenses (the "<u>Carve-Out</u>"):<br><br>a) To the extent not otherwise paid through the DIP Facility pursuant to the Budget and any pre-petition retainers, the claims of the retained professionals of the Debtor in the Bankruptcy Case (the "**Retained Professionals**") for fees and expenses incurred on and after the Petition Date and prior to the delivery of a Carve-Out Trigger Notice[6]; provided that, in each case, such fees and expenses are ultimately allowed, if and as applicable, on an interim or final basis by the Bankruptcy Court under sections 330 or 331 (such fees and expenses described in this clause (i), the "**Pre-Termination Date Expenses**" and the allowed amount thereof, the "**Pre-Termination Date Amount**"). The fees and expenses of Retained Professionals may be paid in accordance with any Bankruptcy Court order authorizing the payment of interim compensation consistent with the Budget;<br><br>b) The claims of the Retained Professionals for fees and expenses which were incurred on and after the delivery of a Carve-Out Trigger Notice; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed, if and as applicable, on a final basis by this Court under sections 330 or 331 of the Bankruptcy Code and do not exceed $125,000 in the aggregate for all of the Retained Professionals, plus the fees and expenses incurred by any professionals engaged by any successor to the Debtor, including, without limitation, any trustee appointed under chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $5,000 (such fees and expenses described in this clause "(ii)" the "**Post-Termination Date Expenses**" and the allowed amount thereof, the "**Post-Termination** |

---

[6]   "Carve-Out Trigger Notice" means, upon occurrence of an Event of Default, DIP Lender's delivery of written notice to Debtor's counsel expressly stating that the Carve-Out has been invoked and terminating the Debtor's right to pay professional fees incurred thereafter under the Budget that are not included in the Carve-Out.

| | |
|---|---|
| | **Amount**" and, together with the Pre-Termination Date Amount, the "**Professional Fees**").<br><br>c) The unpaid fees and expenses of the United States Trustee and the Clerk of the Court (or any agent thereof) pursuant to 28 U.S.C. § 1930(a)(6) or otherwise.<br><br>*See* DIP Term Sheet, at pp. 2-3; DIP Order, at ¶ 5. |
| **Modification of Automatic Stay:** *Bankruptcy Rule 4001(c) (1)(B)(iv)* | The automatic stay of section 362 of the Bankruptcy Code is modified with respect to the DIP Lender to the extent necessary to effectuate the provisions of this DIP Order, including, after the Termination Date, to permit the DIP Lender to exercise its rights contemplated herein.<br><br>*See* DIP Order, at ¶ 7(c). |

## BASIS FOR RELIEF REQUESTED

### I.   Financing Under Section 364 of the Bankruptcy Code

23.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

24.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    The debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also

because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

### A. *Credit Is Not Obtainable on Better Terms*

25.     In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c).  *In re Snowshoe*, 789 F.2d. at 1088.  When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

26.     The Debtor did not search for other financing, but there can be no doubt that no other lender would make a loan to the Debtor on as favorable terms.  Here the DIP Facility is an unsecured administrative priority, with no lien or security, no facility fees, PIK interest at 4%, no expense reimbursement (other than enforcement expenses), and the potential to be rolled into exit facility if Debtor does not have the liquidity to repay the DIP Facility at maturity.

27.     The terms and conditions set forth in the DIP Facility are the best financing terms and conditions obtainable by the Debtor and would not be available to the Debtor without granting the DIP Lender the super-priority administrative expense claim under the terms and conditions set forth in the DIP Documents.

**B.  *The DIP Facility is Necessary to Preserve the Debtor's Estate***

28.     The DIP Facility is necessary to preserve the value of the Debtor's claims and causes of action so that they can be prosecuted or otherwise resolved in a manner that will benefit the Debtor's creditors and investors.  To that end, the DIP Facility is critical.

29.     In addition, up to $220,000 of the DIP Facility may be used to make up to a 75% distribution to the Debtors' unsecured creditors.

**C.  *The Terms of the DIP Financing are Fair, Reasonable, and Adequate and Represent the Sound Exercise of Business Judgment***

30.     After appropriate investigation and analysis, the Debtor submits that the DIP Documents before the Court reflect fair and reasonable terms and present the best available option under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  *See Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994).  The terms of the DIP Facility and the DIP Budget reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

31.     Additionally, courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the debtor's business judgment regarding the necessity for obtaining financing.  *See Trans World Airlines*, 163 B.R. at 974 (noting that the interim loan, receivables facility, and asset based facility were approves because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors.").

32.     Here, the DIP Facility contains the following favorable characteristics:  (a) it is unsecured, (b) it bears only a 4% interest rate; (c) interest is PIK'd until maturity, (d), there are no loan fees, (e) the DIP Lender's costs and expenses of negotiating and administering the loan are

not charged to the Debtor's estate, and (f) if the Debtor lacks liquidity to pay the loan at maturity, the DIP Facility can be rolled into an exit loan and is not due until the Debtor has liquid assets to repay it.

33.     The Debtor submits that it clearly has exercised sound business judgment in agreeing to the terms of the DIP Facility.  Accordingly, the Debtor respectfully submits that the Court should approve the DIP Financing.

## II.     The DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code

34.     Under section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of the debt incurred or priority of the lien granted as long as the entity that extended credit "extended such credit in good faith."  *See* 11 U.S.C. § 364(e).

35.     Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned.  *See Unsecured Creditors' Comm. v. First Nat'l Bank & Tr. Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

36.     Here, the terms of the DIP Facility were negotiated in good faith and represent a very favorable financing facility for the Debtor for the reasons set forth above.

37.     The DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code and the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

38.     Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a), and the 14-day stay under Bankruptcy Rule 6004(h).  The Debtor submits that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

39.     Notice of this Motion will be provided to (a) the United States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors as identified pursuant to Fed. R. Bankr. P. 1007(d); (c) counsel to the DIP Lender; and (d) all parties entitled to notice of this Motion pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the DIP Order, substantially in the form attached as **Exhibit A**, approving the Debtor's borrowing of up to $1,750,000 under the DIP Facility, (ii) and granting such other relief as appropriate.

Dated: August 13, 2018
       Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By:     */s/ Kurt F. Gwynne*
     Kurt F. Gwynne (No.  3951)
     Jason D. Angelo (No. 6009)
     1201 North Market Street, Suite 1500
     Wilmington, DE 19801
     Telephone: (302) 778-7500
     Facsimile: (302) 778-7575
     Email: kgwynne@reedsmith.com
          jangelo@reedsmith.com

*Proposed Counsel to the Debtor in Possession*